Toby Gerber (SBT 07813700)
Michael Berthiaume (SBT 24066039)
**NORTON ROSE FULBRIGHT US LLP**
2200 Ross Ave., Suite 3600
Dallas, TX 75201
Telephone: (214) 855-8274
Facsimile: (214) 855-8200
Email: toby.gerber@nortonrosefulbright.com
michael.berthiaume@nortonrosefulbright.com

Jason L. Boland (SBT 24040542)
**NORTON ROSE FULBRIGHT US LLP**
1301 McKinney Street, Suite 5100
Houston, Texas 77010
Telephone: (713) 651-5151
Email: jason.boland@nortonrosefulbright.com

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| IN RE: § | CHAPTER 11 |
| --- | --- |
| § | |
| **TOMMY'S FORT WORTH, LLC,** *et al*,[1] § | **CASE NO. 24-90000** |
| § | |
| **DEBTOR.** § | **(JOINT ADMINISTRATION** |
| § | **REQUESTED)** |

### OMNIBUS OBJECTION OF M&T BANK TO CERTAIN EMERGENCY FIRST DAY MOTIONS

M&T Bank ("**M&T**"), by and through its attorneys of record, files this *Omnibus Objection to Certain Emergency First Day Motions* (the "**Objection**") filed by the above-captioned Debtors (collectively, the "**Debtors**"), and respectfully states as follows:

**I.    SUMMARY OF THE DEBTORS' FILING OF THE EMERGENCY FIRST DAY MOTIONS AND NOTICE TO M&T OF THE EMERGENCY HEARING**

1. The Debtors, who operate a number of boat dealerships in Michigan and other states, filed these cases on May 20, 2024 (the "**Petition Date**") without warning or consultation with M&T, their senior secured lender, or to the Michigan state court-appointed receiver who was in possession of M&T's collateral.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Tommy's Fort Worth, LLC (3473); Tommy's Holding Company, LLC (2662); Tommy's Grand Rapids, LLC (9224); Tommy's Castaic, LLC (7501); Tommy's Lewisville, LLC (4750); High Country Watersports, LLC (6160); Walloon Lake Village Marina, LLC (0277); MKB Florida Holdings, LLC (5698); Tommy's Detroit, LLC (5242); Tommy's California Fresno, LLC (8597); Tommy's Phoenix, LLC (3036); Tommy's Las Vegas, LLC

2. In connection with its freefall filing, the Debtors' filed four customary and non-controversial first day motions which M&T does not oppose:

(a) Motion of Debtors for Entry of an Order Authorizing and Directing the Joint Administration of Debtors' Chapter 11 Cases [Docket No. 3];

(b) Emergency Application for Entry of an Order (A) Authorizing the Retention and Appointment of Omni Agent Solutions, Inc. as Claims, Noticing, and Solicitation Agent, Effective as of the Petition Date and (B) Granting Related Relief [Docket No. 6];

(c) Emergency Motion of Debtors for Entry of an Order Authorizing the Filing of a Consolidated Mailing Matrix and Consolidated List of Top Thirty Largest Unsecured Creditors [Docket No. 7]; and

(d) Debtors filed Debtors' Emergency Motion for Entry of an Order Extending Time for Filing Schedules of Assets and Liabilities and Statement of Financial Affairs [Docket No. 11].

3. The Debtors also issued a Notice of Emergency Hearing on First Day Motions [Docket No. 8] setting motions (a) through (c) for hearing on May 23, 2024 at 1:30 pm.

4. On May 21, 2024, Debtors' counsel contacted M&T's counsel seeking to meet and confer regarding a proposed (but not yet filed) motion for use of cash collateral but did not provide a proposed budget or proffer a proposal for adequate protection. It is undisputed that the Debtors may not use M&T's cash collateral without M&T's consent or an order by this Court in compliance with Bankruptcy Code §363(c)(2)(b).

