Liz Boydston (SBN 24053684)
Alexandria Rahn (SBN 24110246)
GUTNICKI LLP
10440 N. Central Expressway, Suite 800
Dallas, Texas 75231
Telephone: (469) 895-4413
Facsimile: (469) 895-4413
lboydston@gutnicki.com
arahn@gutnicki.com

Max Schlan (*Pro Hac Vice* Pending)
Ren-Ann Wang (*Pro Hac Vice* Pending)
GUTNICKI LLP
45 Rockefeller Plaza, Suite 2000
New York, New York 10111
Telephone: (646) 825-2330
Facsimile: (646) 825-2330
mschlan@gutnicki.com
rwang@gutnicki.com

*Proposed Counsel to the Debtors and
Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS**

**FORT WORTH DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TOMMY'S FORT WORTH, LLC, *et al.*,[1] | ) Case No. 24-90000-11 |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DECLARATION OF MONICA S. BLACKER IN SUPPORT OF FIRST DAY MOTIONS**

I, Monica S. Blacker, hereby declare under penalty of perjury:

1.      I am the Chief Restructuring Officer ("**CRO**") of Debtor Tommy's Fort Worth,

LLC and sixteen (16) of its affiliated Debtors: Tommy's Fort Worth, LLC; Tommy's Lewisville,

LLC; Tommy's Holding Company, LLC; Tommy's Grand Rapids, LLC; Tommy's Castaic, LLC;

High Country Watersports, LLC; Walloon Lake Village Marina, LLC; MKB Florida Holdings,

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Tommy's Fort Worth, LLC (3473); Tommy's Holding Company, LLC (2662); Tommy's Grand Rapids, LLC (9224); Tommy's Castaic, LLC (7501); Tommy's Lewisville, LLC (4750); High Country Watersports, LLC (6160); Walloon Lake Village Marina, LLC (0277); MKB Florida Holdings, LLC (5698); Tommy's Detroit, LLC (5242); Tommy's California Fresno, LLC (8597); Tommy's Phoenix, LLC (3036); Tommy's Las Vegas, LLC (7721); Tommy's Chattanooga, LLC (0839); Tommy's California Ventura, LLC (5149); Tommy's Rancho Cordova, LLC (1070); Tommy's Stockton, LLC (1338); and Tommy's Knoxville, LLC (8052).

LLC; Tommy's Detroit, LLC; Tommy's California Fresno, LLC; Tommy's Phoenix, LLC; Tommy's Las Vegas, LLC; Tommy's Chattanooga, LLC; Tommy's California Ventura, LLC; Tommy's Rancho Cordova, LLC; Tommy's Stockton, LLC; and Tommy's Knoxville, LLC (collectively, the "**Debtors**" or "**Tommy's**" or the "**Company**") in the above-captioned chapter 11 cases (the "**Cases**").

2.      In addition to my role as CRO of the Debtors, I am a Partner with Force 10 Partners ("**Force 10**"), where I provide broad restructuring, crisis management, and financial advisory services across a wide spectrum of distressed situations. Force 10 and I specialize in corporate restructurings, acquisitions/sales and due diligence, implementation and/or monitoring of bankruptcy plans and settlements, and have worked with a number of companies across a range of retail, manufacturing industries, automotive, real estate, finance, service, healthcare and both public and private, through out-of-court and in-court reorganizations and liquidations. Prior to becoming a partner at Force 10, I was a practicing lawyer in several BigLaw law firms for over 20 years. During my time as a lawyer and as a partner at Force 10 partners, I have served as counsel for Debtors, unsecured creditors' committees, secured lenders and other parties in interest. In these cases, I have been responsible for the management of corporations, significant asset sales, as well as complex litigation. Members of Force 10 have been appointed as CROs, receivers in the Federal District Courts, as well as state courts in California, Oregon, and Delaware. In addition, I have been retained as an independent director in numerous distressed matters by acting boards of directors.

3.      I was hired by the Debtors on May 18, 2024. Based on the limited time available to both myself and my support team, we have begun to develop an understanding and familiarity with the business and are developing a familiarity of the financial condition of the Debtors. As CRO, I

am authorized to make this declaration (this "**Declaration**") on behalf of the Debtors. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' employees, agents, attorneys, and advisors, the accuracy and completeness of which information I relied upon to provide this Declaration.

4.      I submit this Declaration to assist the Court and parties in interest in understanding the circumstances that led to the commencement of these Cases and in support of: (a) the Debtors' voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") filed on May 20, 2024 (the "Petition Date") in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "**Court**"); and (b) the relief that the Debtors have requested from the Court pursuant to the motions and pleadings (collectively, the "**First Day Pleadings**").

5.      Contemporaneously herewith, the Debtors have filed the following First Day Pleadings:

a.   Motion of Debtors for Entry of an Order Authorizing and Directing the Joint Administration of Debtors' Chapter 11 Cases 24-90000-11, 24-90001-11, 24-90002-11, 24-90003-11, 24-90004-11, 24-90005-11, 24-90006-11, 24-90007-11, 24-90008-11, 24-90009-11, 24-90010-11, 24-90011-11, 24-90012-11, 24-90013-11, 24-90014-11, 24-90015-11, and 24-41734 [Docket No. 3; Filed 5/21/24] (the "**Joint Administration Motion**");

b.   Debtors' Emergency Application for Entry of an Order (A) Authorizing the Retention and Appointment of Omni Agent Solutions, Inc. as Claims, Noticing, and Solicitation Agent, Effective as of the Petition Date and (B) Granting Related Relief [Docket No. 6; Filed 5/21/24] (the "**Claim's Agent Application**");

c.   Emergency Motion of Debtors for Entry of an Order Authorizing the Filing of a Consolidated Mailing Matrix and Consolidated List of Top Thirty Largest Unsecured Creditors [Docket No. 7; Filed 5/21/24]; (the "**Consolidated Creditor Motion**");

