Liz Boydston (SBN 24053684)
Alexandria Rahn (SBN 24110246)
GUTNICKI LLP
10440 N. Central Expressway, Suite 800
Dallas, Texas 75231
Telephone: (469) 895-4413
Facsimile: (469) 895-4413
lboydston@gutnicki.com
arahn@gutnicki.com

Max Schlan (*Pro Hac Vice* Pending)
Ren-Ann Wang (*Pro Hac Vice* Pending)
GUTNICKI LLP
45 Rockefeller Plaza, Suite 2000
New York, New York 10111
Telephone: (646) 825-2330
Facsimile: (646) 825-2330
mschlan@gutnicki.com
rwang@gutnicki.com

*Proposed Counsel to the Debtors and
Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

### FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TOMMY'S FORT WORTH, LLC, *et al.*,[1] | ) | Case No. 24-90000-11 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

### SUPPLEMENTAL DECLARATION OF MONICA S. BLACKER
### IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST-DAY PLEADINGS

I, Monica S. Blacker, hereby declare under penalty of perjury:

1.     I am the Chief Restructuring Officer ("**CRO**") of Debtor Tommy's Fort Worth, LLC

and sixteen (16) of its affiliated Debtors: Tommy's Fort Worth, LLC; Tommy's Lewisville, LLC;

Tommy's Holding Company, LLC; Tommy's Grand Rapids, LLC; Tommy's Castaic, LLC;  High

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Tommy's Fort Worth, LLC (3473); Tommy's Holding Company, LLC (2662); Tommy's Grand Rapids, LLC (9224); Tommy's Castaic, LLC (7501); Tommy's Lewisville, LLC (4750); High Country Watersports, LLC (6160); Walloon Lake Village Marina, LLC (0277); MKB Florida Holdings, LLC (5698); Tommy's Detroit, LLC (5242); Tommy's California Fresno, LLC (8597); Tommy's Phoenix, LLC (3036); Tommy's Las Vegas, LLC (7721); Tommy's Chattanooga, LLC (0839); Tommy's California Ventura, LLC (5149); Tommy's Rancho Cordova, LLC (1070); Tommy's Stockton, LLC (1338); and Tommy's Knoxville, LLC (8052).

Country Watersports, LLC; Walloon Lake Village Marina, LLC; MKB Florida Holdings, LLC; Tommy's Detroit, LLC; Tommy's California Fresno, LLC; Tommy's Phoenix, LLC; Tommy's Las Vegas, LLC; Tommy's Chattanooga, LLC; Tommy's California Ventura, LLC; Tommy's Rancho Cordova, LLC; Tommy's Stockton, LLC; and Tommy's Knoxville, LLC    (collectively, the "**Debtors**" or "**Tommy's**" or the "**Company**") in the above-captioned chapter 11 cases (the "**Cases**").

2.        In addition to my role as CRO of the Debtors, I am a Partner with Force 10 Partners ("**Force 10**"), where I provide broad restructuring, crisis management, and financial advisory services across a wide spectrum of distressed situations. I was hired by the Debtors on May 18, 2024. Based on the limited time available to both myself and my support team, we have begun to develop an understanding and familiarity with the business and are developing a familiarity of the financial condition of the Debtors. As CRO, I am authorized to make this supplemental declaration (this "**Supplemental Declaration**") on behalf of the Debtors. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' employees, agents, attorneys, and advisors, the accuracy and completeness of which information I relied upon to provide this Supplemental Declaration.

3.        I submit this Supplemental Declaration in support of: (a) the Debtors' voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") filed on May 20, 2024 (the "Petition Date") in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "**Court**"); and (b) the relief that the Debtors have requested from the Court pursuant to the motions and pleadings (collectively, the "**First Day Pleadings**").

4.     The Court continued the hearing on some of the First Day Pleadings, which are listed below. Moreover, contemporaneously herewith, the Debtors have filed the following additional First Day Pleadings:

a.  Continuation of Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Setting a Second Interim Hearing, (V) Setting a Final Hearing; and (VI) Granting Related Relief [Docket No. 12; Filed 5/22/24] (the "**Cash Collateral Motion**");

b.  Continuation of Debtors' Emergency Motion for Entry of an Order Authorizing Debtors to Pay Certain Prepetition Debt [Docket No. 14; Filed 5/22/24] (the "**Motion to Pay Prepetition Debt**");

c.  Emergency Motion of Debtors for Order (I) Authorizing Continuation of, and Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with, Various Insurance Policies, (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto, (III) Preventing Insurance Companies from Giving any Notice of Termination or Otherwise Modifying any Insurance Policy Without Obtaining Relief from the Automatic Stay, and (IV) Authorizing the Debtors to Continue to Honor Premium Financing Obligations [Docket No. 49; Filed 5/24/24] (the "**Insurance Motion**");

d.  Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service, (II) Approving the Debtors' Proposed Adequate Assurance of Payment for Post-petition Services, and (III) Establishing Procedures for Resolving Requests for Additional Adequate Assurance of Payment [Docket No. 50; Filed 5/24/24] (the "**Utilities Motion**");

e.  Debtors' Emergency Motion for Entry of an Order Establishing Certain Notice, Case Management, and Administrative Procedures as well as Granting Related Relief [Docket No. 57; Filed 5/27/24] (the "**Omnibus Hearing Motion**");

f.  Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Pay Prepetition Taxes and Fees; and (ii) Granting Related Relief [Docket No. 59] (the "**Tax Motion**"); and

g.  Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing Payment of (I) Certain Prepetition Workforce Claims, Including Wages, Salaries, and Other Compensation, (ii) Certain Employee Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis, (iii) Reimbursement to Employees for Prepetition Expenses, (iv) Withholding and Payroll Related Taxes (v) Worker's

Compensation Obligations, and (vi) Granting Related Relief [Docket No. 61] (the "**Wages Motion**").

