Liz Boydston (SBN 24053684)
Alexandria Rahn (SBN 24110246)
GUTNICKI LLP
10440 N. Central Expressway, Suite 800
Dallas, Texas 75231
Telephone: (469) 895-4413
Facsimile: (469) 895-4413
lboydston@gutnicki.com
arahn@gutnicki.com

Max Schlan (*Pro Hac Vice*)
Ren-Ann Wang (*Pro Hac Vice*)
GUTNICKI LLP
45 Rockefeller Plaza, Suite 2000
New York, New York 10111
Telephone: (646) 825-2330
Facsimile: (646) 825-2330
mschlan@gutnicki.com
rwang@gutnicki.com

*Proposed Counsel to Debtors and Debtors
in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TOMMY'S FORT WORTH, LLC, *et al.*,[1] | ) | Case No. 24-90000 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' EMERGENCY MOTION TO ENFORCE AUTOMATIC
STAY AND PUNITIVE DAMAGES FOR WILLFUL VIOLATIONS OF THE
AUTOMATIC STAY AGAINST MALIBU BOATS, INC. AND MALIBU BOATS, LLC**

**Emergency relief has been requested. Relief is requested not later than 2:30 p.m. (prevailing Central Time) on June 6, 2024.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing (if one is set) or file a written response prior to the earlier of (a) the start of the hearing (if one is set) and (b) the date by which the relief is requested (per the preceding paragraph). Otherwise, the Court may treat the pleading as unopposed and grant the relief requested. If a response is filed, you must file your response electronically at https://ecf.txnb.uscourts.gov/ prior to the**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Tommy's Fort Worth, LLC (3473); Tommy's Holding Company, LLC (2662); Tommy's Grand Rapids, LLC (9224); Tommy's Castaic, LLC (7501); Tommy's Lewisville, LLC (4750); High Country Watersports, LLC (6160); Walloon Lake Village Marina, LLC (0277); MKB Florida Holdings, LLC (5698); Tommy's Detroit, LLC (5242); Tommy's California Fresno, LLC (8597); Tommy's Phoenix, LLC (3036); Tommy's Las Vegas, LLC (7721); Tommy's Chattanooga, LLC (0839); Tommy's California Ventura, LLC (5149); Tommy's Rancho Cordova, LLC (1070); Tommy's Stockton, LLC (1338); and Tommy's Knoxville, LLC (8052).

**earlier of (a) the start of the hearing (if one is set) and (b) the date by which the relief is requested (per the preceding paragraph). If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk and filed on the docket prior to the earlier of (a) the start of the hearing (if one is set) and (b) the date by which the relief is requested (per the preceding paragraph).**

**A hearing will be conducted on this matter on June 6, 2024, at 2:30 p.m. (prevailing Central Time), in Room 204, U.S. Courthouse, 501 W. Tenth Street, Fort Worth, Texas 76102. Unless the presiding judge orders otherwise, you may participate in the hearing either in person or by WebEx videoconference or audioconference (subject to compliance with the Court's WebEx Hearing Instructions). For WebEx video participation/attendance, use the following link: https://us-courts.webex.com/meet/morris; Meeting Number 2309-445-3213. Click the settings icon in the upper right corner of your screen and enter your name under the personal information setting. For WebEx telephone only participation/attendance, use the following dial-in: 1.650.479.3207; Access Code 2309 445 3213. WebEx Hearing Instructions may be obtained at the following address: https://www.txnb.uscourts.gov/judgesinfo/hearing-dates/judge-morris-hearing-dates-0.**

The above captioned debtors and debtors in possession (collectively, the "**Debtors**") hereby submit this motion (this "**Motion**") (i) to enforce the automatic stay and (ii) for punitive and compensatory damages for willful violations of the automatic stay against Malibu Boats, Inc. and Malibu Boats, LLC (collectively, "**Malibu**"). In support of the Motion, the Debtors submit the *Declaration of Matthew Borisch in Support of Debtors' Emergency Motion to Enforce Automatic Stay and Punitive Damages for Willful Violations of the Automatic Stay Against Malibu Boats, Inc. and Malibu Boats, LLC* (the "**Borisch Declaration**"), filed contemporaneously with this Motion. Additionally, the Debtors respectfully state as follows:

**<u>JURISDICTION AND STATUTORY BASIS</u>**

1.     The United States Bankruptcy Court for the Northern District of Texas (this "Court") has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. section 1334. This is a core proceeding pursuant to 28 U.S.C. section 157(b).

2.      The Debtors consent to entry of a final order under Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. section 1408 and 1409.

4.      The statutory predicates for the relief requested herein are 11 U.S.C. sections 105(a), 362, and 365.

## RELIEF REQUESTED AND PRELIMINARY STATEMENT

5.      Pursuant to sections 105(a) and 362 of the Bankruptcy Code, the Debtors seek an order, substantially in the form of **Exhibit A**, (i) enforcing the automatic stay and (ii) seeking punitive and compensatory damages for willful violations of the automatic stay against Malibu.

6.      The Debtors' exclusive right to sell Malibu and Axis boats in their Exclusive Territories is the most valuable asset of the Debtors' estates. Despite the plain language of the Dealership Agreements regarding how and when termination could occur, the 12-year course of dealing between the Debtors and Malibu, the months-long customary negotiation process, and Malibu's actions, Malibu contends that no Dealership Agreements exist.

7.      Despite the Debtors serving notices on Malibu that moving new dealers into their Exclusive Territories is a violation of the automatic stay, Malibu continues to advertise "replacement dealers" for the Debtors in the Debtors' Territories and ship boats to those replacement dealers. Malibu's actions have caused Malibu and/or their replacement dealers to poach the Debtors' employees postpetition to staff these replacement dealers' businesses, one of which is set to open on Monday, June 3, 2024 (the date of the filing of this Motion).

8.      Even if there is some question as to whether the Dealership Agreements are still in place, the Fifth Circuit holds that this Court should weigh any ambiguity of enforcement of the automatic stay in favor of the Debtors, "presume protection of property when faced with

uncertainty or ambiguity," and "impose the automatic stay where there is only an arguable claim of right to the property."

9. Thus, this Cout should enforce the automatic stay until final determination on the status of the Dealership Agreements can be made.

## BACKGROUND

### A. Case Background

10. On May 20, 2024 (the "**Petition Date**"), each of the Debtors filed a voluntary petition in this Court commencing a case for relief under Chapter 11 of Title 11 of the Bankruptcy Code (the "**Chapter 11 Cases**").

11. The Debtors continue to operate their businesses and manage their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

12. No trustee, examiner, or official committee of unsecured creditors have been appointed in the Cases.

### B. Tommy's Boats

13. The Debtors are a high-octane water-sports-enthusiast brand known as "Tommy's Boats" ("**Tommy's**") that began in 2012 in Colorado. Today, Tommy's is the largest Ski & Wake dealer globally. Currently consisting of 14 dealerships plus nine additional on-water rental programs operating in Texas, Colorado, Michigan, Arizona, California, Florida, Nevada, and Tennessee. Tommy's supplies a full suite of boat repair services, boat rental services, on-the-water fueling and docking services, retail sales of super-premium ski and wake boats, luxury cruisers, fishing boats, pontoons, flightboards, and retail goods & apparel at Tommy's Pro Shops. Tommy's is and always has been dedicated to bringing the absolute best products and services to its loyal customers.

