Toby L. Gerber (SBT 07813700)
Michael Berthiaume (SBT 24066039)
**NORTON ROSE FULBRIGHT US LLP**
2200 Ross Ave., Suite 3600
Dallas, Texas 75201
Telephone: (214) 855-8274
Facsimile: (214) 855-8200
Email: toby.gerber@nortonrosefulbright.com
michael.berthiaume@nortonrosefulbright.com

Jason L. Boland (SBT 24040542)
**NORTON ROSE FULBRIGHT US LLP**
1550 Lamar Street, Suite 2000
Houston, Texas 77010
Telephone: (713) 651-5151
Facsimile: (713) 651-5246
Email: jason.boland@nortonrosefulbright.com

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **CHAPTER 11** |
| | § | |
| **TOMMY'S FORT WORTH, LLC,** *et al,*[1] | § | **CASE NO. 24-90000** |
| | § | |
| **DEBTOR.** | § | **(JOINTLY ADMINISTERED)** |
| | § | |

**BRIEF IN SUPPORT OF AGREED EMERGENCY MOTION TO APPOINT CHAPTER
11 TRUSTEE**

**A hearing will be conducted on this matter on June 14, at 10:00 am in Room 204, U.S. Courthouse, 501 W. Tenth Street, Fort Worth, Texas 76102**

**You may participate in the hearing either in person or by an audio and video connection. Audio communication will be by use of the Court's dial-in facility. You may access the facility at 1.650.479.3207; Meeting ID: 2309 445 3213 . Video communication will be by use of the Cisco WebEx platform. Connect via the Cisco WebEx application or click the link on Judge Morris's home page and access the link at Link: https://us-courts.webex.com/meet/morris; Meeting Number: 2309-445-3213. Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of electronic hearings. To make your appearance, click the "Electronic Appearance" link on Judge Morris's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tommy's Fort Worth, LLC (3473); Tommy's Holding Company, LLC (2662); Tommy's Grand Rapids, LLC (9224); Tommy's Castaic, LLC (7501); Tommy's Lewisville, LLC (4750); High Country Watersports, LLC (6160); Walloon Lake Village Marina, LLC (0277); MKB Florida Holdings, LLC (5698); Tommy's Detroit, LLC (5242); Tommy's California Fresno, LLC (8597); Tommy's Phoenix, LLC (3036); Tommy's Las Vegas, LLC (7721); Tommy's Chattanooga, LLC (0839); Tommy's California Ventura, LLC (5149); Tommy's Rancho Cordova, LLC (1070); Tommy's Stockton, LLC (1338); and Tommy's Knoxville, LLC (8052).

## Table of Contents

**Page**

I.    INTRODUCTION ................................................................................................ 5

II.    BACKGROUND ................................................................................................ 5

    A.    Lending Relationship ............................................................................. 5

    B.    Conversion of Collateral and Sales Out of Trust ................................... 6

    C.    Appointment of a Receiver .................................................................... 7

    D.    Bankruptcy Case .................................................................................... 8

III.    ARGUMENT .................................................................................................. 13

    A.    Section 1104(a)(1): Mandatory Appointment of a Chapter 11 Trustee for "Cause",
Including Fraud, Dishonesty, Incompetence, Or Gross Mismanagement ....................... 13

    B.    Section 1104(a)(2): Discretionary Grounds for Appointment of a Chapter 11
Trustee: In the Interests of Creditors, Etc. ....................................................... 18

IV.    EMERGENCY RELIEF REQUESTED ......................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Amerejuve, Inc.*,
No. 14-35482, 2015 Bankr. LEXIS 1496 (Bankr. S.D. Tex. Apr. 29, 2015) .........................18

*In re Anchorage Boat Sales, Inc.*,
4 B.R. 635 (Bankr. E.D.N.Y. 1980).......................................................................................17

*In re Bibo, Inc.*,
76 F.3d 256 (9th Cir. 1996) ...................................................................................................17

*In re Cajun Elec. Power Coop.*,
191 B.R. 659 (Bankr. D. La. 1995), *aff'd* 74 F.3d 599 (5th Cir.), *cert denied*,
519 U.S. 808 (1996). Cause ...............................................................................16, 20, 21, 22

*Commodity Futures Trading Comm'n v. Weintraub*,
471 U.S. 343 (1985).................................................................................................................16

*In re Deena Packaging Industries, Inc.*,
29 B.R. 705 (Bankr. S.D.N.Y. 1983) .....................................................................................21

