Toby Gerber (SBT 07813700)
Michael Berthiaume (SBT 24066039)
**NORTON ROSE FULBRIGHT US LLP**
2200 Ross Ave., Suite 3600
Dallas, TX 75201
Telephone: (214) 855-8274
Facsimile: (214) 855-8200
Email: toby.gerber@nortonrosefulbright.com
michael.berthiaume@nortonrosefulbright.com

Jason L. Boland (SBT 24040542)
**NORTON ROSE FULBRIGHT US LLP**
1550 Lamar Street, Suite 2000
Houston, Texas 77010
Telephone: (713) 651-5151
Facsimile: (713) 651-5246
Email: jason.boland@nortonrosefulbright.com

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| IN RE:<br><br>TOMMY'S FORT WORTH, LLC, *et al*,[1]<br><br>DEBTOR. | §<br>§<br>§<br>§<br>§<br>§<br>§ | CHAPTER 11<br><br>CASE NO. 24-90000<br><br>(JOINTLY ADMINISTERED) |

## M&T BANK'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF AGREED EMERGENCY MOTION TO APPOINT CHAPTER 11 TRUSTEE

M&T Bank ("**M&T**"), by and through its attorneys of record, hereby submits its Proposed Findings of Fact and Conclusions of Law in Support of the Agreed Emergency Motion to Appoint Chapter 11 Trustee (together with the brief in support, the "**Motion**"):

1.  The Debtors, who operate boat dealerships in Michigan and other states, filed these cases on May 20, 2024 (the "**Petition Date**") without warning or consultation with M&T, their senior secured lender, or to the Michigan state court-appointed receiver who was in possession of M&T's collateral.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tommy's Fort Worth, LLC (3473); Tommy's Holding Company, LLC (2662); Tommy's Grand Rapids, LLC (9224); Tommy's Castaic, LLC (7501); Tommy's Lewisville, LLC (4750); High Country Watersports, LLC (6160); Walloon Lake Village Marina, LLC (0277); MKB Florida Holdings, LLC (5698); Tommy's Detroit, LLC (5242); Tommy's California Fresno, LLC (8597); Tommy's Phoenix, LLC (3036); Tommy's Las Vegas, LLC (7721); Tommy's Chattanooga, LLC (0839); Tommy's California Ventura, LLC (5149); Tommy's Rancho Cordova, LLC (1070); Tommy's Stockton, LLC (1338); and Tommy's Knoxville, LLC (8052).

2. Since the Petition Date, the Debtors have expended more than $1.4 million of M&T's collateral culminating in this Court's denial on Debtors' most recent request for use of cash collateral pursuant to a proposed 13-week Cash Forecast. *See Order Denying Debtors' Request for Entry of Fourth Interim Cash Collateral Order*, Dkt. 149.

3. The Debtors have agreed to the relief sought in the Motion, including to the appointment of an independent fiduciary to oversee the administration and efficient wind-down of the Debtors' estates.

4. The Debtors executed and delivered to M&T a Variable Rate Demand Note (Floor Plan) dated May 18, 2023 (the "**Floor Plan Note**"). The Debtors also executed and delivered to M&T a Revolving Line Note (New York) dated May 18, 2023 (the "**Revolving Note**," and collectively with the Floor Plan Note, the "**Notes**"), and a Loan Agreement (Floor Plan Financing) dated May 18, 2023 (the "**Loan Agreement**"). Pursuant to the Notes and Loan Agreement, M&T made two revolving credit loans to the Debtors for purposes of providing floor plan financing and working capital, in an aggregate maximum principal amount totaling over $115,000,000.00 (the "**Loans**"). On May 17, 2023, Debtors executed a General Security Agreement (New York) (the "**Security Agreement**"). The Notes, Loan Agreement, Security Agreement, and related documents are referred to collectively as the "**Loan Documents**."[2]

5. Under the terms of the Security Agreement, M&T was granted a first priority lien on all of the Debtors' accounts, inventory, equipment, general intangibles and all other business assets and personal property including, without limitation, all boats, trailers, and other marine

---

[2] The Loan Documents are attached to the Motion as Exhibit 1; *M&T Bank's Appendix in Support of Emergency Motion to Appoint Chapter 11 Trustee* ("**Appx**") at M&T 00002.

inventory (whether acquired by the Debtors with Loan advances or otherwise), and all products, replacements, cash and non-cash proceeds thereof. *See* Security Agreement § 1.1. ("**Collateral**").

