**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| TOMMY'S FORT WORTH, LLC., *et al.*,[1] | § | Case No. 24-90000 (ELM) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**DECLARATION OF MARK E. ANDREWS,**
**CHAPTER 11 TRUSTEE, IN SUPPORT OF CONFIRMATION**
**OF THE TRUSTEE'S FIRST AMENDED JOINT CHAPTER 11 PLAN**

Mark E. Andrews declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.      On June 18, 2024 (the "Appointment Date"), I was appointed as chapter 11 trustee (the "Trustee") in the above referenced chapter 11 cases. I submit this declaration ("Declaration") in support of confirmation of the *Trustee's First Amended Joint Chapter 11 Plan* [Docket No. 879, as modified by Docket No. 935-1] (as modified, amended, or supplemented from time to time, the "Plan").[2] If called as a witness, I would testify competently to the facts set forth in this Declaration.

**Background and Qualifications**

2.      I have extensive experience in, and knowledge of, debtors' protections, creditors' rights, and complex proceedings under chapter 11 of the Bankruptcy Code. I was first admitted to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tommy's Fort Worth, LLC (3473); Tommy's Holding Company, LLC (2662); Tommy's Grand Rapids, LLC (9224); Tommy's Castaic, LLC (7501); Tommy's Lewisville, LLC (4750); High Country Watersports, LLC (6160); Walloon Lake Village Marina, LLC (0277); MKB Florida Holdings, LLC (5698); Tommy's Detroit, LLC (5242); Tommy's California Fresno, LLC (8597); Tommy's Phoenix, LLC (3036); Tommy's Las Vega`s, LLC (7721); Tommy's Chattanooga, LLC (0839); Tommy's California Ventura, LLC (5149); Tommy's Rancho Cordova, LLC (1070); Tommy's Stockton, LLC (1338); and Tommy's Knoxville, LLC (8052).

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan.

the practice of law in 1983, and was practicing attorney for over 40 years, during which I regularly represented or served as a chapter 11 fiduciary in multiple venues around the United States, including Texas and the Northern District of Texas in particular.  For over 30 years, I have provided operational leadership, business turnaround, and bankruptcy services to companies in operational and financial distress across a broad array of industries.  I previously served as a chapter 11 trustee in a case involving the ownership and operation of a small community hospital, and I am also serving as a chapter 11 trustee in another case that is pending in the Western District of Texas.  Over the last five years, I have transitioned out of legal practice and into turnaround consulting, serving as a chief restructuring officer and similar roles.

3.       In an effort to achieve success in these bankruptcy cases, I have become familiar with the Debtors' businesses, financial affairs, capital structure, and creditor body.  I reviewed pleadings filed before the Appointment Date and have familiarized myself with the Court's prior rulings in the contested matters that predate my appointment.  I worked closely with the Debtors' management and personnel, representatives of M&T Bank, representatives of the Committee, and my professionals to assist with the myriad requirements of managing and ultimately winding down the Debtors' businesses over the course of the last 11 months.  The Plan is the result of my months-long work with all stakeholders (including the Borisch Parties and their representatives through private negotiations), and I believe it is a fair compromise that maximizes recoveries for the Debtors' bankruptcy estates, creditors, and other parties in interest.

4.       Except where specifically noted, the statements in this Declaration are based on: (i) my personal knowledge and experience, (ii) information provided by members of my professional team; (ii) information provided by current and former members of the Debtors' staff;

and (iii) my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives.

## **Introduction**

5.      The Plan is an embodiment of the significant efforts of the Trustee, M&T Bank, the Committee, and the key stakeholders of the Debtors' Estates throughout the Chapter 11 Cases.  I believe that confirmation of the Plan is in the best interests of the Debtors' estates and their stakeholders.  The key feature of the Plan includes a proposed settlement with M&T Bank, the Debtors' Prepetition Lender.  Under the settlement, M&T Bank will contribute at least $4 million of its cash collateral (the "Contributed Cash Collateral") (in addition to cash collateral previously used with M&T Bank's consent during the course of the chapter 11 cases).  The Contributed Cash Collateral will be funded into several Plan Reserves. The Plan Reserves will allow for payment of outstanding administrative expenses, professional fee claims, priority tax and non-tax claims, customer claim settlements, and pro rata distributions to other general unsecured non-priority creditors.  While the Plan does not pay all creditors in full, I believe that the Plan, in general, is in the best interest of creditors and represents a fair and equitable resolution of creditors' claims that far exceeds what creditors (other than M&T Bank) would receive through a chapter 7 liquidation. Indeed, without M&T Bank's agreed contributions, the Plan would not be feasible and the Trustee would have no ability to fund significant portions of the proposed distributions under the Plan to the holders of administrative and priority tax and non-tax claims.  Through the Plan, with M&T Bank's agreed contributions, the Trustee will use the Contributed Cash Collateral to fund distributions to administrative claimants, tax claimants, priority non-tax claimants, customers, and other general unsecured creditors.

6.      Matthew Borisch, the Debtors' direct or indirect equity holder and former president, filed an objection to the Plan, challenging, among other things, whether the Plan was proposed in good faith and whether the Plan provides disparate treatment to the Borisch Parties by excluding them from the Third-Party Releases.  As discussed below, the Plan is the product of extensive arms' length negotiations, which included direct discussions with Matthew Borisch and his representatives in advance of filing the initial Plan.  Before filing the Plan, I communicated with Mr. Borisch and his representatives several times, all in an effort to engage Mr. Borisch in settlement discussions and a potential mediation with M&T Bank.  Despite my best efforts to bring Mr. Borisch to the table, Mr. Borisch declined to meet M&T Bank's preconditions for a mediation or settlement conference.  On that basis, I had little choice but to proceed with the Plan process, reserving all claims against Mr. Borisch and the other Borisch Parties.  Under the circumstances, I believe the Borisch objection, along with all other objections to the Plan, should be overruled, and the Plan should be confirmed.

## I.      The Plan Satisfies the Requirements of Confirmation.

7.      I have been advised of the applicable standards under which a plan of reorganization may be confirmed.  For the reasons detailed below, and with the consultation and guidance of my financial advisors and legal counsel, I believe that the Plan satisfies the applicable Bankruptcy Code requirements for confirmation.  I have set forth the reasons for such belief below, except where such compliance is apparent on the face of the Plan, the Plan Supplement, or the related documents, or where it will be the subject of evidence introduced at the Confirmation Hearing.

