IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In Re: | ) | **Case No. 24-90000-elm-11** |
| | ) | (Jointly Administered) |
| TOMMY'S FORT WORTH, LLC, | ) | |
| et al., | ) | Fort Worth, Texas |
| | ) | July 8, 2025 |
| Debtors. | ) | 9:30 a.m. Docket |
| | ) | |
| | ) | CONFIRMATION OF PLAN [879] |
| | ) | |

_____

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE EDWARD L. MORRIS,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For Trustee Mark Andrews:     Lydia R. Webb
                              Aaron Michael Kaufman
                              GRAY REED, LLP
                              1601 Elm Street, Suite 4600
                              Dallas, TX  75201
                              (469) 320-6050

For M&T Bank:                 Toby L. Gerber
                              Michael Berthiaume
                              Kristian Gluck
                              NORTON ROSE FULBRIGHT US, LLP
                              2200 Ross Avenue, Suite 3600
                              Dallas, TX  75201-7932
                              (214) 855-7171

For Matthew Borisch:          Floyd E. Gates, Jr.
                              BODMAN, PLC
                              99 Monroe Avenue NW, Suite 300
                              Grand Rapids, MI  49503
                              (616) 205-1860

For Matthew Borisch:          Marc Bakst
                              BODMAN, PLC
                              1901 St. Antoine Street
                              6th Floor at Ford Field
                              Detroit, MI  48226
                              (313) 393-7530

```
 1   APPEARANCES, cont'd.:

 2   For Malibu Boats, Inc.:      Daniel S. Shamah
                                  COOLEY, LLP
 3                                55 Hudson Yards
                                  New York, NY  10001
 4                                (212) 479-6000

 5   For Malibu Boats, LLC:       Joshua I. Divack
                                  THOMPSON COBURN, LLP
 6                                488 Madison Avenue
                                  New York, NY  10022
 7                                (212) 478-7340

 8   For STORE Master Funding     Khaled Tarazi
     XVIII, LLC:                  BUCHALTER, A PROFESSIONAL
 9                                   CORPORATION
                                  15279 North Scottsdale Road,
10                                  Suite 400
                                  Scottsdale, AZ  85254
11                                (602) 383-1840

12   For Joshua Magill:           Judith W. Ross
                                  ROSS, SMITH & BINFORD, P.C.
13                                700 N. Pearl Street, Suite 1610
                                  Dallas, TX  75201
14                                (214) 377-7879

15   For the Official Committee   Dylan Tanner Franklin Ross
     of Unsecured Creditors:      REED SMITH, LLP
16                                2850 N. Harwood Street, Suite 1500
                                  Dallas, TX  75201
17                                (469) 680-4262

18   For the U.S. Trustee:        Erin Marie Schmidt
                                  OFFICE OF THE UNITED STATES
19                                   TRUSTEE
                                  1100 Commerce Street, Room 976
20                                Dallas, TX  75242-1496
                                  (214) 767-1075
21
     Recorded by:                 Shelley Warren
22                                UNITED STATES BANKRUPTCY COURT
                                  501 W. 10th Street
23                                Fort Worth, TX  76102
                                  (817) 333-6041
24

25
```

1  Transcribed by:            Kathy Rehling
2                             311 Paradise Cove
                              Shady Shores, TX  76208
3                             (972) 786-3063

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          Proceedings recorded by electronic sound recording;
            transcript produced by transcription service.

1          <u>FORT WORTH, TEXAS - JULY 8, 2025 - 9:31 A.M.</u>

2          THE CLERK:  All rise.

3          THE COURT:  All right.  Please be seated.

4     All right.  Good morning, everybody.  We're on the July

5     8th, 2025 9:30 a.m. docket.  We have the Tommy's Fort Worth,

6     LLC and affiliated debtors' cases, jointly administered under

7     Case 24-90000, obviously here on confirmation today.

8          Let me go ahead and start by taking appearances of

9     counsel.  And let me note first that we have had a few

10    electronic appearances.  I'll just note those quickly so that

11    those folks know.  We have Mr. Divack on behalf of the Malibu

12    Boats parties; Mr. Gerber on behalf of M&T Bank, although I

13    see him in the courtroom as well; Mr. Tarazi on behalf of

14    STORE Master Funding XVIII, LLC; and Ms. Ross on behalf of

15    Joshua Magill.

16         So, in addition to that, let me go ahead and take

17    additional appearances, and we'll start with counsel in the

18    courtroom.  Mr. Kaufman?

19         MR. KAUFMAN:  Good morning, Your Honor.  For the

20    Chapter 11 Trustee, Aaron Kaufman and Lydia Webb.  Mr.

21    Andrews, the Chapter 11 Trustee, is also in the courtroom, as

22    well as Nick Foley from Trinity River Advisors, the financial

23    advisor for the Trustee.

24         THE COURT:  Okay.  Great.  Good morning to all of

25    you.

1        Mr. Ross?

2            MR. ROSS:  Good morning, Your Honor.  Dylan Ross

3    with Reed Smith here on behalf of the Official Committee of

4    Unsecured Creditors.

5            THE COURT:  All right.

6            MR. BAKST:  Good morning, Your Honor.  Marc --

7            THE COURT:  Mr. Bakst?

8            MR. BAKST:  Marc Bakst.  I'm also here with my

9    partner, Floyd Gates.  We represent Matthew Borisch and the

10   Borisch Parties.  Thank you.

11           THE COURT:  All right.  Good morning to you all.

12       Ms. Schmidt?

13           MS. SCHMIDT:  Good morning, Your Honor.  Erin

14   Schmidt for the U.S. Trustee.

15           THE COURT:  All right.  Good morning.

16       Mr. Gerber?

17           MR. GERBER:  Good morning, Your Honor.  Toby Gerber,

18   along with Michael Berthiaume in the courtroom, and also on

19   the conference is my colleague Kristian Gluck, appearing --

20           THE COURT:  Okay.

21           MR. GERBER:  -- all appearing for M&T Bank.

22           THE COURT:  Very good.  Good morning to all of you.

23       All right.  On WebEx, let me see if there are folks who I

24   know who will wish to appear.  Do we have anybody today on

25   behalf of the Tennessee Department of Revenue?

1      Okay.  Then let me, at the risk of having -- well,

2   actually, let's do this, because I do see somebody who popped

3   up on the screen.  Perhaps Mr. Shamah?

4          MR. SHAMAH:  Good morning, Your Honor.  Daniel

5   Shamah of Cooley on behalf of the Malibu entities.

6          THE COURT:  All right.  Good morning to you.

7      All right.  And again, at the risk of having folks talk

8   over each other, just be patient, but let me open the floor

9   to see if we have anybody else on WebEx wishing to make a

10   formal live appearance.

11          MR. PAUL:  Good morning, Your Honor.  Jeriad Paul

12   with Omni Agent Solutions, claims and noticing agent for the

13   Debtor.

14          THE COURT:  All right.  Good to have you.

15      All right.  Well, then it appears that perhaps we did a

16   good job.  All right.  Mr. Kaufman?

17          MR. KAUFMAN:  Your Honor, just I'll handle the

18   housekeeping portion, which will be very brief, and then I'm

19   going to tender the podium to Ms. Webb to cover the opening

20   statements.

21          THE COURT:  Okay.

22          MR. KAUFMAN:  We had two matters set for today:  the

23   motion to enforce, which has now been resolved by the agreed

24   order that was entered this morning, which leaves the

25   confirmation of the Trustee's plan.

1      We do have some agreements on exhibits.  We'll get to

2  that after the openings, unless the Court wants to take it up

3  now.  But I think this should be pretty streamlined.  So I

4  think what we'll do is just open, do the evidence, close, and

5  hopefully it will be a pretty streamlined proceeding.

6          THE COURT:  Okay.  Any preliminary issues from your

7  end that you think we need to do, or should we just dive in?

8          MR. BAKST:  I don't think there are issues, Your

9  Honor.  We're going to proceed similarly to what Mr. Kaufman

10  indicated.  I would present the opening arguments, and then

11  Mr. Gates will take the lead on witness and exhibits and

12  cross-examination and examination of witnesses.

13          THE COURT:  Okay.  Very good.

14      And let me, if it helps you all at all, I have spent

15  quite a bit of time trying to look through materials.  So in

16  terms of trying to ensure that we use our time efficiently,

17  what I would suggest is, for those who have engaged in the

18  process, I certainly will provide an opportunity for some

19  introductory comments.

20      What would be helpful for me is -- what I don't really

21  want to do is two sets of closing arguments.  What I'd rather

22  do is outline what you think that I need to know in terms of

23  what you're expecting to show through the evidence.  We'll

24  take up the evidence.  And then I'll give certainly everybody

25  a full opportunity to argue in closing arguments once we're

1    done with the evidence.  But like I said, just know that I

2    definitely don't want to spend two rounds of closing

3    arguments.  So, if that helps at all.

4        Okay.  Ms. Webb?

5        OPENING STATEMENT ON BEHALF OF MARK ANDREWS, CHAPTER 11

6                                    TRUSTEE

7            MS. WEBB:  Good morning, Your Honor.  Lydia Webb on

8    behalf of the Chapter 11 Trustee.

9        The Trustee submits that the evidence will show today

10   that he has met all requirements for confirmation of the

11   plan.  Mr. Andrews did submit a declaration that set forth in

12   detail how the plan meets each confirmation requirement, and

13   we will also put Mr. Andrews on the stand today to provide

14   some additional testimony specifically related to the issues

15   raised by the Borisch Parties.

16       The Trustee received three formal objections to the plan,

17   only two of which remain live today.  An objection was filed

18   by the Tennessee Department of Revenue, primarily to the

19   plan's proposed treatment of priority tax claims, and this

20   objection has been resolved.

21       An objection was filed by the U.S. Trustee at Docket No.

22   934.  This objection relates primarily to the third-party

23   release and the related injunction provision in the plan.

24       And finally, an objection was filed by the Borisch

25   Parties at Docket No. 994, and this relates to a variety of

1   issues stemming from the modification of the plan made on

2   June 6th.  And this objection does remain live.

3       With respect to the U.S. Trustee objection, the Trustee

4   did file a reply at Docket No. 937 that sets forth the

5   arguments in support of the third-party releases and the

6   corresponding plan injunctions.  You will hear testimony from

7   Mr. Andrews today that the release provisions were heavily

8   negotiated with M&T Bank and the Committee, and that they

9   were an integral part of the consideration offered to M&T in

10   exchange for its support of the plan.  But for the inclusion

11   of the third-party releases, we do not believe that M&T would

12   have signed on and agreed to contribute the $4 million of

13   their contributed cash collateral to fund payments under the

14   plan.

15       I will walk the Court through the legal arguments on how

16   these releases are consensual and comply with the Fifth

17   Circuit standards, and you'll also hear testimony from Mr.

18   Andrews in support of those factors.

19       But suffice it to say, we do believe that the releases

20   are necessary, appropriate, and justified by the facts and

21   circumstances of this case and should be approved.

22       With that said, the evidence will demonstrate that the

23   heavily-negotiated plan releases were never intended to apply

24   to the Borisch Parties.  As the disclosure statement and

25   solicitation materials made clear, the Borisch Parties were

1  not released parties and were never intended to be released

2  or receive a release under the plan.

3     The Borisch Parties contend that this is unfair,

4  discriminatory, and bad faith.

5     The Trustee did file a reply yesterday at Docket No.

6  1015, and Your Honor will recall that the Trustee made three

7  minor modifications to the plan on June 6th that clarified

8  that the Trustee believed what was evident from the beginning

9  of the plan process, that the insider Borisch Parties would

10  neither be giving nor receiving a release under the plan.

11     On June 9th, this Court held a status conference where

12  you provided the Borisch Parties with additional time to file

13  an objection and amend their ballots.  It was 21 days.  And

14  the Borisch Parties took advantage of that.  They both filed

15  an objection and they amended their ballots.

16     The Borisch Parties do raise four primary objections to

17  confirmation of the plan.  The first is with the plan

18  modifications themselves and that the modifications are

19  improper and that the Court should instead approve the

20  solicitation version of the plan.  Frankly, Your Honor, the

21  solicitation version of the plan is no longer live.  The

22  Trustee is not here seeking confirmation of that plan.  The

23  Trustee is only seeking confirmation of the modified plan

24  filed at 935-1.

25     Second, Mr. Borisch contends that the plan as modified

1  does not meet the --

2         THE COURT:  So, hang on for one quick second.

3     Mr. Magill, I'm going to put you on mute because your

4  line is making noise.

5     Okay.  Go ahead.

6         MS. WEBB:  Second, Your Honor, Mr. Borisch contends

7  that the plan as modified does not meet the good faith

8  standard of 1129(a)(3).  The evidence will show that the plan

9  was proposed with the honest purpose of making distributions

10 in accordance with the Bankruptcy Code and that the plan is

11 the result of extensive negotiations between the Trustee, M&T

12 Bank, the Creditors' Committee, as well as other constituents

13 that have raised issues with the Trustee along the way.

14    The testimony will also show that Mr. Borisch was not

15 excluded from this process and that the Trustee has had an

16 ongoing dialogue with Mr. Borisch, really, from the beginning

17 of the case, but certainly in earnest with respect to a

18 global -- a potential global settlement with M&T Bank since

19 the Court had us here back in November of 2024 on the

20 settlement with Malibu.

21    Now, that settlement never came to fruition, and the

22 Trustee had no choice but to proceed with a plan process with

23 M&T Bank that offers $4 million in contributed cash

24 collateral as well as an assignment of potential causes of

25 action that the estate holds against Mr. Borisch to M&T Bank.

1      We believe that the totality of the circumstances will

2   support a finding that the plan, as modified, has been

3   proposed in good faith.

4      Third, Mr. Borisch contends that the plan as modified

5   violates the equal treatment requirement of 1123(a)(4).  The

6   issue with this, Your Honor, is what the Trustee proposes is

7   the precedent on this matter, is that plan releases is not

8   treatment under 1123(a)(4).  As a result, the fact that the

9   Borisch Parties are not receiving a release under the plan

10  whereas other parties are receiving a release under the plan

11  simply has no bearing on the 1123(a)(4) analysis.  The

12  Borisch Parties will receive the same distributions as other

13  similarly-situated creditors under the plan, and their rights

14  against the estate and M&T are preserved.

15     Again, Mr. Borisch is not being forced to give a release

16  here under this plan.  The status quo is being maintained

17  with respect to Mr. Borisch and M&T and the estates.

18     Mr. Andrews will testify that the Borisch Parties had the

19  same if not better opportunities to negotiate for a

20  settlement.  The fact that he was unable to do so does not by

21  itself indicate unequal treatment.

22     Finally, Your Honor, the Borisch Parties contend that the

23  Trustee cannot satisfy the cramdown requirements of

24  1129(e)(2) because the plan unfairly discriminates by denying

25  the Borisch Parties releases.  As the Court knows, plans can

1   treat parties differently, but not in a way that is unfair.

2   The evidence will demonstrate that there is nothing unfair

3   about a plan that preserves claims against insider parties.

4   The Borisch Parties are situated differently from other

5   creditors in this case.  They are insiders whose claims are

6   contingent upon paying underlying creditors in full.  M&T

7   does have direct claims against Mr. Borisch as guarantor.

8   And the Borisch Parties are potential targets of Chapter 5

9   causes of action.

10       Contrary to the Borisch Parties' arguments in their

11   objection, creditors do not have a fundamental right to a

12   release under a plan.

13       As I mentioned, the plan does maintain the status quo

14   between the parties, and as a result, to the extent that Mr.

15   Borisch finds this to be discriminatory, the evidence will

16   show that the plan is consistent with every other liquidating

17   cramdown plan where claims against insiders are being

18   preserved.

19       That concludes my opening remarks.  We look forward to

20   presenting you the case for confirmation of the Trustee's

21   plan today.

22           THE COURT:  All right.  Thank you.

23       Let me see.  Mr. Gerber, do you wish to make any

24   introductory comments?

25   ///

OPENING STATEMENT ON BEHALF OF M&T BANK

1

2          MR. GERBER:  Thank you, Your Honor.  May it please

3    the Court.

4        M&T Bank supports the plan as modified and amended, and

5    only that plan.  Its willingness to permit the use of its

6    cash collateral to fund the Debtors' obligations under the

7    modified and amended plan is conditioned on the Court's

8    confirmation of that plan.

9        M&T's agreement, at least with respect to the releases

10   provided under the amended plan, has always, as a matter of

11   law and fact, always has been conditioned on confirmation of

12   the plan -- of a plan in form and substance acceptable to M&T

13   Bank, and this amended and modified plan reflects the form

14   and substance of the plan which M&T negotiated and agreed to.

15       We have never asked Mr. Borisch for a release or the

16   Borisch Parties for a release.  We've never demanded that he

17   release us in his individual capacity.  So any representation

18   or inference from the votes on the previously-proposed plan

19   do not carry that sort of weight.

20       And we believe the evidence you will hear today will

21   support that statement.  You'll hear from the Chapter 11

22   Trustee, and perhaps from Mr. Borisch himself, of the efforts

23   to seek a global settlement, not only of the Bank's claims

24   against the estate and also the guaranty dispute, a global --

25   truly global dispute, and Mr. Borisch's alleged claim for

1   indemnification from the estate and why Mr. Borisch chose not

2   to pursue that global settlement.  But there's nothing in the

3   current plan and the only plan we will support that provides

4   -- requires him to release M&T Bank or requires M&T Bank to

5   release him.

6          THE COURT:  All right.  Thank you.

7      All right.  I don't know who wants to go first in terms

8   of -- I see Mr. Ross jumping up.  Mr. Ross, I'll give you an

9   opportunity for closing arguments, but I don't think that the

10  Committee has filed anything.

11         MR. ROSS:  Correct, Your Honor.  No problem.

12         THE COURT:  Okay.  All right.

13         MR. ROSS:  Thank you, Your Honor.

14         THE COURT:  So, Mr. Bakst?  Ms. Schmidt?   Flip a

15  coin?

16         MS. SCHMIDT:  Mine will be very brief.  I don't --

17         THE COURT:  All right.

18    OPENING STATEMENT ON BEHALF OF THE UNITED STATES TRUSTEE

19         MS. SCHMIDT:  Your Honor, very briefly, Erin Schmidt

20  for the U.S. Trustee.

21      I'll just note that the U.S. Trustee's objection to

22  third-party releases and the injunction provisions in the

23  plan as they apply to M&T Bank and its current and former

24  officers, managers, attorneys, and other professional

25  advisers has not been resolved, and I'll just defer arguments

1    on this issue until final.

2              THE COURT:  Okay.

3              MS. SCHMIDT:  Until the end.

4              THE COURT:  All right.  Very good.  Thank you.

5              MS. SCHMIDT:  Thank you.

6              THE COURT:  All right.  Mr. Bakst?

7              MR. BAKST:  Thank you, Your Honor.

8         OPENING STATEMENT ON BEHALF OF THE BORISCH PARTIES

9              MR. BAKST:  The Chapter 11 Trustee has, as we know,

10   expressed great interest in confirming a plan of

11   reorganization.  As is often the case in the many bankruptcy

12   cases all of us in this room have been involved in, at the

13   beginning of bankruptcy cases there is a great rush for the

14   first day motions and things to get entered quickly, and some

15   creditors must stand up and say no at the beginning of those

16   cases.

17       And like that time period, at the end of a case, as we're

18   approaching confirmation, there's great urgency and need to

19   -- perceived by the proponent and others to get forward with

20   a confirmation of a plan, and some people have to stand up

21   and say that the plan has to conform to the Bankruptcy Code

22   and ask the judge to consider that.

23       We are being portrayed in the papers that are being filed

24   and at the status conference that we recently held as

25   blocking this rolling freight train, and, of course,

1   exercising and proceeding in bad faith in doing so.  And

2   nothing could be further from the truth.  What we want here

3   today is for the plan that has been voted on, that has been

4   solicited, and that has -- is ripe for confirmation, but for

5   the objection of the U.S. Trustee, to be confirmed.

6        Counsel for the Trustee has indicated that she and they

7   believe that the modification has already been accomplished.

8   That's not what 1127 says.  What 1127 says is that (a) says

9   -- 1127(a) says that, prior to confirmation, or prior to --

10  prior to confirmation, between the time period of the

11  balloting ending, the objection period ending, and the

12  confirmation hearing, the Trustee or the Plan Proponent may

13  modify the plan if it satisfies at least -- but can only do

14  so if it doesn't violate 1122 or 1123.

15       I won't belabor the points that we made in our pleadings,

16  but we take the position that this plan, as modified, does

17  not satisfy the requirements of 1123(a)(4), and so the plan

18  is not modified, and the plan that's before the Court today

19  is either no plan at all, if the Trustee wants to withdraw

20  it, which we would suggest he cannot, or the plan that was

21  originally filed on May 1st, 2025 as the solicitation plan

22  and solicited to creditors.  And so that is Step 1.

23       The declaration that Mr. Kaufman filed for Mr. Andrews

24  that Mr. Andrews signed supports the confirmation of either

25  plan.  And I believe the testimony will show that the plan as

1    originally filed on May 1st is prime and ready for

2    confirmation by this Court, should this Court choose to

3    pursue that.

4        To understand -- the proofs will show, and as indicated

5    by counsel for the Trustee, there was tremendous negotiation

6    and discussion among the parties about the contents of the

7    plan.  And the proofs that we will put in will show that

8    discussion and that significant back-and-forth over the

9    course of many months about the contents of the plan,

10    including the very provisions of the important paragraph at

11    issue in X.D. of the plan, of the second paragraph of that

12    section.  That section was modified, at least once, by an

13    email shared amongst the parties.

14        So it's no mystery that the plan included a release of

15    Consenting Creditors.  It's no mystery that Consenting

16    Creditors, the proofs will show, do not include Mr. Borisch.

17    It's no mystery that Released Parties, which Mr. Borisch does

18    not claim to be, are not Mr. Borisch, but that he can be and

19    is a consenting party.  And the testimony will be that he

20    understood that and took this position after much thought

21    about whether it made sense in the context of his life and

22    lifestyle and the needs of him and his family and his family

23    member, the Borisch Parties generally who are human beings

24    and the Borisch Parties that are entities.

25        And so to suggest that -- well, go back one step.  The

1   Trustee indicated that it was an imperative to the Bank, and

2   Mr. Gerber said the same, that he receive a third-party

3   release.  Had the plan been structured in a way at the

4   initial stages that the creditors in Class 6 were to be

5   treated differently than the creditors in Class 5 -- both of

6   whom are receiving the same distribution ultimately if the

7   Class 6 creditors become the recipients of the rights of the

8   Class 5 creditors by virtue of paying off their guaranties --

9   if they were being treated differently, then the plan was

10  ripe for objection by Mr. Borisch or perhaps others about how

11  the plan was being done.

12      It was an imperative on the part of the Plan Proponent to

13  get this plan confirmed and to get the release, the third-

14  party release for M&T Bank.  The proofs will show it.  The

15  admission of the counsel in argument is that that was the

16  case.

17      They did not engage, and the representation that they did

18  engage with us in plan discussions is misleading and false.

19  Had they done so, perhaps they would have understood that

20  there was a possibility that Mr. Borisch would make the

21  decision to opt out.  They were convinced that -- and the

22  proofs will show that they suggested that our concern was

23  misplaced about the contents of the plan and the releases

24  being given in the plan and the third-party release when we

25  commented that that was kind of a controversial thing to do

1    in light of *Purdue* and other cases.  The response was, what

2    do you care, you are going to opt out.

3        So the expectation was that we were going to opt out.

4    Fine.  But the plan didn't provide for that and the plan

5    didn't require that.  And so we proceeded after --

6    particularly after your decision on May 22nd, which indicated

7    that we had claims and the proofs -- as a matter of record,

8    you have indicated that Mr. Borisch can pursue defenses and

9    he can pursue personal claims in the Kent County Circuit

10   Court against M&T Bank.  There was a weight of decision-

11   making to go into whether or not to grant -- to be a

12   Consenting Creditor or not.  And, again, I apologize for

13   repeating myself, but the answer is that we made an

14   intelligent, informed decision to do that based on the plan

15   before us that is ripe for confirmation.  And so the proofs

16   will show that we should be able to proceed.

17       If modification is permitted, which it shouldn't be, the

18   proofs will show that the plan discriminates against Mr.

19   Borisch.  Again, that might be an interesting argument

20   because, if you allow it to be modified, the same argument I

21   have about discrimination exists there, but I would repeat it

22   and want it to be considered by you, that we -- the burden of

23   good faith and the burden of proving everything in this case

24   for confirmation is really on the Trustee, and we will show

25   -- our proofs will show that the modification is not in good

1    faith, particularly because we were not included at all in

2    the negotiation process, and that the entire exercise is one,

3    under the totality of the circumstances, to revisit that

4    which the Bank and the Committee and all of the creditors --

5    there was only four people who opted out.  Many, many people

6    chose not to opt out.  And Mr. Borisch had the right to not

7    opt out, and he exercised that right.  And now they seek in a

8    manner that lacks good faith to seek to confirm the plan.

9        The plan was not accepted by all creditors because Class

10   6 would reject the modified plan.  The plan is not subject to

11   cramdown because it was not proposed in good faith.  The

12   proofs will show that.  The plan is not fair and equitable.

13   There are four factors to fair and equitable, which are

14   pointed out in our brief, and I'll rely on those.

15       So, in sum, rather than risk having an objection take

16   place, the parties were convinced that Mr. Borisch, should

17   they have not wanted to give him the release or allow him to

18   accept a release, they were convinced that he would opt out.

19   That mistake, that error on their judgment, is not a basis

20   for modifying the plan.

21       And so we would ask that the Court -- that you deny

22   modification of the plan in the first instance, and then

23   confirm the solicitation version of the plan that was

24   solicited on May 1st.

25       The parties -- we have heard discussion about the

1  disclosure statement and other documents suggesting that Mr.

2  Borisch was not a Released Party, not receiving a release.

3  And Mr. Borisch doesn't claim to be a Released Party.  And

4  the plan says at Section XII, Roman Numeral XII-D, that the

5  plan controls any discrepancies between the disclosure

6  statement and the balance.

7      We relied on the plan.  In the disclosure statement, the

8  proofs will show that Mr. Borisch is treated differently --

9  Borisch and the Borisch Parties are treated at least

10  differently in two different ways.  On Page 2 of the

11  disclosure statement, M&T Bank is going to receive transfers

12  of claims against the Borisch Parties, and on Page 21 of the

13  disclosure statement it says that the Creditor Trust is going

14  to receive them.

15      Obviously, that can't be the case.  It can't go to both

16  parties.  So that's one reason why plans provide, regularly

17  and always, that the plan is the document that controls.  And

18  that's the document that we rely on.  And all allegations or

19  issues or suggestions to the contrary are simply made to

20  create confusion for the Court and to lead to wrongheaded

21  conclusions.

22      So, our expectation and hope is that the Court will deny

23  the modification and proceed with confirmation of the

24  original plan.  We think that the proofs that the Trustee

25  puts on and that we are able to present to the Court will

1    demonstrate the well-founded request.

2              THE COURT:  All right.  Thank you.

3         Okay.  Mr. Kaufman, Mr. Bakst, or Mr. Gates, why don't we

4    chat about -- and I don't mean to exclude -- Ms. Schmidt, I

5    don't know if you've been in the middle of this discussion.

6    I know that the U.S. Trustee designated some exhibits, too.

7    But why don't we just chat about what we have lined up as far

8    as agreements vis-à-vis exhibits before we start taking any

9    testimony.

10             MR. GATES:  Your Honor, if it's okay, I'll let Mr.

11   Kaufman --

12             THE COURT:  Sure.

13             MR. GATES:  -- recite our understanding, and then

14   I'll just confirm that for the record.

15             THE COURT:  Absolutely.

16             MR. KAUFMAN:  Yeah.  Before I do that, I'm going

17   through the U.S. Trustee's exhibits, and it looks like

18   they're -- it's the disclosure statement, the notice of plan

19   supplements, notice of modifications, and then two cases.  So

20   I don't have an issue with A, B, or C.  D and E, I don't know

21   that they need to be in evidence.

22             MS. SCHMIDT:  Well, they're going to be more for

23   convenience.  They're transcripts of Judge Everett's

24   decisions, I mean, of his rulings in *Ebix* and *4 West*

25   *Holdings*.

1          MR. KAUFMAN:  Yeah.

2          THE COURT:  All right.  So, that's not really

3   evidence, but if nobody cares I don't have a problem with

4   admitting it.

5          MR. KAUFMAN:  No objection.

6          THE COURT:  Anyone else?

7      All right.  So that's Exhibits -- we have A through E by

8   the U.S. Trustee.  Are you asking for all of those to be

9   admitted?

10          MS. SCHMIDT:  Yes, Your Honor.

11          THE COURT:  All right.  And again, just to make

12   sure, any objections from anyone?

13      All right.  Then, without objection, UST Exhibits A

14   through E are admitted.

15      (United States Trustee's Exhibits A through E are

16   admitted into evidence.)

17          THE COURT:  Okay.

18          MS. SCHMIDT:  Thank you, Your Honor.

19          THE COURT:  And I have all those up here.  Correct?

20          MS. SCHMIDT:  Yes.

21          THE COURT:  Okay.

22          MS. SCHMIDT:  Yes.  And we don't have any objection

23   to the Trustee's exhibits or Mr. Borisch.  I mean, --

24          THE COURT:  Okay.  All right.

25          MR. KAUFMAN:  M&T filed an exhibit list as well.

1    We'll let Mr. Gerber confirm, but I think those are

2    duplicative of what's in the Trustee's exhibit book.  So I

3    don't know that we need to admit them.  Duplicate.

4         (Pause.)

5              MR. KAUFMAN:  That's fine.

6              MR. GERBER:  Your Honor, we move for admission of

7    M&T Exhibits -- M&T Bank 1, 2, and 3.

8              THE COURT:  All right.  Any objection?

9              MR. GATES:  No, Your Honor.

10             THE COURT:  All right.  Without objection, M&T

11   Exhibits 1, 2, and 3 are admitted.  And that's from Docket

12   1011.  And I should note that the U.S. Trustee's exhibits are

13   from Docket -- at least the designations are 1008.

14        (M&T Bank's Exhibits 1, 2, and 3 are admitted into

15   evidence.)

16             MR. KAUFMAN:  And then the two exhibit books from

17   Mr. Borisch, or I should say the Borisch Parties, those are

18   at -- well, they're filed under seal, but at Docket 1012.

19   And then the Trustee's exhibit book is at 1013.

20        Let me deal with the Borisch Parties' exhibits first.

21   They're filed under seal because I think Exhibits 20, it

22   might have been 21, no, Exhibits 20 through 58 were all

23   marked confidential pursuant to the protective order, and

24   we've confirmed with Mr. Gates and counsel that the Trustee

25   doesn't have an opposition to using those documents that were

1    produced pursuant to the protective order for the limited

2    purpose of this hearing, so we don't need to seal the

3    courtroom or --

4              THE COURT:  Okay.

5              MR. KAUFMAN:  Or --

6              THE COURT:  Thankfully on that, because I was

7    actually a little worried when I saw they all got filed under

8    seal.  Okay.

9              MR. KAUFMAN:  Yes.  And then -- oh, there's a list

10   of exhibits that Mr. Gates asked us to agree to admissibility

11   and authenticity, and we've done so.  Those are Exhibits --

12   I'm going to rattle them off.  Just let me know if I miss

13   any.

14             MR. GATES:  Sure.

15             MR. KAUFMAN:  So this is Borisch Exhibits 22, 24,

16   27, 28, 29, 30, 31, 33, --

17             MR. GATES:  Sorry.  32 as well, please.

18             MR. KAUFMAN:  Oh, I'm sorry.  I missed that one.

19   That's fine.  32.  33.  35.  36.  37.  38.  39.  And then we

20   skip to 44?

21             MR. GATES:  Correct.

22             MR. KAUFMAN:  49.  54.  55.  56.  And 58.  And those

23   exhibits, I think it's 19 or maybe 20, no objection to

24   admissibility or authenticity of those documents.

25             THE COURT:  All right.  Do you all want to offer

1    those at this time?

2              MR. GATES:  Yes, Your Honor.

3              THE COURT:  All right.  So, any objection, then --

4    just you all pay attention, because I'm going to rattle back

5    through these to make sure any of our other parties don't

6    have objections.  Any objections to the admission of Borisch

7    Exhibits 22, 24, 27 through 33, 35 through 39, 44, 49, 54

8    through 56, or 58?

9        All right.  Without objection, each of those exhibits are

10   admitted.

11       (Borisch Parties' Exhibits 22, 24, 27 through 33, 35

12   through 39, 44, 49, 54 through 56, and 58 are admitted into

13   evidence.)

14             MR. KAUFMAN:  And then the Trustee has -- our

15   exhibits are at 1013, Docket 1013.  We have 26 exhibits.  And

16   we will offer all 26 exhibits at this time.

17             THE COURT:  All right.  Any objection?

18             MR. GATES:  No objection, Your Honor, but I do have

19   a bit of housekeeping on that.  It'll help out, I think.  We

20   also have Exhibits 1 --

21             MR. KAUFMAN:  Oh, I apologize.

22             MR. GATES:  We also have Exhibit 1 through 18, which

23   are in large part duplicative of what the Trustee is

24   offering.  They're essentially pleadings, Your Honor.

25       I think the understanding was, with the exception of 12,

1  which we have struck, our 1 through 18, being duplicative and

2  being largely pleadings, neither of us have any objection to

3  authenticity or admissibility of what the Trustee has just

4  recited on the record or our 1 through 18, with the exception

5  of 12.

6     We struck 12, Your Honor, because it just wasn't

7  necessary.

8           MR. KAUFMAN:  Yeah.  The only caveat to that, Your

9  Honor, is Exhibit 1 is a transcript.  I don't think it needs

10  to be admitted for all purposes, but for the purpose of there

11  was a hearing, a status conference.  There was no actual

12  evidence offered at that status conference.

13          THE COURT:  All right.  You all are throwing

14  different sets of exhibits at me, so let's start with where

15  we initially started, which is I have an offer from the

16  Trustee of Exhibits 1 through 26.  Any objection?

17          MR. GATES:  No.

18          THE COURT:  All right.  Without objection, Trustee's

19  Exhibits 1 through 26 are admitted.  And that's from Docket

20  No. 1013.

21     (Chapter 11 Trustee Mark Andrews' Exhibits 1 through 26

22  are admitted into evidence.)

23          THE COURT:  And then I have, I think what I'm

24  hearing from you, Mr. Gates, is, while there may be some

25  overlap, a request for the admission of Borisch Exhibits 1

1  through 11 and 13 through 18.

2          MR. GATES:  Correct, Your Honor.

3          THE COURT:  Any objection?

4          MR. KAUFMAN:  Only objection is to Exhibit 1 in that

5  it's a transcript.  Same objection that we had with the U.S.

6  Trustee's.  It can be admitted for the purpose of it's a

7  transcript, but not --

8          THE COURT:  So let's --

9          MR. KAUFMAN:  -- not really evidence.

10          THE COURT:  Hang on.  Let's rewind.  Because there

11  wasn't any caveat associated with the U.S. Trustee's

12  exhibits.  If we need to rewind and talk about that, let's do

13  that, because I've admitted U.S. Trustee Exhibits A through E

14  for all purposes.

15          MR. KAUFMAN:  The comment that the Court made was D

16  and E weren't really -- not really evidence, they were

17  transcripts.  So I would --

18          THE COURT:  Well, transcripts can be evidence.  I

19  think -- I don't remember what I -- I think -- well, okay.

20  Let me back up.  Because maybe I'm misunderstanding

21  transcripts.  My point was transcripts of somebody else's

22  hearing in a different case isn't really evidence for

23  purposes of this case.  If what we're talking about is

24  transcripts in this case, that may well be evidence.

25      But either way, if it's admitted, it's evidence however

1  you slice and dice it.  It's just sort of awkward evidence, I

2  guess I'll call it, if we're talking about like whatever

3  Judge Everett in his wisdom articulated over in Dallas.  I

4  mean, I'm just saying, like, I don't know that that's

5  evidence *per se*, but it certainly is indicative of something

6  that somebody else has done.

7       In any event, all I really care about, whether we call it

8  -- whatever bearing it has, whatever weight, for example, it

9  has, is something that I can assess.  But for admissibility,

10  do we have any objections to the admission of Borisch

11  Exhibits 1 through 11 or 13 through 18?

12            MR. KAUFMAN:  No, Your Honor.

13            THE COURT:  Okay.

14            MR. KAUFMAN:  Not from the Trustee.

15            THE COURT:  All right.  Hearing no other objections,

16  either, then Borisch Exhibits 1 through 11 and 13 through 18

17  will also be admitted.  And all of those are from Docket

18  1012.  Correct, Mr. Gates?

19            MR. GATES:  Correct, Your Honor.

20            THE COURT:  Okay.  All right.  Well, great.

21     (Borisch Parties' Exhibits 1 through 11 and 13 through

22  18 are admitted into evidence.)

23            THE COURT:  Well, I think we've made some headway

24  here.

25            MR. GATES:  Thank you.

1                    THE COURT:  All right.

2                    MR. KAUFMAN:  And then before I call Mr. Andrews to

3    the stand, there's one other witness on our list, and that's

4    Mr. Paul from Omni Agent Solutions, the ballot agent.  His

5    declaration is admitted, so I -- if the Court wants to hear

6    him confirm that declaration, let's do that now, and then we

7    can release him.

8                    THE COURT:  So, if the declaration has been

9    admitted, it's evidence already.  But I guess the question,

10   is the idea to try to cut him loose if we don't have to have

11   --

12                   MR. KAUFMAN:  If there's no cross-examination for

13   Mr. Paul.

14                   THE COURT:  Is there any expectation to cross-

15   examine Mr. Paul?

16                   MR. GATES:  I will just have a couple of questions

17   for Mr. Paul, Your Honor.  And I don't mind going out of

18   order.

19                   THE COURT:  Okay.

20                   MR. GATES:  If we want to stop to cut him loose,

21   then we're --

22                   THE COURT:  So, --

23                   MR. KAUFMAN:  Let's do that.  I don't have any

24   further questions for Mr. Paul, so I'll tender him for cross-

25   examination at this time.

1            THE COURT:  Okay.  All right.  Very good.

2       Real quick before we do that.  Any other preliminary

3    matters we need to take up before we start taking live

4    testimony?

5       All right.  Then, Mr. Paul, if I could have you take

6    yourself off mute.  I see you on the screen.  And let's just

7    do a quick audio check.  If you can just say hello.

8            MR. PAUL:  Hello.

9            THE COURT:  Perfect.  All right.  We can hear you

10   fine.  If I can go ahead and have you raise your right hand.

11    JERIAD PAUL, CHAPTER 11 TRUSTEE MARK ANDREWS' WITNESS, SWORN

12           THE COURT:  Mr. Gates?

13           MR. GATES:  Thank you, Your Honor.

14           THE COURT:  Come on up.

15                         CROSS-EXAMINATION

16   BY MR. GATES:

17   Q   Good morning, Mr. Paul.

18   A   Good morning.

19   Q   Mr. Paul, just a couple of questions.

20           THE COURT:  And let me ask.  I apologize to

21   interrupt.  Real quick, tell me, what is the exhibit that is

22   his declaration, just so I have that handy?

23           MR. GATES:  I have 11 and 14 on our list, Judge.

24           MR. KAUFMAN:  It's Trustee's Exhibit 15, so that's

25   Docket 1013.  1013-15.

 1              THE COURT:  Okay.  Just so we have the exhibit

 2      number.  Trustee's Exhibit 15 is the second amended

 3      declaration.  Okay.  Very good.  Thank you.

 4      BY MR. GATES:

 5      Q   Mr. Paul, just --

 6              MR. GATES:  Oh, I'm sorry, Judge.  You all set?

 7              THE COURT:  I am.  Thank you.

 8              MR. GATES:  I'm sorry.

 9      BY MR. GATES:

10      Q   Mr. Paul, just a couple quick questions for you.  I've

11      read your declaration that has been introduced into evidence

12      here today.  Just to confirm with you, the deadline for

13      accepting and/or opting out of the May 1st solicitation plan

14      was June 5 at midnight.  Is that correct?

15      A   That is correct.

16      Q   Okay.  Do you know what time Mr. Borisch and the Borisch

17      Parties filed their balloting, their acceptance of the plan,

18      and did not opt out of the plan?

19      A   Unfortunately, I do not have the exact time.  I believe,

20      though, it might have been later that evening, but I'm not

21      one hundred percent sure.

22      Q   Okay.  Fair enough.  Let's ask the same question in terms

23      of what time you informed the Trustee's counsel that Mr.

24      Borisch and the Borisch Parties had accepted the plan.  Do

25      you know when you informed the Trustee's counsel?  In terms

1    of time, do you know what time it was that you informed

2    Trustee's counsel that Mr. Borisch and the Borisch Parties

3    had accepted the plan and not opted out?

4    A    I believe it would have been the -- the following

5    business day.

6    Q    All right.  So is that -- how comfortable are you with

7    that response?

8    A    I'm not entirely comfortable without actually verifying

9    that, but that's typically our normal protocol.

10   Q    All right.

11   A    Anytime that the voting deadline does pass, it's the

12   following business day that we notify counsel of the results.

13   Q    So that's your standard operating procedure, the next

14   business day?

15        Is it possible that you informed the Trustee's counsel

16   very late in the evening on this particular occasion, on June

17   5, that the Borisch Parties and Mr. Borisch had accepted the

18   plan and had not opted out?  Is it possible?

19   A    That is possible.  There are times on the day of the

20   voting deadline we may do a preliminary notification to

21   counsel of what the results are, without final review or

22   verification of the ballots.

23   Q    So it's your testimony the notification to Trustee's

24   counsel in this case would have been very late in the evening

25   to next business day?

1    A    Correct.

2    Q    Okay.

3            MR. GATES:  Nothing further, Your Honor.

4            THE COURT:  Okay.  Any other cross-examination from

5    anyone?

6        Any redirect?

7            MR. KAUFMAN:  No redirect.

8            THE COURT:  Okay.  All right.  So can we let Mr.

9    Paul --

10            MR. GATES:  Yes, Your Honor.

11            THE COURT:  -- free?

12        Okay.  Mr. Paul, thank you for your time.  You are free

13    to go about your business however you may see fit.  You're

14    obviously free to stick around, too.  It's up to you.  But

15    just know that if you've got other things that you need to

16    do, there's nothing in this process to keep you from that.

17    Okay?

18            THE WITNESS:  Great.  Thank you, Your Honor.

19        (The witness is excused.)

20            THE COURT:  All right.  Mr. Kaufman?

21            MR. KAUFMAN:  The Trustee would call -- counsel

22    would call the Trustee, Mark Andrews, to the stand.

23            THE COURT:  All right.  Mr. Andrews, before you sit

24    down, if you'll raise your right hand.

25    MARK ANDREWS, CHAPTER 11 TRUSTEE MARK ANDREWS' WITNESS, SWORN

1          THE COURT:  All right.  Please be seated.

2          THE WITNESS:  I'm losing my voice.

3          THE COURT:  And feel free to -- if you can see

4    around the binders, great.  If you need to put one or both or

5    whatever on the back shelf and then grab them whenever you

6    need them, feel free --

7          THE WITNESS:  Okay.

8          THE COURT:  -- to do that as well if it gets too

9    busy.

10          THE WITNESS:  Thank you.

11                         DIRECT EXAMINATION

12   BY MR. KAUFMAN:

13   Q    Good morning, Mr. Andrews.  Could you state your name for

14   the Court?

15   A    Sure.  Mark Andrews.

16   Q    And Mr. Andrews, have you submitted a declaration in

17   support of confirmation?

18   A    I have.

19   Q    And there's two exhibit notebooks in front of you.  I'm

20   referring to the one on the left side.  That's the Trustee's

21   exhibits.  Could you turn to Tab 19, Trustee's Exhibit 19,

22   and confirm that that's your declaration?

23   A    It is.

24   Q    Okay.  And that was filed -- that was filed on July 1st.

25   Is that correct?

Andrews - Direct                          37

1    A    It looks like filed July 1st and entered July 3rd.  Yes.

2    Q    And do you adopt your statements --

3         THE COURT:  For whatever it's worth, just so the

4    record is nice and clean, I think what the second entry on

5    the 3rd is the exhibit list that was filed, as opposed to the

6    --

7         MR. KAUFMAN:  That --

8         THE COURT:  So it was filed effectively twice, one

9    as a freestanding document on July 1 and then second as an

10   attachment to an exhibit list on July 3rd.  So all that is

11   just of record in the ECF system, so I just figured I'd have

12   that nice and clean for our record.

13        THE WITNESS:  Thank you.

14        MR. KAUFMAN:  Thank you, Your Honor.

15   BY MR. KAUFMAN:

16   Q    Mr. Andrews, do you adopt the statements from your

17   declaration as your testimony today?

18   A    I do.

19   Q    Okay.  And let's jump into the issues raised in the

20   Borisch objection, starting with why have you proposed the

21   plan in this case?

22   A    Because we felt like this was the best outcome available

23   to all the constituencies.  The Bank was a necessary party to

24   support the plan because it's their cash collateral.  We had

25   lots of communication with ultimately different groups,

1  including the Creditors' Committee, including customers,

2  including employees, including sales tax authorities.  And

3  this was what we decided was the best outcome under the

4  circumstances in a case where there had been tremendous

5  losses suffered by all the parties.

6  Q    And you mentioned that the plan was negotiated with

7  various creditor constituencies.  I think you just went

8  through the list.  It includes M&T Bank, the Committee, and

9  others?

10  A    Yes.

11  Q    And we -- the initial plan was filed, do you recall, in

12  late March?

13  A    Yes.

14  Q    Okay.  And a few -- we filed a few stipulations after the

15  initial plan was filed.  Could you turn to Tab 10 in the

16  Trustee's exhibit notebook?

17  A    Okay.  I'm there.

18  Q    And if you would, just flip through Exhibits 10, 11, 12,

19  and 13, and describe those for the Court.

20  A    So, Exhibit 10 is a stipulation regarding classification

21  and treatment of a claim by Magill and Christensen.

22      11 is a stipulation with Thomas Gautreaux.  Sort of

23  another situation that has been sort of recurring in the case

24  with consumer claims.

25      And then Exhibit 12 is a stipulation with a party that we

1  entered into, with a creditor who had a claim against Tommy's

2  Phoenix and a series of claims there that were handled.

3  Sorry.  I'm losing my voice.

4  Q    Can I pour you some water?

5  A    I'll do it.  But --

6  Q    And let me stop there.  Magill, Christensen, Gautreaux,

7  and Schaefer, those are consumers, correct?

8  A    That's right.

9  Q    And are they treated in Class 4 of the plan?

10  A    Yes.

11  Q    Okay.  And then the next stipulation at Trustee's Exhibit

12  13 is with the Colorado Department of Revenue.  Is this one

13  of the taxing authorities that you were referencing?

14  A    Yes.

15  Q    And let's turn to Exhibit 20, Trustee's Exhibit 20.

16          MR. KAUFMAN:  And Your Honor, I apologize.  This

17  document, when we filed it as an exhibit, for some reason

18  some characters were stripped from the document.  I just

19  noticed that this morning.  The original document is filed at

20  Docket 1004.  But I'm going to ask Mr. Andrews: --

21  BY MR. KAUFMAN:

22  Q    -- can you describe what this stipulation was intended to

23  do?

24  A    This is a stipulation that relates to the amount of

25  reserves based on available cash that we've entered into.

Andrews - Direct                         40

1   Q    Okay.  And under the original plan, the reserves were, do

2   you recall, roughly $2.9 million?

3   A    Yeah.  Just a -- just slightly under $3 million.  That's

4   correct.

5   Q    And now what are they?

6   A    Around $4 million.

7   Q    Okay.

8   A    Yeah.

9   Q    And I want to take a step back.  We'll walk the Court

10  through the plan negotiation process, but I want to build

11  kind of a rough timeline, starting from your appointment in

12  the case.  When were you appointed?

13  A    June 17th of 2024.

14  Q    And how did you spend the first few months from June of

15  2024 after your appointment in this case?

16  A    Without a lot of sleep.  So, what happened at the

17  beginning of the case was, you know, typical of these kinds

18  of cases, we attempted to initially determine what cash was

19  available, what operating costs looked like, come up with a

20  credible budget, working from numbers that were not always

21  very good numbers.

22      We had to meet with the management team.  We had to make

23  some early determinations on what we were going to do with

24  the management team.

25      We had to ward off a lot of different competitors who

1   were involved in taking our employees, and so it would have

2   made it impossible for us to liquidate or do anything else.

3        We had to come up with the available game plans by

4   determining whether or not it was feasible to sell parts of

5   the company as a whole and whether or not it was feasible to

6   fix the relationship with Malibu.

7        We concluded that it was not really possible to sell the

8   company as a whole or as a going concern.  We concluded that

9   we weren't going to be able to fix the relationship and re-

10  establish a relationship with Malibu.  And so we concluded

11  that we were going to be liquidating, and we picked with the

12  Lender a liquidating company to come in and assist us.  And

13  we -- and then we proceeded to figure out a way to finance

14  the case by working out an arrangement with M&T.

15       And all of that was against the backdrop of, early in the

16  case, we had hundreds of calls into the company from

17  consumers who couldn't get title, who couldn't figure out

18  where their boats were that had been consigned, who needed

19  various things from us to comply with regulations in their

20  states.  And so we were inundated with those types of claims

21  and requests early in the case.

22  Q    How long did the dealership -- the boat liquidation

23  process, about how long did that take?

24  A    I think it was seriously initiated in late July, would be

25  my memory.  I may be a little bit early on that.  And it was

1   concluded for the most part by October.  There were still

2   some straggler boats that had to be sold after that point,

3   but that's a pretty good capsule summary of the process.

4   Q   And along this -- during this timeline, there was a

5   mediation with Malibu, correct?

6   A   Yes.

7   Q   How did the Malibu settlement fit into this process?

8   A   We -- early on in the case, we had three or four major

9   issues with Malibu.  One was we had people coming to the

10   company who wanted to know whether or not warranties that

11   they had on their boats from Malibu would be honored at our

12   dealership or whether they had to go elsewhere.  And so we

13   had to work something out there.

14       We had Malibu opening dealerships that were in the same

15   geographic area as our dealerships, and so there was a fair

16   amount of tension because there were employees who were

17   moving between our dealership and their dealership.  And so

18   we had to have discussions about that.

19       We had a general history with Malibu that had resulted in

20   a lawsuit that was filed prior to my involvement in the case.

21   But we tried to bring down the heat to see if we could have

22   conversations.  We entered into a mediation with Judge Atlas,

23   which was successful, in the fall of 2024.

24   Q   And do you recall when the Court approved the settlement

25   with Malibu, roughly?

Andrews - Direct                              43

1   A    Yeah.  Mid-November of 2024.

2   Q    Okay.  And you talked about the liquidation process kind

3   of wrapping up around that time.  What else was happening in

4   the case end of November?

5   A    Well, we were trying to make a decision on what would be

6   the best way to go forward.

7   Q    And what --

8   A    And we knew -- we knew we had buckets of claims from

9   basically five or six different groups.  We had tax

10  authorities.  We had -- obviously, the largest claim would

11  have been the Lender, which had a very large deficiency

12  claim.  M&T.  We had some relatively minor claims, the

13  executory contracts and the like.  And we had a lot of

14  consumer issues that sort of continued to percolate through

15  the system all the way through the end of the year, and

16  they're still percolating.  There still are some of those

17  consumer claims that we deal with.

18  Q    And so liquidations are wrapping up.  You said you're

19  considering what to do next. What were some strategies that

20  you considered as the Trustee?

21  A    We thought there were really two basic options, and

22  Option 1 was to file a plan that would be a liquidating plan,

23  to have as the sort of backstop to that plan some arrangement

24  with the Lender, because the only credible way to put

25  together a plan that was going to make distributions meant we

1   were going to have to rely on the Lender to be willing to

2   commit to making some cash contribution from proceeds of

3   sales that were under their cash collateral.  So we needed

4   the Lender's support, so that was important.

5       Another option would have been simply to convert it to a

6   Chapter 7.  I, you know, hated that option as a personal

7   matter, but it had to be discussed, because from the Lender's

8   point of view they had to consider whether or not it was

9   better to just go ahead and tender it to a Chapter 7 trustee

10  and liquidate it out that way, or whether in fact it might be

11  better to go through the plan liquidation process.

12  Q   You mentioned that personally you thought the liquidation

13  in a Chapter 7 was -- I think -- I don't want to put words in

14  your mouth, but not a good option.  Why was that?

15  A   I thought it was a bad option because I thought, number

16  one, it would result in a number of difficult problems in a

17  case where there are technically a number of separate

18  companies, in a case where, for example, you might have 13

19  Chapter 7 trustees or whatever the number of companies is

20  that we're dealing with here.

21      I thought that it was likely in those circumstances that

22  there wouldn't be a way to have continuity with regard to the

23  numerous consumer issues that had to still be dealt with and

24  the various state taxing authorities that would be isolated

25  in each case.  I thought that, frankly, it would have wasted

1   a lot of work that had already been done to try to put

2   something together that was coherent and would do a good job,

3   I thought would do a better job, than trying to waste all of

4   that work and then sort of start over, would be the way that

5   I looked at it.

6   Q   So you mentioned that we're in November, considering an

7   exit strategy.  Did you have discussions with the Bank about

8   these two options?

9   A   Yes.

10  Q   And how did those conversations go?

11  A   Well, it was a difficult situation for all around,

12  because the key was what do the projections look like on the

13  available cash, what do we think are the needs in order to

14  support a plan, what, you know, frankly, does the Bank get

15  out of it?  I mean, it's typical Chapter 11 horse trading.

16  And so those are the things that the Bank was looking at.

17      We also had to deal with a lot of other parties in the

18  case.  We had to deal with the sale tax authorities.  Again,

19  a lot of consumers, many of them well represented.  So it's

20  not as if we were free to just do whatever.  We had a lot of

21  different people who had legitimate claims to the money.

22  Q   And while you were having these discussions with the Bank

23  in late November, kind of around the holidays, where was Mr.

24  Borisch in this process?  Were you having discussions with

25  him?

1   A    I did.  I had some discussions with Mr. Borisch, and for

2   two different reasons, actually.  Mr. Borisch and Mr.

3   Borisch's father had an interest in another entity that we

4   had sold, a -- one of the -- I'll call it dealership.  That's

5   not exactly what it is, but we had sold a location, if you

6   will, back to Jonathan Borisch in August, you know, approved

7   by this Court.  So there were follow-up things that we had to

8   deal with that had to do with each of the transactions that

9   had taken place back in August.

10      And you have to bear in mind that, in each of these

11  transactions, there were lots of little pieces that remained

12  to be dealt with.  As an example, there are hundreds and

13  hundreds of boat trailers all over the country that had been

14  moved around.  There were liens that were held by the Bank on

15  some or most of those trailers.  There were difficult

16  situations involving trade-in boats and who had what rights

17  in those boats.  And there were just other situations that

18  involved some commonality of interests, because we had all

19  the obligations prior to the sale to Mr. Borisch's father and

20  they had the obligations after.  So we were trying to do

21  true-up.  So we had communications related to that.

22      And then we had general communications about what's next,

23  and with me forecasting to Mr. Borisch and counsel that we're

24  going to do a plan.  We're working with the Bank to see if we

25  have support for that plan.  We don't know that we have it.

Andrews - Direct                              47

1   But here are some things that you might start to think about

2   on your end.

3   Q   Did you pitch to Mr. Borisch in late November the idea of

4   doing a mediation with Judge Atlas?

5   A   Yes.

6   Q   And what happened?  Did a mediation ultimately occur?

7   A   No.  There were several discussions about whether or not

8   it made sense to have a mediation.  I had discussions with

9   Mr. Borisch.  I had discussions with the Bank.  And I

10  continued to see if there were -- probe to see if there were

11  ways, if there were common areas of agreement between the

12  parties.

13      I make no secret, it's no secret in any of these cases

14  that 95 percent plus of these matters ultimately settle.  I'm

15  a personal fan of mediation, and I thought Judge Atlas did a

16  terrific job.  So I was hopeful that we could go back in

17  front of her to see if we could complete a deal.  But we -- I

18  couldn't seem to cross a threshold with the parties to quite

19  put it together and make it work.

20  Q   Can you describe for the Court kind of the evolution of

21  your discussions with Mr. Borisch and M&T Bank that led you

22  to come to the conclusion that you couldn't cross that

23  threshold to get the parties together?

24  A   There were positions --

25          MR. GATES:  Your Honor, may I?  I'll object to the

 1  fact that Mr. Andrews is about to get into the substance of

 2  settlement discussions under FRE 408.

 3      However, they're already in the documents and been

 4  admitted, the details of those.  And the only reason I raise

 5  this for the Court is to identify I'm going to dig deeper

 6  into those settlement discussions, the details of those

 7  settlement discussions.  And now that I'm allowing Mr.

 8  Kaufman to get in, I hope that door is open and I won't

 9  receive an objection when I ask about the details of

10  settlement discussions.

11          THE COURT:  Any reaction?

12          MR. KAUFMAN:  Yeah.  Your Honor, I think they've

13  opened the door, so I intended to get into this, so I don't

14  oppose getting into the details of the discussions.

15          MR. GATES:  No objection, Judge.

16          THE COURT:  All right.

17  BY MR. KAUFMAN:

18  Q   All right.  Do you need me to ask the question again?

19  A   No, I think -- I think I understood.  The -- excuse me.

20  The --

21      (Feedback.)

22  Q   Hold on.  I think we're getting some feedback.

23  A   Yeah.

24      (Pause.)

25          MR. KAUFMAN:  Nobody touch it.

1          THE WITNESS:  So, maybe --

2      (Feedback resumes.)

3          THE WITNESS:  Uh-oh.

4      (Pause.)

5          THE COURT:  All right.

6          THE WITNESS:  Ready?

7          THE COURT:  But do me a favor.  Pull that microphone

8   down.  Yes.  You don't have to go all the way down, but just

9   -- yes.  Okay.

10  BY MR. KAUFMAN:

11  Q   Okay.  The question is, describe for the Court the

12  evolution of your discussions between Mr. Borisch and the

13  Bank.

14  A   So, I had conversation with Mr. Borisch, and I'm going to

15  credit Mr. Borisch.

16      (Feedback.)

17          THE COURT:  So, I don't know what's going on.  If I

18  can have everybody just pull their microphones down a little

19  bit.  Because if they're pointing up, they're picking up

20  reverb.  You might have to do it, too.  Yes.  All right.

21  Let's try it.

22          THE WITNESS:  Okay.  All right.  Is that any better?

23  I don't hear any feedback.

24      (Feedback.)

25          THE WITNESS:  Oh, yeah, now I do.  Sorry.

1          THE COURT:  All right.  Can you just reset the --

2      (Court confers with Clerk.)

3          THE COURT:  We're reset now?  Okay.  All right.

4  Let's try it.  So we just hit a reset button, Mr. Kaufman, so

5  hopefully let's see where we are.

6          MR. KAUFMAN:  Try again?

7          THE COURT:  Yes.

8          MR. KAUFMAN:  All right.  Third or fourth time's the

9  charm.

10         THE COURT:  And it's typical government electronics,

11  which is, when in doubt, reboot, basically.  So we're not

12  having feedback, so what do you know.  We'll see.

13         MR. KAUFMAN:  Okay.

14  BY MR. KAUFMAN:

15  Q   Mr. Andrews, try again.

16  A   All right.

17  Q   Let's describe the discussions between Mr. Borisch and

18  you and the Bank.

19  A   Well, I'm going to start by saying that, look, I think

20  both Mr. Borisch and M&T, and certainly me as Trustee, the

21  desire was to come up with some sort of way to settle it.

22  But it was -- it was difficult because there were certain

23  threshold issues that I could not seem to get the parties to

24  navigate through.

25      On the one hand, it was pretty clear to me that what Mr.

1   Borisch would like is to get a release, to figure out a way

2   to be able to retain his causes of action against Malibu.

3   What the Bank would like is to get paid on its deficiency

4   claim and get something out of Mr. Borisch on the guaranty.

5   And what the estate wanted was peace in the valley and a

6   clear path to get a plan to cover obligations to all of its

7   constituencies.  And so that was the sort of starting point

8   of, well, what are the possibilities here?

9       I think that each of the parties then had their own

10  issues that they had to deal with, whether internally or

11  whether for whatever other reason, to be cautious.  And so

12  there was a lot, to me, of concern expressed, you know,

13  directly by some of the parties, as to making certain that if

14  they were going to do x, y, or z, or take a particular

15  action, you know, they wanted to be cautious to protect

16  themselves.

17      And so my conclusion sort of gradually was it may be a

18  little bit too early.  But I still made the effort and had

19  put together calls, including I put together a call with just

20  the business principals at one point of the Bank and Mr.

21  Borisch and his father, Jonathan Borisch.  And what I did on

22  that call, which was back in January, was recited, look,

23  Bank, this is what I'm hearing you say.  Borisch Parties,

24  this is what I'm hearing you say.  Because I was trying to

25  make sure that I wasn't in the middle and not getting the

1   parties to communicate directly.  And I didn't formulate that

2   as being a mediation so much as I wanted it to be that each

3   party sort of heard me reflect in front of the other party,

4   this is what you want, I think, and so how do we sort of get

5   there?

6       I then had follow-up phone calls after that phone call

7   that I believe took place in January with Mr. Borisch.  Mr.

8   Borisch wanted to have copies of the earlier versions of the

9   plan.  I told him, look, we're still negotiating with the

10  Bank because we have issues related to, you know, what the

11  reserves are going to look like.  And some of those things

12  are so basic that, without getting through those -- that part

13  of the negotiations, it's very difficult for me to pivot over

14  to you.

15      But a really important issue to the Lender that I did not

16  see a way around without some consent from the Borisch

17  Parties was that they wanted to know what offer -- if any

18  offer was going to be on the table in connection with a

19  release.  So, what would you pay, you, Borisch Parties, pay

20  us for a release?

21      And number two, I think, just as important if not more

22  so, was they wanted a disclosure.  They wanted to understand

23  what it was --

24  Q   They?  I'm sorry.  They?

25  A   Sorry.  Yeah.  I'm using the pronoun without using the

1   party name.

2        So, the Lender wanted to see what the financial condition

3   was of Mr. Borisch.  They no doubt had prior financial

4   condition statements when they took the guaranty, but they

5   wanted to know, are those statements still accurate?  Have

6   things changed?  Because they didn't want to negotiate with

7   the Borisch Parties in the dark in connection with any

8   request from the Borisch Parties for a release.

9        And so that part of the deal seemed to me to be not

10  bridgeable at some point.  I couldn't see a way to get around

11  the requirement from the Lender and, in my view, the Borisch

12  Parties' unwillingness to give that information, for reasons

13  that, you know, I can think of but that I'll let them

14  respond.  So --

15  Q    Would you say that there -- did you reach a conclusion

16  about whether there was a deal to be cut between the Borisch

17  Parties and the Bank?

18  A    I thought it was really unlikely.  And I thought that not

19  because I -- it's not because I don't think both parties

20  would like it.  It's because I think the Bank isn't going to

21  be in a position -- I've represented banks a lot of my career

22  -- they're not going to take an in-the-dark offer on a $50

23  million deficiency claim.  They are going to want to know

24  what it is that the guarantor party has and make a judgment

25  on whether or not that's fair in terms of the requested

1    release.

2        And so I didn't see a way to get around that that I

3    thought was likely.

4    Q    Let me take a step back.  How did you communicate with

5    Mr. Borisch during these Chapter 11 cases?  What methods?

6    A    Mostly short phone calls.

7    Q    And as the Chapter 11 Trustee, did you keep

8    contemporaneous time records of your work in this case?

9    A    Yes.  I mean, I have timesheets that get turned in to

10   become part of the bills.

11   Q    And were those time records produced to the Borisch

12   Parties in response to their written discovery requests?

13   A    I'm assuming so, but even if not, they're all filed of

14   record.  There are no secrets.

15   Q    Have -- in preparing for your testimony today, did you go

16   back and review those time records?

17   A    I looked at time records, and then I looked at just the

18   -- kind of the docket, to try to remember things as they

19   happened.

20   Q    You --

21   A    And reviewed some of the email traffic that was produced

22   back and forth by the parties.

23   Q    So, based on your discussions that you were having with

24   Mr. Borisch along this time period -- I think you talked

25   about in January -- in November, December, and into January

1    -- do you believe that you gave him an opportunity to enter

2    into negotiations for settlements or releases under a

3    prospective plan?

4    A    Oh, I, you know, sure.  I mean, the door is open always

5    with a trustee to cut deals.  I think the real problem is

6    here that the deal that I think the Borisch Parties need is

7    less with the Trustee and more with the Bank.  And the deal

8    that I needed was with the Bank to support the plan.  And

9    that the best case would be Bank supports plan, Bank and

10   Borisch Parties settle, everybody goes home.

11        But I couldn't get -- I couldn't get everybody together.

12   And so my hope was elusive.  I couldn't -- I couldn't make

13   that happen.

14   Q    And based on your discussions with the Bank, what do you

15   believe -- do you believe the Bank would have supported a

16   plan that gave the Borisch Parties a release under a plan?

17   A    Not without the Borisch Parties contributing money and

18   without a financial disclosure.  So, no.

19   Q    So, did you ultimately instruct your professionals to

20   draft a plan?

21   A    Yes.

22   Q    And was that plan shared with Mr. Borisch before it was

23   filed?

24   A    It was probably shared either shortly after it was filed

25   or right around the time.  I don't recall.

1       The contents of the plan, though, were not anything you

2   wouldn't have predicted.  It was simply always a liquidating

3   plan.  So there's nothing secret in the plan.

4   Q   And did you ever attend a mediation or a settlement

5   conference between the Borisch Parties and the Bank?

6   A   We had phone traffic.  There wasn't any mediation, but

7   there was -- there was phone traffic.  I don't remember how

8   many times, if ever, there was a Bank, Trustee, and Borisch

9   phone call other than the one I described back in January.

10  Q   Do you believe the parties reached a settlement?  The

11  parties being the Borisch Parties and the Bank?

12  A   No.

13  Q   When you filed the initial plan, or when you instructed

14  your counsel to file the initial plan in March, did you

15  intend to provide a release to the Borisch Parties under the

16  plan?

17  A   No.

18  Q   Why not?

19  A   Because the bargain that we had with the Bank, in order

20  for them to provide the consideration to make the plan

21  feasible, was that the Bank was going to pick up claims

22  against the Borisch Parties.  And the reason for that, in my

23  mind, was really sort of pretty simple.  The Bank had a very

24  high percentage of all of the debt in the case.  The Bank was

25  already in a lawsuit with the Borisch Parties.  My view was

Andrews - Direct                    57

1  that, on behalf of the estate, the likelihood is that many of

2  the claims would be somewhat duplicative and that, at the end

3  of the day, it made very little sense for the Bank and to the

4  estate parties to have two groups of professionals pursuing

5  the Borisch Parties over claims, and that the Bank, further,

6  was likely to reach a judgment before the estate might, for

7  much bigger dollars.  So it seemed to me to be overall

8  wasteful and sort of not conserving of the estates' assets to

9  do it the other way.

10 Q    Did you have any further discussions with the Borisch

11 team, Mr. Borisch and his father or their counsel, about the

12 plan after it was initially filed in March?

13 A    I'd have to think about that.  If I did, it was -- it was

14 modest.  I think most of the conversations after that point

15 either went through counsel.  I don't recall talking to

16 Jonathan Borisch about the plan after it was filed, and if I

17 did, it was a real short conversation.

18 Q    Is it fair to say that the prospect of a settlement that

19 you were trying to work on before filing the plan was

20 basically stalled?

21 A    I didn't -- I didn't see conditions changing to make a

22 deal that had the support of the Bank, which is the primary

23 financial source to fund the plan.

24 Q    And you ultimately approved modifications to the plan in

25 June, correct?

1   A    You're talking about the most recent ones?

2   Q    The ones on June 6th that -- and they're Exhibit 14 in

3   your notebook.

4   A    That's right.  And I viewed them as clarifications, but

5   that's right.

6   Q    Yeah.  Could you describe for the Court why you decided

7   to modify the plan?

8   A    Because it was clear to me that one of two things had

9   happened.  When I understood that there had been a vote in

10  favor by the Borisch Parties of this plan, the conclusion

11  that I came to was either there was confusion about what the

12  plan did, because I didn't think that they would likely vote

13  for it, or, you know, there was gamesmanship.  It was one of

14  two things, in my mind.

15       And going back and reviewing the provisions that were in

16  the plan and seeing that there was this provision that made

17  it appear that a Consenting Creditor could obtain a release,

18  but in this situation, knowing, it seemed to me, full well

19  that the Bank certainly had never agreed to a release, would

20  never support a plan that contained a release of the Borisch

21  family on $50 million of guaranty, and that that wasn't the

22  deal we had made, it struck me that, again, either there was

23  confusion, in which case we needed to cure it by making an

24  amendment, explaining to them, no, that's not how that works,

25  or, you know, if it wasn't confusion but trying to get an

1    advantage.

2        Either way, I wanted to make sure that we came to see the

3    Court and we filed appropriate documents to make sure there

4    was clarity.

5    Q    And, again, I asked if anyone had -- if anyone on the

6    Borisch team had discussed the plan with you after it was

7    filed.  Did anyone raise any confusion, Mr. Borisch or his

8    father, about whether they were getting releases under the

9    plan?

10   A    Not with me, no.

11   Q    Did you view these plan modifications as material?

12   A    I really, you know, sort of hate calling it a

13   modification.  I know that's what it's titled.  But to me,

14   this is a clarification of what was always intended.  It was

15   never intended to grant some sort of a back door release on a

16   $50 million claim.

17   Q    Did the Bank force you or ask you to modify the plan

18   before you made the decision to go forward?

19   A    No.  I didn't have a communication with the Bank about

20   the modification.

21   Q    After you filed, or after you informed the Bank that you

22   were making the modifications, did the Bank indicate an

23   agreement with your modifications?

24   A    They did, but I think that was through counsel, to be

25   honest.  I don't think it came directly to me.

1   Q    Do you agree with Mr. Borisch and his objection that

2   you're just doing the Bank's bidding through this case?

3   A    No.  And I don't think the Bank would agree, either.

4   Q    Do you believe the plan has been proposed in good faith?

5   A    Yes.

6   Q    Do you believe the plan was negotiated at arm's length

7   with the creditor constituencies in these cases?

8   A    Yes.

9   Q    Do you believe that you've given Mr. Borisch a fair

10  opportunity to negotiate for releases through the plan?

11  A    Yes.

12  Q    And do you believe the plan discriminates unfairly

13  against the Borisch Parties?

14  A    No.

15          MR. KAUFMAN:  Your Honor, I'll pass the witness at

16  this time.

17          THE COURT:  All right.  In terms of alignment, Mr.

18  Gerber, any questions?

19          MR. GERBER:  Yes.  Just a couple, Your Honor.  Toby

20  Gerber on behalf of M&T Bank.

21                      CROSS-EXAMINATION

22  BY MR. GERBER:

23  Q    As I understood Mr. Borisch's counsel's argument, they

24  are asking the Court to approve not the plan as clarified or

25  modified but a plan -- the plan that was submitted with the

1   disclosure materials.  Did you understand that as well?

2   A    Yes.

3   Q    Okay.

4   A    That's the way I understand it.

5   Q    Going to feasibility of the plan as modified, the plan

6   that you're asking the Court to confirm, would this plan be

7   feasible without the Bank's commitment to fund the plan

8   reserves?

9   A    No.

10  Q    Okay.  And do you have a commitment from the Bank to fund

11  the plan reserves if the plan is not confirmed as modified?

12  A    No.

13  Q    Okay.  So, in other words, even if the Court were

14  inclined to try to confirm the plan as Mr. -- as counsel for

15  Mr. Borisch has suggested, you could not testify that it

16  would be feasible; is that correct?

17  A    It would -- it would not be feasible.

18       MR. GERBER:  Pass the witness, Your Honor.

19       THE COURT:  All right.  Any cross-examination?

20       MR. GATES:  Yes, Your Honor.

21       THE COURT:  Okay.

22       MR. GATES:  Your Honor, it's going to take me a

23  moment to disconnect and come up, so if the Court would give

24  us a moment.

25       THE COURT:  All right.

Andrews - Cross                                62

1          (Pause.)

2                          CROSS-EXAMINATION

3    BY MR. GATES:

4    Q    Before we begin, is my screen in front of you, --

5    A    Yes.

6    Q    -- Mr. Andrews?

7    A    Yes.

8    Q    Okay.  All right.  Good morning, Mr. Andrews.  How are

9    you?

10   A    Doing well.

11   Q    Good.

12   A    Thank you.

13   Q    I struggled whether just to address some of the issues

14   you raised first, Mr. Andrews, or go through and sort of

15   address these methodically, and I think I've opted to go

16   through these and address them methodically.  So if you'll

17   bear with me with a little bit, we're going to address

18   everything you've talked about on direct today.

19        First of all, Mr. Andrews, you're represented by the Gray

20   Reed firm and Mr. Kaufman as your lead counsel, correct?

21   A    That's right.

22   Q    All right.  And you'll agree with me, you've been a

23   practicing lawyer and/or a trustee for 40 years or more.

24   Correct?

25   A    That's right.

1  Q   All right.  You've retained Mr. Kaufman's firm, Gray

2  Reed, to represent you, and therefore Mr. Kaufman talks on

3  your behalf, correct?

4  A   That's right.

5  Q   All right.  So Mr. Kaufman can also bind you.  Correct?

6  A   If -- as long as he has authority from me, yes.

7  Q   All right.  Has Mr. Kaufman done anything in this case

8  without your authority to date?

9  A   Don't -- don't know.  Maybe you're going to tell me about

10 one.

11 Q   Okay.  Do you make it a practice of reviewing what Mr.

12 Kaufman does and what --

13 A   I do.

14 Q   -- the Gray Reed firm does?

15 A   And he generally sends things by me.

16 Q   Okay.  You haven't noticed anything to date that Mr.

17 Kaufman has done or his firm has done without your authority,

18 correct?

19 A   No.

20 Q   All right.

21       THE COURT:  So, Mr. Gates, I trust that this is

22 going to lead to something productive, because --

23       MR. GATES:  It is, Judge.

24       THE COURT:  -- the tenor of your questions is

25 certainly interesting to me.  So, like I said, I trust that

1  this is going to lead somewhere, as opposed to just creating

2  an insinuation of something untoward.

3          MR. GATES:  Moving into it right now, Judge.  We're

4  going to start --

5          THE COURT:  Okay.

6          MR. GATES:  -- with the transcript from June 9th.

7          THE COURT:  All right.

8          MR. GATES:  And Your Honor, forgive me, I have a

9  hearing aid, and it is going off in my ear.

10         THE COURT:  Okay.

11         MR. GATES:  Excuse me one second.

12      (Pause.)

13         MR. GATES:  My apologies.

14         THE COURT:  Are you good?

15         MR. GATES:  I'm good.  Yes, thank you.

16         THE COURT:  Okay.

17 BY MR. GATES:

18 Q   Mr. Andrews, I'm going to bring up in front of you what's

19 been marked and admitted already as Borisch Exhibit 1.  Just

20 showing you the title there.  The June 9, 2025 status

21 conference.  It's the transcript of that.  Do you see that in

22 front of you?

23 A   I do.

24 Q   All right.  I'm going to ask you some questions about

25 representations that were made during the status conference.

Andrews - Cross                           65

1    And I'll take you through this testimony if you need, but I'm

2    going to try to just ask you questions.  To the extent you

3    need to refresh your recall, we'll go to the transcript.  But

4    I'm going to put this in front of you for now, knowing it's

5    there.  You attended the June 9 status conference, did you

6    not?

7    A    I did.

8    Q    All right.  During the June 9 status conference, do you

9    recall the Court asking Mr. Kaufman to address the

10   materiality, if you will, of the modifications that were made

11   by you on June 6th to the plan?

12   A    Generally, yes.

13   Q    I'm going to take you to Page 7 here real quick, because

14   your recall is only general.  All right.  I'm on Page 7, for

15   the record.  And if you go to Lines 20 through 24 that I have

16   up in front of you right now, and I'll have you take a look

17   at that, and then I'll ask you the same question again.

18        (Brief pause.)

19   A    Right.  I see it.

20   Q    All right.  So, I'm paraphrasing, I'm not quoting

21   directly from Judge Morris, but he was essentially interested

22   in finding out what had materially changed regarding the

23   modification from the solicitation version of the plan,

24   correct?

25   A    Yes.

1  Q    All right.  And then he also asked, kind of walk me

2  through all the changes.  That's his last statement to Mr.

3  Kaufman, correct?

4  A    Yes.

5  Q    All right.  So I'm going to go to the next page, around

6  Page 8.  Specifically, I'm going to refer to, this next line

7  of questions, I'm going to refer to the transcript at Lines 1

8  through 9.  You see that Mr. Kaufman indicated it was a very

9  simple change, correct?

10  A    Yes.

11  Q    All right.  And Mr. Kaufman goes on to say, Looking at

12  the disclosure statement the Court approved and that Mr.

13  Borisch and his counsel even opposed or requested

14  modifications to the disclosure, and the disclosure statement

15  at the bottom of Page 1, it couldn't be any clearer, claims

16  and causes of action against insiders and affiliates such as

17  Matthew Borisch and his related companies are not released

18  under this plan.

19       Do you see that?

20  A    Yes.

21  Q    All right.  So the judge also asked for materiality,

22  right?  He wanted to know what had changed.  And Mr. Kaufman

23  said it was a very simple change.

24       It was a very simple change.  Literally, all that really

25  changed, Mr. Andrews, was to take the language that was

1    initially found in the plan prohibiting Mr. Borisch and the

2    Borisch Parties from being a Released Party, a defined term,

3    it basically took that same definition and put it under the

4    definition of Consenting Creditors, correct?

5    A    I think that's right.

6    Q    All right.  So that's a very simple change, right?  It's

7    language that was already in the plan, and you just basically

8    cut it and then you -- or you copied it and pasted it in

9    another spot of the plan.  Correct?

10   A    I think that's probably right.

11   Q    All right.  But the Court also asked Mr. Kaufman for the

12   materiality.  Okay?  In fact, Mr. Kaufman asked you today if

13   the changes were material.  And I think your testimony,

14   correct me if I'm wrong, but the changes were not material.

15   Correct?

16   A    Yeah, I -- I -- look.  The way that I see this is through

17   the prism of the intention of the document that we filed

18   originally.  Right?  And --

19   Q    I hate to cut you off.

20   A    Sorry.

21   Q    I just asked you a question.

22   A    Okay.

23   Q    You testified the changes were not material; isn't that

24   correct?

25   A    I think that's right.

1  Q   All right.  Thank you.  The changes are incredibly

2  material from the solicitation version of the plan to the

3  modified plan, incredibly material to Mr. Borisch and the

4  Borisch Parties, are they not?

5  A   If you indulge in the tortured reading --

6  Q   I just asked for a yes or no.

7  A   -- that you're asserting, then yes.  But no, if not.

8  Q   I just asked a yes or no.

9  A   Okay.  I don't think it is material because I don't

10 believe it was ever intended to be the way that you're

11 reading it.  I'm sorry.  I'm really trying to --

12 Q   Yeah.

13 A   -- not fight with you here, but --

14 Q   Mr. Andrews, I'm going to try to be respectful to you and

15 let you -- I've been -- I didn't raise a bunch of objections

16 --

17          THE COURT:  So let's do this.

18          MR. GATES:  Yes.

19          THE COURT:  I'm the judge.

20          MR. GATES:  Okay.

21          THE COURT:  Okay.  If you have an objection to

22 something that he's saying, make an objection.

23          MR. GATES:  Thank you, Judge.  Will do.

24          THE COURT:  Don't lecture him.

25          MR. GATES:  All right.  Thank you, Judge.

1                 THE COURT:  Okay.

2                 MR. GATES:  I'd like to strike the last piece of his

3     testimony, Judge, because it wasn't responsive to my

4     question.

5                 THE COURT:  Overruled.

6                 MR. GATES:  All right.

7     BY MR. GATES:

8     Q    The changes were in fact material to Mr. Borisch and the

9     Borisch Parties, yes or no?

10    A    From their point of view, I assume they are or you

11    wouldn't --

12    Q    Thank you.

13    A    -- be here arguing.

14    Q    Thank you very much.  In fact, the change took away this

15    concept of a global release, the give/get release, correct?

16    A    I don't agree with you.  I don't think it ever was

17    intended to grant a release.  And that's --

18                MR. GATES:  Your Honor, if I may object.  I just

19    asked for a correct.

20                THE COURT:  Overruled.

21                MR. GATES:  All right.

22    BY MR. GATES:

23    Q    Go ahead.

24    A    I just, I don't agree.  I think that it was never

25    intended to grant the release.  It doesn't fit with anything

1   else in the plan.

2   Q    You said it was, earlier, I think on your direct

3   testimony, it was more of a clarification.  Correct?

4   A    I think it is a clarification, in my view.

5   Q    All right.

6   A    Yes.

7   Q    So let's talk about that a little bit.  When I suggested

8   to you that the changes were substantive and material to the

9   Borisch Parties, and I think your testimony will stand for

10  itself, but you said, to them, it probably was, if I sort of

11  talk about the claims, you've referenced a couple times that

12  M&T's claim, the deficiency claim against Mr. Borisch, may be

13  in the range of $50 million.  Is that an accurate statement?

14  A    Yes.

15  Q    Okay.  Have you quantified or done anything to value the

16  claims that Mr. Borisch has against M&T Bank that are pending

17  in Kent County, Michigan?

18  A    No.  If you're talking about offset claims?

19        MR. GATES:  I just asked for a yes or no, Judge.  I

20  think --

21        THE WITNESS:  No, I -- no.

22  BY MR. GATES:

23  Q    Okay.  Thank you.  Let's talk about those a little bit.

24  Are you aware of the concept of a repurchase agreement that

25  was missing in the underlying loan facility between M&T Bank

1   and Mr. Borisch as a guarantor?

2   A    I'm aware there's a contention related to the absence of

3   a repurchase agreement.

4   Q    In fact, Mr. Andrews, isn't it true that a lawyer for M&T

5   Bank once told you that that Kent County litigation is

6   pending all because M&T Bank "forgot to get a repurchase

7   agreement"?

8   A    I -- I'm not sure that's quite right.  But I think that

9   the -- the repurchase agreement is certainly a contention

10  between the parties.

11  Q    Is it possible that statement was made to you by a lawyer

12  for M&T Bank?

13  A    I don't remember, sitting here today.

14  Q    So it's possible?

15  A    It's possible.

16  Q    Okay.  Thank you.

17  A    Yeah.  I just don't remember.

18  Q    All right.  So you're familiar with the concept of the

19  lack of repurchase agreement.  Going back to my initial

20  question, are you aware of what value a lack of repurchase

21  agreement puts on Mr. Borisch's claims against M&T Bank?

22  A    I'm going to try to answer.  Can you ask that one more

23  time?  I'm --

24  Q    Sure.

25  A    I got lost in the thread of your question.

1   Q    That's okay.  We got onto this about you've certainly

2   quantified consistently the value of M&T's claim against Mr.

3   Borisch on a guaranty.

4   A    Right.

5   Q    All right.  I'm just looking to see if you've done the

6   same thing with respect to Mr. Borisch's claims -- and

7   defenses, frankly -- pending in Kent County Circuit Court

8   against M&T Bank.

9   A    I'm not familiar with the litigation.  I don't know that

10  I've ever read the pleadings.

11  Q    Okay.  So you haven't quantified his claims?

12  A    No.

13  Q    Okay.  Very good.  In the spring of 2024, I'm going to

14  take you back to that time frame.  That's when we were having

15  difficulty with -- you had just been brought in shortly after

16  the spring of 2024, I think June of '24?

17  A    June.  That's right.

18  Q    Okay.  Right at the beginning of the boating season.

19  Correct?

20  A    Yes.

21  Q    Approximately?  There was a great deal of difficulty at

22  that time about use of cash collateral.  Would you agree?

23  A    Yes.

24  Q    All right.  And do you know at that time, once you got

25  your feet wet, do you know how much -- what value the boating

Andrews - Cross                              73

1    inventory sitting at all the Tommy's locations, do you know

2    what the value of those boat -- that boat inventory was at

3    that time?

4    A    On the books or how do you -- value from what

5    perspective?  It's a little --

6    Q    Your perspective.

7    A    -- tricky.

8    Q    What was the value from your perspective of the boating

9    inventory?  I think on cross -- on direct examination, you

10   mentioned hundreds of -- you mentioned hundreds of boats

11   across the country.

12   A    I think there were roughly 800 boats at that point.  Some

13   were used.  Some were new.  Malibu boats.  If you were going

14   to peg a number I think at the start, you could go back and

15   look at the schedules that were filed by Force 10.  And that

16   would be, you know, at least a starting point --

17   Q    Fair enough.

18   A    -- for the total value.

19   Q    Fair enough.  Would you agree with me that boating

20   inventory could have been in an approximate range of $100

21   million in value?

22   A    I'm trying to be really careful here.  At book value,

23   yes, it could have been a hundred million dollars.  At fair

24   retail, it would have been a different number.  At

25   liquidation, it would have been yet a different number.

1   Q    Let me see if I understand your question.  Fair -- book

2   value, a hundred million.  Fair retail could have been more

3   than a hundred million, correct?

4   A    Could have -- could have been, depending on what the

5   market conditions were like.  It could have varied up or

6   down.

7   Q    Okay.

8   A    That's right.

9   Q    Liquidation value would certainly be less than what you

10  would expect to be the book value, correct?

11  A    That's right.  Yeah.

12  Q    Okay.  And at the time, let me sort of compare that to

13  the claim of M&T Bank.  My understanding, the approximate

14  numbers when you got involved in this case, M&T Bank's claim,

15  total indebtedness, was in the range of $105 million.

16  A    That's right.

17  Q    Okay.  So fairly close numbers, wouldn't you agree, in

18  terms of the book value, fair retail value of the boat

19  inventory, relative to the amount of M&T's claim?  Those are

20  close numbers, correct?

21  A    If you're just -- right.  If you're just looking at the

22  book value and you're looking at the total debt, you're

23  right, they'd be pretty close.

24  Q    Okay.  And we talked that liquidation value would be

25  less.

1        When you were ultimately able to use cash collateral and

2    start selling boats, you had fairly good success, correct?

3    A    We sold a lot of boats.

4    Q    Correct.  No argument with me, you wouldn't have any

5    argument with a statement that if you were allowed to sell

6    boats in the heart of the summer, that you would have had

7    better success, correct?

8    A    That's what I'm told by the boat people, yes.

9    Q    Okay.  No argument with that statement, then?

10   A    No.

11   Q    Okay.  In fact, you couldn't sell boats in June, right?

12   A    I was just appointed June 17th, and so there was no cash

13   collateral usage when I was appointed, so there was no sale

14   of boats in June, other than very modest sales.

15   Q    And you weren't selling boats in July, either, correct?

16   A    Not at the beginning of July, but we started to sell I

17   think by the middle of July, yeah.

18   Q    Okay.  I know it differs throughout the country, but

19   there's a boat season, certainly.  Let's use Michigan, for

20   example.  Right?  There's a boat season in Michigan, and that

21   boat season, the heart of the boat season for buying boats is

22   earlier in the summer than later in the summer, correct?

23   A    That's my understanding.

24   Q    Okay.  So are you familiar with the concept of a

25   repurchase agreement and what it means?

1  A    Yes.

2  Q    Okay.  In your opinion, or in your understanding, what is

3  a repurchase agreement in connection with this loan facility

4  and how it would have impacted this boat inventory?

5  A    I'm more familiar with it in the context of cars and car

6  dealership loans.  But assuming that it's analogous, it means

7  that if you have too much inventory on your hands, the

8  manufacturer will, under certain conditions, buy back the

9  inventory.  So it's a protection.

10  Q    Okay.  And in fact, did you ever have an opportunity to

11  review repurchase agreements that had been signed by Malibu

12  Boats and M&T Bank in connection with this case?

13  A    Some, yes, that were dated.

14  Q    Okay.  Did you ever have an opportunity to look at, for

15  example, a dealership agreement between Tommy's Boats, any of

16  the entities, and Malibu Boats?  Did you ever review any of

17  those dealership agreements?

18  A    Yes.

19  Q    Okay.  And in fact, those dealership agreements called

20  for Malibu's right to buy boat-backs at a certain price,

21  correct?

22  A    I don't recall the specifics anymore.  It's been a while.

23  Q    Okay.

24  A    But that sounds right.  I'm not disagreeing with you.

25  Q    Okay.

Andrews - Cross                          77

1    A    I just haven't seen them in a while.

2    Q    And a repurchase agreement sort of works, it's not only

3    the right but the obligation to buy them back, right?

4    A    That's right.

5    Q    And in that repurchase agreement, the parties will agree

6    on a number, at a price at which those boats can be back,

7    correct, purchased?

8    A    Some have a strike price.  Some have another mechanism.

9    But, yeah, there's some sort of way of determining --

10   Q    All right.

11   A    -- a fixed value.

12   Q    Have you ever reviewed the public filings by Malibu Boats

13   as it relates to their willingness to enter into repurchase

14   agreements --

15   A    Some.

16   Q    -- with their dealers?

17   A    Some.

18   Q    And the lenders?  Some?

19   A    Some.  Yeah.

20   Q    So which public filings did you review?

21   A    This would have been back in the fall of last year.  I

22   think we took a look at some of their filings with the SEC.

23   It's been -- it's been more than seven months ago.

24   Q    Okay.  Would you agree with me, then, based on your

25   review, Malibu Boats has a public disclosure that they as a

1    regular course enter into repurchase agreements with their

2    dealers who use floorplan financing with lenders?

3    A    I -- I don't remember the specifics of that.  I'm not

4    arguing with you.  I just don't remember.

5    Q    Okay.  Is it possible that that exists?

6    A    It's possible.

7    Q    Okay.  Let's say, for sake of discussion, a repurchase

8    agreement had been in place and Malibu Boats had had the

9    obligation to purchase some of this approximate hundred-

10   million-dollar inventory.  That would have been of great

11   assistance to you in terms of liquidating these boats, would

12   it not?

13   A    Presuming they honored it at a price that was more

14   favorable than we obtained, yes.

15   Q    Well, let's go back to the public filings.  Do you have a

16   recall of Malibu Boats indicating in its public filings that

17   it enters into these repurchase agreements on a regular

18   basis, and by the way, the repurchase agreement is beneficial

19   to Malibu because oftentimes they're willing to -- not only

20   do they take those boats back at a stated price, but they're

21   actually willing to sell them for more and make money in

22   connection with that exchange?  Do you recall that?

23   A    I don't.

24   Q    Is it possible that exists in the public record?

25   A    Sure.

1   Q    Okay.

2           MR. KAUFMAN:  Your Honor, I apologize.  I wanted to

3   not object, but I'm just -- I'm objecting to relevancy

4   because I don't know where this is going and what it has to

5   do with the plan.

6           THE COURT:  Response?

7           MR. GATES:  Your Honor, it's relevant because what

8   we're going to get to is he's valued the M&T claim against

9   Mr. Borisch.  He has not --

10          THE COURT:  Well, I think what he's done is he's

11  provided testimony of the range of the deficiency.  I don't

12  know that I've heard actual testimony about the, quote, value

13  of a cause of action.  But either way, I mean, --

14          MR. GATES:  I can move on from this, Judge.

15          THE COURT:  Okay.

16          MR. GATES:  All right.

17  BY MR. GATES:

18  Q    So you haven't valued Mr. Borisch's claim against M&T

19  relative to the lack of a repurchase agreement.  That's fair,

20  correct?

21  A    If there's -- I think that's -- I think that's right.

22  Q    Okay.  So let's talk, in addition to the lack of

23  repurchase agreement, are you familiar with the concept of

24  liquidating inventory in a commercially reasonable manner?

25  A    Yes.

1  Q    All right.  What does liquidating inventory in a

2  commercially reasonable manner mean to you?

3  A    Generally, it's a legal concept, and commercially

4  reasonable manner is something that is imposed under the

5  Uniform Commercial Code as an obligation in order to collect

6  on a deficiency claim.  When I started practice, it was 9504

7  of the Uniform Commercial Code, but it may be something

8  different now, so I don't know.

9  Q    Okay.

10 A    Yeah.

11 Q    So you would agree with me that whether or not M&T has

12 allowed or participated in a liquidation of their collateral

13 in a commercially reasonable manner is something that is

14 pending in the Kent County, Michigan litigation, correct?

15 A    I've not seen that litigation, so I just don't know what

16 the allegations are.

17 Q    Okay.  You're familiar that the claim against -- the

18 claim by M&T against Mr. Borisch on his guaranty is pending

19 in Kent County, Michigan, correct?

20 A    Yes.

21 Q    Okay.

22 A    Yeah.

23 Q    And you are familiar that I believe in -- on or about

24 June of 2024, shortly after you came in, as we were

25 negotiating the use of cash collateral, I'll just cut to the

1    chase, Mr. Borisch -- Mr. Borisch's defenses and those claims

2    regarding guaranty were carved out for Kent County, Michigan,

3    correct?

4    A    I think that's right.

5    Q    So, in other words, they're not -- they're not pending in

6    this Court, correct?

7    A    Not that I'm aware of.

8    Q    Okay.

9    A    Yeah.

10   Q    Do you remember that M&T Bank was actually given an

11   option as to whether or not they wanted those claims to be

12   litigated in this Court versus carved out for Kent County,

13   Michigan?

14           MR. GERBER:  Your Honor, I would object to that

15   question.  It assumes facts not in evidence.  And it's not --

16           THE COURT:  Sustained.

17           MR. GERBER:  -- a correct statement --

18           THE COURT:  If you want to lay a better foundation

19   for the question.

20   BY MR. GATES:

21   Q    Were you present during a hearing in June of 2024 when we

22   were litigating or arguing over the use of cash collateral?

23   A    Yes.

24   Q    Okay.  In connection with that effort to arrive at a cash

25   collateral order, there was a challenge period.  Are you

1   familiar with the concept of a challenge period?

2   A    Yes.

3   Q    There was a challenge period provided to people like the

4   Unsecured Creditors' Committee to, before they provided a

5   release to M&T Bank, to be able to challenge issues like

6   commercially reasonable liquidation of collateral.  Correct?

7   A    Yes.

8   Q    Okay.  Mr. Borisch was given that same opportunity to

9   also engage in this challenge period to also litigate that

10  issue in this Court, correct?

11          MR. GERBER:  Objection.  Again, Your Honor, that's

12  assuming facts not in evidence and that is not an accurate

13  portrayal of the proceedings.  If Mr. -- I'm sorry, I forgot

14  your name.

15          THE COURT:  Mr. Gates.

16          MR. GERBER:  If Mr. Gates wants to ask him, have him

17  bring up the transcript and let's talk about what the

18  transcript says.  I don't see any relevancy, but --

19          THE COURT:  I tend to agree with you on the

20  relevancy point.

21          MR. GERBER:  Yeah.

22          THE COURT:  But I'm going to provide a little bit of

23  latitude here.  I'm going to sustain the objection.  We all

24  know that this was an evolving process, which, quite frankly,

25  Mr. Borisch himself was insistent on negotiating something

1  different than what you're talking about, Mr. Gates.  So, if

2  you want to lay a better foundation of what you're trying to

3  do, I will provide some latitude.

4      I really struggle to see the relevance, because it never

5  became part of the deal.  But, in any event, if you want to

6  lay a better foundation for where you're trying to go, I'll

7  give you some latitude.

8          MR. GATES:  I appreciate that, Judge.  I have just a

9  couple more questions in that regard, --

10          THE COURT:  Okay.

11          MR. GATES:  -- and then I'll move on and try to tie

12 this up.

13          THE COURT:  All right.

14 BY MR. GATES:

15 Q   In connection with the challenge period, are you familiar

16 with the fact that Mr. Borisch and the Creditors' Committee

17 were allowed a discovery with M&T Bank in order to dig into

18 those issues, like commercially reasonable liquidation of

19 collateral?

20 A   I remember there was an opportunity for some discovery,

21 yes.

22 Q   All right.  Do you recall a discovery dispute which we

23 raised in this Court because M&T Bank would not permit

24 discovery with Mr. Borisch in terms of allowing him to argue

25 during that challenge period that the boats were not

1   commercially reasonably liquidated?

2   A    I --

3           MR. GERBER:  Objection again, Your Honor.  I'm not

4   sure that was at all stated during the transcript.  But in

5   any event, --

6           THE COURT:  I'll sustain the objection.

7           MR. GATES:  I'll move on, Judge.

8           THE COURT:  There's no foundation --

9           MR. GATES:  I'll move on.  Thank you.

10          THE COURT:  -- for that.  So if you want to use

11  something.  It's kind of a best evidence issue.

12          MR. GATES:  Understood.

13          THE COURT:  Because, frankly, certainly, that was

14  never brought to my attention in connection with any of the

15  proceedings that took place in front of the Court.  So if you

16  want to use something as a better foundation, I'm happy for

17  you to be able to do that.

18          MR. GATES:  Let me move on, Judge.

19          THE COURT:  Okay.

20  BY MR. GATES:

21  Q    Mr. Andrews, do you recall a virtual meeting with Mark

22  Wells and Tim Freel during the early tenure of your

23  trusteeship when you referenced the fact or complained about

24  the fact that M&T Bank was not acting in a commercially

25  reasonable manner as it relates to the liquidation of their

1  collateral?  Do you remember a discussion like that?

2  A    I would never have said commercially reasonable manner in

3  a conversation with a management team.  I would have said I

4  don't like how we're proceeding here, or I would have said

5  specific complaints about a too-tight budget at the beginning

6  of the case, which I was -- and the Bank is fully aware of.

7  So, --

8  Q    Okay.

9  A    -- yeah.

10 Q    Do you recall -- then let's talk specifics.  Do you

11 recall informing Mr. Wells and Mr. Freel that you had been

12 informed by one of the attorneys for M&T Bank that that

13 attorney might actually withdraw from the case if that

14 attorney's client didn't start acting in a more commercially

15 reasonable manner?

16 A    I don't think that's --

17         MR. KAUFMAN:  Your Honor, can I just object that

18 this question calls for multiple layers of hearsay?  I have

19 no issue with Mr. Andrews testifying about what he may have

20 said, but I think now we're getting into two different layers

21 from that.  So, --

22         THE COURT:  Response?

23         MR. GATES:  I was looking for an admission from Mr.

24 Andrews.  I mean, he answered the question he doesn't recall

25 it, but I was looking for an admission from him that that was

1   in fact an issue in the early part of his trusteeship.

2          THE COURT:  Okay.  That really wasn't your question.

3   Your question was whether or not somebody made a statement,

4   which does appear to be hearsay, so I'll sustain the

5   objection.

6          MR. GATES:  Thank you.

7   BY MR. GATES:

8   Q   So, again, we're still on the valuation of Mr. Borisch's

9   claims, counterclaims, defenses against M&T Bank.  Have you

10  done anything to value an argument regarding commercially

11  reasonable liquidation or lack of commercially reasonable

12  liquidation as it relates to the liquidation of inventory?

13  A   In this sense, yes.

14  Q   Okay.  What value have you placed on the fact that boats

15  -- or, that cash collateral was not allowed in the early

16  stages and boats were not liquidated during the summer months

17  of 2024?  What value do you put on that?

18  A   I -- I -- let me start by saying boats were liquidated

19  during the summer.  Summer ends September 21st.  The heavy

20  lifting of all the liquidation took place from late July into

21  early September, if you look at the records.  Right?

22      Second, that if you're asking me to come up with a

23  particular value from the delay, that's really hard to do,

24  because the way the liquidation works is that there are

25  prices that get set, and then there were joint discussions

1    with the liquidating agent, Gordon Brothers, over whether we

2    were seeing enough traffic at each store, by particular

3    datasets that they generated, and that we then looked at

4    other datasets -- for example, people who auction off boats

5    -- trying to see where we were pricewise versus where

6    everybody else was.

7        So it -- and it was an ongoing discussion with Gordon

8    Brothers, the Trustee's team, the management team, and the

9    Lender.  All of them weighed in on these pricing issues,

10   because it was sort of mission-critical to do our best on

11   that.

12   Q   So you haven't valued it, was my question.  Or you

13   haven't put a number on it, correct?

14   A   I don't think anybody could put a particular number on

15   it.

16   Q   Okay.  While we might not be able to put a number on it,

17   perhaps we could talk about it in this way.  You would agree

18   with me that the management team, the employees and the

19   management team of the Tommy's entities were very critical in

20   your liquidation of inventory, sale of assets.  Correct?

21   A   It -- yes, in they certainly were very important and

22   helpful.  From the salespeople who were onsite, and then some

23   of the people on the management team were very directly

24   involved in sales.  Others were more financial people who,

25   you know, like Ms. Hoffman, who keeps track of the financial

1   records and that kind of thing.  So some more critical than

2   others.

3   Q   Mr. Wells, for example, Mark Wells, did a very good job

4   for you, did he not?

5   A   He did.

6   Q   All right.  In fact, you actually retained Mr. Wells on

7   your own consulting agreement to keep him engaged in the

8   liquidation of assets, right?

9   A   We did.  We had him approved as an independent consultant

10  on this with this Court.

11  Q   All right.  Earlier, in your direct testimony, you

12  indicated one of the problems that you faced during the early

13  stages of your tenure was the fact that you were getting

14  eaten up, people were stealing your employees.  Correct?

15  A   Yes.

16  Q   Okay.  Those employees were critical to your success,

17  correct?

18  A   We had to -- we entered into an agreement to retain them

19  with this Court.

20  Q   Okay.  Those were the same employees that were working

21  for Mr. Borisch when he was operating and managing --

22  A   Some.  Some were, yes.

23  Q   Okay.

24          THE COURT:  So, and just for my own benefit, working

25  for Mr. Borisch individually or working for the Debtors under

Andrews - Cross                                89

1    the --

2              THE WITNESS:  Oh, good clarification, Your Honor.

3    So I took his question to mean they were working for Mr.

4    Borisch as the president of the company during the preceding

5    time.

6              THE COURT:  So let me ask a follow-up question,

7    because it sort of is the same issue.  You just said working

8    for him as president.  Did he individually, in whatever

9    capacity, hire these individuals, or was it they were hired

10   by the Debtors and working for the Debtors, with Mr. Borisch

11   as he was acting as the president?

12             THE WITNESS:  Hired by the Debtors, working for the

13   Debtors.  And we're talking about Matthew Borisch, just to be

14   really clear.  Jonathan Borisch, Matthew's father, also had a

15   business as well, and he had his own employees.

16       So, a little confusing, but I took his question to mean

17   the employees who were working for the Tommy's entities prior

18   to the bankruptcy filing that I then picked up as the

19   Trustee.

20             MR. GATES:  And Your Honor, for the record, I was

21   referring about the capability of the employees.

22             THE COURT:  So, no need, unless you want to testify.

23             MR. GATES:  No.  I'm sorry, Judge.  I just --

24             THE COURT:  All right.

25             MR. GATES:  I was answering your question.

1          THE COURT:  All right.

2          MR. GATES:  All right.  Let me move on.

3  BY MR. GATES:

4  Q   Let's -- one more question in that regard.  What I was

5  getting at, Mr. Andrews, you would agree that the employees

6  that were working for the Tommy's entities were capable

7  employees when you took over as Trustee, correct?

8  A   In general, yes.

9  Q   Okay.  Okay.  Back to the transcript, Exhibit 1.  I still

10 have the Page 8 up in front of you.  I want to focus on the

11 statement at Lines 2 through 6.  See if I accurately state

12 this.  Mr. Kaufman says, Also, looking at the disclosure

13 statement that the Court approved and that Mr. Borisch and

14 his counsel even opposed a requested modification, --

15         THE COURT:  So, I'm sorry.  Tell me where you're at.

16         MR. GATES:  Oh, I'm sorry, Judge.  I'm on Exhibit 1,

17 Page 8.  I'm at Lines 2 through 5.

18         THE COURT:  Okay.

19 BY MR. GATES:

20 Q   Also, looking at the disclosure statement that the Court

21 approved that Mr. Borisch and his counsel even opposed

22 requested modifications to the disclosure statement.  And

23 that disclosure statement, at the bottom of Page 1, it

24 couldn't be any clearer.  Do you see that?

25 A   Yeah.

1    Q    Okay.

2    A    I see that.

3    Q    All right.  So I also then want to point out, same page,

4    and I'm just going to generally cover this, at Lines 10

5    through that entire paragraph, Lines 10 through 25.  I count,

6    and we can go through it and read it if you like, by my count

7    Mr. Kaufman indicates not less than three times he

8    represented the issue to be, quote, an ambiguity between the

9    disclosure statement and the plan.  Do you see that?

10   A    What we perceived as an ambiguity?  Is that what you're

11   --

12   Q    Let's look at Page -- let's look at Line 13.  I'll read

13   this for the record.  The modification simply cleared up what

14   could be an ambiguity.  That would be one.

15   A    Uh-huh.

16   Q    What we perceived as an ambiguity.  That would be twice.

17        And late on Thursday night, when we saw the ballots and

18   learned that Mr. Borisch was not opposing confirmation, not

19   opting out, which was a surprise to us, frankly, and that

20   made us realize one of two things is happening.  Either Mr.

21   Borisch was genuinely confused because the disclosure

22   statement says one thing but Mr. Borisch is reading the plan

23   to something else, or Mr. Borisch was hoping to exploit some

24   ambiguity in the plan.

25        Do you see that?

Andrews - Cross                              92

1   A    Yes.

2   Q    All right.  So my statement or my question was, isn't it

3   true that Mr. Kaufman made representations on your behalf not

4   less than three times in just that one paragraph that this

5   issue was premised upon an ambiguity?

6   A    He said it's what we perceived as an ambiguity.  I --

7   look.  I'm not going to quibble with you.  Yes, he says it's

8   --

9   Q    Okay.

10  A    -- an ambiguity.

11  Q    Very good.  And the ambiguity, we can go through the

12  transcript if we need, but I'll just ask you the question.

13  The ambiguity that Mr. Kaufman is identifying is an ambiguity

14  between the disclosure statement and the plain language of

15  the plan, correct?

16  A    Well, he's referencing that, and then he's saying, at the

17  same time, he's reading the plan to say something else, you

18  know, than what we had intended.

19  Q    So, again, the ambiguity he was talking about is an

20  ambiguity between the disclosure statement and the plan.

21  Isn't that correct?

22  A    I think he -- I -- look, I really don't want to argue

23  with you.  I -- my perception is different as to what he's

24  saying there.

25  Q    Okay.  Let's go on to Line 18, then.  And I'll quote:

1    Either Mr. Borisch was genuinely confused because the

2    disclosure statement says one thing but Mr. Borisch is

3    reading the plan to something else.

4    A    Uh-huh.

5    Q    That identifies ambiguity between the plan and the

6    disclosure statement, correct?

7    A    It is his interpretation of Mr. Borisch's behavior that

8    he's relaying to the Court.

9    Q    We'll review more of the transcript here in a moment.

10   Let me ask you these questions, Mr. Andrews.  You've been a

11   practicing attorney and/or trustee for nearly 40 years.  Are

12   you aware of the -- are you familiar with the definition of

13   ambiguity?  Generally speaking?

14   A    The legal -- legal definition, I take it?

15   Q    Generally speaking.  Are you familiar with the --

16            THE COURT:  So, are you asking him generally as a

17   layperson or are you asking him for a legal definition?

18            MR. GATES:  Fair point, Judge.  I'll ask him

19   specifically.

20   BY MR. GATES:

21   Q    In your experience as an attorney and a trustee for the

22   last 40 years, have you had an opportunity to become familiar

23   with the concept of ambiguity in a contract?

24   A    Yes, but I probably wouldn't pass the bar exam on that

25   topic anymore.  It's been a while.

1    Q    All right.  In your 40 years of practice, have you ever

2    become familiar with a resource known as *Black's Law*

3    *Dictionary*?

4    A    I am.  I remember receiving two of those when I graduated

5    from law school.

6    Q    I got one as well.  I still have it on the shelf.

7              THE COURT:  So, let's move on.  Okay?

8              MR. GATES:  I am, Judge.

9              THE COURT:  All right.

10             MR. GATES:  Okay.

11   BY MR. GATES:

12   Q    Would you argue with me, Mr. Andrews, that *Black's Law*

13   *Dictionary* states that the language in a contract is

14   "ambiguous" when it's reasonably capable of being understood

15   in more than one sense?

16   A    I'm not going to argue with *Black's Law Dictionary*.

17   Q    Okay.  Essentially, an inconsistency, right?

18   A    Yeah.

19   Q    This part of the contract says one thing.  This part of

20   the contract says something entirely differently.  It allows

21   for two different interpretations.  Correct?

22   A    Yes.

23   Q    Okay.  The plan that you proposed, the solicitation

24   version of the plan that you proposed on May 1, is

25   essentially an effort to enter into a contract, correct?

1  A    It's, like all plans, it's sort of a hybrid of a

2  settlement agreement and a contract.

3  Q    Okay.  Let me go to, if I can, Exhibit 6.  Mr. Andrews,

4  tell me if you see -- you see the document I'm pulling up

5  labeled as Exhibit 6?

6  A    I see -- Exhibit 6 has come up.  I --

7  Q    Okay.  And then I'm going to bring up -- that's just the

8  cover page.  The actual document is the document filed at

9  Docket 879, correct?

10  A    It looks like it, yes.

11  Q    All right.  And it's filed May 1st, 2025.  The title on

12  that document is Trustee's First Amended Joint Chapter 11

13  Plan.  Correct?

14  A    Yes.

15  Q    All right.  This document has been admitted into

16  evidence.  This is what we refer to, if you'll allow me, Mr.

17  Andrews, this is what we refer to as the solicitation version

18  of the plan.  Is that term okay with you?

19  A    Understood.

20  Q    All right.  Let's take a look at some of the definitions

21  in this plan.

22         MR. GATES:  I'm going to go first to the bottom of

23  Page 6, for the record, Your Honor, and top of Page 7.

24  BY MR. GATES:

25  Q    Do you see the definition starting at Page -- Mr.

1  Andrews, of the term "Released Parties"?

2  A    I do.

3  Q    All right.  To paraphrase, the Released Parties means,

4  quote, (a) the Trustee; (b) each Debtor; (c) the Committee

5  and its members; (d) the Creditor Trustee; and (e) M&T Bank.

6  And then it goes on to say current officers, directors, et

7  cetera.  Correct?

8  A    And then it says after that, Provided the Borisch Parties

9  shall not be Released Parties.  Yes.

10  Q    Thank you.  Yep.  And I was going to indicate that, after

11  that definition, it states those words, that Borisch Parties

12  shall "not be Released Parties."  Correct?

13  A    Yes.

14  Q    A defined term?  There's no ambiguity there, is there?

15  A    Not in my mind.

16  Q    The Borisch Parties were not to be a Released Parties --

17  or, a -- fall within the definition of Released Parties under

18  this plan, correct?

19  A    That's right.

20  Q    Okay.  Now let's go to the definition at -- just the next

21  one down, at Paragraph 84 of the solicitation version of the

22  plan.  And, again, top of Page 7.  I'm referring to the

23  definition of "Releasing Parties."  Do you see that

24  definition?

25  A    Yes.

Andrews - Cross                              97

1   Q   All right.  Releasing Parties, again, to paraphrase,

2   includes (a) the Debtor; (b) the Trustee; (c) the Committee;

3   (d) the Creditor Trustee; and (e) Consenting Creditors.

4   Correct?

5   A   Yes.

6   Q   All right.  There's no ambiguity there, is there?

7   A   Doesn't appear to be.

8   Q   All right.  And it does not indicate in the definition of

9   Releasing Parties, like it did in the definition of Released

10  Parties, that the Borisch Parties shall not be included in

11  the definition of Releasing Parties.  It doesn't say that,

12  does it?

13  A   It doesn't say it because it probably thinks it's

14  redundant, but I get it.

15  Q   Okay.  Let's go next to the definition of "Consenting

16  Creditor."  Consenting Creditor we just confirmed for the

17  record is within the definition of Releasing Parties,

18  correct?

19  A   I'm going to take your word for that.  I have to go back

20  and take a look here for just a second.

21      (Pause.)

22  A   I'm not -- I'm not going to argue it.  I'd have to have

23  the plan --

24  Q   Well, let's clarify --

25  A   -- and go back through it.

1   Q   Let's clarify that for the record.  I asked you a

2   question and you were busy concentrating on "Continuing

3   Creditors" definition.  Let me go back to the definition of

4   "Releasing Parties."

5           THE COURT:  I'll just take judicial notice of the

6   fact that the definition of "Releasing Parties" in Borisch

7   Exhibit 6 includes "Consenting Creditors."

8           MR. GATES:  Thank you, Judge.

9   BY MR. GATES:

10  Q   So we're going back to the definition of "Consenting

11  Creditors" now, Mr. Andrews.  Again, we're at the top of Page

12  7 of 35.  Do you see the definition of "Consenting Creditors"

13  at Paragraph 27 there?

14  A   I do.

15  Q   All right.  I'm going to paraphrase again.  Consenting

16  Creditors includes "(a) all holders of claims or equity

17  interests that vote to accept or are deemed to accept the

18  plan and who do not check the box on the applicable ballot to

19  affirmatively opt out of the third-party releases."

20          Did I read that accurately?

21  A   You did.

22  Q   All right.  That definition would include Mr. Borisch,

23  would it not?

24  A   It would but for the surrounding context that his

25  acceptance is something that wasn't contemplated and that,

1  moreover, won't work because the Plan Sponsor in terms of

2  funding is the Lender, who will not fund.  And so --

3  Q   All right.

4  A   -- its context tells you it can't be right.

5  Q   All right.

6         MR. GATES:  I'm going to move to strike the last

7  part of that question, Your Honor.  I just asked him if Mr.

8  Borisch and the Borisch Parties could fall within -- or,

9  sorry, if Mr. Borisch could fall within that definition of

10 "Consenting Creditors."

11 BY MR. GATES:

12 Q   And your testimony is he could but for those other things

13 you raised?

14 A   Could but for the context --

15 Q   Okay.

16 A   -- of the rest of the plan.

17 Q   All right.  There's no ambiguity in that Subpart (a), is

18 there, Mr. Andrews?

19 A   You're -- in the literal words of 27(a), it seems clear.

20 But given the context, it isn't.

21 Q   So the express language of the Consenting Creditors is

22 clear, but in context you say it's not?

23 A   It doesn't -- it doesn't work.

24 Q   Okay.  And it doesn't work, I think your testimony was it

25 doesn't work because it wouldn't be feasible under the plan

Andrews - Cross                          100

1   because M&T wouldn't fund.  Correct?

2   A    Yeah.  Among other things, but yes.

3   Q    Okay.  Very good.

4   A    Yeah.

5   Q    Let's go drill down on this a little bit.  All holders of

6   claims.  Again, I'm referring to Subsection (a) of Paragraph

7   27.  All holders of claims.  Mr. Borisch holds claims, does

8   he not?

9   A    Yes.  He asserts claims.

10  Q    Okay.  In fact, he's a member of Class 6, correct?

11  A    That's right.

12  Q    Okay.  And it says, Or.  Claims or equity.  Mr. Borisch

13  actually holds equity interests as well, does he not?

14  A    He does.

15  Q    Okay.

16  A    Yeah.

17  Q    So he qualifies under both of those disjunctives, right?

18  A    Yeah.  All holders of.  Yeah.

19  Q    In fact, is there another -- is there another claimant in

20  this case that satisfies both of those definitions?

21          THE COURT:  I just want to ask a question.

22          MR. GATES:  Sure.

23          THE COURT:  Because I don't really understand why

24  we're spending so much time on this.  Is there any dispute

25  among the parties that, under the plan as originally -- the

1   first amended plan as originally solicited, which is Borisch

2   Exhibit 6, that the Borisch Parties could be Consenting

3   Creditors?  Is there a dispute about that?  Because we're

4   spending all kinds of time on definitions that it seems clear

5   as day to me.

6           MR. GATES:  My response --

7           THE COURT:  And I think that's really what you're

8   trying to do.

9           MR. GATES:  Yes.

10          THE COURT:  So I'm just trying to figure out, is

11  there -- can we just stipulate to the fact that, as

12  originally formulated, Mr. Borisch could be a Consenting

13  Creditor?

14          MR. GATES:  I would certainly submit yes.

15          MR. KAUFMAN:  No, no issue with that, Your Honor.

16          THE COURT:  All right.

17          MR. GATES:  I'll move on, Judge.  Thank you.

18          THE COURT:  Thank you.  I just felt like you were

19  spending a lot of time doing all of this and we didn't need

20  to do that.

21          MR. GATES:  All right.  I appreciate it, Judge.

22  Thank you.

23          THE COURT:  All right.

24  BY MR. GATES:

25  Q   Let's now go, within this plan document, to the third-

1    party releases themselves.  If you'll bear with me one

2    second, Mr. Andrews.

3            MR. KAUFMAN:  Your Honor, whatever stipulation the

4    Court would like.  The document says what it says.  I just --

5    it's not the right plan anymore.  Happy to offer whatever

6    stipulation to get through this as well.

7            MR. GATES:  I can propose a stipulation, Your Honor.

8            THE COURT:  Sure.

9            MR. GATES:  The stipulation I would like to propose

10   is that, as a Consenting Creditor, under the third-party

11   releases, Mr. Borisch, under the solicitation version of the

12   plan, would have been entitled to a release from M&T Bank in

13   exchange for his not opting out and becoming a Consenting

14   Creditor.

15           THE COURT:  I'm guessing that that may be a farther

16   bridge.  Because when you start saying entitled and then we

17   get into a question of was the document ambiguous on a

18   contextual basis.

19           MR. GATES:  I can --

20           THE COURT:  But if you're asking for isolated -- if

21   you're asking for a stipulation in isolation, if we look at

22   the language of, what is it, Section X.D.?

23           MR. GATES:  X.D.  Yes, Your Honor.  X.D.

24           THE COURT:  In isolation, based upon the definition

25   of Consenting Creditor, in isolation, that based upon Mr.

1  Borisch's originally-cast ballots, he could be entitled to a

2  release by the Released Parties.

3      Is that a stipulation that everybody can agree to?

4          MR. KAUFMAN:  Under the old formulation of the plan.

5  Yes, Your Honor.

6          THE COURT:  Okay.

7          MR. GATES:  I'm good with that version, Your Honor.

8          THE COURT:  Okay.  All right.

9          MR. GATES:  All right.  So let's move on.  I do have

10 one more question under the third-party releases, though,

11 just as it relates to what was released.

12         THE COURT:  Sure.  No problem.  I'm just trying --

13         MR. GATES:  Okay.

14         THE COURT:  I'm trying to assist here, too, because

15 I think --

16         MR. GATES:  I appreciate the assistance, Judge.

17 BY MR. GATES:

18 Q   I've got up in front of you, or I should have, Mr.

19 Andrews, the Section X.D. that Judge Morris just referenced,

20 the third-party releases.  Do you see that?

21 A   Yes.

22 Q   So I will say the first paragraph, if we follow along

23 here, the first paragraph, the Releasing Parties provide

24 releases to the Released Party.  Correct?  If you read that

25 first paragraph?

1   A    I think that's right.

2   Q    Okay.  If we go to the second paragraph, which is the

3   operative paragraph here, and we have a stipulation on the

4   record for what that paragraph says, I want to also then

5   focus in on what was actually being released.

6        So this paragraph is the opposite of the first.  Here,

7   the Released Parties are providing releases to the Releasing

8   Parties or the Consenting Creditors, correct?

9   A    I think that's right.

10  Q    Okay.  And among those releases being provided -- bear

11  with me one second here.

12       (Pause.)

13            THE COURT:  So, I'm actually --

14            MR. GATES:  I don't --

15            THE COURT:  I'm going to, just again to try to help,

16  I'm not sure that what you just said, I'm not sure that the

17  foundation of the question that you just asked is accurate.

18  The first paragraph provides for a release by the Releasing

19  Parties of the Released Party.  The second paragraph appears

20  to provide a release by the Released Parties of the

21  Consenting Creditors.

22            MR. GATES:  Who are, I think I said or I intended to

23  say, Judge, who are Releasing Parties.  So it's the give and

24  the get.

25            THE COURT:  Well, --

1          MR. GATES:  If I misspoke, --

2          THE COURT:  -- but it doesn't refer to Releasing

3    Parties.  I mean, I think you need to --

4          MR. GATES:  Okay.  Fair enough.

5          THE COURT:  -- focus on the black and white.

6          MR. GATES:  Very good.

7          THE COURT:  Okay.

8          MR. GATES:  Let's just go with the Consenting

9    Creditor.  I'll reform -- I'll rephrase my question.

10   BY MR. GATES:

11   Q    In the second paragraph, Mr. Andrews, this is the

12   paragraph where the Released Parties are giving a release to

13   the Consenting Creditors in exchange for the release that the

14   Consenting Creditors gave the Released Parties.  True?

15   A    Yes.

16   Q    Okay.

17   A    That appears to be the case.  I'm, you know, reading the

18   document on the screen, and that's what it appears to show.

19   Q    Okay.  And we've already stipulated that, under the plain

20   language of this document, Mr. Borisch fell into the

21   definition of Consenting Creditor, correct?

22   A    Under the plain language, in isolation, --

23   Q    Okay.

24   A    -- would be the way I would say that.

25   Q    So if I'm looking at the second paragraph, of those

1   claims that are being released, if I go down one, two, three,

2   four, five lines, the second word from the end, of the claims

3   that are being released include claims arising out of

4   guaranties.  Correct?

5   A   Yes.  That's what it says.

6   Q   Okay.  And finally under this document, let's go to

7   Section XII-D.  So, earlier, we talked about the ambiguity

8   resulting in an inconsistency, and so at 12-D here we

9   actually have a provision for inconsistency, correct?

10  A   Yes.  Between the plan and the confirmation order.

11  Q   Okay.  And --

12  A   Between the disclosure statement and the plan.

13  Q   Okay.

14  A   Yeah.

15  Q   You would agree with me that the plan, the solicitation

16  version of the plan that you filed indicates that in the

17  event of any inconsistency among the plan and the disclosure

18  statement -- I'm going to paraphrase -- the provision of the

19  plan shall govern?

20  A   The document at D says those things.

21  Q   That's what I just asked.

22  A   Yeah.

23  Q   It's what it says, right?

24  A   Yeah.

25  Q   Okay.  So remember when I gave you the definition of

1    ambiguity, and it's a reasonable interpretation of two

2    different outcomes, or two different interpretations,

3    correct?

4    A    Yes.

5    Q    Mr. Kaufman's representation to the Court at the time of

6    the June 9 status conference was that the ambiguity -- we

7    covered this on the record -- the ambiguity arises between

8    the disclosure statement and the actual plan document.

9         But my question to you is, Mr. Andrews, it's not

10   reasonable to try to create an ambiguity or an inconsistency

11   between the plan document and the actual -- the plan document

12   and the disclosure statement, when the very plan that you

13   filed indicated that any inconsistency between those, the

14   default goes to the plan.  Correct?

15   A    I'm sorry.  I can't agree with your predicate to your

16   question.

17   Q    All right.

18   A    I understand what you just said.  I'm just, I disagree.

19   Q    Okay.  If you have an ambiguity between the plan document

20   and the disclosure statement, this provision very clearly

21   says that the plan prevails, correct?

22   A    This provision says what it says, yes.

23   Q    All right.  Thank you.  I'm going to go back to Exhibit 1

24   real quick.

25            THE COURT:  And just so that we can be crystal clear

1    for our record, Borisch Exhibit 1, correct?

2              MR. GATES:  Borisch Exhibit 1.  Yes.

3              THE COURT:  Yes.

4              MR. GATES:  Thank you, Judge.

5    BY MR. GATES:

6    Q    So I'm back on Page 9, and now I'm going to go to Lines

7    11 through 19.

8              MR. GATES:  For the record, Judge.

9              THE COURT:  Thank you.

10   BY MR. GATES:

11   Q    I want to walk through these with you, Mr. Andrews.

12   Starting at Line 11, Mr. Kaufman makes a representation to

13   the Court:  And, again, if you think about the history of

14   this case, Your Honor, we're disappointed but not at all

15   surprised that Mr. Borisch would oppose confirmation.

16        Do you see that?

17   A    Yes.  I'm sorry.

18   Q    Okay.  But to be clear for the record, Mr. Borisch did

19   not oppose confirmation of the solicitation version of the

20   plan, correct?

21   A    It doesn't sound like he did.  That's right.

22   Q    All right.  Mr. Kaufman goes on to say:  This isn't the

23   first time Mr. Borisch has opposed a key action taken by the

24   Trustee in this case.  We can go back to the cash collateral

25   usage, which was resolved after the filing of a notice of

1    appeal.

2         Did I read that accurately?

3    A    You did.

4    Q    That issue was actually resolved by Mr. Borisch being

5    carved out of that process and no longer having to

6    participate in the challenge period, correct?

7    A    That's -- that's my memory.

8    Q    Okay.  And then Mr. Kaufman goes on to say:  He opposed

9    the Malibu settlement and forced our hand and required the

10   enforcement motion, which the Court ruled upon a couple weeks

11   ago.

12        Did I read that accurately?

13   A    You did.

14   Q    All right.  We actually resolved the Malibu settlement

15   here in front of the Court on the record, correct?

16   A    That's -- after a hearing, yes.

17   Q    All right.  And the hearing, if I'm not mistaken, was --

18   there was -- there was two things that happened on that day.

19   It was not only approval of the Malibu settlement, but it was

20   also your motion to enforce the stay, arguing that the

21   parallel litigation in Michigan and Tennessee, those -- that

22   litigation filed by Mr. Borisch, was actually bringing

23   claims, derivative claims that belonged to the Trustee and to

24   the estate, correct?

25   A    I -- I -- I'm trying to follow that question.  I think

1  the answer is yes.

2  Q    Okay.  Sorry for the confusion on the question.

3  A    Yeah.

4          THE COURT:  It might be ambiguous.

5          MR. GATES:  It probably was, Judge.

6          THE COURT:  I'm sorry.  I couldn't resist.

7       (Chuckling.)

8          MR. GATES:  Thank you, Judge.  Point well taken.

9          THE COURT:  And I'm just saying that in jest, for

10 purposes of our record.  It wasn't ambiguous.  I think we've

11 dealt with it.

12         MR. GATES:  Understood.

13         THE COURT:  Sometimes you have to add a little bit

14 of levity.

15         MR. GATES:  I got it.

16 BY MR. GATES:

17 Q    Going back to the Line 19, Mr. Kaufman references the

18 fact the Court ruled on that a couple weeks ago.  In fact,

19 Judge Morris actually ruled on the issues regarding the

20 derivative claims versus direct claims.  He ruled in that

21 regard on May 22nd of 2025, correct?

22 A    I think that's right.

23 Q    All right.  The record will reflect that that was -- the

24 record will reflect what it reflects, but Mr. -- Judge Morris

25 ultimately ruled on that.

1        And in fact, my description of that, you tell me if I --

2   if I say this description is accurate in your mind as well,

3   Judge Morris sort of split the baby, if you will.  There were

4   some claims that Mr. Morris had made that crossed over the

5   line and were derivative claims, and there were some claims

6   that he was bringing that were in fact his individual claims

7   and he was free to bring.  Correct?

8   A    I'm just going to defer to the ruling.

9   Q    Okay.

10  A    I don't want to characterize it.

11  Q    That's fair.  Thank you.

12  A    It says what it says.

13  Q    So, at the risk of asking another question that may

14  frustrate purpose here, your testimony seemed earlier on

15  direct that you really didn't place any blame on M&T or Mr.

16  Borisch in terms of not being able to reach a settlement.  Is

17  that accurate?

18  A    It's not my job to place blame.  I tried to effectuate a

19  settlement.  I couldn't make it happen.

20  Q    All right.  But here in the -- on the record in front of

21  the Court and in these pleadings once again, your lawyer who

22  speaks on your behalf is, would you agree with me, trying to

23  suggest that Mr. Borisch seemed to be the obstacle on a

24  regular basis?

25  A    He's speaking in that -- in that particular speech, he,

1  yes, he does, he does say that Mr. Borisch had opposed a

2  number of actions that we had prosecuted.

3  Q    Incidentally, Mr. Andrews, --

4            THE COURT:  Let me ask you a quick question.

5            MR. GATES:  Yes.

6            THE COURT:  How are we doing in terms of how much

7  time do you think you're still going to have and is this a

8  good transition point?  The only reason I say that, I'm

9  perfectly content to keep going.  I have a judges meeting at

10 noon.

11           MR. GATES:  Okay.

12           THE COURT:  And so I'm just here to tell you I could

13 skip that.

14      (Laughter.)

15           THE COURT:  I'm sorry.  That came across wrong, and

16 I do appreciate the laughter.  But if we're kind of at -- if

17 we're heading into a transition point, we might look at that

18 landing zone, because if it's going to be a while, then it

19 may be a good time to just do the proverbial lunch break

20 anyway.

21      But I don't want to disrupt if you're still in the zone

22 of where you're heading.  Or we can start looking for a

23 natural break for you.  Or if you think you're going to

24 conclude within a reasonably short period of time, we can

25 just power through it.

1          MR. GATES:  I would think the natural transition

2    point is going to be in about five minutes, Judge, after I

3    get through this question.

4          THE COURT:  Okay.  Great.  So, yes, let me not

5    interrupt your flow.

6          MR. GATES:  All right.

7          THE COURT:  I just, I thought you were transitioning

8    prematurely.  So, go ahead.

9          MR. GATES:  No worries.  Thank you.

10   BY MR. GATES:

11   Q    What I started to ask you, Mr. Andrews, incidentally, M&T

12   Bank filed a response to Mr. Borisch's objection at Docket

13   No. 1009.  Are you aware of that filing?

14   A    I'm aware of it.

15   Q    Okay.

16   A    Yes.

17   Q    Did you have the opportunity to review that filing?

18   A    You know, I glanced at it, but I didn't spend a bunch of

19   time.

20   Q    I will state for the record, and the record will speak

21   for itself, that document is one of the pleadings, but I will

22   make a representation to the Court and for my question to

23   you:  At Paragraph 8 of that opposition, of that response to

24   Mr. Borisch's objection, Mr. Gerber, who executed the

25   opposition, refers to the inconsistency that we were talking

Andrews - Cross                                    114

1   about between the plan document and the disclosure statement.

2   Mr. Gerber describes that inconsistency as a "obvious error."

3   Have you -- you didn't read it?  You haven't read those words

4   for yourself?

5   A   I read it.  I don't recall, but I'll take your word for

6   it --

7   Q   Okay.

8   A   -- that that's what it says.

9   Q   All right.  The question for you is, you made -- I think

10  you did a great job on direct talking about the length of

11  time and the amount of energy that was put into trying to

12  negotiate a plan with various of the constituencies in this

13  case.  Correct?

14  A   Yes.

15  Q   Literally I think you indicated you started that in about

16  November.  I actually see that the discovery that was

17  provided indicated you started in December of 2024.  But

18  you've been working on it for some time, correct?

19  A   Yes.

20  Q   All right.  And a great deal of time, would you agree

21  with me the majority of that time was spent working with M&T

22  Bank as the most important constituency in that plan,

23  correct?

24  A   They're the funding source.  And yes.

25  Q   Okay.  In fact, those exchanges that you had with M&T

Andrews - Cross                        115

1    Bank actually include markups of an early version of your

2    plan, correct?

3    A    I'm sure they do.

4    Q    Okay.  My question for you is, if it was so obvious, if

5    this inconsistency that Mr. Kaufman referred to as an

6    ambiguity, if it was so -- so much, quote, an obvious error

7    in the words of Mr. Gerber, any idea why Mr. Gerber or any of

8    the attorneys for M&T Bank did not correct it in the months

9    spent in negotiations with you over the terms of the plan?

10   A    The answer is, you know, sometimes when you have a lot of

11   people reading a document and you have a lot of people

12   looking at it, everybody's got their own thing that they're

13   looking for.  And one way or another, it was missed.  But no

14   one presumed that Mr. Borisch was likely to support the plan

15   or consent to it.

16        MR. GATES:  All right.  I think that's a natural

17   stopping point, Judge, if you want --

18        THE COURT:  Okay.  Very good.

19        MR. GATES:  -- if you want to make the judges

20   meeting.

21        THE COURT:  Yes.

22        MR. GATES:  If you want us to keep going to give you

23   an excuse, happy to do it.

24        THE COURT:  Exactly.  Well, either way, I think

25   we're probably at a natural point where people could use a

Andrews - Cross                           116

1    leg-stretch, if you will, and we might as well rope in a

2    lunch break while we're at it.

3        Why don't we plan on -- it's 12:00 o'clock straight up.

4    Why don't we plan to try -- I'm going to try to hold us a

5    little bit tight to the clock.  Unfortunately, we do not have

6    any bad courtroom cafeteria to share with you all.  I'm going

7    to get myself in trouble for saying things like that.  There

8    are some restaurants that are relatively close.  Hopefully,

9    you all can get there.  But what I was going to suggest is

10   can we plan on maybe being back by 1:15, so just over an

11   hour?  Do we think that will work?

12           MR. GATES:  It does for us, Judge.

13           THE COURT:  Okay.  I'm not seeing anybody shake

14   their head no.  Maybe some people -- I don't know, but I --

15           MS. WEBB:  I could eat quicker, Your Honor.

16           THE COURT:  Okay.  All right.  I hear you.  It's

17   always amazing how fast, though, time escapes.  Trust me.

18   Because by the time you get out there, you don't want to be

19   like eating and walking at the same time.  So why don't we

20   plan for 1:15.

21       You all can leave anything and everything in place.  We

22   will lock the doors once everybody is out.  Just take

23   anything that you know you're going to need.  And if you come

24   back and you realize that you need to actually get in sooner

25   than expected, just know, we have sort of awkward chambers

1   here, so if we open up we would have to close off certain

2   things.  So that's why I'm saying, try to take things that

3   you know you're going to want or need.  We'll try to open up

4   probably right at 1:00.  But if you need to get in here

5   sooner than that, just buzz the door and we'll get you back

6   in.  But otherwise, the main story is you can leave

7   everything in place.  Nobody else is going to be here today.

8   So that will take care of that.

9       For those who are on WebEx, just it's a system thing.

10  We're going to go ahead and terminate this WebEx session, and

11  we will start it back up, because that tends to, for whatever

12  weird reasons, clear out the queue or whatever so that we

13  don't have any glitches with the WebEx session.  So we will

14  plug back in around 1:00 as well, so you all can dial back in

15  at that time.  But that will take care of that.  And

16  otherwise, the Court will be in recess until 1:15.

17              THE CLERK:  All rise.

18      (A luncheon recess ensued from1 12:02 p.m. until 1:21

19  p.m.)

20              THE CLERK:  All rise.

21              THE COURT:  All right.  Please be seated.

22      All right.  Let's go back on the record in Case 24-90000.

23  And Mr. Andrews, I just remind you that you remain under

24  oath.

25      Mr. Gates, when you're ready.

1        MR. GATES:  Thank you very much, Judge.

2                    CROSS-EXAMINATION, RESUMED

3    BY MR. GATES:

4    Q   Mr. Andrews, you would agree with me that you have a

5    fiduciary responsibility as the Chapter 11 Trustee to all

6    creditors, correct?

7    A    Yes.

8    Q   All right.  Including Mr. Borisch, correct?

9    A    Yes.

10   Q   All right.  And I want to show you what has been marked

11   as Exhibit 31.  I'll pull it up in front of you.  Thank you,

12   by the way.

13            THE COURT:  So, Borisch Exhibit 31?

14            MR. GATES:  Borisch Exhibit 31.

15            THE COURT:  Sorry.  I'm going to keep doing that,

16   just because --

17            MR. GATES:  I'm sorry.

18            THE COURT:  -- we've got the overlapping numbering.

19            MR. GATES:  Yeah.  I'm sorry, Judge.  Borisch

20   Exhibit 31.

21   BY MR. GATES:

22   Q   I'm sorry, Mr. Andrews.  First of all, I'll show you the

23   cover sheet.  Do you see where it says Exhibit 31?

24   A    I do.

25   Q   Borisch Exhibit 31.  And then I'm going to show you what

1    I believe is an email from Aaron Kaufman to Christine Barba

2    and various others, including the cc's.  What I'm pointing

3    out in this email is that the email is dated December 28,

4    2024.  Is that accurate?

5    A    Yes.

6    Q    All right.  And if you look at the substance of this

7    email, I'll give you a moment to review it, I want to ask you

8    a couple questions about it.

9    A    Okay.  I've read it.

10    Q    You've read it?

11    A    Yes.

12    Q    All right.  Correct me if I'm wrong, but I believe this

13    is one of your very earliest communications with M&T Bank

14    regarding a -- terms and conditions of a proposed plan.  Is

15    that accurate?

16    A    I think that's right.

17    Q    All right.  So I see a December 28, 2024 email.  This has

18    been admitted into evidence.  Earlier in your testimony, you

19    thought those communications started back in November?

20    A    I -- yes.

21    Q    All right.  I didn't get any documents, for what it's

22    worth, no documents were turned over regarding earlier

23    communications other than this December 28, 2024 document.

24    So your testimony is still that you started those discussions

25    in November?

Andrews - Cross                    120

1   A    We -- we talked about plan versus conversion.

2   Q    Okay.  Fair enough.  All right.  So on direct

3   examination, I believe you indicated that you included Mr.

4   Borisch in the process, the plan process, since November of

5   2024.  What I'd like to confirm is that what you meant by

6   that is you had ongoing discussions with Mr. Borisch

7   regarding settlement of his claims with M&T Bank.  You did

8   not have any substantive discussions with Mr. Borisch

9   regarding a plan.  Is that accurate?

10  A    Yeah.  So, I'm going to break it into pieces.

11  Q    Sure.

12  A    So, most of the conversations with Mr. Borisch regarded

13  the plan as a possible platform for settlement of claims back

14  and forth between Mr. Borisch, the Bank, and the Trustee,

15  because there were different claims that each of those

16  parties held.  And so as -- with that answer, you know, I

17  hope it clarifies your understanding, that we were -- we were

18  talking about it as a sort of three-cornered deal, if you

19  will.

20  Q    So when you said you were talking to him since November

21  of 2024 regarding the plan process, what you really meant was

22  settlement with M&T and how that in your mind affected the

23  plan?

24  A    It would be settlement with M&T -- the best -- the way I

25  described it to Mr. Borisch was the best outcome would be one

1    where there is a settlement among all the parties that I just

2    mentioned and also some other parties.  And I told him that I

3    thought that there were ways in which that could be

4    accomplished, but that in order to do that there would have

5    to be some contribution on his end, and then there would have

6    to be, on the other ends, relinquishment or releases.  And

7    that was the sort of generic starting point of the

8    discussions that I had with him and then ultimately with, you

9    know, the lawyers.

10   Q   But all done before you evaluated his defenses and his

11   counterclaims against M&T, correct?

12   A   Well, I guess wait a minute when you say that.  All done

13   without knowing what claims and possible counters that he

14   might have, but also sort of knowing the case generally.  So,

15   not doing it with complete ignorance of the fact that there

16   might be offsets and counterclaims.  In fact, I even talked a

17   little bit about it at one point.  But if you're asking me

18   were there specific numbers attached to that, no.  No, there

19   weren't.

20   Q   Okay.  Fair enough.  It's fair to say that Mr. Borisch

21   never saw a copy of any early version of the plan prior to it

22   being filed, correct?

23   A   I think that's right.

24   Q   All right.  And it's also -- you would agree with me that

25   Mr. Borisch actually called you and asked you to see a copy

1    of the plan --

2    A    He did.

3    Q    -- before it was filed.  Correct?

4    A    He did.

5    Q    Okay.  And you basically told him you'd be happy to

6    explain it to his lawyers but you were not giving him a copy

7    of the plan.  Isn't that accurate?

8    A    Yes.  And --

9    Q    Okay.  And you're aware that Mr. Bakst and I actually

10   asked Mr. Kaufman and you to see a copy of the plan before it

11   was filed, correct?

12   A    Yes.

13   Q    All right.  We were not provided a copy of the plan

14   before it was filed, either, were we?

15   A    Not by me.

16   Q    Okay.

17   A    Yeah.

18   Q    Are you aware if anybody else sent us a copy?

19   A    I don't know.

20   Q    Okay.  To the best of your knowledge today, Mr. Bakst and

21   I, as counsel for Mr. Borisch, were never provided a copy of

22   the plan document before it was filed?

23   A    As far as I know, that's right.

24   Q    Okay.

25   A    Yeah.

1  Q    Did you assist your counsel with the production of

2  documents responsive to Mr. Borisch's requests for production

3  of documents in preparation for this proceeding?

4  A    I did.

5  Q    Okay.  Are you aware of approximately how many pages were

6  produced?

7  A    Of mine or just in general?

8  Q    Just documents by your counsel in response to our

9  requests.

10  A    I remember it's a big number, but it's a lot of linked

11  emails, so it's the same email over and over with further

12  emails.

13  Q    An add-on here or there, right?

14  A    Yeah.  Exactly.

15  Q    Okay.  Does the number 16,700 approximately pages sound

16  about right?

17  A    That sounds like something I've heard in court before,

18  but I don't have personal knowledge.

19  Q    Okay.  It's a lot of pages, correct?

20  A    Oh, yeah.

21  Q    Okay.

22  A    I think that's probably right.

23  Q    And you would agree with me that the substance

24  essentially of the requests was to get the Trustee's

25  communication with M&T regarding the plan, correct?

Andrews - Cross                          124

1    A    Yes.

2    Q    And I'm summarizing here.

3    A    Sure.  Understood.

4    Q    To get the Trustee's communication with the Unsecured

5    Creditors' Committee regarding the plan.  Correct?

6    A    I think so.

7    Q    All right.  And to get the Trustee's communication with

8    Malibu regarding settlement and the plan.  Correct?

9    A    I think that's right.

10   Q    All right.  And also to have you produce any

11   communication that the Trustee had with Mr. Borisch, or the

12   Borisch Parties, actually, --

13   A    Uh-huh.

14   Q    -- regarding the plan.  Correct?

15   A    Yes.

16   Q    Okay.  You wouldn't disagree with me if I told you that,

17   out of the 16,700 pages that were produced, there was not one

18   page of documentation evidencing the fact that we received a

19   copy of the plan prior to its filing, correct?

20   A    Yeah.  I don't -- it doesn't sound like -- I don't think

21   that's controverted.

22   Q    Okay.  In fact, the only communication that we received

23   regarding communication with Borisch, the Borisch Parties and

24   their counsel -- I'm going to paraphrase, I'll generalize

25   here -- one was with respect to the limited objection to the

Andrews - Cross                                125

1  disclosure statement.  Do you recall that?

2  A    Yes.

3  Q    Okay.  And so that was clearly after the plan was filed,

4  right?  And the second one, the second series of

5  communication simply related to the balloting on June 5 and

6  the subsequent modification, correct?

7  A    As -- I'll take your word for that.

8  Q    Okay.

9  A    Yeah.

10 Q    So out of the vast majority of documents that were

11 produced, would you agree with me that all those documents

12 support long-term negotiations with M&T Bank regarding the

13 plan?

14 A    Sure.

15 Q    Long-term negotiations with the Unsecured Creditors'

16 Committee regarding the plan?

17 A    I think that's right.

18 Q    In fact, even a great deal of communications of Malibu

19 regarding the plan and settlement, correct?

20 A    I don't recall as many with them, but yeah, I think there

21 were certainly some.

22 Q    Okay.  Much more than there was with Borisch and the

23 Borisch Parties?

24 A    In terms of both written and oral?  Yes.

25 Q    Okay.  And would you agree with me that those documents

Andrews - Cross                          126

1  show a great deal of strategy on the part of the Trustee,

2  working with M&T, to get a plan confirmed?

3  A    Yeah.  Yes.

4  Q    Would you agree with me -- same question with respect to

5  the Unsecured Creditors' Committee.  A great deal of strategy

6  with the Unsecured Creditors' Committee about how to go

7  forward and get a plan confirmed?

8  A    I don't recall as much with the Unsecured Creditors'

9  Committee, to be honest.  I think that was mostly with

10 counsel.

11 Q    There were certainly some -- when I say Unsecured

12 Creditors' Committee, I mean their counsel, just for the

13 record.

14 A    Yeah.  I -- I didn't have those communications, is what

15 I'm saying.

16 Q    Okay.

17 A    I think that mostly went through Mr. Kaufman.

18 Q    You wouldn't doubt that there's ongoing strategy

19 discussions with the --

20 A    No.

21 Q    -- Unsecured Creditors' Committee and its counsel?

22 A    No.

23 Q    Okay.  And then same -- again, somewhat limited, but

24 certainly more so, and as we indicated with Mr. Borisch, but

25 there's even ongoing discussion and strategy with Malibu

Andrews - Cross                              127

1  about getting a plan confirmed and their settlement.

2  Correct?

3  A    There was some, yes.

4  Q    Okay.  How about communications regarding a strategy to

5  "pursue Borisch"?  Are you aware of any communications with

6  M&T and/or the Unsecured Creditors' Committee specifically in

7  reference to how to pursue recovery and collection against

8  Borisch?

9  A    There -- there would have been discussions about where

10  claims against Borisch or Borisch entities would lie after

11  the confirmation, whether they were going to stay in a

12  creditors' trust, be assigned over to the lender, or what

13  would happen with respect to those claims.

14  Q    When would those discussions have taken place?  Later in

15  the plan process --

16  A    Uh, --

17  Q    -- or earlier?

18  A    -- I think, in the course of time, it was certainly in

19  2025.

20  Q    Okay.

21  A    But how deep in, I -- I don't remember.

22  Q    We had a hearing in this Court, a rather substantive --

23  I'm sorry.  Did I cut you off?

24  A    No.

25  Q    I thought I heard you say something.  I'm sorry.  We had

1    a rather substantive hearing in this Court on November 19 of

2    2024 regarding approval of the Malibu settlement.  Do you

3    recall that?

4    A    I do.

5    Q    All right.  And regarding your motion to enforce the

6    stay, arguing that the claims that Mr. Borisch was pursuing

7    in both state and federal court in Michigan and Tennessee

8    were derivative claims and they belonged to you.  Correct?

9    A    Right.

10   Q    All right.  So would it surprise you that, immediately

11   following that hearing, there was a discussion between your

12   counsel and the Unsecured Creditors' Committee as well as M&T

13   Bank regarding how to pursue Borisch?

14   A    It wouldn't surprise me.  It's part of the conversations

15   that I'm sure were had at some point.

16   Q    Were you involved in that discussion?

17   A    I -- I don't recall.

18   Q    Okay.  So, in addition to the documents we've already

19   discussed, how about communications with the M&T Bank and the

20   Unsecured Creditors' Committee, and particularly -- let me --

21   strike that.  How about discussions with M&T Bank regarding,

22   I'll paraphrase, how to force a settlement or bring a

23   settlement about amongst Borisch and M&T Bank?  Do you recall

24   a great deal of discussion about that?

25   A    No.  You know, in terms of the discussions that were

Andrews - Cross                          129

1    held, again, the entire case had the same problem in that

2    there were certain claims that were held by the Bank, there

3    were certain liens that the Bank held.  The Trustee is in the

4    middle with cash collateral as the only assets to use.  And

5    then there were unidentified potential claims against Borisch

6    from the estate and there were direct guaranty claims from

7    the Bank.  All of that was discussed at different points,

8    because every bit of it was part of the key assets in the

9    estate.

10   Q    You said unidentified claims that the Trustee may have

11   against Borisch?

12   A    Probably like transfer claims, preference claims,

13   Chapter 5 causes of action.

14   Q    So you're talking, generally speaking, in any Chapter 11,

15   correct?

16   A    Yeah.

17   Q    Okay.

18   A    Yeah.

19   Q    In the year-plus that you've been installed as the

20   Trustee, you've never identified any such claims, have you?

21   A    Small -- I think some small claims.  I don't think

22   anything that was significant.

23   Q    By way of small, can you quantify small for me?  What

24   does that mean to you?

25   A    Well, under a million dollars.

1  Q   Okay.  I'm going to refer you to Exhibit 27.

2          MR. GATES:  Borisch Exhibit 27, Your Honor.  Maybe

3  I'll start doing that on a regular basis, I hope.

4          THE COURT:  Thank you.

5  BY MR. GATES:

6  Q   This is a, if I read it right, correctly, it's an email

7  from Mr. Kaufman to the Unsecured Creditors' Committee

8  counsel, Ross Dylan.  Or excuse me, Dylan Ross.  Even cc's

9  you, correct?

10 A   Yes.

11 Q   And it's dated March 25, 2025.  (Pause.)  Correct?

12 A   Yes.

13 Q   Okay.  So I want to draw you your attention to Bates Page

14 1357, when we get there.

15         MR. GATES:  For the record, Your Honor.

16 BY MR. GATES:

17 Q   So this is in the same string.  I'm at the bottom of the

18 page.  Do you see where it says 1357?

19 A   I do.

20 Q   Okay.  If we go up to this -- the third-to-the-last

21 paragraph, which was rather substantive here.  In this

22 string, let me just clarify for the record, this is Mr.

23 Kaufman, January 24, 2025, to, again, counsel for the

24 Unsecured Creditors' Committee, you're on there, M&T is on

25 there as well, correct?

1   A    Yes.

2   Q    All right.  And actually, let me correct myself.  I don't

3   see you on there, so I misspoke.  But to M&T Bank as well as

4   the Unsecured Creditors' Committee.  And it's a -- this is

5   dated January 24, 2025.  Confidential Settlement

6   Communication Subject to 408.  Do you see that?

7   A    I do.

8   Q    Okay.  Down to the third-to-the-last paragraph, and I'll

9   start with halfway through that paragraph:  Of course, if Mr.

10  Borisch decides to make a serious settlement proposal after

11  we file, we can schedule mediation during that intervening

12  period, schedule confirmation as needed to fit the settlement

13  discussions.  We do not expect Borisch to make any proposals

14  until a plan is on file and hearings are scheduled.

15       So, correct me if I'm wrong, but I believe Mr. Kaufman is

16  indicating that the moving forward with the filing of the

17  plan is intended to get Mr. Borisch to "get serious" or make

18  a serious, excuse me, "make a serious settlement proposal."

19  That was sort of the intent of moving forward very quickly

20  with a plan, correct?

21  A    It's -- yeah, that's what that looks like to me.  You'd

22  have to ask Mr. Kaufman, but that's what it looks like he's

23  saying.

24  Q    Okay.  And for what it's worth, he also indicates that

25  getting that serious settlement offer is sort of more

1  pressing than even plan confirmation, wouldn't you agree?

2  Because he says that we can schedule mediation during that

3  intervening period and reschedule confirmation as needed to

4  fit the settlement discussions.

5      So he's saying a settlement is more important than the

6  plan, correct?

7  A   He's -- the predicate to that sentence is, If Borisch

8  decides to make a serious settlement proposal after we file,

9  and then all the other statements you just gave follow.

10 Q   Right.

11 A   Then we can schedule a mediation, et cetera.  So he's --

12 putting a serious settlement proposal on the table would have

13 prompted perhaps moving the confirmation hearing and

14 rescheduling.

15 Q   So, how we got here is I indicated that these 16,700

16 pages of documentation include discussions regarding using

17 the plan process in order to basically force a settlement or

18 arrive at a settlement with Borisch.  Isn't that accurate?

19 A   It couldn't force it.

20 Q   Certainly intended to encourage it, wasn't it?

21 A   I mean, so that's not -- that's not -- look, the plan

22 process is a great framework from which you can always settle

23 in a Chapter 11.  The part, I agree with you.  And to the

24 extent that it prompts people to move or change positions, it

25 can be helpful.  But there isn't any forcing here.

1   Q   Let's look at Exhibit 28, if we can, please.  So there's

2   the cover page.

3            MR. GATES:  Borisch Exhibit 28, Your Honor.

4   BY MR. GATES:

5   Q   And on Borisch Exhibit 28, which is a March 18, 2025

6   email string, originating with Aaron Kaufman, again, to the

7   counsel for Creditors' Committee.  This one also cc's you and

8   your representatives, correct?

9   A   I'm looking.  Yes.  Correct.

10  Q   And if we go to Bates 1382 of that email chain, this is a

11  communication from Mr. Andrews -- or Mr. Kaufman on your

12  behalf to the Creditors' Committee, indicating, We've had

13  many discussions with Borisch about a mediation.  It seems

14  the parties are still too far apart to make a mediation

15  productive.  We'll continue to gauge Borisch over the next

16  several weeks, with the goal of engaging in global settlement

17  discussions on a parallel track.

18       So, again, the goal is to proceed with the plan, but the

19  parallel goal is to get Mr. Borisch to the table on a

20  settlement discussion, right?

21  A   Agree.

22  Q   Okay.  And once again, nobody's valued -- nobody has

23  valued at this point what Mr. Borisch's claims, defenses, are

24  actually worth as to M&T, correct?

25  A   I -- not that I'm aware of.

Andrews - Cross                              134

1    Q    Okay.  And you would also agree with me, this email is

2    dated March 18, 2025.  We talked about this earlier, but

3    Judge Morris ultimately ruled via Memorandum Opinion and

4    Order on May 22nd as to what counterclaims, affirmative

5    claims that Mr. Borisch actually has against M&T in the Kent

6    County litigation, right?

7    A    Against M&T or against Malibu?  I'm sorry.

8    Q    In the Kent County.  I think -- Malibu is in the

9    Tennessee Federal District Court.  I believe the M&T

10   litigation is in the Kent County Circuit Court state court in

11   Michigan.  Is that your understanding?

12   A    I -- yes.  I understood that.

13   Q    Okay.

14   A    But I think, excuse me, I thought where you were going

15   was on the Malibu side, that that -- that memorandum opinion.

16   It sounds like you're talking about something else.

17   Q    Yeah.  I'm on the M&T side at this point.  Because in

18   that motion to endorse the stay, there was a component of the

19   Tennessee litigation claiming that we were bringing

20   derivative claims, but also there was also a component in the

21   M&T litigation, correct.

22   A    Yeah, I'd forgotten that part, frankly.

23   Q    Okay.

24   A    Yeah.

25   Q    So, fair to say that on the date of this email, when Mr.

1   Borisch has not yet I guess engaged to the level that

2   everyone would want him engaged on a settlement discussion,

3   even Mr. Borisch doesn't know what claims he has

4   affirmatively against M&T Bank.  Isn't that accurate?

5   A    I don't know what Mr. Borisch knows.

6   Q    Well, let's go back.  This is an email dated March 18th,

7   --

8          THE COURT:  So, just out of curiosity, is that an

9   acknowledgement that the stay was willfully violated?

10         MR. GATES:  No, Your Honor.

11         THE COURT:  Because if you're saying that you were

12  asserting things that you didn't know whether or not you had

13  a good faith belief were the individual property of Mr.

14  Borisch, that certainly gives me pause.

15         MR. GATES:  That's not what I'm saying, Judge.

16         THE COURT:  Okay.  All right.

17         MR. GATES:  Do you want a response to that?  I'm

18  happy to give the Court a response.

19         THE COURT:  That's fine.

20         MR. GATES:  Okay.  For what it's worth, I think the

21  record is clear from that hearing that we all walked away

22  thinking we were --

23         THE COURT:  I'm just focusing on the way that you're

24  asking the questions and I'm reacting to what I'm hearing.

25         MR. GATES:  Well, let me -- let me rephrase the

Andrews - Cross                              136

1    question.

2    BY MR. GATES:

3    Q    On March 18 of 2025, Judge Morris had not yet ruled

4    affirmatively as to what claims Mr. Borisch could bring in

5    Kent County Circuit Court without violating the stay.

6    Correct?

7    A    I think that's right.

8    Q    Okay.  Ultimately, he ruled, and ultimately there were

9    claims that Mr. Borisch could proceed with in Kent County

10   Circuit Court against M&T?

11   A    I -- I'd kind of let that order speak for itself.

12   Q    All right.

13   A    I, you know, I don't want to characterize it.

14         MR. GATES:  Apology for the confusion in the

15   question, Judge.  That's what I was getting at.

16         THE COURT:  I'm not sure that that's really done

17   anything, but go ahead.

18   BY MR. GATES:

19   Q    Let's look at Exhibit 29, Mr. Andrews.  Exhibit 29.

20   This, again, an email originated or a string that originates

21   from -- or at least this email part of it is from Aaron

22   Kaufman.  To, again, the Unsecured Creditor Committee

23   counsel, correct?

24   A    Yes.

25   Q    All right.  So, of this email chain, I want to direct

1   your attention to Bates 1389.  You see where it says Trustee

2   1389 at the bottom right?

3   A    I do.

4   Q    Okay.  That page, 1389, happens to be a January 14

5   communication from Aaron Kaufman, again, to the Unsecured

6   Creditors' Committee, and cc'ing various people, including

7   yourself on your team.  Correct?

8   A    Yes.

9   Q    All right.  And it's, again, Confidential Settlement

10  Communications Subject to FRE 408.  And down at the bottom of

11  that email Mr. Kaufman indicates, We expect to be in a

12  position to file the plan, disclosure statement, solicitation

13  procedures motion as early as late next week.  The goal would

14  be to get to confirmation by mid- to late March unless we're

15  able to mediate a consensual global settlement in the

16  interim.

17       So, again, parallel paths.  The goal is to get a

18  settlement done, correct?

19  A    Yes.

20  Q    All right.  I'll direct your attention to Borisch Exhibit

21  32.

22             THE COURT:  So, I'm sorry, this is --

23             MR. GATES:  Borisch Exhibit 32, Your Honor.

24             THE COURT:  I do not have a 32 in my binder.

25             MR. GATES:  My apology, Judge.  32 was one of the --

Andrews - Cross                        138

1   I believe it was one that we admitted, but if you -- I'm not

2   doubting that you don't have it in your binder.  I apologize.

3   Let me see if I have a -- would you like me to see if I have

4   a copy in my binder for you?

5          THE COURT:  If you want the Court to consider it.

6          A VOICE:  We have an extra binder.

7       (Discussion.)

8          MR. GATES:  Your Honor, I have a hard copy.  I

9   apologize.  It has some highlighting on it.  But I'm happy to

10  approach and give it to you.

11      (Discussion.)

12         MR. GATES:  Would you like me to approach with a --

13         THE COURT:  Well, let's find out who all needs it.

14         A VOICE:  31 and 32.

15      (Discussion.)

16         THE COURT:  So if you've got an unmarked one, I'll

17  take the unmarked one.

18         A VOICE:  Yeah.  31 and 32.

19         THE COURT:  Great.  Thank you.

20         A VOICE:  And I have 32.

21         A VOICE:  I've got 32.

22         A VOICE:  Okay.

23         A VOICE:  I have 32 --

24         MR. GATES:  Thank you.

25  BY MR. GATES:

1  Q   Borisch Exhibit 32, Mr. Andrews, is the cover page.  This

2  is an email communication admitted.  And this one, this page

3  happens to be from Christine Barba on behalf of M&T Bank to

4  Aaron Kaufman, your counsel, correct?

5  A   Yes.

6  Q   All right.  And Page 1549 of that communication, Bates

7  1549, indicates:  Hi, Aaron.  I can talk after 10:30.  That

8  said, I don't think we're in a position to give you the kind

9  of direction you're looking for.  Whether the Bank can

10 support a plan at all or whether and what terms are deal-

11 breakers is going to depend in large part on whether there's

12 any likelihood of a Borisch mediation or settlement.  It

13 doesn't sound like yesterday's call shed any light on that.

14      So, did I read that accurately?

15 A   You did.

16 Q   Okay.  So, again, I'm not going to belabor the point.

17 You would agree with me there's countless emails in the

18 documents that you produced indicating that we're trying to

19 get Matt Borisch to settle this case, right?

20 A   Yes.

21 Q   Okay.  And all those communications, by the way, no

22 argument with the fact that they are all prior to the Court's

23 ruling on May 22nd, 2025?

24 A   That's right.

25 Q   Okay.  Thank you.  Do you recall a discussion that we had

1  regarding -- this goes back a ways to just prior to the

2  Malibu settlement mediation.  Do you recall having a

3  discussion with us regarding the Malibu settlement mediation

4  --

5  A    Yes.

6  Q    -- that was to take place?

7  A    In the fall.

8  Q    Okay.

9  A    I think that's right.  Yeah.

10  Q    Do you recall during that settlement discussion, or

11  during that discussion with Mr. Bakst and I, do you recall

12  telling us that Mr. Borisch was not going to be included in

13  those settlement discussions because M&T Bank did not want

14  him included in those settlement discussions?

15  A    I don't recall that, to be honest.

16  Q    Is it possible that you said that?

17  A    Possible.  I just don't recall it.

18  Q    Do you recall M&T Bank telling you that they did not want

19  Mr. Borisch involved in the Malibu settlement discussions?

20          MR. KAUFMAN:  Objection.  That calls for hearsay.

21          MR. GATES:  It's his statement, Your Honor.

22          MR. KAUFMAN:  I think the question was --

23          THE COURT:  Sustained.

24  BY MR. GATES:

25  Q    Mr. Andrews, did M&T Bank tell you that they did not want

1    Mr. Borisch involved in the discussions regarding a proposed

2    Chapter 11 plan --

3                MR. KAUFMAN:  Objection.

4                MR. GATES:  -- before it was filed?

5                THE COURT:  So, state the objection again.

6                MR. KAUFMAN:  State the objection now?

7                THE COURT:  Yes.  I'm sorry.  It's just you were

8    both talking at the same time.

9                MR. KAUFMAN:  I'm sorry.  I thought he was done.  I

10   object that it's calling for Mr. Andrews to answer statements

11   made by M&T to him, which calls for hearsay.

12               THE COURT:  All right.  Do you have a response?  I

13   know that we just did this.

14               MR. GATES:  I simply asked him if M&T -- if anybody

15   from M&T Bank told him that they did not want Borisch

16   involved in the plan negotiation process.

17               THE COURT:  Understood.  Do you have a response to

18   the hearsay objection?

19               MR. GATES:  I don't think it's hearsay, Your Honor.

20   I'm asking him if that's --

21               THE COURT:  All right.  I'll sustain the objection.

22               MR. GATES:  Okay.

23   BY MR. GATES:

24   Q   Mr. Andrews, if you had gotten Mr. Borisch's comments or

25   comments from his counsel on the proposed plan before it was

1  filed, wouldn't that more likely than not lead to resolution

2  of potential objections?

3  A    It's a -- I don't know the answer to that.  Because it's

4  like when you were in my position, I make a change for you, I

5  circulate it, and then I get 50 other changes.  Whether or

6  not there was a way to make that all work is really hard to

7  know.  But I concede that it's always better to try to

8  communicate.

9  Q    Thank you.  All right.  Mr. Andrews, I'm going to move to

10  Exhibit 15 now, Borisch Exhibit 15.  And if I've done this

11  right, this will be a copy of your declaration.  Borisch

12  Exhibit Cover Page 15.  And this to be -- this appears to be

13  Docket 1005 filed on July 1, 2025, which I believe to be your

14  Declaration as Chapter 11 Trustee in Support of Confirmation

15  of the Trustee's First Amended Joint Chapter 11 Plan.  Is

16  that accurate?

17  A    Yes.

18  Q    All right.  Just, logistically, this declaration was

19  drafted for you, Mr. Andrews; isn't that accurate?

20  A    Well, it was drafted in concert with my counsel, if

21  that's what you mean.  Yes.

22  Q    Yes.  And I -- and what I'm referring to is,

23  logistically, in fact, actually preparing this.  It wasn't

24  prepared -- you didn't type it, it was actually prepared by

25  your counsel, correct?

1  A    You wouldn't want me to type anything.

2  Q    Okay.

3  A    No, I didn't type it.

4  Q    Okay.

5  A    But --

6  Q    You reviewed it thoroughly before you signed it.

7  Correct?

8  A    I did.

9  Q    Okay.  And you agree with all of the statements and

10  representations within the declaration?

11  A    I do.

12  Q    Okay.  I want to walk through a few of those with you.

13  Let's go all the way to the end of this declaration.

14        MR. GATES:  For the record, Your Honor, I'm on Page

15  32 of that document.  The conclusion, which is Section VI.

16  BY MR. GATES:

17  Q    In conclusion, it's my opinion the plan satisfies the

18  confirmation requirements of the Bankruptcy Code and thus

19  should be approved.

20        Did I read that accurately?

21  A    You did.

22  Q    Okay.  This declaration, a very similar declaration was

23  also prepared in connection with the solicitation version of

24  the plan that was filed on May 1, 2025, wasn't it?

25  A    I'll take your word for it.  I don't recall it, but it

1    wouldn't be a surprise.

2    Q    And, well, I'll just ask you, rather than the

3    declaration.  You made a similar statement and believed the

4    same, that the May 1 version, the solicitation version of the

5    plan, was also -- satisfies the confirmation requirements of

6    the Bankruptcy Code and thus should be approved.  Correct?

7    A    Yeah.  I wouldn't have filed it if I didn't think it was

8    --

9    Q    Okay.

10   A    -- confirmable.

11   Q    Earlier, you made a statement regarding the feasibility,

12   I believe you said, of the May 1 solicitation version.  It

13   wasn't feasible because M&T Bank would not have funded.  Was

14   that a close summary of your testimony?

15   A    Yeah.

16   Q    Okay.  But yet M&T actually voted in favor of the May 1st

17   solicitation version, correct?

18   A    They did.

19   Q    Okay.  They didn't file any objections as it relates to

20   the May 1st solicitation version of the plan, did they?

21   A    I'm not aware of one.

22   Q    In fact, they didn't even ask to have their deadline by

23   which they object extended to be able to object to that May

24   1st solicitation version, did they?

25   A    That part, you'd have to ask them.  I don't -- I don't

1    know.

2    Q    So the point I'm making is that plan was scheduled for

3    confirmation on June 13, 2025 initially, right?

4    A    I think so.

5    Q    Okay.  And the only thing that changed was on -- after

6    the balloting was done and Mr. Borisch voted not to opt out

7    and accepted that plan, the only thing that changed

8    thereafter was your effort to modify that plan.  Correct?

9    A    The only thing that changed thereafter, you mean after

10    the --

11    Q    After the voting was in.

12    A    After the voting was closed?  I think there may have been

13    other changes, but that was probably the principal change.

14    Q    That's fair.  We'll go with principal change.  And in

15    fact, we talked about that earlier.  The principal change was

16    taking the prohibition of Mr. Borisch and the Borisch Parties

17    expressly being eliminated as a Released Party and taking

18    that same language and putting it under the definition of

19    Consenting Creditors, correct?

20    A    Again, in isolation, what you said is -- is accurate.

21    But for context, I don't think that that would have flown at

22    an ultimate confirmation hearing, given that the funding

23    source, M&T, would not fund if in fact the effect of the plan

24    was as you -- as you read it, to give a release to Mr.

25    Borisch.  They would not have funded.  And so the plan would

1  have collapsed.  It never would have gone effective.

2  Q    Earlier, I think you testified that you brought this

3  issue up regarding the ambiguity or the inconsistency.  It

4  wasn't brought to your attention by M&T Bank.  Correct?

5  A    The issue didn't come from the Bank.  The issue came up

6  after the filings on the -- the balloting occurred.  And I

7  talked to my counsel.

8  Q    In fact, the balloting deadline was midnight -- I believe

9  midnight on June 5, 2025.  Correct?

10  A    I -- I'll take your word for it.

11  Q    Okay.

12  A    I'm sure that's within a day or so.

13  Q    The record -- the record is what it is, but does that

14  sound about right?

15  A    Sounds right.

16  Q    Okay.  In fact, your counsel was actually waiting to see

17  if Mr. Borisch was going to opt out and hoping he would opt

18  out of that May 1 solicitation plan, correct?

19  A    You'd have to ask Mr. Kaufman what he was hoping for.

20  Q    Are you aware of any reason why he would be waiting for

21  that?

22  A    No.

23  Q    Earlier, you were in the courtroom and heard the

24  testimony of Mr. Paul from Omni, correct?

25  A    I heard it, yes.

1    Q    I recall -- don't let me put words in your mouth -- but I

2    recall Mr. Paul indicating that he informed Mr. Kaufman, he

3    thought it would be the next day, that would be his standard

4    operating procedure, correct?

5    A    I think that's what he said, yes.

6    Q    Words to that effect?

7    A    Yeah.

8    Q    But then he also thought that it could have been that

9    night.  Correct?

10   A    He -- that's what he said.

11   Q    Okay.  I want to draw your attention to Exhibit 22.

12   Borisch Exhibit 22.  So this is an email communication from

13   Mr. Kaufman to the Unsecured Creditor Committee counsel.

14   Correct?

15   A    Yeah.  Yes.

16   Q    Yep.  And the subject is, Tommy's Solicitation Update.

17   Correct?

18   A    I'm with -- yes.

19   Q    Okay.  And the time on this is most interesting to me.

20   This is very early in the morning on June 6, 2025.  Is that

21   accurate?

22   A    Yeah.  I'm going to go with you that that's a -- 1:00 in

23   the morning, it looks like, but I'm not sure.

24   Q    Okay.  So this is Mr. Kaufman's communication to Keith

25   and Dylan:  Here's the provisional ballot tally.  Note Class

Andrews - Cross                                     148

1  6.  I'll call in a bit to discuss.

2       I don't know if that's -- if that's -- if that's military

3  time, perhaps that's afternoon, but the point I'm making here

4  is, very early in the day, Mr. Kaufman is communicating to

5  the Unsecured Creditors' Committee, here's the results, note

6  Class 6.

7       Class 6 happens to be the class that all the Borisch

8  Parties are in.  Correct?

9  A    That's right.

10  Q    All right.

11  A    And, I'll call in a bit to discuss.

12       Do you know what was most intriguing to you or Mr.

13  Kaufman regarding the Class 6 in the ballot tally?

14  A    Well, I don't know that I knew it as of that particular

15  date, but I think whatever point in time that I became aware

16  that he had voted for, I thought it was a little bit odd

17  because it didn't make sense to me.

18  Q    Okay.  If I go down in that chain, for what it's worth,

19  the next -- same exhibit, but now I'm on Trustee Page 618, do

20  you see the email June 5, 2025, 10:28 p.m., from Mr. Paul to

21  Mr. Kaufman:  Attaching the draft tabulation reports for

22  review?  Do you see that?

23  A    I do.

24  Q    Okay.  So it looks to me, would you agree, that actually

25  Mr. Paul in this case, unlike his standard operating

Andrews - Cross                              149

1  procedures, actually told -- made it a point of letting Mr.

2  Kaufman know the night of the balloting what the results

3  were.  Correct?

4  A   It looks like it.

5  Q   All right.  And then I'll go, very similar, Exhibit 24,

6  Borisch Exhibit 24.  Again, Aaron Kaufman.  This one goes to

7  counsel for M&T Bank.  Correct?

8  A   Yes.

9  Q   All right.  And "cc" to you and your colleagues?

10 A   Yes.

11 Q   Again, Tommy's Solicitation Update.  June 6, 2025.  And

12 this one appears to be one minute earlier.  Correct?  12:57?

13 A   It looks that way.

14 Q   So, again, similar email.  This one goes to Chrissey and

15 Toby, counsel for M&T Bank:  Here is the provisional ballot

16 tally.  Note Class 6.  I'll call Chrissey in a bit to

17 discuss.

18     Going down to Trustee Bates Stamp 626, again, Mr. Paul's

19 communication regarding these ballots.  Again, 10:28 in

20 evening on June 5 to Mr. Kaufman, correct?

21 A   Yes.

22 Q   All right.  So is it fair to say that the Trustee brought

23 this issue to M&T and the Unsecured Creditors' Committee

24 attention and not the other way around?

25 A   Um, --

1  Q    That is fair to say, isn't it?

2  A    It -- I don't know the answer to that because I don't

3  know who talked to who when.  But assuming that these are the

4  first communications between the parties, that's probably

5  right.

6  Q    If there had been earlier communication, it should have

7  been provided in connection with our discovery requests,

8  right?

9  A    In the absence that it was a phone call, yes.

10 Q    Okay.  So, at the risk of asking you an open question,

11 Mr. Andrews, if you have -- if you have the ballots in, no

12 objections from M&T Bank, you have a confirmable plan with

13 the balloting on June 5, why would you think that M&T would

14 not be obligated to fund the plan after it was confirmed on

15 June 13?

16 A    Well, I think M&T, even if the plan were confirmed, let's

17 go with your hypothetical for a minute, and then you take the

18 position that you're released under the plan, M&T would take

19 the position that they're not funding and the plan would

20 never go effective.  So almost no matter how you get there,

21 you wind up in the same spot, where you have something that's

22 sort of dead on arrival.

23 Q    So would you agree with me you would have had a dispute

24 with M&T at that point?  Would you not have had the legal

25 ability to tell M&T they're obligated to fund because they

Andrews - Cross                          151

1   voted in favor of a plan?

2   A    I -- I really would not think that that would work.  I

3   mean, quite candidly, they would take the position that this

4   is not what they bargained for and it would be, to me, a

5   position that I wouldn't want to take as the Trustee, try to

6   hoodwink people.

7   Q    Let me go back.  I got off of your declaration.  Let's go

8   back to your declaration, Borisch Exhibit 15.  I started at

9   the end.  I want to go back to the top now.

10           MS. ROSS:  Your Honor?  I'm sorry to interrupt.

11  This is Judith Ross on the phone.

12           THE COURT:  Yes, ma'am.

13           MS. ROSS:  We are having -- I'm having a great deal

14  of difficulty hearing Mr. Andrews and the speaker.  Every

15  time he steps away from the microphone, it's very hard to

16  hear.  And I apologize for interrupting, --

17           THE COURT:  Okay.  No, --

18           MS. ROSS:  -- but I would ask that they speak up.

19           THE COURT:  Certainly.  Thank you for letting us

20  know, and we will ask our folks to make sure and drag those

21  microphones a little closer to themselves.

22           MR. GATES:  Thank you very much.

23           MS. ROSS:  Thank you, Your Honor.  I'm sorry to

24  interrupt.

25           THE COURT:  Not a problem.  I appreciate you letting

Andrews - Cross                              152

1  us know, because there's no way that we would know.

2  BY MR. GATES:

3  Q   So I want to go to Page 3 of your declaration, and go to

4  the introduction.  And I want to focus on that first couple

5  of sentences.  You state there, do you not, that the plan is

6  an embodiment of significant efforts of the Trustee, M&T

7  Bank, the Committee, and key stakeholders of the Debtors'

8  estates through the Chapter 11 cases?

9      The key stakeholders of the Debtors' estates would

10  include Mr. Borisch and the Borisch Parties, would it not?

11  A   It would.

12  Q   And yet there wasn't any significant effort to assist

13  with the pursuit of a plan on behalf of the Borisch Parties

14  because we were never invited to comment on the plan before

15  it was filed.  Correct?

16  A   That's -- you're making two leaps ahead, I think.  Number

17  one, there were efforts to try to see if there was a way to

18  come to some agreement that could be embodied in a plan

19  through a settlement with Mr. Borisch and the Bank.

20      And number two, the key stakeholders statement in that

21  sentence doesn't mean every key stakeholder in the case.  It

22  means the key stakeholders that we were able to have fruitful

23  communications with.

24  Q   Is it your testimony, after all of the settlement

25  negotiation -- the settlement discussions that we put into

Andrews - Cross                           153

1   the record, is it your testimony that Mr. Borisch and the

2   Borisch Parties were not key stakeholders, Mr. Andrews?

3   A    No.   It's -- that's not what I just said.   I said that

4   not every key stakeholder was involved in the actual crafting

5   of the plan.

6       And, second, what I said was I reject the premise that

7   there was no effort to have conversations with the Borisch

8   Parties.   In fact, we've talked about several of them.

9   Q    So, the second sentence of the intro -- of that opening

10  couple sentences there:   I believe the confirmation of the

11  plan is in the best interests of the Debtors' estates and

12  their stakeholders.

13      Again, Mr. Borisch and the Borisch Parties are

14  stakeholders, correct?

15  A    They are.

16  Q    And in this declaration, when you say confirmation of the

17  plan, you're referring to the plan as modified, correct?

18  A    Yes.

19  Q    Which eliminates Mr. Borisch from being a -- and the

20  Borisch Parties from being a Consenting Creditor.   Correct?

21  A    Yes.   In this version, that is correct.

22  Q    Okay.   So it's clearly not in the Borisch Parties and Mr.

23  Borisch's best interest to have the plan as modified

24  confirmed, is it?

25  A    The sentence says, in the best interests of the Debtors'

 1  estates.  That's not a Borisch Party.  That is the estates.

 2  And their stakeholders in the collective.  It doesn't mean

 3  each stakeholder benefits.

 4  Q   So, --

 5  A   So it's not inconsistent with what you're -- with what

 6  we've been saying.

 7  Q   So, again, I'm just trying to understand, yes or no, are

 8  the Borisch Parties, Mr. Borisch in particular, is he a key

 9  stakeholder of the Debtors' estates?

10  A   He is a stakeholder in the Debtors' estates.

11  Q   Okay.

12  A   Yes.

13  Q   Let me have you go, the same page, we'll go down a few

14  lines.  Are you able to see my cursor?

15  A   Yes.  I can.

16  Q   Okay.  So, that's a lot easier than me trying to count

17  lines.

18  A   Yep.

19  Q   So, with my cursor, I'm going to start right there:

20  While the plan does not pay all creditors in full, I believe

21  the plan in general is in the best interests of creditors and

22  represents a fair and equitable resolution of the creditors'

23  claims that far exceeds what the creditors other than M&T

24  Bank would receive through a Chapter 7 liquidation.

25      Did I read that accurately?

1   A    You did.

2   Q    The same statement was also true with respect to the May

3   1st solicitation version of the plan, correct?

4   A    Well, it's hard for me to answer your question because,

5   as you construe the first plan, if Mr. Borisch got a complete

6   release, then, no, the plan would not have been as

7   beneficial.  Without the complete release, the plan would

8   have been beneficial.  So it sort of depends on how you read

9   that first plan.

10  Q    Again, I think we've established this, but I want to just

11  confirm again.  The principal purpose in modifying the May 1

12  solicitation version of the plan to the plan as modified that

13  you're now the proponent of, the principal modification was

14  eliminating Mr. Borisch and the Borisch Parties from the

15  definition of Consenting Creditors, correct?

16  A    It was to remove any ambiguity, if you want to use that

17  word, or it was to remove any sort of misconception, if you

18  want to use another word, related to what the Borisch Parties

19  might have assumed based upon their read of one segment of

20  the plan that had been proposed that you call the

21  solicitation version.

22  Q    I understand your explanation of it.  My question --

23  maybe it was a bad question.  I'm focusing on simply

24  logistically what happened from the solicitation version of

25  the plan to the plan as modified.  We talked about the only

Andrews - Cross                         156

1    material change was ensuring that the Borisch Parties and Mr.

2    Borisch could not be a Consenting Creditor.  Correct?

3    A    I -- I'm going to reject necessarily the "material" word

4    but say that --

5              MR. GATES:  Your Honor, that was a straightforward

6    question.

7              THE WITNESS:  -- there is only one change, and that

8    change --

9              MR. GATES:  Can I object and have his --

10             THE WITNESS:  -- sort of speaks for itself.

11             THE COURT:  You can object, and I'll overrule the

12   objection.  He can respond by explaining what he meant.

13             THE WITNESS:  So, --

14   BY MR. GATES:

15   Q    Sorry to cut you off.  Go ahead.

16   A    No, I -- the -- all I was saying was that -- you know,

17   we'll let it pass.  Let's go on to the next one.

18   Q    All right.  Let's go to Page 4 of your declaration.

19   Specifically, --

20             MR. GATES:  And Your Honor, you're not able to see

21   my cursor when I set it somewhere, are you?  Or are you able

22   to see the cursor?

23             THE COURT:  I focus on hard copies because that's

24   the way I function.

25             MR. GATES:  Okay.

1        THE COURT:  So if you tell me which paragraph you're

2  on, that's all I need.

3        MR. GATES:  Okay.  So I'm on Paragraph 6, Your

4  Honor, and I'll still explain for the record that I'm

5  starting one, two, three, four lines down, where it begins,

6  As discussed below.

7        THE COURT:  Perfect.

8        MR. GATES:  Thank you.

9  BY MR. GATES:

10 Q    So, Mr. Andrews, I'm going to start where my cursor is

11 at.  You see that, right?

12 A    I do.

13 Q    You state in this sentence, As discussed below, the plan

14 is the product of extensive arm's length negotiations, which

15 included direct discussions with Matthew Borisch and his

16 representatives in advance of filing the initial plan.

17      Here again, you must be talking about the settlement

18 discussions.  You're certainly not talking about talking to

19 him or his counsel about the plan and negotiating the plan,

20 correct?

21 A    There was no discussion of the mechanics or the --

22 Q    Okay.

23 A    -- or the verbiage in the plan.  The discussion was about

24 the concept of a settlement.  So if that's what you're

25 asking, it's correct.

1    Q    I'm going to go down to the next sentence that starts

2    with, Before filing the plan, where I put my cursor.  It

3    states, Before filing the plan, I communicated with Mr.

4    Borisch and his representatives several times, all in an

5    effort to engage Mr. Borisch in settlement discussions

6    and potential mediation with M&T Bank.

7         That's what you meant by engaging him with settlement

8    discussions with M&T Bank, correct?

9    A    Yes.

10   Q    All right.  And then you go on to say:  Despite my best

11   efforts to bring Mr. Borisch to the table, Mr. Borisch

12   declined to meet M&T Bank's preconditions for a mediation or

13   a settlement conference.

14        So, earlier in your direct testimony, I thought you were

15   somewhat agnostic in terms of saying that both parties sort

16   of made best efforts, but in your declaration, the way I read

17   this, you correct me if I'm wrong, you're sort of pinning the

18   failure of getting of a settlement on Mr. Borisch for not

19   bringing -- being able to bring him back to the table.  Isn't

20   that accurate?

21   A    I'm rereading where you are.

22   Q    Yeah.  I'll put the cursor back.  Before filing the plan.

23   A    (sotto voce)  Despite my best efforts to bring Mr.

24   Borisch --

25        I'm saying that the precondition, which was a financial

Andrews - Cross                              159

1   disclosure coupled with an offer, was the starting point for

2   the Lender.  And Mr. Borisch wouldn't meet either of those

3   preconditions.  And so, from that point of view, yes, I guess

4   I'm blaming Mr. Borisch for that.

5   Q    And let's talk about those preconditions a little bit.

6   This is the point where I made a point that I was going to

7   dig into those settlement discussions because I believe that

8   door has been opened.  So, when you talked about those

9   preconditions, you said a disclosure, a financial disclosure.

10  Is that accurate?

11  A    Correct.

12  Q    And the second component of that settlement process was a

13  -- not just an offer, but a substantial offer to M&T Bank.

14  Correct?

15  A    There were discussions from M&T Bank that they wanted a

16  substantial opening offer because they felt like there would

17  be -- in their view, there was no way that it was going to be

18  some small offer that they would view as being in good faith

19  or even the start of a negotiation.  And so that was their

20  precondition to have a mediation.

21  Q    You never spoke to M&T Bank about evaluating Mr.

22  Borisch's defenses to their guaranty claims, did you?

23  A    I talked generally that Mr. Borisch had said that he had

24  offsets and counterclaims, and they were aware, I suspect, of

25  some of those offsets and counterclaims from the litigation.

1    I didn't go through numbers, if that's what you're asking.

2    But I told them that I thought that Mr. Borisch would assert

3    offsets and counterclaims to their guaranty claim.

4    Q    So that was sort of the point of my question, is you

5    didn't have any discussions with them about valuing those

6    defenses, offsets, and counterclaims?

7    A    I -- my view was that the Bank was going to be able to

8    internally evaluate that and that the Borisch Parties would

9    be able to assert it and that the best I was going to do was

10   try to get them into the same room to have that conversation.

11   Q    The reason that we didn't get in the same room -- correct

12   me if I'm wrong, though, Mr. Andrews -- was because the Bank

13   wanted that substantial offer upfront.  Correct?

14   A    They -- they did want an offer upfront.  And they wanted

15   a financial disclosure.  And I urged Mr. Borisch to consider

16   at least the financial disclosure, because if it turned out

17   that his financial disclosure undercut what the Bank thought

18   that they could get in litigation, that might be at least a

19   starting point.  But that was one man's view.  You know, I

20   don't know what the Bank would have done and I don't know

21   what Mr. Borisch would have done.

22   Q    M&T's conditions were clear:  a substantial --

23   substantial initial proposal and disclosures?

24   A    I think so.

25   Q    So, Mr. Andrews, if we had followed your lead and just

1   given disclosures with no substantial offer, that didn't

2   satisfy their demands, did it?

3   A    Well, I don't know what it would or wouldn't have done.

4   People like to not always give me their bottom line.  And so

5   I'd be speculating.

6   Q    Gotcha.  Incidentally, --

7        (Pause.)

8   Q    Mr. Andrews, we touched on this somewhat, but I want to

9   clarify.  It's fairly clear, now particularly we have the

10  stipulation in place on the -- on Mr. Borisch's falling

11  within the definition and the Borisch Parties falling within

12  the definition of the Consenting Creditors in the May 1

13  solicitation version of the plan, it's fairly clear that, as

14  a Consenting Creditor, Mr. Borisch had an option of opting

15  out or not opting out.  Correct?

16  A    Again, assuming all that in isolation and not in the

17  context of the -- what I've said before, I'm not going to

18  repeat it, it would be fairly clear, again, restricted to the

19  way that we view all this in isolation.

20  Q    The express language would have allowed him to opt out,

21  correct?

22  A    The express language would have made it -- it would have

23  given him an argument that he would have then been able to

24  say that, well, I've given this release, I get a release back

25  and a walkaway.

1      The context makes it clear that that would have been a

2   nonevent.  The plan would never have either been confirmed or

3   gone effective.  I don't --

4   Q   I'm making a little bit of a subtle point here, and I'll

5   try to make it again and we'll just move on.  I'm literally

6   talking about the express language of the definition of

7   "Consenting Creditor."

8          THE COURT:  So I can help on this front, because if

9   somebody opts out, they're not a Consenting Creditor.  So you

10  might want to rephrase the question.

11         MR. GATES:  All right.

12  BY MR. GATES:

13  Q   Let me go -- Mr. Borisch had an option of opting out or

14  not opting out of that May 1 solicitation version of the

15  plan.  Correct?

16  A   Under your --

17  Q   Of the express language.

18  A   Yes.  Under the strict language reading, I'll call it,

19  yes, it would have -- that would appear to be the case.

20  Q   Okay.

21  A   But it's counter-factual.

22  Q   And if he had, for the Court's point, if he had not opted

23  out, then he would have fallen within the definition of

24  Consenting Creditor?

25  A   It -- I -- I understand that, in isolation, that would be

1    his argument.

2    Q    Didn't we just stipulate to that point?

3    A    I -- again, in isolation, --

4              THE COURT:  We did.  Let's move on.

5              THE WITNESS:  Yeah.

6              MR. GATES:  Okay.

7              THE WITNESS:  Yeah.

8    BY MR. GATES:

9    Q    I'm going to move to -- down just a little bit.  I'm just

10   going to Subpart I.  Section I, if you will, the opening

11   statement:  The plan satisfies the requirements for -- or, of

12   confirmation.

13        Did I read that accurately?

14   A    You did.

15   Q    All right.  Again, the May 1 solicitation version

16   satisfied the requirements of confirmation as well, did it

17   not?

18   A    Yes, uh, --

19   Q    Okay.  Let's go on to --

20             THE COURT:  So let me ask, because it's a little bit

21   of an elephant in the room.  Did you actually execute a

22   declaration in relation to the pre-modified plan?  Was that

23   produced or something?  Or was there just a document that was

24   prepared?

25             THE WITNESS:  I don't remember, to be honest, --

Andrews - Cross                    164

1          THE COURT:  Okay.

2          THE WITNESS:  -- at what point in time the

3    declaration -- I reviewed multiple drafts, added comments of

4    my own, made changes.  And the first date that one was filed

5    would have been whatever is recorded in the record.  I

6    thought that was in July, but --

7          THE COURT:  All right.

8          THE WITNESS:  -- I could be -- I could be mistaken.

9          MR. GATES:  Your Honor, there was an earlier

10   version.  It's not in the listed exhibits.  I could bring it

11   in for rebuttal purposes.  But I think Mr. Andrews has

12   already answered the questions that I've asked him, so I'm

13   not sure I need to try to rebut it.

14         THE COURT:  I hear you, but I've never actually

15   heard the question that he actually executed the declaration.

16   I've heard questions about the declaration, but I've never

17   heard that he actually signed it.

18      (Pause.)

19         MR. GATES:  All right.  Let me move on.  We'll try

20   to answer that question, Judge.

21   BY MR. GATES:

22   Q   I'm going to go to Page 5 of your declaration.  Again,

23   still on Exhibit 15.  I'm going to Paragraph 10.  So, at

24   Paragraph 10, Mr. Andrews, you've identified the relevant

25   classes for this Chapter 11 plan, correct?

1    A    Yes.

2    Q    All right.  The Borisch -- Mr. Borisch and the Borisch

3    Parties are within Class 6, the contribution claims, correct?

4    A    Yes.

5    Q    And general unsecured claims at Class 5.  Do you know who

6    is in the Class 5 claimants?

7    A    Oh, there's vendor claims, there's landlord claims,

8    there's other kinds of claims.

9    Q    Are you aware that there's a Borisch Party in Class 5?

10   A    Wouldn't surprise me.

11   Q    All right.  So let me go, if I can, away from Exhibit 15.

12   We're going to go to 14 real quick.  This is Borisch Exhibit

13   14, and this is Document 1001 filed on July 1, 2025.  Second

14   Amended Declaration of Mr. Paul at Omni Regarding the

15   Solicitation of Votes and Tabulation of Ballots.  Do you see

16   that?

17   A    I do.

18   Q    All right.  I'm going to go to Page 13 of this document.

19           MR. GATES:  And I call this Page 13, Judge, it's PDF

20   Page 13.  For your reference, it's Page 12 of 16 of the hard

21   copy filed at Document 1001.

22           THE COURT:  All right.  Thank you.

23           MR. GATES:  Yep.

24   BY MR. GATES:

25   Q    Do you see the page I pulled up?  Again, 12 of 16 of the

Andrews - Cross                                    166

1  document filed at Document 1001, Mr. Andrews.  What is this

2  -- what is this page?

3  A    It looks like it's general unsecured claims ballot

4  results.

5  Q    Does this page identify the members of the Class 5

6  general unsecured claims?

7  A    Those that voted.  Yeah, I think that's right.

8  Q    Okay.  And so below the description of Class 5 there is a

9  list of creditors in here, correct?  Do you see that?

10  A    I do.

11  Q    All right.  Do you see the last creditor identified on

12  the list of creditors?

13  A    I do.

14  Q    Our Echo, LLC.  Do you know who Our Echo, LLC is?

15  A    No idea.

16  Q    What?

17  A    No idea.

18  Q    I'm sorry, I didn't hear you.

19  A    Yeah.

20  Q    Do you have any reason to dispute or any ability to

21  dispute that Our Echo, LLC is an LLC owned by Jonathan

22  Borisch?

23  A    I don't know anything about it.  I mean, --

24  Q    Okay.

25  A    Yeah.

1    Q    If it would -- if it would be within the definition of

2    Borisch Parties, it should be in Class 6, correct?

3    A    Uh, --

4    Q    That was the intent?

5    A    -- yeah.  As far as I know, yes.  I don't know anything

6    about that claim.

7    Q    Okay.  Let's go back to your declaration.  Again, Borisch

8    Exhibit 15.  I'm going to go back to Page 5.  Specifically,

9    Paragraph 11.

10            MR. GATES:  I'm going to start about three lines

11    down in that Paragraph 11, Your Honor.

12            THE COURT:  So, I'm sorry, tell me where you're at.

13            MR. GATES:  Oh, I'm sorry.  We're on -- back on

14    Borisch Exhibit 15, the declaration, Page 5, Paragraph 11.

15            THE COURT:  Thank you.

16            MR. GATES:  And I'm three lines down in that

17    paragraph.

18    BY MR. GATES:

19    Q    See where my cursor is at, Mr. Andrews?

20    A    Yes.

21    Q    You state here:  I believe that valid business, legal,

22    and factual reasons justify the separate classification of

23    particular claims or interests into the classes created under

24    the plan, and no unfair discrimination exists between or

25    among holders of claims and interests.

Andrews - Cross                           168

1        Do you see that?

2    A    Yes.

3    Q    So if Our Echo, LLC is a Jonathan Borisch-owned entity,

4    that statement would not be accurate, is it?

5    A    I'm sorry, I don't -- I don't see the connection.

6    Q    Well, you have Walloon Lake Holdings, LLC in the Class 6

7    creditors, right?

8    A    If you say so.

9    Q    Okay.

10   A    I really would have to go back and look.

11   Q    You know Walloon Lake Holdings to be an entity owned by

12   Jonathan Borisch, right?

13   A    Yes.  Uh-huh.

14   Q    All right.  If you have one entity owned by Jonathan

15   Borisch in Class 6 and another entity owned by Jonathan

16   Borisch in Class 5, that statement you've made here regarding

17   --

18   A    Well, --

19   Q    -- that there are business, legal, and factual reasons to

20   justify the separation and classification of particular

21   claims or interests into classes created under the plan, and

22   no unfair discrimination exists between or among those

23   holders of claims and interests, that would be an inaccurate

24   statement if they're both entities owned by Jonathan Borisch,

25   correct?

1  A    Well, no, because it depends upon the nature of the type

2  of claim.  Right?  It's not just who the owner of the claim

3  is.  Is, is it generally unsecured?  Is it secured?  Is it an

4  executory contract?  What type of claim is it?

5      And then if Our Echo is owned by Jonathan Borisch solely

6  versus it's owned by some combination of people.

7      These are, you know, I just, I don't know.  I'm not

8  familiar with the Our Echo entity.

9  Q    Okay.  And let me jump to Exhibit 6 real quick, Borisch

10 Exhibit 6.  Again, this is the -- what we refer to as the

11 solicitation version, marked on the document, May 1, 2025, of

12 the plan.  Do you see that?

13 A    Yes.

14 Q    All right.  I want to go to Paragraph 13 of that

15 document.  At Paragraph 13, there's a --

16          THE COURT:  So, --

17          MR. GATES:  Oh, sorry.

18          THE COURT:  -- Section 1.A.13?

19          MR. GATES:  It is -- yes, Your Honor, Section I, I

20 believe.  Yeah.  Article I.A., Subparagraph 13.  And it's on

21 Page 6 of 35 of that document.

22          THE COURT:  Understood.  I just wanted to make sure

23 we were --

24          MR. GATES:  I gotcha.

25          THE COURT:  -- clear.

Andrews - Cross                    170

1    BY MR. GATES:

2    Q    Paragraph 13 is a description or a definition of what

3    "Borisch Parties" means, is it not?

4    A    Yes.

5    Q    Okay.  So I want to ask some questions about everybody in

6    this Borisch Party.  So we know who Matthew Borisch is,

7    correct?  Do you know who Kara Borisch is?

8    A    No.

9    Q    You know who Jonathan Borisch is, right?

10   A    Yes.

11   Q    Do you know who MKB Holdings is?

12   A    Yes.

13   Q    What is MKB Holdings?

14   A    It was a business that was used in part at the initial

15   operation of Tommy's.  And so it has various interests that

16   are entwined with these Debtors.  And are Borisch-controlled

17   or owned entities.

18   Q    Do you know as you sit here today whether MKB Holdings is

19   owned by Matthew Borisch?

20   A    Well, I don't know sitting here today because it might

21   have changed, but it -- I had been informed earlier that it

22   was.

23   Q    Certainly.  When you were installed as Trustee, you were

24   informed that that MKB Holdings, LLC was owned by Matthew

25   Borisch, correct?

1    A    Correct.

2    Q    All right.  And then the Matthew Borisch Trust, the Kara

3    Borisch Trust, those are the trusts of the two people we

4    previously mentioned.

5        Let's talk about Walloon Lake Facilities, LLC.  Do you

6    know anything about Walloon Lake Facilities, LLC?

7    A    All the Walloon Lake entities, and I would hesitate to

8    say that I know a lot about them, but they were owned by

9    Matthew's father, Jonathan.

10   Q    Okay.  I want to specifically drill down on the ones that

11   are actually owned by Matthew's father.  Let's talk about

12   Walloon Lake Holdings, LLC, different than Facilities.

13   Walloon Lake Holdings, LLC, you have no reason to doubt that

14   that's owned by Jonathan Borisch, correct?

15   A    Not -- again, I haven't looked at it recently, but that

16   was my understanding at the outset.

17   Q    All right.  JLB Restaurant Holdings, LLC.  No reason to

18   doubt that that's owned by Jonathan Borisch, correct?

19   A    Not -- again, I haven't looked at it recently, but that

20   was what I was told at the outset.

21   Q    Let's skip to --

22   A    And I'm going to say that with respect to just about all

23   of these.  Because the way that they came into the plan and

24   were defined, the way that they were defined was a

25   combination of company records, counsel review, and then

1    things we verified.  So it wasn't all verified by me, but it

2    was verified.

3    Q    Hotel Walloon.  Any reason to doubt that that's owned by

4    Jonathan Borisch?

5    A    I -- same answer.

6    Q    Okay.  And then JLB Property Holdings, LLC.  Any doubt

7    that's owned by Jonathan Borisch?

8    A    I -- same answer.  That was what I was informed.  It may

9    be different or may have changed.

10   Q    And then, lastly, let's talk about Legacy Water Sports

11   and Marina.  You have some familiarity with that entity, do

12   you not?

13   A    I believe that entity was a purchaser of certain assets

14   out of the Tommy's cases.

15   Q    And you know that one to be owned by Jonathan Borisch,

16   correct?

17   A    Yes.

18   Q    All right.  So Mr. Borisch has a guaranty obligation, a

19   written express guaranty obligation, part of the loan

20   documentation that was executed.  Mr. Borisch, there's a

21   claim pending in Kent County, Michigan that Mr. Borisch is

22   responsible under that written guaranty document, correct?

23   A    Matt Borisch, --

24   Q    Yeah, I'm sorry, Matt Borisch.

25   A    -- you're talking about now?

Andrews - Cross                                          173

1   Q    Thank you.

2   A    Yeah, I'm just trying to be careful with the names.

3   Q    Matt Borisch.

4   A    Yes.

5   Q    Right.  Jonathan Borisch doesn't have any obligation, to

6   your knowledge, under any guaranty to M&T Bank, does he?

7   A    I don't.  I don't know.

8   Q    Well, do you know of anything that would suggest that Mr.

9   Borisch, Jonathan Borisch, has a guaranty obligation?

10  A    I don't know whether he guaranteed or pledged property,

11  but there is some relationship between M&T and Jonathan

12  Borisch, I thought.  But I could be mistaken.

13  Q    Okay.  Wouldn't that affect whether or not Jonathan

14  Borisch and the entities solely owned by Jonathan Borisch

15  should be in these Class 6 creditors?

16  A    It might.  Um, --

17       (Pause.)

18       MR. GATES:  I'm sorry for jumping around, Judge, but

19  I'm going to go back to Exhibit 15 again.  And --

20       MR. KAUFMAN:  Your Honor, we've been going about an

21  hour and a half.  At an appropriate time, could we take a

22  quick recess, five minutes?

23       THE COURT:  Yes.

24       MR. GATES:  I have no objection to doing it now,

25  Judge.

1          THE COURT:  Is now a good stopping point?

2          MR. GATES:  That's fine.

3          THE COURT:  All right.  So we'll do that.  It's just

4    before 2:40.  When I say five, it turns into seven, so why

5    don't we just say 2:50.  I kind of hate to round up, but

6    we'll do 2:50, and that way everybody stretch because we'll

7    go for a good long time after that.  So the Court will be in

8    recess until 2:50.

9          THE CLERK:  All rise.

10        (A recess ensued from 2:39 p.m. until 2:50 p.m.)

11         THE CLERK:  All rise.

12         THE COURT:  All right.  Please be seated.  We're

13   back on the record in Case 24-90000.  And as per usual, Mr.

14   Andrews, you remain under oath.

15      Mr. Gates, when you're ready.

16         MR. GATES:  Thank you very much, Judge.

17                    CROSS-EXAMINATION, RESUMED

18   BY MR. GATES:

19   Q   Mr. Andrews, one more question, if I can, regarding I

20   asked you earlier about the enforceability, if you will, of

21   the May 1 solicitation version of the plan, given the fact

22   that M&T approved it, did not object, didn't ask to extend

23   their deadline for balloting, et cetera.  I indicated, I said

24   I suggest that you could probably enforce that if they

25   decided not to fund, and you were not sure about that.  I

1    think you indicated that that would not be something you

2    would do.  Are you aware if the -- are you aware --

3                THE COURT:  So, I'm just going to -- sorry.

4                MR. GATES:  I'm sorry, Judge.  Bad question.

5                THE COURT:  Yes, I mean, --

6                MR. GATES:  It was a bad question.

7                THE COURT:  -- I think that you're misstating all

8    kinds of testimony, but if you want to try again.

9                MR. GATES:  Yeah, I will.  I'll just make it quick.

10   BY MR. GATES:

11   Q    There's no provision in the May 1 solicitation version of

12   the plan that would allow M&T to change its mind on funding

13   after approving the plan, correct?

14   A    There's no provision that addresses their funding.  There

15   are provisions that address whether the plan can go effective

16   and conditions precedent.

17   Q    I said we would go back to your declaration.  So we're

18   back on your declaration, Exhibit 15.

19   A    Just before you start, see if you can make -- the screen

20   that's up right now for me is the same as the screen that's

21   --

22   Q    Oh.

23   A    -- up over here.

24   Q    It's coming.

25   A    Oh, okay.  All right.  I just wanted to make sure we were

1    -- all right.

2    Q    That's all right.

3    A    Perfect.  It's on.  Thank you.

4    Q    Thank you for pointing that out.  No worries.

5              THE WITNESS:  And before we go any other further,

6    Ms. Ross, can you hear us?  If you're still on.

7              MS. ROSS:  I can hear you.  Thank you.

8              THE WITNESS:  All right.

9              MR. GATES:  I'm going to try to stay in front of

10   this mic.  My apologies.

11             THE WITNESS:  Yeah.

12   BY MR. GATES:

13   Q    So going to Page 6 of the declaration, specifically

14   Paragraph 13.  In Paragraph 13, Mr. Andrews, you make a

15   declaration that, quote:  Another separate classification is

16   the Contribution Claims Class 6, which are defined as -- and

17   you go on to define the classification for Contribution

18   Claims.  Are you aware of that?  Do you see that?

19   A    Yes.  I see that, yes.

20   Q    Okay.  I won't read the description, but you close that

21   paragraph with:  I elected to place these creditors into

22   their own class because Section 509 of the Bankruptcy Code

23   contemplates slightly different treatment for creditors

24   holding such claims.

25        You're now not sure whether or not the totality of Class

Andrews - Cross                              177

1   6 belongs in Class 6, are you?  In light of our last

2   question?

3   A    I'm sorry, I don't really mean to nitpick, but are you

4   talking about the Class 6 ballot list that you showed me as

5   being the group that's in Class 6 for purposes of the

6   question you just asked me, --

7   Q    Correct.

8   A    -- or are you asking me something else?

9   A    Yes.  No, just you're not aware -- as you sit here today,

10  you don't know whether all of those individuals now fall into

11  this description of Class 6 or not, do you?

12  A    No.  They would have been classified and would have had

13  an opportunity to object if they didn't like their

14  classification.  But, no.

15  Q    But Mr. Andrews, whose obligation is it to properly

16  classify creditors?  Is it our obligation or is it the

17  Trustee's obligation?

18  A    The Debtor/Trustee --

19  Q    Thank you.

20  A    -- puts the classification out.  And then if someone

21  doesn't like it or disagrees, they have a right to object.

22  Q    We've objected, have we not, Mr. Borisch and the Borisch

23  Parties?

24  A    I haven't looked at the papers in connection with the

25  classification issue.

1   Q    You're aware that we're here today on an objection to

2   your modified plan, correct?

3   A    To the plan, yes.

4   Q    Right.  We didn't object to the solicitation version of

5   the plan, though, correct?

6   A    No, I don't think you did.

7   Q    Okay.

8          THE COURT:  So, just for my own benefit, because now

9   I'm completely lost:  Are you aware of any dispute about

10  whether those who cast a ballot with a Class 6 ballot is

11  taking issue as to whether or not their claim is a claim that

12  falls within the characterization of what Class 6

13  encompasses?

14         THE WITNESS:  No.  We haven't, that I'm aware of --

15  and probably it's a better question for Mr. Kaufman -- but

16  that I'm aware of, we haven't drawn any objections with

17  respect to classification of any of the claims or the ballots

18  that were sent to any of the claimants.  Frankly, until just

19  a few minutes ago, I wasn't really aware there was any issue

20  with that.

21  BY MR. GATES:

22  Q    I'm going to move to Page 11 of your declaration.

23  Specifically, Paragraph 27.  You see my cursor there?

24  A    I do.

25  Q    So here again, Paragraph 27, second sentence down, I

1  believe each of these provisions, and this is regarding

2  Article X, I believe each of these provisions is appropriate

3  because, among other things, each (a) is the product of arm's

4  length negotiation among stakeholders, including the

5  Committee and M&T bank.

6      We've already talked about the fact that Mr. Borisch and

7  the Borisch Parties as stakeholders had no ability to

8  negotiate arm's length regarding the plan, correct?  Only the

9  settlement with M&T?

10 A    Well, I'm sorry, I'm going to disagree with the front

11 part of that question, because even after the plan and

12 disclosure statement were filed, you have had opportunity to

13 have conversations and to provide input on the plan.

14 Q    Just a couple more questions.  On 12 leading over the 13,

15 I'm going to move it -- this is the Section II, titled, The

16 Releases by the Trustee.

17          THE COURT:  I apologize.  You said 2?  2 moving to

18 13, or 12 to 13?

19          MR. GATES:  12.  12 leading over to 13.  But it's --

20          THE COURT:  So 12 of -- what are you --

21          MR. GATES:  I'm sorry.

22          THE COURT:  Oh, I'm sorry.  You're on Page 12?

23          MR. GATES:  I'm on Page 12, Your Honor.  Thank you.

24          THE COURT:  Okay.  All right.

25          MR. GATES:  Section II.  That was my fault.

1          THE COURT:  I was, like, thinking paragraph numbers

2     or --

3          MR. GATES:  Page 12, Section II, entitled, Releases

4     by the Trustee.

5          THE COURT:  Let's call it Header 2.

6          MR. GATES:  Header 2.

7          THE COURT:  Okay.  I know.  Because we've got like

8     dueling numbering.  We've got Header 2 that's followed by

9     Paragraph 29.  So which paragraph number are we on?

10          MR. GATES:  So I'm going to move, under Heading 2,

11     I'm going to move to, going over to Page 13, that very top

12     paragraph, which will be the second half of Paragraph 31 --

13          THE COURT:  Okay.  Perfect.

14          MR. GATES:  -- at the top of page 13.

15          THE COURT:  Thank you.

16          MR. GATES:  Yeah.  Too many numbers.

17     BY MR. GATES:

18     Q    Let me get there with the cursor, Mr. Andrews.  Starting

19     with the language "In particular" at the top of Page 13, this

20     states:  In particular, as discussed more fully below, the

21     settlement embodied in the plan (including by the releases by

22     Trustee) was negotiated by sophisticated parties and counsel,

23     including several months of negotiations amongst the

24     Committee and M&T Bank that resulted in a proposed settlement

25     with M&T Bank and the support of the plan.

1        Did I read that accurately?

2    A    You did.

3    Q    All right.  Paragraph 32, which is the second element of

4    the releases by the Trustee, you go on to say:  The releases

5    by the Trustee are essential terms, providing fair

6    consideration in exchange for the Released Parties'

7    contributions to and support for the plan.

8        Did I read that accurately?

9    A    You did.

10    Q    All right.  That's where my question falls.  My apology.

11    So, there was fair consideration given to M&T Bank for its

12    vote to accept the May 1 solicitation version of the plan,

13    was there not?

14    A    It -- again, I don't want to have the same argument, but

15    there was fair consideration in connection with the plan as

16    it solicited as they understood it, which did not mean there

17    was going to be a release given to Mr. Borisch.

18    Q    There was no additional consideration given to M&T Bank

19    in connection with the modification of the plan, correct?

20    Given by M&T Bank.  That was a bad question.  There was no

21    additional consideration given to the estates by M&T Bank for

22    the modification of the plan, correct?

23    A    Again, the only changes are the changes we identified.

24    Q    Okay.

25    A    And so other than arguing about what the effect of that

Andrews - Cross                          182

1  first solicitation version of the plan is versus the second,

2  there were no other real changes.

3  Q   Let's go to Paragraph 34.  You say:  Fourth, my

4  professional team (at my direction) has conducted a robust

5  investigation of all known causes of action.

6  A   Can you scroll it down just a little bit?

7  Q   Oh, I'm sorry.

8  A   Yeah.

9  Q   I did not keep up --

10  A   No.

11  Q   -- with my --

12  A   That's okay.

13  Q   -- questioning.

14  A   Yeah.

15  Q   I'm sorry.  I'm on Paragraph 34.

16  A   Thanks.

17  Q   My professional team (at my direction) has conducted a

18  robust investigation of all known causes of action.  Other

19  than the claims and causes of action that are specifically

20  reserved and assigned under the plan, my investigation did

21  not uncover any viable estate claims that, if litigated, are

22  likely to produce value for the Debtors' estates.

23      Did I read that right?

24  A   You did.

25  Q   Okay.  So let's talk about the claims and causes of

1  actions that are specifically reserved and assigned under the

2  plan.

3      There are various cause of action under the -- both the

4  modified plan as well as the solicitation version of the

5  plan, there were various causes of action that were assigned

6  to M&T Bank, correct?

7  A    Yes.

8  Q    All right.  Of those causes of action assigned to M&T

9  Bank were causes of action against the collective Borisch

10 Parties, correct?

11 A    Yes.

12 Q    All right.  You indicated that your professional team

13 conducted a robust investigation of all of those known causes

14 of action.  I think you said earlier that you may have

15 identified potential causes of action against Mr. Borisch,

16 right?

17 A    Yes.

18 Q    All right.  Relatively speaking, not great value, but you

19 may have identified some, right?

20 A    Right.  In the scheme of this case, not huge value.

21 Q    Right.  And you don't know --

22         THE COURT:  So hang on for one second.

23         MR. GATES:  I'm sorry.

24         THE COURT:  Mr. Bakst, can I just have you take that

25 microphone that's in front of you and either hit the button

Andrews - Cross                                184

1    that will turn it off --

2              MR. BAKST:  Oh, yeah, of course.  I'm sorry.

3              THE COURT:  No, no, it's fine.  You can't tell

4    because you're sitting right there, but we can tell every

5    time you're typing.  We're hearing the typing.  So --

6              MR. BAKST:  It didn't even cross my mind.  I

7    apologize.

8              THE COURT:  It was an easy fix.  No, no.  That's why

9    I'm saying, you wouldn't have any way of knowing because

10   you're right there.  So, thank you.

11             MR. GATES:  Thank you, Judge.

12   BY MR. GATES:

13   Q    So with respect to Jonathan Borisch, did your

14   professional team uncover any cause of actions against

15   Jonathan Borisch?

16   A    I don't recall anything significant.  Again, there were

17   different claims that are out there, but I'm not -- I don't

18   recall any of them being, you know, million-dollar-type

19   claims.

20   Q    How about Walloon Lake Holdings?

21   A    I think same answer.

22   Q    Okay.  How about I just cover this by saying any of the

23   additional Borisch Parties?

24   A    Yeah, I don't recall there being any significant claims

25   against the Borisch Parties generally.  The usual back and

Andrews - Cross                              185

1   forth, because there are a lot of insider entities and

2   relationships here, but not big-dollar claims.

3   Q    Okay.  And in fact, in terms of investigating the

4   viability of those claims, that includes finding a factual

5   basis to assert the claim first, correct?

6   A    Yes.

7   Q    Okay.  And then also evaluating what defenses or

8   counterclaims could be raised, correct?

9   A    Yes.

10  Q    All right.  Did your professional team get that far in

11  the process?

12  A    They looked at the fact bases for various claims.  They

13  looked, they did a run to see what the transfer issues looked

14  like and any preferences and fraudulent transfers.

15       They then typically, and I think they did it in this case

16  as well, go through and do a list of what amount to being

17  standard defenses to preferences and fraudulent transfer to

18  sort of eliminate the stuff that's obviously defensible.

19  Q    So, for example, with a potential preference claim, in

20  order to evaluate that claim you have to look to see if there

21  was any contemporaneous exchange for that, correct?

22  A    That's right.

23  Q    Okay.

24  A    You'd look at that or new value exceptions and those

25  kinds of things.

Andrews - Cross                                186

1    Q    Right.

2    A    That's right.

3    Q    That wasn't done in connection with the evaluation of

4    these potential claims as to the Borisch Parties, right?

5    A    No, I'm not -- I'm not sure of the answer to that.  I

6    think -- there are some claims that I think we concluded

7    there were some defenses.

8    Q    Okay.

9    A    Yeah.

10   Q    But to summarize, your testimony is, when you take the

11   totality of the Borisch Parties, including Mr. Borisch,

12   nothing there by way of value in terms of claims that the

13   Trustee --

14   A    That we -- that we located doing our first-run sift

15   through everything, right.

16   Q    Okay.

17   A    I'm not going to preclude somebody else from re-looking,

18   but I don't see any -- I didn't see anything.

19   Q    All right.  So let's go down to Paragraph 36, same page.

20   Now we're on the third-party releases.  You indicate at the

21   bottom of Page 13, I'll put my cursor there:  This provision

22   was heavily negotiated among the Trustee, the Committee, and

23   M&T Bank and is an integral part of the plan.

24        Isn't it true, Mr. Andrews, that the Trustee actually

25   first introduced the concept of a third-party release to M&T

1  Bank in connection with the negotiation of this plan?

2  A    I don't remember how it came up, to be honest.

3  Q    You have no reason to dispute the fact that it was first

4  introduced by your counsel, correct?

5  A    Well, my experience tells me it would have been either

6  Lender counsel or my counsel who would have started to talk

7  about it.  Who talked about it first, I don't know.

8  Q    And at the very end of -- going over to Page 14 now, the

9  very first paragraph, I'm going to put my cursor there.  The

10  bottom of Paragraph 36, top of Page 14, you state:  Moreover,

11  I'm advised and believe that third-party releases are

12  consensual under prevailing Texas and Fifth Circuit law, and

13  that the plan expressly allowed any party in interest to opt

14  out of third-party releases.

15       Correct?

16  A    Yes.

17  Q    And in fact, any party can opt out of those releases or

18  choose not to opt out, correct?

19  A    Yes.

20  Q    I have another exhibit I want to go to here.  I believe

21  it's Exhibit 44.  Bear with me.  Cover Page Exhibit 44.  So

22  this is, for the record, an email from Mr. Kaufman directly

23  to Marc Bakst, correct?

24  A    Yes.

25  Q    All right.  And it cc's others from the U.S. Trustee's

1   Office as well as the Creditors' Committee and counsel for

2   M&T Bank, et cetera, correct?

3   A    Yes.

4   Q    All right.  So this is, again, the subject:  Tommy's

5   Amended Plan DS Redline.  So that's the disclosure statement

6   redline, correct?

7   A    I think that's right.

8   Q    All right.  This email, the very first on this string,

9   the very first email from Mr. Kaufman indicates:  I didn't

10  have any further suggestion to resolve your objection.  I

11  think we're just treating the words differently.  If your

12  clients opt out, this is all academic and moot because your

13  clients wouldn't have any claims, lowercase C, as opposed to

14  defined term Claims with capital C that would be impacted by

15  the plan.

16      So, correct me if I'm wrong, but this is acknowledgement

17  on behalf of your counsel on April 29 of 2025 that the

18  Borisch Parties, specifically Mr. Borisch, may not opt out,

19  correct?

20  A    I'm struggling.  I'm sorry, I'm not following you.

21  Q    Let me put the cursor, I'm sorry, let me put the cursor

22  right here.

23  A    Yeah.

24  Q    It says:  If your clients opt out.

25  A    Okay.

Andrews - Cross                                189

 1  Q    Doesn't that also indicate that they may not opt out,

 2  when you start that sentence with the word "If"?

 3  A    Oh, I -- you're -- I see what you're saying.  You're

 4  saying that there's a possibility that you could not opt out,

 5  is what you're saying?

 6  Q    I'm just saying isn't this an acknowledgement on the part

 7  of your counsel that the Borisch Parties may not opt out when

 8  he starts a sentence with --

 9  A    I think it's --

10  Q    -- "If your clients opt out"?

11  A    I think it's my -- my --

12  Q    It leaves the potential that they may not opt out,

13  correct?

14  A    I think he's pointing out that, if they do, it's

15  academic.

16  Q    Right.  But if they don't, it's not academic, is it?

17  A    That --

18  Q    Isn't that the counterpoint?

19  A    Well, I understand the argument.

20  Q    Isn't that the counterpoint?  It's only academic if they

21  opt out, right?

22  A    On your terms, I understand.  Yes.

23  Q    Okay.  All right.  Let's go back to your declaration,

24  Exhibit 15.  And I'll try my best to stay there for a while

25  now.  Let's go to Page 14 of Exhibit 15.

1      Again, you're talking about third-party releases here at

2  the beginning of Page -- or beginning of Paragraph 37, you

3  say:  First, I believe the Releasing Parties were provided

4  detailed notice about the plan, the objective deadline, the

5  voting deadline, and the opportunity to opt out of the third-

6  party releases through the information in the solicitation

7  package.

8      So we've already established that the definition of

9  Releasing Parties includes Consenting Creditors, correct?

10  A    I think that's right.

11  Q    All right.  So this statement -- and we've indicated

12  that, on the express language of the solicitation version of

13  the plan dated May 1, Mr. Borisch would fall into that

14  category of a Consenting Creditor on the express language.

15  So this --

16  A    On the --

17  Q    I'm sorry.

18  A    -- isolated and express language, yes.

19  Q    Sure.  So this statement indicates that you believe Mr.

20  Borisch was provided detailed notice about the plan, the

21  objective deadline, the voting deadline, and the opportunity

22  to opt out of the third-party releases through information in

23  the solicitation package?

24  A    He had the --

25          THE COURT:  Hang on.

1          MR. KAUFMAN:  Your Honor, I'm just going to object

2    to that.  It mischaracterizes what's here in front of Mr.

3    Andrews and the testimony and the stipulations that we've

4    made.

5          MR. GATES:  I just tried to read it, Your Honor.  So

6    --

7          THE COURT:  So, but in fairness, Mr. Gates, doesn't

8    this declaration relate to the plan as modified?

9          MR. GATES:  The only -- this plan relates to a plan

10   as modified.

11         THE COURT:  Right.  So you're --

12         MR. GATES:  But the language --

13         THE COURT:  So you're asking an unfair question.

14         MR. GATES:  No, Your Honor, because the language

15   regarding -- the language regarding the right to opt out was

16   in the plan, the solicitation version of the plan on May 1.

17   That explanation regarding Releasing Parties were provided a

18   detailed notice about the plan, the objective deadline, those

19   Releasing Parties included Mr. Borisch.  Even in the modified

20   plan.  Even in the modified plan, they're only eliminating

21   Mr. Borisch as the Consenting Creditor.

22         THE COURT:  So, --

23         MR. GATES:  I'm sorry.

24         THE COURT:  -- let's look at Page 1.

25         MR. GATES:  Pardon me?

1          THE COURT:  Let's look at Page 1.  Okay?

2          MR. GATES:  All right.  I'll go Page 1.

3          THE COURT:  Would you please read for me Footnote 2?

4          MR. GATES:  Capitalized terms used but not defined

5    herein have the meanings ascribed to them in the plan.

6          THE COURT:  Okay.  And Plan, if you go up into

7    Paragraph 1, is defined as--?

8          MR. GATES:  As amended.  I acknowledge that, Judge.

9          THE COURT:  Okay.  So let's deal with this fairly.

10   I get your point.

11         MR. GATES:  Okay.

12         THE COURT:  There wasn't a solicitation *per se* of

13   first amended plan as modified.  I get it.  I get the point.

14         MR. GATES:  Okay.

15         THE COURT:  But I think that, in fairness, the

16   declaration testimony, when it's using defined terms, it's

17   referring to defined terms to the plan as modified.  So --

18         MR. GATES:  Point taken, Judge.  I get it.

19         THE COURT:  Okay.  All right.

20   BY MR. GATES:

21   Q    Top of Page 38.  Or, excuse me, Paragraph 38, top of Page

22   15.  You see that Paragraph 38, Mr. Andrews?

23   A    I do.

24   Q    Second, I understand that third-party releases are given

25   for fair consideration.

1       This goes to the point I attempted to get to earlier.

2    The third -- there was -- there were third-party releases

3    provided in connection with the solicitation version of the

4    plan as well, correct?

5    A    Yes.

6    Q    All right.  And to the Court's point, this declaration

7    relates to the plan as modified.  There's also third-party

8    releases given here as well, correct?

9    A    Yes.

10   Q    All right.  We've talked about the distinction, we won't

11   go back into that, but this is my point.  Third-party

12   releases are given for fair consideration.  We've established

13   the fact that M&T voted in favor of the May 1 solicitation

14   version.  There has been no additional consideration given to

15   M&T, or M&T didn't give any additional consideration to go

16   from the May 1 solicitation version of the plan to the

17   modified plan, correct?

18   A    It didn't change, from their perspective.

19   Q    Okay.  The next sentence says:  Specifically, M&T Bank

20   will provide a substantial amount of contributed cash

21   collateral in addition to cash collateral previously used

22   with M&T Bank's consent during the course of the Chapter 11

23   cases to fund plan reserves.

24      I acknowledge, as the Court points out, the word "plan"

25   related to the modified plan, but that same statement was

1   true with respect to the solicitation version of the plan,

2   correct?

3   A    Yes.

4   Q    All right.  They're not giving any more now than they

5   were before, correct?

6   A    (no immediate response)

7   Q    Correct?

8   A    Yes, that's correct, within the limitations of, again,

9   they would not contribute cash collateral if the Borisch

10  Parties were getting a release.  So if you want to call that

11  extra consideration, I don't know what you want to call it,

12  but --

13  Q    Let's go to the bottom of Page 15, under Paragraph 39.

14  Here, acknowledging this relates to the plan as modified,

15  this statement says:  Third, I believe that the third-party

16  releases are sufficiently specific, listing the potential

17  causes of actions to be released so as to put the Releasing

18  Parties on notice of the released claims.

19       I'll stop there for a second.  Both the solicitation

20  version of the plan and the plan as modified both released

21  Consenting Creditors, as defined in those plan documents,

22  from liabilities under guaranties, correct?

23  A    Yeah, I think that's correct.

24  Q    And then, same paragraph, starting with third-to-the-last

25  line at the bottom:  The third-party releases explicitly list

1   out the causes of action released, including, among others,

2   those related to the Debtors, these Chapter 11 cases, the

3   plan and disclosure statement, and any related act or

4   omission, transaction -- carrying over to Page 16 --

5   agreement, event, or other occurrence taking place on or

6   before the effective date.

7       The only point I'm going to make there is that statement

8   is true with respect to the May 1 solicitation version of the

9   plan as well as the plan as modified, correct?

10  A   Yes.

11  Q   And then at the top of Page 16, at the end of Paragraph

12  39, correct me if I'm wrong, but I believe this is the only

13  change or material change that we've talked about:  The

14  third-party releases -- again, in the plan as modified --

15  also explicitly provide that Borisch Parties are not

16  receiving third-party releases under the plan.  It is my

17  intent that the Borisch Parties are neither giving nor

18  receiving any releases under the plan.

19      Did I read that accurately?

20  A   You did.

21  Q   And that's because, in the modified plan, you simply

22  added that prohibition that the definition of Consenting

23  Creditors cannot include Borisch Parties, correct?

24  A   Yes.

25  Q   I'm going to go to Page 18.  Top of Page 18, which would

 1  be the end of Paragraph 45.  About halfway down where it

 2  says, "Further."  You state here:  Further, as I announced at

 3  the hearing on approval of the disclosure statement, I agreed

 4  to revise the injunction provision to resolve an objection

 5  raised by Matthew Borisch.

 6      To summarize that objection, tell me if I state this

 7  accurately, Mr. Andrews, but the objection was literally

 8  eight additional words that would have prohibited Mr. Borisch

 9  and the Borisch Parties from bringing any cause of action

10  because of the injunction against M&T Bank, correct?

11  A    I'm going to defer to what the literal language is.  It's

12  a short phrase that was removed.  That's correct.  But what

13  the literal language does, I would defer to the language.

14  Q    Let's go to Page 20, Paragraph 51.  I think we've covered

15  this a little bit.  But you state at the top of Paragraph 51

16  you commenced plan negotiations in early January of 2025.

17  Your testimony was that you went back to November of 2024,

18  correct?

19  A    Yes.

20  Q    All right.  Let's go to Page 21.

21          THE COURT:  So, let me sure that I'm understanding.

22  So is that statement, is that first sentence in 51, I'm just

23  trying to understand, did the plan negotiations actually

24  start in November 2024 --

25          THE WITNESS:  It --

Andrews - Cross                                    197

1          THE COURT:  -- or were those settlement

2    negotiations?  Or what was -- I'm trying to understand what's

3    the difference between November versus January.

4          THE WITNESS:  I think it's the specifics of a plan

5    document actually being formulated, which I think Gray Reed

6    had started at the very end of the year, December, maybe very

7    early January, that versus the concept of the plan, which is

8    pretty simple, it's just a pot plan, as the, you know, Court

9    can see.

10        And the question that began to resonate with the group

11   was two things.  One, are we doing a plan or are we

12   converting it?  And then, two, and this goes to the

13   discussions with all the parties, but including the Borisch

14   Parties, was, okay, we have claims back and forth between the

15   estate, the Borisch Parties, the Bank, and, you know, each

16   other, along with the Creditors' Committee.

17        I reached out at some point in November and started a

18   conversation about what does a settlement look like that

19   could be incorporated into a plan.  I don't think it was

20   anything that specific.  And then by January it was more

21   specific.  It was, look, it's going to be a liquidating plan.

22   And the question is, do you want to contribute to that plan

23   in exchange for a release, either from the estate or from the

24   estate and the Lender?  And pretty quickly, it became clear

25   that the preconditions with the Lender were going to make

1   that not possible.

2        So that may be more than you asked, but I'm trying my

3   best to give context.

4              THE COURT:  Okay.

5              MR. GATES:  Thank you, Judge.

6   BY MR. GATES:

7   Q   I'm at the top of Page 21 again on your -- still within

8   your declaration.  I put the cursor here.  In the third line

9   down, you state that -- let's go back to the first sentence:

10  I also spoke to Mr. Borisch during this time to see if a

11  global deal could be reached between the Debtors, the Borisch

12  Parties, and the Prepetition Lender.

13       You go on to say those discussions were ultimately

14  unsuccessful.  Again, you stated earlier -- I'm going to stop

15  there for a second -- you stated earlier because the

16  preconditions made by M&T Bank were not going to be met,

17  correct?

18  A   Yes.

19  Q   Okay.  Then you go on to say:  And I determined that

20  further negotiation with Mr. Borisch would be futile because

21  the Prepetition Lender and the Borisch Parties were not

22  aligned on key points underpinning the plan.

23       You stated further negotiation with Mr. Borisch would be

24  futile.  Did you also believe that further negotiations with

25  M&T bank would be futile?

Andrews - Cross                          199

1  A    Well, negotiations with M&T Bank were separate also from

2  Mr. Borisch.  In other words, we were continuing to have a

3  dialogue with M&T Bank, because it wasn't just the Borisch

4  relationship that was part of those discussions.

5  Q    I'm going to jump to one more exhibit on settlement

6  discussions, if I can.  Mr. Andrews, we're going to go to

7  Exhibit 56 real quick, Borisch Exhibit 56.  So here's the

8  Cover Page Exhibit 56, and I want to go to -- this is an

9  email from Aaron Kaufman to Mr. Gerber, Ms. Barba,

10  representatives of both M&T Bank as well as the Unsecured

11  Creditor Committee, correct?

12  A    Yes.

13  Q    All right.  cc'ed to you.  And this is November 26th,

14  2024.  And the subject matter:  Chapter 5 Causes of Action

15  Against Borisch.  Do you see that?

16  A    Yes.

17  Q    Okay.  So, November 26th, 2024, Mr. Kaufman is saying:

18  All, To follow up on our discussion last week, we've

19  connected with Matt and Jon Borisch and they indicated their

20  willingness to commit to a formal mediation with Judge Atlas

21  to address estate causes of action and Borisches' personal

22  exposure to the Bank.

23      Did I read that accurately?

24  A    You did.

25  Q    All right.  So you were aware that both Jon and Matt

1   Borisch were willing to actually go to mediation with Judge

2   Atlas, right?

3   A    Yes.

4   Q    Okay.  That didn't happen because of the preconditions

5   that were set forth by M&T Bank, correct?  Those

6   preconditions being disclosures and a substantive initial

7   offer, right?

8   A    Yes.

9   Q    Actually, your words were a substantial initial offer

10  when you described it to us, correct?

11  A    I think that's right.

12  Q    Okay.  And it looks like Mr. Kaufman actually connected

13  with Judge Atlas the weekend -- in that weekend to get dates,

14  correct?

15  A    Looks like it, yes.

16  Q    Okay.  The next paragraph indicates that she actually

17  gave her fee schedule, and Mr. Kaufman says:  I know these

18  dates are far off, but I do not think any other mediator will

19  be able to get us in before the holidays.  We also think

20  Judge Atlas is the right personality for these issues.

21       Do you recall both Mr. Borisch, both Mr. Matt Borisch and

22  Jon Borisch both liked the idea of mediating with Judge

23  Atlas, correct?

24  A    Yeah, I think so.  I certainly remember Matt was

25  receptive.

1    Q    Okay.  Go back to --

2            THE COURT:  So I just have to ask.  Is that a

3    correct statement, a daily rate of $32,000?

4            THE WITNESS:  That is -- that is correct.

5            THE COURT:  Wow.

6            THE WITNESS:  And I will add --

7            MR. KAUFMAN:  I'll say she's worth every penny.

8            THE WITNESS:  Yeah, I will add --

9            THE COURT:  I hear you.  I personally, I know Judge

10   Atlas from years ago when we were at Sheinfeld, but wow.

11   Okay.

12           THE WITNESS:  In her defense, she worked and prepped

13   and made multiple phone calls.  So that that day rate really

14   is sort of misleading, because she probably spends three or

15   four days.

16           THE COURT:  I hear you.

17           THE WITNESS:  And I know you're not picking on her,

18   but I would say that you get value.  It was extremely

19   helpful.

20   BY MR. GATES:

21   Q    Moving on with your declaration, Mr. Andrews, I'm now at

22   Paragraph 52.  At the very top of Page -- or, Paragraph 52,

23   you say you did not believe that Mr. Borisch was excluded

24   from the plan process.  Again, I'll just clarify.  That must

25   mean he was not excluded from settlement discussions, because

1  you've already testified he was very clearly excluded from

2  negotiating, discussing, commenting on the plan before it was

3  filed.  Correct?

4  A   Before it was filed, the discussions were settlement

5  discussions.  After it was filed, there were discussions

6  about some of the points in the plan and disclosure

7  statement, and the professionals all talked to each other

8  about them.

9  Q   I want to go to Paragraph 78 on Page 31.  Put the cursor

10  on Paragraph 78.  Do you see that, Mr. Andrews?

11  A   I do.

12  Q   So let's just -- I'll start at the top here on 78 and 79:

13  I have agreed to make certain modifications reflecting in the

14  plan, including those set forth in the Notice of

15  Modifications to Trustee's First Amended Joint Chapter 11

16  Plan, as well as other settlement -- settlements and

17  resolutions announced on the record at the confirmation

18  hearing.  I believe these modifications were technical in

19  nature, contemplating under the plan, and did not materially

20  diminish or alter any creditor's substantive rights under the

21  plan without their consent.

22      We've already established that Mr. Borisch is a creditor

23  under the plan, correct?

24  A   He is.

25  Q   All right.  And we've established that it's an incredibly

1   substantive material change for Mr. Borisch not to get a

2   release from M&T Bank relative to thinking that he had a

3   release from M&T Bank.  Correct?

4   A    I understand from his perspective it would appear to be

5   material.  From the perspective of the estate, it was never

6   intended to be a release of Mr. Borisch.  And so from the

7   perspective of the estate, it's not.

8   Q    I understood.  That was not my question, but I understand

9   your answer.

10       And this goes on to say:  Did not materially diminish or

11   alter any creditor's substantive rights under the plan

12   without their consent.

13       You certainly don't have Mr. Borisch's consent for this

14   modification, correct?

15   A    I don't think I need it, but I understand that he does

16   not consent.

17   Q    Paragraph 79.  (Pause.)  I am sorry.  Bear with me.  I'm

18   trying to pull up another exhibit for reference.

19       Here we go.  All right.  So I need to -- let's talk about

20   Paragraph 79, and then I'm going to go to another exhibit to

21   further clarify.  Paragraph 79, you state:  I understand that

22   Matthew Borisch has objected to the modifications relating to

23   the third-party releases in Article X.D. of the plan as well

24   as corresponding changes to the definitions of Consenting

25   Creditors and Releasing Parties.  The modification to the

1    third-party releases were filed on June 6th to clarify that

2    Borisch Parties would not be giving or receiving any releases

3    under the plan.  This clarification was consistent with my

4    intent from beginning of the process, plan process.

5         Did I read that accurately?

6    A    I think so.  Could you scroll it down just a little?

7    Q    Oh, I'm sorry.  I did it again.  Sorry.

8    A    Yeah.

9    Q    I won't read the whole thing, but I'm --

10   A    Yes.  No, you read it accurately.

11   Q    Yes.

12   A    Yeah.

13   Q    Where the cursor is at:  This clarification was

14   consistent with my intent from the beginning of the plan

15   process.

16        As a practicing lawyer and/or trustee for 40 years, you

17   understand, do you not, Mr. Andrews, that the first step in

18   determining the intent of a contract or a document is by the

19   four corners of the document, correct?

20   A    That's a step, yes.

21   Q    Okay.  That's the first step, actually, right?

22   A    Yes.

23   Q    Okay.  And also if the four corners of the document are

24   clear, you don't go any further.  Isn't that correct?

25   A    You know, I don't want to argue contract law with you.

1    It's the four corners of the document are the first thing you

2    look at.  Then you have to look at if there are ambiguities

3    or if there are misconceptions, or in the case of a

4    solicitation package like this, you've got to make sure that

5    everybody is on the same page.  And --

6    Q    Right.

7    A    -- it looks like we all collectively were not.

8    Q    So I don't want to argue contract law with you, either,

9    but I think you just confirmed that the next step is to see

10   if there's ambiguities or inconsistencies.  You don't go

11   beyond the four corners of a document if there's no

12   ambiguities or inconsistencies, correct?

13   A    Well, you -- you --

14   Q    If you know.

15   A    I don't have an answer that's not just going to get into

16   a legal argument with you.  And so I would say that that's a

17   decision for our judge to make and not for me to --

18   Q    I agree.

19   A    -- opine on.

20   Q    Thank you.  What other evidence, on that statement that

21   this clarification was consistent with my intent from the

22   beginning of the plan process, what other evidence would you

23   have, Mr. Andrews, to show that that was your intent from the

24   beginning of the plan process, --

25   A    The --

Andrews - Cross                                206

1   Q    -- other than the four corners of the plan itself?

2   A    The statements in the disclosure statement that made

3   clear there were no releases intended to be given to the

4   Borisch Parties.

5   Q    Okay.

6   A    The transfer of causes of action over to the Lender that

7   were part of the consideration that they were receiving in

8   connection with the plan.

9        The fact that in the plan and disclosure document, if you

10  go through the different exchanges that were made, the give

11  and the get, so to speak, between or among the Lender, the

12  Creditors' Committee, and the Trustee, what you'll find is

13  that there are assignments of the causes of action, you'll

14  find that there are quid pro quos where the Lender is putting

15  in cash collateral proceeds in exchange for getting a bundle

16  of rights from the Debtor that it couldn't really get from

17  anywhere else.

18       So when you read it as a whole, it's a, like you

19  suggested, it is something like a contract or something like

20  a settlement agreement.  And that's what evidences the intent

21  of the parties to come to a deal that did not contemplate a

22  release for Mr. Borisch.

23  Q    Okay.  So I heard in response to my question "disclosure

24  statement" and I heard "transfer of causes of action."  Did

25  you say anything else in there that's of material value?

1  A    Well, I --

2  Q    And I'm not trying to be cute.  I just I heard your

3  statement --

4  A    I understand.

5         THE COURT:  It is a little argumentative, honestly.

6         MR. GATES:  I'm sorry.  I didn't mean it that way,

7  though, Judge.

8  BY MR. GATES:

9  Q    I heard causes -- transfer of cause of actions and

10  disclosure statement.  Did I miss anything else?

11  A    Well, the consideration for the exchange with the Lender

12  included obviously being assigned these causes of action.

13  And without that exchange, then there wasn't a -- there would

14  not have been a deal.  Right?  And so -- and without the

15  deal, there is no plan.  It falls away.

16      I recall there being specific places in the disclosure

17  statement indicating there was no release to Mr. Borisch.  I

18  think it's on the very first page.  I think it's repeated

19  somewhere on like the second page.  I think that there are,

20  independently, places in the disclosure statement.

21      To your point, in the plan, do I remember a specific

22  bold-lettered No Borisch Release?  I don't remember it

23  sitting here, but I'll defer to what the plan document

24  actually says as opposed to my memory, which I may be missing

25  something.

1  Q    Okay.  So I heard the disclosure statement, transfer of

2  cause of actions, and sort of a subset of the transfer of

3  causes of action being the consideration.  Is that correct?

4  A    Right.  With the Lender, yeah.

5  Q    All right.  So we've already established, have we not,

6  that the disclosure statement, to the extent that it has any

7  inconsistencies with the express language of the plan, the

8  plan controls, correct?

9  A    It -- right.  Read in isolation, I don't disagree with

10  what you just said.

11  Q    That's paragraph 12-D, correct?

12  A    I'll take your word for that.  I don't remember it.

13  Q    Okay.  With respect to the transfer of causes of action,

14  over 40 years, how many -- approximately how many settlement

15  discussions do you think you've engaged in?

16  A    Oh, I --

17  Q    Tens of thousands?

18  A    I don't know about that, but certainly -- certainly

19  hundreds.

20  Q    Okay.

21  A    Yeah.

22  Q    So isn't it true that when you're engaging in settlement

23  discussions with two parties, one of the principles of that

24  settlement discussion is sort of finality, correct?

25  A    Yes.

Andrews - Cross                                    209

1  Q    Okay.

2  A    Yeah.  Sorry.

3  Q    It's very rare that somebody wants to settle a piece and

4  then live to have a liability to fight a later day, correct?

5  A    That's right.

6  Q    Okay.  So when you talk about transfer of causes --

7  transferring causes of actions against the Borisch Parties to

8  M&T Bank, isn't it entirely consistent that that would lead

9  to a more robust global settlement and a settlement providing

10 finality if M&T Bank held all of the causes of actions that

11 they could release in exchange for whatever settlement they

12 could release for the Borisch Parties?

13 A    It --

14        MR. KAUFMAN:  Your Honor, I'll --

15        THE WITNESS:  I'm having a hard time following that.

16        MR. KAUFMAN:  Yeah, I was just going to object --

17        THE WITNESS:  Yeah.  Yeah.

18        MR. KAUFMAN:  -- that this calls for speculation and

19 not -- it's a hypothetical.  I'm not really sure where we're

20 going with this.

21        MR. GATES:  I laid the foundation, Your Honor, for

22 his experience in terms of negotiating settlements, having

23 discussions.  He said hundreds over the last 40 years.

24        THE COURT:  I'll overrule the objection.  It is

25 entirely speculative, but I'll allow.  I'm not really sure

Andrews - Cross                                          210

1    how it helps, frankly, because if the idea is -- I think what

2    I heard the question to be is if M&T has all of the claims

3    against the Borisch Parties, does that lead to a greater

4    propensity for a resolution between M&T and the Borisch

5    Parties?  I mean, does that sound like a possibility?

6           THE WITNESS:  It hasn't so far.  I mean, what can I

7    say?  We're sitting here today.

8           THE COURT:  So I guess, along the same lines, could

9    that be one of the reasons why the Bank wanted to get an

10   assignment of all of the claims?

11          THE WITNESS:  It wanted the claims because it would

12   have then had control and would have been able to use the --

13   any additional leverage from the point of view of the Bank.

14     From the point of view of the estate, it seemed to me to

15   be duplicative of what the Bank was going to be doing.  It

16   made no sense for the estate and the Bank to be pursuing the

17   Borisch Parties independently.  And it made no sense to me.

18   It never made any sense to me.

19   BY MR. GATES:

20   Q   So I'll close with this.  The assignment of those causes

21   of action against the Borisch Parties was something the Bank

22   negotiated for, was provided to them in connection with the

23   May 1 solicitation version of the plan, correct?

24   A   It was part of the plan filed May 1, yes.

25   Q   Okay.  And then it was after May 1 that this Court ruled

1  in terms of what causes of action were individual causes of

2  action that Mr. Borisch could proceed to pursue in both Kent

3  County, Michigan, and for that matter, in Tennessee District

4  Court with respect to Malibu, correct?

5  A   Yes.

6  Q   Okay.  So the timing is what I'm nailing down.  It was

7  after wanting all those causes of action that everybody was

8  informed by this Court in terms of what individual cause of

9  actions would remain in Kent County Circuit Court against

10 M&T, correct?

11 A   Yes.  I don't see the connection clearly, but --

12 Q   That's fine.

13 A   -- sequencing-wise, I understand what you're saying.

14 Q   Okay.  I think we're on one of our last exhibits here.  I

15 want to take you to Exhibit 49.

16         MR. GATES:  Borisch Exhibit 49, Your Honor.

17 BY MR. GATES:

18 Q   Okay.  So for the record, Mr. Andrews, this is an email

19 from Aaron Kaufman to me, or the last one in the chain is

20 from Aaron Kaufman to me, dated June 6, 2025.  Is that right?

21 A   Yes.

22 Q   All right.  And the subject was:  Tommy's Ballots and

23 Plan.  So this one, I'm going to go down to the beginning of

24 the communication here.  Just walk through this entire

25 chronology, because I think it's valuable.

Andrews - Cross                    212

1      Let me start with the first email in the series here.

2   Trustee 4941.  This is June 6, 2025, 9:50 a.m.  I believe

3   that's actually Eastern Time and not Central, because this is

4   my printout of this.  Or, I'm sorry, no, that's Central,

5   because this is the Trustee's production.

6      So this is an email from Aaron Kaufman to Marc and me

7   regarding Tommy's Ballots and Plans.  And it says:  Marc and

8   Floyd, I left a voicemail for Marc this morning.

9      So, clearly, Mr. Andrews, there was a call prior to this

10  email, correct?

11  A    Sounds like it, yes.

12  Q    Okay.  Please let me know a good time to visit this

13  morning regarding the ballots that were submitted by the

14  Borisch Parties yesterday.

15     So we know from the evidence already that has been

16  admitted Omni, Mr. Paul, informed Mr. Kaufman in -- in the --

17  before the 11:00 p.m. hour on June 5 the results of the

18  balloting, correct?

19  A    Yes.

20  Q    So here we are at 9:50 in the morning.  Mr. Kaufman has

21  already left a voicemail for Mr. Bakst, and now he's sending

22  this email:  We want to make abundantly clear in the plan

23  that the Borisch Parties are neither giving nor getting

24  releases from any parties.

25     Do you see that?

1    A    Yes.

2    Q    So isn't it true, Mr. Andrews, that the fact that the

3    Borisch Parties could have in fact chosen not to opt out, as

4    was otherwise expected from your earlier testimony, isn't it

5    clear that, based on the timing of this email, Mr. Kaufman

6    was clearly looking for that early in the morning on June

7    6th?

8    A    Was looking for what?  I'm sorry.

9    Q    Looking, looking to clarify that there was no give-and-

10   get releases for the Borisch Parties.  Isn't that what he

11   says there in that third sentence?  We want to make

12   abundantly clear in the plan that the Borisch Parties are

13   neither giving nor getting releases from any parties?

14   A    Yeah, that's what he says.

15   Q    So here's what I want to point out.  This May 1st

16   solicitation version of the plan was negotiated over months.

17   In fact, the first version of the plan was filed in mid-

18   March, right, or March 25, I believe, 2025.  But still, the

19   negotiation started November or December of 2024.  It was

20   negotiated for months, correct?

21   A    Yes.

22   Q    All right.  M&T Bank had every opportunity to review,

23   make comments, negotiate, and provide feedback on the

24   proposed terms of the plan, correct?

25   A    Yes.

Andrews - Cross                                214

1   Q    All right.  And nobody, at least we're told, nobody prior

2   to June 5 of 2025, at the time that Mr. Borisch filed his

3   ballots, I believe it's your testimony that nobody ever

4   picked up on this ambiguity, this obvious error, up until

5   that point in time, correct?

6   A    Nope, --

7   Q    Okay.

8   A    -- I think that's right

9   Q    And yet, and just --

10          THE COURT:  Let me make sure our record is clear.

11   When you say nope, you're agreeing with him that it hadn't

12   been caught, or that nope, he's not correct?

13          THE WITNESS:  Oh.

14          THE COURT:  Because he ended the question with

15   "Correct?" --

16          THE WITNESS:  Yeah.

17          THE COURT:  -- and you said, "Nope."

18          MR. GATES:  Sorry, Judge.  Thanks for the catch.

19          THE WITNESS:  Yeah.

20   BY MR. GATES:

21   Q    That's a correct statement?

22   A    No one had caught that there was this subpart of the plan

23   that had, under just the literal isolated language, as we'll

24   describe it, had this apparent glitch, from my point of view,

25   that would have permitted what I would call sort of a

Andrews - Cross                                    215

1    backdoor release.  Right?  No one in the group outside of the

2    Borisch Parties had noticed that that provision could be

3    argued to operate that way.  And probably that's because we

4    didn't ever intend it to be that way.

5    Q    So tell me this, Mr. Andrews.  In a plan that's been

6    negotiated for months, has a lot of very smart lawyers

7    reviewing and revising and providing comments, how is it we

8    file -- how is it we file our ballots and not opt out,

9    approve the plan on the -- apparently, according to Mr. Paul,

10   he said it was the evening hours of June 5 -- how is it,

11   after all those months it's not picked up on, but in a matter

12   of hours, including the sleeping hours, right, in a matter of

13   hours, how is it Mr. Kaufman comes back and wants to not just

14   ask us what's going on, make sure that we're clear what we're

15   doing, but he absolutely wants to drill down on the fact that

16   we're not getting and getting -- not giving and getting any

17   releases?

18       He knew we -- that we were getting and giving releases if

19   we -- if we did not opt out of that May 1 plan.  Isn't that

20   accurate?

21   A    Well, I think he -- you'd have to ask him why he did what

22   he did, right?  I can't, I can't answer for what he did.

23   Q    You would agree with me, in a matter of hours, he just

24   went right to the subject, correct, in terms of the giving

25   and getting releases?

Andrews - Cross                              216

1   A    Yeah.  It sure looks like it.  Yeah.

2   Q    Okay.  And he says:  If this requires a modification, we

3   are happy to do so and extend your objection voting deadlines

4   for a few days to allow you to amend the ballots, if needed.

5   Are you able to speak before 11:00?

6       So let's go up to the -- continuing on this chain.  So

7   then I respond to Mr. Kaufman at 1:22 p.m. to his email to me

8   at 9:50 a.m.  I said:  Aaron, I'm not sure if his out-of-

9   office message is on or not, but I know that Marc is

10  attending a family wedding in Iowa presently.  I spoke to him

11  for a great deal of his drive yesterday and believe he's out

12  of pocket for most of the day today.  In the interim, I'm not

13  quite sure what you're getting at, but I believe, from my

14  discussion with Marc, that we agree that Borisch is not a

15  Released Party under the plan.  If that is not what you are

16  getting at, please explain why the Trustee has interest in

17  what M&T and the Borisch -- and Borisch have agreed to.

18      I'm going to leave the rest of that alone.  I don't think

19  it's material.

20      Mr. Kaufman then responds that, at 2:30 p.m.:  Perhaps

21  email isn't the best way to explain this.  Can we hop on a

22  quick call at 3:00 p.m. Eastern?  I respond:  I'm in a client

23  meeting at 3:00 and then again at 4:00.  At 5:00 p.m., I'm

24  meeting with my kids for an end-of-school-year celebration.

25  Email is all I have available today.

Andrews - Cross                          217

1        And so then we get a lengthy email, and this is the email

2    to the top of this exhibit.  We get a lengthy email back from

3    Mr. Kaufman that says, this is at -- I think this is military

4    time, maybe 7:24:47:  Understood.  I'll do my best to outline

5    this via email.

6        So we referenced an agreement between -- it said:  You

7    reference an agreement between M&T and Borisch, but we are

8    not aware of one.  And the Bank has confirmed for us that our

9    plan and the third-party releases should not be construed as

10    such an agreement.

11        So it's the Bank that's informing you folks that -- that

12    the not opting out, benefiting from a release from the

13    Release Parties and not opting out and becoming a Consenting

14    Creditor, there was no such agreement with the Bank.  That's

15    what Mr. Kaufman is confirming, correct?

16    A    That's right.

17    Q    And he actually spoke to the Bank to confirm that.  He

18    says:  As I said in my initial email, the Trustee did not

19    intend for the Borisch Parties to give or receive any

20    releases to or from any party through this plan.  Mr.

21    Borisch's affirmative votes and your email below suggests to

22    us that Mr. Borisch is reading the plan differently.

23        So I think we've already established that Mr. Borisch

24    read the plan consistent with how we've all stipulated.

25    Under the express language of the plan, he was allowed to be

Andrews - Cross                                    218

1    a Consenting Creditor, correct?

2    A    Under the isolated language, yes.

3    Q    Okay.

4    A    Under the stipulation that we entered into earlier, yes.

5    Q    And for what it's worth, Mr. Andrews, how else should we

6    read it other than the language of the plan?  Isn't that --

7    isn't that what we should read?

8    A    You always read things against the context in which the

9    facts have arisen.  Right?  And so you knew full well that

10   there was not a contemplated release from the Bank to you

11   all.  How -- how would you have ever thought otherwise?

12   Q    What evidence do you have that we knew full well that

13   there was never contemplated a release to the Borisch

14   Parties?

15   A    Well, I will, without going through the laundry list,

16   simply say you and the Bank had not had direct

17   communications.  There was a precondition to negotiate with

18   the Bank that you had not met.  There was no communication

19   regarding a release or its extent.  There was no release

20   document.

21       You were trying to use a portion of a plan in order to

22   obtain a release that wasn't intended to be given.  And so I

23   -- look, I hear you, it's creative, but it's just not the

24   state of the facts.

25   Q    You don't dispute that M&T Bank was looking for a global

1   release from the Borisch Parties, correct?

2   A    Look, Banks like releases.

3   Q    I'm just asking -- I'm just asking that question.  You

4   don't dispute that?

5   A    Banks love releases.  You guys would like releases.  I'm

6   sure both sides would like releases.  But you also have a lot

7   of claims to sort through.

8   Q    So the Bank was looking for a global release and your

9   testimony is Mr. Borisch was looking for a global release?

10  A    Both sides would like to have some way of finalizing a

11  deal.  And the problem is that you all were very far apart

12  and there wasn't enough information for the Bank to proceed,

13  nor an offer on the table.  And as you point out, the Bank

14  may not even have knowledge of what your offsets or

15  counterclaims are.

16       So there was not anywhere close to a meeting of the minds

17  between those key parties to make any sort of deal with

18  respect to a release.

19  Q    So I think you agree both parties were looking for a

20  global release, correct?

21  A    Both parties would love to have --

22           MR. KAUFMAN:  Your Honor?  Your Honor, I'm going to

23  object.

24           MR. GATES:  I'm just asking --

25           MR. KAUFMAN:  This cross has gone on five hours.

Andrews - Cross                                        220

 1  This question has been asked and answered about a dozen or so

 2  times.

 3            THE COURT:  Sustained.

 4            MR. GATES:  All right.

 5  BY MR. GATES:

 6  Q    Let's move on to the timeline.  You indicated there was

 7  no further substantive discussions regarding settlement after

 8  the May 1st version of the solicitation plan was filed,

 9  correct?

10  A    Between who?

11  Q    Between you, you trying to mediate a resolution between

12  Mr. Borisch and M&T Bank.  I think you earlier testified that

13  those discussion sort of dried up after the May 1st --

14  A    I think, I think that's fair.

15  Q    Okay.

16  A    I think that's right.

17  Q    All right.

18  A    Yeah.

19  Q    But that's why I'm pointing out something very important

20  that happened on May 22nd.  On May 22nd, isn't it clear that

21  M&T Bank found that there was a very substantive counterclaim

22  that would be pursued against it in the Kent County

23  litigation by Mr. Borisch?  In fact, a $29 million

24  counterclaim?

25  A    I don't know either the number or whether M&T Bank was --

Andrews - Cross                         221

1   what M&T Bank thought about that.  I just, I literally had no

2   conversations with them about that counterclaim.

3   Q   Okay.  But just in the timeline, this is -- this June 5

4   voting, accepting the plan, opting out or not opting out,

5   happened after the judge had ruled regarding what affirmative

6   claims Mr. Borisch could maintain in his individual capacity

7   against M&T in Kent County, correct?

8   A   I understand that the timing suggests to you that there

9   may be a link between the events.  It doesn't suggest it to

10  me.

11  Q   And the only point I'm making there is, up until that

12  period of time on May 22nd, I'll say it this way, the Trustee

13  certainly believed, based on his filings, and M&T, based on

14  those filings as well, that all of the claim -- the

15  affirmative claims that were being pursued by Mr. Borisch in

16  Kent County -- Kent County, Michigan against M&T, those were

17  all derivative and didn't belong to him in his individual

18  capacity.  Isn't that a fair statement?

19  A   I don't agree that it was all of the claims, but I think

20  that the dominant share of the claims we thought were estate

21  claims.  Yeah.

22  Q   Did you have an opportunity to review the motion that was

23  filed and scheduled for hearing on November 19th, 2024, where

24  the Trustee was asking?

25           MR. KAUFMAN:  Your Honor, I'm going to object to

Andrews - Cross                                    222

1 relevance.  And also, I think we've already gone through this

2 a few times.

3          MR. GATES:  I believe it's entirely relevant.

4          THE COURT:  I'm going to overrule the objection and

5 I'll allow it.  But let's move there quickly, because I get

6 it.

7          MR. GATES:  I will, Judge.

8          THE COURT:  I know you want to make a record, and I

9 understand that.  So make a record, but just also know that I

10 am not as dense as what people often think that I am.  This

11 is so clear to me.  It's been clear to me since like 10:00

12 a.m. this morning.  So please make your record, because I

13 want you to be able to make your record, but if you're trying

14 to lead me down a path, I've been there a long time ago.

15          MR. GATES:  Okay.  Thank you, Judge.  I'm trying to

16 remember what my last question was, Your Honor.  Give me a

17 second.

18          THE COURT:  Your question was, did you all -- Mr.

19 Andrews, do you recall that you all took a position in a

20 pleading that, at least --

21          MR. GATES:  Thank you.

22          THE COURT:  -- on the pleading basis, that all of

23 the claims that Mr. Borisch was pursuing against M&T -- or

24 sought to pursue, because I don't think it had actually been

25 granted leave to pursue, it was a motion for leave to assert

1  a counterclaim -- that the position that was taken in the

2  motion was that all of those counterclaims were property of

3  the estate?

4          THE WITNESS:  Yes, I acknowledge that.

5  BY MR. GATES:

6  Q    Okay.  And you were here for the hearing on November 19,

7  correct?

8  A    Yes.

9  Q    Okay.  I believe Mr. Kaufman stood somewhere in this

10 proximity arguing to the Court that all of the claims that

11 were asserted or attempting to be asserted by Mr. Borisch in

12 that proposed amended counterclaim were all derivative

13 claims, correct?

14 A    Yes.

15 Q    Okay.

16         MR. GATES:  I have nothing further, Judge.

17         THE COURT:  Okay.  All right.  Ms. Schmidt, any

18 cross-examination?

19         MS. SCHMIDT:  Yes.

20         MR. GATES:  Oh, I'm sorry.

21         MS. SCHMIDT:  Did you want your computer?

22         MR. GATES:  I'll move my computer.  Give me one

23 second.

24      (Pause.)

25                      CROSS-EXAMINATION

1   BY MS. SCHMIDT:

2   Q    Good afternoon, Mr. Andrews.

3   A    Hi.  Excuse me.  Sorry.

4   Q    Mr. Andrews, there's a small binder in front of you.

5   A    Ah.  I have it.

6   Q    That's the U.S. Trustee's binder.  And if you don't mind

7   turning to Exhibit C, U.S. Trustee's Exhibit C.

8   A    I have it.

9   Q    And this is the same as, I believe, the Trustee's Exhibit

10  14.  It's the notice of the modified plan.

11  A    It is.

12  Q    And I'm trying to -- if you could give me just a tiny

13  second, I want to make sure that I keep my questions as brief

14  as possible.

15       There's the header on top for Docket 935, but then on the

16  bottom, there's also in red, if you turn to Page -- the red

17  Page 20.  And that's --

18  A    I have it.

19  Q    For Docket 935-1, that's Page 17.  I just want to make

20  clear for the record in case anybody's using the Trustee's

21  exhibits.  Look --

22           THE COURT:  So, just for clarity, at the top, it's

23  Exhibit A, ECF Page 18 of 39.  Correct?

24           MS. SCHMIDT:  It's --

25           THE COURT:  So you're saying printed red.  What I'm

1  concerned about, Ms. Schmidt, is that when things get

2  transmitted to an appellate court, if, God forbid that's

3  where all this goes, I'm not sure that the color is going to

4  show up.

5         MS. SCHMIDT:  Yeah.

6         THE COURT:  So when you say Red 21, what I'd like to

7  do is, like at the top, do you have an ECF header at the top?

8         MS. SCHMIDT:  I do have an ECF header at the top.

9  The top header is Docket 935-1, and Page 17 of 39.

10         THE COURT:  Oh, Page 17 of 39?  Okay.  So that's not

11  Page 21, then; that's Page 20?

12         MS. SCHMIDT:  Yes.

13         THE COURT:  Okay.  All right.  I'm with you.  Thank

14  you.

15  BY MS. SCHMIDT:

16  Q    Mr. Andrews, so for the Class 5 general unsecured claims,

17  are these -- are these mostly the vendors and landlords and

18  such?

19  A    Yes.

20  Q    And under the plan, they would be paid -- would be paid

21  about a one percent dividend from the $350,000 plan?

22  A    It's a -- that's right.  It's a very small dividend, with

23  a potential for some upside depending upon litigation, but

24  that's correct.

25  Q    Okay.  And if you turn to -- and we're still in the same

1   exhibit, and I'm looking at the top header, Page 32 of 39.

2   A    Okay.

3   Q    And I know we went -- I know you went over this a little

4   bit earlier today on the third-party releases at Paragraph D,

5   but you mentioned -- here, it states that, in exchange for

6   other good and valuable consideration, the adequacy of which

7   is hereby confirmed, each of the Releasing Parties shall be

8   deemed blah, blah, blah.

9       But the good and valuable consideration, so just focusing

10  on the Class 5 claimants, those general unsecureds, so would

11  part of that consideration include the $350,000 put into the

12  trust by M&T Bank?

13  A    Yes.

14  Q    Okay.  And this would also include M&T Bank releasing its

15  -- any possible claims it might have against those general

16  unsecureds?

17  A    I think that's -- I think that's technically right.  Yes.

18  Q    Do you know, was there any valuation done of what claims

19  M&T might have against --

20  A    So, so it's -- really, it's liens that M&T would have on

21  estate recoveries that might be made against parties that opt

22  in for the releases.  So, for example, there are releases of

23  trade creditors from what would be sort of Chapter 5 causes

24  of action if they opt in.  This is a very low distribution

25  plan with respect to the general unsecureds, as you can see.

1  Where most of the money goes is to settle either the consumer

2  claims, which are significant in the case, and there were

3  still a lot of them that we had to deal with, or to the state

4  sales tax authorities.  Right?  The remainder goes to the

5  Lender, for the most part.  And there are also some employee

6  claims that are getting paid, or at least a percentage will

7  be paid out of the funds that have been reserved.

8       So just on balance, what the plan does is it returns an

9  additional dividend to the Lender.  The exchange that the

10 Lender receives for that is that it gets its release.  It

11 provides a reserve in order to cover obligations that are

12 denoted in the plan.  But basically it's consumers who were

13 trapped in situations where they had trade-ins and didn't get

14 the benefit of the money from the payoff to the underlying

15 lender, trust-fund-type claims, some claims that these

16 consumers had that are smallish.  Most of those we have now

17 processed through, but it was impeding the consumers from

18 receiving title.

19      There were all sorts of issues.  We got I can't tell you

20 how many phone calls and still deal with those consumers.  So

21 it takes care of that.  It takes care of the state sales tax

22 authorities by providing a pretty hefty dividend to them.

23 And then it provides, you know, smallish amounts of money to

24 just the general unsecureds.

25 Q    Okay.  And just to be clear, those consumers who were,

1  for example, whose boats might have been converted, they're

2  under Class 4, correct?

3  A   Yes, I think that's right.  They're in Class 4.  There is

4  a -- there were a couple of relatively small, not really

5  populated classes in the -- like always.  There's Other

6  Secured Claims Class that I think is probably pretty empty,

7  and some other smallish classes.  And we got rid of

8  intercompany claims and equity claims and things like that.

9       So the plan is really a simple liquidating plan that had

10 some more complicated stuff in it, as you heard from the

11 arguments today, but most of that really relates to the two

12 or three sort of large players in the estate.

13 Q   Okay.  Now, and I --

14         THE COURT:  Can I ask a follow-up question?  So kind

15 of opt-out versus non-opt-out, to the extent that the estate

16 has any avoidance claims against creditors holding claims in

17 Class 5, just so that I'm clear, to your understanding, the

18 plan mechanics are let's just start with the ones who do not

19 opt out.  Are those retained by anybody?

20         THE WITNESS:  So, I'm going to probably end up

21 looking very hard at Mr. Kaufman in a minute to make sure

22 that I get it right, --

23         THE COURT:  Right.

24         THE WITNESS:  -- because this was -- we spent a fair

25 amount of time trying to make sure we were compliant.  And

Andrews - Cross                                      229

1   the way that I think that it works is if you completely opt

2   out, right, you aren't giving any releases, you aren't

3   receiving any releases, if there is in fact a cause of action

4   that's asserted against you and there are dollars that get

5   generated out of that cause of action, depending upon, you

6   know, a couple of different alternatives, but in general I

7   think that will end up going into the unsecured creditor

8   trust, if you will.

9           THE COURT:  So, yes, --

10          THE WITNESS:  Yeah.

11          THE COURT:  -- I think maybe you're focusing on

12   something a little different.

13          THE WITNESS:  Oh, okay.

14          THE COURT:  So let's just, to have a hypothetical --

15   and I hear you that probably we're going to have to focus on

16   the plain language, but I'm just trying to get my own

17   bearings.  For simplicity, let's assume that we've got a

18   vendor.  Vendor received a preference within the preference

19   period.  If that holder of a claim in Class 5 is, because of

20   the actions taken or not taken, are a Consenting Creditor,

21   does that cause of action get released?

22          THE WITNESS:  Yes, I think that's correct, and I'm

23   --

24          THE COURT:  Okay.

25          THE WITNESS:  -- now I'm going to stare at Mr.

1    Kaufman and make him say that that's right.

2                MR. KAUFMAN:  I don't want to -- I don't want to --

3                THE COURT:  It doesn't matter.  We could take it up

4    at closing argument.  Because I'd rather not guess.

5                THE WITNESS:  Yeah.

6                THE COURT:  So, all right.

7                THE WITNESS:  Because --

8                THE COURT:  I guess, though, from the standpoint of

9    -- I mean, obviously, your calculus in terms of the terms of

10   the settlement is important to the Court.  And I think what

11   Ms. Schmidt is getting at is trying to get an understanding

12   of what are people getting in Class 5.  And so that's part of

13   the question, --

14               THE WITNESS:  Yeah.

15               THE COURT:  -- is, from your perspective.  I mean,

16   what we've heard a lot about is how other creditors are going

17   to get paid.  What does a Class 5 creditor get out of this

18   deal?

19               THE WITNESS:  A very small amount of money is

20   guaranteed to the Class 5 creditors.  It's going to be like

21   in the range of one percent, with the potential for some

22   upside.  The -- most of the money in the case flows into

23   either dealing with these consumer claims or dealing with the

24   sales tax authorities, because there were roughly $5 million

25   worth of unpaid accrued sales tax when we got into this case

Andrews - Cross                                231

1    that happened prepetition.  Some of those, it's a mixed bag.

2    Some have entitlement to priority.  Some may not.  It varies

3    by state.  It varies by the assets that remain within the

4    state.  It's an unbelievably complicated sort of challenging

5    accounting issue.

6        And so what we did is we basically put out a compromise

7    with respect to the sales tax authorities.  And as you can

8    see, most of them signed off.

9        The consumer claims get a fairly substantial

10   distribution.  That's a subset of the totality of all the

11   claims, and it's a special subset because there are -- the

12   nature of some of those claims includes claims that at least

13   arguably would be of a type that are either -- could create

14   constructive trust issues.

15       And so we had long had conversations and had an

16   understanding with the Lender that we were going to try to

17   deal with those claims in a way that made sense and was

18   protective of everybody, consumers, lender, et cetera.

19       Most of the rest of the consideration that remains in the

20   case goes to the Lender.  The Lender started the case with

21   roughly $100 million in debt, a little bit more than that.

22   Will end the case somewhere probably in the mid-fifties in

23   terms of the total value that it receives out of the case.

24   So roughly call it $54 to $55 million.  And that's before the

25   results of any further or future litigation that the Lender

Andrews - Cross                               232

1    may have.

2         The remaining sort of back and forth that we had in

3    conversations with the Committee were to look at various

4    other ways that we could potentially get value.  And the

5    conclusion we all came to was that there wasn't a lot of

6    value here.  And the other thing that the Bank was

7    considering was the conversion, because they felt that even

8    pushing the plan forward was sort of a heavy lift given their

9    losses and given the situation.

10        So that's -- I hope that answers the Court's question

11   about what the give and take were.

12        The Committee negotiated the portion of the plan that had

13   the release or opting in creditors because there were

14   preference exposures.  I will tell the Court that even that

15   is somewhat complicated, because the case came before Your

16   Honor May the 20th.  Prior to that, there had been a

17   receivership.

18        There hadn't been a lot of money going outbound, but

19   there was a considerable amount of obligation that was built

20   up by the Receiver, which was a whole other series of issues

21   that we mostly dealt with.

22        So we -- what isn't apparent from the plan that the Court

23   should know is that we dealt with a lot of claims along the

24   way in the case, particularly the consumer claims, and when

25   we could we dealt with some of the sales tax authorities or

1    tried to make what arrangements we could with them.

2         So a lot of things happened before we actually got to the

3    carcass that's left, if that's a -- maybe a good way to put

4    it.

5              THE COURT:  Okay.  All right.

6              MS. SCHMIDT:  All right.  Thank you, Your Honor.

7    BY MS. SCHMIDT:

8    Q    But from the -- and just to make sure I understand, and

9    I'm asking this just from the perspective of the Class 5

10   creditors.  So, as part of the consideration, they -- you had

11   referenced in your declaration, and that is -- that's in your

12   binder, your big binder, Exhibit 19.  I'm looking at the top

13   header, the Header 1 on Page 15.

14   A    Is it Page 15 of 33?

15   Q    Yes.

16   A    Okay.  I have it.

17   Q    In Paragraph 38.  And you state here that part of the

18   consideration as well are the mutual releases between

19   Consenting Creditors, because the Debtors' mismanagement of

20   cash left many customers and creditors to fend for themselves

21   and potentially pursue remedies against each other.

22        Did you do any type of valuation as to what remedies some

23   of these creditors might have had against -- for example, the

24   Class 5 creditors against each other?

25   A    So, we did some analysis a couple of different ways.  We

1    sifted through with the accountants, you know, what we could

2    see that transpired during the prepetition period, what had

3    happened to the vendor creditors, what had taken place with

4    respect to the landlords, and we did a little bit of an

5    analysis of, you know, what happened with respect to various

6    smaller trade creditors.  Because, keep in mind, each one of

7    the locations was not only selling boats, it had a store, it

8    was selling t-shirts and water skis and whatnot.  And we had

9    very particular situations in each of the store locations

10   where we had fusses with different vendors and that kind of

11   thing.

12        So what we did is we tried to figure out, first of all,

13   what all the claims were against the estate generally,

14   because the function of this entire enterprise was really

15   sort of one big operation.  And we tried to ascertain whether

16   or not we had good and accurate records with respect to boat

17   sales, underlying lien payoffs, which was a huge headache at

18   the beginning of the case.  We had to create what amounted to

19   being a -- not a model, I wouldn't call it that -- but maybe

20   a set of schedules.  And we had to look at the old schedules

21   that were filed by Force 10 and then verify out whether we

22   thought those were accurate or not accurate.

23        We ended up doing a complete recasting of the sales tax

24   obligations because they just were never really right.  And

25   so we had to go back through and rework that.

1      And so in this paragraph here that describes the back and

2  forth on the various claims, we tried to figure out were

3  there other third parties who might be responsible parties,

4  and if there were, what are the options as far as recovery

5  from any of those parties.

6      And candidly, what it sort of boiled down to was that

7  there were really only a few spots that we thought that there

8  were things worth pursuing, some of which we pursued during

9  the course of the case.

10      So the answer is we looked at and tried to assess what

11  value is there out there that we can give, and it just, it

12  looked to us to be relatively slim, other than just the value

13  of releases back and forth.

14      And the reason for that is there weren't lots of payments

15  that went outbound in the 90 days prior to the May 20th

16  filing, so you didn't have as many preferences as you

17  normally would because the company was essentially shut down

18  by the Receiver.  So there wasn't a lot of money flowing at

19  that point.

20      You also had a company that was sort of starved for cash,

21  and so it was trying to hoard cash just to make payroll and

22  do things like that.

23      All the sort of obvious stuff you'd normally do in a

24  Chapter 11 to find who can help pay for this mess, most of

25  the other parties who might have some responsibility either

Andrews - Cross                                236

1   were entwined with the Debtor and were empty vessels, there

2   was nothing there to collect, or they were already being sued

3   in other actions by the Bank, you know.  So it just -- it's

4   not a situation where there's as much as you would think,

5   given the size of the operations.

6       Does that answer your question?  I rambled, and I didn't

7   mean to, but --

8   Q   No, it did.  Just a few final questions.  So there were a

9   couple of creditors that submitted opt-outs.  And so I think

10  some of them might have been in Class 5.  Are they still

11  entitled to payment from that pot of money, their one

12  percent-ish?

13  A   I think if they opted out, they retain their claim in the

14  case but they get no release and they give no release.  And

15  I'm going to defer to Aaron if he tells me otherwise, but I

16  think that's the way that works.  I'm trying to remember

17  whether the opt-out means you actually leave whatever dollars

18  are on the table.

19  Q   Okay.  And I'll confirm with Mr. Kaufman.

20          MS. SCHMIDT:  Those are my questions.  Thank you.

21          THE COURT:  All right.  Mr. Kaufman, any redirect?

22          MR. KAUFMAN:  I --

23          THE COURT:  And let me ask you how much time you

24  think.

25          MR. KAUFMAN:  Yeah, Ms. Webb gave you three minutes,

1   so I intended to take three minutes.

2          THE COURT:  Three minutes?  Okay.  Because one of

3   the downsides of drinking copious amounts of coffee is that,

4   notwithstanding my earlier admonition that we would go for

5   quite a long time, --

6          MR. KAUFMAN:  Well, if the Court -- if you want to

7   take a quick --

8          THE COURT:  -- I'm just here to say after we do this

9   we might take a break.

10          MR. KAUFMAN:  I'm perfectly happy to take a break

11   first if the Court would prefer.

12          THE COURT:  If you're telling me three minutes, I

13   think we can do three.

14          MR. KAUFMAN:  Okay.  Let me be quick.

15                    REDIRECT EXAMINATION

16   BY MR. KAUFMAN:

17   Q   Mr. Andrews, we spent a great amount of -- a great deal

18   of time on your cross-examination going through what Mr.

19   Gates has called the solicitation version.  I want to ask you

20   just two quick questions on that.  If you could turn in your

21   Trustee's exhibit binder to Exhibit -- Trustee's Exhibit 1.

22   So that's the one that doesn't have a cover on it.  And

23   specifically, in Trustee's Exhibit 1, if you'd turn to, if

24   you look at the top file stamp, go to Page 33 of 35.  So

25   Document 1013-1, Page 33 of 35.  Let me know when you're

1  there.  (louder)  Let me know when you're there.

2  A    I'm there.

3  Q    Okay.  In Article XII, you got some questions on cross-

4  examination about Section D, as in dog, about the

5  inconsistency.  I want to point your -- direct you to

6  Subsection C, as in cat, and Subsection F, as in Frank.  And

7  you don't -- you can read them really quickly, but my

8  question is simply:  Does the solicitation version of the

9  plan contemplate a modification before confirmation?

10 A    Yes.

11 Q    And is the solicitation plan binding by the mere act of

12 filing it?

13 A    No.

14 Q    Okay.  Are you seeking confirmation of this solicitation

15 plan that's filed at Trustee's Exhibit 1?

16 A    No.

17 Q    Which plan are you seeking confirmation of today?

18 A    Of the one that was modified.

19 Q    And is that at Trustee's Exhibit 14, which was filed at

20 Docket 935, but for purposes of the record, Docket 1013-14?

21 A    Yes.

22 Q    You had some questions on cross-examination about the

23 Michigan litigation between the Bank and Mr. Borisch on his

24 guaranties.  Are you intending to offer any testimony today

25 about the merits of that litigation?

1    A    No.

2    Q    And then, finally, there were some questions on cross-

3    examination about the value of the inventory when you took

4    over as the Trustee.  Do you recall those, that line of

5    questions?

6    A    Yes.

7    Q    Mr. Gates asked you what the book value of the inventory

8    was.  I think you said it was -- the book value was roughly

9    $100 million, give or take?

10   A    Close to the debt of the Bank, I think.

11   Q    Okay.  Did the -- as the Trustee, did you obtain

12   authority under a Liquidation Procedures Order to sell the

13   inventory?

14   A    Yes.

15   Q    And did you obtain authority to retain a liquidation

16   consultant, Gordon Brothers?

17   A    Yes.

18   Q    And did you do the best of your ability in exercising

19   your business judgment to liquidate the inventory pursuant to

20   the court order, with the -- at the direction of your

21   liquidation consultant?

22   A    Yes.

23   Q    And do you believe you've maximized the value of the

24   inventory under the circumstances?

25   A    Yes.

1    Q    Sorry.  I said final.  Now I mean final-final.  Turn with

2    me, if you would, to, in the Borisch exhibit book, to Borisch

3    Exhibit 46.  Let me know when you're there.

4    A    Mine skips from 44 to 49.

5    Q    Okay.

6              THE COURT:  Yes, I also do not have a 46.

7              MR. KAUFMAN:  Your Honor, can I approach the

8    witness?

9              THE COURT:  You may.

10        (Pause.)

11             MR. KAUFMAN:  Can I hand Mr. Andrews his exhibit?

12   And Your Honor, this is not in evidence, so I'm not going to

13   ask Mr. Andrews to read it, but just to refresh his

14   recollection.

15             THE COURT:  Okay.

16   BY MR. KAUFMAN:

17   Q    What are you looking at right now?

18   A    An email, January the 7th, from you to Bank counsel.

19   Q    And does this refresh your recollection about the

20   discussions you were having with Mr. Borisch about a possible

21   global settlement around this time in January?

22   A    That there were such conversations?  Yeah.  No, I thought

23   I'd testified I think around January the 5th or 6th that

24   there was a direct conversation.

25   Q    Okay.  And just so the record is clear, no settlement

Andrews - Redirect                    241

1  ever occurred between the Bank and Mr. Borisch.  Is that

2  fair?

3  A    That's fair.

4          MR. KAUFMAN:  Your Honor, I'll pass the witness.

5          THE COURT:  All right.  Mr. Andrews, you may step

6  down.

7      (The witness steps down.)

8          THE COURT:  Let me ask you, Mr. Kaufman, while we're

9  in transition mode, how are we doing in terms of Trustee

10  witnesses?

11         MR. KAUFMAN:  We are out of witnesses.  We listed

12  Mr. Borisch.  That was only for cross-examination purposes.

13  All of our evidence is in, so at this time, the Trustee

14  rests.

15         THE COURT:  Okay.  Mr. Gerber, any evidence from

16  your end today?

17         MR. GERBER:  No.  We've offered our evidence through

18  the exhibits and through Mr. --

19         THE COURT:  Okay.  All right.  Then let's look at

20  the Objectors' case-in-chief at this point in time.  Mr.

21  Gates, what do you -- I guess, just to get a sense, how many

22  witnesses are you contemplating?  And do you have a ballpark

23  at all about how much time?

24         MR. GATES:  Just Mr. Borisch, Matthew Borisch.  And

25  I would think 20 minutes would be long, Judge.

1            THE COURT:  All right.  Ms. Schmidt, are you

2   anticipating having any witnesses today?

3            MS. SCHMIDT:  No more, Your Honor.  We wouldn't --

4   we don't anticipate calling any additional witnesses.

5            THE COURT:  Okay.  All right.  Just give me a

6   second.

7        (Pause.)

8            THE COURT:  All right.  So why don't we, for real,

9   for real, at least from my standpoint, do the seventh inning

10  stretch here and then we'll come back and we'll keep on

11  keeping on.  So it's 4:32.  Why don't we just -- usually, I

12  like it when we're really close to -- if it feels like a

13  round number, but let's just think roughly 10 minutes.  So

14  roughly 4:42, 4:43.  We'll just kind of aim for that.  Just

15  enough time to run down the hall and do whatever else, but

16  we'll come back at that point.  Okay?  The Court will be in

17  recess until 4:43.

18            THE CLERK:  All rise.

19        (A recess ensued from 4:32 p.m. to 4:45 p.m.)

20            THE CLERK:  All rise.

21            THE COURT:  All right.  Please be seated.

22        All right.  We're back on the record in Case 24-90000.

23  Mr. Gates?

24            MR. GATES:  Thank you, Judge.  Your Honor, I call

25  Matthew Borisch to the stand.

1          THE COURT:  Okay.  Mr. Borisch, if you'll come on

2     up.  You know the drill.  You've seen it.  If you can go

3     ahead and raise your right hand.

4          MATTHEW BORISCH, BORISCH PARTIES' WITNESS, SWORN

5          THE COURT:  Okay.  Please be seated.

6                         DIRECT EXAMINATION

7     BY MR. GATES:

8     Q   Mr. Borisch, let's try to make this lightning-fast, if we

9     can.  Did you have any discussions at all with Mr. Andrews

10    regarding a pending Chapter 11 plan document?

11    A   No.

12    Q   Did you even inquire of Mr. Andrews if you could ever see

13    a Chapter 11 plan document?

14    A   I did.

15    Q   All right.  And what was -- do you recall his response?

16    A   He indicated that he would discuss it with my counsel.

17    Q   Okay.  So is the answer to your question one discussion,

18    or did you have more about a plan document?

19    A   I don't know that you can call it a discussion, but there

20    was one time I said plan.

21    Q   Okay.  And did you call him or did he call you?

22    A   I phoned him.

23    Q   Okay.  So, conversely, did you have several discussions

24    with Mr. Andrews regarding potential settlement with M&T

25    Bank?

M. Borisch - Direct                    244

1    A    Yes.

2    Q    All right.  And what was your position in terms of

3    engaging in settlement discussions with M&T Bank?

4    A    That I would go anywhere, anytime.

5    Q    Did you ever refuse to engage in settlement discussions

6    with M&T Bank?

7    A    No.

8    Q    Did you always remain interested in engaging in

9    settlement discussions with M&T Bank?

10   A    Absolutely.

11   Q    Okay.  Did you hear Mr. Andrews testify today regarding

12   the preconditions that M&T Bank set forth for having any

13   settlement discussions with you?

14   A    I did.

15   Q    And what was your understanding of those preconditions?

16   A    The first was a substantial offer and the second was

17   disclosures about my financial condition.

18   Q    Okay.  Let's talk first about the disclosures.  Any

19   issues with providing disclosures?

20   A    Not at all.

21   Q    Okay.  Why didn't you provide disclosures?

22   A    Because it required a substantial offer.

23   Q    Okay.  The second prong of their precondition?

24   A    Yes.

25   Q    Okay.  And with respect to that substantial offer, did

1  you give consideration to making a substantial offer?

2  A    Not really.  I wasn't in a position, I'm not in a

3  position today to make a substantial offer.

4  Q    Okay.

5  A    If that has anything to do with money, which that's, I

6  think, what it infers.

7  Q    Okay.  And then in terms of evaluating, you know, your

8  claims against M&T Bank, the offsets, the litigation that's

9  taking place in Kent County Circuit Court right now, in terms

10  of evaluating that, have you had the opportunity to evaluate

11  the offsets, the defenses, and the counterclaims that you

12  have against M&T Bank?

13  A    Yeah, of course.

14  Q    Okay.  And what's your evaluation of the defenses,

15  offsets, and counterclaims that you have pending in that

16  litigation against M&T Bank?

17  A    Well, I've felt from the start of this that they were

18  pretty substantial, starting with the lack of repurchase

19  agreement.

20  Q    What would the repurchase agreement have meant regarding

21  a potential deficiency for you with respect to the M&T Bank

22  loan?

23  A    It would have paid it nearly in full.

24  Q    Okay.  And why is that?

25  A    Because the way the repurchase agreement reads, most of

M. Borisch - Direct                                    246

1    the boats that I had financed through M&T Bank were within

2    the time period that Malibu would have had to pay for every

3    one of those boats.  Nearly every one of those boats.

4    Q   So you heard Mr. Andrews talk about the book value of

5    those boats at the time he got involved, approximately a

6    hundred million.  Does that make -- is that about the right

7    number to you as well?

8    A   Yeah, it's close.

9    Q   Okay.  And the -- you heard Mr. Andrews testify that the

10   debt alleged by M&T Bank at the time was approximately $105

11   million?

12   A   Yes, that's -- yeah.

13   Q   Okay.  And so that's with respect to the repurchase

14   agreement.  Did you have an opportunity as well to evaluate

15   the manner in which M&T Bank was working with you or against

16   you in terms of, you know, liquidation of collateral?

17   A   Maybe working with or against the estate?

18   Q   Correct.

19   A   Because I was not in the business anymore after the

20   Trustee was added.  When the Trustee was brought in, the

21   business was selling boats for an average cost plus 10

22   percent.  Book value plus 10 percent, I guess is what we're

23   calling it.  Excuse me.  And when the Trustee was brought in,

24   that negotiation appeared to take a really long time, as I'm

25   not blind and I can see that all of the inventory was still

1   there month after month after month.

2        And the selling season, if you looked at our financials

3   for a decade, the selling season really happens nearly 65

4   percent before the end of the month of June.  So if you don't

5   sell boats through June and July and August -- admittedly,

6   they started selling boats in August, and it was obvious that

7   they had, so --

8   Q    So the Trustee was in place on or about June of 2024.

9   And prior to that, post-receivership, can you generally

10  explain what was going on in that period of time with the

11  ongoing operations of Tommy's?

12  A    Well, I think my perspective would be that not much of

13  anything was going on.  There were constant complaints from

14  people about not even being able to pay for gas in a truck to

15  demo a boat.  And I think that's all of record somewhere, but

16  --

17  Q    Okay.  And then prior to that, there was a receiver in

18  place, correct?

19  A    Yeah.

20  Q    For a short period of time?  What's your explanation of

21  what the Receiver did in connection with, in a commercially

22  reasonable manner, liquidating the inventory?

23  A    Nothing at all.

24  Q    What does that mean, nothing at all?

25  A    I don't believe the Receiver liquidated a single boat.

M. Borisch - Direct                    248

1   I'd have to go back and verify that.  But for the first two

2   weeks, they did -- they did literally nothing at all.  They

3   held all of the money.  They didn't pay any bills, which

4   caused lots of problems that the Trustee ended up having to

5   resolve.

6   Q    If I recall correctly, the Receiver was in place around

7   on or about April 1st of 2024?

8   A    No, it was the third week of April --

9   Q    Okay.

10  A    -- 2024 until the third week of May 2024.

11  Q    Okay.  So about a month?

12  A    Yeah.

13  Q    Okay.  And then prior to the Receiver's installation, did

14  M&T Bank have any involvement with the operation of your

15  business prior to the Receiver being installed?

16  A    Yeah.  Yep.  On March 1st, they installed what was called

17  a CRO, a chief restructuring officer.

18  Q    Okay.  Did you have the opportunity to work closely with

19  that individual?

20  A    Yeah.

21  Q    Okay.  And your explanation of what that individual did

22  to allow for the commercially reasonable liquidation of

23  collateral?

24  A    Well, in the most factual way, many of the things that

25  M&T filed a lawsuit against the company for were done during

M. Borisch - Direct                    249

1    that time.  Not paying sales tax, taking trades but not

2    paying off the liens.  I mean, many of the things that -- not

3    -- and eventually, by the second week of March, not being

4    able to take any trades, which caused problems with boats

5    that we had custom orders on and deposits for custom orders

6    on.  So there's a lot there.

7    Q    Okay.  And all of that is pending in Kent County Circuit

8    Court, not in this Court, right?

9    A    As far as I understand.

10   Q    Okay.  You have a lawyer working on that case with you,

11   right?

12   A    Yeah.

13   Q    Okay.  And then I guess the final piece of the equation

14   with respect to what's pending in Kent County Circuit Court,

15   ultimately, there was an opinion issued by Judge Morris

16   addressing whether you had individual or all derivative

17   claims pending in Kent County Circuit Court.  Do you recall

18   that opinion?

19   A    Yes.

20   Q    Okay.  And in particular, was there anything within that

21   opinion that also helped you evaluate the value of those

22   claims pending in Kent County Circuit Court?

23   A    Well, most certainly.

24   Q    And what was that?

25   A    That I had the potential to go for affirmative claims

M. Borisch - Direct                    250

1    against M&T Bank.

2    Q    Okay.  And the Court actually identified one particular

3    claim, correct?

4    A    Yes.

5    Q    And quantified it.  Do you remember that?

6    A    Yes.

7    Q    All right.  Well, how much was that claim?

8    A    $29 million.

9    Q    Okay.  So I asked a question of Mr. Andrews regarding the

10   valuation of that Kent County Circuit Court.  From your

11   perspective, from your claims, your defenses, what is your

12   position in terms of the value of that case to Matt Borisch?

13   A    Well, if I'm able to prove everything that I think I can

14   prove, I get to zero before I'd have any affirmative claim,

15   and then my affirmative claim, whatever I can gather from

16   that against M&T Bank.

17   Q    Okay.  And I want to move on to this May 1st solicitation

18   version of the Chapter 11 plan.  As you know, ultimately, we

19   filed a ballot in which you accepted that plan and chose not

20   to opt out of that plan.  Do you recall that?

21   A    I do.

22   Q    Okay.  And you directed us to do that, correct?

23   A    Absolutely.

24   Q    Okay.  And why did you direct us to do that?

25   A    Well, after the 22nd, it made it a little more

M. Borisch - Direct                    251

1  challenging of a decision once I had confirmation of my

2  affirmative claims or the ability to pursue them.  But

3  something I learned in the last year through all of this

4  process is that the document matters and there's not a lot

5  that does outside of the document.

6      Actually, a year ago, June, the first time in this

7  courtroom, I learned that really well with the Malibu

8  documentation that we presented.

9      But nonetheless, I read the document.  I saw that I could

10 be a Consenting Creditor.  I saw that by giving a release I'd

11 be getting a release.  And based on the hell that I've lived

12 for the last year, I thought by giving and getting a release

13 that would get one of three things off of my plate and I'd

14 stop living that hell and move on to other things.

15 Q   You mentioned specifically the experience you had and the

16 lesson that you learned in connection with the first issue

17 with Malibu.

18 A   Uh-huh.

19 Q   Can you drill down on that a little bit more?  What are

20 you referring to?

21 A   I certainly don't intend to put words in anybody's mouth,

22 but one of the things I learned in that process was the

23 document we were looking at didn't support the contract that

24 I have.  And as it was relayed to me in that hearing, there

25 may have been a contract, but it wasn't the one we were

1  looking at.

2       And so in this case, I said, all right, well, I don't

3  know what has happened to create this plan, but the plan

4  appears to give me absolutely a release if I give a release.

5  And so that's what I chose to do.

6  Q   The document you're referring to with respect to Malibu,

7  are you talking about the dealership agreement?

8  A   Yeah, the dealership agreement.

9  Q   Okay.

10 A   It had since expired.  As was pointed out, we probably

11 had an agreement, but it wasn't our dealership agreement, and

12 so I lost right out of the gate.

13 Q   Okay.

14           MR. GATES:  Pass the witness, Judge.

15           THE COURT:  All right.  Ms. Schmidt, any questions

16 from your end?

17           MS. SCHMIDT:  No, Your Honor.

18           THE COURT:  All right.  Any cross-examination?

19           MR. KAUFMAN:  No cross.

20           THE COURT:  All right.

21           MR. GERBER:  No cross, Your Honor.

22           THE COURT:  All right.  You may step down.

23           THE WITNESS:  Thank you.

24      (The witness steps down.)

25           THE COURT:  Any additional witnesses today?

1              MR. GATES:  No, Your Honor.

2              THE COURT:  All right.  Ms. Schmidt, any additional

3    witnesses?

4              MS. SCHMIDT:  No, Your Honor.

5              THE COURT:  All right.  Any rebuttal witnesses?

6              MR. KAUFMAN:  No rebuttal.

7              THE COURT:  Okay.  And I assume, Mr. Gerber, --

8              MR. GERBER:  I'm sorry, Your Honor.  No rebuttal.

9              THE COURT:  Okay.  All right.  Then the evidence

10   will be deemed closed at this point in time.

11       Are you all ready to go to closing argument?  Do you need

12   any time to collect thoughts or anything?  Obviously, it is

13   5:00, but certainly I want you to be able be organized, ready

14   to go.

15             MS. WEBB:  The Trustee is ready.

16             MR. BAKST:  We're ready, Your Honor.

17             THE COURT:  Okay.  All right.  Great.  Then let's go

18   ahead and take up closing arguments at this time.

19   CLOSING ARGUMENT ON BEHALF OF CHAPTER 11 TRUSTEE MARK ANDREWS

20             MS. WEBB:  Thank you, Your Honor.  Lydia Webb,

21   again, on behalf of the Trustee.  I am going to try to be

22   succinct, but I do have a fair bit of ground to cover today.

23   So I appreciate the Court's patience as I make the record.

24       The Trustee submits that he has met all requirements for

25   confirmation of the plan.  First, the solicitation process

1    and procedures complied with the Bankruptcy Code and provided

2    creditors and interest holders with sufficient and adequate

3    notice of the plan.

4        On May 2nd, 2025, the Court entered its order approving

5    the disclosure statement and approved the related

6    solicitation deadlines and procedures.  That's our Exhibit 4.

7        Pursuant to those procedures, on May 6th, the Trustee

8    caused the mailing of the solicitation packages to the

9    parties entitled to vote on the plan as well as the

10   confirmation hearing notice and the third-party release opt-

11   out form to all remaining parties of interest.  That's at the

12   Affidavit of Service at Exhibit 9.

13       The Trustee also caused notice of the confirmation

14   hearing, the objection deadline, and the administrative claim

15   bar date to be published in the *Grand Rapids Press* and *The*

16   *Wall Street Journal*.  That's with the Affidavit of

17   Publication at Exhibit 6.  The deadline to submit ballots was

18   June 5th, 2025.

19       As the Court is aware, the Trustee modified the plan on

20   June 6th, 2025, that's our Exhibit 14, in an attempt to

21   resolve certain --

22            THE COURT:  So, and let me -- so, I may have some

23   questions along the way.

24            MS. WEBB:  Absolutely.

25            THE COURT:  But just so that it's crystal clear, so

1    because I know we have this in the disclosure statement

2    order/solicitation order, but just to walk me back through,

3    what exactly was sent to whom?  And we can do it by class.

4          MS. WEBB:  Absolutely.  Your Honor, if you don't

5    mind, let me grab the exhibit look and we'll walk through it.

6          THE COURT:  Sure.

7          MS. WEBB:  Thank you, Your Honor.  So, our affidavit

8    of service was at Exhibit 9, Trustee's Exhibit 9.  And our

9    noticing agent did a pretty good job of breaking down who was

10   solicited by class.

11         THE COURT:  Okay.

12         MS. WEBB:  Okay.  Let me know when you're there and

13   I'll get started.

14         THE COURT:  Okay.

15         MS. WEBB:  Okay.  So if you look, again, I'm looking

16   at Trustee's Exhibit 9, Paragraph 2.  It says:  On May 6th,

17   I, the Noticing Agent, caused to be served the Plan, the

18   Disclosure Statement, the Disclosure Statement Order, the

19   Confirmation Hearing Notice, collectively defined, the

20   Solicitation Package.  Right?

21      Then he continues on, the Ballots, all the way down

22   through Item J, the Trustee's Cover Letter, the Notice of

23   Nonvoting Status, the Third-Party Release Opt-Out Form, the

24   Notice of Nonvoting Status with Respect to Disputed Claims,

25   and the pre-addressed return envelope.  That's all -- that

1    sets the stage of what all was sent.

2         And then if you look at the next paragraph, right, it

3    talks about who receives what.  Right?  So the Confirmation

4    Hearing Notice, the Class 1 Ballot, the Trustee's Cover

5    Letter, the Third-Party Release Opt-Out Form, and the

6    envelope were sent to the parties on Exhibit A, which are the

7    Class 1 Holders.  Okay?

8         The next one are disputed claims.  So those are the

9    parties that we had filed a claim objection.  Your Honor, if

10   you recall, and you did enter an order approving that claim

11   objection --

12             THE COURT:  Got it.  Okay.

13             MS. WEBB:  -- a month or so ago.

14        The parties that were on the claim objections, that's in

15   Roman Numeral II, that got the, you know, the confirmation

16   hearing notice, a ballot, a notice of disputed claim, and

17   opt-out forms.

18        Roman Numeral III, this is a Class 1 ballot and a Class 5

19   ballot.  So these are parties that were both in Class 1 Non-

20   Tax Priority Claims and Class 5 General Unsecured Claims.

21   They also got a copy of the cover letter and the third-party

22   release opt-out form.

23        Roman Numeral IV, the Class 2 ballot.  That's M&T Bank.

24        Roman Numeral V, the Class 4 ballot.  Those are the

25   customer -- or the, yeah, the customer constructive trust

1  claimants.

2      Roman Numeral VI is Class 5 ballots.  These are the

3  general unsecured claims.  You'll see that they got a copy of

4  the cover letter and the third-party release opt-out form to

5  the extent that they had a disputed claim.  That's Roman

6  Numeral V.  Roman Numeral VII are the ones that didn't have

7  disputed claims.

8          THE COURT:  Oh.  All right.  And you know what, so

9  let me back up a little bit.

10          MS. WEBB:  Uh-huh.

11          THE COURT:  Because this is all kind of making sense

12  to me.

13      (WebEx interruption.)

14          THE COURT:  We're going to also do something here,

15  if I can.  I don't know if I can determine who that is.

16          THE CLERK:  Unknown.

17          THE COURT:  Unknown.  Let's see here.  Unknown.

18  There, at the very end.  Okay.  Unknown, since you said that

19  you're going to see everybody tomorrow, we're expelling you.

20      All right.  So, let's take Roman Numeral II for a second.

21  What I want to do is compare Roman Numeral II to Roman

22  Numeral X.

23          MS. WEBB:  Okay.

24          THE COURT:  Okay?  So, --

25          MS. WEBB:  Uh-huh.

1          THE COURT:  So, is the idea that if, in Roman

2     Numeral II, if there was somebody who had a Class I claim --

3          MS. WEBB:  Uh-huh.

4          THE COURT:  -- that wasn't fully disputed but was

5     partially disputed?

6          MS. WEBB:  So, --

7          THE COURT:  What I'm trying to understand is why are

8     they getting a ballot and a notice of disputed claim, and yet

9     in 10 we have like a totally separate --

10          MS. WEBB:  Correct.

11          THE COURT:  -- just notice of disputed claim.

12          MS. WEBB:  And Your Honor, thank you for refreshing

13     my recollection on that.  That's because with respect to some

14     of our claim objections, we had reduce-and-allow objections.

15          THE COURT:  Okay.

16          MS. WEBB:  And so they had a portion of their claim

17     which was disputed but there was a portion that was

18     undisputed.

19          THE COURT:  Got it.  Okay.  That makes sense, and

20     that's what I assumed.

21          MS. WEBB:  Uh-huh.

22          THE COURT:  Okay.  All right.  So, sorry, I

23     interjected, and then Unknown un-interjected, so --

24          MS. WEBB:  It's all good, Your Honor.  We're just

25     here to answer your questions.  I'm happy to continue walking

1  you through, you know, who received what.

2        THE COURT:  I think, yes, actually just pointing me

3  to this exhibit and seeing the flow, I'm with you now.

4        MS. WEBB:  Okay.  Good.

5        THE COURT:  I've got it.  I've got it.

6        MS. WEBB:  I will brag on Omni for doing a good job

7  with this affidavit service.  I thought it was helpful when I

8  was preparing for today's hearing.

9        THE COURT:  Okay.  All right.  Okay.

10        MS. WEBB:  May I continue?

11        THE COURT:  Please.

12        MS. WEBB:  As I was saying, Your Honor, the Trustee

13  did modify the plan on June 6, 2025.  That's Exhibit 14.

14  This was an attempt to resolve certain objections raised by

15  the U.S. Trustee and the Tennessee Department of Revenue, as

16  well as make the clarifying changes that we discussed

17  extensively with Mr. Andrews on the stand today.

18        Following the status conference on June 9th, the Court

19  entered the scheduling order, that's Exhibit 16, which

20  afforded the Borisch Parties an additional 21 days to file an

21  objection to the plan and amend their ballots.

22        The Trustee promptly filed a notice of adjourned

23  confirmation hearing, that's Exhibit 17, in accordance with

24  the Court's request at the status conference on June 9th.

25        On July 1st, 2025, we filed the second amended voting

1    tabulation report, which reflected that Classes 2, 4, and 5

2    voted to accept the plan.  That's Exhibit 15.

3        So, with the service and the notice issues out of the

4    way, Your Honor, I'll turn to the confirmation requirements

5    and I'll walk through those generally, knowing that I will

6    address the ones that are specifically at issue today at the

7    back-end when I'm addressing the Borisch objection and the

8    U.S. Trustee objection.

9        Your Honor, the Trustee does contend that the plan

10    satisfies all applicable requirements for confirmation, which

11    includes 1122, 1123, 1125, 1126, and 1129 of the Bankruptcy

12    Code.

13        The Andrews Declaration sets forth in detail how each

14    confirmation requirement is met, but in particular we do

15    contend that good faith under 1129(a)(3) is satisfied.  And I

16    will get into this in some greater detail at the back half of

17    my presentation.  But the plan was filed for the legitimate

18    purpose of making distributions under and pursuant to the

19    Bankruptcy Code and effectuating the estates' settlement with

20    M&T Bank.

21        The Court heard testimony about the extensive

22    negotiations that led to the plan as well as how Mr. Borisch

23    was afforded an opportunity to participate in that process

24    through the settlement, potential settlement of his claim.

25        The Plan Supplement, Exhibit 7, identifies Mark Andrews

1    as the Creditor Trustee, satisfying 1129(a)(5).

2        The best interest of creditors test is satisfied under

3    1129(a)(7) because, as set forth in the liquidation analysis

4    attached to the disclosure statement, which is Schedule 1 to

5    Exhibit 2, no holder of claims or interests will receive more

6    in a hypothetical Chapter 7 than it would receive under the

7    plan.

8        Section 1129(a)(10) is satisfied, as reflected by the

9    voting tabulation report.  Again, that's Exhibit 15, which

10   indicates that we have three impaired accepting classes,

11   Classes 2, 4, and 5.

12       1129(a)(9) and (a)(12) are satisfied because the plan

13   does provide for payment of administrative claims and United

14   States Trustee fees, as detailed in Article II of the plan.

15       Feasibility under 1129(a)(11) is also satisfied.  This is

16   a simple liquidating plan, as Mr. Andrews testified to.

17   There will be no need for further reorganization or

18   liquidation once the plan goes effective.

19       Your Honor, we are in a cramdown situation because

20   certain claims have rejected or are deemed to reject the

21   plan, and so we cannot satisfy 1129(a)(8).  However, we do

22   satisfy the cramdown requirements of 1129(b).

23       And, again, I will address the Borisch Parties and their

24   cramdown objection at the back half of my presentation, but

25   the plan does not discriminate unfairly as to the non-

1   accepting classes, as all similarly-situated holders will

2   receive substantially similar treatment.

3       Thus, the plan complies with the absolute priority rule

4   and the fair and equitable requirement.

5       Specifically, holders of Class 1 priority non-tax claims

6   which we solicited but we didn't receive any votes from

7   members of that class, they will receive or retain on account

8   of their claims, you know, property on the effective date in

9   a value equal to the value of such claim.

10          THE COURT:  And do I have -- is that part of the

11  declaration?

12          MS. WEBB:  Yes, Your Honor.

13          THE COURT:  Okay.  All right.

14          MS. WEBB:  Holders of Class 3, Other Secured Claims,

15  will receive their collateral, subject to applicable liens.

16  And to the extent such collateral is insufficient to pay the

17  amount of their claim in full, then they will receive Class 5

18  general unsecured claims for the remaining portion of their

19  other secured claims.

20          THE COURT:  And let me ask you on that.

21          MS. WEBB:  Sure.

22          THE COURT:  I know this is getting hyper-technical,

23  but isn't -- I get it, it's set up, option, I see this all

24  the time, the optionality.

25          MS. WEBB:  Uh-huh.

1          THE COURT:  We'll either pay you in full or we'll

2    give you collateral, or we're going to do whatever else is

3    necessary to make sure that you're unimpaired.  But then it

4    gives the option to the Creditor Trustee, I believe.

5        If the idea is to give collateral, isn't that sort of

6    quintessential impairment?  Now, there's plenty of case law

7    that says that it's the indubitable equivalent if we go to a

8    cramdown mode.

9          MS. WEBB:  Correct.

10          THE COURT:  But I was kind of caught sort of

11   scratching my head a little bit as to why that was

12   characterized as an unimpaired class.

13          MS. WEBB:  And Your Honor, I always have the same

14   debate when it comes to these other secured claims as well.

15   We are relying on the indubitable equivalent here, that the

16   fact that these other secured claimants, which, again, we

17   don't believe that there are many of them, but to the extent

18   that they are still holding collateral, they can keep that

19   collateral in satisfaction of their claim, which, again,

20   meets the first half of the cramdown requirement.  Or if they

21   are unable to, then we are going to treat them as a Class 5

22   general unsecured claim.  I realize that they are entitled to

23   vote --

24          THE COURT:  Right.  I mean, to the extent they're

25   Class 5, that's --

1          MS. WEBB:  Right.

2          THE COURT:  -- because they don't have an allowed

3    secured claim.

4          MS. WEBB:  Correct.

5          THE COURT:  Okay.

6          MS. WEBB:  Right.

7          THE COURT:  So, --

8          MS. WEBB:  And so that's, that's what we're here --

9          THE COURT:  Okay.

10         MS. WEBB:  We don't really think, again, that

11   anybody fairly falls within the Class 3 Other Secured Claim

12   that has collateral, and so therefore they are defaulted into

13   Class 5.

14         THE COURT:  Okay.  And is there any declaration

15   testimony that sort of says, hey, here's who we think is in

16   Class 3, or not really?

17         MS. WEBB:  I'm not sure if we have declaration

18   testimony.

19         THE COURT:  I mean, I guess we have the

20   solicitation.

21         MS. WEBB:  Let me look on the fly and see, since we

22   don't have --

23      (Counsel confer.)

24         MS. WEBB:  Yeah, I don't think that we have anything

25   specific to Class 3 since we didn't have a ballot for them.

1          THE COURT:  Oh, that's right.

2          MS. WEBB:  So they would have received a notice of

3    nonvoting status.

4          THE COURT:  All right.  Well, I get it, that this is

5    a little bit more of an intellectual exercise than anything,

6    but okay.

7          MS. WEBB:  For what it's worth, Your Honor, I always

8    kind of struggle with this one as well.

9        So, moving on to holders of Class 6, 7, and 8 claims in

10   interest, this does meet the requirement because no holder of

11   a junior interest will receive or retain any interest in

12   property under the plan on account of their junior interest

13   and no classes senior are going to be receiving more than a

14   100 percent recovery.

15       So, as a result, Your Honor, we believe that the plan can

16   be crammed down notwithstanding the rejection of the plan by

17   Classes 1, 6, 7, and 8.

18       Turning next to --

19          THE COURT:  And let me ask.  On Class 7, --

20          MS. WEBB:  Yes, Your Honor.  The intercompanies.

21          THE COURT:  -- kind of talk me through that one.

22   Does that become a function of the settlement because of the

23   -- I mean, it is kind of awkward, where the Debtors release

24   each other.

25       What I'm trying to understand is how it is justified to

1   treat those claims as different than, for example, a Class 5

2   claim.

3           MS. WEBB:  And I need to look at the appropriate

4   provision of the plan.  I can't -- and I'm going to look at

5   Mr. Kaufman, as is very popular to do.

6           THE COURT:  And I know that there was a request for

7   --

8           MS. WEBB:  Substantive consolidation --

9           THE COURT:  Right.

10          MS. WEBB:  -- for the limited purposes of --

11          THE COURT:  Kind of a limited substantive

12  consolidation.

13          MS. WEBB:  -- of voting and distribution.  But I'm

14  trying to think if we actually waived intercompany claims

15  within the plan.

16          THE COURT:  It may be.

17          MS. WEBB:  Yeah.

18          THE COURT:  And that's fine.  I just wanted to make

19  sure that there was nothing that you were aware of that I

20  wasn't already thinking of, which is fine.

21          MS. WEBB:  No, Your Honor.

22          THE COURT:  Okay.

23          MS. WEBB:  And, frankly, there's going to be no

24  money available to distribute to Class 7, so we do believe

25  that they are impaired and deemed to reject, yeah.

1          THE COURT:  Understood.  I'm just trying to

2     understand -- well, it doesn't matter.  I know where I'm at

3     on that.  I just wanted to make sure there was nothing else

4     out there.  Okay.

5          MS. WEBB:  Very well.  Moving to the plan

6     modifications, the Trustee does contend that the plan

7     modifications comply with Section 1127(a), which provides

8     that a plan may be modified at any time pre-confirmation.

9     The Trustee modified the plan on June 6th.  That's 32 days

10    prior to today's hearing.

11         The modifications were technical in nature and otherwise

12    contemplated by the plan and the other solicitation

13    documents.

14         Mr. Andrews testified that the modifications did not

15    materially or adversely affect any party's substantive rights

16    under the plan, and are supported by M&T and the UCC.

17         Mr. Borisch's objections to the plan modifications should

18    be overruled.  The modification to the third-party release

19    provisions were consistent with the Trustee's intent from the

20    beginning that the Borisch Parties are neither giving nor

21    receiving releases under the plan.

22         This is consistent with the language not only of the

23    disclosure statement but also on the ballots.  Mr. Borisch

24    was afforded additional time to object and amend his ballots,

25    and he did so.  As a result, no additional solicitation or

1    disclosure is required, and the creditors who voted to accept

2    the plan should be deemed to accept the plan as modified.

3            THE COURT:  So let me, I guess, in fairness say,

4    isn't it really accurate to say that there was resolicitation

5    --

6            MS. WEBB:  There was a resolicitation --

7            THE COURT:  -- to the Borisch Parties?

8            MS. WEBB:  -- of the party that was impacted.

9            THE COURT:  Right.

10           MS. WEBB:  Again, we do not believe that this was

11   material.

12           THE COURT:  I understand.

13           MS. WEBB:  I understand that the Borisch Parties

14   have a different view of that.  But in any event, any issue

15   or potential harm from that modification has been cured

16   because Your Honor gave the Borisch Parties 21 additional

17   days to object to the plan and amend their ballots, which

18   they did.

19       The plan has the overwhelming support of the estates'

20   noninsider creditors.  The Trustee has worked diligently

21   since his appointment to address creditor concerns across a

22   wide variety of constituencies.  The plan is the culmination

23   of those efforts.

24       As I mentioned upfront, only two objectors remain, the

25   U.S. Trustee and the Borisch Parties.  I'd like to start with

1   the U.S. Trustee objection to the third-party releases and

2   the injunction provision.

3       The third-party release appears at Section X.D. of the

4   plan.  In sum, it provides that each Releasing Party,

5   including all holders of claims and interests who do not

6   specifically object to or opt out of their inclusion as a

7   Releasing Party, which is what we've been discussing as a

8   Consenting Creditor under the plan, shall release all claims

9   or causes of action set forth in the third-party releases

10  that could be asserted against the Released Parties.

11      The Released Parties include the Trustee, the Debtor, the

12  Committee, its members, and the Creditor Trustee, and M&T,

13  and certain M&T-related parties.

14      All parties in interest were given notice of the language

15  of the third-party release.  The confirmation hearing notice,

16  which is Exhibit 5, which was served on all parties, included

17  the language of the third-party release in bold font.

18  Releasing Parties could opt out of the third-party release by

19  objecting to the third-party release by the confirmation

20  objection deadline, and indeed, as reflected on the ballot

21  tabulation, which is Exhibit 15, we did have three parties

22  that submitted opt-out forms.

23      In addition, we had the Tennessee Department of Revenue,

24  which filed an objection where they objected to the third-

25  party release and seeking to opt out, and so was -- that

1   means of opting out is also effective.

2       This establishes that parties actually received the

3   notice, reviewed it, and were given sufficient information to

4   be able to weigh their decision to opt out or not opt out of

5   the release.

6           THE COURT:  So let me ask you.  This is going to be

7   a pretty granular question, and I don't know if you know the

8   answer.  But focusing on the Class 5 creditors, --

9           MS. WEBB:  Uh-huh.

10          THE COURT:  -- do you have any sense of (a) kind of

11  how many of those creditors there are, and (b) how many of

12  those creditors filed proofs of claims in the case or made an

13  appearance by way of a notice of appearance by counsel or

14  what have you?

15          MS. WEBB:  I am not sure how many proofs of claims

16  we received.  I can tell you that 50 parties voted on the

17  plan, and I can tell you quickly, by eyeballing, again, going

18  back to Exhibit 9, how many parties received the Class 5

19  ballot.  But I do believe that we received hundreds of

20  claims.  Give me a second.  I can try to eyeball kind of the

21  extent of the Class 5 parties.

22      So, yeah, Your Honor, the Class 5 parties start on --

23  okay, I'm looking at Exhibit 9, the header Page 17 of 39.

24          THE COURT:  I see it.

25          MS. WEBB:  So the Class 5 parties go for 17 through

1    22, in pretty tiny font.  I'd hazard a guess, but again, I

2    think that we're looking at, you know, in the hundreds, not

3    thousands, --

4              THE COURT:  Right.

5              MS. WEBB:  -- of parties impacted.

6              THE COURT:  Yes.  And I'm just, what I'm trying to

7    get a sense of is how many of these folks maybe have been

8    scheduled with a claim as liquidated, undisputed,

9    noncontingent, but haven't really shown up on the scene, if

10   you will, in any way.  That's really what I'm asking.

11             MS. WEBB:  So a reconciliation of scheduled claims

12   versus filed claims?

13             THE COURT:  Yes.  I mean, just basically.  And if

14   you don't know, that's fine.  I just, if you had a sense, --

15             MS. WEBB:  I don't have a sense, Your Honor.

16             THE COURT:  Okay.

17             MS. WEBB:  I know we looked at this when we were

18   doing -- or a similar issue when we were doing the claim

19   objections and we were trying to weed out objectionable

20   claims and we were comparing both the scheduled claims and

21   the filed proof of claims.

22        But sitting here today, I can't give you a sense of the

23   amount of parties that were scheduled versus parties that

24   filed claims.  What I can tell you is, as Trustee's counsel,

25   our firm fielded a significant number of calls from creditor

1  constituencies, and as the young lawyer that used to be the

2  one that fielded these calls but has graduated to dealing

3  with other things, I can tell you that --

4           THE COURT:  That rolled downhill to someone else?

5           MS. WEBB:  It rolled.  You know, we have -- other

6  people have opportunities to build that experience now in our

7  firm.

8           THE COURT:  Right.

9           MS. WEBB:  But I can tell you that we did have heavy

10  involvement and concern from the creditor body, I think

11  potentially or particularly since we did have a lot of

12  customer claims which, again, falls into --

13           THE COURT:  Right.  That's Class 4?

14           MS. WEBB:  -- Class 4.  Right?

15           THE COURT:  Right.

16           MS. WEBB:  But we also had a significant involvement

17  from our landlord claimants, our vendor claimants, just I

18  think because of how this case came to be with kind of the

19  somewhat torturous start with the Receiver into --

20           THE COURT:  Right.

21           MS. WEBB:  -- you know, the Chapter 11, into the

22  Chapter 11 Trustee.  Either my office or Mr. Andrews have

23  dealt with a significant number of these creditors.

24      Do you have anything else, or --

25           THE COURT:  No.

1          MS. WEBB:  Okay.  Great.  So I think I was saying

2     that we did provide notice of this.  It was bold on the

3     solicitation materials.  We did receive three opt-out forms,

4     as well as the opt out from the Tennessee Department of

5     Revenue.  And I was coming to my point, that this is all --

6     when courts have looked at this, you know, all of this

7     evidence of notice and parties that actually took the steps

8     of opting out, indicates that the opt-out process worked.

9          As the Court is aware, consensual third-party releases

10    and opt-outs have been approved by courts in the Fifth

11    Circuit many times, and they are certainly not an

12    extraordinary feature in a Chapter 11 plan.  The Supreme

13    Court's *Purdue* opinion did not disturb this longstanding

14    precedent.

15         The Fifth Circuit in *Republic Supply v. Shoaf* held that

16    consensual nondebtor releases that are specific in language,

17    integral to the plan, a condition of the settlement, and

18    given for consideration do not violation Section 524(e) of

19    the Bankruptcy Code, which, as Your Honor knows, is the

20    prohibition against a discharge to a nondebtor.

21         Let's walk through each one of those elements as it

22    relates to our case.  And I'm going to deal with the easy

23    ones first and I'm going to save the juicy consent one for

24    the end.

25         So, first, the third-party release is specific in

language.  Article X.D. sets forth who is getting released

and the subject matter on which they are getting released.

We submit that the language in the third-party release is

sufficient to put parties in interest on notice of who and

what is being released.

Next, the third-party release is a condition of the M&T

settlement and is integral to the plan.  The terms of this

release was negotiated between the Trustee, M&T, and the UCC

as part of the plan process.  M&T has made concessions at

each stage of this case, despite the Debtors owing over $100

million at the start.  But instead of pulling the plug on

these Chapter 11 cases, the Bank did consent to cash

collateral usage and the appointment of a Chapter 11 Trustee

to preserve value and to allow for an orderly liquidation of

these cases.

As the Trustee completed the sale of inventory, his

efforts turned to negotiating an exit from the bankruptcy

that saw some distribution to unsecured creditors.  That exit

came in the form of the plan and the M&T settlement embodied

thereby where M&T has agreed to contribute $4 million in cash

collateral to fund distributions and wind-downs of the

estates.  The plan is the embodiment of the M&T settlement.

I don't think we would have gotten here if M&T was not

anticipating getting a release so that they could buy peace

and move forward with a clean slate.

1     Third, the third-party release is given for

2    consideration.  As I just mentioned, M&T is agreeing to walk

3    $4 million in contributed cash collateral to fund the plan

4    reserves, $825,000 of which is being allocated to payment of

5    Class 4 customer constructive trust claims and $350,000 of

6    which is being used to fund the Creditor Trust for the

7    benefit of Class 5 general unsecured claims.

8     But for the settlement emcbodied by the plan, these funds

9    would have gone to M&T, who had liens on substantially all of

10    the Debtors' assets.  The third-party release is a necessary

11    component to obtain M&T's consent to provide for the plan

12    reserves.  But for the third-party release, M&T would not

13    have agreed to leave behind a pool of money to fund

14    distributions to other creditors that would have otherwise

15    received nothing in a Chapter 7 liquidation.

16     In addition, each Released Party is providing a

17    corresponding mutual release under the plan.  We've obviously

18    talked a lot about that mutual release today.  That does

19    include a release of Chapter 5 causes of action, as Mr.

20    Andrews testified to when Ms. Schmidt had him on cross.

21    These mutual releases serve as mutual consideration, even

22    with respect to parties releasing claims of minimal value.

23    This has been recognized most notably by Judge Isgur in the

24    *Cobalt* case cited in our reply.

25     In addition, with respect to the release of Chapter 5

1    causes of action, this is something that Judge Jernigan found

2    was highly valuable additional consideration in the *Cici's*

3    *Pizza* case, which was filed back in 2021, in support of a

4    third-party release in that case.

5        Fourth and finally, Your Honor, we've made it to consent.

6    The third-party release here is consensual.  The key to

7    determining consent in the context of a third-party release

8    is adequate notice and due process.  I have already walked

9    the Court through adequate notice, but let's talk a little

10   bit more about the due process that's afforded here by the

11   opt-out process.

12       Texas courts have long held that an opt-out procedure

13   like the one utilized in the plan can establish consent when

14   parties are provided clear and conspicuous notice of the

15   third-party release, including the ability to opt out and the

16   effect of failing to opt out.  Opting out of a third-party

17   release in a bankruptcy plan is on par with opting out of a

18   class action settlement, which the Supreme Court and others

19   have noted affords due process to claimants in those cases.

20   We cite a litany of cases in Footnote 13 of our reply,

21   including the *Vista Proppants* case from 2020 where this Court

22   held that the third-party releases were consensual and due

23   notice was afforded when parties were properly informed about

24   the opt-out and the release provisions were conspicuously

25   disclosed in boldface type in numerous solicitation

1    documents.

2        Here, the disclosure statement, plan ballots, and the

3    confirmation hearing notice all expressly state in boldface

4    text that holders of claims and interests that do not file an

5    objection or opt out of the releases contained in the plan

6    will be bound by the third-party releases.

7        As I previously mentioned, we did receive three opt-outs

8    from parties in interest, which means that the process

9    worked.  Parties were adequately notified of their rights and

10   parties made informed decisions on whether to consent or not

11   consent to the third-party release.

12       Setting the stage with that, I can now turn to the U.S.

13   Trustee's objection.  The U.S. Trustee argues that the third-

14   party release cannot be approved because there is no

15   affirmative authority for third-party releases in the

16   Bankruptcy Code.  As a result, according to the U.S. Trustee,

17   we have to look to state law, not federal law, to determine

18   whether consent can be established by a third-party release

19   in a Chapter 11 plan.  And under state law, according to the

20   U.S. Trustee, silence cannot equal acceptance of a contract,

21   and so opt-outs do not work.

22       However, this argument runs afoul of a litany of case

23   law, including *Purdue*, that recognizes that 1123(b)(6) allows

24   bankruptcy courts to approve plan provisions that are not

25   specifically listed in the Bankruptcy Code, so long as they

1  are not radically different from or inconsistent with other

2  Bankruptcy Code provisions.  Consensual releases are

3  voluntary.  I think so often, when we get wrapped up in this

4  third-party release issue, we have to look and contend with

5  524(e), right?  And I think that the very essence of 524(e)

6  is a discharge, and a discharge is not voluntary here.

7      These are consensual releases.  They are voluntary.  We

8  are not talking about discharge.  524(e) does not apply.

9      As the Code has long been recognized to effect -- oh,

10  sorry.  Also, the Code has long been affected -- or, long

11  been recognized to affect relationships between third-party

12  creditors.  Consider -- excuse me.

13      Because consensual third-party releases are appropriate

14  and not inconsistent with other Bankruptcy Code provisions,

15  as recognized by Judge Isgur most recently in the *Wesco*

16  opinion, 1123(b)(6) and federal bankruptcy law interpreting

17  it governs third-party releases, not state law.  The result

18  is that third parties can be released by operation of law

19  under 1123(b)(6) by entry of an order confirming a Chapter 11

20  plan.

21      The *Mallinckrodt* opinion cited in our reply, 639 B.R. 837

22  (Bankr. D. Del. 2022), draws the comparison to the

23  consequence to claimants that fail to file a proof of claim

24  after receiving notice of the bar date or creditors whose

25  claims are objected to and they fail to respond to a claim

1    objection.  These are just two examples of how the Bankruptcy

2    Code already has a system in place that binds parties that

3    fail to act when they are otherwise receiving adequate notice

4    of how their rights could be impacted by a bankruptcy plan or

5    by the Bankruptcy Code.

6        The U.S. Trustee likens third-party releases to separate

7    settlement agreements between nondebtors.  We cite the recent

8    Judge Glenn opinion in *In re GOL Linhas* and Judge Lane's

9    opinion in *Spirit Airlines* for the proposition that releases

10   are not settlements separate and apart from the plan.  The

11   plan is the contract that is at issue.  The third-party

12   release is an integral part of the plan but it's not a

13   standalone provision that can be supported separate and apart

14   from the plan.  It's not an unsolicited offer that's being

15   given for no consideration.

16       If the U.S. Trustee were correct and state law were to

17   apply, I'm afraid it would lead to chaotic results and

18   inconsistent treatment among similarly-situated creditors

19   depending on what state law applies.  Some of the courts that

20   have grappled with this state law versus federal law issue

21   have recognized, okay, if state law applies, what state law?

22   Is it the law of the debtor?  Is it the law that the

23   bankruptcy court sits?  Is it the law where, you know, the

24   creditors are located?

25       Your Honor, I was never a law clerk, and it's something

1    that I certainly wish that I could have been, but I can

2    imagine the fear and terror on your law clerk's eyes if her

3    judge was presented with a plan with a third-party release in

4    it and she would have to go and do all of the research on

5    conflicts of law.  It's something that I very much hated in

6    law school and do not want to revisit unless I am forced to.

7        But even if the Court were to find that state law applies

8    to determine what constitutes consent, silence would still

9    equate to consent under the facts of this case.  Again, I'm

10   not sure what law would apply, but let's take Texas law since

11   we're standing in Texas right now.  Under Texas law, silence

12   can equal consent when an offeree takes the benefit the

13   offered services, with reasonable opportunity to reject them,

14   and reason to know that they were offered with the

15   expectation of compensation.

16       Here, the plans provide parties with the opportunity to

17   reject the releases via the opt-out and with the benefits and

18   compensation to those who do not opt-out -- namely, the

19   mutual releases, including the releases of Chapter 5 causes

20   of action for all Consenting Creditors, and the settlement

21   payments made to holders of Class 4 customer constructive

22   trust claims, as well as any potential distributions made to

23   Creditor Trust interest holders.

24       Either way you slice it, the opt-out mechanism in the

25   plan is consensual and should be approved.  While we

1  appreciate the role of the U.S. Trustee in the bankruptcy

2  process and the policy concerns that she has voiced in

3  connection with the third-party releases, we do not believe

4  that those concerns are sufficient to topple this integral

5  part of a carefully-crafted plan.

6       As the Court is aware, facts matter, and based on the

7  facts and circumstances that we have laid before the Court

8  today, the Trustee submits that the third-party release is

9  consensual and that the release as drafted in Article X of

10  the plan is appropriate, consistent with Fifth Circuit law on

11  releases, and should be approved, along with the injunction

12  provision in Article X.E. that merely implements the third-

13  party release.

14      We ask that the Court overrule the United States Trustee

15  objection and confirm the plan as drafted.

16      I'm happy to answer any additional questions on third-

17  party releases, or I can now move to the Borisch objection.

18            THE COURT:  I would just keep on moving.

19            MS. WEBB:  I'm going to keep on moving, Your Honor.

20            THE COURT:  But let me use the opportunity as we

21  segue.  I take it, and I don't know if you've actually

22  specifically mentioned it in closing, but just to be crystal

23  clear.

24            MS. WEBB:  Uh-huh.

25            THE COURT:  From your perspective, is the Tennessee

1    Department of Revenue, have they effectively told you all

2    that they are walking their objection based upon the

3    modification that was made?

4         MS. WEBB:  We did exchange an email with Mr. Butler

5    at the Tennessee Department of Revenue earlier this week that

6    did confirm that, you know, subject to his allowed admin

7    claim being paid out pursuant to revised language in the

8    confirmation order and plan, that he is not going forward

9    with the objection today.  So I think that when you --

10        THE COURT:  Okay.  And I know he's not here.

11        MS. WEBB:  Correct.

12        THE COURT:  So I just didn't know if that was --

13        MS. WEBB:  That's our understanding.

14        THE COURT:  Okay.  All right.  Fair enough.

15        MS. WEBB:  Right.

16        THE COURT:  Fair enough.

17        MS. WEBB:  Okay.  Your Honor, as I mentioned, there

18   were four issues raised in the Borisch objection.  I feel

19   like I've already adequately addressed the modification issue

20   and so I'm not going to go into that again.  The Trustee is

21   only here seeking confirmation of the modified plan.  We're

22   not here seeking confirmation of the solicitation plan, as

23   it's been called today.  I think that we can move on from

24   there.  So let's talk through the three confirmation-related

25   requirements and issues that the Borisch Parties have raised,

1    first being good faith under 1129(a)(3).

2         Let's discuss the standard.  The standard for good faith

3    is where the plan has been proposed with a legitimate and

4    honest purpose to reorganize and has a reasonable hope of

5    success.  Obviously, we're not in a reorganization here

6    today, so we are substituting in a liquidation, and that we

7    are making distributions in accordance with the Bankruptcy

8    Code's distribution scheme.

9         The good faith status is considered in light of the

10   totality of the circumstances surrounding the establishment

11   of a Chapter 11 plan.  Your Honor, I'm going to be brief

12   because I do think you've heard extensive testimony today on

13   the negotiations that went into the formulation of the plan.

14   We talked about the M&T settlement.  We talked about how, you

15   know, but for M&T getting on board, we would have been

16   looking at a conversion scenario where we don't think value

17   would have been maximized.

18        That meant that our necessary plan partner was M&T.  They

19   were willing to set aside $4 million and able to fund

20   distributions under this plan to creditors that would

21   otherwise not receive anything, creditors that we've been

22   working with since the very beginning, creditors that were

23   really in an unfortunate situation at the start of this case,

24   and we are now able to offer them a not-insignificant

25   distribution.  Right?

1        As part of the consideration for the plan and M&T

2   agreeing to walk away from that $4 million is an assignment

3   of the causes of action against the Borisch Parties.  We

4   don't believe that this is a surprise.  We don't believe that

5   we pulled the rug out from underneath Mr. Borisch when it

6   came to making the clarifying modifications about the scope

7   of -- the definition of Consenting Creditors and the scope of

8   the third-party releases in this case.  We believe that it

9   has been evident from the beginning of the plan process, and

10  just based on the record of this case, that the Borisch

11  Parties were never intended to give or receive releases in

12  this case.  And as a result, based on the totality of the

13  circumstances, we do believe that the plan as modified has

14  been proposed in good faith.

15       Second, the Borisch Parties contend that the plan cannot

16  satisfy the equitable treatment requirement of 1123(a)(4)

17  because they were not afforded a release under the plan.

18  Your Honor, as I mentioned upfront, courts have held that

19  releases under a plan have no bearing on when a plan provides

20  -- on whether the plan provides equal treatment for purposes

21  of 1123(a)(4).  We cite the *Adelphia Communications* and the

22  *Mallinckrodt* cases in our reply at Page 10.

23       Equal treatment of claims is all that is required under

24  1124(a)(4).  Releases do not equal treatment.  As noted by

25  the *Dana Corp.* court, the fact that some claimants have

1    settled while others have not does not by itself indicate

2    unequal treatment.

3        Rather, the key inquiry under 1123(a)(4) is not whether

4    all claimants in a class obtain the same thing but whether

5    they have the same opportunity.  And again, we are talking

6    about the Borisch claimants in Class 6, but just for purposes

7    of this discussion let's discuss them as if, you know, we are

8    equating them with Class 5, right, who are afforded --

9            THE COURT:  So, and actually, what would be helpful

10   is talk me through Class 6.

11           MS. WEBB:  Uh-huh.

12           THE COURT:  Because the described treatment is a

13   little amorphous, honestly.

14           MS. WEBB:  Okay.

15           THE COURT:  So what do you think that the plan --

16   what is the plan treatment?

17           MS. WEBB:  Really, the plan treatment of Class 6

18   creditors is an embodiment of Section 509 of the Bankruptcy

19   Code, which provides for subordination of claims for

20   indemnification, other claims where other creditors have to

21   be paid in full before those claims come into existence.

22       Thank you for the Code, Mr. Kaufman.

23       And so if you look at 509 and compare it to -- give me a

24   moment to flip, Your Honor.  (Pause.)  I'm looking at

25   Trustee's Exhibit 14, which is the modified plan, the header

1    on the top which is Docket 1013-14, Exhibit 14, Page 21 of

2    81, which sets forth the treatment of Class 6 contribution

3    claims.

4         And this reads that, you know, each holder of a

5    contribution claim that is liable with a debtor on any other

6    allowed claim -- so here again we're talking specifically on

7    guaranty claims -- shall be treated in accordance with

8    Section 509 of the Bankruptcy Code, including the

9    subordination of any distributions on account of such

10   contribution claim in accordance therewith.

11        So a holder of a contribution claim that is liable with

12   the debtor on any allowed claim, underlying claim, and that

13   placed such underlying claim in full, shall be subrogated to

14   the rights of the holder of such underlying claim under which

15   for purposes of the claim, and such subrogated claim shall be

16   treated (inaudible) class of such underlying claim.

17        So let's use the specific example here of Mr. Borisch's

18   guaranty of the M&T debt, right.  M&T has not been paid in

19   full.  M&T is going to have a significant deficiency claim.

20   To the extent that Mr. Borisch has a claim against the estate

21   as a result of his guaranty, that claim would only come into

22   existence and be subject to payment after M&T Bank was paid

23   in full.  And so until M&T Bank is full, Mr. Borisch has no

24   right to receive payment under the plan.

25        (Pause.)

1          THE COURT:  Okay.  Fair enough.  So are all of the

2    parties that were solicited with a Class 6 ballot guaranty-

3    related claims or indemnity-related claims?

4          MS. WEBB:  I know that some of them are guaranty-

5    related claims.  Your Honor's --

6          THE COURT:  In other words, --

7          MS. WEBB:  Uh-huh.

8          THE COURT:  -- there was some questioning that sort

9    of suggested that if it was a Borisch Party claim, it was

10   slapped into Class 6, which I sort of viewed as being loose

11   questioning.  I don't even know who was asking the questions.

12   But obviously, that doesn't appear to be what the plan says.

13   The plan is making it clear that a Class 6 claim is clearly a

14   -- I think there's a defined term for what a "Contribution

15   Claim" is.  And so I'm just trying to get a sense of if

16   there's a belief that -- because obviously with shouts out is

17   that all of the Class 6 claimants are Borisch Parties or

18   affiliated with a Borisch Party as defined in the plan.  And

19   so I didn't know if those were all kind of pitched as

20   indemnity claims or guaranty.  I guess it would be indemnity.

21   Indemnity or contribution, right?

22         MS. WEBB:  One second, Your Honor.

23      (Pause.)

24         MS. WEBB:  Mr. Kaufman refreshed my recollection.

25   They are all guaranty claims.  They all just happen to be

1   Borisch Parties.

2           THE COURT:  Okay.  All right.  And when we say

3   guaranty claims, what they are is reimbursement/indemnity

4   claims sort of filed on a contingent basis to the extent that

5   they're called upon to pony up on the guaranty?  Is that --

6           MS. WEBB:  I believe that's my understanding, Your

7   Honor.

8           THE COURT:  Okay.  All right.

9           MS. WEBB:  The Court, again, heard extensive

10  evidence today that the backbone of the plan is the M&T

11  settlement.  The Trustee has chosen --

12          THE COURT:  So, and I'm sorry.

13          MS. WEBB:  Go ahead.  That's go, yeah.

14          THE COURT:  I'm just, I'm like trying to get it all

15  in my head.

16          MS. WEBB:  Yeah, of course.

17          THE COURT:  The one thing that Class -- okay.  So

18  basically, tell me if I'm getting this wrong, Class 6, it

19  could be potentially a little clearer, but Class 6 is

20  basically saying, look, vis-á-vis the claim that you have

21  filed now, you're not entitled to anything.  However, if the

22  claim crystalizes by virtue of actually paying a co-

23  obligation or something that's subject to indemnification or

24  whatever, then you will pop out of effectively Class 6 and

25  pop into another class, subject to the requirements under 509

1  to satisfy the right to step into -- basically, you have to

2  satisfy the underlying co-liable claim or whatever in order

3  to be actually subrogated to that claim.  Is that a fair

4  summary of what's going on there?

5          MS. WEBB:  I do believe that's a fair summary, Your

6  Honor.

7          THE COURT:  Okay.  And I mean, again, it's sort of

8  weird because ordinarily we're used to seeing -- it's kind of

9  like where it says estimated recovery for Class 6 is zero.

10  Sort of necessarily it's always going to be zero because,

11  unless and until the claim crystalizes, there's not really an

12  allowable claim in effect.

13          MS. WEBB:  That's correct, Your Honor.

14          THE COURT:  Okay.

15          MS. WEBB:  And we think that's what the Bankruptcy

16  Code specifically contemplates with respect to treatment of

17  those claims.

18          THE COURT:  All right.  So, fair enough.  All right.

19  And Class 6 is preserving the 509 right, effectively?

20          MS. WEBB:  That's correct, Your Honor.

21          THE COURT:  And is that the idea of why you went

22  ahead and solicited votes from the class?  Because, again,

23  it's kind of an awkward thing, right?  It's on the one hand

24  you're not going to recover anything under the plan, but by

25  giving them a 509 right there is theoretically value there,

1  because you're not saying that they don't receive or retain

2  anything, they retain their 509 rights, so we're going to go

3  ahead and send a ballot?

4          MS. WEBB:  That's correct, Your Honor.

5          THE COURT:  Okay.

6          MS. WEBB:  It's obviously something that we debated

7  internally on how --

8          THE COURT:  Right.

9          MS. WEBB:  -- the impairment of Class 6.  And we

10 ultimately determined that Class 6 is impaired and should be

11 entitled to vote under the plan.

12         THE COURT:  All right.  And am I correct in

13 understanding that every holder of a Class 6 claim who was

14 solicited also returned -- obviously, this is post-

15 modification, post-additional solicitation opportunity or

16 whatever to change votes or whatever else.  Oh, I guess they

17 wouldn't have submitted an opt-out because they're -- are all

18 of those parties captured within the definition of Borisch

19 Parties?

20         MS. WEBB:  Yes, Your Honor.  Those are the Released

21 -- sorry.  The Borisch Parties in Class 6 are, by virtue of

22 being carved out of the Consenting Creditor definition, --

23         THE COURT:  Yes.

24         MS. WEBB:  -- the Releasing Party, all that, right,

25 --

1          THE COURT:  But like don't even get into --

2          MS. WEBB:  Okay.

3          THE COURT:  All I want is just a very simple

4    question.  Because we had sort of this interesting debate

5    about Echo whatever, but Echo is not a Borisch Party.  So, --

6          MS. WEBB:  This is the first time that we are

7    hearing --

8          THE COURT:  So are all of those parties in Class 6,

9    every single one of them, listed within the definition of

10   Borisch Party?

11         MS. WEBB:  Yes, Your Honor.

12         THE COURT:  Okay.

13         MS. WEBB:  And we did have a discussion about this

14   at the status conference back on June 9th when we were trying

15   to craft the appropriate language of the scheduling order, if

16   you recall, --

17         THE COURT:  Right.

18         MS. WEBB:  -- of who are the Borisch Parties?

19         THE COURT:  Exactly.

20         MS. WEBB:  And so the Borisch Parties that are in

21   your scheduling order are the Borisch Parties that are Class

22   6 claimants.

23         THE COURT:  Okay.  All right.

24         MS. WEBB:  Okay.  Your Honor, we do believe that --

25   there was a pseudo-classification issue that was raised today

1   when Mr. Andrews was on the stand.  Classification was not

2   raised as an objection in the pleadings that the Borisch

3   Parties filed.  However, we do believe that there is a

4   justification for separately classifying the Borisch Parties.

5   These are insiders, guarantors.

6            THE COURT:  So, to be clear, and I think probably

7   this is one of the reasons why I'm asking the questions,

8   there isn't a separate classification of Borisch Parties.

9   There's a separate classification of --

10           MS. WEBB:  Of Class 6.

11           THE COURT:  -- of contribution claims.  Correct?

12           MS. WEBB:  Yes, correct.

13           THE COURT:  Okay.  Because Mr. Gates may be right in

14  relation to his questioning.  There may, in fact, be a --

15  I'll call it a Borisch affiliate -- that holds a general

16  unsecured claim in Class 5 who got a Class 5 ballot and an

17  opt-out form.  Right?  I mean, assuming that it is in fact an

18  affiliate, if it wasn't in the Borisch Party definition, then

19  --

20           MS. WEBB:  If it wasn't in the Borisch Party

21  definition, then it's not in Class 6.

22           THE COURT:  Okay.

23           MS. WEBB:  Again, Your Honor, the fact that the plan

24  offers to settle with third-party creditors but not the

25  insider Borisch Parties is not a basis to conclude that the

1    plan provides disparate treatment, in violation of

2    1123(a)(4).

3        Notwithstanding these entanglements, Mr. Andrews

4    testified that the Borisch Parties had the opportunity, the

5    same opportunity if not better, to negotiate for a release.

6    That Mr. Borisch was ultimately unsuccessful in procuring a

7    release from the Trustee and M&T Bank does not render the

8    unconfirmable.

9        At the end of the day, the plan proposes to provide the

10   Borisch Parties with the same distributions as similarly-

11   situated creditors without requiring them to release their

12   claims against M&T.  This, by definition, is equitable

13   treatment, in compliance with 1123(a)(4) of the Bankruptcy

14   Code.

15       Finally, Your Honor, the Borisch Parties contend that the

16   plan cannot be crammed down on them under 1129(b)(2) because

17   the plan unfairly discriminates against them.  1129(b)(2)(B)

18   provides that a plan can be confirmed notwithstanding an

19   impaired rejecting class if the plan does not discriminate

20   unfairly and is fair and equitable with respect to the class

21   of claims.

22       We already covered fair and equitable upfront.  That's

23   the absolute priority rule.  Nobody beneath the Borisch

24   Parties are getting paid --

25            THE COURT:  So rather than referring to them as the

1  Borisch Parties, --

2           MS. WEBB:  Class 6 claims.

3           THE COURT:  -- because, again, I think --

4           MS. WEBB:  Sure.

5           THE COURT:  Right?  I mean, because we don't have a

6  Borisch Party class.

7           MS. WEBB:  Correct, Your Honor.  No one beneath

8  Class 6 is getting paid in full or is getting paid anything

9  under the claim -- getting paid under the plan.  No one on

10 top or superior to Class 6 is getting paid more than a

11 hundred percent under the plan.  I don't think we have an

12 absolute priority rule issue here.

13          THE COURT:  Well, if they're a higher priority, they

14 can get paid all day long.

15          MS. WEBB:  Right.

16          THE COURT:  It's if there's anybody subordinate.

17          MS. WEBB:  Right.  More than a hundred percent.

18          THE COURT:  Yes.

19          MS. WEBB:  Correct.  Right?

20          THE COURT:  Right.

21          MS. WEBB:  Rather, their claim here, objection, as

22 best we can read it, is limited to the unfair discrimination

23 on the basis that they were denied a release under the plan.

24      The case we cite in support of our position here is the

25 *Tribune* case, where Judge Ambro does note that plans can

1    treat parties differently, but not in a way that's unfair.

2    Here, there's nothing unfair about a plan that preserves

3    claims against insider parties.  Frankly, it happens all the

4    time.  Creditors do not have a fundamental right to be

5    released under the plan.  And the plan just maintains the

6    status quo as to the Borisch Parties.

7        We're not here saying, Borisch Parties, you don't get

8    paid and we're forcing you to release M&T Bank.  We're not

9    doing that here.  Everybody maintains their claims and go

10   forward.

11       So, Your Honor, with that, as quoted in *Tribune*, cramdown

12   plans are an antidote to one or more classes of claims

13   holding up confirmation of an otherwise-consensual plan.

14       There was a comment upfront by Mr. Bakst, and I want to

15   clarify here.  I don't think that anybody is saying that

16   what, you know, Mr. Borisch appearing here today and raising

17   his objections is bad faith.  He is certainly entitled to do

18   that under the Bankruptcy Code.  What we have here is a plan

19   that has overwhelming support from all creditors other than

20   the Borisch Parties, though.  And the Court should not

21   sanction Mr. Borisch's attempt to undo the Trustee's work to

22   put together a plan that provides distributions to creditors

23   that would otherwise receive nothing in a Chapter 7.  The

24   Borisch objection should be overruled and the plan confirmed

25   as modified.

1      Your Honor, we did file a revised form of confirmation

2   order at Docket No. 1017.  We did make some changes from the

3   original form.  Some of these were at the request of M&T Bank

4   and some of them were just clarifying comments as we were

5   going through and preparing for today.

6              THE COURT:  Don't say clarifying.

7              MS. WEBB:  Excuse me, Your Honor.

8              THE COURT:  I'm kidding.  I'm kidding.

9              MS. WEBB:  You know.  Right?

10             THE COURT:  I know.  It's late.

11             MS. WEBB:  I'm happy to talk through those changes.

12   If you're good, I'm also happy to cede the podium.

13             THE COURT:  I think, given the time of evening, we

14   ought to keep moving.  And I guess let me just ask, because,

15   frankly, I haven't studied what got filed.  So, as part of

16   what was filed at Docket 1017, does that include a redline?

17             MS. WEBB:  It does, Your Honor.

18             THE COURT:  Okay.

19             MS. WEBB:  Yes.

20             THE COURT:  Then that tells me everything I need to

21   know --

22             MS. WEBB:  Right.

23             THE COURT:  -- in terms of what was changed.

24             MS. WEBB:  Okay.  Thank you.

25             THE COURT:  Okay.  Let me just take a very quick

1    glance, actually, before --

2         MS. WEBB:  It's not -- yeah.  Some of -- a lot of

3    the red is, frankly, striking provisions that were just

4    included in the modified plan.  And what we're doing is, to

5    make it very clear what plan is being confirmed, we propose

6    to just attach the confirmed plan to the back of the

7    confirmation order, and so there was some redundancy in there

8    that we needed to take out.

9         There is a provision in there about the effect of the

10   Malibu settlement, and then, again, there are some additional

11   changes requested by M&T just to clarify the impact of entry

12   of the confirmation order today.

13        THE COURT:  All right.  So is 1017, is it all

14   redline?

15        MS. WEBB:  So the redline starts on Page 36 of 68.

16        THE COURT:  Okay.  Let me just take a quick look,

17   just because I don't want you all to escape out of here

18   before --

19        (Pause.)

20        THE COURT:  All right.  I don't have any questions.

21        MS. WEBB:  Thank you, Your Honor.  And I appreciate

22   your patience.  I realize I talked fast.  I know that I gave

23   Mr. Kaufman three minutes and I talked for an hour.  But you

24   know what, that's the way it is.  And I appreciate your time

25   and consideration.  And we ask that the plan be confirmed.

1            THE COURT:  All right.  Mr. Gerber?

2            MR. GERBER:  Yeah.  Just briefly, Your Honor.

3               CLOSING ARGUMENT ON BEHALF OF M&T BANK

4            MR. GERBER:  At the outset, I told you I thought the

5    evidence would support the confirmation of only one plan.

6    It's the plan that's before the Court.  There is no basis --

7    one of the prayers, I think, of the Borisch objection was

8    that you should confirm what they call the solicitation plan,

9    I believe.  There is no evidence to support confirmation of

10   that plan.

11       Moreover, there's no evidence to support any agreements

12   under that plan that they might attempt to allege occurred by

13   virtue of the votes, since the plan itself, the solicitation

14   plan, was never brought up for confirmation, never heard on

15   confirmation, cannot be confirmed based on the record here

16   today.

17       Our agreement to support the plan, M&T Bank's agreement

18   to support the plan, was strictly based on no release in any

19   fashion of Mr. Borisch or the Borisch Parties.  But more

20   importantly, we didn't ask them to release us.  This Court

21   has been very careful.  You can look back at Docket 353,

22   which was the amendment, if you will, to the cash --

23   supplement to the cash collateral order, where those issues

24   were reserved.  The dispute between the Bank and Mr. Borisch

25   were reserved for a court of competent jurisdiction.

1     We're perfectly willing to litigate that in Michigan.

2  That's where Mr. Borisch has always said he wanted to

3  litigate that.  The idea that he would come here and attempt

4  to wiggle out of that agreement by trying to claim that he

5  had a new agreement with us for a mutual walkaway release,

6  there is no evidence in the record to support that.

7     So we support the Trustee's proposal for the plan.  It's

8  been joined in by the United -- I'm sorry, by the Official

9  Committee of Creditors.

10     We support the revised version of the findings of fact,

11  conclusions of law, and order confirming the plan, which

12  confirms a plan that is in the best interest.  Absent

13  confirmation of this plan today, there's not another plan

14  that's confirmable, and I fear what everyone regretted --

15  what everyone would regret and what everyone with this Court

16  I think expressly has expressed concern about, is state

17  taxing authorities won't get paid, consumer claims will not

18  be paid, there will not be any opportunity for the unsecured

19  creditors to be paid, and we'll be forced into a Chapter 7.

20          THE COURT:  All right.  Thank you.

21          MR. GERBER:  Thank you, Your Honor.

22          THE COURT:  Mr. Ross?

23          MR. ROSS:  Yes, Your Honor.

24     CLOSING ARGUMENT ON BEHALF OF THE OFFICIAL COMMITTEE OF

25                    UNSECURED CREDITORS

1          MR. ROSS:  And before I begin my relatively brief

2    closing, I want to address a couple questions you had

3    regarding number of Class 5 claimants and the ballot

4    tabulation related to those.

5      Your Honor, I don't have the exact number of claimants

6    themselves, but the total amount of Class 5 claims was about

7    $38 million.  Of those Class 5 claimants, total of 20 voted

8    on the plan.  Eighteen voted to accept.  Two voted to reject.

9    Of the 20 total votes, that calculated -- comprised, excuse

10   me, about $18.5 million of general unsecured claims.  So it's

11   a significant participation in the Class 5 claimants in

12   voting for this plan and overwhelming approval.

13         THE COURT:  And I take it, just again for the sake

14   of clarity, that that excludes any type of a monetized vote

15   from M&T Bank?

16         MR. ROSS:  Correct, Your Honor.  Yes.  That $38

17   million calculation excludes M&T's deficiency claim of

18   approximately $50 million, and therefore, of course, no

19   ballot related to the Class 5 claimants include M&T's

20   deficiency claim, either.

21         THE COURT:  Okay.  All right.

22         MR. ROSS:  To be straightforward, Your Honor, the

23   Committee supports the Trustee's plan as modified and

24   amended, and joins with the Trustee and M&T Bank in

25   requesting this Court enter an order confirming the plan.

1   It is important to note how far we've come in these cases

2 since just over a year ago.  Specifically, how far the

3 proposed treatment of general unsecured creditors have come.

4   When the Trustee took over these cases and the Committee

5 was appointed, the cases looked very bleak, to be frank.  The

6 likely outcome for any recovery of general unsecured

7 creditors was zero dollars.  The Debtors had a mountain of

8 immediately-pressing issues that appeared to be almost

9 insurmountable.  It was unclear how the Trustee was going to

10 move forward, if it was going to be able -- if he was going

11 to be able to liquidate the inventory, and if a plan was ever

12 going to be able to be proposed and ultimately be confirmed.

13   Based on this, very early in the case, the Committee

14 recognized the difficulties presented here and made the

15 conscious decision to seek practical solutions with the

16 Trustee, M&T Bank, Malibu, and all other relevant parties.

17 It was this mantra of practicality that resulted in what this

18 Court may have noticed was a unique, at least in today's day

19 and age, lack of direct conflict, at least before open court,

20 between the Committee and the relevant parties in this case.

21   This was intentional.  The Committee sought to maximize

22 recovery to its constituents by working to accomplish out-of-

23 court resolutions to disputes and thus minimize overall

24 expenses.

25   But the Court should make no mistake that the Committee

1   was heavily involved in these cases, as some of the evidence

2   admitted here today shows, so that the Court got to see

3   behind the curtain a little bit of how the sausage was made.

4   The Committee maintained constant and consistent

5   communication with the Trustee and its counsel about the path

6   forward, participated in the Malibu Boat settlement

7   mediation, investigated M&T's liens and potential claims

8   against M&T, which included meeting with Borisch's counsel at

9   the very beginning of the Committee's appointment, and

10  ultimately ended up with negotiating and working with the

11  Trustee and M&T to draft the plan before the Court today.

12      All of this work led to the proposed establishment of the

13  Creditors Trust, which is funded by M&T's cash collateral for

14  the benefit of general unsecured creditors, as well as a very

15  significant recovery to the customer boat claims claimants.

16  The Creditors Trust will be funded to pursue causes of actions

17  and make distributions to general unsecured creditors.  And

18  this, these two successes are a far cry from where the

19  original standing position of the unsecured creditors were at

20  the beginning of this case and despite the fact that M&T

21  likely has a $50-ish million deficiency claim.

22      Based upon all the facts and circumstances present in

23  these cases, the Committee is confident that the plan before

24  the Court today represents the best outcome for general

25  unsecured creditors in these cases.  The plan was negotiated

1    in good faith, and at arm's length negotiation between the

2    parties at all times.  For the reasons presented in this

3    statement as well as admitted into evidence today, this Court

4    should and the Committee requests that this Court enter an

5    order confirming the plan.  Thank you.

6              THE COURT:  All right.  Thank you.

7        Do we have any other parties in interest wishing to be

8    heard in support of confirmation?

9              MS. ROSS:  Your Honor, may I just speak for one

10   minute?

11             THE COURT:  Certainly.

12             MS. ROSS:  This is Judith Ross on behalf of Josh

13   Magill.

14              CLOSING ARGUMENT ON BEHALF OF JOSH MAGILL

15             MS. ROSS:  Your Honor, I've sat quietly here and

16   listened to everything today, and I just want to speak up for

17   the little people in this case.  The Committee, of course,

18   just spoke on their behalf.  But my client, you know, we heard

19   arguments between a bank that's owed over a hundred million

20   and someone else who claims he has over a hundred million in

21   claims, and my poor client bought a boat, and it turned out

22   that he never got his title.  And I want to commend the

23   Trustee and Trustee's counsel for focusing on the consumers in

24   this case, because those issues are, in fact, very complex.

25   My client had arguably constructive trust claims.  Those could

1    have been brought.  And I think the Trustee just did a very

2    good job on behalf of the little people in this case, and I

3    want to urge the Court to confirm based on that.

4        Two other points, Judge.  And I am perhaps just a very

5    simple person here, but I heard arguments earlier about the

6    issue of whether or not the first plan should be enforced, and

7    my reaction to that, Judge, is twofold.  Number one, nobody

8    would dispute that if the Trustee simply withdrew his plan and

9    filed it again tomorrow that it could be confirmed.  So that's

10   point number one.

11       Number two, there is no contract between M&T Bank or the

12   -- and the Debtor, the Trustee in this case, until this plan

13   -- this Court confirms the plan.  Very simple law.  There's --

14   nobody can be bound by anything until this Court approves it,

15   and I would suggest that the plan that is before the Court

16   should be confirmed, and ask the Court to approve same.

17       Thank you --

18            THE COURT:  All right.

19            MS. ROSS:  -- for allowing me to speak.

20            THE COURT:  Certainly.  All right.  Thank you.

21       Do we have any other parties in interest wishing to make a

22   statement in support of confirmation?

23       All right.  I guess we could do another flip of the coin,

24   but why don't we start with you, Mr. Bakst.

25            CLOSING ARGUMENT ON BEHALF OF THE BORISCH PARTIES

1          MR. BAKST:  Thank you, Your Honor.  As I said when I

2     stood up here many hours ago, there are times in cases where

3     there is a rolling freight train moving forward, trying to get

4     something done that many people want to see happen, and

5     there's a basis for doing so consistent with the Bankruptcy

6     Code and there's a basis for doing so perhaps inconsistent

7     with the Bankruptcy Code.  And in this case, as a threshold

8     matter, proceeding to confirmation of the plan as modified

9     would be inappropriate, and we'd ask the Court not to approve

10    the modification of the plan.  I think you have to get to two

11    separate steps.

12         In the first instance, before we get to those steps,

13    Trustee's counsel, proponents' counsel, in her presentation in

14    closing just moments ago laid out a groundwork for

15    confirmation of the plan that could have been the groundwork

16    for confirmation of the plan that was filed May 1st, with no

17    material differences other than the changes that she said were

18    included in the plan filed June 6th to address an alleged

19    confusion over the Borisch Parties being included or excluded

20    from being Consenting Creditors.

21         And so our point earlier that Mr. Gerber has taken odds

22    with is that the Court should and could confirm that plan, and

23    could and should say to the Trustee, why you are not pursuing

24    that plan?

25         And in fact, the testimony that was adduced from the

1   Trustee, that came out from the Trustee today, was that there

2   was lots of negotiation between the parties that -- not

3   including Borisch, but including the Committee, including the

4   Trustee, including the Bank, including Malibu, all talking

5   about the plan, exchanging many, many emails and many, many

6   versions of the plan, but not including Borisch, and reaching

7   a conclusion that this was the plan that they wanted to

8   pursue.

9       We then read the plan carefully, very carefully, because

10  we had had experience with what happened with the cash

11  collateral order in this case, and had we not read the cash

12  collateral order very carefully and sought our rights as a

13  challenge creditor to expend -- extend our rights to the end

14  of August and then ultimately to be carved out, we would have

15  been in a bad situation.

16      So we read the plan very, very carefully, and as you know,

17  I was here on Zoom, WebEx, for the hearing on the disclosure

18  statement when we talked about minutia in the plan that was

19  appended to the disclosure statement that needed to be dealt

20  with because it impaired or created confusion regarding the

21  rights of the Borisch Party.

22      So, for example, in the definition of Released Parties,

23  they had the words M&T Bank in brackets.  I've been drafting

24  plans or other documents for a long time.  It's in brackets

25  because it probably carried over from a draft that had been

1   going on back and forth between the parties for a period of

2   time and they hadn't noticed it.

3       But what did it mean if the circulating plan is going to

4   have M&T Bank in brackets and parties are going to know --

5   have to know whether or not M&T Bank is a Released Party or

6   not, and concomitantly, whether M&T Bank, as a Released Party,

7   gives a release to Consenting Creditors.  So we raised that

8   issue and the brackets were removed.

9       We raised an issue regarding language in the injunction

10  provision of the plan.  In the injunction provision of the

11  plan, the last paragraph of it, the last subparagraph of it,

12  it implied that parties broader than just Releasing Parties

13  would be bound by the injunction, which would have precluded

14  Mr. Borisch from pursuing the plan.

15      So we addressed that with the Court, and Mr. Kaufman

16  struck that provision.  He did not, however, strike the more

17  important provision, the eight magic words that we talked

18  about, and you focused in on, too, at the hearing on the

19  disclosure statement that provided an injunction because --

20  and it would be my position that it was language that the Bank

21  had signed off on, that the Debtor had signed -- Trustee had

22  signed off on, and other people had signed off on, but it

23  enjoined people, anyone, basically, from pursuing anyone,

24  basically, that received a release, lowercase, our release.

25  And so M&T Bank surely, now that the brackets were taken off,

1    received a release under the plan.  And so we looked very

2    carefully at that and made the decision that that language

3    meant something and needed to be taken out.  And after you

4    were exploring with Mr. Kaufman whether or not and how that

5    could be addressed, because the Bankruptcy Rules require that

6    injunctions be addressed very specifically in disclosure

7    statements, after you had started that conversation, Mr.

8    Andrews came up and struck those eight words.  And so those

9    eight words didn't proceed.

10       But my point is that we read the plan carefully, and we

11   read Paragraph -- the second paragraph of X.D. carefully to

12   say that Consenting Creditors got the benefit of a release.

13   And we read the paragraph on 12-D, I think it is, or the one

14   that says that the plan controls over the disclosure

15   statement, also carefully, to know that that's what it said.

16       And as Mr. Borisch testified, he was relying on,

17   justifiably, the fact that what's written down and before the

18   Court and what were his rights and offered to him were rights

19   that were ones that he could assert and did want to assert.

20   And, in fact, the fact that we didn't object to or have any

21   issue with, even before we realized what was in X.D., we

22   didn't have an issue with all of the claims being -- against

23   the Borisch Parties being transferred to M&T Bank because they

24   -- that created one central depository where those claims

25   could be litigated or resolved, rather than having to fight

1   here with the Unsecured Creditors' Committee or the Creditor

2   Trust as it's formed, and with M&T Bank in Kent County or

3   elsewhere.

4        So none of those things were problematic to us, so we

5   voted in -- so, and the other thing we did was we looked at

6   Rule 3019 of the Bankruptcy Code.  And Rule 3019 says that --

7   talks about modifying a plan.  And in a Chapter 11 case, after

8   a plan has been accepted and before confirmation, a plan

9   proponent may file a modification.  No objection there.  The

10  modification is considered accepted by any creditor who has

11  accepted it in writing.  We didn't do that.  For others who

12  have not accepted it in writing but have accepted the plan,

13  the modification is considered accepted if, after notice and

14  hearing, the Court finds that it does not adversely change the

15  treatment of their claims or interests.

16       And in truth, here, we voted in favor of the plan with

17  intent and with intelligence because we wanted to be able to

18  be here, and also Rule 1127 also creates enhanced rights for

19  creditors who actually vote.

20       So the Borisch Parties voted with intent and with an

21  understanding that the plan that was presented to this Court

22  was the one that was going to be confirmed.  And but for the

23  change that was described by Ms. Webb, everything she said

24  supports confirmation of that plan.

25       So that then says they're not -- perhaps they're not

1   pursuing that plan, and perhaps you're going to say that I

2   don't have the right to compel them to pursue that plan.  I'm

3   not sure that that's true.  Or I am sure that they've said

4   they're not going to pursue it, they're not pursuing it.

5   Whether you have the right to say that plan is still before me

6   because I haven't approved -- speaking as you, I apologize --

7   the Court has not approved the modification, so there is no

8   modification plan before -- modified plan before the Court.

9        I think that that has been a working assumption of the

10  Plan Proponent from the beginning, that merely by his effort

11  at filing something called a modified plan, the plan is

12  modified.  But that is not what the Code says, and that is not

13  what the Rule says.

14       And so, as we sit here now, there is no modified plan

15  unless you decide that it doesn't adversely impact the claims

16  of the Borisch Parties.

17            THE COURT:  So talk to me about that, because that's

18  a pretty strong statement.  I may agree with you that it does

19  adversely affect the Borisch Parties, but isn't that the whole

20  point?  Isn't that why we opened the window back up to be able

21  to change the votes and be able to object?

22            MR. BAKST:  Well, we objected to multiple things.  We

23  objected to --

24            THE COURT:  But, I mean, the objection deadline had

25  passed.  So we had a plan modification.  And wasn't that the

1   whole point?  I sort of feel like you all were very successful

2   in convincing me that, yes, with respect to the Borisch

3   Parties -- I mean, whether it was an ambiguity or not an

4   ambiguity, or whether it was a clarification or not a

5   clarification, no matter how you splice and dice it, I agreed

6   with you all.  I agreed that it was material with respect to

7   the Borisch Parties because you all articulated very clearly

8   to me, we relied upon this interpretation in taking action.

9   So not only did I open it back up for an opportunity to change

10  a vote and a supplemental opportunity for objection, but I

11  even built in a window for discovery.

12          MR. BAKST:  Well, we didn't -- we -- you're

13  suggesting that we hadn't objected previously, but before

14  January 6 we had no reason to object.  We supported the plan.

15  We voted in favor of it.

16          THE COURT:  But you're missing the point.  Your

17  argument to me was that I -- that the only way that the plan

18  moves forward as amended is if I determine that it didn't

19  adversely affect the Borisch Parties.

20          MR. BAKST:  Well, I --

21          THE COURT:  And what I'm trying to tell you is I'm

22  not following you on that argument, because I do think it

23  adversely affected the Borisch Parties, which is the whole

24  reason why 3019 says, or I guess in conjunction with 1125,

25  really, if there's a material modification, then the votes

1    won't apply to the amended plan.  You've got to basically give

2    an opportunity.  You've got to open the thing back up.

3            MR. BAKST:  Well, --

4            THE COURT:  And didn't you all -- are you trying to

5    argue to me that any of your clients was not given an

6    opportunity to change a vote?

7            MR. BAKST:  Yes, but that's not the point.  The --

8            THE COURT:  Well, no, it is the point.

9            MR. BAKST:  No, but may --

10           THE COURT:  So tell me who it is.  Who is it that

11   didn't have an opportunity to change a vote?  Because I will

12   grant you leave right now to change a vote.

13           MR. BAKST:  That -- everyone had the opportunity to

14   change the vote.  But the point is that is not what the Rule

15   says, and it cannot be that the mere opportunity to change the

16   vote renders a modification that changes the treatment to be

17   proper.  Otherwise, --

18           THE COURT:  I think there's a vast amount of case law

19   that completely disagrees with you on that point.

20           MR. BAKST:  But here -- but then in this case, maybe

21   those cases don't fall smack within the last sentence or the

22   third one -- third sentence of Bankruptcy Rule 3019(a), which

23   I'd ask the Court to look at.

24           THE COURT:  Okay.

25           MR. BAKST:  It starts with the phrase "For others".

1   I'll read it.

2             THE COURT:  Okay.

3             MR. BAKST:  For others who have not accepted it in

4   writing but have accepted the plan, the modification is

5   considered accepted if, after notice and a hearing, the Court

6   finds that it does not adversely change the treatment of their

7   claims or interests.

8        You have just said to me that you think it does adversely

9   change their treatment, and so now the plan as modified is not

10  before you unless you change your mind now and say that it

11  doesn't adversely change the treatment of their claims or

12  interests.

13            THE COURT:  All right.  So hang on.  Let me just read

14  this.

15       (Pause.)

16            THE COURT:  Okay.  So talk to me about how you

17  disagree with this construction.  As I read 3019(a), it's

18  saying, okay, if we have a plan, if we're at a point where the

19  plan has gone through an acceptance phase but we haven't yet

20  reached confirmation, (a) the proponent can still modify the

21  plan.  If that modification is accepted in writing, then the

22  modification is accepted by the -- the modification is

23  considered accepted by any creditor who has so accepted that

24  modification in writing.  For others who haven't affirmatively

25  accepted the modification in writing but accepted the original

1    plan, the modification is considered also accepted if, after

2    notice and hearing, the Court finds that it didn't adversely

3    change the treatment of that holder of the claim or interest.

4    Okay?

5            MR. BAKST:  That's what it says, and you have said to

6    me --

7            THE COURT:  Okay.  So, case in point, whatever

8    Borisch Parties voted to accept the plan, correct?  Right?

9            MR. BAKST:  Yes.

10           THE COURT:  Okay.  And so what this doesn't say is --

11   so, inversely, what this says is if the Trustee had come and

12   said, hey, with respect to the modification, the Borisch

13   Parties already accepted the plan, and we want you to consider

14   their acceptance as applicable to the plan as modified.

15   3019(a) says nope, that's a no-fly zone, because it materially

16   affected the Borisch Parties.

17      What 3019(a) doesn't say is, oh, by the way, if it

18   materially affects any party, then all bets are off, you can't

19   move forward with the modification.  It means, no, that's

20   where 1125 kicks in.  There has to be an opportunity for a

21   party who has had its treatment materially affected to re-cast

22   the vote, to potentially object.

23      I don't see how there is any harm to the Borisch Parties

24   at all, because you got absolutely every opportunity, and you

25   exercised it.  The exercise was, hey, yes, we voted to accept

1    before, but we're not accepting this modification.

2        So now, with respect to the plan as modified, it's a

3    rejection, and you all got to file a supplemental objection.

4    So what's --

5            MR. BAKST:  But you --

6            THE COURT:  Where is the harm?

7            MR. BAKST:  -- you have to also find -- you have to

8    find it's considered accepted, and it doesn't speak to

9    balloting.  It's considered accepted if the Court finds it

10    does not --

11            THE COURT:  You're missing the point.  I'm not

12    considering it an acceptance.  We threw out those votes.

13            MR. BAKST:  Okay.

14            THE COURT:  With respect to the Borisch Parties, the

15    original votes are gone.  There was a re-solicitation

16    opportunity, and the Borisch Parties exercised that right and

17    submitted ballots that said, nope, we reject.  Correct?

18            MR. BAKST:  They did file --

19            THE COURT:  Is there any Borisch Party with a claim

20    in this case who has not had the opportunity to cast a

21    different vote?

22            MR. BAKST:  No.  They've had the opportunity to cast

23    a different vote, and --

24            THE COURT:  And is there anybody who, in fact, didn't

25    change their vote?

1          MR. BAKST:  Well, the ballots talk about -- the

2    ballots reserve rights.

3          THE COURT:  So, just it's a simple question.

4          MR. BAKST:  They filed --

5          THE COURT:  Did any of your clients not change their

6    vote?

7          MR. BAKST:  No.  We filed an amended ballot that

8    changed the votes to reject Class 6 as set forth in the

9    modified plan, without accepting that the modified plan, and

10   the threshold matter that you need to decide is whether or not

11   the modified plan is the modified plan.  And I don't think

12   that the only thing that is appropriate under the -- under

13   1127 -- I think you were referring to 1127, not 1125, but I

14   could be wrong.

15         THE COURT:  Well, 1127 cross-references 1125.

16         MR. BAKST:  Okay.

17         THE COURT:  I mean, tell me if you disagree.  I can

18   look at that one, too.

19         MR. BAKST:  I'm looking at 1127(a), but --

20         THE COURT:  And doesn't it reference 1125?  It's

21   probably in like 1127(d).

22         MR. BAKST:  Oh, in (c).  Yeah, it does.

23         THE COURT:  Or (c).  Okay.

24         MR. BAKST:  It does.  Yeah, it does.  1127(c).

25      So the threshold matter -- to us, the threshold matter is

1  -- and you'll rule however you rule, but the threshold matter

2  is whether or not the modification is approved and we're

3  voting on that plan.  And my point is, not to beat it to

4  death, but that the plan -- the proposal as was set forth by

5  the Plan Proponent could apply equally to the original plan

6  filed May 1st as it does to the one that is allegedly being

7  sought as modified on June 6th.  And we would ask the Court to

8  consider whether it should approve the modification, because

9  the modification is improper because it violates Section

10  1123(a)(4) with regard to disparate treatment of Mr. Borisch's

11  claims.

12      THE COURT:  So, and tell me, walk me through that

13  one.  Because 1123(a)(4) speaks to what can happen with

14  respect to holders of claims within the same class.  So how is

15  it that a particular claim of any of your clients is not

16  treated the same as every other claim in that class?

17      MR. BAKST:  And you talked about that with Ms. Webb.

18  You talked about what are the rights of the holders of Class 6

19  claims.  And as we sit here now, they have -- they expect no

20  distribution, but -- and you said this, actually, just a few

21  minutes ago -- you said that if, after a period of time,

22  somehow one or more of the subordinated creditors, I mean, the

23  creditors who hold the guaranties that the Borisch Parties in

24  Class 6 have given, the holders of those guarantees, one of

25  them gets paid in full, hypothetically, theoretically, gets

1    paid in full, then that Borisch Party who gave the guaranty,

2    that Class 6 creditor that gave the guaranty, is to be treated

3    as a Class 5 creditor.  You said that.  So that --

4        THE COURT:  But you would agree with me -- I mean,

5    have your clients performed to be subrogated?  I mean, it's

6    not a time machine test.  It's --

7        MR. BAKST:  Well, there are claims pending by another

8    bank against some of the Borisch Parties that is likely to be

9    paid.  So, yeah, there is that possibility.  So there is that

10   possibility that they would succeed to those rights.  But this

11   is --

12       THE COURT:  Didn't we have a record date that was

13   set?  I don't recall anybody objecting to the record date,

14   saying, well, wait a minute, wait a minute, slow this train

15   down because we're going to pay all these guaranty claims so

16   that we can step in and be subrogated.

17       MR. BAKST:  Well, it's -- we're talking about a one

18   percent distribution, number one.  Number two, you're asking

19   us to do something that doesn't make any sense because we're

20   staring at a plan that we don't care about the one percent

21   distribution, we care about the release under X.D.  We care

22   about not being barred and bringing claims against M&T Bank.

23   We didn't care about the one percent distribution.

24       But if we're talking now about treatment and we're talking

25   now about whether a plan satisfies the requirements of the

1    Code, because now we have to come back after a modification

2    and all we have left is to amend our ballot and to file an

3    objection, I have to assert all the objections that we have in

4    order to protect -- to preserve our rights and to articulate

5    to the Court why this is not confirmable under 1123(a)(4).

6    And that is because we will step into the shoes of a Class 5

7    creditor.  And that Class 5 creditor -- theoretically.

8    Theoretically.  And that Class 5 creditor --

9            THE COURT:  But you all were -- again, I appreciate

10   it.  I just, I am trying to understand.  I sort of feel like

11   I'm hearing an argument out of one side of the mouth and a

12   different argument out of the other side of the mouth, because

13   I kept hearing question after question.  Oh, well, you know,

14   why didn't you value the claims of Mr. Borisch at some big

15   number?  Why didn't -- you know, we're going to zero out M&T

16   and we're going to collect affirmatively.  I mean, and now

17   you're talking about potentially being subrogated because

18   you're going to pay off all these guaranty claims.  I mean, --

19           MR. BAKST:  Well, --

20           THE COURT:  -- it's kind of like you can't have your

21   cake and eat it, too.  I sort of view it as Mr. Borisch made a

22   -- he made a choice.  He wants -- he wanted to sue Malibu, he

23   wants to sue M&T, with respect to his individual claims.

24   Absolutely.  God speed.  I hope that ultimately you get your

25   day in court, and whatever the outcome is, the outcome is.

1        I can't force -- I sort of feel like this is a little bit

2   of you can lead a horse to water but you can't force the horse

3   to drink.  I mean, --

4            MR. BAKST:  Well, the point that I'm making is that

5   when we were questioning the Trustee about the value of the

6   claims, that was to evaluate and to help him evaluate whether

7   or not -- and how the settlement process or the settlement

8   process through the plan would work.

9            THE COURT:  And why is that his job?  I mean, that's

10  your job.  That's --

11           MR. BAKST:  Because he took it up on his own.

12           THE COURT:  You all need to pick up the phone and

13  call M&T.  Shoot, you can walk out of here today and talk to

14  M&T and say, hey, provide a balance sheet.  I heard statements

15  by Mr. Borisch.  I can't, you know, this was a non-starter

16  because if I have to put substantial consideration on the

17  table, I don't have it.

18       Fine.  Provide a verified balance sheet to M&T and see if

19  they'll talk.  I mean, what obligation -- a Chapter 11 trustee

20  doesn't have an obligation to settle with everyone.  So why

21  isn't it that -- why is it the Trustee's job to somehow prove

22  up the value of Mr. Borisch's claims, as opposed to Mr.

23  Borisch's obligation?

24           MR. BAKST:  Yeah, I don't think we were suggesting

25  that that was his obligation.  The question was whether or not

1  he considered the value of those claims as a reduction of the

2  exposure, because he was talking about how Mr. Borisch had $50

3  million worth of exposure to the Bank, and I think that the

4  line --

5        THE COURT:  Yes, I don't think he actually said that.

6  I think his testimony was that M&T is sitting with a $50

7  million deficiency claim.

8        MR. BAKST:  Okay.

9        THE COURT:  So whatever Mr. Borisch's exposure is in

10 relation to the guaranties that he granted to M&T, that's a

11 whole different issue.  That's a whole -- I don't think --

12       MR. BAKST:  Now, respectfully, I think you're --

13 you're cutting a fine line there by saying that the Trustee is

14 saying that he's owed $50 million, and that -- but -- and that

15 there is a guaranty, and the exposure's not $50 million.  I

16 mean, --

17       THE COURT:  No.  But I think that's what you're

18 trying to tell me, right?  I mean, the estate only has what it

19 has, right?

20       MR. BAKST:  Right.

21       THE COURT:  So M&T is going to have a deficiency

22 claim.  You would agree with that, right?

23       MR. BAKST:  Yes.

24       THE COURT:  And that that's monetizable, and kind of

25 a ballpark figure is the deficiency claim against the estate

1    -- not against Mr. Borisch, against the estate -- is sort of

2    mapped out as being somewhere in the range of $50 million.  I

3    don't think that the Trustee ever testified to the fact that

4    the value of the guaranty claim that M&T has against Mr.

5    Borisch is worth $50 million.  I mean, it is what it is,

6    right?  It's whatever -- I mean, that was the whole point.

7    You all were very careful to reserve all of your defenses.

8         And I say you, I'm talking about Mr. Borisch, reserved all

9    of his defenses.  We went through the whole exercise about

10   independent causes of action that might be held.  Mr. Borisch

11   has got all of his independent causes of action.  The one

12   thing I don't think I heard Mr. Andrews testify to at all was

13   what the value of M&T's guaranty claim is or what the value of

14   Mr. Borisch's claimed independent personal claims are against

15   M&T or what the value of Mr. Borisch's defenses are against

16   M&T.  Right?

17        MR. BAKST:  There was a lot of testimony, so he may

18   have, he may have not.  I can't say one way or the other.

19        THE COURT:  All right.  Well, I can tell you that

20   there wasn't, because, again, honestly, I was kind of

21   scratching my head as to we spent like a whole day on all this

22   stuff about Mr. Borisch's individual defenses, individual

23   claims, blah, blah, blah, blah, blah.  I mean, --

24        MR. BAKST:  Well, I think that the point of that

25   testimony was to discuss the totality of the circumstances to

1    decide whether -- to ask you to decide whether or not the plan

2    was proposed in good faith.  And --

3            THE COURT:  And fair enough.  I agree that that goes

4    to that.

5            MR. BAKST:  And, you know, good faith is not tied to

6    being a bad person or lack of good faith or no good faith is

7    not tied to not being good -- a bad -- being a bad person.

8    I'm sure, I know Mr. Andrews has been practicing in this court

9    and been in this court many times and in many courts in and

10   around here, and I perceive him to be an honorable man and to

11   want to do right by people.  And he's probably -- I expect

12   that he's well-respected by this Court, and frankly, if I'm

13   standing in the courts in Michigan, I would expect to hear

14   some lawyer say the same thing about me.  So I consider him a

15   fellow soldier before the Court and before the Bankruptcy

16   Court, and I have no ill will towards Mr. Andrews.

17        But the point of the matter is that there's a series of

18   facts about the way that was chosen to get to the plan and the

19   proposal of this plan, and it doesn't satisfy 1129(a)(3).  And

20   I think my partner put on some interesting proofs and some

21   interesting testimony from the Trustee that demonstrated that

22   Mr. -- that the way this happened and the way this proceeded

23   was through extensive communication among the Trustee and the

24   Bank, because he perceived the Bank as his funding source, and

25   the Committee, to get to a plan that paid administrative --

1   and look, I understand how the world works.  It paid

2   administrative expenses in full.  It creates money to pay some

3   consumer debts, a material amount of money.  It pays taxing

4   authorities.  It really pays unsecured creditors nothing, but

5   it leaves a Creditor Trust available for whatever purposes

6   that has, and for some money to be pursued primarily for the

7   benefit of the Bank, if I understand it correctly, although I

8   could be wrong.

9       And so the testimony adduced is how did we get here, and

10  we got here in a way that cut us out, even though we were

11  supposed to be participating in it, and he tried to have us

12  participate in it indirectly and it failed.  But we offered

13  and wanted to participate in the process, and then maybe there

14  wouldn't have been this confusion because people would have

15  changed the language in as though we would be Consenting

16  Creditors or a deal would have been struck.

17      Now, I understand that the fact -- that you can't uncrack

18  the egg or unbreak the egg, but that's the point of that

19  testimony.  And so I don't want you to be misled by thinking

20  that it meant what you were initially suggesting it did.

21      And then the totality of the circumstances was that the

22  first plan was confirmable because Mr. Andrews testified to

23  that, and he testified that he never sought to confirm the

24  plan because he perceived that the Bank would disagree with

25  it.  But the Bank did not object.  You talked about me not

1  objecting earlier to certain things.  The Bank did not object

2  on June 5th because it accepted the plan.  The Bank did not

3  file a motion saying, hey, give me more time to object because

4  if the Court declines the modification I'm going to object to

5  that earlier plan.

6      So the Bank is sitting here accepting the plan and not

7  objecting to modification -- and not -- I'm sorry, accepting

8  the plan and not objecting to the plan.

9      And so if that is the situation and the Trustee identified

10  no reason why -- he said the Bank wouldn't fund it.  The Bank

11  has to fund it.  The plan doesn't give -- I read the plan

12  again after he said that, and the Bank has to fund it.

13  There's nothing in the plan that says that the funding is now

14  discretionary because the plan that the Bank voted on is now

15  no longer the plan that the Bank thought it was because they

16  misread or missed a couple words or because they expected, as

17  Mr. -- there's an exhibit in there where Mr. Kaufman said,

18  well, you're -- what do you care about the third-party

19  release, he said to me, because your client's going to opt

20  out.

21      So they perceived that we were going to opt out, and

22  perhaps at that time we were going to, but we didn't, we

23  changed our minds.  And so there is nothing in -- the good

24  faith element that I ask you to consider is both the process

25  that got us here and the fact that the Trustee made a decision

1    on June 6th at the break of dawn, at the crack of dawn, to

2    modify the plan rather than seek to enforce and confirm the

3    plan that was otherwise wholly and entirely confirmable.  And

4    I don't know if it needed to go to cramdown or not, but it

5    didn't need to go to cramdown for virtue of Class 6 creditors,

6    that's for sure, because it had all the Class 6 creditors as

7    an accepting class, for the reasons that I identified.

8        I understand the Court's inclination to want to confirm a

9    plan, but merely not confirming this plan doesn't mean that no

10   plan can be confirmed.  I would disagree with the attorney

11   from the telephone call, from the screen, who said that there

12   was no basis to object with regard to whether another plan

13   could be confirmed.  Oh, that this plan could be refiled and

14   then confirmed.  Because I would argue that there would be --

15   and I did in my objection -- that that would be a good faith

16   problem, because you can't go down the road and do the same

17   thing again just by paying another filing fee and filing it

18   again, or using ECF and filing it again.

19       But instead, here, there could be another plan.  My

20   telephone is always available and my office phone forwards to

21   my cell.  Call me anytime and we could talk about a different

22   plan.

23       So what I'm asking the Court to do today is to recognize

24   that this plan should not be modified, number one.  Number

25   two, that it's not proposed in good faith.  It doesn't satisfy

1    1129(a)(3).  That it can't be crammed down for the reasons we

2    stated in our objection, because it's not fair and equitable,

3    and doesn't satisfy the requirements of 1129(b).

4        And lastly, that if the Court doesn't want to say, or

5    can't say, or chooses not to say, to Mr. Andrews, come confirm

6    the plan that was before you on May 1st because it's fully

7    confirmable and that would be the best thing for all

8    creditors, which is frankly what I think, if we're not

9    prepared to say that, then let's do a new plan, and maybe

10   there's another plan that works for Mr. Borisch and the Bank

11   and everybody else.  Just because this is not the plan doesn't

12   mean there can be a plan.

13       And so I would ask the Court to consider that objection

14   and to sustain it, and to decline confirmation -- well, to do

15   one of three things:  deny the modification and confirm -- two

16   things:  deny the modification and confirm the May 1 plan, or

17   deny confirmation overall.

18       I heard talk of a confirmation order that was circulated.

19   You realize, Your Honor, that confirmation order is like 33

20   paragraphs long.

21           THE COURT:  Yes.  No, I know.

22           MR. BAKST:  And I don't know where your head is at,

23   whether you're going to overrule my objection and confirm a

24   plan today, but I want to be able to read -- I have not had

25   the opportunity to read that plan.  It's akin to the Big

1    Beautiful Bill, and unlike some congressmen who may or may not

2    have read every word of it, you've heard me talk about how I

3    read every word.  I want the opportunity to read every word

4    and the opportunity to comment on it because it affects my

5    client.

6        I did look at it very briefly in the short time I had, and

7    it makes changes to the Malibu settlement, it enhances M&T

8    Bank's rights in ways not articulated in the plan, and it

9    waives the 14-day stay, for no articulable reason other than

10   that the Plan Proponent wants it.

11       So I would, number one, ask the Court, number one, don't

12   enter any confirmation order, because the plan should not be

13   confirmed.  But should you choose to do so, give us an

14   opportunity to review a 33-page detailed, complicated order

15   with more than just a -- it was filed at 3:52 p.m. yesterday

16   as we were preparing for today.  Unfair.

17       So I'm open to any other questions.

18            THE COURT:  Okay.  All right.  Thank you.  If it

19   makes a difference, I will tell you this much.  I guess, well,

20   I'll wait and I'll make a comment later.

21       All right.  Ms. Schmidt, tell me why the U.S. Trustee

22   wants me to disregard the Committee in this case.  It's always

23   a little bit mystifying to me why our U.S. Trustees around the

24   country in a well-represented case decide that the Committee

25   that's appointed in the case by the United States Trustee and

1    has extremely capable counsel should be ignored because the

2    United States Trustee is so much smarter that everyone else.

3            MS. SCHMIDT:  May I get back to that?

4            THE COURT:  You may.

5        CLOSING ARGUMENT ON BEHALF OF THE UNITED STATES TRUSTEE

6            MS. SCHMIDT:  Your Honor, I'm going to try to keep my

7    comments as brief as I can here.  And I just want to note, I

8    want to stand upon the arguments that were set forth in our

9    objection to the disclosure statement at Docket Entry 862, and

10   then our confirmation objection at 934, but there are some

11   points I would like to address here.

12       I mean, obviously, we're objecting to construing a failure

13   to opt out of a third-party release as knowing and voluntary

14   consent to the release, and we're contending that these

15   releases violate *Purdue* as applied to creditors who have not

16   opted out.

17       And then there's two third-party -- well, a couple of

18   third-party releases here, but we have, obviously, the third-

19   party release of M&T Bank and its former and current officers,

20   directors, and professionals, and then we also have the mutual

21   releases between Consenting Creditors.  I think we also raised

22   the issue of the releases of the Creditor Trustee, but I --

23   there would be -- that's probably *de minimis*.

24       Consensual -- I mean, and just to point out again,

25   reminding the Court that consensual third-party releases

1  between nondebtor parties is a separate agreement that's not

2  governed -- that we're contending is not governed by

3  bankruptcy law but should be governed by state contract law.

4  And state law says the way you have a contract is you have to

5  know what you're releasing, who you are releasing, and the

6  consideration.

7          THE COURT:  So, which state law applies in this case?

8          MS. SCHMIDT:  Well, it probably could have been

9  avoided if we had had opt-in releases as opposed to opt-out

10  releases, because then you wouldn't have had the question of

11  whether you truly have a release.

12      I would say that, arguably, it would be Texas or the state

13  in which that claim arose.  There's -- I just want to address

14  some of Ms. -- some of the Trustee's responses in their

15  response to our objection, and also their arguments.  Ms. Webb

16  cited to the May 29th, 2025 decision in *In re GOL* -- I'm not

17  sure if I'm pronouncing this correctly, but --

18          THE COURT:  Yes.  I know which one you're talking

19  about.

20          MS. SCHMIDT:  Yes.  *Linhas*.  Yes.

21          THE COURT:  Yes.  That's Judge Glenn, right?

22          MS. SCHMIDT:  Judge Glenn's case, yes.  Out of --

23  Case No. 24-10118 out of the Bankruptcy Court for the Southern

24  District of New York.  And I, and again, I think the Court's

25  question gets to the issue that the *GOL Linhas* court raised,

1    but I think Ms. -- pardon me, I think the *GOL* -- the *GOL*

2    *Linhas* court misinterpreted Fifth Circuit case law, which

3    we're in the Fifth Circuit, not the Second.  It refers to

4    federal contract law and relies on Section 1123(b)(6), but --

5    to deem opt-out releases as knowing consent, but I don't think

6    you can stretch 1123(b)(6) to get there.

7        And again, I know that Ms. Webb argued the chaotic results

8    depending on what state law applies, but the solution to that

9    chaos is to have opt-in ballots, not opt-out, where you have

10   parties knowingly accept the releases rather than be required

11   to opt out.

12       And I know -- Ms. Webb also noted that opt-out releases

13   are analogous to other bankruptcy processes where creditors'

14   failure to act have consequences.  For example, failure to

15   file a proof of claim by the bar date.  But the difference is

16   that the consequences of not filing the proof of claim are set

17   forth in the Code and the Rules.  We don't really have that

18   here.

19       The Trustee argues that consideration includes mutual

20   releases between the Consenting Creditors, and that the part

21   of the mutual -- pardon me.  Let me rephrase.  The Trustee

22   argues that the consideration includes the mutual releases

23   between the Consenting Creditors, and reference the possible

24   preference claims, but I -- you know, the Trustee also noted

25   that there weren't -- there weren't really that many

1    preference payments the 90 days before the bankruptcy filing.

2        I think there's also a question about what consideration.

3    And I wanted to focus on Class 5 claimants because I think the

4    Class 4 creditors, without waiving our objection, I think the

5    Class 4 creditors do receive more tangible consideration.  The

6    Class 5 creditors, they get one percent of their claims in

7    these mutual releases.  But if you're a creditor who's owed

8    $500 -- a Class 5 creditor who's owed $500 and there's no

9    preference action, there's no possible cause of action for --

10   under Chapter 5, you get a whopping $5 check.

11       I think there's also concerns, too, with who exactly are

12   you releasing.  And again, this goes to the mutual releases.

13   The creditor doesn't know the universe of Consenting Creditors

14   until after voting, when the opt-outs and the ballots are

15   tabulated.  And going back to the elements of a contract, you

16   can't have a contract if you don't know who or what you're

17   contracting for or who or what you're releasing.

18       I'm still trying to figure out how to answer -- I know the

19   Court had raised the question of why the U.S. Trustee is

20   raising this objection when the creditors are already -- their

21   interests are already represented by the interests of a

22   Committee.  And Your Honor, all I can say is that there are

23   many times in which we have raised these type of objections

24   even when the Committee hasn't raised them themselves.  I

25   guess we just have a different view of the world than the

1  Committee on this issue.  I know that's not a satisfactory

2  answer, but I didn't know if the Court had any other questions

3  or --

4          THE COURT:  I don't, and I obviously appreciate the

5  role that the United States Trustee plays in connection with

6  all of this, and they are important issues, no matter how we

7  splice and dice it.  But it is an important question, why I

8  asked it, and it's obviously not really directed to you.  It's

9  more directed to the institution, if you will.  So, obviously,

10 don't take any of my questions as kind of peppering you

11 individually.  It's more of an institutional question.

12         MS. SCHMIDT:  I mean, I just -- we took *Purdue Pharma*

13 to the Supreme Court when the rest of the bankruptcy bar

14 thought that we had --

15         THE COURT:  I hear you.

16         MS. SCHMIDT:  Yeah.  And we won.

17         THE COURT:  Although there's a lot of opioid victims

18 who are unhappy with you all, but I'll leave it at that.

19         MS. SCHMIDT:  I won't keep --

20         THE COURT:  You don't have to respond.

21    (Laughter.)

22         THE COURT:  I mean, look, I get it.  The U.S. Trustee

23 has a very unique role, and it's just -- it's a tough one,

24 it's a tough one, because it is.  You're balancing.

25 Obviously, this is not an opioid case, but that is sort of a

1   classic example of yikes.  I mean, gosh, so many people were

2   just like desperate to get the recovery that they could get,

3   and they're at ground zero.  And so it's a hard issue, and

4   part of the U.S. Trustee's role, I get it, is, hey, that's an

5   issue for Congress to solve, not for the parties to solve.

6   But --

7           MS. SCHMIDT:  And there's also --

8           THE COURT:  -- it's sometimes very unsatisfactory to

9   the claimant.

10          MS. SCHMIDT:  Well, and I don't know if all of the

11   settlements in the world would ever make any of those

12   claimants whole, and there's issues as well about certain

13   parties being able to -- I won't say any more.

14          THE COURT:  Yes.  No, I hear you.  I hear you.

15      All right.  Is there anybody else, any other parties in

16   interest who are opposed to confirmation that wish to be

17   heard?

18      All right, Ms. Webb.  You get the last word.

19          MS. WEBB:  I have nothing further, Your Honor.

20          THE COURT:  All right.  Well, kudos for you on that

21   one.

22      It is 7:00 p.m., so it probably shouldn't come as a shock.

23   I do not want to do this on the fly.  So where I was going to

24   get to earlier, Mr. Bakst, is to tell you, no, I'm not going

25   to do it on the fly.  I will also tell you this.  I don't

1   really necessarily want to tip my hand more than maybe I

2   already have in terms of where I'm leaning, but irrespective,

3   there is no way that I'm going to be waiving any kind of a 14-

4   day stay with respect to whatever the outcome is, because I

5   get it that -- I don't want to deprive a party of appellate

6   rights if that's where they ultimately want to go, and I don't

7   really think that there's a compelling iceberg-melting-type

8   situation which sort of screams out for a waiver of any

9   applicable stay, so I don't want you to be concerned about

10   that.

11       I am going to tell you all that, as much as I would love

12   to write on this, I don't have the time, frankly, or the

13   bandwidth, given everything else that's going on, to do it

14   within a reasonable amount of time.  I felt like it was very

15   important for me to do it in relation to the -- when we had

16   the dispute about what's an estate claim versus what's a

17   Borisch claim, because I felt like that I really needed to try

18   to articulate as best as I could the parameters so that we

19   could avoid issues down the road.  I felt if I did that in an

20   oral ruling, that could be too loose, and I know that there

21   was some blowback after the fact.  But the fact that you all

22   have consensually resolved that tells me that I did enough to

23   where you all could sort it out and get that resolved.

24       I just, I don't really have the bandwidth to be able to do

25   something in writing.  But at the same time, like I said, I

1    don't want to just do something on the fly without really

2    mapping out a reasoned opinion with respect to the things that

3    are of heightened focus with respect to confirmation.

4       I mean, there was obviously a lot of things with respect

5    to confirmation that aren't contested that I'm not going to

6    cause you all to sit through half a day of talking about

7    whether or not the plan includes provisions as to who's going

8    to manage Creditor Trustee, or Creditor Trust, whatever, but

9    you get the point.  I do want to give you a reasoned opinion

10    with respect to the other aspects of it after I really sit and

11    look at where we're at.

12       In terms of our schedule, we're really a little jammed up,

13    and I want to make sure that I have enough time.  I've kind of

14    found it that if I try to jam something in, then I'm just like

15    -- somebody should have told me that I was going to be doing

16    as many all-nighters in this job as whenever I was in

17    practice.  If you had told me that, I would have said, yeah,

18    you're crazy.  I'm here to tell you, I think I'm doing as many

19    all-nighters in this job than when I was in practice, which is

20    really weird, but it's because when we have things that are

21    urgent to get to, I do take that seriously.  But I'm getting

22    too old for that, frankly.

23       So I'm going to try not to force myself into that box,

24    which means that I am going to set you all for a follow-up

25    hearing next Thursday, which is July 17th, at 1:30 p.m.

1    Central Time.  Obviously, nobody needs to be here.  We can do

2    it by WebEx.  If somebody wants to be here, feel free.  If you

3    don't, then just plug in by WebEx.  But that is my intention,

4    is to, absent something really strange happening that consumes

5    massive amounts of time and forces us to have to reschedule,

6    it is my intention to give you all an oral ruling at that

7    time.  So, that'll be July 17th, 2025 at 1:30 p.m.

8        As always, I will tell you all, frankly, I kind of like

9    the fact that I'm jammed up a little bit.  It's never too

10   late.  I would encourage -- Mr. Borisch is here.

11   Unfortunately, I don't think we have a Bank representative

12   here.  But you all ought to talk.  At least use the

13   opportunity as you're walking out into the hallway, if nothing

14   else, to just kick the tires a little bit.  Is there even a

15   possible opportunity here?  We're really far down the road,

16   and who knows how all of this is going to shake out, but you

17   all ought to talk, if that's possible.

18       And look, if something dramatic occurs that everybody

19   comes -- and when I say everybody, really what I'm talking

20   about is if the Trustee, if M&T, if Mr. Borisch, if you all,

21   as counsel -- not to exclude the Committee, but I am going to

22   kind of exclude the Committee on this one -- if you all

23   collectively come to me and say, please don't rule yet, we

24   need a little more time to talk, I promise you I'm going to

25   respect the parties' wishes on that front, because a

1   resolution is always a better thing than a non-resolution.

2       And I'm trying not to exclude the U.S. Trustee in this

3   mix, but, frankly, I kind of am as well, because I just view

4   that that's our really big party issue here right now at this

5   point.  I know that, one way or the other, I've got to deal

6   with these third-party release issues.  But in terms of just

7   the parties that really have a long-standing fight that's

8   going to continue on and on unless some sort of resolution

9   comes to fruition, those are the ones that need to chat.

10      That's it.  Like I said, I know it's late.  7:00 o'clock.

11  I'm going to owe my folks big here.  If any of you all just

12  would as soon not take your stuff with you today and send

13  somebody back over to pick it up tomorrow, we can accommodate

14  that.  If you just, I guess, work with Ms. Warren in terms of

15  we do have hearings.  But you can kind of pack it up into

16  boxes or whatever and just kind of shove it off to the side

17  and have somebody come later and get it.  Or you could pack it

18  up now.  Either way.  All I'm trying to tell you is we'll try

19  to accommodate you all, because it is late.

20      Otherwise, it was a real pleasure seeing you all.  I

21  appreciate the lawyering.  I hope that the parties appreciate

22  the lawyering.  So it's not a slam dunk, no matter how you

23  look at it.  These are interesting issues.  So I appreciate

24  everybody's efforts in presenting a good case today on all

25  sides.  Okay?

1     So that will conclude the matters on today's docket.  The

2    Court will be in recess.

3          MR. GATES:  Thank you, Judge.

4          THE CLERK:  All rise.

5      (Conclusion of proceedings at 7:08 p.m.)

6                    --oOo--

20                    CERTIFICATE

21     I certify that the foregoing is a correct transcript from

22    the electronic sound recording of the proceedings in the
above-entitled matter.

23   **/s/ Kathy Rehling**              **07/12/2025**

24   _____    _____

25   Kathy Rehling, CETD-444                 Date
Certified Electronic Court Transcriber

INDEX

PROCEEDINGS                                                    4

OPENING STATEMENTS

By Ms. Webb                                                    8
By Mr. Gerber                                                 14
By Ms. Schmidt                                                15
By Mr. Bakst                                                  16

WITNESSES

Chapter 11 Trustee Mark Andrews' Witnesses

Jeriad Paul
- Direct Testimony by Declaration                            32
- Cross-Examination by Mr. Gates                             32

Mark Andrews
- Direct Examination by Mr. Kaufman                          36
- Cross-Examination by Mr. Gerber                            60
- Cross-Examination by Mr. Gates                             62
- Cross-Examination by Ms. Schmidt                          223
- Redirect Examination by Mr. Kaufman                       237

Borisch Parties' Witnesses

Matthew Borisch
- Direct Examination by Mr. Gates                           243

EXHIBITS

United States Trustee's Exhibits

Exhibits A through E                         Received    24

M&T Bank's Exhibits

Exhibits 1, 2, and 3                         Received    25

Borisch Parties' Exhibits

Exhibits 1 through 11 and 13 through  18     Received    30

Exhibits 22, 24, 27 through 33, 35 through 39,  Received    27
44, 49, 54 through 56, and 58

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

INDEX
Page 2


Chapter 11 Trustee Mark Andrews' Exhibits

Exhibits 1 through 26                    Received   28

CLOSING ARGUMENTS

By Ms. Webb                                         253
By Mr. Gerber                                       298
By Mr. Ross                                         299
By Ms. Ross                                         303
By Mr. Bakst                                        304
By Ms. Schmidt                                      329

RULINGS - *Continued to 07/17/2025 at 1:30 p.m.*    334

END OF PROCEEDINGS                                  339

INDEX                                           340-341