1

2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

3

In Re:                          )   **Case No. 24-90000-elm-11**
                                )   (Jointly Administered)
TOMMY'S FORT WORTH, LLC,        )
et al.,                         )   Fort Worth, Texas
                                )   July 18, 2025
4

5        Debtors.               )   10:30 a.m. Docket
                                )
                                )   RULING RE: CONFIRMATION OF
6                               )   CHAPTER 11 PLAN FILED BY
                                )   TRUSTEE MARK E. ANDREWS [879]
7                               )
                                )
8   _____)

9                   TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE EDWARD L. MORRIS,
10              UNITED STATES BANKRUPTCY JUDGE.

11  APPEARANCES:

12  For Trustee Mark Andrews:    Aaron Michael Kaufman
                                 GRAY REED, LLP
13                               1601 Elm Street, Suite 4600
                                 Dallas, TX  75201
14                               (469) 320-6050

15  For M&T Bank:                Toby L. Gerber
                                 NORTON ROSE FULBRIGHT US, LLP
16                               2200 Ross Avenue, Suite 3600
                                 Dallas, TX  75201-7932
17                               (214) 855-7171

18  For Matthew Borisch:         Floyd E. Gates, Jr.
                                 BODMAN, PLC
19                               99 Monroe Avenue NW, Suite 300
                                 Grand Rapids, MI  49503
20                               (616) 205-1860

21  For Matthew Borisch:         Marc Bakst
                                 BODMAN, PLC
22                               1901 St. Antoine Street
                                 6th Floor at Ford Field
23                               Detroit, MI  48226
                                 (313) 393-7530

24

25

```
 1    APPEARANCES, cont'd.:

 2    For Matthew Borisch and      H. Dustin Fillmore, IV
      Borisch Parties:            MCDONALD SANDERS, P.C.
 3                                 777 Main Street, Suite 2700
                                   Fort Worth, TX  76102
 4                                 (817) 336-8651

 5    For Malibu Boats, Inc.:      Daniel S. Shamah
                                   COOLEY, LLP
 6                                 55 Hudson Yards
                                   New York, NY  10001
 7                                 (212) 479-6000

 8    For Joshua Magill:           Judith W. Ross
                                   ROSS, SMITH & BINFORD, P.C.
 9                                 700 N. Pearl Street, Suite 1610
                                   Dallas, TX  75201
10                                 (214) 377-7879

11    For the Official Committee   Dylan Tanner Franklin Ross
      of Unsecured Creditors:      REED SMITH, LLP
12                                 2850 N. Harwood Street, Suite 1500
                                   Dallas, TX  75201
13                                 (469) 680-4262

14    For the U.S. Trustee:        Meredyth Kippes
                                   OFFICE OF THE UNITED STATES
15                                   TRUSTEE
                                   1100 Commerce Street, Room 976
16                                 Dallas, TX  75242-1496
                                   (214) 767-1075
17
      Recorded by:                 Karyn Rueter
18                                 UNITED STATES BANKRUPTCY COURT
                                   501 W. 10th Street
19                                 Fort Worth, TX  76102
                                   (817) 333-6036
20
      Transcribed by:              Kathy Rehling
21                                 311 Paradise Cove
                                   Shady Shores, TX  76208
22                                 (972) 786-3063

23

24
              Proceedings recorded by electronic sound recording;
25             transcript produced by transcription service.
```

1              FORT WORTH, TEXAS - JULY 18, 2025 - 11:33 A.M.

2              THE COURT:  All right.  Good morning, everybody.

3      We're on the July 18, 2025 10:30 a.m. docket.  Let me first

4      say I apologize to folks for the tardiness in coming out, but

5      I appreciate everybody's patience.

6         We have on the docket today Tommy's Fort Worth, LLC and

7      their affiliated debtors' cases, jointly administered under

8      Case 24-90000.

9         Let me just confirm that I have relevant people in

10     attendance.  So let's ensure that we have somebody on behalf

11     of the Chapter 11 Trustee.

12             MR. KAUFMAN:  Good morning, Your Honor.  Aaron

13     Kaufman from Gray Reed for the Trustee.

14             THE COURT:  All right.  Do we have anybody on behalf

15     of the Borisch Parties?

16             MR. BAKST:  Yes, Your Honor.  This is Marc Bakst.

17     And also on the WebEx is Floyd Gates and Dustin Fillmore, our

18     local Texas counsel.

19             THE COURT:  Okay.  Great.  Anybody for M&T Bank?

20             MR. GERBER:  Yes, Your Honor.  Toby Gerber on behalf

21     of M&T Bank.

22             THE COURT:  All right.  How about for the Committee?

23             MR. ROSS:  Good morning, Your Honor.  Dylan Ross

24     with Reed Smith on behalf of the Committee.

25             THE COURT:  All right.  And the U.S. Trustee?

1          MS. KIPPES:  Yes, Your Honor.  Meredyth Kippes on

2   behalf of the United States Trustee.

3          THE COURT:  Okay, Ms. Kippes.

4      All right.  Do we have anybody else wishing to make a

5   formal appearance for today's hearing, understanding that

6   it's just for the purpose of rendering a ruling?

7          MS. ROSS:  Yes, Your Honor.  Judith Ross on behalf

8   of Joshua Magill.

9          THE COURT:  Okay, Ms. Ross.

10         MR. SHAMAH:  Daniel Shamah.  Daniel Shamah; Cooley;

11  on behalf of Malibu.

12         THE COURT:  All right.  Very good.  Good morning to

13  you all.

14      All right.  Let me go ahead and just dive straight in.

15  This jointly-administered bankruptcy case involves the

16  Chapter 11 cases of Tommy's Fort Worth, LLC; Tommy's Holding

17  Company, LLC; Tommy's Grand Rapids, LLC; Tommy's Castaic,

18  LLC; Tommy's Lewisville, LLC; High Country Watersports, LLC;

19  Walloon Lake Village Marina, LLC; MKB Florida Holdings, LLC;

20  Tommy's Detroit, LLC; Tommy's California Fresno, LLC; Tommy's

21  Phoenix, LLC; Tommy's Las Vegas, LLC; Tommy's Chattanooga,

22  LLC; Tommy's California Ventura, LLC; Tommy's Rancho Cordova,

23  LLC; Tommy's Stockton, LLC; and Tommy's Knoxville, LLC, which

24  I will collectively refer to as the "Debtors."

25      The Debtors filed their respective Chapter 11 bankruptcy

1    cases between May 20th and 21st, 2024.  The Court approved

2    joint administration of the cases under Case No. 24-90000,

3    which I will refer to as the "Bankruptcy Case."

4        Initially, the Debtors maintained control of their

5    operations and assets of the bankruptcy estates as debtors-

6    in-possession.  During this time frame, on June 24, 2024, the

7    United States Trustee appointed a four-member Official

8    Committee of Unsecured Creditors, or just the "Committee" for

9    short, comprised of sophisticated business organizations

10   holding substantial unsecured claims against the Debtors to

11   represent the interests of unsecured creditors in the

12   Bankruptcy Case.  *See* Docket No. 197.

13      With the approval of the Court, the Committee employed

14   well-known, sophisticated legal counsel, Reed Smith, to

15   represent it in connection with the Bankruptcy Case.  *See*

16   Docket No. 384.

17      On June 14, 2024, at the request of M&T Bank, who I will

18   sometimes refer to as the "Prepetition Lender," consistent

19   with the terminology of the Plan, and with the consent of the

20   Debtors and no opposition from any other party in interest,

21   the Court entered an order directing the appointment of a

22   Chapter 11 trustee in the Bankruptcy Case.  *See* Docket No.

23   173.

24      Shortly thereafter, the United States Trustee appointed

25   Mark E. Andrews, who I will hereafter refer to as the

1    "Trustee," to serve as the disinterested independent Chapter

2    11 Trustee, which appointment was approved by the Court on

3    June 18, 2024.  *See* Docket Nos. 174 and 178.

4        With the approval of the Court, the Trustee employed

5    well-known, sophisticated counsel, Gray Reed, to represent

6    him in connection with the Bankruptcy Case and employed

7    Trinity River Advisors to serve as his financial advisor.

8    *See* Docket Nos. 302 and 365.

9        Now before the Court for determination in the Bankruptcy

10   Case is confirmation of the Trustee's First Amended Joint

11   Chapter 11 Plan, as Modified and Supplemented.  More

12   specifically, on May 1, 2025, the Trustee filed the Trustee's

13   First Amended Joint Chapter 11 Plan at Docket No. 879, which

14   I will refer to as the "Original Plan."  *See* Trustee's

15   Exhibit 1.

16       On June 6, 2025, the Trustee filed a Notice of

17   Modification to Trustee's First Amended Joint Chapter 11 Plan

18   at Docket No. 935, which I will refer to as the "Plan

19   Modification."  *See* Trustee's Exhibit 14.

20       As contemplated by the Original Plan, the Original Plan

21   was supplemented by the Notice of Plan Supplement filed at

22   Docket No. 917, which was thereafter amended by the Notice of

23   Amended Plan Supplement filed at Docket No. 1002.  I will

24   collectively refer to these supplemental plan documents as

25   the "Plan Supplement."  *See* Trustee Exhibit 7 and M&T Exhibit

1    1.

2        I will hereafter refer to the Original Plan as modified

3    by the Plan Modification and as supplemented by the Plan

4    Supplement as just the "Plan."

5        Objections to confirmation of the Plan were timely filed

6    by the following parties.  First, the Tennessee Attorney

7    General Bankruptcy Division on behalf of the Tennessee

8    Department of Revenue, or just the "Tennessee Department of

9    Revenue," at Docket No. 923, which I will refer to as the

10   "TDOR Objection."

11       Second, the United States Trustee at Docket No. 934,

12   which I will refer to as the "UST Objection."

13       And third, Matthew A. Borisch, or just "Borisch" for

14   short, and certain of his affiliates, who I will name

15   momentarily, at Docket No. 994, which I will refer to as the

16   "Borisch Objection."

17       The affiliated Borisch Parties who have joined with

18   Borisch in the Borisch Objection are Kara A. Borisch;

19   Jonathan L. Borisch; MKB Holdings, LLC a/k/a Simplified

20   Investments; the Matthew Allen Borisch Trust; the Kara Ann

21   Borisch Trust; Walloon Lake Facilities, LLC; Walloon Lake

22   Holdings; JLB Restaurant Holdings, LLC; MKB Restaurant

23   Holdings, LLC; Hotel Walloon; Gen3 Defense and Aerospace,

24   LLC; Expedited Travel, LLC; JLB Property Holdings, LLC;

25   Legacy Water Sports and Marina; Steadfast Marine; the Michael

1  Allen Borisch Trust; and Matthew Allen Borisch Trust UAD

2  September 19, 2005, who collectively, along with Borisch, I

3  will refer to as the "Borisch Parties."

4       I will also note that the Borisch Parties as I have just

5  defined the term is the same as the definition of Borisch

6  Parties used in the Plan.

7       In response to the objections, the following responses or

8  replies, as applicable, have been filed, which I will

9  collectively refer to as the "Replies."  First, the omnibus

10  reply filed by the Trustee at Docket No. 937 in response to

11  the TDOR Objection and UST Objection.  Second, the response

12  filed by the Prepetition Lender at Docket No. 1009 in

13  response to the Borisch Objection.  And third, the

14  Supplemental Reply filed by the Trustee at Docket No. 1015 in

15  response to the Borisch Objection.