5. On May 22, 2024, Debtors' counsel sent M&T's counsel a proposed list of expenses and requested M&T consent to use of its cash collateral. The list of expenses consisted

---

(7721); Tommy's Chattanooga, LLC (0839); Tommy's California Ventura, LLC (5149); Tommy's Rancho Cordova, LLC (1070); Tommy's Stockton, LLC (1338); and Tommy's Knoxville, LLC (8052).

of:

**Funding Request**

| | Week Ending | 05/24/24 | Comments |
|---|---|---|---|
| Payroll | | 8,930 | Final paycheck for CA associate |
| Blarney Castle Fueler | | 8,500 | Clear past due to open 30-day credit terms; $30k spend for M |
| Service Parts for customer boats—turnaround is 2-3 days so customers can use boats over Memorial Day | | 75,000 | Additional detail to be provided |
| WEX Fuel Card | | 36,679 | Pay down balance to open ability for holiday weekend fuel rev |
| Credit Card Processing Fees | | 682 | All locations are down due to past due amount in Lewisville |
| **Total Funding Requested** | | **129,791** | |

6.  On May 22, 2024, the Debtors' counsel and M&T's counsel conferred regarding the "Funding Request" (no budget was presented) and after such discussion, including for the reasons discussed in greater detail below, M&T declined to consent to the use of its cash collateral to meet the Debtors' Funding Request.

7.  On May 22, 2024, at approximately 10:45 pm, Debtors served M&T with the following:

(a) Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protecting, (III) Modifying the Automatic Stay, (IV) Setting a Second Interim Hearing, (V) Setting a Final Hearing, and (V) Granting Related Relief [Docket No. 12] (the "**Cash Collateral Motion**");

(b) Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, and (II) Authorizing Continuation of Existing Deposit Practices [Docket No. 13] (the "**Cash Management System Motion**"; and

(c) Debtor's Emergency Motion for Entry of an Order Authorizing Debtors to Pay Certain Prepetition Debt [Docket No. 14] (the "**Prepetition Debt Payment Motion**").

8. At approximately 11:15 pm on May 22, 2024, Debtors served an Amended Notice of Emergency Hearing on First Day Motions [Docket No. 17] setting all the above-described motions for hearing on May 23, 2024 at 1:30 pm.

9. M&T objects to the Cash Collateral Motion, the Cash Management Motion and the Prepetition Debt Payment Motion because: (a) Debtor has not satisfied its burden to establish any emergency upon which the expedited hearing of such motions could be justified, (b) M&T has not consented, and does not consent, to use of its cash collateral; and (c) for the reasons set forth in detail below.

## II.    BACKGROUND

10. M&T entered into a floor plan financing arrangement with the Debtors, whereby M&T loaned funds to the Debtors to buy boats for resale. Upon the sale of a boat, Debtors agreed to hold the proceeds in trust and remit to M&T for repayment of the amount advanced to Debtors by M&T to purchase the boat. The Debtors, however, failed to remit sale proceeds to repay the loans. Rather, the Debtors have diverted tens of millions of dollars of M&T's collateral proceeds and concealed the full extent of their out-of-trust sales from M&T for months. By March 2024, the misappropriated collateral totaled more than Sixteen Million ($16,000,000.00) Dollars.  In addition, the primary supplier of boats to the Debtors, Malibu Boats, Inc., has terminated all dealer agreements with Debtors to sell Malibu, Cobalt, and Axis boats, which accounted for over 80% of the boats that Debtors sold in 2022-2023. These events are Events of Default under the floor financing arrangement with M&T Bank.

11. Following these defaults, the Debtors consented to the appointment of a receiver to manage the Debtors' assets for the benefit of the receivership estate. The Debtors, however, continued their dishonest conduct and actively prevented the receiver's progress and, ultimately,

physically locked the receiver out of the Debtors' operations. Just a few days after being admonished by the state court judge that they could not use self-help to evade their obligations under the receivership consent order, the Debtors determined to resort to the Bankruptcy Code. As of the Petition Date, the out-of-trust balance remains near $15.5 million.