d.   Debtors' Emergency Motion for Entry of an Order Extending Time for Filing Schedules of Assets and Liabilities and Statement of Financial Affairs [Docket No.11; Filed 5/22/24] ("**Extension Motion**");

e.  Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing
Continued Use of Cash Management System, Including Maintenance of
Existing Bank Accounts, Checks, and Business Forms, and (II) Authorizing
Continuation of Existing Deposit Practices [Docket No. 13; Filed 5/22/24] (the
"**Cash Management Motion**");

f.  Emergency Motion of Debtors for Entry of Interim and Final Orders (I)
Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection, (III)
Modifying the Automatic Stay, (IV) Setting a Second Interim Hearing, (V)
Setting a Final Hearing; and (VI) Granting Related Relief [Docket No. 12; Filed
5/22/24] (the "**Cash Collateral Motion**"); and

g.  Debtors' Emergency Motion for Entry of an Order Authorizing Debtors to Pay
Certain Prepetition Debt [Docket No. 14; Filed 5/22/24] ("**Motion to Pay
Prepetition Debt**").

6.      As discussed in further detail below, these Chapter 11 Cases were necessitated by
the culmination of challenges related to the Debtors' growth strategies, followed by unexpected
changes in consumer behavior, the fraudulent and misleading actions of the Debtors' longtime
business partners, discovery of a former member of management's failure to properly account, and
the receiver's actions and inactions, all of which has had a devastating effect on the Company, the
Company's value, and most importantly, the Company's loyal customers. These culminated in the
Debtors' chapter 11 filing and the Debtors' determination, in an exercise of their sound business
judgment, to pursue a postpetition sale of all of the Debtors'  businesses and dealerships. The
Debtors seek the relief set forth in the First Day Pleadings to minimize the disruption to and
adverse effects the receivership has had on the Debtors' business operations and to maximize the
value of the Debtors' business, assets, and estates so the Debtors can sell substantially all of their
assets for the highest possible value through these Cases.

7.      I am familiar with each of the First Day Pleadings. Absent the relief requested in
the First Day Pleadings, I believe that the Debtors would suffer immediate and irreparable harm
that would jeopardize their ability to continue their business operations and consummate a value-

maximizing sale transaction. I further believe that the relief sought in the First Day Pleadings is critical to the Debtors' efforts to transition into chapter 11 efficiently and minimize disruptions to their business operations, thereby permitting the Debtors to preserve and maximize value while pursuing a section 363 sale and chapter 11 plan process. Finally, I believe that the First Day Pleadings reflect the thorough and targeted analyses of the Debtors' management team and their professional advisors, and capture relief that is critical to the success of these proceedings.

8.      This Declaration is divided into three parts. Part I describes the Debtors' businesses, organizational structure, and prepetition indebtedness. Part II describes the circumstances leading to the commencement of these Chapter 11 Cases. Part III summarizes the First Day Pleadings, and explains why the relief requested in those pleadings is appropriate under the circumstances and necessary to avoid immediate and irreparable harm to the estates, as applicable

9.      References to the Bankruptcy Code, the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel or from my personal experience in other restructurings. If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

## PART I: THE DEBTORS, THEIR OPERATIONS, AND THEIR REVENUE STREAMS

10.     Tommy's is a high-octane water-sports-enthusiast brand known as "Tommy's Boats" that began in 2012 in Colorado. Today, Tommy's Boats is the largest Ski & Wake dealer globally. Currently consisting of fourteen (14) dealerships plus five (5) additional on-water rental programs operating in Texas, Colorado, Michigan, Arizona, California, Florida, Nevada, and Tennessee. Tommy's supplies a full suite of boat repair services, boat rental services, on-the-water fueling and docking services, retail sales of super-premium ski and wake boats, luxury cruisers, fishing boats, pontoons, flightboards, and retail goods & apparel at Tommy's Pro Shops. Tommy's

is and always has been dedicated to bringing the absolute best products and services to its loyal customers.

11. The Debtors' business—water sports and boats—is seasonal, with spring boat shows bringing deposits and April through June being the busiest three-month season of the year in the boating industry. For example, at the Novi boat show the weekend of March 15-17, 2024, Tommy's had peak success securing nineteen (19) deposits for new luxury boats, in addition to generating $1.4 million in revenue from servicing boats and general boat sales.

12. The Debtors' business generates revenue from four primary revenue streams, and the average percentage of total revenue in 2023 ($190,246,504) generated from each stream is set forth below:

| Boat Sales | Service/Repair | Pro Shop | Waterfront (rentals & fueling) |
|---|---|---|---|
| 84% | 12% | 3% | 2% |
| $158,987,459 | $23,540,142 | $4,765,651 | $2,953,252 |

The average percentage of gross margin from May through August generated from each stream is set forth below:

| Boat Sales | Service/Repair | Pro Shop | Waterfront (rentals & fueling) |
|---|---|---|---|
| 68% | 18% | 6% | 7% |

13. Boat sales make up approximately 82 percent of the Debtors' annual revenue. The majority of Debtors' sales are brand-new luxury watercraft from two original equipment manufacturers (OEM) and three brands: Tahoe, Malibu, and Axis. Axis is a Malibu-manufactured brand intended to be more entry market than luxury market. As of the Petition Date, the Debtors' inventory for brand new luxury watercraft is $68 million (cost) and 658 units. The Debtors historically have been and continue to be the largest dealer nationally for OEM Malibu Boats. The

Debtors also sell pre-owned watercraft, however pre-owned watercraft sales make up less eighteen (18) percent of the Debtors' annual revenue.

14.     Year to date, the Debtors' boat sales have cashiered $42.3m in Sales Revenue at an estimated 17 gross margin.

15.     Service and repair work accounts for 18 percent of the Debtors' margin annually. Each of the  fourteen (14) Tommy's dealerships do service work for its customer base. Services range from simple winterizing and summerizing and oil changes to engine replacements, center console replacements, and exterior Gel/Paint repairs.