5.      I am familiar with each of the original First Day Pleadings and the additional First Day Pleadings being heard on May 28, 2024. Absent the relief requested in the First Day Pleadings, I believe that the Debtors would suffer immediate and irreparable harm that would jeopardize their ability to continue their business operations and consummate a value-maximizing sale transaction. I further believe that the relief sought in the First Day Pleadings is critical to the Debtors' efforts to transition into chapter 11 efficiently and minimize disruptions to their business operations, thereby permitting the Debtors to preserve and maximize value while pursuing a section 363 sale and chapter 11 plan process. Finally, I believe that the First Day Pleadings reflect the thorough and targeted analyses of the Debtors' management team and their professional advisors, and capture relief that is critical to the success of these proceedings.

6.      References to the Bankruptcy Code, the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel or from my personal experience in other restructurings. If called upon to testify, I would testify competently to the facts set forth in this Supplemental Declaration.

## I.      GENERAL BACKGROUND OF TOMMY'S

7.      Tommy's is a high-octane water-sports-enthusiast brand known as "Tommy's Boats" that began in 2012 in Colorado. Today, Tommy's Boats is the largest Ski & Wake dealer globally. Currently consisting of fourteen (14) dealerships plus five (5) additional on-water rental programs operating in Texas, Colorado, Michigan, Arizona, California, Florida, Nevada, and Tennessee. Tommy's supplies a full suite of boat repair services, boat rental services, on-the-water fueling and docking services, retail sales of super-premium ski and wake boats, luxury cruisers, fishing boats, pontoons, flightboards, and retail goods & apparel at Tommy's Pro Shops. Tommy's

is and always has been dedicated to bringing the absolute best products and services to its loyal customers.

### A. THE BUSINESS HISTORICALLY

8.      The Debtors' business—water sports and boats—is seasonal, with spring boat shows bringing deposits and April through June being the busiest three-month season of the year in the boating industry. For example, at the Novi boat show the weekend of March 15-17, 2024, Tommy's had peak success securing nineteen (19) deposits for new luxury boats, in addition to generating $1.4 million in revenue from servicing boats and general boat sales.

9.      The Debtors' business generates revenue from four primary revenue streams, and the average percentage of total revenue in 2023 ($190,246,504) generated from each stream is set forth below:

| Boat Sales | Service/Repair | Pro Shop | Waterfront (rentals & fueling) |
|---|---|---|---|
| 84% | 12% | 3% | 2% |
| $158,987,459 | $23,540,142 | $4,765,651 | $2,953,252 |

The average percentage of gross margin from May through August generated from each stream is set forth below:

| Boat Sales | Service/Repair | Pro Shop | Waterfront (rentals & fueling) |
|---|---|---|---|
| 68% | 18% | 6% | 7% |

10.      Boat sales make up approximately 82 percent of the Debtors' annual revenue. The majority of Debtors' sales are brand-new luxury watercraft from two original equipment manufacturers (OEM) and three brands: Tahoe, Malibu, and Axis. Axis is a Malibu-manufactured brand intended to be more entry market than luxury market. As of the Petition Date, the Debtors' inventory for brand new luxury watercraft is $68 million (cost) and 658 units. The Debtors historically have been and continue to be the largest dealer nationally for OEM Malibu Boats. The

Debtors also sell pre-owned watercraft, however pre-owned watercraft sales make up less eighteen (18) percent of the Debtors' annual revenue.

11.     Year to the Petition Date, the Debtors' boat sales have cashiered $42.3m in Sales Revenue at an estimated 17 percent gross margin.

12.     Service and repair work accounts for 18 percent of the Debtors' margin annually. Each of the  fourteen (14) Tommy's dealerships do service work for its customer base. Services range from simple winterizing and summerizing and oil changes to engine replacements, center console replacements, and exterior Gel/Paint repairs.

13.     Year to the Petition Date the Debtors' boat service have cashiered $7.6 million in Service Revenue at 34.4% gross margin.

14.     The Debtors brought their initial First Day Motions seeking to capture the expected Memorial Day boating revenues historical to the Debtors' seasonal business. The below table sets forth the 2021 through 2023 Memorial Day Week revenues by revenue line:

|  | Boat Sales | Service | ProShop | Waterfront | Total Sales |
|---|---|---|---|---|---|
| 2021 | 2,799,365.57 | 164,006.04 | $ 124,630.59 | $   46,661.54 | 3,136,684.74 |
| 2022 | 2,038,449.88 | 339,501.43 | $ 148,096.96 | $   64,022.91 | 2,592,093.18 |
| 2023 | 3,608,332.00 | 249,500.04 | $ 125,324.35 | $   55,967.56 | 4,041,146.95 |
|  | 8,446,147.45 | 753,007.51 | 398,051.90 | 166,652.01 | 9,769,924.87 |

**B.  2024 MEMORIAL WEEK SALES**

15.     With the Court's approval of the use of cash collateral at the hearing on May 23, 2024, the Debtors were able to achieve a productive and profitable Memorial Week.