14.     Boat sales make up approximately 82 percent of the Debtors' annual revenue. The majority of the Debtors' sales are new luxury watercraft primarily from original equipment manufacturer (OEM) Malibu under two brands: Malibu and Axis. Axis is a Malibu-manufactured brand intended to be more entry market than luxury market. The Debtors historically have been the largest dealer nationally for OEM Malibu Boats, accounting for approximately 33 percent of Malibu's power boat sales. In other words, the sale of Malibu boats[2] is a necessary and critical component of the Debtors' business. Without the ability to sell Malibu boats, it is unlikely the Debtors could continue to operate their business.

### C.     Malibu Dealership Agreements

15.     For 12 years, Malibu and each of Debtors' dealerships had a dealership agreement (the "**Dealership Agreements**"). The term of the Dealership Agreements, with the exception of those in Texas, run from July 1 to June 30. Other than the term of the Texas contracts and the location of each dealership, the Dealership Agreements are materially the same. A copy of a recent Dealership Agreement is attached to the Borisch Declaration as <u>Exhibit 1</u>.

16.     Each Dealership Agreement provides exclusivity for the sale of Malibu and Axis boats to the dealership within a specific area (an "**Exclusive Territory**" and collectively the Debtors' "**Exclusive Territories**"). Only upon a material breach of the Dealership Agreement may Malibu appoint another dealer within an Exclusive Territory. Dealership Agreement at ¶ 1.b.

17.     Moreover, the Dealership Agreements provide that "Malibu <u>will</u> provide Dealer with a new agreement, or notice of non-renewal or termination, <u>reasonably in advance</u> of the expiration of this Agreement. *Id.* at ¶ 2.

---

[2] Unless otherwise specified, any reference to "Malibu boats" includes both Malibu and Axis boats.

18.    Historically—and consistently for each of the prior 12 years—Malibu and the Debtors would allow the current Dealership Agreements to just about expire and only then would Malibu begin negotiations of new model-year Dealership Agreements <u>while continuing to operate under the terms of the latest expired-term Dealership Agreement</u>.

19.    Around the time of the contractual expiration of the MY2023[3] Dealership Agreements (other than in Texas) on June 30, 2023, the Debtors and Malibu took the same historic and ordinary course approach and began negotiations for the model year 2024 Dealership Agreements. On June 12, 2023, Malibu sent the first draft of the "Commitment Builder MY24" (the **Commitment Builder** is the annual excel workbook prepared by Malibu for negotiating the number of Malibu and Axis boats each dealer's location will "commit" to purchase for the new Dealership Agreement, and such "commitment" is then included in the respective Dealership Agreement) and for the first time shared the MY24 Malibu & Axis Dealer Performance Programs.[4] Despite historic lows in retail luxury power boat demand and sales activity, Malibu's June 12, 2023 Commitment Builder MY24 set Tommy's MY24 commitment at 1160 boats even though the Debtors currently had more than 800 MY2023 Malibu boats in stock and the low season was approaching. Three days later, Malibu sent a request to the Debtors requesting a favor—that the Debtors *immediately* enter 58 MY24 boats in the order system – boats that Tommy's did not need – in order to *help* Malibu fill its July production as part of Malibu's order chase.[5]

---

[3] MY23 refers to Model Year 2023, which non-Texas MY23 Dealership Agreements had the term July 1, 2022 through June 30, 2023. The date that the non-Texas MY23 Dealership Agreements were executed was September 6, 2022. For reference, the non-Texas MY22 Dealership Agreements (Model Year 2022) were executed on August 24, 2021.

[4] Incentive Programs is defined herein at par. 31.

[5] Ultimately the Debtors did enter the 58 boat order as requested by Malibu, which boats ended up *not* on the M&T Floorplan and out of trust, for which Malibu then used their status as *not* on the M&T Floorplan and out of trust to deny signing the MY24 Dealership Agreements.

20.     Between June 13 and June 30, 2023, several virtual meetings were held between the parties reviewing data and attempting to land on the correct commitment amount. On June 30, 2023, the Debtors sent Malibu the revised Commitment Builder requesting to set Tommy's commitment at 559 boats. email with commitment builder trying to commit to 559 boats. For more than two months, Malibu and the Debtors negotiated the MY24 Dealership Agreements and exchanged revised versions of the Commitment Builder, however Malibu refused to send a Commitment Builder with fewer than 1160 as the Debtors' commitment. On August 25, 2023, Malibu sends MY24 Commitment Sheets totaling 605 boats. The Debtors inform Malibu that they cannot commit to that many boats, and they are nearing danger being out of trust (a/ka "**SOT**") for their current inventory due to the unreasonable number of Malibu boats that Malibu has forced upon the Debtors.

21.     On or about September 2, 2023, Tommy's informs Malibu that it is officially SOT, and on September 3, 2023, the Debtors have a discussion with Scott Davenport of Malibu seeking assistance in right-sizing the inventory. Ultimately, the Debtors begin cancelling stock boat orders. On September 8, 2023, Davenport sends revised MY24 Commitment Sheets totaling 535 boats.

22.     On September 11, 2023, the Debtors try to finalize the MY24 Commitment Sheets so the MY2024 Dealership Agreements can be signed, and Malibu CEO Jack Springer replies, "Tommy's is SOT, which is one of the worst situations that can arise. Until Tommy's is in good standing with M&T, no dealer agreement can be or will be signed. It is critical that Tommy's resolve any and all SOT situations and has adequate, supported floorplan financing."

23.     The Debtors immediately began to work with M&T to resolve the SOT and in October 2023, M&T send confirmation that the Debtors resolved the SOT.

24.     On October 13, 2023, Malibu CEO Jack Springer confirmed by e-mail,

Following up with notes to next steps from our meeting so we are all on the same page. . . . **MBI and Tommy's to work to write new dealer agreements for 2024** which currently expired in 2023 and do not exist. I believe these capture the major topics."

25.     Despite eight months of negotiations and being assured by Malibu that MY24 Dealership Agreements would be entered into, it was not until February 26, 2024 that Malibu informed Tommy's that it was not going to enter into any MY24 Dealership Agreements.