*In re Euro-Am. Lodging, Corp.*,
365 B.R. 421 (Bankr. S.D.N.Y. 2007) ...................................................................................20

*In re Hotel Assocs., Inc.*,
3 B.R. 343 (Bankr. E.D. Pa. 1980) ........................................................................................22

*In re Ionosphere Clubs, Inc.*,
113 B.R. (Bankr. S.D.N.Y. 1990).....................................................................................20, 22

*In re Marvel Entm't Group, Inc.*
140 F.3d 463 (3d Cir. 1998)..............................................................................16, 17, 20, 21

*In re McCorhill Pub., Inc.*,
73 B.R. 1013 (Bankr. S.D.N.Y. 1987) ...................................................................................19

*Mfrs. & Traders Tr. Co. v. Morningstar Marketplace, Ltd. (In re Morningstar
Marketplace, Ltd.)*,
544 B.R. 297 (Bankr. M.D. Pa. 2016) ...................................................................................22

*In re Patman Drilling Int'l, Inc.*,
No. 07-34622-SGJ, 2008 WL 724086 (Bankr. N.D. Tex. Mar. 14, 2008) .................17, 19, 21

*In re Professional Accountants Referral Svcs., Inc.*,
142 B.R. 424 (Bankr. D. Color. 1992)...................................................................................17

*In re PRS Insurance Group, Inc.*,
274 B.R. 381 (Bankr. D. Del. 2001) ......................................................................................17

*In re Sharon Steel Corp.*,
  871 F.2d 1217 (3rd Cir.1989) ..................................................................................18, 21

*In re V. Savino Oil & Heating Co.*,
  99 B.R. 518 (Bankr. E.D.N.Y. 1989)...................................................................16, 17, 18

*In re Westbank Holdings, LLC*,
  No. 22-10082, 2022 WL 3052135 (Bankr. E.D. La. Aug. 1, 2022) .......................................19

*Wolf v. Weinstein*,
  372 U.S. 633 (1963).............................................................................................16

## Rules and Statutes

11 U.S.C. § 1104(a) .............................................................................................18

11 U.S.C. § 1104(a)(2)......................................................................................21, 22

11 U.S.C. § 1104(a)(1)..............................................................................16, 17, 18, 22

M&T Bank ("**M&T**"), by and through its attorneys of record, files this *Brief in Support of Agreed Emergency Motion to Appoint Chapter 11 Trustee* (the "**Motion**"). The Debtors have agreed to emergency consideration of and to the relief sought in the Motion. The United States does not oppose the emergency consideration of and the relief sought in the Motion. M&T respectfully states the following:

## I.    INTRODUCTION

1.    The Debtors, who operate boat dealerships in Michigan and other states, filed these cases on May 20, 2024 (the "**Petition Date**") without warning or consultation with M&T, their senior secured lender, or to the Michigan state court-appointed receiver who was in possession of M&T's collateral.

2.    Since the Petition Date, the Debtors have, on a net basis depleted more than $1.4 million of M&T's collateral culminating in this Court's denial on Debtors' most recent request for use of cash collateral pursuant to a proposed 13-week Cash Forecast. *See Order Denying Debtors' Request for Entry of Fourth Interim Cash Collateral Order*, Dkt. 149.

3.    Recognizing this reality, the Debtors have agreed to the relief sought in this Motion, including to the appointment of an independent fiduciary to oversee the administration and efficient wind-down of the Debtors' estates. In addition, the United States Trustee does not oppose the relief sought herein.

## II.    BACKGROUND

### A. Lending Relationship

4.    The Debtors executed and delivered to M&T a Variable Rate Demand Note (Floor Plan) dated May 18, 2023 (the "**Floor Plan Note**"). The Debtors also executed and delivered to M&T a Revolving Line Note (New York) dated May 18, 2023 (the "**Revolving**

**Note**," and collectively with the Floor Plan Note, the "**Notes**"), and a Loan Agreement (Floor Plan Financing) dated May 18, 2023 (the "**Loan Agreement**"). Pursuant to the Notes and Loan Agreement, M&T made two revolving credit loans to the Debtors for purposes of providing floor plan financing and working capital, in an aggregate maximum principal amount totaling over $115,000,000.00 (the "**Loans**"). On May 17, 2023, Debtors executed a General Security Agreement (New York) (the "**Security Agreement**"). The Notes, Loan Agreement, Security Agreement, and related documents are referred to collectively as the "**Loan Documents**."[2]

5.      Under the terms of the Security Agreement, M&T was granted a first priority lien on all of the Debtors' accounts, inventory, equipment, general intangibles and all other business assets and personal property including, without limitation, all boats, trailers, and other marine inventory (whether acquired by the Debtors with Loan advances or otherwise), and all products, replacements, cash and non-cash proceeds thereof. *See* Security Agreement § 1.1. ("**Collateral**").