6. Under the floor plan financing arrangement, M&T loaned funds to the Debtors to buy marine inventory for resale or rental. Upon the sale of a boat and or trailer, Debtors agreed to hold the proceeds in trust and remit to M&T for repayment of the amount advanced to Debtors by M&T to purchase the boat (the "**Proceeds**"). *See* Loan Agreement, § 9.1. The Debtors also agreed to provide M&T with accurate monthly dealership statements in order to disclose which boats have been sold and which boats are still in inventory. *Id*., § 11.l (ii). Pre-bankruptcy, the Debtors, however, failed to remit some sale proceeds to repay the loans. In the months preceding bankruptcy the Debtors sold millions of dollars of M&T's collateral proceeds out of trust.

7. M&T also learned that Malibu Boats, Inc., the Debtors' primary supplier of new boat inventory ("**Malibu**") sent the Debtors a letter dated March 22, 2024 explaining that all dealer agreements between each Borrower and Malibu had either expired on June 30, 2023, or were terminated on March 11, 2024 (the "**Malibu Termination Letter**").[3] The Malibu Termination Letter stated that Malibu would not sell any more Malibu or Axis boats to Debtors and that Malibu "does not anticipate entering into dealer agreements with any of the Tommy's Dealerships [the Debtors] for the reminder of model year 2024, model year 2025, and beyond." The termination of the Malibu Dealer Agreements was a material adverse change and an Event of Default under Section 7.l(xiii) of the Security Agreement. In addition, since the Malibu Termination Letter, Malibu has entered into new dealership agreements with dealerships in all

---

[3] See Malibu Termination Letter attached to the Motion as Exhibit 2; Appx. M&T 00091.

but one of the Debtors' former geographic territories.[4] These events are Events of Default under the floor financing arrangement with M&T Bank.

8. Pursuant to the terms of the Loan Documents, upon an event of default, M&T may, at its option move for the appointment a receiver. Security Agreement, § 7.2.6. On April 22, 2024, the Circuit Court for the County of Kent, Michigan (the "**Michigan Court**") entered a Consent Order Appointing Receiver ("**Receivership Order**").[5] Pursuant to the Receivership Order, the Michigan Court determined that the Loans were properly secured by all Collateral as defined under the Security Agreement (*see* Receivership Order, ¶ D), and found that the Receivership Property (as defined therein) "is likely insufficient to satisfy [M&T]'s claims." *Id*., ¶ H. Further, the Receivership Order determined that it was appropriate to appoint a receiver to preserve the Receivership Property. In aid of the receiver, the Debtors were obligated to cooperate with the receiver and turnover to the receiver all Collateral. Id., ¶ 1.6.

9. According to the Receiver's Status Report (the "**Receiver's Report**"),[6] the receiver reported to the Michigan Court that the Debtors had failed to provide the receiver with requested information in a timely and reliable basis. To the contrary, the Debtors actively stonewalled the receiver's attempts to verify key financial information.

10. The Receiver's Report confirms that the Debtors' funds were commingled with bank accounts in the name of non-debtor, MKB Holdings. Receiver's Report, ¶ 9. These bank accounts were not maintained at M&T, in breach of the Loan Documents.

---

[4] See Form 8-K attached to the Motion as Exhibit 3; Appx. M&T 00093.

[5] See Receivership Order attached to the Motion at Exhibit 4; Appx. M&T 00097.

[6] See Receiver's Report attached to the Motion as Exhibit 5; Appx. M&T 00121.

11. Since the filing of the bankruptcy case, ongoing due diligence by M&T regarding the pre- and post-petition cash management of the Debtors have illuminated additional concerns in addition to those described above.