**A.      The Plan Satisfies the Applicable Provisions of the Bankruptcy Code — Section 1129(a)(1).**

8.      I understand that section 1129(a)(1) of the Bankruptcy Code requires a chapter 11 plan to comply with all applicable provisions of the Bankruptcy Code.  As set forth below, I believe that the Plan satisfies section 1129(a)(1) of the Bankruptcy Code.

**1.      Proper Classification of Claims and Interests — Section 1122.**

9.      It is my understanding that section 1122 of the Bankruptcy Code requires that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

10.     Under Article III of the Plan, Claims and Interests are classified as follows:

Class 1: Priority Non-Tax Claims
Class 2: Prepetition Lender's Secured Claims
Class 3: Other Secured Claims
Class 4: Customer Constructive Trust Claims
Class 5: General Unsecured Claims
Class 6: Contribution Claims
Class 7: Intercompany Claims
Class 8: Equity Interests

11.     I believe that the Claims and Interests assigned to each particular Class described above are substantially similar to the other Claims or Interests, as applicable, in such Class.  In addition, I believe that valid business, legal, and factual reasons justify the separate classification of particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests.  Namely, the Plan separately classifies the Claims or Interests because each Holder of such Claims or Interests may hold (or may have held) rights in the Estates legally dissimilar to the Claims or Interests in other Classes or because substantial administrative convenience resulted from such classification.  For example, Claims (rights to payment) are classified separately from Interests (representing

5

ownership in the business). Prepetition Lender's Secured Claims (Class 2) and Other Secured

Claims (Class 3) are classified separately because the Prepetition Lender's lien rights and collateral

packages are materially different from the rights of the Other Secured Claims. Secured Claims are

classified separately from unsecured Claims because the Debtors' obligations with respect to the

former are potentially secured by collateral.

12.     Customer Constructive Trust Claims (Class 4) are classified separately from

General Unsecured Claims (Class 5) because certain customers have equitable remedies that

justify alternative treatment from other General Unsecured Creditors. The Plan defines Customer

Constructive Trust Claims as a claim arising from "the Debtors' prepetition failure to remit

proceeds from the sale of the customer's boat, whether such boat was traded into the Debtors for

a new boat, maintained by the Debtors under a consignment arrangement, or otherwise sold to the

Debtors before the Petition Date." Plan Art. I.A.30. The failure to remit sale proceeds from these

boats has left certain creditors with hardships such as the inability to obtain clear title on their

purchased boats, or ongoing obligations to pay off third-party lenders. The Plan offers a settlement

to these Class 4 creditors to resolve equitable remedies that these creditors might have against each

other and M&T Bank. For this reason, I believe the circumstances justify disparate treatment

between Class 4 and Class 5 creditors.

13.     Another separate classification is the Contribution Claims (Class 6), which are

defined as a "Claim for contribution or reimbursement by a Person that is liable with a Debtor on

a Claim held by another creditor (including, for the avoidance of doubt, indemnification claims

against a Debtor) of any kind or nature whatsoever, whether arising under or pursuant to any type

of bylaws, organizational, formation or governance documents or agreements, board resolutions,

management or indemnification agreements, guaranty agreement, employment or other services

4919-1490-2335

contracts, at law, in equity or otherwise." Plan Art. I.A.29. I elected to place these creditors into their own class because section 509 of the Bankruptcy Code contemplates slightly different treatment for creditors holding such claims.

14.     Intercompany Claims (Class 7) as placed into their own class because the Debtors are liquidating. Because the Plan proposes to fund Plan Reserves from M&T Bank's Contributed Cash Collateral, and because the Plan proposes a liquidation of all Debtors, I do not believe it would be an efficient use of resources to reconcile the Debtors' Intercompany Claims for the purposes of making distributions internally. Rather, the Plan proposes to make distributions directly to creditors, without taking this intermediate reconciliation step. In all, I believe the separate classification and treatment for Intercompany Claims is justified by the circumstances of these cases.

15.     Equity Interests are also classified separately based upon their junior status.

16.     Accordingly, I believe that the Plan complies with and satisfies section 1122(a) of the Bankruptcy Code.

**2.     Designation of Classes of Claims and Interests — Section 1123(a)(1)).**

17.     I understand that section 1123(a)(1) of the Bankruptcy Code requires that the Plan designate certain classes of claims and interests. As discussed above, Article III of the Plan properly designates Classes of Claims and Interests. Accordingly, I believe that the Plan complies with and satisfies section 1123(a)(1) of the Bankruptcy Code.

**3.     Specification of Unimpaired Classes — Section 1123(a)(2).**

18.     I understand that section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan." Article III of the Plan identifies each Class that is Unimpaired, and no party has asserted otherwise. As such, I believe that the Plan complies with and satisfies section 1123(a)(2) of the Bankruptcy Code.

### 4.      Treatment of Impaired Classes — Section 1123(a)(3).

19.      I understand that section 1123(a)(3) of the Bankruptcy Code requires that the Plan specify the treatment of any impaired Classes of Claims and Interests. Article IV sets forth the treatment of each impaired Class, and no party has asserted otherwise. Accordingly, I believe that the Plan complies with and satisfies section 1123(a)(3) of the Bankruptcy Code.

### 5.      Equal Treatment within Classes — Section 1123(a)(4).

20.      I understand that section 1123(a)(4) of the Bankruptcy Code requires that the Plan provide the same rights and treatment to each holder of claims or interest as other holders of allowed claims or interests within such holders' respective class. The Plan provides the same treatment for each Claim or Interest of a particular class, except where a Holder of such Claim or Interest has agreed to a less favorable treatment. The slight variation on this "equal treatment" requirement is within Class 4, where the Plan proposes to pay either 45–60% or the actual amount necessary to pay off a third-party lien, if applicable. Not all creditors in this class have claims subject to a third-party lender. As explained above, I have done my best to provide a reasonable framework to address customer claim settlements within this Class, and these creditors have widely accepted the proposed treatment under the Plan, demonstrating their understanding and acceptance of this proposed framework. Accordingly, I believe that the Plan satisfies this requirement because each Holder of Allowed Claims or Interests will receive the same rights and treatment as all other Holders of Allowed Claims or Interests within the same class.