16       On July 8, 2025, the Court conducted an evidentiary

17  hearing with respect to confirmation of the Plan.

18  Participating in the hearing, individually and/or by and

19  through counsel, were, among other parties, the Trustee, the

20  Committee, the Prepetition Lender, the Borisch Parties, and

21  the United States Trustee.

22       At the commencement of the hearing, Trustee's counsel

23  announced that certain stipulations with respect to claim

24  classification and treatment, as well as certain additional

25  modifications to the Plan, had been agreed upon to address

certain informal comments or objections to the Plan/
Confirmation and to resolve the TDOR Objection.  The
stipulations, all of which have previously been approved by
the Court, have been filed at Docket Nos. 930, 931, 932, 933,
and 1004.  *See also* Trustee Exhibits 10 through 13.

The other modifications have been incorporated into the
form of the Proposed Confirmation Order filed by the Trustee
at Docket No. 1017, which I will refer to as the "Proposed
Confirmation Order."  *See* Proposed Confirmation Order
Paragraphs 20, 21, and 23.

I will collectively refer to the stipulations and
modifications as the "Additional Plan Modifications," and
will collectively refer to the earlier-referenced Plan
Modification and the Additional Plan Modifications as just
the "Plan Modifications."

At the hearing, declaration and live testimony of the
Trustee was presented; declaration and live testimony of a
representative of Omni Agent Solutions, Inc., or just "Omni"
for short, the Court-Approved Claims, Noticing, and
Soliciting Agent in the Bankruptcy Case, was presented; and
live testimony of Borisch was presented.

At the conclusion of the hearing, the Court set a follow-
up hearing for July 17, 2025 for the purpose of rendering a
decision on confirmation, which was thereafter reset to
today, July 18, 2025.

1    Having now considered the Original Plan, the Plan

2 Modification, the Plan Supplement, the TDOR Objection, the

3 UST Objection, the Borisch Objection, the Replies, the

4 Additional Plan Modifications, the additional filings and

5 orders that I hereafter reference, of which the Court takes

6 judicial notice, the evidence introduced at the hearing, the

7 representations and arguments of counsel, and the entirety of

8 the record in the Bankruptcy Court, the Court now issues the

9 following Findings of Fact, Conclusions of Law, and Ruling on

10 Confirmation of the Plan, as Modified by the Additional Plan

11 Modifications.

12    For purposes of the ruling and for ease of reference,

13 unless I have separately defined or hereafter separately

14 define a term, I will utilize the same defined terms as set

15 forth in Section I.A. of the Plan.

16    Starting with Jurisdiction.

17    The Court has jurisdiction of the proceeding involving

18 confirmation of the Plan pursuant to 28 U.S.C. Sections 1334

19 and 157 and Miscellaneous Order No. 33 of the United States

20 District Court for the Northern District of Texas.

21    Venue of the Bankruptcy Case and this proceeding in this

22 district is proper pursuant to 28 U.S.C. Sections 1408 and

23 1409.

24    This proceeding constitutes a core proceeding pursuant to

25 28 U.S.C. Section 157(b)(2)(A), (L), and (O).

1      Turning to the Factual Background.

2      Background information with respect to the Debtors,

3  including their corporate history and structure, prepetition

4  capital structure, and the circumstances leading to the

5  Chapter 11 filings is set out in the "Background and Events

6  Leading up to Chapter 11" section of the Disclosure

7  Statement.  *See* Disclosure Statement Section II.

8      The Court also makes reference to the Court's recently-

9  entered Memorandum Opinion at Docket No. 897, which I will

10  refer to as the "May 2025 Opinion."

11      As explained in the Disclosure Statement and May 2025

12  Opinion, the Debtors operated a business under the brand name

13  Tommy's which originated in Colorado in 2012.  Each of the

14  Debtors is directly or indirectly owned by Borisch or the

15  Matthew Allen Borisch Trust.  At all relevant times up to the

16  date of the Trustee's appointment as Chapter 11 Trustee,

17  Borisch served as the president of each of the Debtors.  As

18  of the time of the bankruptcy filings, the Debtors claimed to

19  be the world's largest dealer of ski and wake boats, offering

20  a wide range of services, with fourteen dealerships and five

21  on-water rental programs across Texas, Colorado, Michigan,

22  Arizona, California, Florida, Nevada, and Tennessee.

23      Prepetition, Tommy's principal dealership relationship

24  was with Malibu Boats.

25      In May 2023, Tommy's transitioned its lending

1 relationship to the Prepetition Lender, whereupon its

2 floorplan facility was increased to $110 million, with an

3 additional revolving line of credit of up to $5 million.  The

4 debt was secured by substantially all of the assets of the

5 Debtors.

6     As additional credit support, the Prepetition Lender

7 obtained a personal guaranty from Borisch, and possibly

8 certain other Borisch affiliates.

9     As of the petition date, the Debtors owed approximately

10 $105.7 million to the Prepetition Lender.

11     A.   The Souring of the Malibu Boats and M&T Bank

12 Relationships.

13     For reasons more thoroughly discussed within the

14 Disclosure Statement and May 2025 Opinion, the Debtors'

15 relationships with Malibu Boats and the Prepetition Lender

16 began to disintegrate in late 2023 and early 2024.  And it is

17 an understatement to say that friction existed and continues

18 to exist between Borisch on the one hand and Malibu Boats and

19 the Prepetition Lender on the other hand.

20     Among other things, prior to the Bankruptcy Case, Borisch

21 caused the Debtors to initiate litigation against Malibu

22 Boats, and postpetition, following the Trustee's appointment,

23 Borisch individually sued Malibu Boats.

24     Separately, in response to the Prepetition Lender's

25 actions to collect on the personal guaranty provided by

1    Borisch, Borisch has aggressively taken steps to not only

2    ensure that his defenses to the guaranty litigation are

3    preserved, but to also pursue affirmative litigation claims

4    against the Prepetition Lender.

5        Specifically, in relation to the latter case, after the

6    Trustee was appointed Borisch filed a motion for leave in the

7    state court guaranty litigation to pursue a variety of

8    counterclaims against the Prepetition Lender.  Thus, as

9    indicated, there is no love lost between Borisch on the one

10   hand and Malibu Boats and the Prepetition Lender on the

11   other.

12       Of note, the pursuit of litigation by Borisch in his

13   individual capacity against both Malibu Boats and the

14   Prepetition Lender presented complications to the Trustee in

15   his efforts to negotiate with Malibu Boats and the

16   Prepetition Lender, given Borisch's improper assertion of

17   estate-owned causes of action in addition to individually-

18   owned claims.  The May 2025 Opinion provides details with

19   respect to the improper actions taken by Borisch.

20       B.  The Trustee's Efforts to Administer the Estates.

21       In any event, rewinding to the time of the Trustee's

22   appointment, when the Trustee joined the fray in June 2024 a

23   viable cash collateral order was not in place.  In fact, the

24   Trustee's appointment was brought about as a result of the

25   Prepetition Lender's withholding of consent to the continuing

use of cash collateral and the Debtors' inability to override

such lack of consent because of a failure to establish that

the Prepetition Lender's interest in cash collateral was

being adequately protected.

Hence, the first order of business for the Trustee was to

pursue a workable agreement with the Prepetition Lender for

use of cash collateral.  The Trustee was successful in

negotiating such an agreement and obtaining the Court's

approval of the agreement, even over the objection of

Borisch.  *See* Docket Nos. 272 and 353.

The second order of business was for the Trustee to then

figure out what to do with the Debtors' continuing, albeit

substantially scaled-back, business operations and boat

inventory in the face of terminated Malibu Boats dealership

agreements, unresolved Malibu Boats disputes, and outstanding

customer obligations.

In relation to the business overall and existing boat

inventory, in early August 2024 the Court approved certain

liquidation procedures and the Trustee's engagement of Gordon

Brothers Retail Partners, LLC as a liquidation consultant for

the Trustee.  *See* Docket No. 364.

As explained in the Disclosure Statement, implementation

of the liquidation process resulted in excess of $50 million

in value for the Debtors' estates.

Additionally, the Trustee obtained court approval for the

sale of certain dealership assets. *See* Docket Nos. 421, 446, and 608.

In relation to customer obligations, in mid-September 2024 the Court approved a set of complex procedures proposed by the Trustee to address a variety of thorny customer matters, including customer deposit issues, title and registration fee issues, sales tax issues, and warranty issues. *See* Docket No. 468.

The Trustee's implementation of such procedures resulted in the resolution of many outstanding obligations. Among the issues that were not resolved, however, were certain claims associated with unremitted proceeds from the sale of customer boats and trade-in and consignment matters related thereto. Remaining customer claims involving these types of matters have been classified as Customer Constructive Trust Claims within Class 4 of the Plan.

Finally, in relation to Malibu Boats dealership issues, in October 2024, with the assistance of retired Judge Nancy Atlas, the Trustee and Malibu Boats reached agreement on the terms of a comprehensive resolution of all estate claims against Malibu Boats and all Malibu Boats claims against the Debtors' estates. Both the Prepetition Lender and the Committee attended and participated in the mediation. Borisch was not involved, but the Court notes that he was in the midst of his improper pursuit of estate-owned causes of

action against Malibu Boats, and thus likely would have only created unnecessary distraction to the negotiations.

While Borisch objected to the Trustee's settlement with Malibu Boats, the Malibu Boats Settlement was approved by the Court in late November 2024. *See* Docket No. 602.

With that matter taken care of, the Trustee was then in a position to finally assess whether a viable Chapter 11 plan could be formulated to wind up the Bankruptcy Case. Ultimately, given the outstanding unpaid amount of the Prepetition Lender debt and the Prepetition Lender's liens in cash collateral, the limited amount, if any, of unencumbered cash in the estates, and the amount of unpaid priority unsecured debt, the viability of any Chapter 11 plan would necessarily be dependent upon reaching an agreement with the Prepetition Lender for its contribution of a substantial amount of the remaining cash collateral for plan purposes.

Consequently, the Trustee focused his initial plan development negotiations on the Prepetition Lender, because without a deal with the Prepetition Lender, there would be no viable Chapter 11 Plan.

In engaging in early discussions with the Prepetition Lender, the Prepetition Lender was obviously interested in how, if at all, the guaranty provided by Borisch to the Prepetition Lender would be addressed and how any causes of action against Borisch would be administered. Given the

1  recent success in negotiating a Malibu Boats settlement with

2  the assistance of Judge Atlas, thought was given by the

3  parties to the possibility of an additional mediation session

4  with Judge Atlas in relation to these Borisch issues.

5      Desiring to facilitate a truly global resolution of all

6  issues, the Trustee attempted to work with the parties to

7  obtain an agreement for such a mediation.  In this regard, in

8  late November 2024, Trustee's counsel reported to Prepetition

9  Lender's counsel and Committee's counsel that the Trustee

10 team had connected with Borisch and his father, and that

11 Borisch and his father had indicated a willingness to commit

12 to a formal mediation with Judge Atlas to address the

13 guaranty and estate claims issues.  *See* Borisch Exhibit 56.