12. Now, on barely 12 hours' notice, the Debtors attempt to wrest control of the estate back from independent control, and worse, attempt to force M&T to pay for it. M&T cannot (and does not) consent to the use of its cash collateral, particularly without the statutorily required protection of its interests. Given the facts and circumstances of this case, however, adequate protection simply cannot be fashioned.

**A.    The Floor Plan Financing and Collateral**

13. The Debtors executed and delivered to M&T a *Variable Rate Demand Note (Floor Plan)* dated May 18, 2023 (the "**Floor Plan Note**"). The Debtors also executed and delivered to M&T a *Revolving Line Note (New York)* dated May 18, 2023 (the "**Revolving Note**," and collectively with the Floor Plan Note, the "**Notes**"), and a *Loan Agreement (Floor Plan Financing)* dated May 18, 2023 (the "**Loan Agreement**"). Pursuant to the Notes and Loan Agreement, M&T made two revolving credit loans to the Debtors for purposes of providing floor plan financing and working capital, in an aggregate maximum principal amount totaling over $115,000,000.00 (the "**Loans**"). On May 17, 2023, Debtors executed a General Security Agreement (New York) (the "**Security Agreement**"). The Notes, Loan Agreement, Security Agreement, and related documents are referred to collectively as the "**Loan Documents**."

14. Under the terms of the Security Agreement, M&T was granted a first priority lien on all of the Debtors' accounts, inventory, equipment, general intangibles and all other business assets and personal property including, without limitation, all boats, trailers, and other marine

inventory (whether acquired by the Debtors with Loan advances or otherwise), and all products, replacements, cash and non-cash proceeds thereof. *See* Security Agreement § 1.1. ("**Collateral**").

**B.     The Debtors Misappropriate Collateral and Default under the Loan Documents**

15.     Under the floor plan financing arrangement, M&T loaned funds to the Debtors that Debtors used to buy boats for resale. Upon the sale of a boat, the Debtors agreed to repay M&T the amount advanced to Debtors to purchase the boat (the "**Proceeds**"). *See* Loan Agreement, § 9.1. The Debtors agreed to provide M&T with monthly dealership statements, which disclose what boats have been sold and what boats are still in inventory. *Id.*, § 11.l (ii).

16.     In late February 2024, the auditor conducting a collateral field audit for the M&T discovered that the Debtors were selling boats, but keeping them on the dealership lots in storage. The sales and inventory records supplied to the auditor and M&T by the Debtors did not disclose this practice or distinguish between unsold inventory and "sold-but-stored" inventory. As a result, the audit reports—one of the primary methods for M&T to verify and monitor its Collateral—were inaccurate, leading the M&T to believe that there were more unsold boats in inventory than there actually were. Instead, many of the boats onsite had been sold out of trust, even though they still were listed on the Debtors' records as unsold inventory.

17.     Thus, it was clear that the Debtors sold numerous boats without remitting the Proceeds to M&T. Rather, in breach of the express trust, the Debtors diverted the Proceeds for other purposes. M&T notified the Debtors of the out of trust and diversion of Proceeds reflected in its February 2024 collateral field exam and reiterated the need for complete information. M&T did not discover the full scope of the diversion and breach of trust until mid-March 2024, when the Debtors admitted, with M&T and its consultants, that the actual out-of-trust sales

exceeded $16 million. This conversion, among other things, amounts to a default under the Loan Documents.

18. To compound the Debtors' issues, M&T also learned that Malibu Boats, Inc. ("**Malibu**") sent the Debtors a letter dated March 22, 2024 explaining that all dealer agreements between each Borrower and Malibu had either expired on June 30, 2023, or was terminated on March 11, 2024 (the "**Malibu Termination Letter**")(attached hereto as Exhibit A). The Malibu Termination Letter stated that Malibu will not sell any more Malibu or Axis boats to Debtors and that Malibu "does not anticipate entering into dealer agreements with any of the Tommy's Dealerships [the Debtors] for the reminder of model year 2024, model year 2025, and beyond." Indeed, after terminating Debtor's dealer agreements, Malibu replaced the Debtors in 14 of the 15 Debtor's geographic territories. See Form 8-K attached hereto as Exhibit B. The termination of the Malibu Dealer Agreements is a material adverse change and an Event of Default under Section 7.l(xiii) of the Security Agreement.