16.     Year to date, the Debtors' boat service have cashiered $7.6 million in Service Revenue at 34.4% gross margin.

17.     As set forth in more detail in Part II, below, had the Receiver (defined in Part II) provided authorization to purchase service parts during the month of May 2024, the Debtors would have continued on this trend and had a very good chance of achieving their May Service Revenue Budget of $2.8 million. In many states, May is the kickoff to the summer boating season and Tommy's had an excellent opportunity to bring in large service revenue numbers to match prior years' May Service Revenue and gross margins. The Receiver refused to approve funding for service parts during the receivership period (April 22, 2024 through May 20, 2024), and the Debtors were locked out of three (3) stores that had fully functioning service departments and good customer confidence moving into the peak boating season.

18.     The Debtors bring these First Day Motions seeking to capture the expected Memorial Day boating revenues historical to the Debtors' seasonal business. The below table sets forth the 2021 through 2023 Memorial Day week revenues by revenue line:

|  | Boat Sales | Service | ProShop | Waterfront | Total Sales |
|---|---|---|---|---|---|
| 2021 | 2,799,365.57 | 164,006.04 | $ 124,630.59 | $ 46,661.54 | 3,136,684.74 |
| 2022 | 2,038,449.88 | 339,501.43 | $ 148,096.96 | $ 64,022.91 | 2,592,093.18 |
| 2023 | 3,608,332.00 | 249,500.04 | $ 125,324.35 | $ 55,967.56 | 4,041,146.95 |
|  | 8,446,147.45 | 753,007.51 | 398,051.90 | 166,652.01 | 9,769,924.87 |

19.     Since the Receiver shuttered the Debtors' Service revenue stream, the Debtors have had seventeen (17) Servicepersons resigned, reducing the overall availability of Servicepersons to service the Debtors' customers' boats. However, the Debtors believe that with their current staff of Servicepersons, if this Court were to grant them the ability to use $73,267.80 of cash collateral, the Debtors would cashier approximately $200,000 in open work (meaning in-process or the work is complete, but the customer needs to pick up their boat and pay for service) and an additional $370,000 in service sales for a total of approximately $570,000 in revenue. Most of the estimated $570,000 in Service work is on customers' boats that are currently at the Debtors' service bays awaiting service work. Every day that gets closer to the end of the month reduces the potential for May revenue, pushing back-logged work into June as a result of timing. Had the Receiver approved the Debtors' May 7, 2024 request to purchase parts, the Debtors estimate the May Service Revenue to have been at least an additional $1.1 million, with May Service Revenue more than $2.5 million.

20.     The Debtors filed these Cases to maximize the value of their assets and estates for the benefit of their creditors by reopening the Debtors' Service Department and potentially increasing service revenue by at least 50 percent.

21.     In addition to increased revenue from the (currently shuttered) Service Department, the Debtors filed these Cases to capture the Memorial Day Week historical and expected revenue from the Debtors' Waterfront Department. Waterfront offers boat rentals, slip rentals, docking services, and fueling services. The Debtors have two sources of paying for fueling and for their

boat delivery, Waterfront docking, and fueling services, (a) WEX Cards and (b) Blarney Castle f/k/a Derrer & Sons Oil Co.

22.    WEX Cards are fuel finance cards that function like credit cards with a line of credit of $38,500. The WEX Cards the Debtors use for all of their dealerships totto deliver boats purchased to their customers are not in the Debtors' names, but rather in their non-debtor affiliate name, MKB Holdings, LLC. All of the Debtors use the WEX Cards for fueling. The amount due on the WEX Cards as of the Petition Date is $36,678.65, which leaves nearly no availability for fuel charges. Debtors are seeking authority to use $36,678.65 of cash collateral to pay their WEX Cards charges, which will immediately give the Debtors $38,500 in availability for fueling needs over the Memorial Day Week. *See Exhibit A.*

23.    The amount due to Blarney Castle f/k/a Derrer & Sons Oil Co. as of the Petition Date is $8,476.92. Debtors are seeking  authority to use $8,476.92 to allow their Waterfront locations to obtain fuel for their Waterfront docking and slip rentals over the Memorial Day Week. *See Exhibit B.*

**PART II: EVENTS LEADING TO THE COMMENCEMENT OF BANKRUPTCY**

**A.  MALIBU BOATS**

24.    For twelve (12) years, Malibu Boats ("**Malibu**") was the Debtors' OEM, and Tommy's is the largest national dealer for Malibu boats in the recreational power boat space, accounting for approximately 33 percent of Malibu's power boat sales. Malibu advertises itself as a leading designer, manufacturer, and marketer of a diverse range of recreational power boats, including performance boats, under the brands of Malibu and Axis. The Malibu brand purports to include the latest innovations in performance, comfort and convenience, and retails for between $80,000 and $300,000 per boat. The Axis brand purports to provide a more affordably priced, entry-level performance boat which retails between $80,000 and $175,000 per boat.

25.    Malibu is a public company and asserts that it maintains the number one market share position in the United States in the performance sport boat category through its Malibu and Axis brands.

26.    The majority of Malibu's sales are made pursuant to floor plan financing programs in which Malibu participates on behalf of its dealers through a contingent repurchase agreement with the dealership's lender. Under such an arrangement, a dealer essentially establishes a line of credit with a lender for the purchase of dealer boat inventory from Malibu. When a dealer purchases and takes delivery of a boat pursuant to a floor plan financing arrangement, it draws against its line of credit and its lender pays the invoice cost of the boat directly to Malibu. This amounts to a sale for Malibu ("**Sale**").

27.    For the first 11 years of the Debtors' relationship with Malibu, it was a true partnership with countless examples of Tommy's doing anything and everything asked of it to help Malibu protect and grow its market share while Malibu helped Tommy's growth. The first 11 years of the relationship were based on good faith and fair dealing between the parties.