16.     The revenue booked for Week 1 through today, May 28, 2024 is $1,953,937, and the Debtors have received cash from those sales in the amount of $967,138. *See* Exhibit A Budget attached hereto.

17.     The Debtors' Memorial Week sales will bring in further cash as banks were closed through yesterday.

18.     Attached hereto as Exhibit B is a table of boat sales, showing the New Boat Sales, Pre-Owned Boat Sales, Pre-Petition but not yet closed Boat Sales, and the expected close date for each Boat Sale and the date the Debtors expect to receive full payment for each Boat Sale. *See* Exhibit B Boat Sales, attached hereto.

19.     Nevertheless, the Debtors believe our sales numbers over the Memorial Week for Colorado have been impacted by the News Report that was done by Denver 7 about customer deposits and that included a letter sent by the Receiver informing customers that they "may not" get their deposits back.[2]  We are working on closing the following boat deals in Colorado that are under deposit on Model Year 2023 units:

| Loc | Customer | Sales Rep | Boat Sale Serial No. | Sale Status | Deposit Date | Expected Sell Price |
|---|---|---|---|---|---|---|
| CO | JA | MH | Sale:234731 - 2023 Malibu M240(59XBB2739PL009753), 2023 Malibu M240(MB2V9103I223) | Deposit | 4/24/2024 | $221,991.42 |
| CO | DH | BL | Sale:246871 - 2023 Malibu M220(59XBB2629PL003802), 2023 Malibu M220(MB2W3300E323) | Deposit | 4/25/2024 | $173,946.55 |
| CO | PW | MH | Sale:247269 - 2023 SUZUKI DF250SSTL5(25004F340673), 2023 Phoenix Trailers S26-56TTB(5VWBT2623PT000478), 2023 Tahoe 2585 Cascade Quad Lounger(DVN55293C323) | Deposit | 5/3/2024 | $72,720.74 |
| CO | JP | MH | Sale:247394 - 2023 Malibu 24 MXZ(59XBB2624PL003108), | Deposit | 5/13/2024 | $174,885.57 |

---

[2]  https://www.denver7.com/news/investigations/tommys-boats-files-for-bankruptcy-protection-leaves-customers-in-limbo. A pdf printout of this article is attached hereto as **Exhibit 1**.

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | 2023 Malibu 24 MXZ(MB2L2579C323) | | | |
| CO | EH | BL | Sale:247734 - 2023 Malibu 22 LSV(MB2K2571C323), 2023 Malibu 22 LSV(59XBB262XPL003100) | Deposit | 5/17/2024 | $140,984.48 |
| CO | CF | BL | Sale:247853 - 2023 Malibu 23 LSV(59XBB262XPL004179), 2023 Malibu 23 LSV(MB2S3689E323) | Deposit | 5/24/2024 | $149,930.53 |
| CO | CS | MH | Sale:247910 - 2023 Axis A20(AWRB3831F323), 2023 Axis A20(59XBB2325PL004319) | Deposit | 5/24/2024 | $87,749.48 |
| | | | | **Total** | | $1,022,208.77 |

## C. MANAGEMENT AND BUSINESS OPERATIONS OF THE DEBTORS

20.    Prepetition, non-Debtor MKB Holdings, Inc. dba Simplified Investments ("**MKB**") provided 100% of all management services to the Debtors including administrative, payroll and back-office services. Pre-2024, the Debtors funded MKB's management services in the ordinary course through management fees charged to each dealership at 2% of sales, but as of 2024, these management services have been funded as a pass-through expense solely for the wages and actual expenses for the provision of these management and administrative services provided to the Debtors. No prepetition expenses are owed to MKB or to any MKB employee.

21.    As of the Petition Date, certain of the MKB employees were hired by Tommy's of Grand Rapids LLC. Services performed by these employees include:

- Human Resources

    o  Performance Management

    o  Employee onboarding and offboarding

    o  Benefits administration

    o  Employee relations

- Accounting and Finance Support

  o  Payroll Processing

  o  Financial reporting and analysis

  o  Cash management, including Accounts Payable

  o  Sales Tax filings

- Information Technology

  o  DMS System (Dealership Advantage) and its administration

  o  Security system management

  o  Communication system administration and support, including for email and phone systems

- Dealership Operations

  o  Sales coordination and approval

  o  Customer Finance and Insurance services

  o  Purchasing, including boats, parts, pro shop items, and other soft goods

  o  Logistics coordination

  o  Marketing & Public Relations services

22.    In total 30 employees who prove the above services were employed by Debtor Tommy's Grand Rapids, LLC on the Petition Date. The total payroll (none of which is pre-petition) is $57,603.94. Because none of these employees is due prepetition wages, they are not included in the Wage Motion, but their pay is included in the Cash Collateral Budget, Exhibit A.

## II.    CONTINUED AND OTHER FIRST DAY PLEADINGS

23.    Contemporaneously with the filing of their chapter 11 petitions, the Debtors sought approval of the First Day Pleadings and related orders (the "**Proposed Orders**") and have filed

other First Day Pleadings and related Proposed Orders. The Debtors respectfully request that the Court enter each of the Proposed Orders as they are critical to the Debtors' success in these Cases.

24.     I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief. Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enabling the Debtors to operate with minimum interruptions and disruptions to customers and employees; and (b) constitutes a critical element in the Debtors' ability to successfully maximize value for the benefit of their estates.