26.     Between July 1, 2023 (the day after the term of the MY23 Dealership Agreements) and March 13, 2024 (two days after Malibu alleges they terminated all Dealership Agreements pursuant to the March 11th Letter (defined below)), Malibu delivered 131 boats to the Debtors, requested that Tommy's be the *sole dealer representative of Malibu* at 14 boat shows (wherein Malibu promised the Debtors they would be entitled to Boat Show Program incentives[6] and reimbursement for boat show attendance costs as was the ordinary course of dealing between the parties for 12 years), and included Tommy's in all of their MY23 and MY24 Incentive Programs.[7]

27.     *Even after* the March 11th Letter, Malibu requested that Tommy's be the *sole dealer representative of Malibu* at five boat shows, attendance at and sales during which Malibu promised the Debtors they would be entitled to Boat Show Program incentives[8] and reimbursement for boat show attendance costs as was the ordinary course of dealing between the parties for 12 years:

| | |
|---|---|
| Novi Boat Show: March 15 - 16 2024 | Arizona Outdoor Expo: March 23 - 24 2024 |
| Bakersfield/Sportsman Boat & RV Show: March 15 - 17 2024 | Orlando Boat Show: April 5-7 2024 |
| Traverse City Boat Show: March 15 - 17 2024 | |

---

[6] Boat Show Program incentives (referenced in the industry as BSP) are one of the many Incentive Programs offered by Malibu *only* to its dealers, and compliance with the specifications in any offered Incentive Program entitles the dealer (here, Tommy's) to the financial incentives outlined therein.

[7] Incentive Programs is defined herein at par. 31.

[8] Malibu has refused payment to Tommy's of any incentives, rebates, programs, sales events, bonuses, and/or reimbursements, including for the 19 boat shows that Malibu required Tommy's to attend on Malibu's behalf as the *sole dealer representative of Malibu*.

### D.  Pressure from Malibu That the Debtors Increase the Floor Plan

28.    During the COVID-19 pandemic in 2020 and into 2021, domestic retail demand for recreational powerboats increased to the highest levels seen by the industry in decades as customers turned to boating as a form of outdoor, socially-distanced recreation.

29.    Retail luxury power boat demand and sales activity (referred to in the industry as "retail registration") began declining in the second half of the 2021 calendar year because of inventory shortages due to the strong sales activity during the pandemic and supply chain disruptions that began impacting production levels. During 2022, retail registration continued to decline at a lower year-over-year rate than even the second half of 2021. Forecasting for 2023 national sales of retail luxury power boats projected a drop of approximately 50% from 2022 sales.

30.    In late 2022, despite the historic lows in retail registrations, Malibu began to pressure the Debtors to increase their available floor plan financing from $30 million (drawn on a $50 million facility with a $10 million overlimit) to $160 million. Malibu represented to Tommy's that Tommy's was required to have a minimum of 25 weeks of inventory in stock at the turn of the model year based on Malibu's market analysis. To have a minimum of 25 weeks of inventory of 2023 model year, Tommy's would have to increase its floor plan by more than a factor of five.

31.    At the same time, in 2022, the Debtors had earned significant incentives and rebates through the sale of Malibu boats. Numerous times each year, Malibu would offer various incentive programs including, for example, "Dealer Performance Programs," "Hottest Ever Summer Sales Event" incentives, "Year-End Sales Event Programs," "Boat Show Programs," "Market Share Bonus" programs, "Order Performance Incentives," which would entitle dealers like Tommy's to earn incentives related to sales of Malibu and Axis products (the **Incentive Programs**"). The Incentive Programs are only offered to Malibu dealers and include, but are not limited to, interest

reimbursement, rebates, advertising reimbursements, bonuses, and discounts. The Incentive Programs not only provided a key source of income for the Debtors, but the purpose of the Incentive Programs is to offset lulls in seasonal sales, increased costs, mandated advertising required by Malibu, and to cover the interest charged by a floor plan lender for inventory on the floorplan during low seasons; thus, the Incentive Programs are necessary to sustain a profitable business and to ensure no sales are out of trust.

32.    Historical income and offsets received (and due and owing) from the Incentive Programs is set forth below:

| MY | Total # Boats Delivered | Tommy's Commitment # | # over/under | Rebates, Incentives & Interest Paid | Rebates, Incentives & Interest **NOT** Paid | # of Tommy's Dealerships |
|---|---|---|---|---|---|---|
| 2017 | 217 | 240 | -23 | $2,024,458.20 | n/a | 4 |
| 2018 | 380 | 275 | 105 | $2,333,767.16 | n/a | 5 |
| 2019 | 413 | 450 | -37 | $2,655,512.90 | n/a | 5 |
| 2020 | 345 | 637 | -292 | $2,425,474.20 | n/a | 7 |
| 2021 | 690 | Malibu couldn't to meet COVID | build enough market demands | $3,042,717 | n/a | 12 |
| 2022 | 1014 | Malibu couldn't to meet COVID | build enough market demands | $2,891,370 | $364,750 | 15 |
| 2023 | 1191 | 1234 | -43 | $2,936,006 | $2,017,750 | 14 |
| 2024 | 157 | No signed commitment | n/a | $234,660 | $1,166,929 | 14 |

33.    Beginning in or around late 2022, Malibu refused to pay the Debtors' approximately $365,000 of their earned incentives and rebates. As late as February 7, 2023, Malibu confirmed that Malibu still has not paid the accrued and earned 2022 rebates and promises to "get caught up this week." The Debtors never received those 2022 rebates. Rather, Malibu withheld the earned incentives and rebates and instead promised additional incentives in the future, but only if the Debtors complied with Malibu's compulsory demands. The Debtors never received those

additional incentives either. To date, Malibu owes the Debtors more than $12 million in incentives and rebates.

34.    Without the income and offsets from the Incentive Programs, retail margins on boats are especially small and the only way to make up the margin shortfall was to sell more boats. Facing severe financial pressure without the income from the Incentive Programs, the Debtors succumbed to Malibu's pressure and increased their floor plan capacity from $50 million to $85 million with the Debtors' prior lender, Fifth Third Bank. Malibu wanted the Debtors to take on additional floor plan, but Fifth Third Bank reached its limit.

35.    In March of 2023, the Debtors were introduced to M&T Bank ("**M&T**"), which had the ability to provide a larger floor plan to allow the Debtors to comply with Malibu's demands. By May 2023, with M&T financing, the floor plan increased yet again to $110 million with a $20 million overlimit.

36.    Malibu represented publicly and to M&T Bank that Malibu would support the obligatory increased floor plan by entering into a repurchase agreement with M&T. Repurchase agreements are a major component of floor plan financing.

37.    A repurchase agreement is an agreement between the floor plan lender and the manufacturer that provides that the manufacturer would repurchase the remaining merchandise if the borrower does not pay off the floor plan and if the lender had to take title to the merchandise because of default of the borrower. A repurchase agreement greatly reduces the risk factor to the lender but place additional risk on the manufacturer, which acts as a check to ensure manufacturers do not oversupply retailers. A repurchase agreement is customary and standard in the boat industry, and Malibu had entered into repurchase agreements with Fifth Third Bank (and prior lenders) of the Debtors on each and every one of Tommy's previous floor plan facilities.