**B.  Sales Out of Trust**

6.      Under the floor plan financing arrangement, M&T loaned funds to the Debtors to buy marine inventory for resale or rental. Upon the sale of a boat and or trailer, Debtors agreed to hold the proceeds in trust and remit to M&T for repayment of the amount advanced to Debtors by M&T to purchase the boat (the "**Proceeds**"). *See* Loan Agreement, § 9.1. The Debtors also agreed to provide M&T with accurate monthly dealership statements in order to disclose which boats have been sold and which boats are still in inventory. *Id*., § 11.l (ii). Pre-bankruptcy, the Debtors, however, failed to remit substantial sale proceeds to repay the loans. In

---

[2] The Loan Documents are attached hereto as <u>Exhibit 1</u>;  *M&T Bank's Appendix in Support of Emergency Motion to Appoint Chapter 11 Trustee* ("**Appx**") at M&T 00002.

the months preceding bankruptcy the Debtors sold millions of dollars of M&T's collateral proceeds out of trust.

7.      M&T also learned that Malibu Boats, Inc., the Debtors' primary supplier of new boat inventory ("**Malibu**") sent the Debtors a letter dated March 22, 2024 explaining that all dealer agreements between each Borrower and Malibu had either expired on June 30, 2023, or were terminated on March 11, 2024 (the "**Malibu Termination Letter**").[3] The Malibu Termination Letter stated that Malibu would not sell any more Malibu or Axis boats to Debtors and that Malibu "does not anticipate entering into dealer agreements with any of the Tommy's Dealerships [the Debtors] for the reminder of model year 2024, model year 2025, and beyond." The termination of the Malibu Dealer Agreements was a material adverse change and an Event of Default under Section 7.l(xiii) of the Security Agreement. In addition, since the Malibu Termination Letter, Malibu has entered into new dealership agreements with dealerships in all but one of the Debtors' former geographic territories.[4] These events are Events of Default under the floor financing arrangement with M&T Bank.

### C.  Appointment of a Receiver

8.      Pursuant to the terms of the Loan Documents, upon an event of default, M&T may, at its option move for the appointment a receiver. Security Agreement, § 7.2.6. On April 22, 2024, the Circuit Court for the County of Kent, Michigan (the "**Michigan Court**") entered a Consent Order Appointing Receiver ("**Receivership Order**").[5] Pursuant to the Receivership Order, the Michigan Court determined that the Loans were properly secured by all Collateral as defined under the Security Agreement (*see* Receivership Order, ¶ D), and found that the

---

[3] See Malibu Termination Letter attached hereto as Exhibit 2; Appx. M&T 00092.

[4] See Form 8-K attached hereto as Exhibit 3; Appx. M&T 00095.

Receivership Property (as defined therein) "is likely insufficient to satisfy [M&T]'s claims." *Id.*, ¶ H. Further, the Receivership Order determined that it was appropriate to appoint a receiver to preserve the Receivership Property. In aid of the receiver, the Debtors were obligated to cooperate with the receiver and turnover to the receiver all Collateral. Id., ¶ 1.6.

9.      According to the Receiver's Status Report (the "**Receiver's Report**"),[6] the receiver reported to the Michigan Court that the Debtors had failed to provide the receiver with requested information in a timely and reliable basis. To the contrary, the Debtors actively stonewalled the receiver's attempts to verify key financial information.

10.     The Receiver's Report confirms that the Debtors' funds were commingled with bank accounts in the name of non-debtor, MKB Holdings. Receiver's Report, ¶ 9. These bank accounts were not maintained at M&T, in breach of the Loan Documents.

**D.      Bankruptcy Case**

11.     Since the filing of the bankruptcy case, ongoing due diligence by M&T regarding the pre- and post-petition cash management of the Debtors have illuminated additional concerns in addition to those described above.

1.      <u>Lack of Adequate Protection</u>

12.     On May 22, 2024, the Debtors filed their *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protecting, (III) Modifying the Automatic Stay, (IV) Setting a Second Interim Hearing, (V) Setting a Final Hearing, and (V) Granting Related Relief* [Docket No. 12] (the "**Cash Collateral Motion**"). M&T objected to the Cash Collateral Motion in its *Omnibus*

---

[5] See Receivership Order attached hereto at <u>Exhibit 4</u>; Appx. M&T 00100.