12. On May 22, 2024, the Debtors filed their *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protecting, (III) Modifying the Automatic Stay, (IV) Setting a Second Interim Hearing, (V) Setting a Final Hearing, and (V) Granting Related Relief* [Docket No. 12] (the "**Cash Collateral Motion**"). M&T objected to the Cash Collateral Motion in its *Omnibus Objection of M&T Bank to Certain Emergency Motions* [Dkt. 21] and its *Supplemental Objection to Debtor's Cash Collateral Motion* [Dkt. 106] (together the "**Cash Collateral Objection**").

13. Because the Debtors did not reach an agreement with M&T for the use of cash collateral, the Debtors proposed the use of M&T's cash collateral in exchange for adequate protection liens, super-priority claims, and adequate protection payments. As described in M&T's Cash Collateral Objection, the proposed adequate protection in the Cash Collateral Motion was insufficient to provide M&T with the requisite protection for the potential for diminution of its interests. Further, because Malibu has ended its relationship with the Debtors, the Debtors have no means of replacing M&T's Collateral in the event they were to sell certain units of M&T's Collateral.

14. Ultimately, this Court agreed that the Debtors were unable to provide M&T adequate protection. In its ruling on the hearing held on June 7, 2024, this Court found that the Debtors were unable to carry their burden to demonstrate that M&T was adequately protected from the diminution of its interest and, therefore, denied further use of M&T's cash collateral. [Dkt. 145].

15. Since the Petition Date, ongoing due diligence and discovery propounded by M&T and its financial advisors have confirmed the Receiver's Report and illuminated the lack of corporate form established between and among the debtor entities and several non-debtor entities that existed prior to the Petition Date.

16. It is apparent that, prior to the Petition Date, cash flowed between the Debtors' bank accounts and bank accounts owned by non-debtor MKB Holdings[7]. The Debtors' books and records historically may not have properly accounted for these transfers.[8] Instead, it appears that the Debtors' principal, Matt Borisch, had the authority use the Debtors' bank accounts.[9] This potential lack of reporting has led to inadequate books and records that are inaccurate on their face.[10]

17. As described in the Cash Collateral Objection, the floor financing arrangement between the Debtors and M&T granted M&T a lien interest in all assets of the Debtors, including their marine inventory. This lien is only to be released when M&T receives payment for the inventory, which occurs after the Debtors effectuate a sale of the marine inventory (a boat and/or

---

[7] *Deposition of Denielle Hoffman*, attached to the Motion as <u>Exhibit 6</u> Appx. M&T 00139 ("**Hoffman Depo**"), 15:7–10.
> Q. Tommy's. How did the money get from MKB Holdings' bank account to Tommy's?
> A. There have been times where payments for Tommy's operations would be made directly out of the MKB Holdings bank account.

[8] Hoffman Depo. 30:9-12.
> Q. Well, I'm asking you the practical question. Were they reflected on books and records of either company?
> A. In some cases I believe they were, in some cases they may not be.

[9] Hoffman Depo. 17:24–18:1.
> Q. Okay. Once the funds got into MKB Holding, who was responsible for deciding how those funds would be used?
> A. Matt Borisch.

[10] Hoffman Depo. 30:16-19.
> Q. So what you're saying is that whatever is reflected on the books and records would not be accurate, because not all the transactions were recorded?
> A. That's correct.

trailer). Despite that obligation, M&T has confirmed that the Debtors sold numerous boats and trailers and failed to remit those sale proceeds to M&T.

18. Since the Petition Date, M&T's ongoing due diligence has revealed the Debtors' finance team was aware of these sales out of trust[11] and alerted the Debtors' principal, Matt Borisch, of the issue.[12] Based on M&T's post-petition due diligence, the total sales out of trust balance is currently in excess of $15 million plus additional amounts funded by M&T.

19. In addition to the sales out of trust, prior to the Petition Date, the Debtors failed to account for and remit approximately $5 million in sales taxes and registration fees to relevant governmental authorities.

20. The Debtors are currently locked out and unable to operate at least three of their locations.[13] Shuttered locations only exacerbate the Debtors' financial woes, and further drains M&T's cash collateral.