### 6.      Means for Implementation — Section 1123(a)(5).

21.      I understand that section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide adequate means for its implementation. The Plan satisfies this requirement, because Article VI of the Plan, as well as the documents and forms of documents, agreements, schedules,

and exhibits included in the Plan Supplement (as incorporated into the Plan), provide for the means

by which the Plan will be implemented.  Among other things, the Plan provides for:

a.  Sources of consideration for Plan Reserves and coordinates the distribution thereof via the establishment of the Creditor Trust and appointment of the Creditor Trustee;

b.  limited consolidation of the Debtors for the purpose of voting and distribution on account of Allowed Claims in Classes 1, 2, 3, 4, 5, and 6;

c.  the transfer and distribution of the Creditor Trust Assets, as well as the books, records, and files of the Debtors;

d.  cancellation of existing securities and issuance of the Creditor Trust Interests;

e.  discharge of the Chapter 11 Trustee, dissolution of the Committee, and the cessation of fee and expense payments thereto;

f.  automatic expiration of the terms of each member of each Debtor's current board of directors and board of managers as of the Effective Date;

g.  reservation and assignment of the Assigned Causes of Action and the Other Retained Causes of Action to the Prepetition Lender and the Creditor Trust, respectively; and

h.  other actions that the Creditor Trust, acting by and through the Creditor Trustee, determines to be necessary, including making filings or records that may be required by applicable Law in connection with the Plan.

22.  Accordingly, I believe the Plan satisfies section 1123(a)(5) of the Bankruptcy

Code, and no party has asserted otherwise.

**7.  Prohibition of the Issuance of Non-Voting Securities — Section 1123(a)(6).**

23.  I understand that section 1123(a)(6) of the Bankruptcy Code requires that a debtor's

corporate constituent documents prohibit the issuance of non-voting equity securities.  I understand

that the Trustee is liquidating the Debtors, therefore I believe that the prohibition on the issuance

of nonvoting equity securities is not applicable in this case.  However, Article VI.G of the Plan

9

provides that, on the Effective Date, all Equity Interests and any other certificate, security, share, note, bond, indenture, purchase right, option, warrant, certificates of designation or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Equity Interest, to the extent not already cancelled, shall be deemed cancelled and of no further force or effect.  Accordingly, I believe the Plan satisfies section 1123(a)(6) of the Bankruptcy Code, and no party has asserted otherwise.

### 8.    Directors and Officers — Section 1123(a)(7).

24.    I understand that section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto, be consistent with the interests of creditors and equity security holders and with public policy.  I believe that Article VI.I of the Plan satisfies this requirement by providing for the automatic expiration of the term of each member of each Debtor's current board of directors or board of managers on the Effective Date and the appointment of the Creditor Trustee in accordance with the terms of the Creditor Trust Agreement.

25.    Accordingly, I believe the Plan satisfies section 1123(a)(7) of the Bankruptcy Code, and no party has asserted otherwise.

### B.    The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.

26.    I understand that the Plan includes various discretionary provisions that are consistent with section 1123(b) of the Bankruptcy Code, but not necessary for confirmation under the Bankruptcy Code.  For example, the Plan provides for a general settlement of Claims and Interests, impairs certain Classes of Claims and Interests and leaves others Unimpaired, proposes treatment for Executory Contracts and Unexpired Leases, provides a structure for Claim allowance

and disallowance, and establishes a distribution process for the satisfaction of Allowed Claims entitled to distributions under the Plan.

27.     In addition, Article X of the Plan also contains release, exculpation, and injunction provisions.  I believe each of these provisions is appropriate because, among other things, each (a) is the product of arm's-length negotiations among various stakeholders, including the Committee and M&T Bank, (b) has been critical to obtaining the support of the various constituencies for the Plan, (c) is given for fair, sufficient, and adequate consideration, (d) was a material inducement for M&T Bank's agreement to provide the Contributed Cash Collateral, along with its overall support for the Plan, and (e) is fair and equitable and in the best interests of the Debtors, their Estates, and these Chapter 11 Cases.  Further, these provisions were fully and conspicuously disclosed to all parties in interest through the Confirmation Hearing Notice, Non-Voting Status Notice, Ballots and Opt-Out Form, each of which excerpted the full text of the release, exculpation and injunction provisions as set forth in the Plan.  Based on my extensive discussions with M&T Bank and the Committee, I do not believe I would have support for this Plan without these heavily negotiated provisions.  Such provisions are discussed in turn below but, in summary, I believe each satisfy the requirements of section 1123(b) of the Bankruptcy Code.

      **1.**      **The Plan Appropriately Incorporates a Settlement of Claims and Causes of Action.**

28.     The Plan provides for a general settlement of Claims and Interests in addition to the proposed settlement with M&T Bank.  I understand that pursuant to section 1123 of the Bankruptcy Code debtors may release causes of action held by their estates as consideration for the concessions made by their various stakeholders pursuant to the plan.  I also understand that Bankruptcy Rule 9019 provides trustees with a mechanism through which to seek approval of compromises and settlements. I believe that the general settlement of Claims and Interests under

the Plan including the proposed settlement with M&T Bank is "fair and equitable," because based on discussions with my advisors, I understand that the Plan complies with the absolute priority rule. The Plan does not provide any class skipping or other violations of the payment priorities governed by the Bankruptcy Code. Accordingly, I believe that both the general settlement of Claims and Interests under the Plan, including the proposed settlement with M&T Bank, is the product of my business judgment and is "fair and equitable."

### 2. The Releases by the Trustee.

29. I understand that the releases by the Trustee, as set forth in Article X.C of the Plan, provide that the Trustee, on behalf of each and all Debtors, shall release certain claims and Causes of Action that the Debtors' Estates may hold against third parties, including derivative claims. Assigned Causes of Action will be reserved and assigned to the Prepetition Lender, and Other Retained Causes of Action will be reserved and transferred to the Creditor Trust. The releases by the Trustee were heavily negotiated, and I believe they are appropriate, justified, and integral to the Plan. Accordingly, I believe the releases by the Trustee set forth in Article X.C of the Plan satisfy the requirements of section 1123(b) of the Bankruptcy Code.

30. I believe that the Trustee's releases in Article X.C of the Plan are justified under the circumstances, are the product of arms-length negotiations, are the result of my business judgment, are "fair and equitable" because they comply with the Bankruptcy Code's priority scheme. While certain Classes are deemed to have rejected the Plan, the releases by the Trustee and settlements embodied therein, and in the Plan, do not result in any junior Classes receiving or retaining any property on account of junior Claims or Interests.