14     Importantly, from the Prepetition Lender's perspective,

15 given the magnitude of the loan deficiency that it was facing

16 -- *i.e.*, roughly $50 million -- a mediation with Borisch

17 would only make sense if Borisch were willing to (a) come to

18 the mediation with a substantial opening offer to the

19 Prepetition Lender on the guaranty claim, and (b) provide

20 financial disclosures to back up any asserted inability to

21 provide more.  These conditions were reported back to the

22 Borisch camp.

23     While awaiting word from the Borisch camp, the Trustee

24 marched forward with his effort to negotiate a plan construct

25 with the Prepetition Lender that would commit sufficient cash

1    collateral to make a plan viable.  In this regard, in late

2    December 2024, Trustee's counsel circulated a draft plan term

3    sheet to Prepetition Lender's counsel.  *See* Borisch Exhibit

4    31.

5         About a week later, on January 7th, 2025, Trustee's

6    counsel checked in with Prepetition Lender's counsel to again

7    urge the parties to advance the ball on plan construct

8    concepts while awaiting word from Borisch.  Prepetition

9    Lender's counsel reported, however, that they wanted to first

10   know whether a Borisch mediation and potential settlement

11   would materialize before moving forward.  *See* Borisch Exhibit

12   32.

13        Thereafter, while Borisch remained supportive of a

14   mediation, he made it clear that he would meet neither of the

15   Prepetition Lender's preconditions to a mediation.  Thus, as

16   a result of the stalemate between Borisch and the Prepetition

17   Lender, the mediation effort fell apart.

18        At that point, the Trustee again focused his efforts on

19   the negotiation of a deal with the Prepetition Lender.

20   Eventually, the parameters of a potential deal began to

21   crystallize, whereby the Prepetition Lender would agree to

22   the use of cash collateral to fund certain specified plan

23   reserves, and among other things, the plan would include

24   certain third-party release provisions in favor of the

25   Prepetition Lender.

1      Once the beginnings of a plan construct started to be

2   hammered out, the Trustee brought the Committee into the

3   negotiation fold and drafts of a plan began to be shared with

4   the Prepetition Lender and Committee.  While the Trustee

5   continued his efforts to bring the Prepetition Lender and

6   Borisch together for a group mediation -- *see, for example,*

7   Borisch Exhibit 54 -- it never happened.

8      Even so, Trustee's counsel noted to the parties in March

9   2025, in connection with circulating draft plan documents,

10  that should Borisch, following the filing of the plan, decide

11  to engage and take steps to meet, in one form or another, one

12  or both of the Prepetition Lender's preconditions for

13  mediation, a mediation could be scheduled prior to the

14  Confirmation Hearing to facilitate the potential for a truly

15  global settlement.  *See* Borisch Exhibit 27.  It never

16  happened.

17      C.  The Plan Settlement.

18      Thus, in the end, a comprehensive settlement was

19  negotiated by and among the Trustee, Prepetition Lender, and

20  Committee to be implemented under the Plan.  I will hereafter

21  refer to the comprehensive settlement as the "Plan

22  Settlement."

23      The Plan Settlement is comprised of the following

24  summarized material elements or aspects.  First, from the

25  Prepetition Lender's perspective, the Plan Settlement

provides for the following three categories of relief to the Prepetition Lender:

(1) On account of and in partial satisfaction of the allowed Prepetition Lender's Secured Claims, the Plan provides for (a) payment to the Prepetition Lender on the Effective Date of all cash held by the Debtors or the Trustee as of such date, including the Malibu Settlement Payment if received by then, except as necessary to fund the Plan Reserves; plus (b) payment to the Prepetition Lender of the Malibu Settlement Payment if received after the Effective Date; plus (c) payment to the Prepetition Lender of any additional cash receipts obtained after the Effective Date from consummated sales of inventory, refunds of unearned insurance premiums, merchant card receipts, or any other assets that are not Creditor Trust Assets; plus (d) an assignment to the Prepetition Lender of the Assigned Causes of Action, being Retained Causes of Action against the Borisch Parties, including Avoidance Actions against the Borisch Parties.

The Plan provides for the remaining unpaid balance of the Prepetition Lender's Secured Claims to be treated as a deficiency General Unsecured Claim in Class 5 of the Plan.

(2) The Plan provides for a broad-based release in favor of the Prepetition Lender and its current and former officers, directors, managers, attorneys, and other

professional advisors from the Trustee on behalf of each of
the Debtors, in accordance with the terms of the release set
out in Section X.C. of the Plan, which I will hereafter refer
to as the "Trustee Release."

(3) The Plan provides for a tailored release in favor of
the Prepetition Lender and its current and former officers,
directors, managers, attorneys, and other professional
advisors from each of the "Releasing Parties," as defined in
the Plan, in accordance with the terms of the releases set
out in Section X.D. of the Plan, which I will hereafter refer
to as the "Third-Party Releases."

For purposes of the Third-Party Releases, the term
"Releasing Parties" is defined in the Plan as the Debtors,
the Trustee, the Committee and its members, the Creditor
Trustee, and the Consenting Creditors.  *See* Plan Section
I.A.84.

As made clear by the Plan Modification, the term
"Releasing Parties" expressly excludes the Borisch Parties.

For purposes of the Third-Party Releases, the term
"Consenting Creditors" is defined in the Plan as collectively
the following holders of claims or equity interests:

(1) All holders of claims or equity interests who vote to
accept the Plan and who do not check the box on the Third-
Party Release Opt-Out Form, which I will hereafter define, to
affirmatively opt out of the Third-Party Releases;

1    (2) All holders of claims who are deemed to have accepted

2  the Plan and who do not check the box on the Third-Party

3  Release Opt-Out Form to affirmatively opt out of the Third-

4  Party Releases;

5    (3) All holders of claims or equity interests who vote to

6  reject the Plan and who do not check the box on the Third-

7  Party Release Opt-Out Form to affirmatively opt out of the

8  Third-Party Releases or object to the Plan in respect of the

9  Third-Party Releases;

10    (4) All holders of claims or equity interests who are

11  deemed to have rejected the Plan and who do not check the box

12  on the Third-Party Release Opt-Out Form to affirmatively opt

13  out of the Third-Party Releases or object to the Plan in

14  respect of the Third-Party Releases; and

15    (5) All holders of claims or equity interests who have a

16  right to vote but abstain from voting on the Plan and who do

17  not check the box on the Third-Party Release Opt-Out Form to

18  affirmatively opt out of the Third-Party Releases or object

19  to the Plan in respect of the Third-Party Releases.  *See* Plan

20  Section I.A.27.

21    The Plan Modification, again, makes clear that the term

22  "Consenting Creditors" expressly excludes the Borisch

23  Parties.

24    Second, from the Committee's perspective, the Plan

25  Settlement provides the following six categories of relief to

unsecured creditors and the Committee:

(1) Noting the prospect for no recovery at all to unsecured creditors, I should say nonpriority unsecured creditors, in the absence of a settlement -- *see, for example*, Paragraphs 61 through 62 of Trustee Exhibit 19 -- the Plan provides for the establishment of a Creditor Trust on the Effective Date, for the benefit of holders of Allowed General Unsecured Claims in Class 5 of the Plan, to be administered by a Creditor Trustee, into which will be transferred the Creditor Trust Assets, which will include all Other Retained Causes of Action as of the Effective Date, the Creditor Trust Reserve, any residual portions of the other Plan Reserves, all insurance policies of the Debtors and applicable policy proceeds, excluding refunds of unearned insurance premiums, all tax assets of the Debtors, and any other property of the Estates not otherwise distributed pursuant to the Plan;

(2) The Prepetition Lender's contribution of $350,000 in Contributed Cash Collateral to fund the Creditor Trust Reserve under the Plan;

(3) The Prepetition Lender's agreement to the subordination of its deficiency Class 5 General Unsecured Claim to all other Class 5 General Unsecured Claims;

(4) The Plan provides for a broad-based release in favor of the Committee and its members from the Trustee on behalf

of each and all of the Debtors, in accordance with the terms
of the Trustee Release;

(5) The Plan provides for a tailored release in favor of
the Committee and its members from each of the other
Releasing Parties, in accordance with the terms of the Third-
Party Releases;

(6) The Plan provides for a tailored release in favor of
each of the Consenting Creditors from each of the "Released
Parties," as defined in the Plan, in accordance with the
terms of the Third-Party Releases.

For purposes of the Third-Party Releases, the term
"Released Parties" is defined in the Plan as the Trustee,
each Debtor, the Committee and its members, the Creditor
Trustee, and M&T Bank and its current and former officers,
directors, managers, attorneys, and other professional
advisors.  *See* Plan Section I.A.83.

The Plan makes clear that the term "Released Parties"
expressly excludes the Borisch Parties.

Finally, from the Trustee's and Bankruptcy Estates'
perspective, the Plan Settlement provides the following three
categories of relief to the Bankruptcy Estates, creditors
generally, and the Trustee:

(1) The Prepetition Lender's contribution of in excess of
$3.7 million in Contributed Cash Collateral to fund Plan
Reserves necessary for the satisfaction of claims under the

Plan, as follows:

$500,000 for the Administrative Claims Reserve.  And of note, the Administrative Claims Reserve is separate from the Professional Fee Reserve provided for under the Cash Collateral Order, including funds maintained in the "Funded Reserve Account" as defined in the Cash Collateral Order, which reserve provides for a source of funds for budgeted fees and expenses of professional persons in the Bankruptcy Case that become allowed professional fees, and those funds also being cash collateral;

$2.4 million for the Priority Claims Reserve, taking into account the joint stipulation and agreed order entered at Docket No. 1004, which I will hereafter refer to as the "Plan Reserve Stipulation Order," which increased the $1.75 million amount referenced in the Plan to $2.4 million.  *See* Trustee Exhibit 20; and

$825,000 for the Customer Constructive Trust Claims Reserve, taking into account the Plan Reserve Stipulated Order, which increased the $360,000 amount referenced in the Plan to $825,000, to be used to satisfy Customer Constructive Trust Claims of holders who elect to be Consenting Creditors in relation to the Third-Party Releases by not opting out of the Third-Party Releases.

(2) The Prepetition Lender's contribution of $350,000 in Contributed Cash Collateral to fund the Creditor Trust

1  Reserve under the Plan, thereby enabling the Creditor Trust/

2  Creditor Trustee to administer the remaining assets of the

3  Estates that will be transferred to the Creditor Trust as

4  Creditor Trust Assets.

5      (3) The Plan provides for a tailored release in favor of

6  the Trustee and each of the Debtors from each of the other

7  Releasing Parties, in accordance with the terms of the Third-

8  Party Releases.  *See also* Trustee Exhibit 19, Paragraph 5.

9      With respect to the scope of the Third-Party Releases, in

10 summary, and subject to the specific terms of Section X.D. of

11 the Plan, the Third-Party Releases provide for two different

12 sets of releases.