### C. Appointment and Lockout of Receiver

19. Pursuant to the terms of the Notes, upon an event of default, M&T may, at its option move to the appoint a receiver. Security Agreement, § 7.2.6. On April 22, 2024, the Circuit Court for the County of Kent, Michigan (the "**Michigan Court**") entered a *Consent Order Appointing Receiver* ("**Receivership Order**") (attached hereto as Exhibit C). Pursuant to the Receivership Order, the Michigan Court determined that the Loans were properly secured by all Collateral as defined under the Security Agreement (*See* Receivership Order, ¶ D), but found that the Receivership Property (as defined therein) "is likely insufficient to satisfy [M&T]'s claims." *Id.*, ¶ H. Further, the Receivership Order determined that it was appropriate to appoint a

receiver to preserve the Receivership Property. In aid of the receiver, the Debtors were obligated to cooperate with the receiver and turnover to the receiver all Collateral. *Id.*, ¶ 1.6.

20. Rather than cooperate with the receiver, the Debtors actively frustrated the receiver's attempts to right-size the Debtors' business. According to the *Receiver's Status Report for May 15, 2024 Status Conference* (the "**Receiver's Report**")(attached hereto as Exhibit D), the receiver reported to the Michigan Court that the Debtors had failed to provide the receiver with requested information in a timely and reliable basis. To the contrary, the Debtors actively stonewalled the receiver's attempts to verify key financial information.

21. Namely, the receiver learned that management employees of the Debtors are not actually employees of the Debtors. Instead, management employees are employed by non-debtor MKB Holdings. When the receiver requested information (*e.g.* a management agreement, job description, or time records) the Debtors refused to provide such information, despite demanding the receiver ostensibly fund the payroll of MKB Holdings from the receivership estate. The Receiver's Report states that the Debtors' employees do perform services for non-debtor entities, despite receiving payment from the estate. Receiver's Report, ¶ 9. The Receiver's Report also outlines numerous other issues "created by the [Debtors] and their [Non-Debtor] affiliates' operation of the business," including issues with landlords, vendors, customers, and "inappropriate handling of their human resources." Receiver's Report, ¶ 19.

22. More concerning, the Receiver's Report confirms that the Debtors' funds are commingled with bank accounts in the name of non-debtor, MKB Holdings. Receiver's Report, ¶ 9. These bank accounts are not maintained at M&T, in breach of the Loan Documents. Upon information and belief, these unsanctioned bank accounts contain M&T's cash collateral.

23. The Receiver's Report goes on to detail that the working relationship between the Debtors and the receiver continued to deteriorate, until on May 13, 2024, the Debtors locked the receiver out of the Debtors' administration offices in blatant disregard of the Order. On May 15, 2024, the Michigan Court called the lockout unacceptable, and admonished the Debtors' purported use of self-help.

**D.        Bankruptcy Case and First Day Motions**

24. As noted above, the Debtors served the Cash Collateral Motion and the Cash Management Motion at approximately 10:45 p.m.—the evening before a hearing on it scheduled at 1:30 pm Central the next day.

25. The Cash Management Motion fails to disclose the existence of the MKB Holdings bank accounts. Upon information and belief based upon the Receiver's Report, this bank account (and possibly others) may contain M&T's cash collateral.