28.    During the COVID-19 pandemic, domestic retail demand for recreational powerboats increased to the highest levels seen by the industry in decades, as customers turned to boating as a form of outdoor socially-distanced recreation. Retail registration activity in the recreational powerboat market, however, began declining in the second half of the 2021 calendar year because of inventory shortages due to the strong sales activity during the pandemic and supply chain disruptions that began impacting production levels. During calendar year 2022, retail registration activity continued to decline at a lower year-over-year rate than the second half of year 2021, and by 2023 the industry demand was 50% of what it was in 2021.

29.     Malibu acknowledges in public disclosures that the majority of its dealers have floor plan financing arrangements with lenders in order for the dealer to purchase Malibu boats. The majority of Malibu Sales are financed under floor plan financing arrangements pursuant to which Malibu receives payment for the Sale within a few days of shipping a boat to a dealer.

30.     Malibu publicly represents that it provides its dealer's floor plan lender with a repurchase agreement to support the loan facility (and the dealer) whereby Malibu agrees to repurchase products repossessed by a dealer's floor plan lender if a dealer defaults on its debt obligations to the lender, and the boat is returned to Malibu, subject to certain limitations. A repurchase agreement for boats in connection with a floor plan financing arrangement is customary in the industry.

**Floor Plan Financing**

Our North American dealers often purchase boats through floor plan financing programs with third-party floor plan financing providers. During fiscal year 2023, approximately 75% of our North American shipments were made pursuant to floor plan financing programs which our dealers participate in. These programs allow dealers across our brands to establish lines of credit with third-party lenders to purchase inventory. Under these programs, a dealer draws on the floor plan facility upon the purchase of our boats and the lender pays the invoice price of the boats. As is typical in our industry, we have entered into repurchase agreements with certain floor plan financing providers to our dealers. Under the terms of these arrangements, in the event a lender repossesses a boat from a dealer that has defaulted on its floor financing arrangement and is able to deliver the repossessed boat to us, we are obligated to repurchase the boat from the lender. Our obligation to repurchase such repossessed products for the unpaid balance of our original invoice price for the boat is subject to reduction or limitation based on the age and condition of the boat at the time of repurchase, and in certain cases by an aggregate cap on repurchase obligations associated with a particular floor financing program.

31.     And like the majority of Malibu's dealers, Tommy's has such a floor plan financing arrangement that historically included a repurchase agreement for boats provided by Malibu to Tommy's.

32.     Tommy's currently has its floor plan financing with M&T Bank ("**M&T**").

33.     Malibu and M&T representatives discussed a repurchase agreement at or about the time that Tommy's was moving its floor plan loan facility from Fifth Third Bank to M&T Bank in May 2023.

**B. MALIBU FORCED TOMMY'S TO INCREASE FLOORPLAN FROM $50M INVENTORY TO $160M INVENTORY, FORCED TOMMY'S TO OVERSTOCK HIGH-PRICED MODELS, AND FAILED TO PAY INCENTIVES, REBATES, AND INTEREST COVERAGE AS REQUIRED BY THE DEALERSHIP AGREEMENTS**

34.     Beginning in late 2022, Malibu first began a campaign designed to coerce Tommy's to increase its available floor plan financing from $30 million (drawn on a $50 million facility with a $10 million overlimit) to $160 million. Malibu did so by representing to Tommy's that Tommy's was required to have a minimum of 25 weeks of inventory in stock at the turn of the model year based on Malibu's market analysis. At the time, Tommy's was only into its Fifth Third Bank floor plan approximately $30 million, leaving $30 million of purchasing and financing capacity.

35.     As part of its Dealership Agreements with Malibu, Tommy's was entitled to earn incentives related to sales of Malibu products. The incentives include interest reimbursement, rebates, and discounts. In the 2022 fiscal year, Tommy's earned significant incentives for which Tommy's has demanded payment, but payment has been refused by Malibu. Instead of meeting its obligation to pay these incentives to Tommy's, Malibu withheld these incentives and used promises of additional incentives to be earned while exerting additional financial pressure on Tommy's to increase its floor plan financing capacity.

36.     Facing severe financial pressure, Tommy's ultimately succumbed to Malibu's demands and increased its existing floor plan capacity from $60 million to $85 million with Fifth Third Bank and then to $110 million with a $20 million overlimit with M&T Bank.

37.     All the while, Malibu represented publicly and to Tommy's lender, M&T Bank, that Malibu would support the increased floor plan with a repurchase agreement that  would have protected both M&T and Tommy's in the event Tommy's defaulted on its loan obligations. Pursuant to the repurchase agreement, Malibu would be forced to repurchase Tommy's Malibu inventory, just as Malibu had done for the benefit of Tommy's and Fifth Third Bank (and all prior lenders) on Tommy's previous floor plan facilities for the last 11 years. A repurchase agreement

(which results in virtually no adverse financial impact to Malibu) also protects Malibu's ability to control its boats in the market.

### C. FAILURE TO OBTAIN REPURCHASE AGREEMENT

38.    However, despite a repurchase agreement to protect a floor plan lender (here, M&T Bank) being not only customary in the industry, but historically the course of business between the Debtors and Malibu, Malibu ultimately reneged on its promise to execute a repurchase agreement for the benefit of M&T Bank and Tommy's. For the last 11 years, Malibu has always provided Tommy's floor plan lender with a repurchase agreement.

39.    Yet after (a) inducing Tommy's to expand its floor plan capacity and inventory from $60 million to $130 million, (b) forcefully pumping its highest-priced inventory onto Tommy's without consideration of Tommy's requests for a model mix that Tommy's could actually sell (i.e., the requested model mix of 65/35 Malibu/Axis that was consistent with Malibu policy), (c) making it impossible for Tommy's to hit sales targets, (d) burying Tommy's in interest—interest that Malibu promised to pay as an incentive to Tommy taking delivery of the next model year early, Malibu not only refused to sign the repurchase agreement, but Malibu also reneged on its promise to reimburse Tommy's for the carry interest, refused to pay over earned incentives and rebates, and then attempted to terminate Tommy's Dealership Agreements. Repurchase agreements are absolutely critical and customary at the time the floor plan financing agreement is entered into. The reason is that the OEM requires the dealer to carry excess inventory on its showroom floor, and if there is an issue with sales or demand, then the OEM steps in to relieve the dealer and protect itself, its dealer, and the floor plan financer, here M&T Bank.