A.   **THE CASH COLLATERAL MOTION**

25.     Pursuant to the Cash Collateral Motion the Debtors seek entry of an Interim Order (i) authorizing the Debtors to use the Cash Collateral of M&T Bank ("**M&T**"), (ii) granting the M&T adequate protection upon the terms set forth in the Interim Order and in any final orders, (iii) modifying the automatic stay, and (iv) scheduling a second interim and final hearing on the Motion and approving the form and manner of notice thereof, and granting such other and further relief as the Court deems just and appropriate.

26.     On May 18, 2023, the Debtors, as borrowers, entered into that certain *Loan Agreement (Floor Plan Financing)* (as amended, restated, modified, or supplemented from time to time, the "**Floor Plan Agreement**") with M&T.  Pursuant to the Prepetition Floor Plan Agreement, and the associated *Variable Rate Demand Note (with Variable Rate Rider)* (the "**Prepetition Demand Note**") and *Revolving Line Note (with Variable Rate Rider)* (the "**Prepetition Revolving Note**", together with the Prepetition Demand Note, the "**Notes**" and together with the Floor Plan Agreement, the "**Floor Plan Loan Documents**"), M&T extended to the Debtors floor plan financing, in addition to a revolving line, in the aggregate amount of $115,000,000.

27.     Under the Floor Plan Agreement, M&T, pursuant to the Prepetition Demand Note, provided the Debtors with financing in the maximum aggregate amount of up to $110,000,000. Availability under the Prepetition Demand Note is allocated among certain percentages of the Debtors' inventory; specifically, new, used, and marine inventory.

28.     Pursuant to the Prepetition Demand Note, interest is set at Daily Simple SOFR, although in the event of default, and at M&T's discretion, interest may be set at the Base Rate, without waiving M&T's right to institute the Default Rate. Payment by the Debtors to M&T is to be remitted upon the sale of any item of Floor Loan Collateral (as defined herein) that consists of marine inventory upon Debtors' immediate receipt of the proceeds, or within 10-days from the date of the sale of such marine inventory. Currently, the Prepetition Demand Note is accruing interest at the Default Rate.

29.     Additionally, M&T, pursuant to Prepetition Revolving Note, provided the Debtors with revolving availability in the maximum aggregate amount of up to $5,000,000. The Prepetition Revolving Note is a discretionary facility, with M&T, at its discretion, able to modify, restrict, suspend or terminate the facility at any time and for any reason. Similar to the Prepetition Demand Note, interest on the Prepetition Revolving Note is set at Daily Simple SOFR, although in the event of default, and at M&T's discretion, interest may be set at the Base Rate, without waiving M&T's right to institute the Default Rate.

30.     The obligations under the Notes (the "**Floor Plan Loan Obligations**") are secured by a first priority lien on substantially all of the Debtors' personal property and fixtures including, without limitation, the Debtors' accounts (including receivables), deposit and security accounts, all cash and cash equivalents, investment property, goods, equipment, inventory, general intangibles, chattel paper, instruments, payment intangibles, books and records related to the

foregoing, in addition to all substitutions, accessions, products and proceeds of any kind related to the foregoing (the "**Floor Loan Plan Collateral**").

31.     As of the Petition Date, the Debtors estimate that, in the aggregate, approximately $105,687,454 in Floor Plan Loan Obligations are outstanding.

32.     The Debtors have determined that absent the use of Cash Collateral, the Debtors will be unable to operate their businesses during the Cases, irreparably harming the Debtors' estates and creditors. The denial of the use of Cash Collateral would directly result in the interruption of business operations. Further, the Debtors' business operations would immediately suffer the loss of key employees and vendors because the Debtors would be unable to demonstrate financial stability. Therefore, the Debtors' immediate access to Cash Collateral is necessary to preserve and maximize the value for the benefit of all parties in interest, including customers and employees.

33.     In exchange for the use of Cash Collateral, the Debtors have agreed, and the Interim Order provides, adequate protection in the form of, among other things, adequate protection liens, superpriority claims, and adequate protection payments to protect M&T against any diminution in the value of interest interests in the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral, and the imposition of the automatic stay.

34.     Access to existing Cash Collateral on an interim basis will provide the Debtors with the liquidity necessary to ensure that the Debtors have sufficient working capital and liquidity to operate their businesses and thus preserve and maintain the value of the Debtors' estates. Without access to such liquidity, the Debtors will face irreparable harm.

35.     M&T has not yet consented to the Debtors' use of Cash Collateral on the terms set forth in the Interim Order.  The Debtors will continue to negotiate with the M&T in an attempt to

achieve consent prior to the First Day Hearing. Notwithstanding consent from M&T, the proposed adequate protection included in the Interim Order provides the appropriate level of adequate protection in the form of, among other things, the Replacement Liens, the Superpriority Administrative Claim, adequate protection payments, including fees and expenses, and reporting requirements. The Debtors submit that the proposed adequate protection is appropriate and sufficient to protect  M&T from any diminution in value of the Floor Plan Loan Collateral.

36.     The Cash Collateral will be used for funding business operations and allowing the Debtors to transition into the Cases. Immediate access to this liquidity will permit the Debtors to fund necessary payroll, pay postpetition vendors, and otherwise continue business in the ordinary course on one of the busiest weekends in the boating industry. As detailed herein, one reason underlying the filing of these Cases is to stabilize operations. If Cash Collateral is not available, the Debtors will be unable to make payroll, and thus will dissipate value to the detriment of M&T and other stakeholders, including employees. If the limited amount of Cash Collateral is not made available on an interim basis, the Debtors will be irreparably harmed by the loss of revenues and reputational damage during this most important weekend. Thus, the use of Cash Collateral will protect M&T's security interests by preserving the value of the Floor Plan Collateral throughout the Cases.