38.    Here, the repurchase agreement would have protected both M&T and the Debtors, because the repurchase agreement with M&T would have required Malibu to repurchase the Debtors' Malibu inventory that did not sell, as well as cover all carry interest (monthly interest during the low sales season) on the floor-plan obligations. Importantly, the repurchase agreement would also incentivize Malibu not to oversaturate a dealer (in this case the Debtors) with too much inventory. According to Malibu's own public filings, Malibu has entered into repurchase agreements with multiple lenders.

> In connection with its dealers' wholesale floor plan financing of boats, the Company has entered into repurchase agreements with various lending institutions. The reserve methodology used to record an estimated expense and loss reserve in each accounting period is based upon an analysis of likely repurchases based on current field inventory and likelihood of repurchase. Subsequent to the inception of the repurchase commitment, the Company evaluates the likelihood of repurchase and adjusts the estimated loss reserve accordingly. When a potential loss reserve is recorded, it is presented in accrued liabilities in the accompanying unaudited interim condensed consolidated balance sheets. If the Company were obligated to repurchase a significant number of units under any repurchase agreement, its business, operating results and financial condition could be adversely affected.

Malibu Boats, Form 10-Q, Period Ending Dec. 31, 2023 (available at https://www.sec.gov/Archives/edgar/data/1590976/000159097624000012/mbuu-20231231.htm). *See also* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001590976/186a89fc-6d50-43c8-a26c-e129d3edf001.pdf

**Floor Plan Financing**

Our North American dealers often purchase boats through floor plan financing programs with third-party floor plan financing providers. During fiscal year 2023, approximately 75% of our North American shipments were made pursuant to floor plan financing programs which our dealers participate in. These programs allow dealers across our brands to establish lines of credit with third-party lenders to purchase inventory. Under these programs, a dealer draws on the floor plan facility upon the purchase of our boats and the lender pays the invoice price of the boats. As is typical in our industry, we have entered into repurchase agreements with certain floor plan financing providers to our dealers. Under the terms of these arrangements, in the event a lender repossesses a boat from a dealer that has defaulted on its floor financing arrangement and is able to deliver the repossessed boat to us, we are obligated to repurchase the boat from the lender. Our obligation to repurchase such repossessed products for the unpaid balance of our original invoice price for the boat is subject to reduction or limitation based on the age and condition of the boat at the time of repurchase, and in certain cases by an aggregate cap on repurchase obligations associated with a particular floor financing program.

39. However, despite its promises, its public filings, and the fact that a repurchase agreement is customary in the industry, Malibu ultimately reneged. To date, Malibu has yet to execute a repurchase agreement for the full floor plan with M&T.[9]

40. Malibu's unrelenting pressure on Tommy's to increase its floor plan and Malibu's unwillingness to enter into a repurchase agreement with M&T, despite repeated requests from M&T, created the perfect storm for Malibu to take advantage of the Debtors. Malibu could now pump upwards of $130 million of Malibu's highest-priced inventory on the Debtors without any risk or obligation to repurchase. Not only did Malibu push as many boats as possible on the Debtors, Malibu did so with mainly its most expensive line of boats, outside of the customary and Debtor-requested inventory mix of 65% luxury Malibu boats and 35% entry-level Axis-branded boats. The proper mix of boats at different price points allows for a greater number of sales, which results in a higher turnover of inventory. This allows dealers to bring in fresh inventory.

41. The Malibu-branded boats provide higher margins for Malibu. However, because of the higher price point, they tie up substantially more of the Debtors' floor plan and cost the Debtors substantially more in carry interest due to the slow pace at which they are sold. This prevents the Debtors from bringing in fresh inventory. By pumping the Debtors full of the higher-end Malibu boats, it became impossible for the Debtors to hit sales targets, burying the Debtors in carry interest, which Malibu promised to pay as an incentive (and which, historically, Malibu had

---

[9] Though during the receivership, there were discussions among M&T, the Receiver, and Malibu about Malibu providing a repurchase agreement during the receivership. In the late summer and fall of 2023, Malibu shipped $6 million inventory to Tommy's that was not covered by M&T's floorplan financing. Malibu demanded payment of the $6 million and dangled the promise of the model year 2024 Dealership Agreements being signed if the Debtors were able to pay the $6 million. Between August and November 2023, M&T refused to add the $6 million of Malibu inventory because Malibu repeatedly refused to provide the required repurchase agreement to M&T. After months of back and forth, in December 2023 the Debtors were able to convince Malibu to *at least* provide M&T a repurchase agreement on the $6 million of forced inventory, to which Malibu agreed. To date, that $6 million repurchase agreement is the only repurchase agreement between Malibu and M&T relating to the Debtors' floor plan. After Malibu received its $6 million, Malibu's CEO Jack Springer pushed off any discussion of the MY2024 Dealership Agreements, saying "let's discuss Dealership Agreements in January."

paid as reimbursements to the Debtors through 2022). Malibu reneged on its contractual obligations to reimburse the Debtors for the carry interest. Malibu not only denied the Debtors their carry interest incentives and other rebates, but Malibu also refused to honor their promise to enter into a repurchase agreement with M&T. The last month that Malibu paid any carry interest for Tommy's was for the month of March 2023. Without reimbursement of their carry interest and without a repurchase agreement, there was nothing the Debtors could do.

**E.    Malibu Continued Operating Under the Dealership Agreements Until It Bled the Debtors Dry**

42.    Approximately a month after the Debtors entered into their floor plan financing with M&T, the MY23 Dealership Agreements, other than in Texas, expired by their terms on June 30, 2023. Notwithstanding the expiration, Malibu and the Debtors continued to conduct themselves as if the Dealership Agreements were still in place and that entering into new agreements was merely a formality.

43.    Since July 1, 2023, Malibu delivered 131 boats to the Debtors, by far the most boats delivered to any Malibu dealer. As is set forth above, the dumping of inventory on the Debtors without a repurchase agreement provided increased sales to Malibu in a significantly downturned market without any risk. Indeed, Malibu used the pumping of inventory into the Debtors to relate to the public that "[w]hile retail activity at our dealers trended lower during fiscal year 2023, given low inventory levels at the beginning of the fiscal year, we continued to experience strong wholesale demand throughout the first three quarters of fiscal year 2023." Malibu Boats, Form 10-Q, Period Ending Sept. 30, 2023 (available at https://www.sec.gov/Archives/edgar/data/1590976/000159097623000115/mbuu-20230930.htm)

44.    In February of 2024, at Malibu's direct request, Tommy's represented Malibu at the boat show in Miami. The Debtors took orders and deposits for several Malibu boats. While at the

Miami boat show, Matthew Borisch, principal for all Tommy's dealerships, was pulled aside by three Malibu stakeholders to discuss Tommy's Dealership Agreements with Malibu. The stakeholders disclosed to Mr. Borisch that Malibu and its former CEO, Jack Springer, were "intentionally pumping Tommy's full of inventory" in order to artificially inflate Malibu sales and market share when "most manufacturers are 70% too heavy on inventory and [Jack Springer] knows that."