[6] See Receiver's Report attached hereto as <u>Exhibit 5</u>; Appx. M&T 00125.

*Objection of M&T Bank to Certain Emergency Motions* [Dkt. 21] and its *Supplemental
Objection to Debtor's Cash Collateral Motion* [Dkt. 106] (together the "**Cash Collateral
Objection**").

13.     Because the Debtors did not reach an agreement with M&T for the use of cash
collateral, the Debtors proposed the use of M&T's cash collateral in exchange for adequate
protection liens, super-priority claims, and adequate protection payments. As described in
M&T's Cash Collateral Objection, the proposed adequate protection in the Cash Collateral
Motion was insufficient to provide M&T with the requisite protection for the potential for
diminution of its interests.  Further, because Malibu has ended its relationship with the Debtors,
the Debtors have no means of replacing M&T's Collateral in the event they were to sell certain
units of M&T's Collateral.

14.     Ultimately, this Court agreed that the Debtors were unable to provide M&T
adequate protection. In its ruling on the hearing held on June 7, 2024, this Court found that the
Debtors were unable to carry their burden to demonstrate that M&T was adequately protected
from the diminution of its interest and, therefore, denied further use of M&T's cash collateral.
[Dkt. 145].

2.     The Debtors cash management system reflects large amounts of
commingling between and among the Debtors and non-debtors.

15.     Since the Petition Date, ongoing due diligence and discovery propounded by
M&T and its financial advisors have confirmed the Receiver's Report and illuminated the lack
of corporate form established between and among the debtor entities and several non-debtor
entities that existed prior to the Petition Date.

16.    It is apparent that, prior to the Petition Date,  cash flowed between the Debtors'

bank accounts and bank accounts owned by non-debtor MKB Holdings[7]. The Debtors' books

and records historically did not properly account for these transfers.[8] Instead, it appears that the

Debtors' principal, Matt Borisch, had the authority use the Debtors' bank accounts.[9] This

apparent lack of reporting has led to inadequate books and records that are inaccurate on their

face.[10]

### 3.    The Debtors sold marine inventory and failed to remit proceeds to M&T in violation of the Loan Documents.

17.    As described in the Cash Collateral Objection, the floor financing arrangement

between the Debtors and M&T granted M&T a lien interest in all assets of the Debtors,

including their marine inventory. This lien is only to be released when M&T receives payment

for the inventory, which occurs after the Debtors effectuate a sale of the marine inventory (a

boat and/or trailer). Despite that obligation, M&T has confirmed that the Debtors sold numerous

boats and trailers and failed to remit those sale proceeds to M&T.

---

[7] *Deposition of Denielle Hoffman*, attached hereto as Exhibit 6 Appx. M&T 00140 ("**Hoffman Depo**"), 15:7–10.
    Q.  Tommy's. How did the money get from MKB Holdings' bank account to Tommy's?
    A.   There have been times where payments for Tommy's operations would be made directly out of the MKB Holdings bank account.

[8] Hoffman Depo. 30:9-12.
    Q.  Well, I'm asking you the practical question. Were they reflected on books and records of either company?
    A.  In some cases I believe they were, in some cases they may not be.

[9] Hoffman Depo. 17:24–18:1.
    Q. Okay. Once the funds got into MKB Holding, who was responsible for deciding how those funds would be used?
    A. Matt Borisch.

[10] Hoffman Depo. 30:16-19.
    Q. So what you're saying is that whatever is reflected on the books and records would not be accurate, because not all the transactions were recorded?
    A. That's correct.

18.    Since the Petition Date, M&T's ongoing due diligence has revealed the Debtors' finance team was aware of these "sales out of trust"[11] and alerted the Debtors' principal, Matt Borisch, of the issue.[12]  Based on M&T's post-petition due diligence, the total sales out of trust balance is currently in excess of $15 million plus additional amounts funded by M&Tin violation of the Loan Documents.

4.    <u>The Debtors regularly collected sales tax and other governmental fees and failed to remit approximately $5 million to government authorities.</u>

19.    In addition to the sales out of trust, prior to the Petition Date, the Debtors failed to account for and remit approximately $5 million in sales taxes and registration fees to relevant governmental authorities.

---

[11] Hoffman Depo. 13:17–14:3.
> Q.  Okay. Were any cash proceeds of a sale contract of a boat, a contract between one of the Tommy's entities and the customer, were any of those proceeds sent anywhere other than to M&T Bank?
> A.  Ever?
> Q.  Yes.
> A.  Yes.
> Q.  Okay. What were those circumstances?
> A.  There were times when boat proceeds would be deposited directly into an MKB Holdings bank account.