---

[11] Hoffman Depo. 13:17–14:3.
    Q. Okay. Were any cash proceeds of a sale contract of a boat, a contract between one of the Tommy's entities and the customer, were any of those proceeds sent anywhere other than to M&T Bank?
    A. Ever?
    Q. Yes.
    A. Yes.
    Q. Okay. What were those circumstances?
    A. There were times when boat proceeds would be deposited directly into an MKB Holdings bank account.

[12] Hoffman Depo. 22:17-23:1.
    A. My understanding is that when a boat is sold and we receive funds for it we have to remit the amount of cost on the loan for that boat to M&T.
    Q. And you became aware at some point that that in fact was not being done by Tommy's or by MKB, correct?
    A. Correct.
    Q. I'm sorry, did you say yes?
    A. Yes, that's correct.
    Q. Okay. And did you ever report that to Mr. Borisch?
    A. Yes.

[13] For example, the Debtors are unable to operate their Phoenix and Las Vegas locations. Those locations were part of a pre-petition acquisition, wherein non-debtor MKB Holdings was both tenant of the locations and purchaser under an Asset Purchase Agreement. Prepetition, MKB Holdings breached the lease and the APA. Thus, contrary to Debtors' intimations, any sale of such shuttered premises would require the cooperation of landlords and significant cash to cure rent delinquencies and related breaches of the relevant agreements.

21. According to the Debtors, they have received approximately sixty resignations since the Petition Date and immediately prior. These defections include backoffice staff, , as well as sales staff, service staff, and location managers that are key in driving revenue for the Debtors. These material losses have made it more difficult for the Debtor to operate and for the Debtor to deliver the revenues required to not only pay M&T the balances owed, but pay general administrative costs of managing the estate.

22. Despite the sharp and prolonged decline in revenue, the Debtors have continued to operate as a going concern. The Debtors have sustained substantial cash losses for the period of January 1, 2024 through the Petition Date. Those losses appear to be continuing during the post-petition period.

23. M&T has been able to review the Debtors projected payroll, post-petition accounts payable, rent, unpaid trust fund tax liabilities, and the accumulation of sales out of trust and has determined the Debtors are administratively insolvent.

24. The Debtors' (1) prepetition gross mismanagement, (2) continuing losses to the estate, and (3) acrimonious relationships with creditors constitutes cause for appointment of a trustee.

25. The Debtors' prepetition commingling of assets between accounts of the Debtors and the Debtors' sales out of trust constitute cause to appoint a Chapter 11 trustee. *See In re Anchorage Boat Sales, Inc.*, 4 B.R. 635, 645 (Bankr. E.D.N.Y. 1980) (finding that lack of accounting system and sales out of trust constituted cause to appoint a Chapter 11 trustee). "Diversion of funds and misuse of corporate assets constitutes fraud or dishonesty sufficient to warrant appointment of a trustee under section 1104(a)(1)." *In re PRS Insurance Group, Inc.*, 274 B.R. 381, 385 (Bankr. D. Del. 2001); *see also In re Professional Accountants Referral Svcs.,*

*Inc.*, 142 B.R. 424, 428-29 (Bankr. D. Color. 1992) (diversion of corporate assets for personal use constitutes dishonesty or gross mismanagement which required the appointment of a trustee); *In re Bibo, Inc.*, 76 F.3d 256, 257 (9th Cir. 1996) (court had "ample basis" for appointing a trustee where management had siphoned funds from the debtor through kickbacks); *Sharon Steel*, 871 F.2d at 1228 (systemic syphoning of debtor's assets to other companies under shareholder's common control constituted cause for appoint of trustee).

26. Additionally, the Debtors' prepetition misuse of funds held in trust—in violation of their duties to M&T—constitute cause of appoint a Chapter 11 trustee. Additionally, the Debtors had a duty to ensure that taxes were timely paid to state regulatory agencies, and a duty to hold the proceeds of marine inventory in trust for M&T. The Debtors failed to do so and have provided no explanation. Rather, prepetition, the Debtors wrongfully moved funds out of the Debtors' accounts and into the account of non-debtor MKB Holdings. Courts have found that such actions constitute the dishonesty and mismanagement described in 11 U.S.C. § 1104(a). *See e.g. In re Amerejuve, Inc.*, No. 14-35482, 2015 Bankr. LEXIS 1496, at *29 (Bankr. S.D. Tex. Apr. 29, 2015) (finding that use of payroll taxes out of trust was cause to appoint a chapter 11 trustee).