31. In addition to being fair and equitable, I believe that the releases by the Trustee are in the best interest of the Debtors' Estates. *First*, key stakeholders of the Debtors' Estates were extensively involved in the Plan negotiation process, and there is extensive support for the Plan

among those key stakeholders.  In particular, and as discussed more fully below, the settlement

embodied in the Plan (including the releases by the Trustee) was negotiated by sophisticated

parties and counsel, including several months of negotiations among the Committee and M&T

Bank that resulted in the proposed settlement with M&T Bank and the support for the Plan.

32.    **Second,** the releases by the Trustee are essential terms, providing fair consideration

in exchange for the Released Parties' contributions to and support for the Plan.

33.    **Third**, the Plan, including the releases by the Trustee contained therein, is supported

by M&T Bank and the Committee.

34.    **Fourth**, my professional team (at my direction) has conducted a robust

investigation of all known Causes of Action.  Other than the claims and causes of action that are

specifically reserved and assigned under the Plan, my investigation did not uncover any viable

estate claims that, if litigated, are likely to produce value for the Debtors' Estates.  Accordingly, I

believe that the releases contained within Article X.C of the Plan are fair and reasonable and in the

best interests of the Debtors' Estates.

35.    For these reasons, I believe that the Trustee's releases are justified, a sound exercise

of my business judgment, and should be approved.

**3.    Third-Party Releases.**

36.    I understand that the Third-Party Releases set forth in Article X.D of the Plan

provides that each Releasing Party—including Holders of Claims and Interests who do not

specifically opt-out to their inclusion as a Releasing Party—solely in their capacity as such and to

the maximum extent permitted by the law, shall release any and all Causes of Action such

Releasing Parties could assert against the Released Parties.  This provision was heavily negotiated

among the Trustee, the Committee, and M&T Bank, and is an integral part of the Plan.  I believe

that, absent the Third-Party Releases, M&T Bank would not agree to provide the Contributed Cash

13

Collateral or its support for the Plan. I further believe that the Third-Party Releases benefit all stakeholders by providing finality to these Chapter 11 Cases. For example, the Third-Party Release mechanism avoids creditor-versus-creditor litigation arising from the Debtors' failure to remit sale proceeds following the Debtors' sales of consigned or otherwise encumbered boats. Moreover, I am advised and believe that the Third-Party Releases are consensual under prevailing Texas and Fifth Circuit law in that the Plan expressly allowed any party in interest to opt-out of the Third-Party Releases.

37.    *First*, I believe that the Releasing Parties were provided detailed notice about the Plan, the Objection Deadline, the Voting Deadline, and the opportunity to opt-out of the Third-Party Releases through the information in the Solicitation Package. Specifically, the Ballots each quoted the entirety of the Third-Party Releases in bold, conspicuous font and clearly informed Holders in the Voting Classes that a vote to accept the Plan is deemed consent to the Third-Party Releases. The Ballots further instructed Holders that if they do not consent to the Third-Party Releases, they should opt-out of the releases and either reject the Plan or abstain from voting on the Plan. Similarly, the Opt-Out Form quoted the Third-Party Release provisions in their entirety and included an option to check a box to opt-out of the Third-Party Releases. The *Second Amended Declaration of Jeriad R. Paul of Omni Agent Solutions, Inc. Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Trustee's First Amended Joint Chapter 11 Plan* [Docket No. 1001] (the "Ballot Tabulation") shows a significant amount of creditor participation in the voting process. Notwithstanding such participation, only three (3) parties submitted Opt-Out Forms. In addition, the Tennessee Department of Revenue affirmatively opted out of the Third-Party Releases in its objection to confirmation of the Plan [Docket No. 923]. Accordingly, I believe that the notice provided was unambiguous and that Holders of Claims and Interests fully

14

understood their rights to consent or opt-out of the Third-Party Releases. Under the circumstances, I believe the Court can find that those parties who did not return opt out forms have consented to the Third-Party Releases under applicable law.

38.     ***Second***, I understand that the Third-Party Releases are given for fair consideration. The Released Parties, including M&T Bank, have made significant concessions and commitments that will allow me to maximize the value of the Debtors' Estates. Specifically, M&T Bank will provide a substantial amount of Contributed Cash Collateral (in addition to Cash Collateral previously used with M&T Bank's consent during the course of the Chapter 11 Cases) to fund Plan Reserves. In addition to this Contributed Cash Collateral, M&T Bank has consented to releases of any claims it might have against the other Releasing Parties. Consenting Creditors, on the other hand, will be deemed to release any direct claims they may have against M&T Bank and other Consenting Creditors. Because the Debtors' mismanagement of cash in the months before the Petition Date left many customers and creditors to fend for themselves and potentially pursue remedies against each other, the Third-Party Release provisions are an essential provision in the Plan that ensures finality for Consenting Creditors. The mutuality of the contemplated Third-Party Releases provides adequate consideration to support the Third-Party Releases with respect to all Releasing Parties, including those that are not otherwise receiving any recovery under the Plan.

39.     ***Third***, I believe that the Third-Party Releases are sufficiently specific—listing the potential Causes of Action to be released—so as to put the Releasing Parties on notice of the released Claims. Plan Art. X.D (describing specifically the nature and type of claims released); Plan Art. I.A.83 (describing specifically the parties released). The Third-Party Releases explicitly list out the Causes of Action released, including, among others, those related to the Debtors, these Chapter 11 Cases, the Plan, the Disclosure Statement, and any related act or omission, transaction,

agreement, event or other occurrence taking place on or before the Effective Date.  *See* Plan Art.

X.D.  The Third-Party Releases also explicitly provide that the Borisch Parties are not receiving

Third-Party Releases under the Plan and that it is my intent that the Borisch Parties are neither

giving nor receiving any releases under the Plan.

40.     ***Fourth***, I believe that the circumstances of these chapter 11 cases warrant the

Third-Party Releases.  The Third-Party Releases are an integral aspect of the proposed settlement

with M&T Bank without which there would be no funds available to distribute under the Plan.

Moreover, I understand that the availability of the Third-Party Releases were key in securing the

support of the Released Parties to, among other things, provide the Contributed Cash Collateral

and negotiate the proposed settlement, both of which inured to the benefit of all stakeholders.  Put

simply, the Debtors' key stakeholders are unwilling to support the Plan without the assurance that

they and their collateral would not be subject to post-emergence litigation or other disputes related

to these cases, other than with respect to parties who expressly opt out.  The Third-Party Releases

therefore not only benefit the non-Debtor Released Parties, but also Consenting Creditors and the

Estates as a whole.