13     First, the release of the Released Parties by the

14 Releasing Parties, to the fullest extent permissible under

15 applicable law, from any and all claims and causes of action

16 (and other similar descriptives), assertable directly or

17 derivatively, including any causes of action asserted or

18 assertable on behalf of the Debtors, the Trustee, the

19 Creditor Trust, or the Estates, as applicable, arising from,

20 relating to, or connected with the Debtors (or any

21 predecessor entity) or the Chapter 11 Cases or affecting

22 property of the Debtors' Estates, the Plan, or the

23 administration and implementation of the Plan, or based upon

24 any other related act or omission, transaction, agreement,

25 event, or other occurrence taking place on or before the

1  Effective Date.

2       Second, the release of each Consenting Creditor by the

3  Released Parties, to the fullest extent permissible under

4  applicable law, from any and all claims and causes of action

5  (and other similar descriptives), including Avoidance

6  Actions, assertable directly or derivatively, arising from,

7  relating to, or connected with the Debtors (or any

8  predecessor entity) or the Chapter 11 Cases or affecting

9  property of the Debtors' Estates, the Plan, or the

10  administration and implementation of the Plan, or based upon

11  any other related act or omission, transaction, agreement,

12  event, or other occurrence taking place on or before the

13  Effective Date.

14       For the avoidance of doubt, the Plan further provides

15  that such releases do not release (1) any obligations of any

16  party under the Plan or any document, instrument, or

17  agreement executed to implement the Plan; or (2) the rights

18  of holders of allowed claims to receive distributions under

19  the Plan.

20       The Trustee's reasons for agreeing to the Trustee Release

21  and why it is fair and equitable and in the best interests of

22  the Debtors' estates are set out in Paragraphs 29 through 35

23  of Trustee Exhibit 19.  The Trustee's reasons for agreeing

24  to, and agreeing to promote, the Third-Party Releases and why

25  the releases are necessary, appropriate, and justified under

the facts and circumstances of the Bankruptcy Case, why the

notice provided to holders of claims and equity interests of

the releases and of the opt-out procedure was reasonable and

sufficient to satisfy due process considerations, and why

each particular holder's failure to return a completed Third-

Party Release Opt-Out Form is a sufficient indication of

consent to the Third-Party Releases under the facts and

circumstances of the Bankruptcy Case are set out in

Paragraphs 36 through 41 of Trustee Exhibit 19.

D.  The Plan's Claim Classification Structure, Plan
Noticing and Voting, and Additional Plan-Related Filings.

To help further frame the issues in this case, it is also

helpful to outline the Plan classification structure and

approved noticing and voting procedures utilized by the

Trustee and to highlight certain additional confirmation-

related filings.

First, with respect to Plan structure, eight different

classes of claims and equity interests are established under

the Plan, seven for various types of claims and one for

equity interests.

Class 1 is for Priority Nontax Claims.

Class 2 is for the Prepetition Lender's Secured Claims.

Class 3 is for Other Secured Claims.

Class 4 is for Customer Constructive Trust Claims.

Class 5 is for General Unsecured Claims.

1      Class 6 is for Contribution Claims.

2      Class 7 is for Intercompany Claims.

3      And Class 8 is for Equity Interests.  *See* Plan Article

4  III.

5      Classes 1, 2, 4, 5, 6, 7, and 8 are all identified within

6  the Plan as impaired classes.  Class 7, the class established

7  for Intercompany Claims held by the Debtors against each

8  other, and Class 8, the sole class of Equity Interests held

9  in the Debtors, are both designated as classes that are

10 deemed to have rejected the Plan because the holders of such

11 claims and equity interests, respectively, will not receive

12 or retain anything on account of such claims or equity

13 interests under the Plan.

14     That said, in relation to Class 7, the class of

15 Intercompany Claims, the Plan is functionally an empty class

16 if the Plan's terms for the Plan Settlement and limited

17 substantive consolidation are taken into account.

18     The remaining classes, Classes 1, 2, 4, 5, and 6, are

19 designated as impaired classes of claims entitled to vote.

20 Importantly, this same structure was utilized under the

21 Original Plan.  In other words, the Plan Modification did not

22 change anything in relation to the Original Plan's

23 classification scheme.

24     With that in mind, the process and deadlines applicable

25 to the solicitation of votes on and the establishment of a

1   confirmation objection deadline with respect to the Plan were

2   in relation to the Original Plan because the Plan

3   Modification was not filed until after the initial deadlines

4   had passed.

5       With respect to the Original Plan, on May 1, 2025, the

6   Trustee filed his Proposed Disclosure Statement Regarding

7   Trustee's First Amended Joint Chapter 11 Plan at Docket No.

8   880, which I will refer to as the "Disclosure Statement."

9   *See* Trustee Exhibit 2.

10      On May 2nd, 2025, the Court entered an order at Docket

11  No. 882, which I will refer to as the "Solicitation Order,"

12  that approved the Disclosure Statement as containing adequate

13  information with respect to the Original Plan pursuant to 11

14  U.S.C. Section 1125 and approved certain solicitation and

15  noticing procedures, approved the forms of ballots and

16  notices to be used and sent, and established relevant

17  confirmation deadlines.  *See* Trustee Exhibit 4.

18      More specifically, pursuant to the Solicitation Order,

19  the Court approved, among other things:

20      (1) solicitation and voting procedures in relation to the

21  Original Plan.  *See* Attachment 1 to Solicitation Order.

22      (2) the form of ballots to be sent to the holders of

23  claims within Classes 1, 2, 5, and 6 of the Original Plan.

24  *See* Schedule 2A to Solicitation Order.

25      (3) the form of ballot to be sent to the holders of

claims within Class 4 of the Original Plan.  *See* Schedule 2B
to the Solicitation Order.

(4) the form of Notice of Non-Voting Status to be sent to
the holders of claims within Classes 3, 7, and 8 of the
Original Plan.  *See* Schedule 3 to Solicitation Order.

(5) the form of Notice of Non-Voting Status with Respect
to Disputed Claims to be sent to the holders of claims within
voting classes to which an objection to the allowance of the
claim has been lodged.  *See* Schedule 4 to Solicitation Order.

(6) the form of the Third-Party Release Opt-Out Form to
be used to opt out of the Third-Party Releases included as
part of the Plan Settlement proposed within the Original
Plan, or just the "Third-Party Release Opt-Out Form" for
short, to be sent to all holders of claims and equity
interests.  *See* Schedule 5 to Solicitation Order.

(7) the form of cover letter from the Trustee to be sent
to all holders of claims entitled to vote.  *See* Schedule 6 to
Solicitation Order.

And (8) the form of Confirmation Hearing Notice to be
sent to all holders of claims and equity interests.  *See*
Schedule 7 to Solicitation Order.

In accordance with the Solicitation Order, on May 2nd,
2025, the Trustee filed a Notice of Hearing to Consider
Confirmation of the Trustee's First Amended Joint Chapter 11
Plan at Docket No. 884, which I will refer to as the

1   "Confirmation Hearing Notice." *See* Trustee Exhibit 5.

2        In compliance with the Solicitation Order, the

3   Confirmation Hearing Notice includes, among other things, a

4   QR code that can be used to access all Plan-related documents

5   and instructions on how to alternatively or additionally

6   request a paper copy of such documents.

7        With the foregoing in mind, on June 3, 2025, an Affidavit

8   of Service of Omni was filed at Docket No. 929 to evidence

9   Omni's service of Plan-related documents in compliance with

10  the Solicitation Order. *See* Trustee Exhibit 9.

11       As evidenced by the Affidavit of Service, Omni served the

12  following items on the holders of claims and equity interests

13  on May 6, 2025:

14       First, all holders of claims and equity interests,

15  including holders of claims that are not classified -- for

16  example, Administrative Claims and Priority Tax Claims --

17  were served with a copy of the Confirmation Hearing Notice

18  and a Third-Party Release Opt-Out Form.

19       Second, in addition, with respect to each voting class:

20       (a) in relation to those claims as to which no claim

21  objection had been lodged, the holders thereof were served

22  with the Trustee's cover letter and an approved form of

23  ballot for such class;

24       (b) in relation to those claims as to which a claim

25  objection had been lodged but not to the full amount of the

claim, the holders thereof were served with the Trustee's cover letter, a Notice of Disputed Claim, and an approved form of ballot for such class in relation to the unobjected portion of the claim; and

(c) in relation to those claims as to which a claim objection had been lodged to the full amount of the claim, the holders thereof were served with a Notice of Disputed Claim.

Third, with respect to Class 4, the holders of claims therein were also served with a hard copy of the Original Plan, Disclosure Statement, and Solicitation Order.

Fourth, with respect to each nonvoting class, the holders of claims or equity interests therein were also served with a copy of the Non-Voting Notice.  *See* Trustee Exhibits 21 through 26 (finalized forms of the Class 1 Ballot, Class 2 Ballot, Class 4 Ballot, Class 5 Ballot, Class 6 Ballot, and Third-Party Release Opt-Out Form served on holders of claims and equity interests, as applicable).

E.   The Ballot Results in Relation to the Original Plan are Reported, a Plan Drafting Error is Discovered and Fixed, and the Confirmation Hearing is Continued to Provide the Borisch Parties with the Opportunity for Additional Discovery and to Change Their Votes in Relation to the Plan and to Object to Confirmation of the Plan.

Pursuant to the Solicitation Order, the voting deadline

1  on the Original Plan was fixed at June 5, 2025 at midnight.

2  During the evening of June 5, 2025, technically prior to

3  expiration of the deadline, Omni provided a preliminary

4  provisional ballot tally to Trustee's counsel.  *See* Borisch

5  Exhibit 22.

6      In reviewing the ballot tally, Trustee's counsel was

7  surprised by the voting results of Class 6, the class of

8  Contribution Claims, each of which is held by Borisch or

9  another Borisch Party.  *See* Trustee Exhibit 9, Exhibit H

10 thereto.

11     In particular, given the Plan's provision for all

12 Retained Causes of Action against the Borisch Parties to be

13 assigned to the Prepetition Lender, in partial satisfaction

14 of the Prepetition Lender's Secured Claims, Trustee's counsel

15 was surprised to see that all holders of Class 6 claims had

16 voted to accept the Original Plan.

17     Consequently, Trustee's counsel shared the preliminary

18 results with Committee counsel and the Prepetition Lender's

19 counsel, with the intent that everyone check to ensure that

20 there was not a glitch in the Plan's drafting.  *See* Borisch

21 Exhibits 22 and 24.

22     In fact, it turned out that there was a glitch with

23 respect to the definitions used in relation to the Third-

24 Party Release provisions.  Pursuant to the Original Plan,

25 claims and causes of action against the Borisch Parties were

1 | to be retained as Retained Causes of Action and then

2 | transferred as Assigned Causes of Action to the Prepetition

3 | Lender, in partial satisfaction of the Prepetition Lender's

4 | Secured Claims in Class 2.  *See* Original Plan, Section III.B.

5 | Additionally, the Plan Supplement identified the Assigned

6 | Causes of Action to be assigned to the Prepetition Lender.

7 | *See* Trustee Exhibit 7.

8 | On top of that, the Original Plan attempted to make clear

9 | that no releases would be provided to the Borisch Parties by

10 | specifying that the term "Released Parties" expressly

11 | excluded the Borisch Parties.  *See* Original Plan, Section

12 | I.A.83.

13 | Finally, the Disclosure Statement expressly stated the

14 | following:  "To be clear, claims and causes of action against

15 | insiders and affiliates, such as Matthew A. Borisch and his

16 | related companies, are not released under the Plan.  Rather,

17 | such claims and causes of action are expressly reserved as

18 | Retained Causes of Action under the Plan and will be Assigned

19 | Causes of Action assigned to the Prepetition Lender, M&T

20 | Bank.  The proceeds of such litigation, if any, shall be the

21 | sole property of the Prepetition Lender."  *See* Disclosure

22 | Statement Section I.A. at Pages 1 through 2.