26. The Cash Collateral Motion explains that Debtors estimate M&T's claim to be worth approximately $105,687,454, which is "secured by a first priority lien on substantially all of the Debtors' personal property and fixtures including, without limitation, the Debtors' accounts (including receivables), deposit and security accounts, all cash and cash equivalents, investment property, goods, equipment, inventory, general intangibles, chattel paper, instruments, payment intangibles, books and records related to the foregoing, in addition to all substitutions, accessions, products and proceeds of any kind related to the foregoing (the "**Floor Loan Collateral**")." Cash Collateral Motion, ¶ 12. But, the Cash Collateral Motion also alleges that the Debtors have allowed other claims to encumber the Floor Loan Collateral, including (i) a subordinated secured loan from Mercantile Bank of Michigan in an original principal amount of $7,294,048.29; (ii) a lien on products, inventory, parts, engines, and accessories filed by Volvo

Penta of the Americas, LLC; (iii) a lien on inventory filed by Malibu; (iv) various equipment lenders' liens; and (v) liens on the Debtors' personal property filed by several of the Debtors' landlords (collectively the "**Other Liens**").

27. Unable to reach agreement with M&T, the Debtors propose the use of M&T's cash collateral in exchange for adequate protection liens, super-priority claims, and adequate protection payments. Further, the Cash Collateral Motion proposes to limit the use of Cash Collateral to a proposed Budget (defined therein) and supposedly attached to the motion and in accordance with a declaration of Monica Blacker, in support of the first day motions. Notably, no Budget was attached to the Cash Collateral Motion and no declaration in support of the first day motions has been filed with the Court as of the time of the filing of this objection.

28. The Cash Collateral Motion also does not make clear the purposes for which the proposed use of Collateral would be used. This lack of transparency is particularly worrisome given the Receiver's Report, which details the funding of non-debtor entities' businesses and operations with assets of the then-receivership estate (now bankruptcy estate). M&T cannot be forced to fund operations through its Collateral in a manner that does not benefit M&T or the estate as a whole.

29. Moreover, despite the Cash Collateral Motion's promise of adequate protection liens, the Cash Collateral Motion makes clear that any adequate protection lien to be granted to M&T would be subordinate to the Other Liens.

### III. ARGUMENT

30. A debtor may not use, sell or lease cash collateral unless (a) each entity that has an interest in the cash collateral consents, or (b) the court, after notice and a hearing, authorizes

such use, sale or lease of the cash collateral. 11 U.S.C. § 363(c)(2).[2] Additionally, the Court, on request of an entity that has an interest in the cash collateral, shall prohibit or condition the use, sale or lease of cash collateral as is necessary to provide adequate protection of such interest. 11 U.S.C. § 363(e) ("the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.") (emphasis added). The burden of proof with regard to adequate protection in cash collateral matters is on the debtor-in-possession, with the exception that the entity asserting an interest in the cash collateral must establish the validity, priority and extent of its interest. *Id.* at § 363(p).

31. In this case, the Debtors have failed to obtain M&T's permission to use cash collateral. Therefore, this court must authorize the use of cash collateral, and may only do so having determined that M&T is adequately protected. M&T submits that the Debtors cannot provide adequate protection sufficient to grant the Cash Collateral Motion.

A. **M&T Received Insufficient Notice of the Cash Collateral Motion, the Cash Management Motion and the Payment of Prepetition Debt Motion.**

32. The Debtor did not contact M&T prior to filing this bankruptcy case, nor did the Debtors move with any urgency for approval of these motions. In fact, the Debtor has not provided M&T with any kind of budget regarding the Debtor's operating needs—not even on an interim basis. M&T first received each of the motions late in the evening not much more than 12 hours before its hearing.

---

[2] Section 363(c)(2) of the M&Truptcy Code provides, in pertinent part:
The trustee may not use … cash collateral…unless—
(A) each entity that has an interest in such cash collateral consents; or
(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.
11 U.S.C. § 363(c)(2).

**B.     The Cash Collateral Motion, the Cash Management Motion and the Payment of Prepetition Debt Motion are not properly supported by the facts or any evidence.**

33.     Each of the motions purport to rely on the Declaration of Monica S. Blacker in Support of Chapter 11 Petitions and First Day Pleadings for factual and evidentiary support. As of the filing of this Objection, no such declaration has been filed.