40.    For example, if there is $100 million of Malibu inventory on floorplan and there is a default, then Malibu pays the floor plan financer (M&T Bank) up to 100 percent of the principal balance of the remaining inventory cost, so long as the boat has been on the floorplan for less than

12 months. Here, M&T failed to obtain, and Malibu refused to provide, the repurchase agreement – an agreement that is *between M&T and Malibu* and to which Tommy's is not a party.

41.     The resulting effect of the failure to obtain a repurchase agreement is that the M&T debt skyrocketed to the full financed amount of the Malibu inventory, instead of where it should have been on April 1, 2024, which the Debtors assert should be $40 million instead of the approximately $105 million M&T currently asserts against the Debtors.

42.     On April 10, 2024, the Debtors filed suit against Malibu in the US District Court for the Eastern District of Tennessee, Northern Division in Case No. 24-00166, *Tommy's Castaic, LLC, et al. v. Malibu Boats, Inc. See Exhibit C.* The Debtors intend to continue to pursue this litigation as an asset of their estate that will lead to a substantially higher recovery to creditors.

43.     As of the Petition Date, the Debtors assert that Malibu owed the Debtors more than $12 million in 2022 through 2024 rebates, incentives, and carry interest:

| TYPE of Rebate | DUE |
|---|---|
| 2022 COOP[2] | $364,750 |
| 2023 BCP[3] | $666,250 |
| 2023 COOP | $414,000 |
| 2023 QCP[4] | $505,500 |
| 2023 MSB[5] | $432,000 |
| 2024 OPI[6] | $258,500 |
| 2024 Interest[7] | $508,429 |
| 2024 YESE and BSP Discounts with no order[8] | $1,506,950 |
| Interest on 2023s since MBUU stopped covering[9] | $5,302,285 |
| Est 2024 COOP | $400,000 |
| Spring into Summer Upfront Stock | $2,625,000 |
| TOTAL DUE TO TOMMY'S FROM MALIBU | $12,983,664 |

---

[2] 2022 COOP means advertising dollars spent of Malibu's behalf that are owed back
[3] 2023 BCP means Boat Confirmation Payout
[4] 2023 QCP means Quarterly Confirmation Payout
[5] 2023 MSB means Market Share Bonus
[6] 2024 OPI means Order Performance Incentive
[7] 2024 Interest means interest recapture that should have been paid by Malibu
[8] 2024 YESE and BSP Discounts with no order means Year end sales event and Boat Show program discount to be applied to future orders
[9] Interest on 2023s since MBUU stopped covering means interest that should have been paid by Malibu that was not paid.

Case 24-90000-elm11    Doc 23    Filed 05/23/24    Entered 05/23/24 13:13:32    Desc Main
Document    Page 15 of 27

D.  **DISCOVERY OF UNPAID SALES TAXES**

44.    A third-party auditor employed by the Debtors discovered in November 2023 that approximately $3 million in sales taxes had not been paid on boat sales. In response, Tommy's controller at the time is no longer with he Company. Unfortunately, due to decreasing demand, decreasing sales, and increasing pressure from Malibu to expand, purchase dealerships in California (Sacramento and Stockton), and financial drain from Malibu refusing to honor its commitment to pay carry interest (averaging approximately $1 million/month), Tommy's was only able to pay a portion of the past-due sales taxes.

45.    As of the Petition Date, approximately $4.8 million in sales taxes remains outstanding. Although there was a repayment plan in place prior to Receivership, the Receiver defaulted on the payment plan.

E.  **RECEIVERSHIP**

46.    Under the M&T Bank Floor Purchase Agreement, termination of a dealership agreement and/or failure to have a valid dealership agreement is an Event of Default. On March 22, 2024, Malibu improperly terminated the Debtors' Dealership Agreements without cause, which in turn caused M&T Bank to call a Default, which the Debtors were unable to cure.

47.    On April 1, 2024, M&T Bank applied for a receivership, to which the Debtors consented, believing a receiver (the "**Receiver**") and M&T Bank would try to work with Malibu to not only reinstate the Dealership Agreements, but also to finally enter into the repurchase agreement, thus allowing the more than $110 million of Malibu and other inventory on the showrooms of the Debtors' 14 dealerships to be marketed and sold at the highest and best price.

48.    On or about April 22, 2024, the Receiver was appointed.

49.    Instead of working together to obtain the highest value for the more than $110 million of Malibu and other inventory that the Debtors have, M&T and the Receiver valued the

15

inventory at $41 million at fire sale liquidation, began to shutter the Debtors' Service Department (which generates 18% of the Debtors' total gross margin), and refused to pay required Receivership obligations in the currently known aggregate amount of $1,268,582, including $150,000 in sales commission and $566,109 in sales taxes.

50.    On Sunday, May 19, 2024, the Debtors were informed that the Receiver had negotiated with Malibu and the Debtors' competitors to remove ten (10) Malibu boats from the Debtors' dealerships to competitors' dealerships. The Debtors filed these Cases to protect their estates, the value of their assets and operations, and to operate their businesses until a sale of substantially all of their assets at the highest and best price can be obtained through the orderly chapter 11 process.

## **PART III: FIRST DAY PLEADINGS**

51.    Contemporaneously with the filing of their chapter 11 petitions, the Debtors seek approval of the First Day Pleadings and related orders (the "Proposed Orders"). The Debtors respectfully request that the Court enter each of the Proposed Orders as they are critical to the Debtors' successful reorganization in these Cases.

52.    I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief. Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enabling the Debtors to operate with minimum interruptions and disruptions to customers and employees; and (b) constitutes a critical element in the Debtors' ability to successfully maximize value for the benefit of their estates.