37.     Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Collateral Motion should be approved.

**B.  THE INSURANCE MOTION**

38.     Pursuant to the Insurance Motion, the Debtors seek entry of an order (i) authorizing, but not directing, the Debtors to continue and, to the extent necessary, renew prepetition insurance policies in the ordinary course of business and pay prepetition obligation in respect thereof, (ii) authorizing banks and other financial institutions at which the Debtors hold accounts (collectively

the "Banks") to honor and process check and electronic transfer requests related to the foregoing, (iii) preventing insurance companies from giving any notice of termination or otherwise modifying or cancelling any insurance policies without first obtaining relief from the automatic stay imposed by Bankruptcy Code § 362, and (iv) authorizing, but not directing, the Debtors to continue to honor premium financing and brokerage obligations.

39.      In the ordinary course of their business, the Debtors maintain approximately thirteen (13) insurance policies with various insurance providers (collectively, the "**Insurers**") that provide coverage for, among other things, the Debtors' marine general liability, employee benefits liability, marina operators' legal liability, protection and indemnity, automobile liability, workers' compensation liability, environmental liability, automobile liability, and property liability (each, an "**Insurance Policy**" and collectively, the "**Insurance Policies**"), as summarized in Exhibit B annexed to the Insurance Motion.

40.      The Debtors incur a total of approximately $1.82 million in premiums on an annual basis under the terms of their existing Insurance Policies as well as other obligations, and other related fees and costs (collectively, the "**Insurance Obligations**"). In addition, the Debtors may make retroactive adjustments in the ordinary course of business with respect to one or more of the Insurance Policies, as applicable. The Debtors seek authority to pay premiums under the Insurance Policies based on a fixed amount established and billed by each Insurance Provider. Depending on the particular Insurance Policy, premiums are primarily (a) prepaid in full at a policy's inception or renewal; (b) financed through a premium financing company; or (c) paid in installments to a broker over the term of the policy.

41.      In the ordinary course of business, the Debtors finance the premiums on certain policies pursuant to one premium financing agreement ("**PFA**") with First Insurance Funding

("**First Insurance**"). The Debtors entered into the PFA with First Insurance in order to finance insurance premiums for certain policies as detailed in Exhibit B, including marine general liability, employee benefits liability, marina operators' legal liability, protection and indemnity, automobile liability, workers' compensation liability, environmental liability, automobile liability, and property liability. Beginning May 1, 2024, there are unpaid premiums.

42.     If the Debtors are unable to continue making payments on the remaining PFA, First Insurance may be permitted to terminate the PFA. The Debtors would then be required to obtain replacement insurance on an expedited basis and at a significant cost to the estates. If the Debtors are required to obtain replacement insurance and to pay a lump-sum premium for such Insurance Policy in advance, this payment would likely be greater than what the Debtors currently pay. Even if First Insurance were not permitted to terminate the PFA, any interruption of payment would have a severe, adverse effect on the Debtors' ability to finance premiums for future policies.

43.     It is critical that the Debtors maintain insurance coverage and preserve additional liquidity by financing their insurance premiums; thus, the Debtors believe it is in the best interest of their estates to receive Court approval to honor their obligations under the PFA and, as necessary, renew or enter into new such agreements.

44.     The Debtors use R.A. Belter Insurance Agency, Inc. (the "**Broker**") to assist them with the procurement and negotiation of certain Insurance Policies. The Broker assists the Debtors in obtaining comprehensive insurance coverage for their operations, analyzing the market for available coverage and negotiating policy terms, provisions, and premiums. The Broker also provides ongoing support through the policy periods. As of the Petition Date, the Debtors do not believe that they owe any amounts to the Broker on account of fees, commissions, or any other pre-petition obligations beyond the commission amounts already contained in the next PFA installment

that will come due in the ordinary course of the Debtors' business. Out of an abundance of caution, however, the Debtors seek authority to honor any amounts owed to the Broker to ensure uninterrupted coverage under their Insurance Policies.

45.     The coverage provided under the Insurance Policies is essential for preserving the value of the Debtors' assets and, such coverage is required by various regulations, laws, and contracts that govern the Debtors' business operations. If the Debtors fail to perform their obligations under the Insurance Policies, their coverage thereunder could be voided. Such a disruption of the Debtors' insurance coverage could expose the Debtors to serious risks, including but not limited to: (i) direct liability for the payment of claims that otherwise would have been payable by the Insurers; (ii) material costs and other losses that otherwise would have been reimbursed by the Insurers under the Insurance Policies; (iii) the loss of good standing certification in jurisdictions that require the Debtors to maintain certain levels of insurance coverage; (iv) the inability to obtain similar types of insurance coverage; and (v) higher costs for re-establishing lapsed policies or obtaining new insurance coverage. I believe that any or all of these consequences could cause serious harm to the Debtors' business. Granting the relief requested in the Insurance Motion will enhance the likelihood of the Debtors' successful rehabilitation or sale process.