45.    By this time the Debtors learned of Malibu's plan to oversell its inventory to the Debtors without a repurchase agreement, the Debtors had become overextended on their floor plan with an inventory mix that was difficult to sell. On February 27, 2024, M&T notified the Debtors that it would not be able to provide financing for additional boats, leaving the Debtors with stale inventory and the inability to bring in anything new. Additionally, the Debtors could not fill custom boat orders, which made up a significant portion of the Debtors' boat sales.

46.    Using the Debtors' financial difficulties with M&T as pretext, difficulties directly caused by Malibu's actions, on March 11, 2024 Malibu sent a letter to the Debtors purporting to "terminate" the Dealership Agreements at the Texas locations (the "**March 11th Letter**"). Another letter followed on March 22, 2024 purporting "to confirm that Malibu does not anticipate entering into dealer agreements with any of the Tommy's Dealerships . . ." (the "**March 22nd Letter**"). After leading the Debtors on for months about the prospect of 2024 Dealership Agreements and continually performing as though the agreement were in place, it took only a few weeks after Malibu got everything it could out of the Debtors to simply attempt to walk away.

47.    On April 10, 2024, after discussions between the parties failed for the final time, the Debtors filed a Verified Complaint (the "**Complaint**") in the US District Court for the Eastern District of Tennessee, evidencing Tommy's swift move to protect itself and preserve the status quo

(i.e. no competitors or new Malibu dealers in the Exclusive Territories). The Complaint (provided to Malibu in draft prior to filing) initially included a prayer for injunctive relief and was ultimately removed upon Malibu's counsel indicating that Malibu had no issue continuing to honor the Dealership Agreements at least through the 2024 boating season.

### F.    Malibu Signs with Competitor Dealerships

48.    The Debtors immediately disputed Malibu's position in both the March 11th Letter and March 22nd Letter, setting forth the arguments contained herein. Instead of engaging with the Debtors, Malibu informed M&T Bank that it had terminated any and all Dealership Agreements with the Debtors. Days later, M&T Bank defaulted the Debtors based on the "new information" that there were no Dealership Agreements in place with Malibu – though all parties knew that Malibu, M&T, and the Debtors were functioning for more than nine months under the terms of the 2023 Dealership Agreements and were each relying on the promise that the 2024 Dealership Agreements (which by terms would have expired approximately 100 days later) were in progress.

49.    Instead, Malibu almost immediately began discussions with competitor dealerships in the Debtors' Exclusive Territories to sell its products. To date, the Debtors believe at least 11 agreements with competitors have been signed within the Debtors' Exclusive Territories. For example, upon information and belief, Malibu entered into a Dealership Agreement with competitor Liquid Planet in Clermont, Florida, within the Exclusive Territory of Tommy's Florida.[10] So close in fact, Liquid Planet intends to open its dealership two doors down from the Debtors on the same day the Debtors filed this Motion. Many employees, including one of Tommy's top-ranking managers in the area, have given notice to Tommy's expressly to work for Liquid Planet as Malibu's "replacement dealer."

---

[10] Debtor MKB Florida Holdings, LLC does business as Tommy's Florida.

50.    In fact, Malibu is already advertising their "replacement" dealers.





51.    Adding insult to injury, the Debtors have been informed by store-level employees that *entire staffs have been made job offers* by the competitor dealerships now selling Malibu boats.

52.    In fact, on Friday, May 31, 2024, the Debtors held a virtual all-staff meeting with all Tommy's locations. Then the Debtors held follow-up meetings with each store individually. The Fort Worth manager informed the Debtors' management that all but seven Texas employees have received job offers from Malibu Texas, that Malibu Texas took over the Debtors' Fort Worth lease, and that Malibu Texas was opening a Fort Worth dealership at the Debtors' Fort Worth dealership and a brand new Lewisville dealership. Despite the automatic stay and warnings by the Debtors to Malibu that poaching their employees was a violation of the automatic stay, Malibu continues to "replace" the Debtors in the Debtors' Exclusive Territories and poach the Debtors' employees.

53.     Although, Malibu does not want to recognize the continuation of their Dealership Agreements with the Debtors, (a) the historical and customary course of dealing between Malibu and the Debtors relating to the Dealership Agreements, (b) their historical actions between the contract term of each historical Dealership Agreement and the renegotiation of the next year's Dealership Agreement, (c) their continued actions after the contract term expiration of the 2023 Dealership Agreements, (d) their statements and actions that a 2024 Dealership Agreement was forthcoming, and (e) their delivery of (and demand that Debtors' accept and pay for) 131 boats between July 1, 2023 and March 13, 2024 establish that the full intent of the parties was that the Dealership Agreements are still in place.

54.     Accordingly, the Court should enforce the automatic stay by requiring Malibu to honor the exclusivity provision of the Dealership Agreements. Moreover, to the extent Malibu has already violated the exclusivity provision of the Dealership agreements, the Debtors should receive punitive and compensatory damages for Malibu's willful violations of the automatic stay.

## **ARGUMENT**

I.    **The Court Should Enforce the Exclusivity Provision of the Dealership Agreements Through the Automatic Stay.**

55.     The application of the protections afforded a debtor by sections 362 of the Bankruptcy Code is automatic upon the filing of a chapter 11 petition. *See* 11 U.S.C. § 362(a) ("[A] petition filed under section 301 . . . of this title . . . operates as a stay, applicable to all entities . . . ."). This includes enjoining all persons from, among other things, taking any action to obtain possession of property of the estate or to exercise control over property of the estate. *See* 11 U.S.C. § 362(a)(3). "The automatic stay is one of the most important—if not the most important—features of the Bankruptcy Code, and it is integral to the public bankruptcy scheme… [it] protects not just one person or entity, but rather protects all of those persons and entities affected by the filing of a

bankruptcy petition." *In re Turner*, 462 B.R. 214, 221 (Bankr. S.D. Tex. 2011), *aff'd*, No. 10-3300,

2012 WL 12535013 (S.D. Tex. Mar. 15, 2012); *see also In re Abacus Broad. Corp.*, 150 B.R. 925,

927 (Bankr. W.D. Tex. 1993) (stating the automatic stay is "broad and all encompassing").

56.     The injunction contained in section 362 of the Bankruptcy Code is self-executing,

*Campbell v. Countrywide Home Loans, Inc*., 545 F.3d 348, 355 (5th Cir. 2008). The automatic stay

constitutes a fundamental debtor protection that, together with other provisions of the Bankruptcy

Code, provides a debtor with a "breathing spell" that is essential to a successful chapter 11 process.

*Halo Wireless, Inc. v. Alenco Commc'ns, Inc.* (*In re Halo Wireless, Inc.*), 684 F.3d 581, 586 (5th

Cir. 2012) (internal quotations omitted); *S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc.* (*In re

S.I. Acquisition, Inc.*), 817 F.2d 1142, 1146 (5th Cir. 1987); *see also Midlantic Nat'l Bank v. N.J.