[12] Hoffman Depo. 22:17-23:1.
> A.  My understanding is that when a boat is sold and we receive funds for it we have to remit the amount of cost on the loan for that boat to M&T.
> Q.  And you became aware at some point that that in fact was not being done by Tommy's or by MKB, correct?
> A.  Correct.
> Q.  I'm sorry, did you say yes?
> A.  Yes, that's correct.
> Q.  Okay. And did you ever report that to Mr. Borisch?
> A.· Yes.

> 5.    The Debtors are locked out of 3 locations and cannot operate their business due to failure to pay rent at the premises.

20.    The Debtors are currently locked out and unable to operate at least three of their locations.[13] Shuttered locations only exacerbate the Debtors' financial woes, and further drains M&T's cash collateral.

> 6.    The Debtors are experiencing critical losses of employees responsible for cash reporting and generation of revenue.

21.    According to the Debtors, they have received approximately sixty resignations since the Petition Date and immediately prior. These defections include back office staff, as well as sales staff, service staff, and location managers that are key in driving revenue for the Debtors. These material losses have made it more difficult for the Debtor to operate and for the Debtor to deliver the revenues required to not only pay M&T the balances owed but pay general administrative costs of managing the estate.

> 7.    The Debtors have inadequately disclosed funding of professional fees.

22.    On June 3, 2024, the Debtors filed their *Disclosure of Compensation of Attorney for Debtor*. Dkt. 110 ("**Disclosure**"). According to the Disclosure and other diligence conducted by M&T, the Debtors and their advisors received payment of their retainer from non-debtor Artemis Capital, LLC ("**Artemis**"). The Disclosure does not describe, and M&T has been unable to discern, the purpose for Artemis's involvement in the Debtors' bankruptcy case or the nature, extent or source of consideration provided to Artemis for apparently advancing $550,000 to Debtors' professionals.

---

[13] For example, the Debtors are unable to operate their Phoenix and Las Vegas locations. Those locations were part of a pre-petition acquisition, wherein non-debtor MKB Holdings was both tenant of the locations and purchaser under an Asset Purchase Agreement. Prepetition, MKB Holdings breached the lease and the APA. Thus, contrary to Debtors' intimations, any sale of such shuttered premises would require the cooperation of landlords and significant cash to cure rent delinquencies and related breaches of the relevant agreements.

8. <u>The Debtors have failed to rationalize expenses.</u>

23. Upon information and belief, the Debtors' cash losses for the period of January 1, 2024 through the Petition Date exceed $20 million. Those losses appear to be continuing during the post-petition period.

24. M&T has been able to review the Debtors projected payroll, post-petition accounts payable, rent, unpaid trust fund tax liabilities, and the accumulation of sales out of trust and has determined the Debtors are administratively insolvent.

### III. ARGUMENT

25. The Bankruptcy Code generally permits a Chapter 11 debtor to remain in control of their assets and business operations provided that current management "can be depended upon to carry out the fiduciary responsibilities of a trustee." *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) (*quoting Wolf v. Weinstein*, 372 U.S. 633, 651 (1963)). But, when a debtor is incapable of performing these fiduciary duties, or when confidence in the debtor evaporates, a chapter 11 trustee may be appointed (a) for cause— particularly where, as here, there is evidence of fraud, dishonesty, incompetence, or mismanagement by the debtor's leadership; or (b) when it is shown that appointment of a trustee would be in the best interests of the Debtors' creditors and the estate. *See In re Marvel Entm't Group, Inc.* 140 F.3d 463, 473 (3d Cir. 1998).

**A. Section 1104(a)(1): Mandatory Appointment of a Chapter 11 Trustee for "Cause", Including Fraud, Dishonesty, Incompetence, Or Gross Mismanagement**

26. Section 1104(a)(1) of the Bankruptcy Code provides authority for the mandatory appointment of a chapter 11 trustee if "cause" exists. *Marvel*, 140 F.3d at 471–72; *In re V. Savino Oil & Heating Co.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989) (once the court has found

that cause exists under § 1104(a)(1) there is no discretion; an independent trustee must be appointed).  Section 1104 (a)(1) provides:

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a)(1); *In re Cajun Elec. Power Coop.*, 191 B.R. 659, 661 (Bankr. D. La. 1995), *aff'd* 74 F.3d 599 (5th Cir.), *cert denied*, 519 U.S. 808 (1996). Cause for appointment of a trustee must be by current management, but it can relate to either pre-petition or post-petition acts or omissions.  11 U.S.C. § 1104(a)(1).