27. The Debtors' projected cash flow demonstrates that continued operation will lead to substantial cash losses. Courts have held that continued losses to the estate may constitute cause to appoint a Chapter 11 trustee. *In re Ionosphere Clubs, Inc.*, 113 B.R. at 170 (Bankr. S.D.N.Y. 1990) ("The Debtors' inability to formulate a business plan and make operating projections which have a longevity of more than several months, along with the continuing enormous operating losses being sustained by the estate, mandate that this Court order the appointment of a trustee for cause . . . the magnitude of the Debtors' losses together with the

Debtors' inability to make reliable forecasts, even over a short period of time, supports a finding that [Debtors'] owner manager . . . is not competent to reorganize this estate.").

28. The Debtors' business practices leave M&T without confidence in the Debtors' management's ability to oversee a successful liquidation and work effectively with key parties in interest. *See In re Marvel Entertainment, Inc.* 140 F.3d 463, 474 (3d Cir. 1998) (acrimony between debtor and creditor could rise to the level of cause to appoint a trustee) (citing *Cajun Elec.,* 69 F.3d at 747). Here, a reorganization is not likely and the Debtors' assets should be liquidated. Without the use of cash collateral, the Debtors are patently unable to oversee this process. *In re Euro-Am. Lodging, Corp.*, 365 B.R. 421, 432 (Bankr. S.D.N.Y. 2007) (holding that lack of confidence in management and the greater likelihood that a planned sale will be consummated with a trustee justifies appointment).

29. Further, the Debtors' management has demonstrated an inability to work in coordination with M&T, Malibu, and other key constituents in this case. Acrimony between the debtor and creditors, parties whose interests must be balanced and protected by the court, has consistently been held as cause to appoint a trustee. *In re Marvel Entertainment, Inc.* 140 F.3d at 474; *Cajun Elec.,* 69 F.3d at 747; *In re Patman Drilling Int'l, Inc.*, 2008 WL 724086, at *6 (holding that trustee appointment was appropriate because of management's conflicts of interest, and creditors' lack of confidence).

30. As described above, cause exists to appoint a Chapter 11 trustee to ensure the highest recovery for the Debtors' chapter 11 estate.

31. For the reasons described above, grounds also exist for this Court to exercise is discretionary powers to appoint a Chapter 11 trustee for the benefit of the Debtors' estate.

35. The facts and circumstances of this case require expedited consideration of M&T's Motion. Without the use of cash collateral, the Debtors' estate is in danger of incurring further liabilities without the ability to pay them, and the prompt appointment and installation of a Chapter 11 trustee is key to preserving value of the Debtors' estate for the benefit of its creditors.

June 14, 2024

                                                Respectfully submitted,

                                                **NORTON ROSE FULBRIGHT US LLP**

                                                */s/ Toby L. Gerber*
                                                Toby L. Gerber (SBT 07813700)
                                                Michael Berthiaume (SBT 24066039)
                                                **NORTON ROSE FULBRIGHT US LLP**
                                                2200 Ross Ave., Suite 3600
                                                Dallas, TX 75201
                                                Telephone: (214) 855-8274
                                                Facsimile: (214) 855-8200
                                                Email: toby.gerber@nortonrosefulbright.com
                                                michael.berthiaume@nortonrosefulbright.com

                                                and

                                                Jason L. Boland (SBT 24040542)
                                                **NORTON ROSE FULBRIGHT US LLP**
                                                1550 Lamar Street, Suite 2000
                                                Houston, Texas 77010
                                                Telephone: (713) 651-5151
                                                Facsimile: (713) 651-5246
                                                Email: jason.boland@nortonrosefulbright.com

                                                **Counsel to M&T Bank**

## CERTIFICATE OF SERVICE

    I hereby certify that a true and correct copy of the foregoing pleading was served by CM/ECF Notification on June 14, 2024 in accordance with Bankruptcy Rule 9036 and L.B.R. 9036-1.

                                            */s/ Toby L. Gerber*
                                            Toby L. Gerber