41.     Therefore, I believe that the Third-Party Releases are appropriate, justified, and

necessary under the facts and circumstances of these Chapter 11 Cases.

### 4.    Exculpation.

42.     I understand that Article X.B of the Plan provides that each Exculpated Party—*i.e.*,

the Trustee and the Creditors' Committee and each of its members—shall be released and

exculpated from any Cause of Action arising out of acts or omissions in connection with these

Chapter 11 Cases and certain related transactions, except for acts or omissions that are found to

have been the product of actual fraud, willful misconduct, or gross negligence (the "<u>Exculpation

Provision</u>").

43.     I believe that the Exculpation Provision in the Plan is an integral piece of the overall settlement embodied by the Plan.  It is limited to parties who have performed valuable services in connection with the administration of the Chapter 11 Cases, the Disclosure Statement, the preparation of the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the occurrence of the Effective Date, or the administration of the Plan or property to be distributed under the Plan.  The Exculpation Provision is narrowly tailored to exclude acts of actual fraud, willful misconduct, or gross negligence, and relates only to acts or omissions in connection with, or arising out, of the Debtors' liquidation.  It is my understanding that the Exculpation Provision was important to the development of a feasible, confirmable Plan, and the Exculpated Parties participated in these Chapter 11 Cases in reliance upon the protections afforded to those constituents by the Exculpation Provision.  Specifically, I believe that the Exculpated Parties would not have been willing to participate in the Debtors' restructuring efforts absent assurances that they would be exculpated for their conduct during these chapter 11 cases to the extent they acted in good faith.

44.     Accordingly, I believe that the Exculpation Provision is appropriate, justified, and necessary under the facts and circumstances of these Chapter 11 Cases.

**5.    Injunction.**

45.     It is my understanding that the injunction provision set forth in Article X.E of the Plan (the "Injunction Provision") is a necessary part of the Plan because it enforces the discharge, release, and exculpation provisions that are critically important to the Plan.  The Injunction Provision affords the Trustee and the key stakeholders of the Debtors' Estates (including, among others, the Released Parties and the Exculpated Parties) a greater degree of certainty with respect to the Chapter 11 Cases and the acts and transactions contemplated by the Plan by requiring the Court's authorization for parties to commence or pursue Claims or Causes of Action that relate to

17

or are reasonably likely to relate to any act or omission in connection with, relating to, or arising

out of a Claim or Cause of Action subject to the Releases by the Trustee, the Third-Party Release,

or the Exculpation Provision.  Further, as I announced at the hearing on approval of the Disclosure

Statement, I agreed to revise the Injunction Provision to resolve an objection raised by Matthew

Borisch.   Accordingly, I believe that the Injunction Provision is appropriate, justified, and

necessary under the facts and circumstances of these Chapter 11 Cases.

### C.       The Plan Complies with Section 1123(d) of the Bankruptcy Code.

46.     I understand that section 1123(d) of the Bankruptcy Code provides that the amount

proposed in a plan to cure a default will be determined in accordance with the underlying

agreement and applicable nonbankruptcy law.  Because the Plan does not contemplate the cure of

any defaults, I believe that section 1123(d) of the Bankruptcy Code is not applicable in this case

and no party has asserted otherwise.

### D.       The Trustee Has Satisfied the Applicable Provisions of the Bankruptcy Code — Section 1129(a)(2).

47.     I understand that section 1129(a)(2) of the Bankruptcy Code requires the plan

proponent to comply with the applicable provisions of the Bankruptcy Code.  I have been advised

that section 1129(a)(2) encompasses both the disclosure and solicitation requirements set forth in

section 1125 of the Bankruptcy Code, as well as the plan acceptance requirements set forth in

section 1126 of the Bankruptcy Code.

48.     I understand that the Court approved the Disclosure Statement as containing

adequate information, and I solicited and tabulated votes on the Plan in accordance with the

Solicitation Procedures approved by the Court in the Disclosure Statement Order.  As further

detailed in the Ballot Tabulation, the Trustee, through Omni Agent Solutions, the solicitation agent

approved under the Solicitation Procedures Order, complied with the content and delivery

4919-1490-2335

requirements of the Disclosure Statement Order. The same Disclosure Statement was distributed to each Holder of a Claim entitled to vote on the Plan.

49.    I solicited votes from the Holders of Claims in Impaired Classes entitled to vote under the Plan, as indicated below. The remaining Holders of Claims and Interests in the Classes listed in the table below are either Unimpaired under the Plan and therefore were deemed to accept the Plan or will not receive any distribution under the Plan and are therefore deemed to reject the Plan. While I did not solicit votes from the Holders of Claims and Interests in such Classes, I mailed (a) the Confirmation Hearing Notice and (b) the applicable Notice of Non-Voting Status to such Holders in accordance with the Disclosure Statement Order. The Classes not entitled to vote on the Plan and each Class's respective status are as follows:

4919-1490-2335

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| *1* | *Priority Non-Tax Claims* | *Impaired* | *Yes* |
| *2* | *Prepetition Lender's Secured Claims* | *Impaired* | *Yes* |
| 3 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| *4* | *Customer Constructive Trust Claims* | *Impaired* | *Yes* |
| *5* | *General Unsecured Claims* | *Impaired* | *Yes* |
| *6* | *Contribution Claims* | *Impaired* | *Yes* |
| 7 | Intercompany Claims | Impaired | No (deemed to reject) |
| 8 | Equity Interests | Impaired | No (deemed to reject) |

**E.     The Trustee Proposed the Plan in Good Faith — Section 1129(a)(3).**

50.     I understand that section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be proposed in good faith.  I believe that the Plan was proposed in good faith and is based on the collaborative efforts of the Trustee, my advisors and legal counsel, and the key stakeholders in these Chapter 11 Cases with the legitimate and honest purpose of maximizing value for the Debtors and their estates.