23 | When considering all of these provisions, it was clear

24 | that the Trustee's intent, consistent with the terms of the

25 | Plan Settlement negotiated with the Prepetition Lender, was

1  for the Borisch Parties to be excluded from the release

2  provisions and for the Retained Causes of Action constituting

3  Assigned Causes of Action against the Borisch Parties to be

4  assigned to the Prepetition Lender.

5       Notwithstanding same, because the Original Plan failed to

6  expressly exclude the Borisch Parties from the definition of

7  "Consenting Creditors" -- *see* Original Plan, Section I.A.27.

8  -- by returning an acceptance ballot and not returning a

9  Third-Party Release Opt-Out Form, a Borisch Party holder of a

10  Class 6 claim, such as Borisch, could definitionally fit

11  within the category of a Consenting Creditor and thereby,

12  definitionally, make an argument upon the Effective Date of

13  the confirmed Original Plan that it had received a release by

14  the Released Parties under the Third-Party Releases, which

15  would include both the Debtors and M&T Bank.

16       To the credit of counsel for the Borisch Parties, they

17  caught the mistake, and the Borisch Party holders of Class 6

18  claims, including Borisch, understandably attempted to

19  benefit from the mistake by returning acceptance ballots

20  without an executed Third-Party Release Opt-Out Form.

21       Thereafter, however, the Trustee filed the Plan

22  Modification to "clarify" the provisions of the Third-Party

23  Release or to remedy the "ambiguity" within the Original

24  Plan.

25       Immediately after the filing, the Borisch Parties

1    requested an emergency status conference to address the

2    implications of the Plan Modification, which the Court

3    granted.  Finding the Plan Modification to be a material

4    modification to the rights of the Borisch Parties under the

5    Original Plan, on June 11, 2025 the Court entered an order at

6    Docket No. 945 continuing the Confirmation Hearing for

7    several weeks, providing an opportunity for additional

8    discovery by the Borisch Parties, and setting a revised

9    deadline for the Borisch Parties to be able to change their

10    votes in relation to the Plan and file objections to

11    confirmation of the Plan, the Plan obviously being the

12    Original Plan, as modified by the Plan Modification.  *See*

13    Trustee Exhibit 16.

14        Utilizing this opportunity, the Borisch Parties did in

15    fact engage in additional discovery, did in fact return

16    amended Class 6 ballots rejecting the Plan -- *see* Borisch

17    Exhibit 13 -- and did in fact file an objection to

18    confirmation of the Plan, being the previously-referenced

19    Borisch Objection.

20        F.  The Finalized Ballot Tabulation.

21        On July 1, 2025, a Second Amended Declaration of Mr. Paul

22    of Omni was filed at Docket No. 1001, which I will refer to

23    as the "Ballot Tabulation," to evidence the finalized results

24    of the Plan solicitation process.  *See* Trustee Exhibit 15.

25        The Ballot Tabulation reflects the following voting

results:

Class 1, no ballots received.

Class 2, acceptance by 100 percent in number and amount.

Class 4, acceptance by 100 percent in number and amount, with the amount voting in favor greater than $734,000.

Class 5, acceptance by 90.48 percent in number and 89.75 percent in amount, with the amount voting in favor greater than $28.5 million.

Class 6, rejection by 100 percent in number and amount, being the class of Contribution Claims held by the Borisch Parties.  *See* Ballot Tabulation, Paragraphs 13 and 14.

With respect to the Third-Party Releases under the Plan, it is important to note that each of the Confirmation Hearing Notice, the ballots sent to those entitled to vote, and the Non-Voting Notice sent to those not entitled to vote contained conspicuous language with respect to the terms of the Third-Party Releases, the necessity to submit a completed Third-Party Release Opt-Out Form if the holder did not consent to the Third-Party Releases, instructions on how to submit the Third-Party Release Opt-Out Form, and the deadline for the submission of the Third-Party Release Opt-Out Form. *See* Trustee Exhibits 5 and 21 through 26.  *See also* Ballot Tabulation, Paragraphs 15 through 17.

Three Third-Party Release Opt-Out Forms were returned, each by the holder of a claim who also was served with a Non-

1    Voting Notice.  *See* Ballot Tabulation, Paragraphs 15 through

2    17.

3        Turning finally to the Discussion.

4        Confirmation of the Plan in this case is governed by the

5    provisions of 11 U.S.C. Section 1129.  To obtain confirmation

6    of the Plan, the Trustee has the burden of proving by a

7    preponderance of the evidence that each of the applicable

8    requirements of Section 1129(a) has been satisfied.

9        If all of such requirements -- with the sole exception of

10   the requirements of Section 1129(a)(8), requiring that each

11   class of claims or interests under the Plan is either

12   unimpaired or has accepted the Plan -- has been satisfied,

13   then, on the request of the Trustee, which has been made, the

14   Court must confirm the Plan under Section 1129(b) if the Plan

15   does not discriminate unfairly and is fair and equitable with

16   respect to each class of claims or equity interests that is

17   impaired under and has not accepted the Plan.  *See* 11 U.S.C.

18   Section 1129(a) through (b).

19   A.  Consideration of the Initial Question of Whether the

20   Original Plan has Permissively Been Modified by the Plan

21   Modifications.

22       Pursuant to Section 1127(a) of the Bankruptcy Code, a

23   plan proponent may modify a proposed plan at any time before

24   confirmation, but may not modify such plan so that such plan

25   as modified fails to meet the requirements of Sections 1122

1  and 1123 of the Bankruptcy Code.  Provided there is no such

2  failure, the plan as modified becomes the plan under

3  consideration.  *See* 11 U.S.C. Section 1127(a).

4       In relation to the provisions of Section 1127(a),

5  pursuant to the Borisch Objection, the Borisch Parties assert

6  that the Plan Modification proposed a change to the Original

7  Plan which causes the Plan, being the Original Plan, as

8  modified by the Plan Modification, to fail to comply with the

9  provisions of Section 1123(a)(4) of the Bankruptcy Code.

10  Therefore, the Borisch Parties argue that the Original Plan

11  was never modified and that the Original Plan is the Chapter

12  11 Plan that should be confirmed by the Court.

13       Section 1123(a)(4) of the Bankruptcy Code provides that a

14  plan shall provide the same treatment for each claim or

15  interest of a particular class unless the holder of a

16  particular claim or interest agrees to a less-favorable

17  treatment of such particular claim or interest.

18       The Borisch Parties' argument in relation to Section

19  1123(a)(4) is convoluted.  Initially, the Borisch Parties

20  acknowledge that they hold claims against the Debtors based

21  upon guaranties that they have provided to other nondebtor

22  parties.  *See* Borisch Objection, Paragraph 18.

23       As a result, under the terms of the Plan, whether the

24  Original Plan or the Original Plan as modified by the Plan

25  Modification, the Borisch Parties hold Contribution Claims

1   within Class 6.  In summary, the treatment provided to each

2   Contribution Claim of Class 6 is that, in accordance with

3   Section 509 of the Bankruptcy Code, in the event that the

4   holder of such Class 6 claim that is on account of a

5   contribution/reimbursement right tied to the holder's co-

6   liability with one of the Debtors on any allowed claim,

7   referred to as an "Underlying Claim," pays such Underlying

8   Claim in full, then to the extent provided by Section 509 of

9   the Bankruptcy Code, such holder shall be subrogated to the

10  rights of the holder of the Underlying Claim under and for

11  purposes of the Plan, and such subrogated claim shall be

12  treated under the applicable class of the Underlying Claim in

13  accordance with the Plan.  *See* Plan Section IV.F.

14      Thus, the argument goes that if any of the Borisch

15  Parties hereafter ends up paying in full any such Underlying

16  Claim, thereby entitling the Borisch Party to be subrogated

17  to the rights of the holder of the Underlying Claim in

18  relation to the subrogated claim, and if the holder of the

19  Underlying Claim had the right to become a Consenting

20  Creditor, thereby obtaining the benefit of a release from the

21  Released Parties under the Third-Party Releases, then by not

22  giving the Borisch Parties, as the holders of Class 6 claims,

23  the upfront right to also become Consenting Creditors, upon

24  such subrogation pursuant to Section 509, the treatment

25  afforded to the Borisch Party holding the subrogated claim

1  will be different than the treatment afforded to the holders

2  of other claims within the applicable class of the Underlying

3  Claim.

4       Separately, the Borisch Parties also assert that Matthew

5  Borisch holds an Other Secured Claim in Class 3 on account of

6  a scheduled claim in the Tommy's Holding Company, LLC case.

7  *See* Borisch Objection, Paragraph 19.  See also Borisch

8  Exhibit 18, Copy of Page of Schedules.

9       In a cleaner manner, the Borisch Parties argue that

10  because the other holders of Class 3 claims are given the

11  opportunity to become Consenting Creditors, whereas Borisch

12  cannot become a Consenting Creditor, the treatment of

13  Borisch's Class 3 claim is not the same as the treatment

14  afforded to other Class 3 claims.

15       The Trustee's response to such arguments is twofold.

16  First, that the Borisch Parties are improperly conflating the

17  Plan's bankruptcy claims treatment provisions with the Third-

18  Party Release provisions to be implemented under the Plan as

19  part of the Plan Settlement.  And second, that vis-à-vis the

20  Plan's treatment of each bankruptcy claim included within

21  Class 6 of the Plan and the Plan's treatment of each

22  bankruptcy claim included within Class 3 of the Plan, the

23  treatment afforded to each claim within such class is

24  identical.

25       The Court agrees.  In relation to the Borisch Parties'

1   Class 6 argument, there is only one class of the Plan that

2   links the treatment to be afforded to bankruptcy claims

3   included within such class to the Third-Party Release

4   provisions:  Class 4, the class of Customer Constructive

5   Trust Claims.

6        With respect to Class 4 claims, only if the holder of the

7   Customer Constructive Trust Claim does not opt out of the

8   Third-Party Releases will the claim receive the treatment

9   afforded within Class 4 of the Plan.  Otherwise, the claim

10  will be treated as a Class 5 claim and receive the treatment

11  provided by Class 5 of the Plan.

12       But absolutely no evidence was introduced to suggest that

13  any of the Borisch Parties could be subrogated to the rights

14  of the holder of a Customer Constructive Trust Claim pursuant

15  to Section 509 of the Bankruptcy Code in relation to its

16  Class 6 Contribution Claim.

17       In relation to the Borisch Parties' Class 3 argument, and

18  also the Class 6 argument, for that matter, the Plan -- *i.e.*,

19  the Original Plan, as modified by the Plan Modification --

20  clearly provides for the same treatment of each Other Secured

21  Claim in Class 3 and for the same treatment of each

22  Contribution Claim in Class 6, thereby satisfying the

23  requirements of Section 1123(a)(4) of the Bankruptcy Code.

24  The fact that the Borisch Parties were unsuccessful in

25  engaging in settlement negotiations with the Prepetition

1    Lender so as to be folded into the Plan Settlement instead of

2    excluded from the Plan Settlement Third-Party Release

3    provisions has no bearing upon the treatment of the Borisch

4    Parties' bankruptcy claims and whether the Plan violates

5    Section 1123(a)(4) of the Bankruptcy Code.  *See, also, In re*

6    *Adelphia Communications Corp.*, 368 B.R. 140, 251 (Bankr.