34.     Without evidence, there is no basis to determine the merits of any of the motions.

**C.     The Debtors have not alleged grounds for an emergency hearing.**

31.     While setting the motions on such short notice, the Debtors do not attempt to demonstrate exigent circumstances that warrant emergency relief. To the contrary, the Debtors apparently have ample sources of capital from Debtors' affiliate Artemis Holdings. Upon information and belief, M&T alleges that Debtors' counsel received a $250,000 retainer from Artemis Holdings and the Debtors' CRO received a $300,000 retainer from Artemis Holdings. The Debtors provide no explanation of whether the Debtors will have to repay Artemis Holdings for such payments to Debtors' proposed professionals. These cash infusions also raise potential conflicts regarding whether the Debtors can honor their fiduciary responsibilities to its creditors when its counsel and CRO may have caused Debtor to incur $550,000 of debt on the eve of bankruptcy.

**D.     The Debtors cannot provide M&T with adequate protection.**

32.     The proposed adequate protection in the Cash Collateral Motion is woefully insufficient to provide M&T with the requisite protection for the potential for diminution of its interests. Foremost, M&T is undersecured and the Debtors, therefore, have no means to protect M&T against the diminution in the value of its Collateral. This issue is only exacerbated by the nature of the Collateral, and the Debtor's history of misappropriating M&T's Collateral. Further,

because Malibu has ended its relationship with the Debtors, the Debtors have no means of replacing M&T's Collateral in the event they were to sell certain units of M&T's Collateral.

33. To the extent the Debtor has used any of M&T's cash collateral (including providing a retainer to Debtor's counsel), M&T asserts that it is entitled to a super-priority administrative expense claim, replacement liens, adequate protection payments, disgorgement of payments to various parties and/or other appropriate remedies for the Debtor's unauthorized use of cash collateral. *See In re Aerosmith Denton Corp.*, 36 B.R. 116 (Bankr. N.D. Tex. 1983) (stating that a bankruptcy court may grant a secured creditor replacement liens pursuant to section 105 of the Bankruptcy Code based on a debtor's unauthorized use of cash collateral);

34. Under the current circumstances, M&T does not consent to the use of its cash collateral. However, if the Court nevertheless is inclined to authorize the Debtor to use cash collateral, M&T hereby requests that the Court condition such use by providing M&T with: (i) a replacement lien upon all property of the Debtor, of the same type and description as M&T's prepetition collateral as protection against any diminution in the value of M&T's interests in the collateral, including the cash collateral; (ii) a super-priority administrative expense claim under section 507(b) of the Bankruptcy Code; and (iii) adequate protection payments in accordance with the Loan Documents.

35. M&T reserves all of its rights and remedies against the Debtor under the Loan Documents, the Bankruptcy Code, other applicable state and federal law, and in equity.

WHEREFORE, M&T respectfully requests that the Court deny the first day motions.

Respectfully submitted,
May 23, 2024

**NORTON ROSE FULBRIGHT US LLP**

*/s/ Toby Gerber*
Toby Gerber (SBT 07813700)
Michael Berthiaume (SBT 24066039)
**NORTON ROSE FULBRIGHT US LLP**
2200 Ross Ave., Suite 3600
Dallas, TX 75201
Telephone: (214) 855-8274
Facsimile: (214) 855-8200
Email: toby.gerber@nortonrosefulbright.com
michael.berthiaume@nortonrosefulbright.com

and

Jason L. Boland (SBT 24040542)
**NORTON ROSE FULBRIGHT US LLP**
1301 McKinney Street, Suite 5100
Houston, Texas 77010
Telephone: (713) 651-5151
Email: jason.boland@nortonrosefulbright.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading was served by CM/ECF Notification on May 23, 2024.

                                              */s/ Toby Gerber*
                                              Toby Gerber