### A.  THE JOINT ADMINISTRATION MOTION

53.    Pursuant to the Joint Administration Motion, the Debtors seek the joint administration of their seventeen (17) chapter 11 cases (the "**Cases**") for procedural purposes only.

Many of the motions, hearings, and other matters involved in the Cases will affect all of the Debtors. Therefore, I believe that the joint administration of these Cases will avoid the unnecessary time and expense of duplicative motions, applications, and orders, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates. Accordingly, I believe the Court should approve the joint administration of these Cases.

**B. THE CLAIMS AND NOTICING AGENT APPLICATION**

54.     Pursuant to the Claims and Noticing Agent Application, the Debtors request entry of an order authorizing the appointment of Omni Agent Solutions, Inc. ("**Omni**") as the claims, noticing, and solicitation agent for the Debtors in these Cases, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in these Cases.

55.     The Debtors' selection of Omni to act as the Claims, Noticing and Solicitation Agent is appropriate under the circumstances and in the best interests of their estates. Although the Debtors have not yet filed their schedules of assets and liabilities and statements of financial affairs, they anticipate there will be hundreds of parties due to the number of customers and employees associated with the Debtors. By appointing Omni as the Claims, Noticing, and Administrative Agent in these Chapter 11 Cases, the distribution of notices will be expedited and the Clerk will be relieved of the administrative burden of noticing and is in the best interest of the Debtors' estates and their creditors.

56.     Accordingly, on behalf of the Debtors, I respectfully submit that the Claims and Noticing Agent Application should be approved.

57.     The Consolidated Creditor Motion

58.     Pursuant to the Consolidated Creditor Motion, the Debtors request entry of an order authorizing the Debtors to file one consolidated list of their thirty (30) largest unsecured creditors for all Debtors.

59.     The Debtors are comprised of seventeen (17) affiliated companies that maintain their books and records on a consolidated basis with one accounts payable system. There are hundreds of creditors and other parties in interest in these Cases, and there may be potential for confusion and/or overlap regarding creditor obligations. Given the circumstances, the Debtors submit that it is appropriate for them to file one consolidated mailing matrix and one consolidated list of their thirty largest unsecured creditors. If the Debtors were not granted the relief requested herein, the Debtors would have to manually build each accounts payable sub-ledger for each entity. This process would be burdensome and time-consuming with no meaningful benefit. The consolidated list of creditors will provide good and sufficient notice to all creditors and parties in interest in an efficient manner. Accordingly, on behalf of the Debtors, I respectfully submit that the Consolidated Creditor Motion should be approved.

C.  **THE SCHEDULES EXTENSION MOTION**

60.     Pursuant to the Schedules Extension Motion, the Debtors seek entry of an order extending the deadline to file their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "**Schedules and Statements**") by an additional twenty-one (21) days, from the date such Schedules and Statements are otherwise required to be filed, for a total of thirty-two (35) days from the Petition Date.

61.     I believe cause exists to extend the deadline for filing the Schedules and Statements. As detailed herein, the Debtors have had limited time to prepare to file these Cases. Given the amount of work required to complete the Schedules and Statements, and the competing demands

on the Debtors' Employees and professionals to continue to maximize the Debtors' business operations during the initial phase of these Cases and to provide continued support to the Debtors' efforts to execute a transition strategy, the Debtors likely will not be able to properly and accurately complete the Schedules and Statement within the initial fourteen-day period prescribed by Bankruptcy Rule 1007(c). To completely and accurately file Schedules and Statements, the Debtors must collect, review, and analyze a substantial amount of information.

62.    The Debtors are working expeditiously to prepare and file their Schedules and Statements and intend to have them filed as soon as possible.  However, given the amount of information required to adequately prepare such Schedules and Statements, in an abundance of caution, the Debtors respectfully request an extension of twenty-one (21) days, making the updated due date June 24, 2024.

### D.  THE CASH COLLATERAL MOTION

63.    Pursuant to the Cash Collateral Motion the Debtors seek entry of an Interim Order (i) authorizing the Debtors to use the Cash Collateral of M&T Bank ( "**M&T**" ), (ii) granting the M&T adequate protection upon the terms set forth in the Interim Order and in any final orders, (iii) modifying the automatic stay, and (iv) scheduling a second interim and final hearing on the Motion and approving the form and manner of notice thereof, and granting such other and further relief as the Court deems just and appropriate.

64.    On May 18, 2023, the Debtors, as borrowers, entered into that certain *Loan Agreement (Floor Plan Financing)* (as amended, restated, modified, or supplemented from time to time, the "**Floor Plan Agreement**") with M&T.  Pursuant to the Prepetition Floor Plan Agreement, and the associated *Variable Rate Demand Note (with Variable Rate Rider)* (the "**Prepetition Demand Note**") and *Revolving Line Note (with Variable Rate Rider)* (the "**Prepetition Revolving Note**", together with the Prepetition Demand Note, the "**Notes**" and

together with the Floor Plan Agreement, the "**Floor Plan Loan Documents**"), M&T extended to the Debtors floor plan financing, in addition to a revolving line, in the aggregate amount of $115,000,000.

65.     Under the Floor Plan Agreement, M&T, pursuant to the Prepetition Demand Note, provided the Debtors with financing in the maximum aggregate amount of up to $110,000,000. Availability under the Prepetition Demand Note is allocated among certain percentages of the Debtors' inventory; specifically, new, used, and marine inventory.

66.     Pursuant to the Prepetition Demand Note, interest is set at Daily Simple SOFR, although in the event of default, and at M&T's discretion, interest may be set at the Base Rate, without waiving M&T's right to institute the Default Rate. Payment by the Debtors to M&T is to be remitted upon the sale of any item of Floor Loan Collateral (as defined herein) that consists of marine inventory upon Debtors' immediate receipt of the proceeds, or within 10-days from the date of the sale of such marine inventory. Currently, the Prepetition Demand Note is accruing interest at the Default Rate.