46.     Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

### C.  THE UTILITIES MOTION

47.     Pursuant to the Utilities Motion, the Debtors seek entry of an order (i) prohibiting Utility Providers (as defined below) from: (a) altering, refusing, or discontinuing utility services to, or discriminating against, the Debtors on account of any outstanding amounts for services rendered prepetition, or (b) drawing upon any existing security deposit, surety bond, or other form of security to secure future payment for utility services; (ii) determining that adequate assurance

16

of payment for postpetition utility services has been furnished to the Utility Providers providing services to the Debtors; and (iii) establishing procedures for resolving future requests by any Utility Provider for additional adequate assurance of payment.

48.    In conjunction with its day-to-day operations, the Debtors receive traditional utility services from fifty-nine (59) utility providers (each, a "**Utility Provider**" and collectively, the "**Utility Providers**") for, among other things, electricity, internet, telephone, trash, water, and similar utility products and services (collectively, the "**Utility Services**").

49.    The Debtors paid an average of approximately $80,031.61 per month on account of all Utility Services. As "adequate assurance," the Debtors propose to segregate on their books and records, within twenty (20) days of the Petition Date, an amount equal to the estimated cost for two weeks of Utility Services (i.e., approximately $40,700.00), calculated based on the historical data for 2023 - 2024 (the "**Adequate Assurance Deposit**") into one segregated bank account designated for the Adequate Assurance Deposit (the "**Adequate Assurance Deposit Account**") for the benefit of all Utility Providers.

50.    I believe that uninterrupted Utility Services are vital to the Debtors' continued business operations and, consequently, to the success of these Cases. Accordingly, the relief requested herein is necessary and in the best interests of the Debtors, their estates, and their creditors. Such relief ensures that the Debtors' business operations will not be disrupted and provides Utility Companies and the Debtors with an orderly and fair procedure for determining "adequate assurance."

51.    Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

### D.  THE OMNIBUS HEARING MOTION

52.     Pursuant to the Omnibus Hearing Motion, the Debtors request the of an Order establishing the Case Management Procedure for application to these Cases and any adversary proceedings filed in connection with these Cases.

53.     Consistent with the Complex Chapter 11 Cases Procedure Order and the designation of the Chapter 11 Cases as complex chapter 11 cases, entry of an order establishing the proposed Case Management Procedures is reasonable and appropriate to promote judicial economy and to enhance procedural predictability within the context of the Chapter 11 Cases.

54.     The Case Management Procedures set forth in the Proposed Order establish, among other things, (i) omnibus hearing dates and times for considering all motions and other matters in the Chapter 11 Cases; (ii) an official service list; and (iii) other administrative procedures to facilitate the efficient handling of the Chapter 11 Cases and any adversary proceedings filed in connection with the Chapter 11 Cases. 11. I believe, if approved, the Case Management Procedures will minimize costs to the Debtors' estates and reduce the burden on the Court's docket and, to that end, are an appropriate means to protect and maximize the value of the Debtors' estates.

55.     Accordingly, on behalf of the Debtors, I respectfully submit the Omnibus Hearing Motion should be approved.

### E.  THE TAX MOTION

56.     Pursuant to the Tax Motion, the Debtors seek entry of an order: (i) authorizing the Debtors to pay prepetition Taxes and Related Obligations (as defined below); and (ii) authorizing the Banks to honor and process checks and transfers related to such prepetition taxes and related obligations. In the ordinary course of business, the Debtors are subject to a variety of sales, use, franchise, business-related taxes and charges, regulatory fees, assessments and related obligations (collectively, the "**Taxes and Fees**").  The Debtors pay the Taxes and Fees to various federal,

state, and local taxing, regulatory, and governmental authorities (collectively, the "**Taxing Authorities**") through checks and electronic funds transfers that are processed through their banks. A schedule identifying the Taxing Authorities is attached to the Tax Motion as **Exhibit B**.

57.    The Taxes and Fees set forth below represent all outstanding Taxes and Fees during the Debtors prepetition period. While the relief sought by the Debtors in this Motion authorizes the Debtors to pay these prepetition Taxes and Fees, the Debtors do not anticipate paying all such Taxes and Fees initially.   Certain Taxes and Fees require immediate payment.   For example, in Texas, the Debtors owe approximately $220,000 in sales tax and registration fees for boat sales. In Texas, to properly transfer title of the boats, the Debtors must timely pay the sales tax and registration fees.   Such payment, in the Debtors' judgment takes priority over the payment of other such Taxes and Fees.

58.    Additionally, while, again, the Debtors are authorized to pay the Taxes and Fees, any such payments require the use of cash collateral from M&T Bank ("**M&T**").   Therefore, the Debtors will only make payment on such Taxes and Fees with M&T's consent or order of the Court granting use of cash collateral for such payment.

59.    Some of the Debtors' most significant Taxes and Fees include:

   i.    *Sales and Use Taxes.*   In the ordinary course of their business, the Debtors incur certain use taxes when they purchase materials and services from a vendor that is not registered to collect sales taxes for the state where the property is delivered or the services are provided (the "**Use Taxes**").   In these circumstances, the Debtors, as purchasers, must self-assess and pay the Use Taxes, when due, to the appropriate Taxing Authorities.   The Debtors' sales are ordinarily tax exempt, however, the Debtors occasionally incur and pay state and local sales and use taxes as the result of their intermittent sales of equipment.   Additionally, in the ordinary course of their business, the Debtors incur certain sale taxes when they sell goods and services (the "**Sales Taxes**," and together with the Use Taxes, the "**Sales and Use Taxes**").   Many of the Sales and Use Taxes are considered by Taxing Authorities to be funds that are held in trust for the benefit of the Taxing Authorities.   The Debtors have accrued approximately $4,838,500 in Sales and Use Taxes as of the Petition Date.