Dep't of Envtl. Prot*., 474 U.S. 494, 503 (1986) ("The automatic stay provision of the Bankruptcy

Code, § 362(a), has been described as one of the fundamental debtor protections provided

by  the bankruptcy laws." (citation and internal quotation marks omitted)).

57.     "The purposes of the bankruptcy stay under 11 U.S.C. § 362 'are to protect the

debtor's assets, provide temporary relief from creditors, and further equity of distribution among

the creditors by forestalling a race to the courthouse.'" *Reliant Energy Servs., Inc. v. Enron Canada

Corp*., 349 F.3d 816, 825 (5th Cir. 2003) (citing *GATX Aircraft Corp. v. M/V Courtney Leigh*), 768

F.2d 711, 716 (5th Cir. 1985)); *see Commonwealth Oil Refining Co. v. EPA* (*In re Commonwealth

Oil Refining Co.*), 805 F.2d 1175, 1182 (5th Cir. 1986) ("The purpose of the automatic stay is to

give the debtor a 'breathing spell' from his creditors, and also, to protect creditors by preventing a

race for the debtor's assets." (citation omitted)).  Or, as stated by the Fifth Circuit, the stay

"prevent[s] a chaotic and uncontrolled scramble for the debtor's assets in a variety of

uncoordinated proceedings in different courts." *Hunt v. Bankers Tr. Co.*, 799 F.2d 1060, 1069 (5th Cir. 1986).

58.     Pursuant to section 105(a) of the Bankruptcy Code, the Court may issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Section 105(a), therefore, authorizes a bankruptcy court to issue injunctions or take other necessary steps in aid of its jurisdiction. *See, e.g., U.S. v. Sutton*, 786 F.2d 1305, 1307 (5th Cir. 1986); *MacArthur Co. v. Johns-Manville Corp.* 837 F.2d 89, 93 (2d Cir. 1988). Such orders are appropriate where, as here, they are essential to the debtor's reorganization efforts and do not burden creditors. *See In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994) (holding that, as courts of equity, bankruptcy courts are empowered to invoke equitable principles to achieve fairness and justice in the reorganization process).

59.     The relief requested in this Motion is fully consistent with the terms of the Bankruptcy Code and will protect and preserve the Debtor's assets, specifically, the Debtors' exclusive contractual rights to sell Malibu boats within their Exclusive Territories according to the terms of their Dealership Agreements. It is manifestly appropriate for the Court to enforce the automatic stay to protect the Debtors' exclusivity rights and prevent Malibu from violating those rights by delivering boats to competitor dealerships within the Debtor's Exclusive Territories. Without the protection of the Debtors' exclusivity rights through the automatic stay, the Debtors would be challenged in their operations, crippled in the ability to meet the aims and goals of a chapter 11 process, and unable to maximize value for their creditors. Accordingly, the Court should enforce the automatic stay.

**A.      The Debtors' Contractual Exclusivity Rights Are Assets of the Debtors Estates Subject to Protection Under the Automatic Stay.**

60.      Property of the bankruptcy estate includes "all legal and equitable interests of the debtor in property as of the commencement of the case" wherever located or by whomever held. 11 U.S.C. § 541(a)(1). "Section 541 is read broadly and interpreted to include all kinds of property . . . ." *In re Equinox Oil, Inc.*, 300 F.3d 614, 618 (5th Cir. 2002). "Courts have held, specifically, that property of the estate includes contract rights." *In re EBC I, Inc.*, 356 B.R. 631, 639 (Bankr. D. Del. 2006). *See also In re Enron Corp.,* 300 B.R. 201, 212 (Bankr. S.D.N.Y. 2003) (concluding that employment agreement between debtor and its head of trading was property of the estate subject to the automatic stay); *Elder–Beerman Stores Corp. v. Thomasville Furniture Indus., Inc. (In re Elder–Beerman Stores Corp.),* 195 B.R. 1019, 1023 (Bankr. S.D. Ohio 1996) ("Courts have consistently held that contract rights are property of the estate.").

61.      As property of the estate, the Debtors' contractual rights, including their exclusive right to sell Malibu (and Malibu's Axis) boats within their Exclusive Territories, is an asset of the Debtors' estates subject to protection of the automatic stay. *See In re Mirant Corp.*, 303 B.R. 319, 328 (Bankr. N.D. Tex. 2003) (finding that because contract rights are property of the estate, they are protected by the automatic stay); *In re Computer Commc'ns, Inc.*, 824 F.2d 725, 729 (9th Cir. 1987) ("Courts have consistently held that contract rights are property of the estate, and therefore those rights are protected by the automatic stay."). While the Debtors believe their contractual rights with Malibu are of the most valuable assets of the Debtors' estates, value of a contractual right is not determinative in enforcement of the automatic stay. *See In re Sherlock Homes of W.N.Y., Inc.*, 246 B.R. 19, 24–26 (Bankr. W.D.N.Y. 2000), (finding that contract rights are assets of the estate, even when those contract rights would have had limited or even no value and interference of such rights is a violation of the automatic stay).

62.     The automatic stay protects the contractual rights of the Debtors, specifically the exclusivity rights found in the Dealership Agreements. Upon information and belief, the Dealership Agreements with competitor dealerships within the Debtors' Exclusive Territories are not set to commence until July 1, 2024.  There is still time to correct this grievous violation of the automatic stay. That said, the only way to protect the Debtors' exclusivity rights through the automatic stay is to enjoin Malibu from (i) performing under any existing Dealership Agreements with competitor dealers within the Exclusive Territories; (ii) entering into any new Dealership Agreements with competitor dealers in the Exclusive Territories; and (iii) selling or shipping boats to competitor dealers within the Debtors' Exclusive Territories that would violate the Debtors' Dealership Agreements. Such relief is neither extreme nor harmful to Malibu. Malibu, through the Debtors' Dealership Agreements, still retains the ability to sell boats to the Debtors. While the Debtors' purchases will likely slow during these Chapter 11 Case to reduce the excess of inventory already in the Debtors' possession, the need for the Debtors' reduction of inventory is a creation of Malibu's making and not an excuse to violate the automatic stay.

63.     Accordingly, the Debtors request enforcement of the automatic stay by enjoining Malibu from (i) performing under any existing Dealership Agreements with competitor dealers within the Exclusive Territories; (ii) entering into any new Dealership Agreements with competitor dealers in the Exclusive Territories; and (iii) selling or shipping boats to competitor dealers within the Debtors' Exclusive Territories that would violate the Debtors' Dealership Agreements.

**B.      The Dealership Agreements are Enforceable Contracts and Any Ambiguity Should Weigh in Favor of the Debtors with Respect to the Automatic Stay.**

64.     Notwithstanding the term expiration of the Dealership Agreements on June 30, 2023, the plain language of the Dealership Agreements, the course of dealing between the parties, and actions taken by Malibu and the Debtors make the Dealership Agreements enforceable

contracts. The Dealership Agreements explicitly state that "Malibu will provide Dealer with a new agreement, or notice of non-renewal or termination, reasonably in advance of the expiration of this Agreement."[11] Dealership Agreement at ¶ 2 (emphasis added).