27.     Under § 1104(a)(1), the words "including" and "or similar cause" indicate that the grounds for appointing a chapter 11 trustee are not limited to the derelictions specifically enumerated.  *Marvel*, 140 F.3d at 472; *Savino Oil*, 99 B.R. at 525. In addition to fraud and gross mismanagement, courts have also found that conflicts of interest, continuing losses, and acrimonious relationships between management and creditors may justify cause to appoint a Chapter 11 trustee. *See In re Patman Drilling Int'l, Inc.*, No. 07-34622-SGJ, 2008 WL 724086, at *6 (Bankr. N.D. Tex. Mar. 14, 2008).

28.     Here, the Debtors' (1) prepetition gross mismanagement, (2) continuing losses to the estate, and (3) acrimonious relationships with creditors constitutes cause for appointment of a trustee.

    1.    <u>Gross Mismanagement of the estate constitutes cause to appoint a Chapter 11 trustee.</u>

29.     The Debtors' prepetition commingling of assets between accounts of the Debtors and the Debtors' sales out of trust constitute cause to appoint a Chapter 11 trustee. *See In re*

*Anchorage Boat Sales, Inc.*, 4 B.R. 635, 645 (Bankr. E.D.N.Y. 1980) (finding that lack of accounting system and sales out of trust constituted cause to appoint a Chapter 11 trustee). "Diversion of funds and misuse of corporate assets constitutes fraud or dishonesty sufficient to warrant appointment of a trustee under section 1104(a)(1)." *In re PRS Insurance Group, Inc.*, 274 B.R. 381, 385 (Bankr. D. Del. 2001); *see also In re Professional Accountants Referral Svcs., Inc.*, 142 B.R. 424, 428-29 (Bankr. D. Color. 1992) (diversion of corporate assets for personal use constitutes dishonesty or gross mismanagement which required the appointment of a trustee); *In re Bibo, Inc.*, 76 F.3d 256, 257 (9th Cir. 1996) (court had "ample basis" for appointing a trustee where management had siphoned funds from the debtor through kickbacks); *Sharon Steel*, 871 F.2d at 1228 (systemic syphoning of debtor's assets to other companies under shareholder's common control constituted cause for appoint of trustee).

30.     Additionally, the Debtors' prepetition misuse of funds held in trust—in violation of their duties to M&T and numerous state agencies—constitute cause of appoint a Chapter 11 trustee. Additionally, the Debtors had a duty to ensure that taxes were timely paid to state regulatory agencies, and a duty to hold the proceeds of marine inventory in trust for M&T. The Debtors failed to do so and have provided no explanation. Rather, prepetition, the Debtors wrongfully moved funds out of the Debtors' accounts and into the account of non-debtor MKB Holdings. Courts have found that such actions constitute the dishonesty and mismanagement described in 11 U.S.C. § 1104(a). *See e.g. In re Amerejuve, Inc.*, No. 14-35482, 2015 Bankr. LEXIS 1496, at *29 (Bankr. S.D. Tex. Apr. 29, 2015) (finding that use of payroll taxes out of trust was cause to appoint a chapter 11 trustee).

31.     Moreover, "[o]ne of the most fundamental and crucial duties of a debtor-in-possession upon the filing of a Chapter 11 petition is to keep the Court and creditors informed

about the nature, status and condition of the business undergoing reorganization." *Savino*, 99 B.R. at 526. Consequently, the Debtors' inability to provide sufficient, accurate financial data constitutes cause to appoint a trustee. *See In re Sharon Steel Corp*., 871 F.2d 1217, 1228 n. 15 (3rd Cir.1989) (noting that inaccurate, incomplete recordkeeping alone amounts to cause requiring appointment of a trustee under 11 U.S.C. § 1104(a)(1)) (collecting cases.).