51.     I commenced plan negotiations in early January 2025.  My legal counsel prepared drafts of what eventually became the Plan and Disclosure Statement and circulated initial drafts to the Prepetition Lender and the Committee on January 10, 2025, and January 14, 2025, respectively. Over the next two months, the Trustee's professionals, the Prepetition Lender, and the Committee had several conference calls to discuss Plan terms and exchanged multiple drafts of the Plan, Disclosure Statement, and supporting documents.  The Trustee solicited feedback in advance from the Prepetition Lender and the Committee because these parties were contributing significant consideration to the Plan, including but not limited to the Contributed Cash Collateral.  At the same time, my legal counsel and I continued to engage with other creditors and parties in interest about issues that ultimately made their way into the Plan, including but not limited to the treatment

20

of Customer Constructive Trust Claims.  I also spoke with Mr. Borisch during this time to see if a global deal could be reached between the Debtors, the Borisch Parties, and the Prepetition Lender. Those discussions were ultimately unsuccessful, and I determined that further negotiations with Mr. Borisch were futile because the Prepetition Lender and the Borisch Parties were not aligned on key points underpinning the Plan.  The initial Plan was filed on March 25, 2025.

52.    I do not believe that Mr. Borisch was excluded from the Plan process.  While Mr. Borisch did not receive drafts of the Plan before it was filed, the Trustee's professionals engaged with Mr. Borisch's counsel on revisions to the Plan leading up to, and including, the Disclosure Statement hearing.  Mr. Borisch's requested changes were ultimately incorporated into the Plan.

53.    In sum, it is my testimony that the Plan and its classification, distribution, exculpation, release and injunction provisions are the result of good-faith negotiations held at arm's length between the myself and those key stakeholders, including the Prepetition Lender and the Committee, among others.  I believe that such provisions are consistent with sections 105, 1122, 1123(b)(6), 1125, 1129 and 1142 of the Bankruptcy Code, and that each is necessary for the success of the Plan.  I further believe that the Plan maximizes the economic return to creditors of the Debtors in light of the totality of the facts and circumstances of the case.  Accordingly, I believe the Plan satisfies section 1129(a)(3) of the Bankruptcy Code.

**F.     Payment of Professional Fees and Expenses Is Subject to Court Approval — Section 1129(a)(4).**

54.    It is my understanding that section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, a debtor, or a person receiving distributions of property under the plan be approved by the Court or remain subject to approval by the Court as reasonable.  The Plan provides that Professional Fee Claims and corresponding payments are subject to prior Court approval as reasonable and comply with all applicable provisions of the

21

Bankruptcy Code. Plan, Article II.B. Moreover, Article II.B of the Plan provides that all final requests for payment of Professional Fee Claims must be filed no later than thirty (30) days after the Effective Date. Accordingly, I believe that the Plan complies with section 1129(a)(4) of the Bankruptcy Code.

### G. The Plan Satisfies the Bankruptcy Code's Governance Disclosure Requirements — Section 1129(a)(5).

55. It is my understanding that section 1129(a)(5) of the Bankruptcy Code requires that the plan proponent disclose the identity and affiliation of any individual proposed to serve as a director or officer of the debtor or a successor to the debtor under the plan; appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy; and to disclose the identity of insiders to be retained by the reorganized debtor and the nature of any compensation for such insider. Article VI.I of the Plan provides that, as of the Effective Date, the terms of the current members of the boards of the Governing Bodies of the Debtors shall expire, and the Creditor Trustee shall be appointed. From and after the Effective Date, Article VI.I states that the Creditor Trustee may exercise all power and authority that may be exercised by any officer, director or manager of, or holder of an Equity Interest in, the Debtors, with like effect. Accordingly, I believe that the Plan complies with section 1129(a)(5) of the Bankruptcy Code.

### H. The Plan Does Not Require Government Regulatory Approval of Rate Changes — Section 1129(a)(6).

56. It is my understanding that the Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission and, accordingly, will not require governmental regulatory approval.

4919-1490-2335

I.     **The Plan Is in the Best Interests of Holders of Claims and Interests —
Section 1129(a)(7).**

57.     I have reviewed the classification of Claims and Interests under the Plan and the
proposed distributions to each class of Claims or Interests.  Pursuant to that review, I believe that
the Plan satisfies the requirements of the Bankruptcy Code regarding the "best interests of
creditors" test.

58.     I understand that section 1129(a)(7) of the Bankruptcy Code, known as the "best
interests of creditors test," requires that each Holder of an impaired Claim or Interest either
(a) accepts the Plan or (b) receives or retains property under the Plan having a value, as of the
Effective Date, that is not less than the value such holder would receive if the Debtors' Estates
were liquidated under Chapter 7 of the Bankruptcy Code.  My understanding is that the best
interests of creditors test applies to each non-consenting member of an impaired class and is
generally satisfied by comparing estimated recoveries for a debtor's stakeholders in a hypothetical
chapter 7 liquidation against the estimated recoveries under a Chapter 11 plan.  Based on the
analysis discussed below, I believe that the projected recoveries for the non-consenting Impaired
Claims and Interests under the Plan are equal to or in excess of the recoveries estimated in a
hypothetical chapter 7 liquidation and that the Plan therefore satisfies the best interests of creditors
test.

59.     To determine whether the Plan satisfies the best interests of creditors test, the
Trustee prepared a hypothetical liquidation analysis, which is attached to the Disclosure Statement
as Schedule 1 (the "Liquidation Analysis").  The Liquidation Analysis was completed after due
diligence by the Trustee, his financial advisors, and counsel, and was based on a variety of
assumptions, which I believe are reasonable under the circumstances.

60.     The Liquidation Analysis is based upon the balance sheets of the Debtors from November and December of 2024, which are used to estimate the Debtors' assets and liabilities as of the hypothetical conversion date.  To estimate the liquidation proceeds, the Liquidation Analysis assumes that the Debtors' Estates, utilizing the Trustee's resources and necessary third-party advisors, are wound down during a brief wind-down period, in which the Debtors' assets are sold in a straight liquidation through an accelerated sale process.  The Liquidation Analysis provides: (a) an estimate of the cash proceeds (the "Net Estimated Liquidation Proceeds") that a Chapter 7 trustee would generate if the Chapter 11 Cases were converted to Chapter 7 cases on June 30, 2025, and the assets of the Debtors' estates were liquidated; (b) an estimate of the distribution that each non-accepting Holder of a Claim or Interest would receive from the Net Estimated Liquidation Proceeds under the priority scheme dictated in chapter 7; and (c) a comparison of each such Holder's estimated liquidation recovery to the distribution that such Holder would receive under the Plan if the Plan is confirmed and consummated.