7    S.D.N.Y. 2007) and *In re Mallinckrodt PLC*, 639 B.R. 837, 862

8    (Bankr. D. Del. 2022).

9        Secondarily, the Borisch Parties also argue that the Plan

10   Modification violates the requirements of Bankruptcy Rule

11   3019(a).  Initially, because this objection was not lodged as

12   part of the Borisch Objection, the Court finds that the

13   objection is waived.

14       But even if it had been timely asserted, it lacks merit.

15   Bankruptcy Rule 3019(a) starts with the premise that, after a

16   plan has been accepted and before confirmation, the plan

17   proponent may file a plan modification.  This portion of

18   Bankruptcy Rule 3019(a) conforms with the provisions of

19   Section 1127(a) of the Bankruptcy Code.

20       Bankruptcy Rule 3019 then goes on to state that the

21   modification is also considered accepted by any creditor or

22   equity security holder who also accepted the modification in

23   writing.  But for all other creditors and equity security

24   holders who did not accept the modification itself in writing

25   but who previously accepted the pre-modified plan, the

1 modification will also be considered accepted if, after

2 notice and a hearing, the Court finds that the modification

3 does not adversely change the treatment of their claims or

4 interests.  *See* Federal Rule of Bankruptcy Procedure 3019(a).

5    This portion of Bankruptcy Rule 3019(a) effectively

6 marries up with the provisions of Section 1127(d) of the

7 Bankruptcy Code.

8    Pursuant to Section 1127(d), any holder of a claim or

9 interest that has accepted or rejected a plan is deemed to

10 have accepted or rejected, as the case may be, such plan as

11 modified, unless, within the time fixed by the court, such

12 holder changes such holder's previous acceptance or

13 rejection.

14    With this in mind, in the case of a plan modification

15 that the Court, after notice and a hearing, determines does

16 not adversely change the treatment of a claim or interest

17 held by a creditor or equity security holder, it is

18 unnecessary to provide an opportunity for such holder to

19 change the prior acceptance or rejection.

20    As explained in the latter portion of Bankruptcy Rule

21 3019(a), if the holder accepted the pre-modified plan, then

22 the plan modification will also be considered accepted in

23 such instance.

24    Implicitly, the latter part of Bankruptcy Rule 3019(a)

25 recognizes that if the court determines that the plan

1  modification does adversely change the treatment of the

2  holder's claim or interest, then the prior acceptance of the

3  pre-modified plan will not apply to the plan as modified.

4  And pursuant to Section 1127(c), if there is going to be a

5  new opportunity to vote on the plan as modified, then the

6  proponent of the plan modification must comply with the

7  adequate information requirements of Section 1125 of the

8  Bankruptcy Code with respect to the modification.

9      With all of the foregoing in mind, the Court finds that

10 none of the Plan Modifications proposed by the Trustee

11 adversely changed the treatment of any claims held by any

12 creditors other than the Borisch Parties.  Thus, all of the

13 votes cast by the holders of claims other than the Borisch

14 Parties apply with equal force to the Plan, which includes

15 the Plan Modification, as further modified by the Additional

16 Plan Modifications.

17     In fact, as a technical matter, none of the Plan

18 Modifications adversely changed the treatment of any claims

19 or equity interests held by the Borisch Parties, either.

20 However, given the materiality to the Borisch Parties of the

21 exclusionary language added regarding the Borisch Parties in

22 relation to the Third-Party Release provisions, the Court

23 deemed it proper to provide an opportunity for additional

24 discovery, a change of votes, and the filing of a

25 confirmation objection by the Borisch Parties, which the

1    Borisch Parties availed themselves of.

2        And the Court additionally finds that the Trustee

3    complied with Section 1125 of the Bankruptcy Code in

4    connection with the Court's reopening of the voting

5    opportunity to the Borisch Parties in that the Plan

6    Modification itself reflected the modifications and was self-

7    explanatory with respect to the nature of the changes.

8        While unnecessary to dwell on, the Court also notes that

9    the Prepetition Lender has emphasized in its reply that the

10   Plan Settlement agreed upon by the Prepetition Lender

11   obviously did not contemplate the release of any of the

12   Borisch Parties, and that the Plan Settlement is not properly

13   memorialized under the terms of the Original Plan.

14       In any event, for the reasons previously discussed, the

15   Court finds that the Original Plan was permissibly modified

16   by the Plan Modification pursuant to Section 1127(a) of the

17   Bankruptcy Code; that the Plan has also been permissibly

18   modified by the Additional Plan Modifications pursuant to

19   Section 1127(a) of the Bankruptcy Code; that all of the votes

20   cast by holders of claims other than the Borisch Parties

21   apply with equal force to the Plan as modified by the

22   Additional Plan Modifications; and that in the case of the

23   Borisch Parties, the subsequently-cast amended ballots for

24   rejection of the Plan apply to the Plan as modified by the

25   Additional Plan Modifications.

1      For all purposes hereafter, the Court's reference to the

2  Plan will mean and refer to the Plan as modified by the

3  Additional Plan Modifications.

4      B.  The Borisch Parties' Confirmation Objections.

5      (1) Compliance with 11 U.S.C. Section 1129(a)(3), The

6  Plan's Proposal in Good Faith.

7      Section 1129(a)(3) of the Bankruptcy Code requires that

8  the Plan has been proposed in good faith and not by any means

9  forbidden by law.  *See* 11 U.S.C. Section 1129(a)(3).

10      "The generally-applicable test for good faith under

11  Section 1129(a)(3) is that the plan has been 'proposed with

12  the legitimate and honest purpose to reorganize and has a

13  reasonable hope of success.'"  *In re Village at Camp Bowie I,*

14  *LP*, 454 B.R. 702, 709 (Bankr. N.D. Tex. 2011), affirmed 710

15  F.3d 239 (5th Cir. 2013), quoting *B.M. Brite v. Sun Country*

16  *Development, Inc. (In re Sun Country Development, Inc.)*, 764

17  F.2d 406, 408 (5th Cir. 1985).

18      Pursuant to the Borisch Objection, the Borisch Parties

19  argue that the filing of the Plan Modification to exclude the

20  Borisch Parties from the Third-Party Releases was improperly

21  motivated, underhanded, and intentionally exclusionary.  The

22  Borisch Parties suggest that the Trustee had a duty as an

23  appointed independent fiduciary to plow forward with

24  confirmation of the Original Plan instead of changing the

25  Original Plan to exclude the Borisch Parties.

1    In response, the Trustee simply notes that the Plan as

2    currently formulated properly memorialized the actual Plan

3    Settlement; was the result of extensive negotiations with the

4    Prepetition Lender and the Committee, with input from, among

5    others, several Class 4 claimants; that the Trustee attempted

6    on several occasions to bring Borisch into the negotiation

7    fold, without any success; and that the Plan as currently

8    formulated, as indicated, embodies the actual agreement

9    reached with the Prepetition Lender under the Plan

10   Settlement.

11       Moreover, the Trustee has proposed the Plan with the

12   legitimate belief that it presents a viable resolution to the

13   Bankruptcy Case and has a reasonable hope of being

14   successfully confirmed, or did as of the time of its filing.

15       As both parties agree, the good faith test of Section

16   1129(a)(3) is to be determined in light of the totality of

17   the circumstances surrounding the formulation and proposal of

18   the Plan.  Here, the Court easily finds that the Trustee

19   proposed the Plan in good faith.  At multiple stages, the

20   Trustee re-introduced the potential for a joint mediation

21   with Judge Atlas of issues concerning Borisch.  Ultimately,

22   the Prepetition Lender found no utility in doing so unless

23   Borisch was prepared to demonstrate his seriousness about a

24   potential settlement by both (a) putting a substantial

25   opening offer on the table, and (b) offering up reliable

1   financial information with respect to his wherewithal.

2   Borisch did not engage on any front.

3       Ultimately, the Trustee cannot force either Borisch or

4   the Prepetition Lender to settle.  The Trustee was forced to

5   live under the well-known proverbial saying that you can lead

6   a horse, or in this case, horses, to water, but you can't

7   force them to drink.

8       First, the Plan properly embodies the actual Plan

9   Settlement negotiated with the Prepetition Lender.

10      Second, there was nothing improper with the Trustee

11  electing to proceed with a Plan that embodies a settlement

12  with less than all of the key parties in interest in the

13  case.  The Trustee's focus needed to be on developing a Plan

14  that presented a viable means for concluding the case and

15  that had a reasonable hope of success.  He succeeded in doing

16  that.

17      There is no credible evidence in the record to suggest

18  that anything about the Plan process was designed to punish

19  or in any way bring disadvantage to any of the Borisch

20  Parties.  Indeed, there is nothing now to prevent the Borisch

21  Parties and the Prepetition Lender from leaving this hearing

22  today and immediately entering into a settlement with each

23  other alone that includes the very types of releases desired

24  by the Borisch Parties.

25      Irrespective, the Court finds that the Trustee has

1  carried his burden of proving that the Plan was filed in good

2  faith and not by any means forbidden by law, as required by

3  Section 1129(a)(3) of the Bankruptcy Code.

4     (2) Satisfaction of the Cramdown Requirement of No Unfair

5  Discrimination.

6     Based upon the recast votes of the Borisch Parties in

7  relation to Class 6, Class 6 has not accepted the Plan.

8  Consequently, the Trustee requested that the Court approve

9  the Plan over the Class 6 rejection, pursuant to Section

10  1129(b) of the Bankruptcy Code.  Such provision requires,

11  among other things, that the Plan not discriminate unfairly

12  against rejecting classes.

13     According to the Borisch Parties, the Plan here does

14  discriminate unfairly by providing unequal treatment and

15  opportunity through the exclusion of the Borisch Parties from

16  the Third-Party Release provisions.

17     Without reiterating everything that I have already said,

18  I adopt the Trustee's simply-put response that the Borisch

19  Parties do not have a "right" to be released under the Plan

20  and there is no authority for the proposition that insiders,

21  like the Borisch Parties, have a fundamental right to a

22  third-party release from settlement creditors, like the

23  Prepetition Lender.

24     Perhaps if the evidence were such that the Trustee had

25  actively taken steps to prevent or obstruct the Borisch

1    Parties from interfacing with the Prepetition Lender on Plan-

2    related matters or negotiations and/or purposefully concealed

3    important information from the Prepetition Lender that might

4    have had a bearing on whether to include the Borisch Parties

5    in the Third-Party Release provisions, there might be

6    something to talk about.  But here, there is no such

7    evidence.

8        Instead, the evidence demonstrates that, if anything, the

9    Trustee attempted on multiple occasions to open doors and

10   facilitate mediation, all the while, however, understanding

11   that the viability of any plan would necessarily have to

12   start with an agreement with the Prepetition Lender.

13       As previously noted, there is nothing within the Plan

14   that prevents the Borisch Parties from immediately hereafter

15   engaging in negotiations with the Prepetition Lender on a

16   deal that may lead to the inclusion of the release of all

17   claims and causes of action against them that the Prepetition

18   Lender may obtain under the terms of the Plan.

19       In relation to Plan treatment matters, however, the

20   treatment afforded to Class 6 is entirely consistent with

21   Section 509 of the Bankruptcy Code, and there is nothing

22   discriminatory about it, much less unfairly so.