67.     Additionally, M&T, pursuant to Prepetition Revolving Note, provided the Debtors with revolving availability in the maximum aggregate amount of up to $5,000,000. The Prepetition Revolving Note is a discretionary facility, with M&T, at its discretion, able to modify, restrict, suspend or terminate the facility at any time and for any reason. Similar to the Prepetition Demand Note, interest on the Prepetition Revolving Note is set at Daily Simple SOFR, although in the event of default, and at M&T's discretion, interest may be set at the Base Rate, without waiving M&T's right to institute the Default Rate.

68.     The obligations under the Notes (the "**Floor Plan Loan Obligations**") are secured by a first priority lien on substantially all of the Debtors' personal property and fixtures including,

without limitation, the Debtors' accounts (including receivables), deposit and security accounts, all cash and cash equivalents, investment property, goods, equipment, inventory, general intangibles, chattel paper, instruments, payment intangibles, books and records related to the foregoing, in addition to all substitutions, accessions, products and proceeds of any kind related to the foregoing (the "**Floor Loan Plan Collateral**").

69.     As of the Petition Date, the Debtors estimate that, in the aggregate, approximately $105,687,454 in Floor Plan Loan Obligations are outstanding.

70.     The Debtors have determined that absent the use of Cash Collateral, the Debtors will be unable to operate their businesses during the Cases, irreparably harming the Debtors' estates and creditors. The denial of the use of Cash Collateral would directly result in the interruption of business operations. Further, the Debtors' business operations would immediately suffer the loss of key employees and vendors because the Debtors would be unable to demonstrate financial stability. Therefore, the Debtors' immediate access to Cash Collateral is necessary to preserve and maximize the value for the benefit of all parties in interest, including customers and employees.

71.     In exchange for the use of Cash Collateral, the Debtors have agreed, and the Interim Order provides, adequate protection in the form of, among other things, adequate protection liens, superpriority claims, and adequate protection payments to protect M&T against any diminution in the value of interest interests in the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral, and the imposition of the automatic stay.

72.     Access to existing Cash Collateral on an interim basis will provide the Debtors with the liquidity necessary to ensure that the Debtors have sufficient working capital and liquidity to

operate their businesses and thus preserve and maintain the value of the Debtors' estates. Without access to such liquidity, the Debtors will face irreparable harm.

73.     M&T has not yet consented to the Debtors' use of Cash Collateral on the terms set forth in the Interim Order.  The Debtors will continue to negotiate with the M&T in an attempt to achieve consent prior to the First Day Hearing. Notwithstanding consent from M&T, the proposed adequate protection included in the Interim Order provides the appropriate level of adequate protection in the form of, among other things, the Replacement Liens, the Superpriority Administrative Claim, adequate protection payments, including fees and expenses, and reporting requirements. The Debtors submit that the proposed adequate protection is appropriate and sufficient to protect  M&T from any diminution in value of the Floor Plan Loan Collateral.

74.     The Cash Collateral will be used for funding business operations and allowing the Debtors to transition into the Cases. Immediate access to this liquidity will permit the Debtors to fund necessary payroll, pay postpetition vendors, and otherwise continue business in the ordinary course on one of the busiest weekends in the boating industry. As detailed herein, one reason underlying the filing of these Cases is to stabilize operations. If Cash Collateral is not available, the Debtors will be unable to make payroll, and thus will dissipate value to the detriment of M&T and other stakeholders, including employees. If the limited amount of Cash Collateral is not made available on an interim basis, the Debtors will be irreparably harmed by the loss of revenues and reputational damage during this most important weekend. Thus, the use of Cash Collateral will protect M&T's security interests by preserving the value of the Floor Plan Collateral throughout the Cases.

75.     Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Collateral Motion should be approved.

### E.  THE CASH MANAGEMENT MOTION

76.    Pursuant to the Cash Management Motion, the Debtors seek entry of interim and

final orders (i) authorizing, but not directing, the Debtors to continue to maintain and use their

existing cash management system including maintenance of existing bank accounts, checks, and

business forms, (ii) if necessary, granting the Debtors a waiver of certain bank account and related

requirements of the Office of the United States Trustee for the Northern District of Texas (the

"U.S. Trustee") to the extent that such requirements are inconsistent with the Debtors' practices

under their existing cash management system or other actions described herein, and (iii)

authorizing, but not directing, the Debtors to continue to maintain and use their existing deposit

practices notwithstanding the provisions of Bankruptcy Code § 345(b).

77.    In the ordinary course of business, the Debtors utilize the Cash Management

System to collect and disburse funds generated by the Debtors' operations.  To lessen the

disruption caused by the bankruptcy filings and maximize the value of their estates in these Cases,

it is vital for the Debtors to maintain their system of managing cash in the early phase of these

Cases.  The Debtors significantly pared down their system of managing cash and their bank

accounts prior to the Petition Date. During the first week(s) of these Cases, the Debtors will need

to use their existing bank accounts to collect funds and pay their ordinary operating expenses,

including payroll.  As of the Petition Date, the Debtors maintain thirty (30) bank accounts having

recently closed approximately ten (10) bank accounts (the "Bank Accounts")10. The Debtors

maintain seventeen (17) accounts at Lake Michigan Credit Union ("LMCU"), two (2) accounts at

M&T Bank, one (1) account at Mercantile Bank, two (2) accounts at US Bank, one (1) account at

---

[10] Attachment 1 included after the Cash Management Motion contains a chart listing each of the bank accounts and
column four (4) lists the amounts in each of those accounts.

4Front Credit Union, one (1) account at First Bank ("1st Bank"), and six (6) accounts at Bank of America ("BOA"). The majority of the funds and transactions made by the Debtors occur in the two Bank Accounts at M&T Bank, both are general checking accounts, but the one ending in (-1578) gets swept daily into the account ending in (-1511). The Debtors use both accounts to receive payments from customers and pay ordinary operating expenses (the "Working Capital Accounts" or "M&T Accounts").