ii.  *Income Taxes*.  The Debtors incur federal and state taxes on the income they earn (the "**Income Taxes**"), and the Debtors pay the Income Taxes annually if due. The Debtors have accrued approximately $36,700 in Income Taxes as of the Petition Date.

iii.  *Property Taxes*.  The Debtors are required to pay property taxes in the ordinary course of operating their business (the "**Property Taxes**").  The Debtors typically pay the Property Taxes annually.  The Debtors have accrued approximately $221,250 in Property Taxes as of the Petition Date.

iv.  *Other Taxes and Fees*.  The Debtors also pay a variety of taxes and fees required to operate their business in certain states, including business and occupation taxes, commercial activity, and other miscellaneous corporate taxes (collectively, the "**Other Taxes and Fees**").  The Debtors pay the Other Taxes and Fees to certain Taxing Authorities either quarterly or annually depending on their nature.  The Debtors have accrued approximately $1,000 in Other Taxes and Fees as of the Petition Date.

v.  *Audits*.  From time to time, the Debtors are subject to audits on account of tax returns and/or tax obligations for prior obligation periods (collectively, the "Audits").  Audits may result in additional prepetition Taxes and Fees being assessed against the Debtors (such additional Taxes and Fees, "**Assessments**").  The Debtors seek authority, but not direction, to pay Taxes and Fees on account of the Audits as they arise in the ordinary course of the Debtors' business, including as a result of any settlements of issues addressed in an Audit.[3]

60.  The Debtors estimate that the pre-petition amount owing to the Taxing Authorities in the aggregate is approximately $5,095,650.

61.  I believe that continued payment to the Taxes and Fees on their normal due dates as well as any past due Taxes and Fees will ultimately preserve the resources of the Debtors' estates, thereby promoting their prospects for a successful chapter 11 process. Any failure by the Debtors to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways, including, but not limited to: (a) the Taxing Authorities may initiate Audits of the Debtors, which would unnecessarily divert the Debtors' attention from the restructuring process;

---

[3] Nothing in this Motion, or any related order, constitutes or should be construed as an admission of liability by the Debtors with respect to any Audit or Assessment. The Debtors expressly reserve all rights with respect to any Audit and the right to contest any Assessments claimed to be due as a result of any Audit.

(b) the Taxing Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and/or pursue other remedies that will harm the Debtors' estates; and (c) in certain instances, the Debtors' principals could be subject to claims of personal liability, which would distract those key individuals from their duties related to the Debtors' restructuring. Taxes and Fees not paid on the due date as required by law may result in fines and penalties, the accrual of interest, or both. The Debtors also collect and hold certain outstanding tax liabilities in trust for the benefit of certain applicable Taxing Authorities, and these funds may not constitute property of the Debtors' estates.

62.     Accordingly, on behalf of the Debtors, I respectfully submit the Tax Motion should be approved and the Debtors be authorized to pay, in their reasonable discretion, the Taxes and Fees (including Assessments) in the ordinary course of business as they come due.

### F.   THE WAGES MOTION

63.     Pursuant to the Wages Motion, the Debtors request entry of interim and final orders authorizing, but not directing, the Debtors to (i) pay accrued prepetition wages, salaries, and other compensation to their Workforce; (ii) honor any prepetition obligations in respect of, and continue in the ordinary course of business until further notice (but not assume), certain of the Debtors' paid time off policies, severance practices, and employee benefit plans and programs; (iii) reimburse Employees for prepetition expenses that Employees incurred on behalf of the Debtors in the ordinary course of business on a prepetition basis; (iv) pay all related prepetition payroll taxes and other deductions, including union benefits; (v) honor worker's compensation obligations and related obligations; and (vi) pay any prepetition claims of administrators and providers in the ordinary course of business to the extent that any of the foregoing programs are administered, insured, or paid through a third-party administrator or provider, all in accordance with prepetition practices, and as described in further detail in the Wages Motion.

64.     In connection with the operation of their businesses, the Debtors currently employ approximately: 279 employees consisting of 91 full-time, salary employees, 170 full-time, hourly employees, and 18 part-time, hourly employees (the "**Employees**" or "**Workforce**"). The Employees are employed at the Debtors' fourteen (14) Dealerships located throughout the United States (each a "**Dealership**" and collectively the "**Dealerships**").

65.     The Employees are critical to the Debtors' business, and their value cannot be overstated. The Debtors rely on the services of employed personnel to conduct their business operations, and the Debtors incur obligations to or on account of such Employees in the ordinary course of business. The Employees perform a wide variety of functions that support the Debtors' operations and will be critical to the administration of these Cases and to maximizing the value of the Debtors' estates. Their skills, knowledge, and understanding of the Debtors' operations are essential to preserving operational stability and efficiency during these Cases. Without the continued, uninterrupted services of the Employees, the Debtors' business operations will suffer immediate and irreparable harm.

66.     If the Debtors cannot assure their Employees that they will promptly pay prepetition Employee Obligations to the extent allowed under the Bankruptcy Code, and continue to honor, as applicable, the Employee Benefits Obligations, certain Employees will likely seek employment elsewhere. The loss of Employees at this critical juncture would have a material adverse impact on the Debtors' business and ability to maximize value through these Cases.

67.     The vast majority of the Employees rely exclusively on their compensation and benefits from the Debtors to pay their daily living expenses and support their families. Thus, the employees will be exposed to significant personal financial hardship if the Debtors are not

permitted to continue paying their compensation and providing benefits in the ordinary course. Consequently, the relief requested herein is necessary and appropriate.