65.    Moreover, the course of dealing between the Malibu and the Debtors implies is the Dealership Agreements are still in place and extended beyond the expiration term. *See* T.C.A. § 47-1-303(b)[12] (defining course of dealing as "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly regarded as establishing a common basis of understanding for interpreting their expressions and other conduct."). While a single transaction cannot establish a course of dealing, the emphasis on a sequence of events can establish an agreement. *See Jerles v. Phillips*, 2006 WL 2450400 at *9 (Tenn. Ct. App. Aug. 22, 2006); *Stoop v. Southern Life Ins. Co.*, 660 S.W. 2d 46, 48 (Tenn. Ct. App. 1983).

66.    Not on, before, or as of the term expiration of the MY23 Dealership Agreement did Malibu provide any notice of non-renewal to the Debtors. Rather, Malibu, as it had for every one of the 11 years prior, began negotiations for new Dealership Agreements. As negotiations continued, Malibu continued its contractual relationship with the Debtors by selling more than 130 boats to the Debtors as well as the Debtors' representation of Malibu (as Malibu's sole dealer representative) at no fewer than 19 boat shows. The continual sequence of events between Malibu and the Debtors from the negotiations of further contracts after the expiration period year after

---

[11] Paragraph 2 of the Dealership Agreements also provide that "[n]othing in this Agreement (including provisions or projections dealing with future performance goals or requirements for periods beyond the term of this Agreement) shall be construed to create a promise, representation or agreement of a continuing relationship beyond the term of this Agreement, and this Agreement shall be deemed terminated, null and void, if no new agreement is signed except as to any provisions which expressly continue beyond the term of this Agreement." Dealership Agreements at ¶ 2. This provision cannot be accepted as it is directly in conflict with the provision that Malibu will enter into a new agreement unless proper notice of non-renewal is provided before expiration of the agreement. If the Court accepts this provision, it will annihilate the benefit of the bargain that the Debtors entered into guaranteeing further Dealership Agreements without notice to the contrary, making such a promise illusory.

[12] The Dealership Agreements require their interpretation under Tennessee law. Dealership Agreements at ¶ 17.

year, and the willingness and forcefulness of Malibu continually shipping boats in the hundreds to the Debtors—even after the expiration term of the MY23 Dealership Agreements—clearly establish a course of dealing that the Dealership Agreements continue even after the expiration of their terms. Thus, because the Dealership Agreements are in place, enforcement of the automatic stay to protect the Debtors' contractual rights must also be in place.

67.    Even if there is some question as to whether the Dealership Agreements are still in place, the Fifth Circuit holds that the Court should weigh any ambiguity of enforcement of the automatic Stay in favor of the Debtors. *See In re Mirant Corporation*, 440 F.3d 238, 251 (5th Cir. 2006) ("Furthermore, this Court has recognized the automatic stay's broad application and noted that such breadth reflects a congressional intent that courts will presume protection of property when faced with uncertainty or ambiguity."); *In re Chestnut*, 422 F.3d 298, 300 (5th Cir. 2005) (finding that the court should impose the automatic stay where there is only an arguable claim of right to the property).

68.    While the Debtors contend that the Dealership Agreements are still in place due to Malibu's course of dealing with the Debtors, at the very least, the automatic stay should be enforced as the contract rights are arguable property of the estates until final determination on the status of the Dealership Agreements can be made.

## II.    Punitive Damages for Malibu's Willful Violation of the Automatic Stay are Appropriate.

69.    Section 362(k)(1) of the Bankruptcy Code expressly authorizes this Court to award both actual damages, including costs and attorneys' fees, and punitive damages for willful violations of the stay. 11 U.S.C. § 362(k)(1). "A willful violation of the stay occurs when a creditor, with knowledge of the stay, seizes the debtor's property without first obtaining relief from the stay from the bankruptcy court." *In re Chestnut*, 422 F.3d at 300. "Willfulness within the context of an

alleged stay violation is almost universally defined to mean intentional acts committed with knowledge of the bankruptcy petition." *In re San Angelo Pro Hockey Club, Inc.*, 292 B.R. 118, 124 (Bankr. N.D. Tex. 2003) (internal citations omitted). "Whether the party believes in good faith that it had a right to the property is not relevant to whether the act was willful or whether compensation must be awarded." *In re Chestnut*, 422 F.3d at 302 (quoting *In re Taylor*, 884 F.2d 478, 482 (9th Cir. 1989)).

70.     Here, since the Petition Date, upon information and belief, Malibu has continued to deliver boats to competitor dealerships within the Debtors' Exclusive Territories in violation of the Dealership Agreements. There is no dispute Malibu is aware of the Chapter 11 Cases, and the Debtors sent notice of such violations to Malibu. Even if Malibu takes the position that there are no Dealership Agreements in place (which the Debtors dispute and have established they clearly are in effect), any violation of the Dealership Agreements, specifically the exclusivity provision of the Dealership Agreements by continuing to provide boats to competitive dealerships, is a willful violation of the automatic stay. As such, the Debtors are entitled to actual compensatory damages, including attorneys' fees. The Debtors request to reserve for a future hearing to determine the amount of actual compensatory damages.

71.     Moreover, the Debtors are entitled to punitive damages "in appropriate circumstances" where a willful violation of the stay has occurred. 11 U.S.C. § 362(k)(1). The Fifth Circuit adopted an "egregious conduct" standard to determine whether to allow for punitive damages. *See In re Repine*, 536 F.3d 512, 521 (5th Cir. 2008). "Such damages are generally designed to cause a change in the creditor's behavior and serve as a deterrent to certain actions of creditors." *In re Wilson*, 610 B.R. 255, 278 (Bank. N.D. Tex. 2019) (internal quotations omitted).

72.     Here, again, the actions of Malibu surely meet the "egregious conduct" standard set by the Fifth Circuit. Even after the filing of the Chapter 11 Cases, Malibu continues its campaign to effectively destroy the Debtors through the violation of the exclusivity provision of the Dealership Agreements. Malibu continues to advertise and promote the opening of new and replacement dealerships as well as poach the Debtors' employees to operate those dealerships. Even after the Debtors contacted Malibu to alert them to their stay violations, Malibu continues to move forward with its scheme to erase the Debtors. Accordingly, this egregious conduct by Malibu requires punitive damages to prevent any further misconduct. In order to achieve this, the Debtors request punitive damages for the value of each boat delivered to competitor dealerships in violation of the Dealership Agreements and the loss of each employee.