    2. <u>The Debtors' conflicts of interest constitute cause to appoint a Chapter 11 trustee.</u>

  32. A debtor's fiduciary duties owed to the bankruptcy estate include the duty of loyalty, which precludes the debtor's directors and officers from engaging in self-dealing. *In re Patman Drilling Int'l, Inc.*, 2008 WL 724086, at *2. Where transactions between the debtor and insiders warrant investigation and may result in litigation, the current management of the debtor is not the appropriate party to pursue that investigation because of conflicting loyalties with regard to those transactions. *Id*. (finding cause to appoint a chapter 11 trustee where, among other things, the debtor's potential for investigation and pursuit of litigation constituted a conflict of interest). That is because "the debtor's ability to fulfill its duty of care to protect the assets, its duty of loyalty, and its duty of impartiality" is at the heart of the analysis. *In re Westbank Holdings, LLC*, No. 22-10082, 2022 WL 3052135, at *14 (Bankr. E.D. La. Aug. 1, 2022)

  33. While the Debtors have not filed their statements of financial affairs, M&T's post-petition discovery and analysis by M&T's financial advisors have uncovered numerous instances of conveyances to non-debtor affiliates including MKB Holdings. The sheer volume of intercompany transfers forces the parties to presume that Borisch and the Debtors' management will be unable to conduct the impartial investigations and make the decisions required to evaluate and pursue intercompany claims on behalf of the Debtors' estate. *See e.g.*

*Westbank*, 2022 WL 3052135, at *15 (finding cause to appoint trustee where intercompany transfers presented conflict of interest); *In re McCorhill Pub., Inc.*, 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987) ("[w]here there are questionable inter-company financial transfers and the principals of the debtor occupy conflicting positions in the transferee companies, a trustee should be appointed in the best interests of creditors and all parties in interest in order to investigate the financial affairs of the debtor.").

34.     Additionally, further investigation into the relationship between Artemis and the Debtors is necessary. The Debtors are an inappropriate party to conduct such an investigation, and an impartial Chapter 11 trustee better suited to do so.

3.     <u>The Debtors' continuing losses to the estate constitute cause to appoint a Chapter 11 trustee.</u>

35.     The Debtors' projected cash flow demonstrates that continued operation under the Debtors' leadership will lead to substantial cash losses. Court have held that continued losses to the estate may constitute cause to appoint a Chapter 11 trustee. *In re Ionosphere Clubs, Inc.*, 113 B.R. at 170 (Bankr. S.D.N.Y. 1990) ("The Debtors' inability to formulate a business plan and make operating projections which have a longevity of more than several months, along with the continuing enormous operating losses being sustained by the estate, mandate that this Court order the appointment of a trustee for cause . . . the magnitude of the Debtors' losses together with the Debtors' inability to make reliable forecasts, even over a short period of time, supports a finding that [Debtors'] owner manager . . . is not competent to reorganize this estate.").

    4.    <u>M&T's lack of confidence in Debtor's management constitutes cause.</u>

36.    The Debtors' business practices leave M&T without confidence in the Debtors' management's ability to oversee a successful liquidation and work effectively with key parties in interest. *See In re Marvel Entertainment, Inc.* 140 F.3d 463, 474 (3d Cir. 1998) (acrimony between debtor and creditor could rise to the level of cause to appoint a trustee) (citing *Cajun Elec.,* 69 F.3d at 747). Here, a reorganization is not likely and the Debtors' assets should be liquidated. Without the use of cash collateral, the Debtors are patently unable to oversee this process. *In re Euro-Am. Lodging, Corp.*, 365 B.R. 421, 432 (Bankr. S.D.N.Y. 2007) (holding that lack of confidence in management and the greater likelihood that a planned sale will be consummated with a trustee justifies appointment).

37.    Further, the Debtors' management has demonstrated an inability to work in coordination with M&T, Malibu, and other key constituents in this case. Acrimony between the debtor and creditors, parties whose interests must be balanced and protected by the court, has consistently been held as cause to appoint a trustee. *In re Marvel Entertainment, Inc.* 140 F.3d at 474; *Cajun Elec.,* 69 F.3d at 747; *In re Patman Drilling Int'l, Inc*., 2008 WL 724086, at *6 (holding that trustee appointment was appropriate because of management's conflicts of interest, and creditors' lack of confidence).

38.    Thus, and as further described above, cause exists to appoint a Chapter 11 trustee to ensure the highest recovery for the Debtors' chapter 11 estate.

**B. Section 1104(a)(2): Discretionary Grounds for Appointment of a Chapter 11 Trustee: In the Interests of Creditors, Etc.**

39.    Section 1104(a)(2) provides courts broad discretion to appoint a Chapter 11 trustee even absent a finding of "cause," when the discretionary appointment of a Chapter 11

trustee in the interest of creditors. *In re Deena Packaging Industries, Inc.*, 29 B.R. 705, 706

(Bankr. S.D.N.Y. 1983) (appointing a trustee to protect the interests of creditors, entails

equitable considerations through which the court may exercise its discretionary powers).