61.     A comparison of the range of estimated liquidation recoveries to the estimated Plan recoveries indicates that each Holder of a non-consenting Impaired Claim or Interest will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors' Estates were liquidated under chapter 7 of the Bankruptcy Code.  Specifically, the projected recoveries under the Plan and the results of the Liquidation Analysis for all Holders of Claims and Interests are as follows:[3]

---

[3] The projections below are based on the Plan prior to its modifications on May 1, 2025.  My professional team is continuing to reconcile Priority Tax Claims, and I believe based on current estimates that the recovery for Priority Tax Claims and Priority Non-Tax Claims should be higher than projected in the Liquidation Analysis.  Similarly, I expect the recoveries for Class 4 claims will be higher, based on the revisions to the Plan on May 1, 2025.

| Class | Claims/Interest | Estimated Recovery Under Hypothetical Liquidation | Estimated Recovery Under Plan |
|---|---|---|---|
| Unclassified | Priority Tax Claims | 0% | 31%–40% |
| Class 1 | Priority Non-Tax Claims | 0% | 31%–40% |
| Class 2 | Prepetition Lender's Secured Claims | 53%–55% | 52%–55% |
| Class 3 | Other Secured Claims | 100% | 100% |
| Class 4 | Customer Constructive Trust Claims | 0% | 23% - 45% |
| Class 5 | General Unsecured Claims | 0% | 1% |
| Class 6 | Contribution Claims | 0% | 0% |
| Class 7 | Intercompany Claims | 0% | 0% |
| Class 8 | Equity Interests | 0% | 0% |

62.     Pursuant to section 1129(a)(7) of the Bankruptcy Code, I understand that the Court may not confirm a plan of reorganization unless each holder in impaired classes will receive value under the plan that is not less than what they would receive in a chapter 7 liquidation. Here, based on the Liquidations Analysis, no Holder of Claims or Interests would receive more in a hypothetical chapter 7 liquidation than it would receive under the Plan. Notably, in a hypothetical chapter 7 liquidation, all creditors junior to the Other Secured Claims, including the Holders of Class 4-Customer Constructive Trust Claims and Class 5-General Unsecured Claims, would receive zero recovery. Accordingly, I believe that the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

**J.     Voting Requirements — Section 1129(a)(8).**

63.     I understand that the Bankruptcy Code generally requires that each class of claims or interests must either accept the plan or be unimpaired under the plan. I further understand that if any class of claims or interests rejects the plan, the plan must satisfy the "cramdown"

25

requirements with respect to the claims or interests in that class. Here, I understand that because certain Classes have rejected or are deemed to reject the Plan, the Plan cannot satisfy section 1129(a)(8) of the Bankruptcy Code. However, even though certain Classes rejected or are deemed to reject the Plan, I understand that the Plan can still satisfy section 1129(b) of the Bankruptcy Code as at least one Impaired Class voted to accept the Plan. I believe that the Plan is confirmable because the Plan does not discriminate unfairly and is fair and equitable with respect to the deemed rejecting Classes and, therefore, the Plan satisfies section 1129(b) of the Bankruptcy Code with respect to such Classes.

      **K.**      **Priority Cash Payments — Section 1129(a)(9).**

64. I have been advised that section 1129(a)(9) of the Bankruptcy Code generally requires that claims entitled to administrative priority must be repaid in full in cash or receive certain other specified treatment. Article II.A of the Plan contemplates that Allowed Administrative Claims will be repaid in full in Cash. Further, no Holders of the types of Claims specified by section 1129(a)(9) of the Bankruptcy Code are Impaired under the Plan. Finally, each Holder of Priority Tax Claims shall be paid in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

      **L.**      **At Least One Impaired Class of Claims Accepted the Plan — Section 1129(a)(10).**

65. I understand that the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan "without including any acceptance of the plan by any insider," as an alternative to the requirement under section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan. I understand that Holders of Claims in Classes 2, 4, and 5 are Impaired under the Plan and voted to accept the Plan independent of any insiders' votes.

4919-1490-2335

Accordingly, I believe that the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

**M.    The Plan Is Feasible — Section 1129(a)(11).**

66.    I understand that section 1129(a)(11) of the Bankruptcy Code requires a court to determine that a chapter 11 plan is feasible and that confirmation of such plan is not likely to be followed by the liquidation or further financial reorganization of the Debtors (or any successors thereto) unless such liquidation or reorganization is proposed in the Plan.  I have been advised that to demonstrate that a plan is feasible, it is not necessary for a debtor to guarantee success.  Because the Trustee is liquidating the Debtors' Estates pursuant to the Plan in a manner that complies with the priority scheme and other provisions of the Bankruptcy Code as well as applicable non-bankruptcy law, it is my belief that the requirements of section 1129(a)(11) of the Bankruptcy Code are satisfied.

**N.    The Plan Provides for Payment of All Fees — Section 1129(a)(12).**

67.    Article II.C of the Plan includes an express provision requiring payment of all U.S. Trustee Fees that arise before the Effective Date from the Debtors' available Cash by the Creditor Trust on or before the Effective Date but before the closing of the Chapter 11 Cases.  Accordingly I believe the Plan satisfies section 1129(a)(12) of the Bankruptcy Code.

**O.    Retiree Benefits — Section 1129(a)(13).**

68.    The Debtors do not pay any "retiree benefits," as defined in section 1114 of the Bankruptcy Code.  Accordingly, I believe that section 1129(a)(13) of the Bankruptcy Code in inapplicable to this Chapter 11 Cases.

**P.    Domestic Support Obligations, Individuals, and Nonprofit Corporations — Section 1129(a)(14), (15), and (16).**

69.    Based on my knowledge of the Debtors' business and information provided by the Debtors' advisors, I believe that sections 1129(a)(14) through 1129(a)(16) of the Bankruptcy Code do not apply to the Plan because the Debtors are not subject to domestic support obligations, are not "individuals," and are not nonprofit corporations.

**Q.    The Plan Satisfies the Requirements for Confirmation of the Plan Over Nonacceptance of Impaired Classes — Section 1129(b).**

70.    I understand that if all applicable requirements of section 1129(a) of the Bankruptcy Code are satisfied, other than section 1129(a)(8), a plan may still be confirmed so long as the requirements set forth in section 1129(b) are satisfied.