23       Moreover, the Plan's treatment of Class 6 is also fair

24   and equitable inasmuch as no junior class of claims or

25   interests will receive or retain anything under the Plan.

1       Accordingly, the Court finds that the Plan satisfies the

2   cramdown requirements of Section 1129(b) in relation to Class

3   6, and thus the Borisch Parties' objection to the contrary is

4   overruled.

5       C.   The United States Trustee's Confirmation Objections.

6       The United States Trustee raises three high-level

7   objections to confirmation of the Plan.  First, that the

8   Third-Party Release provisions of Section X.D. of the Plan

9   violate the Bankruptcy Code by imposing nonconsensual third-

10  party releases.

11      Second, that the Third-Party Releases improperly purport

12  to release a Creditor Trustee who will not be appointed until

13  the applicable release period of the Third-Party Releases has

14  expired.

15      And third, that the injunction provisions of Section X.E.

16  of the Plan violate the Bankruptcy Code by imposing a

17  sweeping injunction to enforce the Third-Party Releases.

18      (1)  Whether the Third-Party Releases are Consensual.

19      In *Harrington v. Purdue Pharma, LP*, 144 U.S. 2071 (2024),

20  obviously, as you all know, the Supreme Court held in a 5-4

21  opinion that the Bankruptcy Code does not bestow upon a

22  bankruptcy court the power to extinguish claims held by

23  nondebtors against other nondebtors without their consent.

24  In doing so, at every stage of the analysis, the Supreme

25  Court was careful to consistently include the buzzwords

1    "without their consent," "without consent," "without the

2    consent," et cetera.

3         And to hammer the point home, the majority concluded with

4    the statement, "Nothing in what we have said should be

5    construed to call into question consensual third-party

6    releases offered in connection with a bankruptcy

7    reorganization plan.  Those sorts of releases pose different

8    questions and may rest on different legal grounds than the

9    nonconsensual release at issue here.  Nor do we have occasion

10   today to express a view on what qualifies as a consensual

11   release or pass upon a plan that provides for the full

12   satisfaction of claims against a third-party nondebtor."  *Id.*

13   at 2087-88, citation omitted.

14        This stance has been the stance expressed by the Fifth

15   Circuit Court of Appeals for decades.  Yet the U.S. Trustee,

16   in the face of opposition by the Trustee, an independent

17   fiduciary appointed by the U.S. Trustee herself to act for

18   the benefit of all creditors in the Bankruptcy Case, and by

19   the Committee, comprised of individuals selected by the U.S.

20   Trustee herself to represent the interests of unsecured

21   creditors in the Bankruptcy Case, apparently deems the *Purdue*

22   *Pharma* case to be a watershed moment necessitating a complete

23   reevaluation of the means by which consensual third-party

24   releases have been pursued and implemented within this

25   circuit for years.

1      The U.S. Trustee starts with the argument that the test

2 to apply with respect to whether a third-party release is

3 consensual is of a contractual nature under applicable state

4 contract law.  In other words, the U.S. Trustee asserts that

5 a plan proponent must establish that, in relation to each

6 individual nondebtor party to be bound by the third-party

7 release, an agreement was reached in accordance with state

8 law contract principles that apply to the parties'

9 interactions.

10     The Trustee disagrees, arguing that consent is a question

11 of federal law.

12     While the state law contract approach has been adopted by

13 one of my colleagues to the east of this division, and also

14 by at least one other judge of a court outside of this

15 district, I respectfully disagree with such view of the

16 world.  As recognized by both the majority and the dissent in

17 the *Purdue Pharma* case, the bankruptcy process is inherently

18 a form of collective action proceeding.  It brings together

19 in a single forum all creditors of a debtor for the purpose

20 of sorting out debts against the debtor and other debtor-

21 creditor relations.

22     As explained by the majority in *Purdue Pharma*,

23 "bankruptcy courts may have many powers, including the power

24 to address certain collective action problems when they

25 implicate the debtor's rights and responsibilities."  *Id.* at

1    2084.

2         Such a collective action problem implicating the debtor's

3    rights and responsibilities may include the settlement of

4    certain claims by and against the estate that are dependent

5    upon the simultaneous consensual resolution of correlated

6    nondebtor claims that are integrally intertwined with the

7    claims by and/or against the estate to be settled.

8         Pursuant to Section 1123(b)(3) of the Bankruptcy Code,

9    for example, a plan may provide for the settlement of any

10   claim belonging to the debtor or to the estate.  If the

11   effectuation of such a settlement is dependent upon the

12   simultaneous resolution of a correlated nondebtor claim that

13   is integrally intertwined with the claim being settled, then

14   Section 1123(b)(6) of the Bankruptcy Code would appear to

15   provide the means to simultaneously pursue such resolution as

16   part of a plan, provided the buy-in is consensual.  *See* 11

17   U.S.C. Sections 1123(b)(3) and (b)(6).

18        What the Supreme Court did not find convincing in *Purdue*

19   *Pharma* was the concept of attempting to involuntarily bind

20   nondebtor parties, including future claimants who had not

21   even asserted a claim in the bankruptcy case, to a release in

22   favor of another nondebtor.  Because such a release is

23   tantamount to the imposition of a nonconsensual bankruptcy

24   discharge without requiring the nondebtor to comply with the

25   Bankruptcy Code's requirements for obtaining such a

1    discharge, the Supreme Court invalidated the attempt.  But in

2    doing so, it did not in any way suggest that the evaluation

3    of consensual third-party releases should be relegated to a

4    contract law analysis under applicable state law following a

5    potentially tortured evaluation of conflicts of law

6    principles.

7        Instead, provided the third-party release sought to be

8    implemented is in fact a necessary component of a settlement

9    of claims by or against the estate, and the settlement is

10   necessary to the successful resolution of the case by way of

11   a Chapter 11 plan, thereby satisfying the "appropriate"

12   standard of Section 1123(b)(6), then the question of consent

13   is a question of federal law to be determined under

14   recognized principles of collective action proceedings in the

15   nature of bankruptcy proceedings.  *See also In re GOL Linhas*

16   *Aereas Inteligentes, S.A.*, 2025 WL 1466055 (Bankr. S.D.N.Y.

17   May 22, 2025) and *In re Spirit Airlines, Inc.*, 668 B.R. 689

18   (Bankr. S.D.N.Y. 2025).

19       Here, the scope of the Third-Party Releases sought to be

20   implemented are tied exclusively and directly to the Debtors,

21   the Debtors' estates, and the Bankruptcy Case.  They seek to

22   affect only claims and causes of action (and other similar

23   descriptives) arising from, relating to, or connected with

24   the Debtors (or any predecessor entity) or the Chapter 11

25   Cases or affecting property of the Debtors' Estates, the

1    Plan, or the administration and implementation of the Plan,

2    or based upon any other related act or omission, transaction,

3    agreement, event, or other occurrence taking place on or

4    before the Effective Date.  And the evidence presented

5    establishes that the Third-Party Releases are a central

6    component of the Plan Settlement and that there is no Chapter

7    11 resolution to this Bankruptcy Case in the absence of the

8    Plan Settlement.

9         Thus, the Court finds that because the Third-Party

10   Release provisions fall within the realm of what may be

11   permissible under Section 1123(b)(6), in conjunction with

12   Section 1123(b)(3), there calling for the evaluation of

13   consent in the context of plan proceedings to be controlled

14   and determined in reference to federal law, not state law.

15        Under federal law collective action principles, the

16   determination of consent is largely a question of due

17   process, taking into account such questions as whether the

18   party to be bound has actively engaged in the proceeding; if

19   not, whether the party to be bound was represented by a

20   person or entity designated to serve as a representative for

21   those in the same shoes as the party; whether notice of the

22   proposed disposition of the party's claim was adequately

23   provided; whether the party was provided an opportunity to

24   opt out and was clearly instructed on how to do so; and

25   whether the party will receive anything in exchange.  *See,*

1   *for example*, *Phillips Petroleum Company v. Shutts*, 472 U.S.

2   797 (1985).  *See also* the *GOL Linhas Aereas Inteligentes,*

3   *S.A.* and *Spirit Airlines* cases, as well as recent opinions of

4   my colleagues within the district who have approved opt-out

5   election mechanics for third-party releases.

6      This then takes the Court to the question of whether

7   consent to the Third-Party Releases was provided by the

8   holders of claims and equity interests in this case.  Here,

9   obviously, the Trustee relied upon an opt-out feature as

10   opposed to an opt-in feature.  Considered in isolation, it

11   presents a thorny question.  However, context matters.

12      Initially, it is important to note certain holders of

13   claims and equity interests that are unnecessary to consider.

14   First, with respect to Classes 6 and 8.  Because each of the

15   holders of Class 6 claims and Class 8 equity interests are

16   Borisch Parties -- and I'll come back to Class 8 -- and the

17   Borisch Parties are not part of the Third-Party Release

18   offering, there is no issue to determine.

19      I should note that, in relation to Class 8, there may be

20   certain direct-line equity holders that are Debtors

21   themselves.  However, the Debtors themselves are part of the

22   Plan Settlement and have expressly consented to the

23   provisions.

24      Second, Class 7.  Because Class 7 involves intercompany

25   claims of the Debtors, and the Debtors are effectively party

1    to the settlement, and the intercompany claims are

2    effectively wiped out in connection with the limited

3    substantive consolidation as well, there is no issue to

4    determine.

5        As an additional threshold matter, the Court finds that

6    by and through the Confirmation Hearing Notice and the

7    ballots, the Disputed Claim Notice, or the Non-Voting Notice,

8    as applicable, information with respect to the Third-Party

9    Releases and the means to opt out of the releases was

10   properly and sufficiently provided to all holders of claims

11   and was reasonably calculated to alert each holder,

12   consistent with federal due process principles, to the fact

13   that consent to the Third-Party Releases would be deemed

14   given in the absence of the return of a completed Third-Party

15   Release Opt-Out Form.

16       Finally, as to all holders of claims other than the

17   Borisch Parties and the Debtors, the Court starts with the

18   easiest of categories of consent: those holders who have

19   actively participated in the Bankruptcy Case.

20       For those holders, the Court finds that the absence of

21   the return of a Third-Party Release Opt-Out Notice

22   constitutes consent to the Third-Party Releases.  And the

23   reason is because all of those holders have actively

24   participated, and given the nature of the clear and

25   unequivocal notice provided to such parties, their lack of

1    action to return a Third-Party Opt-Out Notice is clear

2    indication of consent.

3         Those holders include those who returned a ballot,

4    whether acceptance or rejection, except in the case of

5    rejection if there was an objection to the Plan in relation

6    to the Third-Party Releases, which I don't think occurred

7    here as to any of those parties, that would not constitute

8    consent.  But otherwise, consent.  Those who filed any sort

9    of pleading in relation to confirmation.  Again, unless it

10   was an objection in specific reference to the Third-Party

11   Releases, which I don't think applied here, and they didn't

12   otherwise accept the Plan or be deemed to accept the Plan.

13   Those who filed a proof of claim against any of the Debtors,

14   thereby engaging explicitly in the bankruptcy process.  Those

15   who have filed a notice of appearance, either *pro se* or by

16   and through counsel, again, evidencing their clear

17   participation in the case.