78.     In addition to the Bank Accounts, the Debtors, in their pro shops, utilize Worldpay Credit Card Machines (the "WCC Machines"). These WCC Machines allow the Debtors' customers to use credit cards in the Pro Shops. Currently, a fee of $681.74 needs to be paid for the Lewisville Pro Shop. Until this $681.74 is paid, none of Debtors' Pro Shops are able to take purchases from customers using credit cards. I submit that the ability to continue to use the WCC Machines in the ordinary course of the Debtors' business is critical, especially with the Memorial Day Weekend rush occurring. If this amount is not paid, the Debtors will not be able to use their credit card machines and will undoubtedly lose numerous sales because many customers use credit cards exclusively to pay for items and services provided by the Pro Shops. I believe that requiring the customers to pay the Pro Shops only using check or cash is not a practical alternative and will lead to most, if not all, not purchasing the item or service.

79.     The Debtors, therefore, request that the Court authorize them to continue to use the existing Cash Management System, and to transfer funds into, out of, and through the Cash Management System as the Debtors did prepetition including, without limitation, any prepetition cash management agreements, bank account terms and conditions, or treasury services agreements.

80.     The Cash Management System is an ordinary course, customary, and essential business practice, the continued use of which is essential to the Debtors' ability to conduct their

businesses during the Cases and their goal of maximizing value for the benefit of all parties in interest. To require the Debtors to adopt a new cash management system at this early and critical stage would be expensive, impose needless administrative burdens, and cause undue disruption. Any disruption in the collection of funds as currently implemented would adversely (and perhaps irreparably) affect the Debtors' ability to maximize estate value. Moreover, such a disruption would be wholly unnecessary because the Cash Management System provides a valuable and efficient means for the Debtors to address their cash management requirements; and all of the Debtor Bank Accounts, to the best of Debtors' knowledge, are held at financially stable institutions insured in the United States by the Federal Deposit Insurance Corporation ("FDIC"). For the aforementioned reasons, maintaining the existing Cash Management System without disruption is in the best interests of the Debtors, their estates, and all interested parties. Accordingly, the Debtors request that this Court allow them to maintain and continue to use the Cash Management System, including their existing Debtor Bank Accounts.

81.      Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

F.  **MOTION TO PAY PREPETITION DEBT**

82.      Pursuant to the Motion to Pay Prepetition Debt, the Debtors request authority to make four (4) pre-petition payments. Specifically, Debtors are requesting the authority to make payments on (1) the balance of $36,678.65 on their WEX fuel cards (the "**WEX Card**"); (2) outstanding wages in the amount of $8,930.16 to one former employee based in California; (3) credit card processing fees to Worldpay in the amount of $682; and (4) an insurance payment in the amount of $148,984.60.

83.      Debtors seek authority to make a payment on the WEX Card.  The WEX Card is the primary means for the Debtors to purchase fuel, necessary for a large portion of the Debtors'

business.11 Paying off this debt will open up credit to use the card during the upcoming Memorial Day Week, which is anticipated to generate significant revenue for the Debtors.

84.     Debtors seek authority to make a payment in the amount of $8,930.16 to a California-based Boat Sales Associate, whose last paycheck was due May 21, 2024.  Of this amount, the associate earned approximately $7,000 through commissions, all of which is under the wage priority cap. The associate was employed by Debtor Tommy's Rancho Cordova LLC. Under California law, there is a fine of $115 per day for nonpayment of an employee's wages. Fines will continue to accrue until the final wage payment is made.

85.     Debtors seek authority to make payment on credit card processing fees to the Debtors' credit card processor, Worldpay, in the amount of $682.  Without payment of the credit card processing fees, the Debtors cannot operate their credit card processing machines to accept payments.  Because the credit card processing services are connected among all the Debtors, delinquency in any credit card processing fees affects all of the Debtors.  Payment of the credit card processing fees is necessary for the Debtors to continue their businesses in the ordinary course.

86.     Lastly, Debtors seek authority to make an insurance payment in the amount of $148,984.60. The purpose of the insurance is blanket liability coverage for Debtor Walloon Lake Village Marina, LLC.  While in receivership, prior to the Petition Date, the receiver authorized this insurance payment though the payment never cleared.  Payment for this insurance coverage is necessary to protect Debtor Walloon Lake Village Marina, LLC while it operates in the ordinary course.

---

[11] The WEX Card is in the name of non-debtor MKB Holdings, LLC. Although not a debt held directly by the Debtors, the fuel purchased on the card results in proceeds that go directly toward the Debtors' businesses.

87.     I submit that payment of the pre-petition debts is an exercise of sound business judgment, as the Debtors' satisfaction of the pre-petition debt is necessary to avoid the obstacles to a smooth transition through these Cases and additional expenses such as interest, fees, and penalties. Without these payment, significant disruptions of the Debtors' operations of the types described above threaten to irreparably impair the Debtors' ability to maximize the value of the Debtors' estates for the benefit of creditors.

88.     Accordingly, on behalf of the Debtors, I respectfully submit that the Motion to Pay Prepetition Debt should be approved.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: May 23, 2024

    Dallas, Texas


                                                        _____*/s/ Monica S. Blacker*_____

                                                        **Monica S. Blacker**

                                                        **Proposed Chief Restructuring Officer**

                                                        Tommy's Fort Worth, LLC; Tommy's Fort Worth, LLC; Tommy's Lewisville, LLC; Tommy's Holding Company, LLC; Tommy's Grand Rapids, LLC; Tommy's Castaic, LLC;  High Country Watersports, LLC; Walloon Lake Village Marina, LLC; MKB Florida Holdings, LLC; Tommy's Detroit, LLC; Tommy's California Fresno, LLC; Tommy's Phoenix, LLC; Tommy's Las Vegas, LLC; Tommy's Chattanooga, LLC; Tommy's California Ventura, LLC; Tommy's Rancho Cordova, LLC; Tommy's Stockton, LLC; and Tommy's Knoxville, LLC