68.     In the ordinary course of business, the Debtors incur payroll and other compensation obligations for their Workforce. The Debtors' Employees are paid in arrears on a biweekly basis for pay periods of fourteen (14) days. Immediately following each regular pay date, Employees are owed approximately one week of earned but unpaid compensation, and payroll obligations are funded by Debtors approximately one (1) day before each regular pay date.

69.     On average, per pay date, the Debtors' payroll obligations with respect to the Employees is approximately $570,000.00, plus applicable employer-paid payroll taxes of approximately $40,000.00 related to such earnings. The last payroll date before the Petition Date was approximately May 17, 2024, and the Debtors paid payroll obligations for work completed through May 11, 2024. The next payroll date will be May 31, 2024, and the Debtor's payroll obligations will include work completed from May 12, 2024 through May 25, 2024.

70.     The Debtors estimate that as of the Petition Date, approximately $522,000.00 has accrued and remains unpaid, which includes gross wages and compensation earned and employer-paid payroll taxes related to such earnings (the "**Employee Compensation Obligations**"). To the best of the Debtors' understanding, no Employee is owed more than $15,150.00 in accrued and unpaid general prepetition wages or salaries; thus, falling below the priority cap. If it is discovered an Employee is owed more than the priority cap, the Wages Motion only seeks to pay prepetition amounts owed up to the priority cap.[4]

---

[4] To the extent that any Employee is owed more than $15,150.00, the Debtors will seek the authority to pay such amounts by separate motion pursuant to Bankruptcy Code § 502.

71.     Additionally, In the ordinary course of business, the Debtors have typically maintained performance-based commission and bonus programs (the "**Commission**") for certain categories of Employees (collectively, the "**Commission Program(s)**"). The Commission Program is based on a percentage of Gross Profit on sales, plus discretionary extras to boost sales (the "**Commission**"). The Commissions earned are paid at the end of the next month. For instance, the Commissions due on May 31st are for sales made in April of 2024.

72.     Approximately 67 Employees are eligible to receive compensation under the Commission Programs. As of the Petition Date, the Debtors estimate that they owe $225,000.00 on account of the Commission Program available to eligible Employees. That amount includes $156,000 to be paid on the May 31st payroll, and the remainder is an estimate for what will be due at the end of June for Commissions earned in May up to the Petition Date.

73.     For those Employees who receive them, the Commissions earned under the Commission Programs are an important aspect of their overall compensation. Maintaining historical prepetition practices with regard to the Commission Programs is essential to ensuring that the Debtors can retain their Employees and continue to operate their business and maximize value through the duration of these Cases. Therefore, the Debtors seek authority, but not direction, to honor their obligations under the Commission Programs and to maintain the Commission Programs in the ordinary course of the Debtors' business.

74.     The Debtors seek authorization, but not direction, to pay any unpaid Employee Compensation Obligations and any obligations pursuant to the Commission Programs. In addition, the Debtors seek authority to cause any prepetition checks or electronic payment requests that were given in payment of Employee Compensation Obligations to be honored and to reissue any check

or electronic payment request that is not cleared by the applicable bank or other financial institution, to the extent necessary.

75.     The Debtors also request authorization to maintain all Employee Benefit Obligations. Together, the Debtors request authority that they be authorized, but not directed to (a) pay prepetition claims and honor obligation incurred or related to the Compensation Obligations, the Withholding Obligations, PTO, Holiday Pay, the Reimbursable Expense Obligations, the Employee Benefits Obligations, the 401(k) Plan, Workers' Compensation Claims, and all fees and costs incident to the foregoing (collectively the "**Employee Obligations**"), and (b) maintain, continue, and honor, in the ordinary course of business, PTO, and Holiday Pay policies, postpetition Reimbursable Expense Obligations, the Employee Benefits Plans, and the Workers' Compensation Claims (collectively, the "**Employee Plans and Programs**").

76.     To enable the Debtors to implement the relief requested, the Debtors also request that the Court authorize all applicable banks and financial institutions (collectively, the "**Banks**"), and BambooHR (together with the Banks, the "**Processors**"), to receive, process, honor, and pay all checks presented for payment and all electronic payment requests made by the Debtors relating to the Employee Obligations and the Employee Plans and Programs, whether such checks were presented or electronic-payment requests were submitted prior to or after the Petition Date.

77.     Accordingly, on behalf of the Debtors, I respectfully submit that the Wages Motion should be approved.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 28, 2024

      Dallas, Texas

                                                  */s/ Monica S. Blacker*

**Monica S. Blacker**
**Proposed Chief Restructuring Officer**
Tommy's Fort Worth, LLC; Tommy's Fort
Worth, LLC; Tommy's Lewisville, LLC;
Tommy's Holding Company, LLC;
Tommy's Grand Rapids, LLC; Tommy's
Castaic, LLC;  High Country Watersports,
LLC; Walloon Lake Village Marina, LLC;
MKB Florida Holdings, LLC; Tommy's
Detroit, LLC; Tommy's California Fresno,
LLC; Tommy's Phoenix, LLC; Tommy's
Las Vegas, LLC; Tommy's Chattanooga,
LLC; Tommy's California Ventura, LLC;
Tommy's Rancho Cordova, LLC; Tommy's
Stockton, LLC; and Tommy's Knoxville,
LLC