## III.    An Emergency Hearing on the Motion is Necessary to Prevent Irreparable Harm.

73.     As set forth above, Malibu continues to move forward with "replacement" competitor dealerships that have been poaching employees necessary for the Debtors' operations. Action must be taken now to stop the irreparable harm and bleeding that Malibu has already caused through its willful violations of the automatic stay. Waiting until June 27, 2024, the next available date on regular notice according to the case procedures approved by this Court [Dkt. No. 84], will be too late. By that time, the Debtors will have likely lost all Texas and Miami employees plus employees at each of the Debtors dealerships where Malibu has replacement dealerships (at the time of this Motion, the Debtors are aware of 11 replacement dealerships) making it nearly impossible to run the operations of the Debtors, certainly requiring shutdown of several dealerships, and the competitor dealerships will likely received a full complement of boat inventory. These results have already caused and would continue to cause irreparable hams to the Debtors.

74.    Accordingly, the Debtors request an emergency hearing on the motion, at least as to the injunctive relief sought in the enforcement of the automatic stay, be heard no later than June 6, 2024 at 2:30 p.m. Additional hearings as to damages may be heard on regular notice.

## NOTICE

75.    Notice of this Motion will be served upon the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the U.S. Trustee; (b) Malibu; (c) M&T Bank; (d) the Committee (if any); (e) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis if no Committee has yet been appointed; and (f) those parties who have formally filed requests for notice in these Cases pursuant to Bankruptcy Rule 2002.

76.    In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## NO PRIOR REQUEST

77.    No prior application for the relief requested herein has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

Dated: June 3, 2024
       Dallas, Texas

**GUTNICKI LLP**

*/s/ Liz Boydston*
Liz Boydston (SBN 24053684)
Alexandria Rahn (SBN 24110246)
10440 N. Central Expy., Suite 800
Dallas, Texas 75231
Telephone: (469) 935-6699
Facsimile: (469) 895-4413
lboydston@gutnicki.com
arahn@gutnicki.com

-and-

Max Schlan (Admitted *Pro Hac Vice*)
Ren-Ann Wang (Admitted *Pro Hac Vice*)
Gutnicki LLP
45 Rockefeller Plaza, Suite 2000
New York, New York 10111
Telephone: (914) 920-2662
Facsimile: (646) 825-2330

*Proposed Counsel to the Debtors and Debtors
in Possession*

## <u>CERTIFICATE OF CONFERENCE</u>

      Pursuant to Local Rule 9007-1(f), the Debtors do not believe a conference with Malibu is practicable. On May 27, 2024, counsel to the Debtors provided a letter to counsel for the Debtors that requested Malibu cease and desist all violations of the automatic stay. On May 31, 2024, counsel to Malibu provided a letter in response took the position that "the Debtors' accusation that Malibu Boats violated to automatic stay is meritless." Due to Malibu's intransigence to their willful violation of the automatic stay, the Debtors do not believe any conference with Malibu is practicable.

**Exhibit A**

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TOMMY'S FORT WORTH, LLC, *et al.*,[13] | ) | Case No. 24-90000-11 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER TO ENFORCE AUTOMATIC STAY AND FOR
PUNITIVE DAMAGES FOR WILLFUL VIOLATIONS OF THE
AUTOMATIC STAY AGAINST MALIBU BOATS, INC. AND MALIBU BOATS, LLC**

Upon the emergency motion (the "Motion")[14] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order") pursuant to 11 U.S.C. sections 105(a) and 362 to enforce the automatic stay so as to prohibit Malibu from taking any further actions to violate the exclusivity provisions of the Dealership Agreements with the Debtors and for punitive damages for willful violations of the automatic stay; the Court having reviewed the Motion; the Court having considered the evidence and the statements of counsel with respect to the Motion at a hearing before the Court; the Court having found that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. sections 157 and 1334, (b) venue is proper in this district pursuant to 28 U.S.C. sections 1408 and 1409, (c) this is a core proceeding pursuant to 28 U.S.C. section 157(b), and (d) notice of the Motion and the Hearing was sufficient under the circumstances and no other or further notice is required; and this Court having determined that the

---

[13] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Tommy's Fort Worth, LLC (3473); Tommy's Holding Company, LLC (2662); Tommy's Grand Rapids, LLC (9224); Tommy's Castaic, LLC (7501); Tommy's Lewisville, LLC (4750); High Country Watersports, LLC (6160); Walloon Lake Village Marina, LLC (0277); MKB Florida Holdings, LLC (5698); Tommy's Detroit, LLC (5242); Tommy's California Fresno, LLC (8597); Tommy's Phoenix, LLC (3036); Tommy's Las Vegas, LLC (7721); Tommy's Chattanooga, LLC (0839); Tommy's California Ventura, LLC (5149); Tommy's Rancho Cordova, LLC (1070); Tommy's Stockton, LLC (1338); and Tommy's Knoxville, LLC (8052).

[14] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion

legal and factual bases set forth in the Motion and at the hearing establish just cause for the relief

granted herein; and the Court having determined that the relief sought in the Motion is in in the

best interests of the Debtors, their estates and parties in interest; and sufficient cause appearing

therefor, it is therefore ORDERED that:

1.      The Motion is granted as set forth herein.

2.      Malibu has willfully violated the automatic stay pursuant to 11 U.S.C.

§ 362(a)(3).

3.      As a means to enforce the automatic stay, Malibu shall be enjoined from performing

under any Dealership Agreement with competitor dealers in violation of the Debtors' Dealership

Agreements whether or not such Dealership Agreements with competitor dealers were entered into

before the Petition Date.

4.      As a means to enforce the automatic stay, Malibu shall be enjoined from entering

into any new Dealership Agreements with competitor dealers in violation of the Debtors'

Dealership Agreements.

5.      As a means to enforce the automatic stay, Malibu shall be enjoined from selling,

shipping, or delivering any boats to any party other than the Debtors in violation of the Dealership

Agreements with the Debtors.

6.      The relief set forth in this Order shall have immediate effect upon entry of this

Order.

7.      A further hearing to determine damages for Malibu's willful violation of the

automatic stay, including determination of punitive damages, shall be held on June, 27, 2024 at

1:30 p.m. prevailing Central Time. The Debtors will provide notice of the further hearing by first

class mail to (a) Malibu; (b) counsel for M&T, (c) counsel for the Committee (if any), (d) the

Office of the United States Trustee, (e) all parties who have filed requests for notice under

Bankruptcy Rule 2002, (f) the holders of the thirty (30) largest unsecured claims against the

Debtors on a consolidated basis if no Committee has yet been appointed, and (g) such other parties

as this Court may order. Any party wishing to object to the relief sought at the further hearing shall

file such objection with the Court, together with proof of service thereof, and served upon: (a)

counsel for the Debtors; (b) Malibu; (c) counsel for M&T; (d) counsel for the Committee (if any);

and (e) the Office of the United States Trustee, so as to be received no later than June 20, 2024, at

4:00 p.m. prevailing Central Time.

8.      The Court shall retain exclusive jurisdiction over any and all matters arising from

or related to the implementation, interpretation or enforcement of this Order.

# # # END OF ORDER # # #