Section 1104 (a)(2) provides:

> At any time after the commencement of the case but before confirmation of a
> plan, on request of a party in interest or the United States trustee, and after notice
> and a hearing, the court shall order the appointment of a trustee-- . . . (2) if such
> appointment is in the interests of creditors, any equity security holders, and other
> interests of the estate, without regard to the number of holders of securities of the
> debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104 (a)(2).

40.    Section 1104(a)(2) creates a flexible standard and allows the appointment of a

trustee even when no "cause" exists. *See In re Sharon Steel Corp.*, 871 F.2d 1217, 1228-29 (3d

Cir. 1989) (Under the discretionary determination of cause required by 11 U.S.C. § 1104(a)(1)

and the flexible standard embodied in (a)(2), the court acted within its discretion in concluding

that the totality of the circumstances signaled the need for a trustee); *In re Ionosphere Clubs*,

Inc., 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990).   In general, in deciding motions brought

pursuant to section 1104(a)(2), courts consider the following factors:

> (i) the trustworthiness of the debtor; (ii) the debtor in possession's past and
> present performance and prospects for the debtor's rehabilitation; (iii) the
> confidence or lack thereof of the business community and of creditors in present
> management; and (iv) the benefits derived by the appointment of a trustee,
> balanced against the cost of the appointment.

*In re Ionosphere Clubs, Inc.*, 113 B.R. at 169 (internal citations omitted); *In re Cajun Elec.*

*Power Coop.*, 191 B.R. 659, 661-662 (Bankr. D. La., 1995), *aff'd* 74 F.3d 599 (5th Cir.), *cert*

*denied*, 519 U.S. 808 (1996).

41.    In making its determination of whether to exercise its equitable powers to

appoint a trustee under Section 1104(a)(2), courts "look to the practical realities and necessities

inescapably involved in reconciling competing interests." *See In re Hotel Assocs., Inc.*, 3 B.R. 343, 345 (Bankr. E.D. Pa. 1980). A court should strongly consider appointment of a trustee when a reorganization is not possible and a debtor's principal "may be motivated to protect his own interests rather than the interests of creditors." *Mfrs. & Traders Tr. Co. v. Morningstar Marketplace, Ltd. (In re Morningstar Marketplace, Ltd.)*, 544 B.R. 297, 305 (Bankr. M.D. Pa. 2016).

42.    For the reasons described above, this Court should exercise is discretionary powers to appoint s Chapter 11 trustee for the benefit of the Debtors' estate.

## IV.    EMERGENCY RELIEF REQUESTED

35.    The facts and circumstances of this case require expedited consideration of M&T's Motion. Without the use of cash collateral, the Debtors' estate is in danger of incurring further liabilities without the ability to pay them, and the prompt appointment and installation of a Chapter 11 trustee is key to preserving value of the Debtors' estate for the benefit of its creditors.

WHEREFORE, M&T, with the agreement of the Debtors, respectfully requests that the Court grant M&T's Motion, which the United States Trustee does not oppose, and for such other relief to which M&T is entitled.

Respectfully submitted,
June 12, 2024

**NORTON ROSE FULBRIGHT US LLP**

  */s/ Toby L. Gerber*
Toby L. Gerber (SBT 07813700)
Michael Berthiaume (SBT 24066039)
**NORTON ROSE FULBRIGHT US LLP**
2200 Ross Ave., Suite 3600
Dallas, TX 75201
Telephone: (214) 855-8274
Facsimile: (214) 855-8200
Email: toby.gerber@nortonrosefulbright.com
michael.berthiaume@nortonrosefulbright.com

and

Jason L. Boland (SBT 24040542)
**NORTON ROSE FULBRIGHT US LLP**
1550 Lamar Street, Suite 2000
Houston, Texas 77010
Telephone: (713) 651-5151
Facsimile: (713) 651-5246
Email: jason.boland@nortonrosefulbright.com

## CERTIFICATE OF CONFERENCE

In accordance with L.B.R. 9007-1(f), I hereby certify that on June 10, 2024 I conferred via teleconference with the Debtors and the United States Trustee through their respective counsel to determine whether agreement on the Motion could be met.  The Debtors have agreed to emergency consideration of and to the relief sought in the Motion. The United States Trustee has indicated it does not oppose emergency consideration or the relief sought in the Motion.

*Toby L. Gerber*
Toby L. Gerber

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading was served by CM/ECF Notification on June 12, 2024 in accordance with Bankruptcy Rule 9036 and L.B.R. 9036-1. Additionally, a true and correct copy of the foregoing pleading was served via first class mail on all parties listed on the Complex Service List.

*/s/ Toby Gerber*
Toby Gerber