71.    I understand that the Plan will distribute value to Holders of Claims in the priorities set forth in the Bankruptcy Code, and no Holder of a junior Claim or Interest will receive a recovery on account of such junior Claim or Interest until all senior Claims are paid in full.  It is my understanding that (a) Classes 2, 4, and 5–Classes comprised of creditors whose Claims are Impaired–voted to accept the Plan; (b) the Plan does not discriminate unfairly and is fair and equitable with respect to the Claims and Equity Interests in the Classes; (c) the Plan has been proposed in good faith and is reasonable; (d) with respect to Class 3, the Plan meets the requirements that (i) the holder of any Other Secured Claim receive their Collateral subject to applicable Liens on the Effective Date; and (ii) to the extent the value of the Collateral is insufficient to satisfy the Other Secured Claim, the holder of such Other Secured Claim will receive a Class 5 General Unsecured Claim for the remaining portion of its Other Secured Claim; (e) with respect to Class 1, the Plan meets the requirement that each holder of a Priority Non-Tax Claim receive or retain on account of such Claim property of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claim; and (f) with respect to Classes 6, 7, and 8, the Plan

4919-1490-2335

meets the requirements that (i) no holder of any Claim or Equity Interest that is junior to each such

Classes will receive or retain any property under the Plan on account of such junior Claim or

Equity Interest and (ii) no holder of a Claim or Equity Interest in a Class senior to such Classes is

receiving more than 100% on account of its Claim.  As a result, the Plan satisfies the requirements

of section 1129(b) of the Bankruptcy Code.

### R.      Only One Plan Is Eligible to be Confirmed — Section 1129(c).

72.      I understand that section 1129(c) of the Bankruptcy Code prohibits the confirmation

of multiple plans.  Section 1129(c) of the Bankruptcy Code is not implicated here because there is

only one proposed plan.

### S.      The Principal Purpose of the Plan Is Not the Avoidance of Taxes or Securities Law as Required Under Section 1129(d) of the Bankruptcy Code.

73.      The Plan was not filed for the purpose of avoidance of taxes or the application of

section 5 of the Securities Act of 1933, as amended.  Accordingly, I believe that the Plan satisfies

the requirements of section 1129(d) of the Bankruptcy Code.

### T.      Section 1129(e) of the Bankruptcy Code Is Inapplicable.

74.      I understand that section 1129(e) of the Bankruptcy Code does not apply to the Plan

because none of the Debtors' Chapter 11 Cases is a "small business case" within the meaning of

the Bankruptcy Code.

## II.      The Plan Complies with Section 1125 of the Bankruptcy Code

75.      I understand that Section 1125(e) of the Bankruptcy Code requires each person that

solicits acceptance or rejection of a plan to have acted in good faith and in compliance with the

applicable provisions of the Bankruptcy Code.  It is my belief that in these Chapter 11 Cases, the

Trustee, the Committee, and each of their respective Professional Persons, has acted in "good

faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the

4919-1490-2335

applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules in connection with all of their respective activities arising out of, relating to, or connected with the administration of the Chapter 11 Cases. These activities included the negotiation and pursuit of approval of the Disclosure Statement, the preparation and solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the funding of the Plan, the consummation of the Plan, the administration of the Plan and the property to be distributed under the Plan, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code. It is my belief that each such party has, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, is not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Accordingly, it is my belief that the Exculpated Parties and their respective Professional Persons have acted in "good faith" pursuant to section 1125(e) of the Bankruptcy Code.

### III.   The Plan Complies with Section 1126 of the Bankruptcy Code

76.   I understand that section 1126 of the Bankruptcy Code provides the requirements for a class of claims or interest holders to have "accepted" the plan, and further that a class of claims has accepted a Plan if such Plan has been accepted by creditors, other than any entity designated under subsection (e) but that holds at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such Plan. I understand that classes that are not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances from such class is not required. As set forth in the Ballot Tabulation, Classes 2, 4, and 5 have

voted to accept the Plan.  Accordingly, it is my belief that the requirements of section 1126 of the Bankruptcy Code are satisfied.

**IV.      The Modifications to the Plan Comply with Section 1127 of the Bankruptcy Code.**

77.      I understand that Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation.

78.      I have agreed to make certain modifications reflected in the Plan, including those set forth in the *Notice of Modification to Trustee's First Amended Joint Chapter 11 Plan* [Docket No. 935], as well as other settlements and resolutions announced on the record at the Confirmation Hearing (collectively, the "Modifications").  I believe these Modifications were technical in nature, contemplated under the Plan, and do not materially diminish or alter any creditor's substantive rights under the Plan without their consent.  It is my opinion that such Modifications do not materially adversely affect any party's substantive rights and are supported by all of the Debtors' key constituencies including the Prepetition Lender and the Committee.

79.      I understand that Matthew Borisch has objected to the Modifications related to the Third-Party Releases in Article X.D of the Plan, as well as corresponding changes to the definitions of Consenting Creditors and Releasing Parties.  The Modifications to the Third-Party Releases were filed on June 6, 2025 to clarify that the Borisch Parties would not be giving or receiving any releases under the Plan.  *See* Docket No. 935.  This clarification was consistent with my intent from the beginning of the Plan process.  At an emergency status conference on June 9, 2025, the Court extended the Borisch Parties' deadline to vote and/or object to the Plan, as modified, through and including June 30, 2025.  *See* Docket No. 945.  Mr. Borisch and the other Borisch Parties did in fact change their votes to reject the Plan, as modified, and filed an objection to the Plan, as modified.  *See* Docket Nos. 994 & 995.

4919-1490-2335

80.     Accordingly, I believe no additional solicitation or disclosure is required on account of the Modifications and all creditors in the Voting Classes who accepted the Plan should be deemed to have accepted the Plan as modified.

**V.     Good Cause Exists to Waive the Stay of the Confirmation Order.**

81.     I understand that certain Bankruptcy Rules provide for the 14-day stay of an order confirming a chapter 11 plan, but that such a stay may be waived upon court order after a showing of good cause.

82.     Given the complexity of the Plan and the various transactions implicated by the Plan, and that each day the Debtors remain in chapter 11 they incur significant administrative and professional costs, the Trustee may take certain steps to effectuate the Plan so that the Effective Date can occur as soon as needed.  Accordingly, I believe that good cause exists to waive any stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry.

**VI.     Conclusion.**

83.      In conclusion, it is my opinion that the Plan satisfies the confirmation requirements of the Bankruptcy Code and thus, should be approved.

*[Remainder of page intentionally left blank]*

32

4919-1490-2335

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: July 1, 2025

By: /s/ *Mark E. Andrews*
Name: Mark E. Andrews
Title: Chapter 11 Trustee