18        With respect to each of those categories of parties, it

19   is not reasonable to conclude that, while actively

20   participating in the case, and in the face of a clear and

21   conspicuous notice of the implications of not returning a

22   Third-Party Release Opt-Out Notice, that they would suddenly

23   play ostrich and put their head in the ground and not know

24   what's going on and thereby not express consent.

25        So, for all of those parties, it's an easy call that

1    consent has been provided unless they returned an executed

2    Third-Party Release Opt-Out Form.

3        The harder case involves those who have not actively

4    participated, which, generally speaking, is probably

5    comprised of just creditors who were scheduled with a claim

6    in the case in a liquidated amount that was not disputed and

7    noncontingent, and like I said, has not separately filed a

8    proof of claim or otherwise filed a notice of appearance or

9    otherwise appeared in the case in conjunction with

10    confirmation proceedings.

11        With respect to those parties, it is important to

12    consider the factors that I previously went through that have

13    been identified by the Supreme Court in the context of

14    consent in a class action context.

15        First, the question of whether or not there was

16    representation.  In this regard, all of the parties at issue

17    here that are focused on are effectively holders of unsecured

18    claims in one form or another.  And in relation to those

19    holders, again, we have the U.S. Trustee's appointed

20    Committee in the case that was appointed for the express

21    purpose of representing the interests of unsecured creditors

22    in the case.  And we have evidence that the Committee itself

23    was actively engaged in the Plan Settlement negotiations that

24    ultimately included, for the benefit of unsecured creditors,

25    the Third-Party Release provisions, which include reciprocal

1  release benefits.

2        While it may be, as candidly disclosed by the Trustee in

3  testimony, that there isn't really a lot of avoidance action

4  exposure, getting released from avoidance action exposure

5  means something.  And I'll come back to that in a minute.

6  But the point is that there was somebody there to look out

7  for the interests of unsecured creditors and who was actively

8  engaged in the actual negotiations that led to the Third-

9  Party Release construct.

10       Second, the question of notice.  I've already gone

11  through this.  There were multiple forms of notice provided

12  to the holders of claims to make it crystal clear of the

13  existence of the Third-Party Releases, the implication of not

14  returning a Third-Party Release Opt-Out Form, and the binding

15  effect of that.

16       Finally, the question of receipt of value.  For all of

17  the unsecured claims, excluding Class 5 for the moment,

18  substantial recoveries will be obtained in the case which

19  would not otherwise be available if the Prepetition Lender

20  were to exercise remedies with respect to cash collateral.

21       In the case of Class 4 in particular, those are very

22  complex claims relating to sales proceeds, and the Plan

23  provides for a meaningful settlement opportunity with respect

24  to that class.

25       Even in the case of Class 5, however, while it is true

1   that there's an estimated recovery of one percent of the

2   allowed amount of the claims in that class, we have active

3   approval of the Plan by holders of claims in the amount of at

4   least $28 million [Court correction], meaning something.  We

5   also have the recovery of something to that class, whereas

6   there would be a recovery of nothing to that class in the

7   absence of the Plan Settlement [Court correction].  And

8   again, we have reciprocal release exchanges for the benefit

9   of Consenting Creditors in that class, as opposed to being

10  nothing more than the attempt to secure a gratuitous Third-

11  Party Release solely given by the Consenting Creditor with

12  the consent of the creditor.

13       So, because there was representation, there was

14  sufficient notice, and there is the receipt of value, all of

15  that indicia suggests that, in the context of considering

16  collective action proceedings similar to class action

17  proceedings, that those parties had a reasoned belief, either

18  expressly acknowledged their consent in affirmatively

19  deciding to not return the form or sort of implicitly

20  expressed such consent by knowing that there was somebody

21  looking out for them in the form of the Committee and not

22  worrying about having to take action to prevent the consent

23  from being given.

24       So, for all of those reasons, I will find that, as a

25  general proposition, the consent provisions of the Third-

1  Party Release mechanics will be approved.

2      (2) With Respect to the Creditor Trustee as a Releasing

3  Party or Released Party.

4      I do agree with the U.S. Trustee's objection in this

5  regard.  Neither the Creditor Trust nor the Creditor Trustee

6  will exist until the Effective Date, yet the Third-Party

7  Release provisions cover a period of time that is up until

8  the Effective Date.  Therefore, it is sort of nonsensical to

9  consider that a release is either being given by or being

10  received by an individual that hasn't even been appointed

11  prior to the Effective Date.

12      Therefore, the Third-Party Release provisions with

13  respect to the Creditor Trustee will be disapproved to the

14  extent that the Creditor Trustee is identified as a Releasing

15  Party or Released Party.

16      (3) Finally, With Respect to the Objection to Plan

17  Injunctions.

18      The Plan injunctions have been specifically tailored to

19  provide for the implementation of both the -- well, all of

20  the release provisions that are included in the Plan.  It is

21  an appropriate corollary basis for relief to provide for the

22  Plan injunctions to effectuate the releases that are granted,

23  and that's within the power of the Court under Section 105(a)

24  of the Bankruptcy Code, in furtherance of a confirmed plan.

25      Therefore, for reasons that have been more thoroughly

 1   briefed in the Trustee's Reply, the Court finds that the Plan

 2   injunction provisions are appropriate and permissive, and

 3   they will be approved.

 4       Thus, in conclusion -- I should also note that, in all

 5   other respects, and for brevity, the Court adopts the

 6   proposed findings and conclusions that are set forth in the

 7   Proposed Confirmation Order.

 8       And with that said, for all of the foregoing reasons, and

 9   taking into account the adoption, the Court overrules all

10   objections to confirmation of the Plan and will confirm the

11   Plan, again, as modified pursuant to all of the Plan

12   Modifications, pursuant to 11 U.S.C. Section 1129.

13       I will also note, however, that in reference to the

14   Proposed Confirmation Order, that I am not going to approve

15   the waiver of any stays that would be applicable to the

16   enforceability of the order.  So whatever the applicable

17   automatic stay provisions are under the Bankruptcy Rules in

18   relation thereto will apply.  But that will be the one

19   modification to make.

20       All right.  Again, thank you for your patience and

21   attention.  That concludes the Court's ruling.

22       Mr. Kaufman, I will look to you to clean up anything that

23   needs to be cleaned up and make sure that everybody is in the

24   loop with respect to --

25           MR. BAKST:  Your Honor?

1          THE COURT:  -- the final confirmation order and have

2     it submitted.

3       Okay.  Yes?  Who's trying to speak?

4          MR. BAKST:  Your Honor?  Marc Bakst, Your Honor.

5          THE COURT:  Okay.

6          MR. BAKST:  Thank you for hearing me.  I apologize

7     for the background noise.  I'm in an airport, so it's a

8     little bit awkward.

9       We were in an awkward position.  You had said today was a

10    decision on the ruling, and I see nothing in your Local

11    Rules, and perhaps I missed it, but our local counsel did not

12    either, about a process for signing off on the order.  We can

13    -- we were hopeful that you would rule in favor of our

14    objections and didn't know, so we couldn't -- and it was

15    difficult to -- we wouldn't submit our comments on the record

16    in the filing about our comments to the Trustee's proposed

17    order.

18      Nonetheless, yesterday I did provide him with substantial

19    redlines.  We have not heard any responses to those.  And I'm

20    wondering if there's a process that we could have in place

21    for addressing those changes, or we could submit them to you

22    as a redline and file that with the Court so the Court could

23    consider our comments to the order.

24      There are some things in the order that are beyond what

25    is in a -- that is necessary for confirmation.  For example,

1    you could just say, "For the reasons stated on the record,

2    the Plan is confirmed," but we don't do that generally in

3    cases.  I understand that, but it could be done.

4        There's 32 pages to this order, and there are a handful,

5    more than a handful of things that are slightly beyond the

6    scope or beyond the scope of what you've ruled upon, in my

7    judgment.  And I don't know how we get that in front of you

8    for you to consider our views on that, Your Honor.  And

9    that's why I -- I thought today was just a ruling and we'd

10   have some opportunity in the future to deal with that.

11   Again, I'm happy to have my local counsel file a redline as

12   something that would give you that guidepost.

13        THE COURT:  All right.  Well, I'm not going to try

14   to go back and unwind my ruling in any respect, although I

15   think I touched upon this a little bit at the conclusion of

16   my ruling.  But in any respect, the point of the exercise

17   here is for parties to be able to have an opportunity to look

18   at form with respect to the finalized confirmation order,

19   which I understand and it's common practice here in the

20   Northern District of Texas to include findings and

21   conclusions.  And, again, rather than spend the rest of the

22   day going through each individual finding and conclusion, I

23   simply tried to reference that I was adopting findings and

24   conclusions set forth within the Proposed Confirmation Order.

25        But nevertheless, I do think it's appropriate to give

1   people an opportunity to take a look at the finalized

2   confirmation order to address any concerns with respect to

3   form.  And then, God forbid, if there are issues, what I

4   would suggest is -- because I don't want this to linger -- is

5   that I don't want to have a hearing on it unless I want a

6   hearing or need a hearing.  But what I would suggest is if

7   the parties aren't on the same page I would say by sometime

8   the morning of next Tuesday, that the parties just simply

9   submit competing drafts of the order.

10      And what I would ask is that anyone who is taking issue

11  with the Trustee's form of order provide with -- well, let me

12  back up.  What I would want is I would want those orders in

13  Word format, and what I would want is, from any party who's

14  taking issue with the Trustee's proposed form of order, to

15  include a redline so that I know what differences are being

16  sought in relation to the Trustee's draft.  And then, like I

17  said, I'll just figure out if a hearing is necessary or not

18  and plow forward.

19      I should note, you did raise one point, though, that I do

20  want to make sure, Mr. Kaufman, that you address, and that is

21  if you will just make sure that the order does incorporate by

22  reference the oral ruling in addition to the additional

23  findings and conclusions within the order, just so that the

24  oral ruling is included.  Okay?  Any other questions?

25          MR. KAUFMAN:  Will do, Your Honor.  Yes.

1           MR. BAKST:  Your Honor, you broke up on that last

2   request of Mr. Kaufman.  I apologize.  It's hard to hear.

3   Could you repeat that?  I apologize.

4           THE COURT:  I just asked him to make sure that he

5   includes language in the proposed order that also

6   incorporates by reference the oral ruling that I've just

7   given.

8           MR. BAKST:  I see.  Thank you.  And thank you for

9   your courtesy on providing time for our commentary.

10         THE COURT:  Okay.  All right.  Well, very good.

11   Anything else from anybody?

12     All right.  Well, again, thank you for your patience.

13   Thank you for also bearing with me to push this a day.

14   Obviously, this is an important matter, so I wanted to give

15   it as much attention as I could.  So that will conclude the

16   hearing for today in the Tommy's case, and the Court will be

17   in recess.

18     (Conclusion of proceedings at 1:12 p.m.)

19                 --oOo--

20               CERTIFICATE

21     I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the

22   above-entitled matter.

23   **/s/ Kathy Rehling**                 **07/19/2025**

24   _____     _____

     Kathy Rehling, CETD-444              Date

25   Certified Electronic Court Transcriber

                                    INDEX

PROCEEDINGS                                                        3

WITNESSES

-none-

EXHIBITS

-none-

RULINGS                                                            4

END OF PROCEEDINGS                                                70

INDEX                                                            71