

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 24, 2025**

_____

**United States Bankruptcy Judge**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| TOMMY'S FORT WORTH, LLC., *et al.*,[1] | § | Case No. 24-90000 (ELM) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING TRUSTEE'S FIRST AMENDED JOINT CHAPTER 11 PLAN, AS MODIFIED

Upon the *Trustee's First Amended Joint Chapter 11 Plan* [Docket No. 879] (the "Original Plan"), as modified by Docket No. 935-1 (the "Plan Modification") (as so modified, attached hereto as **Exhibit A**) and supplemented by the supplement and related exhibits filed by the Trustee on May 26, 2025 [Docket No. 917], as amended on July 1, 2025 [Docket No. 1002]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tommy's Fort Worth, LLC (3473); Tommy's Holding Company, LLC (2662); Tommy's Grand Rapids, LLC (9224); Tommy's Castaic, LLC (7501); Tommy's Lewisville, LLC (4750); High Country Watersports, LLC (6160); Walloon Lake Village Marina, LLC (0277); MKB Florida Holdings, LLC (5698); Tommy's Detroit, LLC (5242); Tommy's California Fresno, LLC (8597); Tommy's Phoenix, LLC (3036); Tommy's Las Vegas, LLC (7721); Tommy's Chattanooga, LLC (0839); Tommy's California Ventura, LLC (5149); Tommy's Rancho Cordova, LLC (1070); Tommy's Stockton, LLC (1338); and Tommy's Knoxville, LLC (8052).

(collectively, the "Plan Supplement") (*see* Trustee Exh. 7 and M&T Exh. 1) (the Original Plan, as modified by the Plan Modification, supplemented by the Plan Supplement, and further modified by the Classification/Treatment Stipulations (as hereafter defined) and Additional Plan Modifications (as hereafter defined), the "Plan");[2] and the Original Plan and the corresponding *Disclosure Statement Regarding Trustee's First Amended Joint Chapter 11 Plan* [Docket No. 880] (the "Disclosure Statement") (*see* Trustee Exh. 2) having been distributed or made available to holders of Claims and Equity Interests and other parties in interest as provided in the Solicitation Order;[3] and good and sufficient notice of the Original Plan, the Disclosure Statement, the Plan Supplement, the Plan Modification, and the Confirmation Hearing having been provided to holders of Claims and Equity Interests in accordance with title 11 of the United States Code (the "Bankruptcy Code"), the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Rules of the United States Bankruptcy Court for the Northern District of Texas (the "Local Rules") and the orders of this Court, as established by the certificates of service filed with the Court (the "Certificates of Service"),[4] and such notice being sufficient under the circumstances and no other or further notice being required; and after due consideration of (i) the *Declaration of Mark E. Andrews, Chapter 11 Trustee, in Support of Confirmation of the Trustee's First Amended Joint Chapter 11 Plan* [Docket No. 1005] (the "Andrews Declaration") (*see* Trustee Exh. 19) and further testimony adduced at the

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan.

[3] *See Order (I) Approving the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Joint Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No. 882] (the "Solicitation Order") (*see* Trustee Exh. 4).

[4] *See* Docket Nos. 892 (Certificate of Service for the publication notice served pursuant to the Solicitation Order), 924 (Certificate of Service for mailing of initial Plan Supplement documents), 929 (Certificate of Service for mailing of Solicitation Packages), 947 (Certificate of Service for mailing of notice of Plan Modification), 955 (Certificate of Service for mailing of Notice of Adjournment of Confirmation Hearing), and 1019 (Certificate of Service for mailing of amended Plan Supplement document).

Confirmation Hearing and (ii) the *Second Amended Declaration of Jeriad R. Paul of Omni Agent Solutions, Inc. Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Trustee's First Amended Joint Chapter 11 Plan* [Docket No. 1001] (the "Ballot Tabulation") (*see* Trustee Exh. 15); and upon the objection to confirmation of the Plan filed by the Tennessee Department of Revenue [Docket No. 923] (the "TDOR Objection"), the United States Trustee [Docket No. 934] (the "UST Objection"), and the Borisch Parties [Docket No. 994] (the "Borisch Objection" and, collectively with the TDOR Objection and the UST Objection, the "Objections"); and upon the *Trustee's Omnibus Reply in Support of Trustee's First Amended Joint Chapter 11 Plan* [Docket No. 937] and the *Trustee's Supplemental Reply in Support of Trustee's First Amended Joint Chapter 11 Plan* [Docket No. 1015]; and upon the entire record of these Chapter 11 Cases, the record made at the Confirmation Hearing and the arguments of counsel and the evidence adduced thereat; and the Court having determined, based upon all of the foregoing, that the Plan should be confirmed; and after due deliberation and good cause appearing therefor, the Court hereby **FINDS, DETERMINES, AND CONCLUDES AS FOLLOWS:**

A.     Findings and Conclusions.  The findings and conclusions set forth herein and on the record at the Confirmation Hearing, including the findings and conclusions issued by the Court through its oral ruling on July 18, 2025, a transcript of which is attached hereto as **Exhibit B** (the "Oral Ruling"), which Oral Ruling is incorporated herein by reference, constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the Court's findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the Court's conclusions of law constitute findings of fact, they are adopted as such.

4915-5440-1855

**JURISDICTION AND VENUE**

B.      <u>Jurisdiction, Venue, Core Proceeding</u>.   This Court has jurisdiction over the Debtors' Chapter 11 Cases and the proceeding involving confirmation of the Plan pursuant to 28 U.S.C. §§ 1334 and 157 and Miscellaneous Order No. 33 of the District Court for the Northern District of Texas.   Consideration of whether the Plan complies with the applicable provisions of the Bankruptcy Code constitutes a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (L), and (O).   This Court may enter a final order on confirmation of the Plan consistent with Article III of the United States Constitution.   Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**CHAPTER 11 CASES**

C.      <u>Commencement of the Chapter 11 Cases</u>.   Between May 20 and 21, 2024 (the "<u>Petition Date</u>"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.   In accordance with the Court's *Order (I) Directing Joint Administration of Debtors' Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 43], these Chapter 11 Cases are being jointly administered pursuant to Bankruptcy Rule 1015.   On June 14, 2024, the Court entered an unopposed order for the appointment of a chapter 11 trustee in the Chapter 11 Cases.   Shortly thereafter, the United States Trustee appointed Mark E. Andrews to serve as the chapter 11 trustee (in such capacity, the "<u>Trustee</u>"), which appointment was approved by the Court on June 18, 2024.   *See* Docket Nos. 174 and 178.   On June 24, 2024, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "<u>Committee</u>").   *See* Docket No. 197.

D.      <u>Judicial Notice</u>.   The Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of the Bankruptcy Court and pleadings reflected therein

4915-5440-1855

including, without limitation, all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at the hearings held before the Court during the pendency of the Chapter 11 Cases.

## SOLICITATION AND NOTICE

E.      <u>Solicitation and Notice</u>.  The Original Plan, the Disclosure Statement, and other materials distributed by the Trustee in connection with solicitation of the Original Plan, as they may have been modified, amended, or supplemented from time to time, were transmitted and served in compliance with the Bankruptcy Rules, including Bankruptcy Rules 3017 and 3018, with the Local Rules, and with the procedures set forth in the Solicitation Order.  As described in the Andrews Declaration and the Certificates of Service, (a) the service of the Solicitation Packages (as defined in the motion for approval and entry of the Solicitation Order, filed at Docket No. 839) was adequate and sufficient under the circumstances of these Chapter 11 Cases, and (b) adequate and sufficient notice of the Confirmation Hearing and other requirements, deadlines, hearings, and matters described in the Solicitation Order was timely provided in compliance with the Bankruptcy Rules and the Solicitation Order.

F.      <u>Voting on the Original Plan</u>.  Votes on the Original Plan were solicited after disclosure to holders of Claims of "adequate information" as defined in section 1125 of the Bankruptcy Code was provided pursuant to the Disclosure Statement.  As evidenced by the Andrews Declaration and the Ballot Tabulation, votes to accept or reject the Original Plan were solicited and tabulated fairly, in good faith, and in a manner consistent with the Solicitation Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

G.      <u>Plan Modifications</u>.  Prior to the Confirmation Hearing, the Trustee made certain modifications to the Original Plan pursuant to the Plan Modification.  Additionally, the Trustee

4915-5440-1855

has agreed to certain additional modifications provided for pursuant to the terms of the confirmation stipulations filed and approved in advance of the Confirmation Hearing (collectively, the "Classification/Treatment Stipulations")[5] and those provided for in accordance with the other settlements and resolutions announced on the record at the Confirmation Hearing, all of which are reflected herein (collectively, the "Additional Plan Modifications", and together with the Plan Modification and the Classification/Treatment Stipulations, the "Plan Modifications"). For reasons indicated below and in the Oral Ruling, the Original Plan, as modified by the Plan Modifications, complies with the classification requirements of section 1122 of the Bankruptcy Code and the content requirements of section 1123 of the Bankruptcy Code. Thus, in accordance with section 1127(a) of the Bankruptcy Code, the Original Plan was validly modified by the Plan Modifications, the Plan is the only chapter 11 plan sought to be confirmed by the Trustee, and the Plan is the only chapter 11 plan before the Court for confirmation consideration.

H.    Application of Votes to Plan.    None of the Plan Modifications materially or adversely change the treatment of any Claim in comparison to the Original Plan. Therefore, except as indicated in paragraph I below in relation to the Borisch Parties, it is and was unnecessary to provide an opportunity for the holders of Claims that voted on the Original Plan to change their previous acceptances or rejections of the Original Plan in relation to the Plan. Consequently, with the exception of the votes cast by the Borisch Parties on the Original Plan, all votes cast on the Original Plan by the holders of Claims apply with equal force and effect to the Plan.

---

[5] *See* Docket Nos. 930, 931, 932, 933, and 1004.

4915-5440-1855

I.    <u>The Provision of an Opportunity for the Borisch Parties to Conduct Supplemental Discovery, to Change Their Votes, and to Object to the Plan</u>.  With respect to the Borisch Parties, while none of the Plan Modifications adversely change the treatment of any Claims held by the Borisch Parties in comparison to the Original Plan, on June 9, 2025, after the filing of the Plan Modification, and at the request of the Borisch Parties, the Court held a status conference to consider the Borisch Parties' oral request for a continuance of the Confirmation Hearing, originally scheduled for June 13, 2025.  Finding that the Plan Modification had the effect of correcting certain definitional errors discovered in relation to the Third-Party Releases that the Borisch Parties claim to have relied upon in casting their original Ballots on the Original Plan, the Court granted the oral continuance request, entering a *Scheduling Order Following the June 9, 2025 Status Conference* [Docket No. 945] (the "<u>Scheduling Order</u>") pursuant to which the Court adjourned the Confirmation Hearing for 25 days, to July 8, 2025, and granted the Borisch Parties additional time to conduct discovery relating to the Plan, to submit amended Ballots in relation to the Plan, and to file objections to confirmation of the Plan.  As explained in greater detail in the Oral Ruling, the Borisch Parties availed themselves of all three of those opportunities and the Borisch Parties holding Claims changed their votes from acceptance of the Original Plan to rejection of the Plan.  *See* Borisch Exh. 13.  The rejection votes have been taken into account and are reflected in the Ballot Tabulation.

## COMPLIANCE WITH THE REQUIREMENTS OF
## SECTION 1129 OF THE BANKRUPTCY CODE

J.    <u>Burden of Proof.</u>  The Trustee has met his burden of proving the elements of sections 1129 of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard.

4915-5440-1855

K.    <u>Bankruptcy Rule 3016</u>.  All Plan documents, including, without limitation, the Original Plan and Plan Modification, are dated and identify the Trustee as the Plan proponent, thereby satisfying Bankruptcy Rule 3016(a).  The Trustee appropriately filed the Disclosure Statement in relation to the Original Plan, thereby satisfying Bankruptcy Rule 3016(b).  The injunction, release, and exculpation provisions in the Disclosure Statement and the Plan describe, with specific and conspicuous language, all acts to be enjoined, released, and exculpated and identify the entities that will be subject to the injunction, releases, and exculpations, thereby satisfying Bankruptcy Rule 3016(c).

L.    <u>Plan Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(1))</u>.  The Plan complies with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

(i)    <u>Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1))</u>.  As required by section 1123(a)(1) of the Bankruptcy Code, Article III of the Plan designates eight (8) Classes of Claims against, and Equity Interests in, the Debtors. Administrative Claims (including Professional Fee Claims) and Priority Tax Claims, which are addressed by Article II of the Plan, need not be classified.  As required by section 1122(a) of the Bankruptcy Code, the Claims and Equity Interests placed in each Class are substantially similar to other Claims and Equity Interests, as the case may be, in each such Class.  Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Equity Interests under the Plan. Thus, the Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

(ii)    <u>Specified Unimpaired Classes (11 U.S.C. § 1123(a)(2))</u>.  Articles III and IV of the Plan specify that Class 3 is unimpaired under the Plan, thereby satisfying section 1123(a)(2) of the Bankruptcy Code.

(iii)    <u>Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3))</u>.
Articles III and IV of the Plan specify that Classes 1, 2, 4, 5, 6, 7, and 8 are impaired, and set forth the treatment of such impaired Classes, thereby satisfying section 1123(a)(3) of the Bankruptcy Code.

(iv)    <u>No Discrimination (11 U.S.C. § 1123(a)(4))</u>.    Article IV of the Plan provides the same treatment for each Claim or Equity Interest in each respective Class unless the holder of a particular Claim or Equity Interest has agreed to a less favorable treatment in respect of such Claim or Equity Interest, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

(v)    <u>Implementation of the Plan (11 U.S.C. § 1123(a)(5))</u>.    The Plan, including the various documents included in the Plan Supplement, provide for adequate and proper means for the Plan's implementation including, without limitation, (a) sources of consideration for Plan Reserves and distribution thereof, (b) the cancellation of Equity Interests, (c) authorizing the transfer of certain of the Debtors' Assets to the Creditor Trust, (d) the reservation and transfer to the Creditor Trust and Prepetition Lender of the Assigned Causes of Action and Other Retained Causes of Action, as applicable, and (e) the execution, delivery, filing, or recording of all contracts, securities, instruments, releases, and other agreements or documents related to the foregoing, thereby satisfying section 1123(a)(5) of the Bankruptcy Code.

(vi)    <u>Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6))</u>.    Because the Plan provides for the liquidation of the Debtors, the prohibition on the issuance of nonvoting equity securities contained in section 1123(a)(6) of the Bankruptcy Code is not applicable.

(vii)    <u>Designation of Directors and Officers (11 U.S.C. § 1123(a)(7))</u>.    Article VI of the Plan provides for the establishment of the Creditor Trust and the appointment of the

4915-5440-1855

Creditor Trustee.  These provisions are consistent with the interests of holders of Claims and public policy, thereby satisfying section 1123(a)(7) of the Bankruptcy Code.

M.    <u>Additional Plan Provisions (11 U.S.C. § 1123(b))</u>.  The additional provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1123(b) of the Bankruptcy Code.

(i)    <u>Impairment/Unimpairment of Any Class of Claims or Equity Interests (11 U.S.C. § 1123(b)(1))</u>.  Pursuant to the Plan, Class 3 is unimpaired and Classes 1, 2, 4, 5, 6, 7, and 8 are impaired, as contemplated by section 1123(b)(1) of the Bankruptcy Code.

(ii)    <u>Assumption and Rejection of Executory Contracts (11 U.S.C. § 1123(b)(2))</u>.  Article X of the Plan provides for the rejection of the Debtors' remaining executory contracts and unexpired leases (if any), effective as of the Effective Date, except for any executory contract or unexpired lease that (a) was previously assumed, assumed and assigned or rejected pursuant to an Order of the Bankruptcy Court entered on or before the Confirmation Date, (b) previously expired or terminated by its own terms, or (c) is the subject of a motion to assume, assume and assign or reject filed on or prior to the Confirmation Date.

(iii)    <u>Settlement of Claims and Causes of Action (11 U.S.C. § 1123(b)(3))</u>.  In consideration for the distributions and other benefits provided under the Plan and with the support of the various creditors, stakeholders, and other parties in interest, the provisions of the Plan constitute a good-faith compromise of all Claims, Equity Interests, Causes of Action, as applicable, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  Those settlements and compromises are fair, equitable, and reasonable and approved as being in the best interests of the Debtors and their Estates.  In this regard, as further discussed in

4915-5440-1855

the Oral Ruling, the Plan embodies a Plan Settlement which is fair and equitable and in the best interests of the Debtors and the Estates.

(iv)    Modification of the Rights of Holders of Claims (11 U.S.C. § 1123(b)(5)). Article IV of the Plan modifies or leaves unaffected, as the case may be, the rights of holders of each class of Claims and Equity Interests.

(v)    Other Appropriate Provisions (11 U.S.C. § 1123(b)(6)).    The Plan's other provisions, including, without limitation, provisions for (a) distributions to holders of Claims, (b) releases by Debtors of certain parties, (c) exculpation of certain parties, and (d) consensual Third-Party Releases, are appropriate and consistent with the applicable provisions of the Bankruptcy Code.

N.    Cure of Defaults (11 U.S.C. § 1123(d)).    The Plan does not contemplate the cure of any defaults.    Thus, section 1123(d) of the Bankruptcy Code is not applicable.

O.    The Trustee's Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(2)). The Trustee has complied with the applicable provisions of the Bankruptcy Code.    Specifically:

(a)    Each of the Debtors is an eligible debtor under section 109 of the Bankruptcy Code;

(b)    The Trustee has complied with all provisions of the Bankruptcy Code and Bankruptcy Rules, except as otherwise provided or permitted by orders of this Court; and

(c)    The Trustee has complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules in transmitting the Original Plan, the Plan Modification, the Disclosure Statement, the Ballots, and related documents and notices and in soliciting and tabulating the votes on the Plan.

P.    Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3)).    The Trustee has proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.    The Trustee's good faith is evident from the facts and

4915-5440-1855

record of these Chapter 11 Cases, the Disclosure Statement, the Andrews Declaration, the record made at the Confirmation Hearing, and the other proceedings in these Chapter 11 Cases. The Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtors' Estates for the benefit of creditors. The Plan and its classification, distribution, exculpation, release, and injunction provisions were all negotiated in good faith and at arm's length among various stakeholders in these Chapter 11 Cases, including, without limitation, the Prepetition Lender and the Committee. Such provisions are consistent with sections 105, 1122, 1123(b)(6), 1125, 1129, and 1142 of the Bankruptcy Code, they are each necessary for the success of the Plan, and they were not included in the Plan for any improper purpose.

Q.    Payment for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)). Any payment to be made by the Trustee, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, is subject to the approval of the Bankruptcy Court as reasonable, thereby satisfying section 1129(a)(4) of the Bankruptcy Code.

R.    Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)). The Trustee has complied with section 1129(a)(5) of the Bankruptcy Code. The Trustee has disclosed the identity and nature of compensation of the Creditor Trustee, whose appointment is consistent with the interests of holders of Claims and with public policy.

S.    No Rate Changes (11 U.S.C. § 1129(a)(6)). Section 1129(a)(6) of the Bankruptcy Code is not applicable to the Debtors.

T.    Best Interest of Creditors (11 U.S.C. § 1129(a)(7)). The Plan satisfies section 1129(a)(7) of the Bankruptcy Code. The liquidation analysis attached as Schedule 1 to the Disclosure Statement and the other evidence related thereto in support of the Plan that was

proffered or adduced at, prior to, or in connection with, the Confirmation Hearing: (a) are reasonable, persuasive, credible, and accurate as of the dates such analysis or evidence was prepared, presented, or proffered; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence; and (d) establish that holders of Allowed Claims and Equity Interests in each Class will recover at least as much under the Plan on account of such Claim or Equity Interest, as of the Effective Date, as such holder would receive if the Debtors were liquidated, on the Effective Date, under chapter 7 of the Bankruptcy Code.

U.    Acceptance by/Unimpairment of Certain Classes (11 U.S.C. § 1129(a)(8)). Class 3 is unimpaired by the Plan, and holders of Claims in such Class are thus conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Classes 7 and 8 are impaired by the Plan, will receive nothing under the Plan on account of such Claims and Equity Interests, and thus are conclusively deemed to have rejected the Plan. Classes 1, 2, 4, 5, and 6 are impaired, and the holders of Claims in such Classes were entitled to vote on the Plan. As established by the Ballot Tabulation, the holders of Claims in Classes 2, 4, and 5 voted to accept the Plan in accordance with section 1126(d) of the Bankruptcy Code. Therefore, Section 1129(a)(8) of the Bankruptcy Code has been satisfied with respect to Classes 2, 4, and 5. For the reasons set forth in more detail by the Court in its Oral Ruling, and as discussed below, the Plan satisfies the "cram down" requirements of section 1129(b) of the Bankruptcy Code, and the Plan may be confirmed notwithstanding the lack of acceptance of the Plan by Classes 1, 6, 7, and 8.

V.    Treatment of Administrative Expense Claims and Priority Tax Claims (11 U.S.C. § 1129(a)(9)). The treatment of Administrative Expense Claims and Priority Tax Claims

4915-5440-1855

pursuant to Article II of the Plan satisfies the requirements of sections 1129(a)(9) of the Bankruptcy Code.

      W.      <u>Acceptance by at Least One Impaired Class of Claims (11 U.S.C. § 1129(a)(10))</u>. As described above, in the Andrews Declaration and in the Ballot Tabulation, Classes 1, 2, 4, 5, and 6 are impaired, and the holders of Claims in Classes 2, 4, and 5 voted to accept the Plan in the requisite number and amount.  Section 1129(a)(10) is, therefore, satisfied.

      X.      <u>Feasibility (11 U.S.C. § 1129(a)(11))</u>.  The Plan provides for the liquidation of the Debtors under the terms of the Plan in a manner that complies with the priority scheme and other provisions of the Bankruptcy Code and other applicable law.  There will be no need for any further restructuring or liquidation of the Debtors or the Estates after implementation of the Plan. As a result, the requirements of section 1129(a)(11) of the Bankruptcy Code have been satisfied.

      Y.      <u>Payment of Fees (11 U.S.C. § 1129(a)(12))</u>.  All fees due and payable pursuant to 28 U.S.C. § 1930, as determined by the Court, have been or will be paid by the Trustee on the Effective Date pursuant to Article II of the Plan, thereby satisfying the requirements of section 1129(a)(12) of the Bankruptcy Code.

      Z.      <u>Continuation of Retiree Benefits (11 U.S.C. § 1129(a)(13))</u>.  The Debtors do not pay any "retiree benefits," as defined in section 1114 of the Bankruptcy Code and section 1129(a)(13) of the Bankruptcy Code is thus inapplicable in these Chapter 11 Cases.

      AA.      <u>No Domestic Support Obligations (11 U.S.C. § 1129(a)(14))</u>.  The Debtors are not required by a judicial or administrative order, or by statute, to pay a domestic support obligation. Accordingly, section 1129(a)(14) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

4915-5440-1855

BB.    <u>Debtors Are Not Individuals (11 U.S.C. § 1129(a)(15))</u>.    The Debtors are not

individuals, and accordingly, section 1129(a)(15) of the Bankruptcy Code is inapplicable in these

Chapter 11 Cases.

CC.    <u>No Applicable Nonbankruptcy Law Regarding Transfers (11 U.S.C. §
1129(a)(16))</u>.    The Debtors are not non-profit corporations or trusts.    Accordingly, section

1129(a)(16) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

DD.    <u>Confirmation Over Nonacceptance of Impaired Classes (11 U.S.C. § 1129(b))</u>.

Notwithstanding the fact that Classes 1, 6, 7, and 8 have not accepted the Plan, the Plan may be

confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code because (a) all requirements of

section 1129(a) of the Bankruptcy Code, other than section 1129(a)(8), have been satisfied; (b)

the Plan does not discriminate unfairly and is fair and equitable with respect to the Claims and

Equity Interests in the Classes 1, 6, 7, and 8; (c) the Plan has been proposed in good faith and is

reasonable; (d) with respect to Class 1, the Plan meets the requirement that each holder of a

Priority Non-Tax Claim receive or retain on account of such Claim property of a value, as of the

Effective Date of the Plan, equal to the allowed amount of such Claim; and (e) with respect to

Classes 6, 7 and 8, the Plan meets the requirements that (i) no holder of any Claim or Equity

Interest that is junior to each such Classes will receive or retain any property under the Plan on

account of such junior Claim or Equity Interest and (ii) no holder of a Claim or Equity Interest in

a Class senior to such Classes is receiving more than 100% on account of its Claim.[6]    As a result,

the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code.

---

[6] Class 3 of the Plan – the Class of Other Secured Claims – has been designated, without objection, as a Class that is
unimpaired under the Plan and, thus, deemed to have accepted the Plan.  Should, however, the Class ever be
determined to be impaired on account of the fact that the Plan provides the Creditor Trustee with the option to
satisfy an Allowed Other Secured Claim with the transfer of the collateral securing such Allowed Other Secured
Claim to the holder of the Claim, thereby causing Class 3 to also be a Class that has not accepted the Plan because
votes were not solicited from the holders of Class 3 Claims, then all of the findings in paragraph DD shall apply
with equal force to Class 3, and specifically in relation to the right to satisfy an Allowed Other Secured Claim by

4915-5440-1855

EE.     <u>Only One Plan (11 U.S.C. § 1129(c))</u>.  For the reasons stated by the Court in its Oral Ruling and in paragraph G above, the Plan is the only chapter 11 plan subject to confirmation.  Section 1129(c) of the Bankruptcy Code has been satisfied.

FF.     <u>Principal Purpose of the Plan (11 U.S.C. § 1129(d))</u>.  The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933, thereby satisfying section 1129(d) of the Bankruptcy Code.

GG.     <u>Not Small Business Cases (11 U.S.C. § 1129(e))</u>.  These Chapter 11 Cases are not small business cases, and accordingly, section 1129(e) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

## **<u>COMPLIANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE</u>**

HH.     <u>Good Faith Solicitation (11 U.S.C. § 1125(e))</u>.  Based on the record before the Court in these Chapter 11 Cases, the Trustee, the Committee, and each of their respective Professional Persons have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules in connection with all of their respective activities arising out of, relating to, or connected with the administration of the Chapter 11 Cases, the negotiation and pursuit of approval of the Disclosure Statement, the preparation and solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, and the funding of the Plan, as applicable, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.  Each such party has, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, is not,

---

transferring the underlying collateral to the holder of such Claim, such treatment is fair and equitable because it enables such holder to realize the indubitable equivalent of the Allowed Other Secured Claim as contemplated by section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

16

and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

## COMPLIANCE WITH SECTION 1126 OF THE BANKRUPTCY CODE

II.      <u>Acceptance of Plan (11 U.S.C. § 1126)</u>.  As set forth in the Andrews Declaration and in the Ballot Tabulation, Classes 2, 4, and 5 have voted to accept the Plan, in accordance with the requirements of section 1126 of the Bankruptcy Code.

## PLAN IMPLEMENTATION

JJ.      The terms of the Plan are incorporated by reference and are, except as addressed herein or in any future order of the Court contemplated by this Confirmation Order, proper in all respects, and constitute an integral part of this Confirmation Order.

KK.      The Plan and this Confirmation Order have been negotiated in good faith and at arm's-length and, subject to the occurrence of the Effective Date, shall bind any holder of a Claim or Equity Interest and such holder's respective successors and assigns, whether or not the Claim or Equity Interest is Impaired under the Plan, whether or not such holder has accepted the Plan, and whether or not such holder is entitled to a distribution under the Plan.  The Plan and this Confirmation Order constitute legal, valid, binding, and authorized obligations of the respective parties thereto and shall be enforceable in accordance with their terms.  Pursuant to section 1142(a) of the Bankruptcy Code, the Plan and this Confirmation Order shall apply and be enforceable, and, notwithstanding any otherwise applicable nonbankruptcy law, rule, or regulation relating to financial condition, the Debtors, the Trustee, Creditor Trust and any other entity organized or to be organized for the purpose of carrying out the Plan (as applicable) shall carry out the Plan and shall comply with any order of the Court.

4915-5440-1855

LL.    All documents and agreements necessary to implement the transactions contemplated by the Plan, including those contained or summarized in the Plan Supplement, and all other relevant and necessary documents have been negotiated in good faith and at arm's-length, are in the best interests of the Debtors, and shall, upon completion of documentation and execution, be valid, binding, and enforceable documents and agreements not in conflict with any federal, state, or local law.  The documents and agreements are essential elements of the Plan, and entry into and consummation of the transactions contemplated by each such document or agreement is in the best interests of the Debtors, the Estates, and the holders of Claims.  The Trustee has exercised reasonable business judgment in determining which documents and agreements to enter into and has provided sufficient and adequate notice of such documents and agreements.  The Trustee is authorized to take any action reasonably necessary or appropriate to consummate such agreements and the transactions contemplated thereby.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

MM.    The Trustee has exercised sound business judgment in rejecting each of the Debtors' remaining executory contracts and unexpired leases pursuant to Article X.H. of the Plan.

## EXCULPATIONS, INJUNCTIONS, RELEASES, AND GATEKEEPER

NN.    The Court has jurisdiction under 28 U.S.C. §§ 1334(a) and (b) to approve the exculpation, injunctions, stays, releases, and gatekeeping provisions set forth in Article X of the Plan, as modified herein.  Section 105(a) of the Bankruptcy Code permits issuance of the injunctions and approval of the releases and injunctions set forth in Article X of the Plan (as modified herein) if, as has been established here based upon the record in the Chapter 11 Cases and the evidence presented at the Confirmation Hearing, such provisions (i) were integral

4915-5440-1855

to the settlement, and are essential to the formulation and implementation of the Plan, as provided in section 1123 of the Bankruptcy Code, (ii) confer substantial benefits on the Debtors' Estates, (iii) are fair, equitable, and reasonable, and (iv) are in the best interests of the Debtors, their Estates, and parties in interest.  Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a), the releases, exculpation, injunctions, and gatekeeping provisions set forth in the Plan and implemented by this Confirmation Order are fair, equitable, reasonable, and in the best interests of the Debtors and their Estates, creditors, and equity holders.

OO.    For the reasons set forth in more detail by the Court in its Oral Ruling, the releases set forth in Article X of the Plan are fair to holders of Claims and are necessary to the financial restructuring proposed pursuant to the Plan and the resolution to these Chapter 11 Cases.  Such releases are given in exchange for and are supported by fair, sufficient, and adequate consideration provided by each and all of the parties receiving such releases.  The record of the Confirmation Hearing and these Chapter 11 Cases is sufficient to support the releases, exculpation, injunctions, and gatekeeping provisions provided for Article X of the Plan. The gatekeeping provisions are appropriately tailored to protect the Exculpated Parties from unnecessary litigation and contain appropriate carve outs for gross negligence, actual fraud, and willful misconduct.

PP.    For the reasons set forth in more detail by the Court in its Oral Ruling, the injunction provisions set forth in Article X of the Plan are essential to the Plan and are necessary to implement the Plan and to preserve and enforce the discharge and the release provisions of the Plan, including the release, exculpation, and gatekeeping provisions of the Plan.  Such injunction provisions are appropriately tailored to achieve those purposes.

4915-5440-1855

QQ.    Accordingly, based upon the record of these Chapter 11 Cases, the representations

of the parties, and/or the evidence proffered, adduced, and/or presented at the Confirmation

Hearing, including the Andrews Declaration, and for the reasons set forth in more detail by the

Court in its Oral Ruling, this Court finds that the injunctions, exculpation, and releases set forth

in Article X of the Plan are consistent with the Bankruptcy Code and applicable law.

## OTHER FINDINGS

RR.    <u>Conditions Precedent to Confirmation</u>.  The conditions precedent to confirmation

set forth in Article IX.A. of the Plan have been satisfied.

SS.    <u>Retention of Jurisdiction</u>.  This Court may properly retain, and if appropriate,

shall exercise jurisdiction over the matters set forth in Article XI of the Plan and section 1142 of

the Bankruptcy Code.

TT.    <u>Objections</u>.  All parties have had a full and fair opportunity to file objections to

confirmation of the Plan and to litigate any such objections.

## THE PLAN SATISFIES CONFIRMATION REQUIREMENTS

UU.    Based upon the foregoing, the Plan satisfies the requirements for confirmation set

forth in section 1129 of the Bankruptcy Code and shall be confirmed.

## ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.    <u>Confirmation</u>.  The Plan shall be, and hereby is, confirmed pursuant to section

1129 of the Bankruptcy Code.

2.    <u>Solicitation and Notice</u>.  Notice of the Confirmation Hearing and the solicitation

of votes on the Original Plan: (a) complied with the terms of the Solicitation Order; (b) were

appropriate and satisfactory based upon the circumstances of the Debtors' Chapter 11 Cases; and

(c) were in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules and

4915-5440-1855

the Local Rules.  In relation to the Borisch Parties, the solicitation of votes on the Original Plan as modified by the Plan Modification: (a) was appropriate and satisfactory based upon the circumstances of the Debtors' Chapter 11 Cases; and (b) was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Scheduling Order.

3.    <u>Approval of Plan Modifications</u>.  In accordance with Bankruptcy Rule 3019, the Plan Modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the re-solicitation of votes with respect to the Plan under section 1126 of the Bankruptcy Code, and they do not require that Holders of Claims (other than the Borisch Parties) be afforded an opportunity to change previously cast votes accepting or rejecting the Original Plan (which will apply with equal force and effect to the Plan).  The Borisch Parties were afforded an extended opportunity to amend their Ballots and object to the Plan.  Under the circumstances, such extension was and is reasonable and appropriate, and no further solicitation is necessary. Accordingly, the Plan is properly before this Court, and in accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all votes cast with respect to the Original Plan by holders of Claims other than the Borisch Parties shall be binding and apply with equal force and effect to the Plan.  In the case of the Borisch Parties, all newly-cast Ballots by them in accordance with the Scheduling Order in relation to the Original Plan as modified by the Plan Modification shall apply to the Plan.

4.    <u>Objections</u>.  All objections to the Plan, including the three formal Objections filed by the U.S. Trustee, the Tennessee Department of Revenue, and Matthew Borisch, to the extent not otherwise withdrawn at or prior to the Confirmation Hearing, are overruled for the reasons articulated by the Court on the record at the Confirmation Hearing and in the Court's Oral Ruling.

4915-5440-1855

5. <u>Binding Effect</u>.  Pursuant to section 1141(a), and except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, the provisions of the Plan shall bind any holder of a Claim against or Equity Interest in the Debtors and such holder's respective successors and assigns, whether or not such Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

6. <u>Implementation</u>.  The Trustee, the Creditor Trust, and the Creditor Trustee are authorized to take all actions necessary, appropriate, or desirable to enter into, implement, and consummate the contracts, instruments, releases, agreements, or other documents created or executed in connection with the Plan.  Without further order or authorization of this Court, the Trustee, the Creditor Trust, and the Creditor Trustee, and their successors are authorized and empowered to make non-material modifications to the Plan documents, or otherwise modify the same as necessary to conform to the terms of the Plan and this Confirmation Order.  Execution versions of the Plan and all related documents, where applicable, shall constitute legal, valid, binding, and authorized obligations of the respective parties thereto, enforceable in accordance with their terms.  The Creditor Trustee shall have the authority to act on behalf of the Debtors to the extent necessary, appropriate, or desirable to effectuate the provisions of the Plan and this Confirmation Order.

7. <u>Plan Classification Controlling</u>.  The classification of Claims and Equity Interests for purposes of the distributions to be made under the Plan shall be governed solely by the terms of the Plan.  The classifications set forth on the Ballots submitted in connection with voting on the Original Plan (or Original Plan as modified by the Plan Modification, in the case of the Borisch Parties): (a) were solely for purposes of voting to accept or reject the Original Plan (or

4915-5440-1855

Original Plan as modified by the Plan Modification, in the case of the Borisch Parties); (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of such Claims and Equity Interests under the Plan for distribution purposes; and (c) shall not be binding on the Debtors for any purpose other than voting on the Plan.

8.    <u>Distribution Under the Plan</u>.  All distributions under the Plan shall be made in accordance with Article VII of the Plan.

9.    <u>Transfer of Retained Causes of Action</u>. On the Effective Date, the Debtors shall be deemed to have transferred and assigned: (a) the Assigned Causes of Action to the Prepetition Lender, and (b) the Other Retained Causes of Action to the Creditor Trust pursuant to the Creditor Trust Agreement.  The transfer and assignment of the Assigned Causes of Action and Other Retained Causes of Action to the Prepetition Lender and the Creditor Trust, as applicable, shall be free and clear of all liens, claims, and encumbrances except as otherwise specifically provided in the Plan.  Upon delivery of the assignment, the Creditor Trust shall be deemed the owner of the Other Retained Causes of Action, and the Prepetition Lender shall be deemed the owner of the Assigned Causes of Action, each with full power and authority to prosecute the Other Retained Causes of Action and Assigned Causes of Action, as applicable.

10.    <u>Vesting of Assets (11 U.S.C. § 1141(b), (c))</u>.  As set forth in Article X.A. of the Plan, as of the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the Creditor Trust Assets shall vest in the Creditor Trust, free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as otherwise provided in this Plan.

11.    <u>Creditor Trust and Creditor Trustee</u>.  On the Effective Date, the Creditor Trust shall be established and shall be authorized to implement and adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan or

4915-5440-1855

Creditor Trust Agreement as necessary or desirable to consummate the Plan or to carry out the Creditor Trust functions.  On and after the Effective Date, the Creditor Trustee shall carry out the Creditor Trust functions on behalf of the Creditor Trust as required by the Creditor Trust Agreement.  The Creditor Trust shall be administered and controlled by the Creditor Trustee as set forth in the Plan and the Creditor Trust Agreement.

12.    <u>Post-Confirmation Governance</u>.    On and after the Effective Date, the Creditor Trustee, or its successor after the effective date of such Person's appointment as the Creditor Trustee consistent with the terms of the Creditor Trust Agreement, shall serve in such capacity through the date the Creditor Trust is dissolved in accordance with the Plan or the Creditor Trust Agreement.    The Creditor Trustee shall be deemed the representative of the Estates in accordance with section 1123 of the Bankruptcy Code and shall have all powers, authority, and responsibilities specified in the Plan and Creditor Trust Agreement, including, without limitation, the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code and Bankruptcy Rule 2004, to act on behalf of the Creditor Trust.

13.    <u>Notice of Entry of Confirmation Order and Occurrence of Effective Date</u>.  Within five (5) business days after the Effective Date, the Trustee or Creditor Trustee, as applicable, shall file with the Bankruptcy Court and serve on all parties in interest in these Chapter 11 Cases notice of: (i) entry of this Confirmation Order and occurrence of the Effective Date; and (ii) the last date to file Professional Fee Claims pursuant to Article II.B. of the Plan.

14.    <u>Administrative Claims</u>.  Pursuant to the Solicitation Order, requests for payment of Administrative Claims (other than Professional Fees or Claims by Governmental Units for payment as specified in section 503(b)(1)(B) or (C) of the Bankruptcy Code) must be filed no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that were

4915-5440-1855

required to file and serve a request for such payment of such Administrative Claims that did not

file and serve such a request on or before the Administrative Claim Bar Date are forever barred,

estopped, and enjoined from asserting such Administrative Claims against the Debtors, and such

Administrative Claims are hereby deemed compromised, settled, and released as of the Effective

Date.

15.    <u>Professional Fee Claims</u>.    Unless otherwise excused by an order of the

Bankruptcy Court, every Professional Person holding a Professional Fee Claim that has not

previously been the subject of a final fee application and accompanying Court order shall file a

final application for payment of fees and reimbursement of expenses no later than the first

Business Day that is thirty (30) days after the Effective Date.  Any such final fee application

shall conform to and comply with all applicable rules and regulations contained in the

Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  The last date to object to any

final fee application shall be the twenty-fourth (24th) day after such fee application has been

filed with the Bankruptcy Court.  All final fee applications shall be set for hearing on the same

day, as the Court's calendar permits, after consultation with counsel to the Trustee and the

Committee.  Allowed Professional Fee Claims shall be paid in accordance with and pursuant to

Article II.B. of the Plan.

16.    <u>Rejection of Executory Contracts and Unexpired Leases</u>.  Pursuant to Article X.H.

of the Plan, except as otherwise provided in the Plan or in any contract, instrument, release,

indenture or other agreement or document entered into in connection with the Plan, each Debtor

is hereby deemed to have rejected each executory contract and unexpired lease to which it is a

party, unless such contract or lease (i) was previously assumed, assumed and assigned, or

rejected by the Debtors or the Trustee, (ii) previously expired or terminated pursuant to its own

4915-5440-1855

terms, or (iii) is the subject of a motion to assume, assume and assign, or reject filed by the Trustee on or before the Confirmation Date.  This Confirmation Order shall constitute approval, pursuant to sections 365(a) and 1123(b) of the Bankruptcy Code, of the rejection of executory contracts and unexpired leases as described above upon the occurrence of the Effective Date. Such rejection shall be legal, valid, and binding upon the applicable Debtor and all non-Debtor counterparties to such contracts or leases and satisfies the requirements of section 365 of the Bankruptcy Code, including without limitation, section 365(d)(4).

17.    <u>General Authorization</u>.  Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects.  All matters provided for in the Plan involving the structure of the Debtors, and any action required by or in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by any person or entity.

18.    <u>Effectuating Documents; Further Transactions</u>. On and after the Effective Date, the Creditor Trustee is authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan in the name of and on behalf of the Debtors and Creditor Trust, as applicable, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan and the Creditor Trust Agreement.

19.    <u>Payment of Statutory Fees</u>.  All fees payable under 28 U.S.C. § 1930 shall be paid on the Effective Date and thereafter, as appropriate.

20.    <u>Taxing Authorities.</u> Notwithstanding anything else to the contrary in the Plan or this Confirmation Order, any Governmental Unit asserting a claim arising from taxes reserves

4915-5440-1855

the following rights: (1) any statutory or common law setoff rights in accordance with 11 U.S.C. § 553; (2) any rights to pursue any non-debtor third parties for tax debts or claims pursuant to applicable law; (3) the right to pursue payment of interest on the Governmental Unit's allowed administrative expense tax claims, if any, in accordance with applicable law; (4) to the extent that interest is payable with respect to any allowed administrative expense, priority, or secured tax claim of the Governmental Unit, payment of the statutory rate of interest pursuant to applicable non-bankruptcy law; and (5) the Governmental Unit is not required to file a motion or application for payment of administrative expense claims pursuant to 11 U.S.C. § 503(b)(1)(D). Should the Trustee or the Creditor Trustee fail to make any payments as required in this Plan or this Confirmation Order, or remain current on post-petition and/or post-confirmation ordinary course tax reporting and payment obligations, the Governmental Unit shall provide written notice of that default to the Creditor Trustee advising of that default and providing the Creditor Trustee with a period of fifteen (15) days to cure the default. In the event the default is not cured within fifteen (15) days, the Governmental Unit may, without further order of this Court or notice to the Creditor Trustee, pursue all rights and remedies available under applicable non-bankruptcy law to collect the full amount of all taxes, penalties, and interest owed.

21.   Resolution of Objection by the Tennessee Department of Revenue. The Tennessee Department of Revenue ("TN DOR"), by virtue of its objection filed at Docket No. 923 (the "Tennessee Objection"), shall not be considered a Consenting Creditor for purposes of the Third-Party Releases.

22.   Post-Confirmation Reporting. After entry of this Confirmation Order, the Trustee or the Creditor Trustee, as applicable, will comply with the United States Trustee's reporting requirements by filing with the Bankruptcy Court quarterly reports for each Debtor in a form

reasonably acceptable to the United States Trustee until such respective Debtor's Chapter 11 case is converted, dismissed, or closed, whichever occurs first.  From the Confirmation Date through the Effective Date, the Trustee will file such post-confirmation reports for each Debtor as are required.  All fees due and payable by the Debtors pursuant to section 1930 of Title 28 of the United States Code before the Effective Date shall be paid by the Debtors on or before the Effective Date.  After the Effective Date, the Creditors Trust and Debtors shall be jointly and severally liable for paying all quarterly fees when due and payable until such respective Debtor's Chapter 11 Case is converted, dismissed, or closed, whichever occurs first.  No quarterly fees shall be calculated on the disbursement of funds from the Debtors to the Creditors Trust.

23.    <u>Effect of Releases on United States Government Entities.</u>    Nothing in the Confirmation Order or the Plan shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person, nor shall anything in the Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action, or other proceedings against any party or person for any liability of such persons whatever, including without limitation any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against such persons, nor shall anything in the Confirmation Order or the Plan exculpate any party or person from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person.

4915-5440-1855

24.     <u>Governmental Approvals Not Required</u>.  This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, and regulations of any state or any other Governmental Unit's authority with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto.

25.     <u>Filing and Recording</u>.  This Confirmation Order (a) is and shall be effective as a determination that, on the Effective Date, all Claims and Equity Interests existing prior to such date have been unconditionally released, discharged, and terminated, except as otherwise provided in the Plan, and (b) is and shall be binding upon and shall govern the acts of all entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required, by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any document or instrument. Each and every federal, state, and local government agency is hereby directed to accept any and all documents and instruments necessary, useful, or appropriate (including Uniform Commercial Code financing statements) to effectuate, implement, and consummate the transactions contemplated by the Plan and this Confirmation Order without payment of any recording tax, stamp tax, transfer tax, or similar tax imposed by state or local law, including, but not limited to, the transfer of any assets of the Debtors' Estates to the Creditor Trust.

26.     <u>Exemption from Transfer Taxes</u>.  Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under or in connection with the Plan, the creation of any mortgage, deed of trust or other security interest, the making or

assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any merger agreements or agreements of consolidation, deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.   All sale transactions consummated by the Debtors or Trustee and approved by the Court on and after the Petition Date through and including the Effective Date, including the transfers effectuated under the Plan, the sale by the Debtors or Trustee of owned property pursuant to section 363(b) of the Bankruptcy Code, and the assumption, assignment, and sale by the Debtors or Trustee of unexpired leases of non-residential real property pursuant to section 365(a) of the Bankruptcy Code, shall be deemed to have been made under, in furtherance of, or in connection with the Plan and, thus, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

27.    Exculpation, Releases, and Injunctions.   The exculpations, releases, injunction and stay, and gatekeeping provisions contained in Article X of the Plan are hereby approved, as modified herein.   For the avoidance of doubt, (x) any prior versions of the plan have been replaced in their entirety by the Plan and are of no further force and effect to the extent inconsistent with the terms of the Plan; (y) none of the exculpations, releases, injunctive or gatekeeping provisions of the Plan shall be effective unless and until the Effective Date occurs; and (z) there are no intended third party beneficiaries of such provisions not expressly identified therein.   Notwithstanding the foregoing or anything in the Plan to the contrary, for the reasons set forth in this Court's Oral Ruling, and because the Creditor Trust Assets will not vest in the Creditor Trust until the Effective Date, the definitions "Released Parties" and the "Releasing

Parties" shall exclude the Creditor Trustee for purposes of the Trustee Releases in Article X.C of the Plan and the Third-Party Releases in Article X.D of the Plan.

28. <u>Conditions to Effective Date</u>. The Plan shall not become effective unless and until the conditions set forth in Article IX.A of the Plan have been satisfied or waived pursuant to Article IX.C. of the Plan.

29. <u>Appeal of the Confirmation Order</u>. Except as otherwise provided herein, if any provision of this Confirmation Order is hereafter reversed, modified, vacated, or stayed by subsequent order of this Court or any other court, such reversal, stay, modification or vacatur shall not affect the validity or enforceability of any act, obligation, indebtedness, liability, priority, or lien incurred or undertaken by the Debtors, Trustee, or Creditor Trustee prior to the effective date of such reversal, stay, modification, or vacatur. Notwithstanding any reversal, stay, modification, or vacatur of this Confirmation Order, any act or obligation incurred or undertaken pursuant to, or in reliance on, this Confirmation Order prior to the effective date of such reversal, stay, modification, or vacatur shall be governed in all respects by the provisions of this Confirmation Order and the Plan or any amendments or modifications thereto, and shall remain binding.

30. <u>Conflicts Between Confirmation Order and Plan</u>. The failure to specifically include any particular provision of the Plan in this Confirmation Order shall not diminish the effectiveness of such provision, it being the intent of the Court that the Plan is confirmed in its entirety and incorporated herein by this reference. The provisions of the Plan and this Confirmation Order shall be construed in a manner consistent with each other so as to affect the purposes of each; *provided, however*, that in the event of any inconsistency among the Plan, the Plan Supplement, the Disclosure Statement, and any exhibit or schedule to the Disclosure

4915-5440-1855

Statement, the provisions of the Plan shall govern.  In the event of any inconsistency between the Plan and this Confirmation Order, the Confirmation Order shall govern.  The provisions of this Confirmation Order are integrated with each other and are nonseverable and mutually dependent unless expressly stated by further order of the Court.

31.     <u>Applicable Nonbankruptcy Law</u>. Pursuant to, and to the extent of, sections 1123(a) and 1142(a) of the Bankruptcy Code, the provisions of this Confirmation Order, the Plan, and related documents, and any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

32.     <u>Retention of Jurisdiction</u>.  Upon the Effective Date, the Court may properly retain, and if appropriate, shall exercise, jurisdiction over the matters set forth in Article XI of the Plan and section 1142 of the Bankruptcy Code.

# # # END OF ORDER # # #

4915-5440-1855

## Exhibit A

**Trustee's First Amended Joint Chapter 11 Plan**
**[As Modified June 6, 2025]**

Jason S. Brookner (Texas Bar No. 24033684)
Aaron M. Kaufman (Texas Bar No. 24060067)
Lydia R. Webb (Texas Bar No. 24083758)
Emily F. Shanks (Texas Bar No. 24110350)
**GRAY REED**
1601 Elm Street, Suite 4600
Dallas, TX 75201
Telephone:   (214) 954-4135
Facsimile:   (214) 953-1332
Email:       jbrookner@grayreed.com
             akaufman@grayreed.com
             lwebb@grayreed.com
             eshanks@grayreed.com

*Counsel to Mark E. Andrews,*
*Chapter 11 Trustee*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| TOMMY'S FORT WORTH, LLC., *et al.*,[1] | § § | Case No. 24-90000 (ELM) |
| Debtors. | § § § | (Jointly Administered) |

## TRUSTEE'S FIRST AMENDED JOINT CHAPTER 11 PLAN
## [AS MODIFIED JUNE 6, 2025]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tommy's Fort Worth, LLC (3473); Tommy's Holding Company, LLC (2662); Tommy's Grand Rapids, LLC (9224); Tommy's Castaic, LLC (7501); Tommy's Lewisville, LLC (4750); High Country Watersports, LLC (6160); Walloon Lake Village Marina, LLC (0277); MKB Florida Holdings, LLC (5698); Tommy's Detroit, LLC (5242); Tommy's California Fresno, LLC (8597); Tommy's Phoenix, LLC (3036); Tommy's Las Vegas, LLC (7721); Tommy's Chattanooga, LLC (0839); Tommy's California Ventura, LLC (5149); Tommy's Rancho Cordova, LLC (1070); Tommy's Stockton, LLC (1338); and Tommy's Knoxville, LLC (8052).

4924-3833-3515

**TABLE OF CONTENTS**

ARTICLE I DEFINITIONS AND INTERPRETATION AND CONSTRUCTION .................................1

    A.    Definitions. ................................................................1

    B.    Rules of Interpretation and Construction. ................................7

ARTICLE II TREATMENT OF UNCLASSIFIED CLAIMS ..............................................8

    A.    Administrative Claims. ..................................................8

    B.    Professional Fee Claims. ................................................9

    C.    U.S. Trustee Fees. ......................................................9

    D.    Priority Tax Claims. ....................................................9

ARTICLE III CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS .............................10

ARTICLE IV TREATMENT OF CLAIMS AND EQUITY INTERESTS ................................10

    A.    Class 1 – Priority Non-Tax Claims. ......................................10

    B.    Class 2 – Prepetition Lender's Secured Claims. ..........................11

    C.    Class 3 – Other Secured Claims. ........................................11

    D.    Class 4 – Customer Constructive Trust Claims. ..........................11

    E.    Class 5 – General Unsecured Claims. ....................................12

    F.    Class 6 – Contribution Claims ..........................................12

    G.    Class 7 – Intercompany Claims ..........................................12

    H.    Class 8 – Equity Interests .............................................12

ARTICLE V IMPAIRMENT; ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION
BY ONE OR MORE CLASSES .....................................................................12

    A.    Classes Entitled to Vote. ..............................................12

    B.    Class Acceptance Requirement. ..........................................13

    C.    Cramdown. ..............................................................13

    D.    Elimination of Classes. ................................................13

ARTICLE VI MEANS OF IMPLEMENTATION .....................................................13

    A.    Limited Substantive Consolidation. ....................................13

    B.    The Creditor Trust. ....................................................13

    C.    Discharge of the Chapter 11 Trustee and Cessation of Fee and Expense Payments. ...18

    D.    Dissolution of Committee and Cessation of Fee and Expense Payments. ...18

    E.    Issuance of Creditor Trust Interests. ..................................18

    F.    Section 1145 Exemption. ................................................18

    G.    Cancellation of Existing Securities. ..................................19

    H.    Corporate Action. ......................................................19

    I.    Directors, and Executive Officers. ....................................19

    J.    Retained Causes of Action. .............................................19

iii

4924-3833-3515

K.      Effectuating Documents; Further Transactions. ................................................. 20

L.      Exemption from Certain Transfer Taxes. ......................................................... 20

ARTICLE VII DISTRIBUTIONS .................................................................................... 20

A.      Date of Distributions. ............................................................................. 20

B.      Sources of Cash for Plan Distributions. ........................................................ 20

C.      Distributions. ...................................................................................... 20

D.      Record Date for Distributions. .................................................................. 21

E.      Delivery of Distributions; Unclaimed Property. ................................................ 21

F.      Means of Payment. ................................................................................ 21

G.      Distributions After Effective Date. ............................................................. 21

H.      Withholding and Reporting Requirements. ....................................................... 21

I.      No Postpetition Interest. ........................................................................ 22

J.      Time Bar to Payments. ............................................................................ 22

K.      De Minimis Distributions. ........................................................................ 22

ARTICLE VIII PROCEDURES FOR RESOLVING AND TREATING DISPUTED CLAIMS ......................... 22

A.      Objections to Claims. ............................................................................ 22

B.      Estimation of Claims. ............................................................................ 22

C.      No Distributions Pending Allowance. ............................................................. 23

D.      Distributions After Allowance. .................................................................. 23

E.      Disallowance of Late Filed Claims. .............................................................. 23

ARTICLE IX CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN .............. 23

A.      Conditions to Confirmation of Plan. ............................................................. 23

B.      Conditions to Effective Date of Plan. ........................................................... 23

C.      Waiver of Conditions Precedent. ................................................................. 24

D.      Effect of Failure of Conditions. ................................................................ 24

E.      Reservation of Rights. ........................................................................... 24

ARTICLE X EFFECT OF CONSUMMATION ............................................................... 24

A.      Vesting of Assets. ............................................................................... 24

B.      Exculpation. ...................................................................................... 25

C.      Releases by the Trustee. ......................................................................... 25

D.      Third-Party Releases. ............................................................................ 25

E.      Injunction and Stay. ............................................................................. 26

F.      Gate Keeping. ..................................................................................... 26

G.      Setoffs and Recoupment. .......................................................................... 27

H.      Rejection of Contracts and Leases. .............................................................. 27

I.      Compromise of Controversies. ..................................................................... 27

4924-3833-3515

ARTICLE XI RETENTION OF JURISDICTION ................................................................. 28

ARTICLE XII MISCELLANEOUS ..................................................................................... 29

    A.    Filing of Additional Documents. ................................................................ 29

    B.    Schedules, Exhibits, and Plan Supplement Incorporated. ......................... 29

    C.    Amendment or Modification of the Plan. ................................................... 29

    D.    Inconsistency. ............................................................................................ 29

    E.    Expedited Tax Determination. ................................................................... 29

    F.    Binding Effect. .......................................................................................... 29

    G.    Severability. ............................................................................................... 29

    H.    No Payment of Attorneys' Fees. ............................................................... 30

    I.    Notices. ...................................................................................................... 30

    J.    Governing Law. ......................................................................................... 30

Mark E. Andrews, chapter 11 Trustee for the Debtors in these Chapter 11 Cases, hereby proposes the following *First Amended Joint Chapter 11 Plan* pursuant to section 1121(a) of the Bankruptcy Code.

## ARTICLE I
## DEFINITIONS AND INTERPRETATION AND CONSTRUCTION

*A.*      *Definitions.*

For the purpose of this Plan, the following terms shall have the respective meanings set forth below:

1.      ***Administrative Claim*** means any right to payment constituting a cost or expense of administration of the Chapter 11 Cases pursuant to sections 503(b) or 507 of the Bankruptcy Code.

2.      ***Administrative Claim Bar Date*** means the deadline to file all Administrative Claims, as established pursuant to the Solicitation Procedures Order.

3.      ***Administrative Claims Reserve*** means the Plan Reserve established on or before the Effective Date by the Trustee from the Contributed Cash Collateral for the sole purpose of paying Allowed Administrative Claims pursuant to section II.A hereof, in the amount of $500,000, unless a different amount has been fixed by stipulation of the Committee, the Trustee and the Prepetition Lender; or, if the Committee, the Trustee, and the Prepetition Lender cannot agree, by the Bankruptcy Court.

4.      ***Allowed*** means any Claim (i) for which a proof of claim has been filed and as to which no objection has been made on or before the Objection Deadline or such other applicable period fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, (ii) which appears in the Debtors' Schedules and is not listed as contingent, liquidated or disputed, (iii) which is allowed by Final Order of the Bankruptcy Court, or (iv) which is expressly allowed under this Plan.

5.      ***Assets*** means property of the Debtors' Estates and proceeds thereof.

6.      ***Assigned Causes of Action*** means all of the Retained Causes of Action scheduled in the Plan Supplement as being assigned to the Prepetition Lender pursuant to section IV.B hereof, as more specifically enumerated in a Plan Supplement, including, without limitation, all Avoidance Actions against any of the Borisch Parties and any other Causes of Action against any of the Borisch Parties, and, to the extent applicable, any subsequent transferee thereof.  For the avoidance of doubt, upon payment of the Malibu Settlement Payment, no Claims or Causes of Action against Malibu Boats shall be assigned Causes of Action.

7.      ***Avoidance Actions*** means any and all avoidance, recovery, subordination or other claims, causes of action, or remedies that have been or may be asserted by or on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including claims, causes of action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553 of the Bankruptcy Code, or under similar or related local, state, federal, foreign law, or common law.

8.      ***Ballot*** means the form of ballot approved by the Bankruptcy Court pursuant to the Solicitation Procedures Order and provided to holders of Claims to indicate their votes to accept or reject the Plan and to make an election with respect to the Third-Party Releases provided under section X.D hereof.

9.      ***Bankruptcy Code*** means title 11 of the United States Code, as amended from time to time.

10.     ***Bankruptcy Court*** means the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division, or any other court of the United States having jurisdiction over the Chapter 11 Cases.

1

11.      ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended and in effect from time to time.

12.      ***Bar Date*** means the last date to file proofs of claim against the Debtors, which was September 30, 2024 for all creditors except Governmental Units, and November 18, 2024 for Governmental Units.

13.      ***Borisch Parties*** means Matthew A. Borisch, Kara A. Borisch, Jonathan L. Borisch, MKB Holdings, LLC a/k/a Simplified Investments, The Matthew Allen Borisch Trust, The Kara Ann Borisch Trust, The Michael Allen Borisch Trust, Matthew Allen Borisch Trust UAD September 19, 2005, Walloon Lake Facilities, LLC, Walloon Lake Holdings, JLB Restaurant Holdings LLC, MKB Restaurant Holdings, LLC, Hotel Walloon, Gen3 Defense & Aerospace LLC, Expedited Travel LLC, JLB Property Holdings LLC, Legacy Water Sports and Marina and Steadfast Marine, and each of their respective current and former officers, directors, employees, managers, attorneys, professional advisors, and agents.

14.      ***Business Day*** means any day other than a Saturday, Sunday, or "legal holiday" as defined in Bankruptcy Rule 9006(a).

15.      ***Cash*** means legal tender of the United States of America.

16.      ***Cash Collateral Order*** means that certain *Final Order (I) Authorizing the Use of Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to the Prepetition Secured Lender; and (III) Granting Related Relief* [Docket No. 272].

17.      ***Causes of Action*** means any claims, causes of action, interests, damages, remedies, demands, rights, actions (including Avoidance Actions), suits, debts, sums of money, obligations, judgments, liabilities, accounts, defenses, offsets, counterclaims, crossclaims, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, now existing or hereafter arising, contingent or non-contingent, liquidated or unliquidated, choate or inchoate, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise, owned by or otherwise accruing to the Debtors and their Estates, whether arising before, on, or after the Petition Date.

18.      ***Chapter 11 Cases*** means the above-captioned jointly administered chapter 11 cases of the Debtors.

19.      ***Chapter 11 Trustee*** or ***Trustee*** means the trustee appointed in these Chapter 11 Cases pursuant to sections 1104 of the Bankruptcy Code, and with all the rights, powers, and duties enumerated in sections 1106–1108 of the Bankruptcy Code.

20.      ***Claim*** means a claim against a Debtor within the meaning of section 101(5) of the Bankruptcy Code.

21.      ***Class*** means any group of Claims or Equity Interests classified by this Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

22.      ***Collateral*** means any interest in property of the Debtors subject to a Lien, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable non-bankruptcy law.

23.      ***Committee*** means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases by the Office of the United States Trustee, as the same may be reconstituted from time to time.

4924-3833-3515

24.     ***Confirmation Date*** means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket.

25.     ***Confirmation Hearing*** means the hearing conducted by the Bankruptcy Court pursuant to sections 1128(a) and 1129 of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

26.     ***Confirmation Order*** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

27.     ***Consenting Creditors*** means collectively the following, in each case in its capacity as such with each being a "*Consenting Creditor*": (a) all holders of Claims or Equity Interests that vote to accept or are deemed to accept the Plan <u>and</u> who do not check the box on the applicable Ballot to affirmatively opt out of the Third-Party Releases; and (b) all holders of Claims or Equity Interests that abstain from voting on the Plan, vote to reject the Plan, or are deemed to reject the Plan <u>and</u> who do not (i) check the box on the applicable Ballot to affirmatively opt out of the Third-Party Releases or (ii) object to the Plan in respect of the Third-Party Releases; *provided, however*, that the Borisch Parties shall not be "Consenting Creditors."

28.     ***Contributed Cash Collateral*** means the portion of the Prepetition Lender's cash collateral that the Prepetition Lender has consented to allocate to the applicable Plan Reserves.

29.     ***Contribution Claim*** means any Claim for contribution or reimbursement by a Person that is liable with a Debtor on a Claim held by another creditor (including, for the avoidance of doubt, indemnification claims against a Debtor) of any kind or nature whatsoever, whether arising under or pursuant to any type of bylaws, organizational, formation or governance documents or agreements, board resolutions, management or indemnification agreements, guaranty agreement, employment or other services contracts, at law, in equity or otherwise.

30.     ***Customer Constructive Trust Claims*** means Claims determined by the Trustee to be asserted by customers based the Debtors' prepetition failure to remit proceeds from the sale of the customer's boat, whether such boat was traded into the Debtors for a new boat, maintained by the Debtors under a consignment arrangement, or otherwise sold to the Debtors before the Petition Date.

31.     ***Customer Constructive Claims Objection Deadline*** means the first Business Day that is 45 days after the Effective Date.

32.     ***Customer Constructive Trust Claims Reserve*** means the Plan Reserve established on or before the Effective Date by the Trustee from the Contributed Cash Collateral for the sole purpose of making settlement payments to Consenting Creditor holders of Customer Constructive Trust Claims pursuant to <u>section IV.D</u> hereof in the initial amount of $360,000, unless a different amount has been fixed by stipulation of the Committee, the Trustee and the Prepetition Lender; or, if the Committee, the Trustee, and the Prepetition Lender cannot agree, by the Bankruptcy Court.

33.     ***Creditor Trust*** means that certain trust that will come into existence on the Effective Date of the Plan, which shall be formed pursuant to, and governed by, the provisions of the Plan and the Creditor Trust Agreement.

34.     ***Creditor Trust Reserve*** means the Plan Reserve established on or before the Effective Date by the Trustee in the amount of $350,000 from the Contributed Cash Collateral for purposes of (i) satisfying, in whole or in part, the obligations of the Creditor Trust, including the Creditor Trust Expenses and (ii) making distributions to holders of Creditor Trust Interests in accordance with the Creditor Trust Agreement and <u>section IV.E</u> of the Plan.

4924-3833-3515

35.     ***Creditor Trust Agreement*** means the agreement governing the Creditor Trust dated as of the Effective Date, which shall be in form and substance acceptable to the Committee and substantially in the form included in the Plan Supplement.

36.     ***Creditor Trust Assets*** means (i) all Other Retained Causes of Action, except as the same may be dismissed, settled or released prior to the Effective Date or otherwise pursuant to the Plan; (ii) the Creditor Trust Reserve and any residual portions of the Plan Reserves, consistent with the terms of the Plan; (iii) all insurance policies of the Debtors and the applicable Policy Proceeds, but specifically excluding any refunds from any insurance policies cancelled or otherwise terminated before the end of the policy term; (iv) all tax assets and tax attributes of the Debtors; (v) any other property of the Estates not otherwise distributed pursuant to the terms of this Plan, including all rights, interests, and privileges of the Debtors; and (vi) all proceeds of the foregoing.

37.     ***Creditor Trust Expenses*** means the reasonable and necessary costs and expenses of the Creditor Trust, including, without limitation, the compensation to and reimbursement of expenses to the Creditor Trustee and the reasonable and necessary fees, costs, and expenses of all professionals retained by the Creditor Trustee in connection with the performance of the Creditor Trustee's duties under this Plan and the Creditor Trust Agreement.

38.     ***Creditor Trust Indemnified Parties*** means the Creditor Trustee and its consultants, agents, attorneys, accountants, financial advisors, estates, employees, officers, directors, principals, professionals, and other representatives, each in their respective capacity as such, and any of such Person's successors and assigns.

39.     ***Creditor Trust Interest*** means a non-transferable beneficial interest in the Creditor Trust.

40.     ***Creditor Trustee*** means the trustee of the Creditor Trust, who shall be Mark E. Andrews, or such other individual to be designated by the Trustee and approved by the Committee, who shall not unreasonably withhold such approval, and who shall be identified in the Plan Supplement.

41.     ***Debtor*** means any one of the Debtors, as the context may require.

42.     ***Debtors*** means, collectively, Tommy's Fort Worth, LLC; Tommy's Holding Company, LLC; Tommy's Grand Rapids, LLC; Tommy's Castaic, LLC; Tommy's Lewisville, LLC; High Country Watersports, LLC; Walloon Lake Village Marina, LLC; MKB Florida Holdings, LLC; Tommy's Detroit, LLC; Tommy's California Fresno, LLC; Tommy's Phoenix, LLC; Tommy's Las Vegas, LLC; Tommy's Chattanooga, LLC; Tommy's California Ventura, LLC; Tommy's Rancho Cordova, LLC; Tommy's Stockton, LLC; and Tommy's Knoxville, LLC.

43.     ***Disallowed*** means any Claim, or portion thereof, that is not an Allowed Claim or a Disputed Claim.

44.     ***Disclosure Statement*** means that certain disclosure statement relating to the Plan, including all exhibits and schedules thereto, as the same may be amended, supplemented, or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to sections 1125 and 1126 of the Bankruptcy Code.

45.     ***Disputed*** means, when used with respect to a Claim, such Claim, as the case may be (a) to the extent neither Allowed nor Disallowed under the Plan or a Final Order nor deemed Allowed under section 502, 503, or 1111 of the Bankruptcy Code, or (b) with respect to which the Creditor Trust or any party in interest have made a timely objection (as a contested matter, adversary proceeding, or otherwise) or request for estimation prior to the Objection Deadline in accordance with the Plan or the Bankruptcy Rules, which objection or request for estimation has not been withdrawn or determined by a Final Order as of the Effective Date.

46.     ***Disputed Claims Reserve*** has the meaning ascribed in section VI.B.14(ii)(C) hereof.

4924-3833-3515

47.     ***Distribution Date*** means the date, occurring on or as soon as practicable after the Effective Date, on which the Trustee or the Creditor Trust, as applicable, first makes distributions to holders of Allowed Claims as provided in the Plan.

48.     ***Distribution Record Date*** means the record date for purposes of receiving distributions under the Plan on account of Allowed Claims, which shall be the Confirmation Date.

49.     ***Effective Date*** means the first Business Day on which all the conditions precedent to the effectiveness of the Plan specified in section IX.B hereof shall have been satisfied or waived as provided in section IX.C hereof; *provided*, *however*, that if a stay, injunction or similar prohibition of the Confirmation Order is in effect, the Effective Date shall be the first Business Day after such stay, injunction, or similar prohibition is no longer in effect.

50.     ***Equity Interest*** means any "equity security" of the Debtors, as that term is defined in section 101(16) of the Bankruptcy Code.

51.     ***Estates*** means the estates of the Debtors as created under section 541 of the Bankruptcy Code.

52.     ***Exculpated Parties*** means, in each case solely in their capacity as such: the Trustee and the members of the Committee.  For the avoidance of doubt, the Exculpated Parties do not include the Debtors or any current or former officer, director, or employee of the Debtors.

53.     ***Final Decree*** means the decree contemplated by Bankruptcy Rule 3022.

54.     ***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a stay, new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a stay, new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of *certiorari*, stay, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, *certiorari* shall have been denied or a stay, new trial, reargument or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for *certiorari*, or move for a stay, new trial, reargument or rehearing shall have expired; *provided*, *however*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure, or Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

55.     ***General Unsecured Claim*** means any Claim against a Debtor that is not an Administrative Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Customer Constructive Trust Claim, the Prepetition Lender's Secured Claim, a Professional Fee Claim, an Other Secured Claim, an Intercompany Claim, or an Equity Interest.

56.     ***Governmental Unit*** has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

57.     ***Insider*** means any Person who is an "insider" as such term is defined in section 101(31) of the Bankruptcy Code, or who may otherwise be determined to be an "insider" under section 101(31) of the Bankruptcy Code by a court of competent jurisdiction.

58.     ***Intercompany Claim*** means a claim held by one Debtor against another Debtor.

59.     ***Local Rules*** means the Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas, as the same may be amended or modified from time to time.

60.     ***Lien*** has the meaning set forth in section 101(37) of the Bankruptcy Code.

4924-3833-3515

61.    ***Malibu Boats*** means, collectively, Malibu Boats, Inc. and Malibu Boats, LLC.

62.    ***Malibu Settlement Agreement*** means that Settlement Agreement dated October 7, 2024, as may be amended from time to time, and approved by the Bankruptcy Court pursuant to the *Order Approving Motion for Entry of an Order (I) Authorizing and Approving the Settlement Agreement Between the Trustee and Malibu Boats and (II) Granting Related Relief* [Docket No. 602] entered on November 20, 2024.

63.    ***Malibu Settlement Payment*** means the $3,500,000.00 payable by Malibu Boats to the Trustee pursuant to the Malibu Settlement Agreement.  Notwithstanding anything to the contrary in the Plan, Disclosure Statement or elsewhere, the Malibu Settlement Payment shall be deemed the Collateral of the Prepetition Lender.

64.    ***Objection Deadline*** means the later of (a) one hundred eighty (180) days after the Effective Date or (b) such later date as may be ordered by the Bankruptcy Court upon motion filed prior to the expiration of such one hundred eighty (180) day period.

65.    ***Other Retained Causes of Action*** means all Retained Causes of Action owned by the Debtors or their respective Estates on the Effective Date, other than the Assigned Causes of Action.

66.    ***Other Secured Claim*** means a Secured Claim that is not a Prepetition Lender's Secured Claim.

67.    ***Petition Date*** means May 20, 2024.

68.    ***Person*** means an individual, partnership, corporation, limited liability company, cooperative, trust, unincorporated organization, association, joint venture, government or agency or political subdivision thereof, or any other form of legal entity.

69.    ***Plan*** means this Joint Chapter 11 Plan, as the same may be amended, supplemented, or otherwise modified from time to time, including any exhibits and schedules hereto.

70.    ***Plan Reserves*** means the separately accounted funds to be utilized in accordance with the provisions of the Plan, including: (a) the Administrative Claims Reserve; (b) the Priority Claims Reserve; (c) the Customer Constructive Trust Claims Reserve; (d) the Creditor Trust Reserve; and (e) any such other reserves that the Creditor Trustee determines is reasonable and necessary to aid the administration of the Plan.

71.    ***Plan Supplement*** means the compilation of documents and forms of documents, schedules and exhibits, to be filed in one or more parts or volumes, no later than seven (7) days prior to the Confirmation Hearing, as amended, supplemented or otherwise modified from time to time, containing, without limitation any documents necessary for the execution and implementation of the Plan.

72.    ***Policy Proceeds*** means the proceeds of the Debtors' insurance policies that constitute property of the Debtors' Estates.

73.    ***Prepetition Lender*** means M&T Bank.

74.    ***Prepetition Lender's Secured Claims*** means the Secured Claims held by the Prepetition Lender.

75.    ***Priority Claims Reserve*** means the Plan Reserve established on or before the Effective Date by the Trustee from the Contributed Cash Collateral for the sole purpose of paying Allowed Priority Non-Tax Claims and Allowed Priority Tax Claims pursuant to section II.D and section IV.A hereof respectively, in the amount of $1,750,000 unless a different amount has been fixed by stipulation of the Committee, the Trustee and the Prepetition Lender; or, if the Committee, the Trustee, and the Prepetition Lender cannot agree, by the Bankruptcy Court.

76.    ***Priority Non-Tax Claim*** means any Claim that is entitled to priority in payment pursuant to sections 507(a)(4) or (5) of the Bankruptcy Code and that is not an Administrative Claim or a Priority Tax Claim.

4924-3833-3515

77.    ***Priority Tax Claim*** means any Claim of a Governmental Unit of the kind entitled to priority in payment as specified in section 507(a)(8) of the Bankruptcy Code.

78.    ***Pro Rata*** means the proportion that the amount of an Allowed Claim or Allowed Equity Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Allowed Equity Interests in such Class.

79.    ***Professional Fee Claim*** means any Claim by a Professional Person under sections 330, 331 or 503 of the Bankruptcy Code for allowance of compensation and/or reimbursement of expenses in the Chapter 11 Cases.

80.    ***Professional Fee Reserve*** means the funds budgeted for Professional Persons under the budgets approved pursuant to the Cash Collateral Order and shall include the funds maintained in the Funded Reserve Account, as that term is defined in the Cash Collateral Order, which funds shall be used for the sole purpose of paying Allowed Professional Fee Claims pursuant to section II.B hereof.

81.    ***Professional Person*** means any Person retained in the Chapter 11 Cases or to be compensated by the Debtors pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code.

82.    ***Rejection Damages Bar Date*** means the first Business Day that is thirty (30) days after the Effective Date.

83.    ***Released Parties*** means collectively the following, in each case in its capacity as such with each being a "Released Party": (a) the Trustee; (b) each Debtor; (c) the Committee and its members; (d) the Creditor Trustee; and (e) M&T Bank and its current and former officers, directors, managers, attorneys and other professional advisors; *provided, however*, that the Borisch Parties shall not be "Released Parties."

84.    ***Releasing Parties*** means collectively the following, in each case in its capacity as such with each being a "Releasing Party": (a) the Debtor; (b) the Trustee; (c) the Committee; (d) the Creditor Trustee; and (e) Consenting Creditors; *provided, however*, that the Borisch Parties shall not be "Releasing Parties."

85.    ***Retained Causes of Action*** means Causes of Action scheduled in the Plan Supplement as "retained" including (but not limited to) all of the Debtors' Causes of Action as more specifically enumerated in a Plan Supplement, including, but not limited to, Avoidance Actions, which, as of the Effective Date have not been sold, transferred, settled, waived, or released pursuant to the Plan, upon order of the Bankruptcy Court or otherwise, all of which shall be reserved, retained, assigned, and transferred to the Creditor Trust.  Upon payment of the Malibu Settlement Payment, no Claims or Causes of Action against Malibu Boats shall be Retained Causes of Action.  For the avoidance of doubt, the Debtors' Causes of Action against the Borisch Parties and, to the extent applicable, any subsequent transferees thereof, shall be Retained Causes of Action.

86.    ***Schedules*** means, collectively, Schedules A through J and the Statement of Financial Affairs, as filed by each Debtor in the Chapter 11 Cases, as the same may be amended from time to time.

87.    ***Secured Claim*** means a Claim secured by a Lien that is valid, perfected and enforceable, and not avoidable, upon property in which a Debtor has an interest, to the extent of the value, as of the Effective Date, of such interest or Lien as determined by a Final Order of the Bankruptcy Court pursuant to section 506 of the Bankruptcy Code, or as otherwise agreed to in writing by the Debtor in question and the holder of such Claim. To the extent a Claim exceeds the value of the Collateral securing such Claim, such deficiency shall constitute a General Unsecured Claim.

88.    ***Solicitation Procedures Order*** means the Bankruptcy Court's *Order (I) Approving the Disclosure Statement, (II) Scheduling a Confirmation Hearing to Consider Confirmation of the Trustee's Plan, (III) Approving the Solicitation Procedures and Dates, Deadlines, and Notices Related Thereto, and (IV) Granting Related Relief.*

89.    ***Third-Party Releases*** means those releases provided under section X.D hereof.

4924-3833-3515

90.     **_Underlying Claim_** has the meaning ascribed in <u>section IV.F</u> hereof.

91.     **_U.S. Trustee_** means the Office of the United States Trustee.

92.     **_U.S. Trustee Fees_** means all fees payable under section 1930 of title 28 of the United States Code.

**_B._**     **_Rules of Interpretation and Construction._**

1.     <u>Interpretation.</u>

Unless otherwise specified herein, all section, article, and exhibit references in the Plan are to the respective section in, article of, and exhibit to, the Plan, as the same may be amended, waived, or modified from time to time. All headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan.

2.     <u>Construction and Application of Bankruptcy Code Definitions.</u>

Unless otherwise defined herein, words and terms defined in section 101 of the Bankruptcy Code shall have the same meanings when used in the Plan.  Words or terms used but not defined herein shall have the meanings ascribed to such terms or words, if any, in the Bankruptcy Code.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan.

3.     <u>Other Terms.</u>

The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular article, section, subsection, or clause contained in the Plan.

4.     <u>Time.</u>

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**ARTICLE II**
**TREATMENT OF UNCLASSIFIED CLAIMS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, the following claims have not been classified and, thus, are excluded from the Classes of Claims and Equity Interests set forth in <u>Article III</u> hereof.

**_A._**     **_Administrative Claims._**

All Administrative Claims against the Debtors, other than Professional Fee Claims, shall be treated as follows:

8

1.    Time for Filing.

All holders of Administrative Claims shall file with the Bankruptcy Court a request for payment of such Claims on or before the Administrative Claim Bar Date. Any such request must be served on the Trustee, his counsel, the Committee, its counsel, and the Creditor Trust and its counsel, and must, at a minimum, set forth (i) the name of the holder of the Administrative Claim; (ii) the amount of the Administrative Claim; and (iii) the legal and factual bases for the Administrative Claim. A failure to file any such request in a timely fashion will result in the Administrative Claim in question being discharged and its holder forever barred from asserting such Administrative Claim against the Debtors or any other Person.

2.    Objection and Allowance.

An Administrative Claim, other than a Professional Fee Claim, for which a request for payment has been properly and timely filed, if necessary, shall become an Allowed Administrative Claim unless an objection is filed by the first Business Day that is thirty (30) days after the Administrative Claim Bar Date, or such later date as may be ordered by the Bankruptcy Court upon motion. If an objection is timely filed, the Administrative Claim in question shall become an Allowed Administrative Claim only to the extent so Allowed by Final Order of the Bankruptcy Court.

3.    Payment.

Except to the extent that a holder of an Allowed Administrative Claim, other than a Professional Fee Claim, agrees to a different treatment of such Claim, each holder of an Allowed Administrative Claim shall receive, on account of and in full satisfaction of such Claim, Cash from the Administrative Claims Reserve in an amount equal to the amount of such Allowed Administrative Claim on (or as soon as reasonably practicable after) the later of (A) the Effective Date or (B) the date that entry of an order by the Bankruptcy Court allowing such Administrative Claim becomes a Final Order. Any surplus of funds in the Administrative Claims Reserve after payment of all Allowed Administrative Claims shall be allocated to the Customer Constructive Trust Claims Reserve for distribution pursuant to section IV.D.3 of this Plan.

**B.    Professional Fee Claims.**

1.    Time for Filing.

Every Professional Person holding a Professional Fee Claim that has not previously been the subject of a final fee application and accompanying Bankruptcy Court order approving the same shall file a final application for payment of fees and reimbursement of expenses no later than the first Business Day that is thirty (30) days after the Effective Date. Any such final fee application shall conform to and comply with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

2.    Objections and Allowance.

The last date to object to any Professional Fee Claim shall be the first Business Day that is twenty-four (24) days after such Professional Fee Claim has been filed with the Bankruptcy Court. All Professional Fee Claims shall be set for hearing on the same day, as the Bankruptcy Court's calendar permits, after consultation with counsel to the Trustee, Creditor Trustee (as applicable) and the Committee (as applicable).

3.    Payment.

Professional Fee Claims shall be paid from the Professional Fee Reserve. To the extent there are insufficient funds on hand in the Professional Fee Reserve to pay all Professional Fee Claims in full, the Trustee or Creditor Trustee (as applicable) shall supplement the Professional Fee Reserve from the Administrative Claims Reserve as necessary to pay all Allowed Professional Fee Claims in full. Any surplus of funds in the Professional

4924-3833-3515

Fee Reserve after payment of all Allowed Professional Fee Claims shall be remitted by the Creditor Trustee to the Prepetition Lender on account of its Secured Claim.

**C.     U.S. Trustee Fees.**

All U.S. Trustee Fees that arise before the Effective Date shall be paid from the Debtors' available Cash on or before the Effective Date or when such amounts are due in the ordinary course.  All such fees that arise after the Effective Date but before the closing of the Chapter 11 Cases shall be paid by the Creditor Trust.  U.S. Trustee Fees will not be assessed against the initial transfer or transfers from the Trustee to the Creditor Trustee. U.S. Trustee Fees will be assessed upon any disbursement of Creditor Trust Assets, until the case is closed, dismissed or converted.

**D.     Priority Tax Claims.**

1.     Time for Filing

Holders of Priority Tax Claims shall file such Priority Tax Claims on or before the applicable Bar Date. Nothing in this Plan shall alter or extend such Bar Date.

2.     Objection and Allowance.

A Priority Tax Claim shall become an Allowed Priority Tax unless an objection is filed by the Objection Deadline.  If an objection is timely filed, the Priority Tax Claim in question shall become an Allowed Priority Tax Claim only to the extent so Allowed by Final Order of the Bankruptcy Court.

3.     Payment

Except to the extent that a holder of an Allowed Priority Tax Claim has agreed or agrees to a different treatment of such Claim, each holder of an Allowed Priority Tax Claim shall receive: (i) on (or as soon as reasonably practicable after) the Effective Date, Pro Rata Cash payments to the extent of available funds in the Priority Claims Reserve, and (ii) to the extent such payments described in (i) above are insufficient to satisfy the Allowed Priority Tax Claim in full, regular installment payments of Cash from the Creditor Trust, having a total value, as of the Effective Date, equal to the Allowed amount of the Claim, and paid over a period ending not later than five (5) years after the Petition Date, in a manner not less favorable than the treatment provided to Class 5 General Unsecured Claims under this Plan. To the extent interest is required to be paid on any Priority Tax Claim, the rate of such interest shall be the rate determined under applicable nonbankruptcy law, as set forth in section 511 of the Bankruptcy Code.  To the extent there are insufficient funds on hand in the Priority Claims Reserve to pay all Allowed Priority Tax Claims in full, the Trustee or Creditor Trustee (as applicable) shall distribute Cash from the Creditor Trust from the proceeds of Other Retained Causes of Action, as necessary, to pay any remaining Allowed Priority Tax Claims in full; *provided*, *however*, the Creditor Trust Reserve shall be distributed in accordance with the Plan and the Creditor Trust Agreement.

4.     Retention of Liens and Setoff

To the extent the holder of an Allowed Priority Tax Claim has a Lien on a Debtor's property, such Lien shall remain in place until such Allowed Priority Tax Claim has been paid in full.

4924-3833-3515

### ARTICLE III
### CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

All Claims against, and Equity Interests in, the Debtors are classified for all purposes, including voting, confirmation, and distribution, as follows:

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| *1* | *Priority Non-Tax Claims* | *Impaired* | *Yes* |
| *2* | *Prepetition Lender's Secured Claims* | *Impaired* | *Yes* |
| 3 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| *4* | *Customer Constructive Trust Claims* | *Impaired* | *Yes* |
| *5* | *General Unsecured Claims* | *Impaired* | *Yes* |
| *6* | *Contribution Claims* | *Impaired* | *Yes* |
| 7 | Intercompany Claims | Impaired | No (deemed to reject) |
| 8 | Equity Interests | Impaired | No (deemed to reject) |

Administrative Claims, Professional Fee Claims, and Priority Tax Claims are not classified for purposes of voting or receiving distributions under the Plan, pursuant to section 1123(a)(1) of the Bankruptcy Code.  Instead, all such Claims shall be treated separately as unclassified claims on the terms previously set forth in <u>Article II</u> of this Plan.

### ARTICLE IV
### TREATMENT OF CLAIMS AND EQUITY INTERESTS

*A.*    *Class 1 – Priority Non-Tax Claims.*

The Trustee or the Creditor Trustee, as applicable, may object to any Priority Non-Tax Claims on or before the Objection Deadline, unless such deadline is extended by an order of the Bankruptcy Court or agreement with the holder of the applicable Priority Non-Tax Claim.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim against a Debtor agrees to a less favorable treatment, each such holder shall receive, in full satisfaction of such Claim, payment in full in Cash from the Priority Claim Reserve on (or as soon as reasonably practicable after) the later of (A) the Effective Date or (B) the date that entry of an order by the Bankruptcy Court allowing such Priority Non-Tax Claim becomes a Final Order.  To the extent there are insufficient funds on hand in the Priority Claims Reserve to pay all Allowed Priority Non-Tax Claims in full, the Trustee or Creditor Trustee (as applicable) shall supplement the Priority Claims Reserve with proceeds of Other Retained Causes of Action, as necessary to pay any remaining Allowed Priority Tax Claims in full.

*B.*    *Class 2 – Prepetition Lender's Secured Claims.*

On the Effective Date, the Trustee or Creditor Trustee (as applicable) shall pay to the Prepetition Lender, in partial satisfaction of the Allowed Prepetition Lender's Secured Claims, all Cash held by the Debtors or the Trustee (including, without limitation, the Malibu Settlement Payment), except as necessary to fund the Plan Reserves.  In the event that the Malibu Settlement Payment is received after the Effective Date, the Creditor Trustee shall promptly remit such funds to the Prepetition Lender.  After the Effective Date, the Creditor Trustee shall promptly remit to the Prepetition Lender, in partial satisfaction of its Allowed Prepetition Lender's Secured Claim, any additional Cash receipts obtained after the Effective Date from consummated sales of inventory, refunds of unearned insurance premiums resulting from cancelled or terminated insurance policies, merchant card receipts remitted from WorldPay, LLC or other merchant card vendors, or any other sources that are not Creditor Trust Assets.  In addition,

4924-3833-3515

on the Effective Date, the Trustee or Creditor Trustee (as applicable) shall assign to the Prepetition Lender the Assigned Causes of Action.  Any remaining balances of the Prepetition Lender's Secured Claims, after such payments, shall be treated as a deficiency General Unsecured Claim in Class 5 and section IV.E hereof.

**C.    Class 3 – Other Secured Claims.**

Except to the extent a holder of an Allowed Other Secured Claim agrees to a different treatment, each holder of an Allowed Other Secured Claim shall at the option of the Trustee or Creditor Trustee (as applicable), upon consultation with the Committee, receive either of the following treatments on the Effective Date or as soon as reasonably practicable thereafter: (i) payment in full, in Cash; (ii) the collateral securing such Allowed Other Secured Claim; or (iii) such other treatment that renders such Allowed Other Secured Claim unimpaired in accordance with section 1124 of the Bankruptcy Code.

**D.    Class 4 – Customer Constructive Trust Claims.**

1.    Consenting Creditors / Right to Opt Out

All holders of Customer Constructive Trust Claims that do not opt out of the Third-Party Releases will be Consenting Creditors entitled to receive expedited settlement payments from the Customer Constructive Trust Claims Reserve.  Any holder of a Customer Constructive Trust Claim that opts out of the Third-Party Releases will (i) retain all rights and defenses to pursue all remedies against third parties and (ii) be treated as a Class 5 General Unsecured Creditor.

2.    Expedited Claim Review

The Trustee or Creditor Trustee (as applicable) shall conduct an expedited review of all Customer Constructive Trust Claims held by Consenting Creditors and must file objections, if any, to Disputed Customer Constructive Trust Claims no later than the Customer Constructive Claims Objection Deadline.  The Creditor Trustee shall use good faith best efforts to resolve any Disputed Customer Constructive Trust Claims prior to making distributions to the Allowed Customer Constructive Trust Claims pursuant to the following subsection.

3.    Settlement Payment

On or before the first Business Day that is 45 days after the Customer Constructive Trust Claims Objection Deadline, each holder of an Allowed Customer Constructive Trust Claim that is a Consenting Creditor shall receive from the Customer Constructive Trust Claims Reserve, in full satisfaction of such Claim against the Estates and in exchange for the Third-Party Releases, in the Creditor Trustee's discretion, payment from the Creditor Trustee (i) to the holder of the Customer Constructive Trust Claim in Cash in the amount of between 45% and up to 60% of the Allowed Customer Constructive Trust Claim or (ii) in the actual payoff amount owed, to a third party lender asserting a lien against a boat (y) purchased by the holder of a Customer Constructive Trust Claim, and/or (z) previously owned by the holder of a Customer Constructive Trust Claim.

The Creditor Trustee shall supplement the Customer Constructive Trust Claims Reserve with proceeds of Other Retained Causes of Action as necessary to the extent there are insufficient funds on hand in the Customer Constructive Trust Claims Reserve to pay the Allowed Customer Constructive Trust Claims in accordance with the preceding paragraph.

**E.    Class 5 – General Unsecured Claims.**

Except to the extent that a holder of an Allowed General Unsecured Claim against a Debtor agrees to less favorable treatment, each holder of an Allowed General Unsecured Claim shall receive a Creditor Trust Interest. Distributions to holders of Allowed General Unsecured Claims who receive a Creditor Trust Interest shall be on a Pro Rata basis with all other Allowed General Unsecured Claims, as set forth in the Creditor Trust Agreement. Notwithstanding the foregoing, solely for purposes of any distribution made from the portion of the Contributed

4924-3833-3515

Cash Collateral funded into the Creditor Trust Reserve, the Prepetition Lender's Allowed General Unsecured Claim shall be subordinated to the holders of all other Allowed General Unsecured Claims.

**F.    Class 6 – Contribution Claims**

Except to the extent that a holder of a Contribution Claim against a Debtor agrees to less favorable treatment, each holder of a Contribution Claim that is liable with a Debtor on any other Allowed Claim shall be treated in accordance with section 509 of the Bankruptcy Code, including the subordination of any distributions on account of such Contribution Claim in accordance therewith.  A holder of a Contribution Claim that is liable with a Debtor on any Allowed Claim (each, an "Underlying Claim") and that pays such Underlying Claim in full, shall, to the extent provided by section 509 of the Bankruptcy Code, be subrogated to the rights of the holder of such Underlying Claim under and for purposes of the Plan, and such subrogated Claim shall be treated under the applicable Class of such Underlying Claim, in accordance with the Plan.  Any payment of an Underlying Claim by a holder of a Contribution Claim shall be presumed to be solely on account of such holder's own liability on account of such Underlying Claim and shall not be deemed to be a payment of the Underlying Claim in full within the meaning of section 509(c) of the Bankruptcy Code until so agreed by the Creditor Trustee or otherwise determined by the Bankruptcy Court.

**G.    Class 7 – Intercompany Claims**

On the Effective Date, all Intercompany Claims by and against the Debtors shall be settled, cancelled, released, and discharged without payment or distribution of any Cash or other property.  Holders of Intercompany Claims are conclusively deemed to have rejected the Plan and are not entitled to vote.

**H.    Class 8 – Equity Interests**

On the Effective Date, all Equity Interests in each Debtor shall be cancelled, extinguished, and of no further force or effect.  Holders of Equity Interests shall neither retain nor receive any property under the Plan on account of such Equity Interests.  Holders of Equity Interests are conclusively deemed to have rejected the Plan and are not entitled to vote.

**ARTICLE V**
**IMPAIRMENT; ACCEPTANCE OR REJECTION OF THE PLAN;**
**EFFECT OF REJECTION BY ONE OR MORE CLASSES**

**A.    Classes Entitled to Vote.**

The holders of Claims in Class 3 are unimpaired and are conclusively deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.  The holders of Claims in Classes 1, 2, 4, 5, and 6 are impaired and are entitled to vote to accept or reject the Plan.  The holders of Claims in Classes 7 and 8 are impaired and are conclusively deemed to reject the Plan and are therefore not entitled to vote to accept or reject the Plan.

**B.    Class Acceptance Requirement.**

A Class of impaired Claims entitled to vote on the Plan shall have accepted the Plan if the holders of at least two-thirds (2/3) in amount and more than one-half (1/2) in number of Claims in such Class who have voted on the Plan have voted to accept the Plan.

**C.    Cramdown.**

To the extent that any Class is impaired under the Plan and such Class fails to accept the Plan in accordance with section 1126(c) or (d) of the Bankruptcy Code, the Debtors hereby request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code.

4924-3833-3515

D.      *Elimination of Classes.*

Any Class that does not contain any Allowed Claims or any Claims temporarily Allowed for voting purposes under Bankruptcy Rule 3018, as of the date of the commencement of the Confirmation Hearing, shall be deemed eliminated from this Plan for purposes of (i) voting to accept or reject this Plan and (ii) determining whether such Class has accepted or rejected this Plan under section 1129(a)(8) of the Bankruptcy Code.

## ARTICLE VI
## MEANS OF IMPLEMENTATION

A.      *Limited Substantive Consolidation.*

The Plan provides for potential recoveries on account of Allowed Claims in Classes 1, 2, 3, 4, 5 and 6 regardless of the Debtor entity against which such Allowed Claims are asserted.  The Debtors shall not be consolidated for any other purpose.  To the extent necessary, the Plan shall serve as a motion seeking, and entry of the Confirmation Order shall constitute, the approval, pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, effective as of the Effective Date, of the limited consolidation for voting and distribution on account of Allowed Claims in Classes 1, 2, 3, 4, 5, and 6.

For the avoidance of doubt, the limited consolidation described in this section shall not affect the legal and corporate structures of the Debtors.  In addition, such consolidation shall not constitute a waiver of the mutuality requirement for setoff under section 553 of the Bankruptcy Code.

B.      *The Creditor Trust.*

1.      Establishment of the Creditor Trust.

The Creditor Trust shall be established for the benefit of the holders of Allowed General Unsecured Claims. This section sets forth the general terms of the Creditor Trust and certain of the rights, duties, and obligations of the Creditor Trustee. In the event of any conflict between the terms of this section and the terms of the Creditor Trust Agreement, the terms of the Creditor Trust Agreement shall govern.

2.      The Creditor Trustee.

The Creditor Trustee shall be selected by the Trustee with the approval of the Committee, with such approval not to be unreasonably withheld, subject only to Bankruptcy Court approval at the Confirmation Hearing. The Creditor Trust, acting by and through the Creditor Trustee, shall be a representative of the estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.  The Creditor Trustee may prosecute, settle, liquidate, and otherwise administer the Creditor Trust Assets on behalf of the Creditor Trust, without the need for Bankruptcy Court approval or any other notice or approval, except as set forth in the Creditor Trust Agreement, and shall also be responsible for objecting to Claims.  The Creditor Trust and the Creditor Trustee shall be exempt from giving any bond or other security in any jurisdiction.

3.      Execution of Creditor Trust Agreement.

On the Effective Date, the Creditor Trust Agreement shall be executed, and all other necessary steps shall be taken to establish the Creditor Trust and the beneficial interests therein. The form of the Creditor Trust Agreement and related ancillary documents shall be mutually acceptable to the Trustee and the Committee, subject only to Bankruptcy Court approval at the Confirmation Hearing.

4.    Purpose of the Creditor Trust.

The Creditor Trust shall be established for the purpose of administering the terms of this Plan, including the liquidation and distribution of the Creditor Trust Assets and all proceeds thereof pursuant to the terms of this Plan and the Confirmation Order.  The Creditor Trust, through the Creditor Trustee, shall not continue or engage in the conduct of a trade or business.  The Creditor Trust, through the Creditor Trustee, shall (i) collect and reduce the Creditor Trust Assets to Cash, (ii) prosecute, settle and otherwise administer the Other Retained Causes of Action, (iii) make distributions in accordance with the Plan and Creditor Trust Agreement, and (iv) take all such actions as are reasonably necessary to accomplish the purpose hereof, as more fully provided in the Creditor Trust Agreement.

5.    Creditor Trust Assets.

The Creditor Trust shall consist of the Creditor Trust Assets. On the Effective Date, the Trustee, on behalf of the Debtors, shall, and shall be deemed to, irrevocably grant, assign, transfer, and convey to the Creditor Trust all rights, title, and interests in and to all of the Creditor Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Creditor Trust Assets shall automatically vest in the Creditor Trust, free and clear of all Liens, Claims, and encumbrances.  The Creditor Trust, acting by and through the Creditor Trustee, may abandon or otherwise not accept any Creditor Trust Assets that the Creditor Trust believes, in good faith, to have no value to, or will be unduly burdensome to, the Creditor Trust.  Any Creditor Trust Assets that the Creditor Trust so abandons or otherwise does not accept shall not be property of the Creditor Trust.

6.    Governance and Powers and Duties of the Creditor Trust.

The Creditor Trust shall be governed by the Creditor Trustee in accordance with the Creditor Trust Agreement and consistent with the Plan.  The Creditor Trustee shall have the power and authority to perform the acts described in the Creditor Trust Agreement.  The powers, rights, and responsibilities of the Creditor Trustee shall be specified in the Creditor Trust Agreement and shall include, among other things, the authority, power, and responsibility to cause the Creditor Trust to: (a) receive, manage, invest, supervise, and protect Creditor Trust Assets; (b) pay taxes or other obligations incurred by the Creditor Trust and issue to employees or other Persons, and/or file with the appropriate Governmental Units, applicable tax and wage returns and forms; (c) retain and compensate, without further order of the Bankruptcy Court, the services of employees, independent contractors, professionals, and consultants to advise and assist in the administration, prosecution and distribution of Creditor Trust Assets; (d) calculate and implement Distributions of Creditor Trust Assets; (e) investigate, prosecute, compromise, and settle, in accordance with the specific terms of the Creditor Trust Agreement and without further order of the Bankruptcy Court, except as otherwise provided therein, Other Retained Causes of Action; (f) resolve issues involving Claims in accordance with the Plan, including the power to object to, or settle, resolve, or compromise objections or disputes with respect to, Claims, and to subordinate and recharacterize Claims by objection, motion, or adversary proceeding; (g) undertake all administrative functions of the Chapter 11 Cases, including the payment of statutory fees and the ultimate closing of the Chapter 11 Cases; and (h) take action pursuant to such other powers as may be vested in or assumed by the Creditor Trustee pursuant to this Plan, the Creditor Trust Agreement, Bankruptcy Court order, or as may be necessary and proper to carry out the provisions of this Plan.

7.    Books and Records.

The Creditor Trust shall: (a) take possession of all copies of books, records, and files of the Debtors and the Estates that were not sold and transferred in connection with a sale; and (b) provide for the retention and storage of such books, records, and files until such time as the Creditor Trust determines, in accordance with the Creditor Trust Agreement, that retention of same is no longer necessary or beneficial to the Creditor Trust.

4924-3833-3515

8.    <u>Cash.</u>

The Creditor Trustee may invest Creditor Trust Assets only in Cash, money market funds, and Government securities (as defined in section 2(a)(16) of the Investment Company Act of 1940, as amended); *provided, however*, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities.

9.    <u>Costs and Expenses of the Creditor Trustee.</u>

The costs and expenses of the Creditor Trust and/or the Creditor Trustee, including the fees and expenses of retained professionals, shall be paid only out of the Creditor Trust Assets.  All such costs and expenses must be satisfied or reserved for in full before distributions may be made to holders of Allowed Claims.

10.    <u>Compensation of the Trustee.</u>

The Creditor Trustee shall be entitled to reasonable compensation paid exclusively from the Creditor Trust Assets as more fully set forth in the Creditor Trust Agreement.

11.    <u>Retention of Professionals by the Creditor Trust.</u>

The Creditor Trust, acting by and through the Creditor Trustee, may retain and reasonably compensate counsel and other professionals out of the Creditor Trust Assets to assist in its duties on such terms as the Creditor Trust deems appropriate without Bankruptcy Court approval.  The Creditor Trust may retain any professional who represented parties in interest (including the Trustee or the Committee) in the Chapter 11 Cases.

12.    <u>Distribution of Creditor Trust Assets.</u>

The Creditor Trust shall distribute Cash in accordance with the Plan and the Creditor Trust Agreement.

The Creditor Trust shall not make any distributions to holders of Disputed Claims unless and until such Claims are Allowed.  The Creditor Trust shall ensure that sufficient funds are reserved, as determined by the Creditor Trustee in his sole discretion, to pay Disputed Claims upon Allowance.  The Creditor Trust shall be permitted to reserve and satisfy amounts that (i) are reasonably necessary to meet contingent liabilities and to maintain the value of the Creditor Trust Assets, (ii) are necessary to pay reasonable expenses (including, but not limited to, any taxes imposed on the Creditor Trust or in respect of the Creditor Trust Assets), and (iii) are required to satisfy other liabilities incurred by the Creditor Trust in accordance with this Plan or the Creditor Trust Agreement.

13.    <u>Creditor Trust Certificates.</u>

Beneficial interests in the Creditor Trust shall not be represented by certificates, receipts, or in any other form or manner, except as maintained on the books and records of the Creditor Trust by the Creditor Trustee, as set forth in the Creditor Trust Agreement.

14.    <u>Federal Income Tax Treatment of the Creditor Trust.</u>

i.    *Creditor Trust Assets Treated as Owned by General Unsecured Creditors*. For all federal income tax purposes, all parties (including, without limitation, the Debtors, the Creditor Trustee, and the holders of beneficial interests in the Creditor Trust) shall treat the transfer of the Creditor Trust Assets to the Creditor Trust for the benefit of the beneficiaries thereof, whether Allowed on or after the Effective Date, as (A) a transfer of the Creditor Trust Assets directly to the holders in satisfaction of General Unsecured Claims, followed by (B) the transfer by such holders to the Creditor Trust of the Creditor Trust Assets in exchange for, beneficial interests in the Creditor Trust. Accordingly, the holders of such General

16

Unsecured Claims shall be treated for federal income tax purposes as the grantors and owners of their respective shares of the Creditor Trust Assets.

    ii.    *Tax Reporting.*

    A)    The Creditor Trust, acting by and through the Creditor Trustee shall file income tax returns for the Creditor Trust as a grantor trust pursuant to Treasury Regulation section l.671-4(a) and in accordance with this section. To the extent required, or if desired by the Creditor Trust, the Creditor Trust shall annually send to each record holder of a beneficial interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction, or credit and will instruct all such holders to report such items on their federal income tax returns or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns. The Creditor Trust's taxable income, gain, loss, deduction, or credit will be allocated among the beneficial holders of Creditor Trust Interests in accordance with each holder's relative beneficial Creditor Trust Interest.

    B)    The Creditor Trust, acting by and through the Creditor Trustee, may, in its sole discretion, determine the best way to report for United States tax purposes with respect to any Creditor Trust Assets allocable to, or retained on account of, Disputed Claims (the "Disputed Claims Reserve"), including, but not limited to, filing a tax election to treat the Disputed Claims Reserve as a disputed ownership fund ("DOF") or other separate entity within the meaning of Treasury Regulation section 1.468B-9 for federal income tax purposes rather than to tax such reserve as a part of the Creditor Trust (and, to the extent permitted by applicable law, report consistently with the foregoing for United States federal, state, and local income tax purposes) (the "DOF Election"). If a DOF Election is made, the Creditor Trust shall comply with all federal and state tax reporting and tax compliance requirements of the DOF or other separate entity, including, but not limited to, the filing of a separate federal tax return for the DOF or other separate entity and the payment of federal and/or state income tax due.

    C)    The Creditor Trust shall be responsible for payments, out of the Creditor Trust Assets, of any taxes imposed on the Creditor Trust or the Creditor Trust Assets, including the Disputed Claims Reserve. In the event, and to the extent, any Cash retained on account of Disputed Claims in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts distributable by the Trustee as a result of the resolutions of such Disputed Claims.

    D)    The Creditor Trust may request an expedited determination of taxes of the Creditor Trust, including the Disputed Claims Reserve, under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Creditor Trust for all taxable periods through the dissolution of the Creditor Trust.

4924-3833-3515

15.    <u>Dissolution.</u>

The Creditor Trust shall be dissolved and the Creditor Trustee shall be discharged no later than the fifth (5th) anniversary of the Effective Date; *provided, however*, that, the Bankruptcy Court, upon motion by a party in interest, including the Creditor Trust, may extend the term of the Creditor Trust if it is necessary to the liquidation and/or distribution of the Creditor Trust Assets, without prejudice to further extensions, so long as Bankruptcy Court approval of such extension is obtained in conformity with IRS Revenue Procedure 94-45, 1994-2 C.B. 684; *provided, however*, that in no event shall the term of the Creditor Trust extend past the tenth (10th) anniversary of the Effective Date; *provided further* that neither the Creditor Trust Agreement nor the continued existence of the Creditor Trust shall prevent the Trustee from closing the Chapter 11 Cases pursuant to section 350 of the Bankruptcy Code and obtaining a Final Decree pursuant to Bankruptcy Rule 3022.  The Creditor Trust may be terminated earlier than its scheduled termination if (i) the Bankruptcy Court has entered a Final Order closing all of or the last of the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code and (ii) the Creditor Trustee has administered all Creditor Trust Assets and performed all other duties required by the Plan, the Confirmation Order, the Creditor Trust Agreement and the Creditor Trust.  The Creditor Trustee shall not unduly prolong the duration of the Creditor Trust and shall at all times endeavor to resolve, settle or otherwise dispose of all claims that constitute Creditor Trust Assets and to effect the Distribution of the Creditor Trust Assets in accordance with the terms hereof and terminate the Creditor Trust as soon as practicable.  Prior to and upon termination of the Creditor Trust, the Creditor Trust Assets will be distributed to the beneficiaries of Creditor Trust, pursuant to the provisions set forth in the Trust Agreement.

If at any time the Creditor Trustee determines that the expense of administering the Creditor Trust is likely to exceed the value of the Creditor Trust Assets, the Creditor Trustee shall have the authority to (i) distribute to the beneficiaries of the Creditor Trust any Cash balance remaining in excess of necessary costs to pay outstanding expenses of the Creditor Trust, including any fees and expenses of the Creditor Trustee and his/her professionals, (ii) donate any Creditor Trust Assets remaining in the Creditor Trust to a non-religious charitable organization exempt from federal income tax under section 501(c)(3) of the Tax Code that is unrelated to the Debtors and any Insider of the Debtors and (iii) dissolve the Creditor Trust.

16.    <u>Preservation of Privileges</u>

The actions taken by the Debtors, the Trustee, or the Committee shall not be (or be deemed to be) a waiver of any privilege, including any attorney-client privilege or work-product privilege attaching to any document or communications (whether written or oral). Notwithstanding the Trustee or the Committee providing any privileged information to the Creditor Trust, Creditor Trustee, or any party or person associated with the Creditor Trust, such privileged information shall be without waiver of any privilege of the Trustee or the Committee, including any attorney-client privilege or work-product privilege. The transfer to and vesting in the Creditor Trust of the Creditor Trust Assets on the Effective Date shall not effect a waiver of any privilege of the Debtors, the Trustee, or the Committee, and upon such transfer, the Creditor Trust, acting by and through the Creditor Trustee, shall hold all rights with respect to such privileges, including the right to waive such privileges in its discretion.

18

17.    Indemnification of Creditor Trustee.

The Creditor Trust shall indemnify the Creditor Trust Indemnified Parties for, and shall hold them harmless against, any loss, liability, damage, judgment, fine, penalty, claim, demand, settlement, cost, or expense (including the reasonable fees and expenses of their respective professionals) incurred without fraud, gross negligence or willful misconduct on the part of the Creditor Trust Indemnified Parties (which fraud, gross negligence or willful misconduct, if any, must be determined by a Final Order of a court of competent jurisdiction) for any action taken, suffered, or omitted to be taken by the Creditor Trust Indemnified Parties in connection with the acceptance, administration, exercise, and performance of their duties under the Plan, Confirmation Order, or the Creditor Trust Agreement, as applicable.  An act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute fraud, gross negligence or willful misconduct.  In addition, the Creditor Trust shall, to the fullest extent permitted by law, indemnify and hold harmless the Creditor Trust Indemnified Parties, from and against and with respect to any and all liabilities, losses, damages, claims, costs, and expenses, including attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Creditor Trust or the implementation or administration of the Plan, if the Creditor Trust Indemnified Party acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interest of the Creditor Trust.  To the extent the Creditor Trust indemnifies and holds harmless any Creditor Trust Indemnified Parties as provided above, the legal fees and related costs incurred by counsel to the Creditor Trust in monitoring or participating in the defense of such claims giving rise to the right of indemnification shall be paid as costs and expenses of the Creditor Trust.  The costs and expenses incurred in enforcing the right of indemnification in this section shall be paid by the Creditor Trust.  This provision shall survive the termination of the Creditor Trust or Creditor Trust Agreement, and the death, dissolution, liquidation, resignation, replacement, or removal of the Creditor Trustee.

C.    *Discharge of the Chapter 11 Trustee and Cessation of Fee and Expense Payments.*

On the Effective Date, the Trustee and the Trustee's Professional Persons (solely in their capacity as such) shall be discharged and released from all their duties relating to the Chapter 11 Cases, except with respect to (a) any applications for Professional Fee Claims or expense reimbursements for the Trustee and his Professional Persons, including preparing same, objecting to same, defending same and attending any hearing with respect to same; and (b) any motions or other actions seeking enforcement or implementation of (i) the Plan or (ii) the Confirmation Order.  Neither the Debtors nor the Creditor Trust shall be responsible for paying any fees or expenses incurred by the Trustee after the Effective Date *except* if incurred in furtherance of the functions of the Trustee set forth in (a) or (b) of this paragraph, subject to the rights of parties in interest to object thereto.

D.    *Dissolution of Committee and Cessation of Fee and Expense Payments.*

The Committee shall be dissolved on the Effective Date and the members of the Committee (solely in their capacities as such) and the Committee's Professional Persons (solely in their capacity as such) shall be released from all their duties relating to the Chapter 11 Cases, except with respect to (a) any applications for Professional Fee Claims or expense reimbursements for members of the Committee, including preparing same, objecting to same, defending same and attending any hearing with respect to same; and (b) any motions or other actions seeking enforcement or implementation of (i) the Plan or (ii) the Confirmation Order.  Neither the Debtors nor the Creditor Trust shall be responsible for paying any fees or expenses incurred by the Committee (or any other committee that may be appointed in these Chapter 11 Cases) after the Effective Date *except* if incurred in furtherance of the functions of the Committee set forth in (a) or (b) of this paragraph, subject to the rights of parties in interest to object thereto.

E.    *Issuance of Creditor Trust Interests.*

4924-3833-3515

All of the Creditor Trust Interests issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. On the Distribution Date, the Creditor Trust shall issue the Creditor Trust Interests for distribution pursuant to the provisions hereof and the Creditor Trust Agreement. All Creditor Trust Interests to be issued shall be deemed issued as of the Effective Date regardless of the date on which they are actually distributed. For the avoidance of doubt, ownership of a Creditor Trust Interest will not be evidenced by any certificate, security, or receipt or in any other form or manner whatsoever, except the book entry system.

The Creditor Trust Interests shall be non-transferable and non-assignable during the term of the Creditor Trust Agreement except by operation of law. An assignment by operation of law shall not be effective until appropriate notification and proof thereof is submitted to the Creditor Trust, and the Creditor Trust may continue to pay all amounts to or for the benefit of the assigning Creditor Trust beneficiaries until receipt of proper notification and proof of assignment by operation of law. The Creditor Trust may rely upon such proof without the requirement of any further investigation.

**F.      Section 1145 Exemption.**

Section 1145 of the Bankruptcy Code shall be applicable to the issuance of the Creditor Trust Interests, if any. To the maximum extent permitted by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, if appropriate, the Creditor Trust Interests, issued pursuant to the Plan and their transfer will be exempt from registration under the Securities Act and all rules and regulations promulgated thereunder, and any and all applicable state and local laws, rules, and regulations.

**G.      Cancellation of Existing Securities.**

On the Effective Date, except as otherwise provided for herein or any other document incorporated in the Plan, all Equity Interests and any other certificate, security, share, note, bond, indenture, purchase right, option, warrant, certificates of designation or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Equity Interest, to the extent not already cancelled, shall be deemed cancelled and of no further force or effect, without the requirement for any further action on the part of the Bankruptcy Court or any other Person.

**H.      Corporate Action.**

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects. All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by or in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Trustee, any Equity Interest holders, or directors or officers of the Debtors. The authorizations and approvals contemplated by this section shall be effective notwithstanding any requirements under non-bankruptcy law.

4924-3833-3515

I.        *Directors, and Executive Officers.*

On the Effective Date, the term of each member of each Debtor's current board of directors or board of managers shall automatically expire.  From and after the Effective Date, the Creditor Trustee may exercise all power and authority that may be exercised by any officer, director or manager of, or holder of an Equity Interest in, the Debtors, with like effect as if authorized, exercised and taken by unanimous consent of such officers, directors, managers or holders of Equity Interests, *provided*, that the Creditor Trustee shall have no duties other than as expressly set forth in the Confirmation Order, the Plan, and the Creditor Trust Agreement.

J.        *Retained Causes of Action.*

Except as otherwise provided in this Plan, an agreement or document entered into in connection with the Plan, or in a Final Order of the Bankruptcy Court, pursuant to sections 363(b) and 1123(b)(3) of the Bankruptcy Code, the Trustee reserves and, as of the Effective Date, grant, release, assign, transfer, and convey to: (i) the Prepetition Lender the Assigned Causes of Action, and (ii) to the Creditor Trust the Other Retained Causes of Action.

The Prepetition Lender shall be the exclusive representative of the estates pursuant to section 1123(b)(3) of the Bankruptcy Code on account of such Assigned Causes of Action.  On and after the Effective Date, the Prepetition Lender, for itself in partial satisfaction of its Allowed Prepetition Lender's Secured Claim, may pursue Assigned Causes of Action.  Any and all recoveries and proceeds from any Assigned Causes of Action shall be the sole property of Prepetition Lender, in partial satisfaction of its Allowed Prepetition Lender's Secured Claim and in consideration for the value provided by the Prepetition Lender under this Plan.

The Creditor Trust, acting by and through the Creditor Trustee, shall be the exclusive representative of the estates pursuant to section 1123(b)(3) of the Bankruptcy Code on account of the Other Retained Causes of Action.  On and after the Effective Date, the Creditor Trustee, on behalf of the Creditor Trust, may pursue Other Retained Causes of Action for the benefit of the holders of Creditor Trust Interests.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Retained Cause of Action against it as any indication that the Prepetition Lender or the Creditor Trustee, as applicable, will not pursue any and all available Retained Causes of Action.  Unless any Retained Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court, the Trustee expressly reserves all Retained Causes of Action for later adjudication by the Prepetition Lender or the Creditor Trust, as applicable, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Retained Causes of Action upon, after, or as a consequence of Plan confirmation or occurrence of the Effective Date; provided, however, that upon payment of the Malibu Settlement Payment, no Claims or Causes of Action against Malibu Boats shall be reserved for the later adjudication by the Prepetition Lender or the Creditor Trust, as applicable.

K.        *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Creditor Trust, acting by and through the Creditor Trustee, is authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

L.        *Exemption from Certain Transfer Taxes.*

Pursuant to section 1146(a) of the Bankruptcy Code, the following will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, sales or use tax, mortgage tax, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any

4924-3833-3515

such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment: (a) the creation of any mortgage, deed of trust, lien or other security interest under or pursuant to this Plan; (b) the release or assignment of liens; (c) the transfer of any assets of the Debtors' Estates to the Creditor Trust; or (d) the making or delivery of any deed or other instrument of transfer under, in furtherance of, in connection with or pursuant to this Plan, including any restructuring, disposition, liquidation or dissolution, deeds, bills of sale or assignments executed in connection with any of the foregoing.

## ARTICLE VII
## DISTRIBUTIONS

**A.**     *Date of Distributions.*

Distributions under the Plan shall be made as set forth herein.  In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act shall be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.

**B.**     *Sources of Cash for Plan Distributions.*

Except as otherwise provided herein or in the Confirmation Order, all Cash required for the payments to be made under this Plan shall come from the Creditor Trust Assets.

**C.**     *Distributions.*

All distributions under the Plan shall be made by the Trustee, his designee, or by the Creditor Trustee. Neither the Trustee, his designee, the Creditor Trust, nor the Creditor Trustee shall be required to post any bond, surety or other security for the performance of its duties hereunder unless otherwise ordered by the Bankruptcy Court.

**D.**     *Record Date for Distributions.*

At the close of business on the Distribution Record Date, the transfer ledgers or registers for Claims against the Debtors shall be closed, and there shall be no further changes in the record holders of such Claims.  Neither the Trustee nor the Creditor Trust shall have any obligation to recognize any transfer of any of the foregoing occurring after the Distribution Record Date and shall be entitled instead to recognize for all purposes hereunder, including to effect distributions hereunder, only those record holders stated on the transfer ledgers or registers maintained by the Trustee as of the close of business on the Distribution Record Date.  All distributions to holders of Allowed Claims under the Plan shall be made to the holder of the Allowed Claim as of the Distribution Record Date.

**E.**     *Delivery of Distributions; Unclaimed Property.*

4924-3833-3515

Subject to Bankruptcy Rule 9010, all distributions under the Plan shall be made at the address of each holder of an Allowed Claim (1) at the address set forth in the underlying proof of claim, if filed, (2) at the address set forth on the Debtors' Schedules, if no proof of claim is filed, or (3) pursuant to a written change of address filed with the Bankruptcy Court and delivered to the Creditor Trust. If any distribution to the holder of an Allowed Claim is returned as undeliverable, no further distributions to such holder shall be made unless and until the Trustee or the Creditor Trust, as applicable, are notified of such holder's then-current address, at which time all missed distributions shall be made to such holder without interest. All such distributions, as well as any distributions by check or other means that have not been negotiated shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of sixty (60) days after the date of the distribution in question. After such 60th day, and notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary (i) all unclaimed property or interest in property in respect of the distribution in question shall revert to the Creditor Trust, and (ii) the Claim of any holder with respect to such unclaimed property or interest in property shall be discharged and forever barred.

**F.**     *Means of Payment.*

All distributions made pursuant to the Plan shall be in Cash.

**G.**     *Distributions After Effective Date.*

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed as of the Effective Date, shall be deemed to have been made on the Effective Date. After the initial distribution, the Creditor Trust, by and through the Creditor Trustee shall make additional interim distributions to holders of Allowed Claims at such time as the Creditor Trust may deem appropriate, in accordance with the terms of this Plan.

**H.**     *Withholding and Reporting Requirements.*

Any party issuing any instrument or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is entitled to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any applicable tax obligations, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan to any holder of any Allowed Claim has the right, but not the obligation, to not issue such instrument or make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

The Creditor Trust shall be authorized to require each holder of a Claim to provide it with an executed Form W-9, Form W-8, or any other tax form, documentation or certification as may be requested by the Creditor Trust as a condition precedent to being sent a distribution under the Plan. If a holder of a Claim does not provide the Trust with an executed Form W-9, Form W-8 or other requested tax form within ninety (90) days after the date of the initial request, the Creditor Trust may, in its sole discretion: (1) make such distribution under the Plan net of applicable withholding; (2) reserve such distribution under the Plan, in which case (i) such holder shall be deemed to have forfeited the right to receive any current, reserved or future distribution under the Plan, (ii) any such distribution under the Plan shall revert to the Creditor Trust for all purposes, including but not limited to, for distribution to other Allowed Claims, and (iii) the Claim of the holder originally entitled to such distribution under the Plan shall be irrevocably waived and forever barred without further order of the Bankruptcy Court, all notwithstanding any federal, state or provincial escheat, unclaimed or abandoned property law to the contrary; or (3) establish any other mechanisms it believes are reasonable and appropriate. The Creditor Trust reserves the right to allocate and distribute all distributions under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, Liens and similar encumbrances.

**I.**     *No Postpetition Interest.*

4924-3833-3515

Unless otherwise specifically provided for in the Plan or in the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claim, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date.

*J.*    *Time Bar to Payments.*

Checks issued under the Plan shall be null and void if not negotiated within sixty (60) days after the date of issuance.  Requests for reissuance of any check shall be made in writing directly to the Creditor Trust by the Person to whom such check was originally issued.  Any request for re-issuance of a voided check must be made on or before the end of the 60-day period referenced in this section.  After such 60-day period, if no request for re-issuance of a voided check was timely made, such amounts shall constitute unclaimed property and be treated in accordance with section VII.E of this Plan, and all Claims in respect of such void checks shall be discharged and forever barred.

*K.*    *De Minimis Distributions.*

Neither the Trustee nor the Creditor Trust shall have any obligation to make a distribution that is less than Fifty Dollars ($50) in Cash.  If an interim distribution to the holder of an Allowed Claim is less than $50, such distribution shall be held for future distributions.  If the final distribution to any holder of an Allowed Claim is less than $50, such amount shall become and constitute unclaimed property and be treated in accordance with section VII.E of the Plan.

## ARTICLE VIII
## PROCEDURES FOR RESOLVING AND TREATING DISPUTED CLAIMS

*A.*    *Objections to Claims.*

Except insofar as a Claim is Allowed under the Plan or pursuant to Final Order of the Bankruptcy Court, the Trustee, the Creditor Trust, and any other party in interest with standing, shall be entitled to object to Claims.  Any objections to Claims shall be served and filed by the Objection Deadline.  Any Claim to which an objection is timely filed shall be a Disputed Claim.

*B.*    *Estimation of Claims.*

Before or after the Effective Date, the Trustee or the Creditor Trustee, as applicable, may at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any such Claim or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the claims register maintained in these Chapter 11 Cases, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the Creditor Trustee may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

*C.*    *No Distributions Pending Allowance.*

If a timely objection is made with respect to any Claim, no payment or distribution under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes Allowed.

*D.*    *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably

24

practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Trustee or the Creditor Trustee, as applicable, shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under this Plan as of the Effective Date, without any interest.

**E.      Disallowance of Late Filed Claims.**

Unless otherwise provided in a Final Order of the Bankruptcy Court, any Claim for which a proof of claim is filed after the applicable Bar Date shall be deemed Disallowed.  The holder of a Claim that is Disallowed pursuant to this section shall not receive any distribution on account of such Claim, and neither the Trustee nor the Creditor Trust shall need to take any affirmative action for such Claim to be deemed Disallowed.

<u>ARTICLE IX</u>
**CONDITIONS PRECEDENT TO CONFIRMATION AND
EFFECTIVENESS OF THE PLAN**

**A.      Conditions to Confirmation of Plan.**

Confirmation of the Plan shall not occur, and the Confirmation Order shall not be entered, until each of the following conditions precedent have been satisfied or waived:

(i)      An order, finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code shall have been entered; and

(ii)     The Confirmation Order shall be in a form and substance reasonably satisfactory to the Trustee, the Committee, and the Prepetition Lender.

**B.      Conditions to Effective Date of Plan.**

The Effective Date of the Plan shall not occur until each of the following conditions precedent have been satisfied or waived:

(i)      The clerk of the Bankruptcy Court shall have entered the Confirmation Order in the Chapter 11 Cases and there shall not be a stay or injunction (or similar prohibition) in effect with respect thereto;

(ii)     The Confirmation Order shall have become a Final Order;

(iii)    The Creditor Trust Agreement has been fully executed, the Creditor Trust shall have been formed, and the Creditor Trust Assets have been transferred to the Creditor Trust;

(iv)     Substantially all Administrative Claims have been Allowed and the Administrative Claims Reserve has been funded in accordance with the terms hereof;

(v)      All conditions precedent to the effectiveness of the Malibu Settlement Agreement, as set forth therein, shall have been satisfied or waived by Malibu Boats or the Trustee, as applicable, and the Trustee shall have received the Malibu Settlement Payment; and

(vi)     All other actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan shall have been executed and delivered by the parties thereto, and, in each case, all conditions to their effectiveness shall have been satisfied or waived as provided therein.

Within two (2) Business Days of the Effective Date, the Trustee shall file a notice of the occurrence of the Effective Date and serve the same on all creditors and parties in interest.

C.      *Waiver of Conditions Precedent.*

Any of the foregoing conditions (with the exception of the conditions set forth in sections IX.A(i), IX.B(i), and IX.B(iii) hereof) may be waived by agreement of the Trustee, the Prepetition Lender, and the Committee without notice to or order of the Bankruptcy Court.  The failure to satisfy or waive any condition may be asserted by the Trustee, the Prepetition Lender, and the Committee regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Trustee, the Prepetition Lender, or the Committee). The failure of the Trustee, the Prepetition Lender, and the Committee to exercise any of the foregoing rights shall not be deemed a waiver of any other rights and each such right will be deemed an on-going right that may be asserted at any time.

D.      *Effect of Failure of Conditions.*

If the foregoing conditions have not been satisfied or waived in the manner provided in sections IX.A, IX.B, or IX.C hereof, then (i) the Confirmation Order shall be of no further force or effect; (ii) no distributions under the Plan or Creditor Trust shall be made; (iii) the Trustee and all holders of Claims against and Equity Interests in the Debtors shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; (iv) all of the Debtors' obligations with respect to Claims and Equity Interests shall remain unaffected by the Plan; (v) nothing contained in this Plan shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Trustee or any Person in any further proceedings involving the Debtors; and (vi) this Plan shall be deemed withdrawn.  Upon such occurrence, the Trustee shall file a written notification with the Bankruptcy Court and serve it on the parties appearing on the master service list maintained in the Chapter 11 Cases.

E.      *Reservation of Rights.*

The Plan shall have no force or effect unless and until the Effective Date occurs.  Prior to the Effective Date, none of the filing of the Plan, any statement or provision contained in the Plan, or action taken by the Trustee with respect to the Plan shall be, or shall be deemed to be, an admission or waiver of any rights of the Trustee, the Creditor Trustee, or any other party with respect to any Claims or Equity Interests or any other matter.

## ARTICLE X
## EFFECT OF CONSUMMATION

A.      *Vesting of Assets.*

Upon the Confirmation Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the Creditor Trust Assets shall vest in the Creditor Trust, free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as otherwise provided in this Plan.

26

4924-3833-3515

B.      *Exculpation.*

Upon the Effective Date, to the fullest extent permissible under applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from, any liability to any holder of a Claim or Equity Interest, or any other party in interest, for any claim or cause of action arising from, relating to, or connected with the administration of the Chapter 11 Cases, the Disclosure Statement, the preparation of the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the occurrence of the Effective Date, or the administration of the Plan or property to be distributed under the Plan, except for claims related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.  The Exculpated Parties shall be deemed to have participated in good faith in connection with the above and entitled to the protection of section 1125(e) of the Bankruptcy Code.  Each Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

C.      *Releases by the Trustee.*

On the Effective Date, unless expressly preserved by the Plan, the Trustee, on behalf of each and all Debtors, shall fully and forever release, acquit, discharge, and dismiss any and all claims, obligations, suits, judgments, damages, rights, remedies, Causes of Action, and liabilities of any nature, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, contingent or non-contingent, existing or hereafter arising, in law, equity, or otherwise, including any Avoidance Actions or other applicable law which they have or may have against any of the Released Parties.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any Released Party under the Plan or any document, instrument, or agreement executed to implement the Plan.

D.      *Third-Party Releases.*

Except as otherwise expressly set forth in the Plan or the Confirmation Order, and in exchange for other good and valuable consideration, the adequacy of which is hereby confirmed, each of the Releasing Parties shall be deemed to have expressly, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Released Party, to the fullest extent permissible under applicable law, from any and all claims, causes of action, interests, damages, remedies, demands, rights, actions (including Avoidance Actions), suits, debts, sums of money, obligations, judgments, liabilities, accounts, defenses, offsets, counterclaims, crossclaims, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, now existing or hereafter arising, contingent or non-contingent, liquidated or unliquidated, choate or inchoate, secured or unsecured, assertable, directly or derivatively (including any Causes of Action asserted or assertable on behalf of the Debtors, the Trustee, the Creditor Trust, or the Estates, as applicable), matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise, arising from, relating to, or connected with the Debtors (or any predecessor entity) or the Chapter 11 Cases or affecting property of the Debtors' Estates, the Plan or the administration and implementation of the Plan, or based upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

The Released Parties shall be deemed to have expressly, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Consenting Creditor to the fullest extent permissible under applicable law, from any and all claims, causes of action, interests, damages, remedies, demands, rights, actions (including Avoidance Actions), suits, debts, sums of money, obligations, judgments, liabilities, accounts, defenses, offsets, counterclaims, crossclaims, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, now existing or hereafter arising, contingent or non-contingent, liquidated or unliquidated, choate or inchoate, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise, arising from, relating to, or connected with, the Debtors (or any predecessor entity) or the Chapter 11 Cases or affecting property of the Debtors'

27

Estates, the Plan or the administration and implementation of the Plan, or based upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything contained herein to the contrary, the foregoing releases do not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, or (ii) the rights of holders of Allowed Claims to receive Distributions under the Plan. Furthermore, notwithstanding anything contained herein to the contrary, nothing in this section X.D shall apply to any of the Borisch Parties.  For the avoidance of doubt, the Borisch Parties are expressly excluded from the definitions of Consenting Creditors, Released Parties, and Releasing Parties, the intent of the Trustee being that the Borisch Parties are neither giving nor receiving any releases under this Plan.

Each of the Releasing Parties knowingly grants the Third-Party Releases notwithstanding that each Releasing Party may hereafter discover facts in addition to, or different from, those which either such Releasing Party now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and each Releasing Party expressly waives any and all rights that such Releasing Party may have under any statute or common law principle which would limit the effect of the Third-Party Release to those claims actually known or suspected to exist as of the Effective Date.  In connection with their agreement to the foregoing Third-Party Releases, the Releasing Parties knowingly and voluntarily waive and relinquish any and all provisions, rights, and benefits conferred by any law of the United States or any state or territory of the United States, or principle of common law, which governs or limits a person's release of unknown claims, comparable or equivalent to California Civil Code § 1542, which provides:  "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

E.      *Injunction and Stay.*

Upon the Effective Date, and except as otherwise expressly provided in this Plan, all Persons who have held, hold, or may hold Claims against or Equity Interests in any Debtor are permanently enjoined, from (i) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Equity Interest against the Estates, (ii) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against any of the Debtors' Estates with respect to any such Claim or Equity Interest, (iii) creating, perfecting, or enforcing any encumbrance of any kind against any of the Debtors, or against the property or interests in property of any of the Debtors, as applicable with respect to any such Claim or Equity Interest, (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from any of the Debtors' Estates, or against the property or interests in property of any of the Debtors' Estates with respect to any such Claim or Equity Interest, or (v) with respect to any Releasing Party, pursuing any claim released or exculpated under the Plan.

Each holder of a Claim or Equity Interest shall be bound by the injunction provisions set forth in this section.  The Trustee, the Released Parties, or the Exculpated Parties shall be entitled to seek sanctions by motion for contempt or other appropriate proceeding for any violations of the Confirmation Order or this Plan, including the Exculpation, Injunction and Stay, and Gate Keeping provisions set forth in this Plan.

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect at least until the Effective Date.

F.      *Gate Keeping.*

No Person or Entity may commence or pursue a claim or cause of action of any kind against any Exculpated Party that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a claim or cause of action subject to <u>sections X.B, X.C, X.D, and X.E</u> hereof, including any claim or cause of action that was asserted or assertable on behalf of the Debtors, including any

4924-3833-3515

**derivative, alter ego, successor liability, or similar claims and Causes of Action based on general harm to the Debtors, holders of Claims and Equity Interests, or any other party in interest, or a theory of lack of separation between the Debtors and an Exculpated Party, without the Bankruptcy Court (i) first determining, upon motion that attaches a copy of the proposed complaint or petition, and after notice and a hearing, that such claim or cause of action represents a direct (as opposed to derivative) and colorable claim of any kind and (ii) specifically authorizing such Person to bring such claim or cause of action against the any Exculpated Party.  At the hearing on such motion, the Bankruptcy Court shall have sole and exclusive jurisdiction to assess whether the proposed complaint or petition satisfies the applicable Federal Rules of Civil Procedure (or other applicable rules of procedure) and to determine whether such claim or cause of action represents a colorable claim of any kind.  For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any claims or Causes of Action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending.  The Bankruptcy Court reserves jurisdiction to adjudicate any such claims to the maximum extent provided by applicable law.**

G.    *Setoffs and Recoupment.*

The Trustee or the Creditor Trust, as appropriate, may, but shall not be required to, setoff against or recoup from any Claim any rights to payment that any of the Debtors may have against the holder of such Claim.  Neither the failure of the Trustee or the Creditor Trust to setoff or recoup, nor the Allowance of any Claim, shall constitute a waiver or release by the Trustee or the Creditor Trust, as appropriate, of any right to payment, or right of setoff or recoupment.

H.    *Rejection of Contracts and Leases.*

Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, each Debtor shall be deemed to have rejected each executory contract and unexpired lease to which it is a party, unless such contract or lease (i) was previously assumed, assumed and assigned, or rejected by the Debtors or the Trustee, (ii) previously expired or terminated pursuant to its own terms, or (iii) is the subject of a motion to assume, assume and assign, or reject filed by the Trustee on or before the Effective Date.  The Confirmation Order shall constitute an order of the Bankruptcy Court pursuant to sections 365 and 1123(b) of the Bankruptcy Code approving the contract and lease rejections described above, as of the Effective Date.  The rejections set forth in this section shall include rejecting any obligations of the Debtors pursuant to their corporate charters, by-laws, limited liability company agreements, or other organizational documents and agreements to indemnify any officers or directors of the Debtors for any prepetition actions or failures to act.

A holder of a Claim arising from the rejection of an executory contract or unexpired lease that was not previously rejected pursuant to prior order of the Bankruptcy Code shall have until the Rejection Damages Bar Date to file a Claim.  The Trustee or the Creditor Trustee, as applicable, must file objections, if any, to any such Claims on or before the later of: (A) the first Business Day that is thirty (30) days after the Rejection Damages Bar Date, or (B) the Objection Deadline.  A holder of an Allowed Claim arising from the rejection of an executory contract or unexpired lease shall have a Class 5 General Unsecured Claim. Notwithstanding anything to the contrary contained herein, neither this Plan nor entry of the Confirmation Order shall reject, discharge, impair or otherwise modify (a) any insurance policies maintained by the Debtors as of the Confirmation Date or (b) any obligations owed to the Debtors or any other parties, including any additional insureds, by non-Debtor parties to any insurance policies maintained by the Debtors or the Trustee as of the Confirmation Date.  For the avoidance of doubt, the Trustee reserves all rights, claims, offsets, setoffs, defenses, counterclaims and all other interests relating to any and all of their insurance policies.

Unless otherwise specified, each executory contract and unexpired lease shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease.

4924-3833-3515

I.       *Compromise of Controversies.*

In consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims and controversies resolved under the Plan, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019.

## ARTICLE XI
## RETENTION OF JURISDICTION

The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, or related to, the Debtors' Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(i)       To hear and determine pending applications for the assumption, assignment, or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom;

(ii)      To determine any and all adversary proceedings, applications, and contested matters in the Chapter 11 Cases and grant or deny any application involving the Debtors that may be pending on the Effective Date or that are retained and preserved herein;

(iii)     To ensure that distributions to holders of Allowed Claims are effected as provided in the Plan;

(iv)      To hear and determine any timely objections to Administrative Claims or to proofs of Claim, including any objections to the classification of any Claim, and to allow or disallow any Disputed Claim, in whole or in part;

(v)       To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(vi)      To take any action and issue such orders, after the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate the Plan or any prior order of the Bankruptcy, or to maintain the integrity of the Plan, the Malibu Settlement Agreement, or any prior order entered by the Bankruptcy Court during these Chapter 11 Cases;

(vii)     To consider any amendments to or modifications of the Plan, or to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(viii)    To hear and determine all requests for payment of Professional Fee Claims;

(ix)      To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, the Creditor Trust Agreement, the documents that are ancillary to and aid in effectuating the Plan or any agreement, instrument, or other document governing or relating to any of the foregoing;

(x)       To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

(xi)      To adjudicate, decide, or resolve any and all

(xii)     To hear any other matter not inconsistent with the Bankruptcy Code;

(xiii)    To hear and determine all disputes involving the existence, scope, and nature of the exculpations and releases granted hereunder, including the matters set forth in section X.E hereof;

(xiv)    To issue injunctions and effect any other actions that may be necessary or desirable to restrain interference by any entity with the consummation or implementation of the Plan;

(xv)    To hear and determine all requests to extend the Objection Deadline, the term of the Creditor Trust, or any other deadlines established by the Plan; and

(xvi)    To enter a Final Decree(s) closing the Chapter 11 Cases.

The Bankruptcy Court's jurisdiction to adjudicate, decide, or resolve any and all matters related to the Retained Causes of Action shall be non-exclusive.

**ARTICLE XII**
**MISCELLANEOUS**

*A.    Filing of Additional Documents.*

The Trustee or the Creditor Trust may file such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

*B.    Schedules, Exhibits, and Plan Supplement Incorporated.*

All exhibits and schedules to the Plan, if any, and the documents contained in the Plan Supplement, if any, are incorporated into and are a part of the Plan as if fully set forth herein.

*C.    Amendment or Modification of the Plan.*

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, alterations, amendments or modifications of the Plan may be proposed in writing by the Trustee at any time prior to or after the entry of the Confirmation Order. Holders of Claims and Equity Interests that have accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, or modified; *provided*, *however*, that any holders of Claims and Equity Interests who were deemed to accept the Plan because such Claims and Equity Interests were unimpaired shall continue to be deemed to accept the Plan only if, after giving effect to such amendment or modification, such Claims and Equity Interests continue to be unimpaired.

*D.    Inconsistency.*

In the event of any inconsistency among the Plan, the Disclosure Statement, and any exhibit or schedule to the Disclosure Statement or the Plan, the provisions of the Plan shall govern. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall govern.

*E.    Expedited Tax Determination.*

The Trustee or the Creditor Trust may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Debtors for any and all taxable periods ending after the Petition Date through, and including, the Effective Date.

*F.    Binding Effect.*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the

4924-3833-3515

Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

**G.       Severability.**

If the Bankruptcy Court determines that any provision of this Plan is unenforceable either on its face or as applied to any Claim or Equity Interest, the Trustee may modify this Plan in accordance with <u>section XII.C</u> hereof so that such provision shall not be applicable to the holder of any Claim or Equity Interest.  Any determination of unenforceability shall not (i) limit or affect the enforceability and operative effect of any other provisions of this Plan; or (ii) require the resolicitation of any acceptance or rejection of this Plan unless otherwise ordered by the Bankruptcy Court.

**H.       No Payment of Attorneys' Fees.**

Except for Professional Fee Claims, no attorneys' fees shall be paid by the Debtors with respect to any Claim or Equity Interest unless otherwise specified in this Plan or a Final Order of the Bankruptcy Court.

**I.       Notices.**

All notices, requests, and demands to or upon the Trustee to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

**GRAY REED**
1601 Elm Street, Suite 4600
Dallas, TX 75201
Attn: Aaron M. Kaufman and Lydia R. Webb
Telephone:    (214) 954-4135
Facsimile:    (214) 953-1332
Email:    akaufman@grayreed.com
              lwebb@grayreed.com

With a copy to the Committee:

**REED SMITH**
2800 N. Harwood St., Suite 1500
Dallas, TX 75201
Attn:  Keith M. Aurzada, Michael P. Cooley, and Dylan T.F. Ross
Telephone:    (469) 680-4200
Facsimile:    (469) 680-4299
Email:    kaurzada@reedsmith.com
              mpcooley@reedsmith.com
              dylan.ross@reedsmith.com

**J.       Governing Law.**

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to the Plan provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas, without giving effect to the principles of conflict of laws that would require application of the laws of another jurisdiction.

Dated:   June 6, 2025

4924-3833-3515

Fort Worth, Texas

*[Remainder of page intentionally left blank.]*

33

**Mark E. Andrews, Chapter 11 Trustee**

By: */s/ Mark E. Andrews*
Mark E. Andrews,
Chapter 11 Trustee for the Debtors

**GRAY REED**
Jason S. Brookner (TX Bar No. 24033684)
Aaron M. Kaufman (Texas Bar No. 24060067)
Lydia R. Webb (Texas Bar No. 24083758)
Emily F. Shanks (Texas Bar No. 24110350)
1601 Elm Street, Suite 4600
Dallas, TX 75201
Telephone:    (214) 954-4135
Facsimile:    (214) 953-1332
Email:        jbrookner@grayreed.com
              akaufman@grayreed.com
              lwebb@grayreed.com
              eshanks@grayreed.com

*Counsel to Mark E. Andrews,*
*Chapter 11 Trustee*

34

4924-3833-3515

**<u>Exhibit B</u>**

**Transcript of Oral Ruling from July 18, 2025**
**[Docket No. 1033]**

```
1                    IN THE UNITED STATES BANKRUPTCY COURT
                      FOR THE NORTHERN DISTRICT OF TEXAS
2                             FORT WORTH DIVISION

3    In Re:                          )    Case No. 24-90000-elm-11
                                     )    (Jointly Administered)
     TOMMY'S FORT WORTH, LLC,        )
4    et al.,                         )    Fort Worth, Texas
                                     )    July 18, 2025
5            Debtors.                )    10:30 a.m. Docket
                                     )
6                                    )    RULING RE: CONFIRMATION OF
                                     )    CHAPTER 11 PLAN FILED BY
7                                    )    TRUSTEE MARK E. ANDREWS [879]
                                     )
8    _____)

9                        TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE EDWARD L. MORRIS,
10                   UNITED STATES BANKRUPTCY JUDGE.

11   APPEARANCES:

12   For Trustee Mark Andrews:    Aaron Michael Kaufman
                                  GRAY REED, LLP
13                                1601 Elm Street, Suite 4600
                                  Dallas, TX  75201
14                                (469) 320-6050

15   For M&T Bank:                Toby L. Gerber
                                  NORTON ROSE FULBRIGHT US, LLP
16                                2200 Ross Avenue, Suite 3600
                                  Dallas, TX  75201-7932
17                                (214) 855-7171

18   For Matthew Borisch:         Floyd E. Gates, Jr.
                                  BODMAN, PLC
19                                99 Monroe Avenue NW, Suite 300
                                  Grand Rapids, MI  49503
20                                (616) 205-1860

21   For Matthew Borisch:         Marc Bakst
                                  BODMAN, PLC
22                                1901 St. Antoine Street
                                  6th Floor at Ford Field
23                                Detroit, MI  48226
                                  (313) 393-7530

24

25
```

```
 1   APPEARANCES, cont'd.:

 2   For Matthew Borisch and      H. Dustin Fillmore, IV
     Borisch Parties:             MCDONALD SANDERS, P.C.
 3                                 777 Main Street, Suite 2700
                                   Fort Worth, TX  76102
 4                                 (817) 336-8651

 5   For Malibu Boats, Inc.:      Daniel S. Shamah
                                   COOLEY, LLP
 6                                 55 Hudson Yards
                                   New York, NY  10001
 7                                 (212) 479-6000

 8   For Joshua Magill:           Judith W. Ross
                                   ROSS, SMITH & BINFORD, P.C.
 9                                 700 N. Pearl Street, Suite 1610
                                   Dallas, TX  75201
10                                 (214) 377-7879

11   For the Official Committee   Dylan Tanner Franklin Ross
     of Unsecured Creditors:      REED SMITH, LLP
12                                 2850 N. Harwood Street, Suite 1500
                                   Dallas, TX  75201
13                                 (469) 680-4262

14   For the U.S. Trustee:        Meredyth Kippes
                                   OFFICE OF THE UNITED STATES
15                                   TRUSTEE
                                   1100 Commerce Street, Room 976
16                                 Dallas, TX  75242-1496
                                   (214) 767-1075
17
     Recorded by:                 Karyn Rueter
18                                 UNITED STATES BANKRUPTCY COURT
                                   501 W. 10th Street
19                                 Fort Worth, TX  76102
                                   (817) 333-6036
20
     Transcribed by:              Kathy Rehling
21                                 311 Paradise Cove
                                   Shady Shores, TX  76208
22                                 (972) 786-3063

23

24

            Proceedings recorded by electronic sound recording;
25             transcript produced by transcription service.
```

1          FORT WORTH, TEXAS - JULY 18, 2025 - 11:33 A.M.

2          THE COURT:  All right.  Good morning, everybody.

3  We're on the July 18, 2025 10:30 a.m. docket.  Let me first

4  say I apologize to folks for the tardiness in coming out, but

5  I appreciate everybody's patience.

6      We have on the docket today Tommy's Fort Worth, LLC and

7  their affiliated debtors' cases, jointly administered under

8  Case 24-90000.

9      Let me just confirm that I have relevant people in

10 attendance.  So let's ensure that we have somebody on behalf

11 of the Chapter 11 Trustee.

12         MR. KAUFMAN:  Good morning, Your Honor.  Aaron

13 Kaufman from Gray Reed for the Trustee.

14         THE COURT:  All right.  Do we have anybody on behalf

15 of the Borisch Parties?

16         MR. BAKST:  Yes, Your Honor.  This is Marc Bakst.

17 And also on the WebEx is Floyd Gates and Dustin Fillmore, our

18 local Texas counsel.

19         THE COURT:  Okay.  Great.  Anybody for M&T Bank?

20         MR. GERBER:  Yes, Your Honor.  Toby Gerber on behalf

21 of M&T Bank.

22         THE COURT:  All right.  How about for the Committee?

23         MR. ROSS:  Good morning, Your Honor.  Dylan Ross

24 with Reed Smith on behalf of the Committee.

25         THE COURT:  All right.  And the U.S. Trustee?

1           MS. KIPPES:  Yes, Your Honor.  Meredyth Kippes on

2   behalf of the United States Trustee.

3           THE COURT:  Okay, Ms. Kippes.

4       All right.  Do we have anybody else wishing to make a

5   formal appearance for today's hearing, understanding that

6   it's just for the purpose of rendering a ruling?

7           MS. ROSS:  Yes, Your Honor.  Judith Ross on behalf

8   of Joshua Magill.

9           THE COURT:  Okay, Ms. Ross.

10          MR. SHAMAH:  Daniel Shamah.  Daniel Shamah; Cooley;

11  on behalf of Malibu.

12          THE COURT:  All right.  Very good.  Good morning to

13  you all.

14      All right.  Let me go ahead and just dive straight in.

15  This jointly-administered bankruptcy case involves the

16  Chapter 11 cases of Tommy's Fort Worth, LLC; Tommy's Holding

17  Company, LLC; Tommy's Grand Rapids, LLC; Tommy's Castaic,

18  LLC; Tommy's Lewisville, LLC; High Country Watersports, LLC;

19  Walloon Lake Village Marina, LLC; MKB Florida Holdings, LLC;

20  Tommy's Detroit, LLC; Tommy's California Fresno, LLC; Tommy's

21  Phoenix, LLC; Tommy's Las Vegas, LLC; Tommy's Chattanooga,

22  LLC; Tommy's California Ventura, LLC; Tommy's Rancho Cordova,

23  LLC; Tommy's Stockton, LLC; and Tommy's Knoxville, LLC, which

24  I will collectively refer to as the "Debtors."

25      The Debtors filed their respective Chapter 11 bankruptcy

1  cases between May 20th and 21st, 2024.  The Court approved

2  joint administration of the cases under Case No. 24-90000,

3  which I will refer to as the "Bankruptcy Case."

4       Initially, the Debtors maintained control of their

5  operations and assets of the bankruptcy estates as debtors-

6  in-possession.  During this time frame, on June 24, 2024, the

7  United States Trustee appointed a four-member Official

8  Committee of Unsecured Creditors, or just the "Committee" for

9  short, comprised of sophisticated business organizations

10 holding substantial unsecured claims against the Debtors to

11 represent the interests of unsecured creditors in the

12 Bankruptcy Case.  *See* Docket No. 197.

13      With the approval of the Court, the Committee employed

14 well-known, sophisticated legal counsel, Reed Smith, to

15 represent it in connection with the Bankruptcy Case.  *See*

16 Docket No. 384.

17      On June 14, 2024, at the request of M&T Bank, who I will

18 sometimes refer to as the "Prepetition Lender," consistent

19 with the terminology of the Plan, and with the consent of the

20 Debtors and no opposition from any other party in interest,

21 the Court entered an order directing the appointment of a

22 Chapter 11 trustee in the Bankruptcy Case.  *See* Docket No.

23 173.

24      Shortly thereafter, the United States Trustee appointed

25 Mark E. Andrews, who I will hereafter refer to as the

1    "Trustee," to serve as the disinterested independent Chapter

2    11 Trustee, which appointment was approved by the Court on

3    June 18, 2024.  *See* Docket Nos. 174 and 178.

4         With the approval of the Court, the Trustee employed

5    well-known, sophisticated counsel, Gray Reed, to represent

6    him in connection with the Bankruptcy Case and employed

7    Trinity River Advisors to serve as his financial advisor.

8    *See* Docket Nos. 302 and 365.

9         Now before the Court for determination in the Bankruptcy

10   Case is confirmation of the Trustee's First Amended Joint

11   Chapter 11 Plan, as Modified and Supplemented.  More

12   specifically, on May 1, 2025, the Trustee filed the Trustee's

13   First Amended Joint Chapter 11 Plan at Docket No. 879, which

14   I will refer to as the "Original Plan."  *See* Trustee's

15   Exhibit 1.

16        On June 6, 2025, the Trustee filed a Notice of

17   Modification to Trustee's First Amended Joint Chapter 11 Plan

18   at Docket No. 935, which I will refer to as the "Plan

19   Modification."  *See* Trustee's Exhibit 14.

20        As contemplated by the Original Plan, the Original Plan

21   was supplemented by the Notice of Plan Supplement filed at

22   Docket No. 917, which was thereafter amended by the Notice of

23   Amended Plan Supplement filed at Docket No. 1002.  I will

24   collectively refer to these supplemental plan documents as

25   the "Plan Supplement."  *See* Trustee Exhibit 7 and M&T Exhibit

1.

I will hereafter refer to the Original Plan as modified by the Plan Modification and as supplemented by the Plan Supplement as just the "Plan."

Objections to confirmation of the Plan were timely filed by the following parties. First, the Tennessee Attorney General Bankruptcy Division on behalf of the Tennessee Department of Revenue, or just the "Tennessee Department of Revenue," at Docket No. 923, which I will refer to as the "TDOR Objection."

Second, the United States Trustee at Docket No. 934, which I will refer to as the "UST Objection."

And third, Matthew A. Borisch, or just "Borisch" for short, and certain of his affiliates, who I will name momentarily, at Docket No. 994, which I will refer to as the "Borisch Objection."

The affiliated Borisch Parties who have joined with Borisch in the Borisch Objection are Kara A. Borisch; Jonathan L. Borisch; MKB Holdings, LLC a/k/a Simplified Investments; the Matthew Allen Borisch Trust; the Kara Ann Borisch Trust; Walloon Lake Facilities, LLC; Walloon Lake Holdings; JLB Restaurant Holdings, LLC; MKB Restaurant Holdings, LLC; Hotel Walloon; Gen3 Defense and Aerospace, LLC; Expedited Travel, LLC; JLB Property Holdings, LLC; Legacy Water Sports and Marina; Steadfast Marine; the Michael

1    Allen Borisch Trust; and Matthew Allen Borisch Trust UAD

2    September 19, 2005, who collectively, along with Borisch, I

3    will refer to as the "Borisch Parties."

4        I will also note that the Borisch Parties as I have just

5    defined the term is the same as the definition of Borisch

6    Parties used in the Plan.

7        In response to the objections, the following responses or

8    replies, as applicable, have been filed, which I will

9    collectively refer to as the "Replies."  First, the omnibus

10   reply filed by the Trustee at Docket No. 937 in response to

11   the TDOR Objection and UST Objection.  Second, the response

12   filed by the Prepetition Lender at Docket No. 1009 in

13   response to the Borisch Objection.  And third, the

14   Supplemental Reply filed by the Trustee at Docket No. 1015 in

15   response to the Borisch Objection.

16       On July 8, 2025, the Court conducted an evidentiary

17   hearing with respect to confirmation of the Plan.

18   Participating in the hearing, individually and/or by and

19   through counsel, were, among other parties, the Trustee, the

20   Committee, the Prepetition Lender, the Borisch Parties, and

21   the United States Trustee.

22       At the commencement of the hearing, Trustee's counsel

23   announced that certain stipulations with respect to claim

24   classification and treatment, as well as certain additional

25   modifications to the Plan, had been agreed upon to address

certain informal comments or objections to the Plan/
Confirmation and to resolve the TDOR Objection.  The
stipulations, all of which have previously been approved by
the Court, have been filed at Docket Nos. 930, 931, 932, 933,
and 1004.  *See also* Trustee Exhibits 10 through 13.

The other modifications have been incorporated into the
form of the Proposed Confirmation Order filed by the Trustee
at Docket No. 1017, which I will refer to as the "Proposed
Confirmation Order."  *See* Proposed Confirmation Order
Paragraphs 20, 21, and 23.

I will collectively refer to the stipulations and
modifications as the "Additional Plan Modifications," and
will collectively refer to the earlier-referenced Plan
Modification and the Additional Plan Modifications as just
the "Plan Modifications."

At the hearing, declaration and live testimony of the
Trustee was presented; declaration and live testimony of a
representative of Omni Agent Solutions, Inc., or just "Omni"
for short, the Court-Approved Claims, Noticing, and
Soliciting Agent in the Bankruptcy Case, was presented; and
live testimony of Borisch was presented.

At the conclusion of the hearing, the Court set a follow-
up hearing for July 17, 2025 for the purpose of rendering a
decision on confirmation, which was thereafter reset to
today, July 18, 2025.

1        Having now considered the Original Plan, the Plan

2   Modification, the Plan Supplement, the TDOR Objection, the

3   UST Objection, the Borisch Objection, the Replies, the

4   Additional Plan Modifications, the additional filings and

5   orders that I hereafter reference, of which the Court takes

6   judicial notice, the evidence introduced at the hearing, the

7   representations and arguments of counsel, and the entirety of

8   the record in the Bankruptcy Court, the Court now issues the

9   following Findings of Fact, Conclusions of Law, and Ruling on

10  Confirmation of the Plan, as Modified by the Additional Plan

11  Modifications.

12       For purposes of the ruling and for ease of reference,

13  unless I have separately defined or hereafter separately

14  define a term, I will utilize the same defined terms as set

15  forth in Section I.A. of the Plan.

16       Starting with Jurisdiction.

17       The Court has jurisdiction of the proceeding involving

18  confirmation of the Plan pursuant to 28 U.S.C. Sections 1334

19  and 157 and Miscellaneous Order No. 33 of the United States

20  District Court for the Northern District of Texas.

21       Venue of the Bankruptcy Case and this proceeding in this

22  district is proper pursuant to 28 U.S.C. Sections 1408 and

23  1409.

24       This proceeding constitutes a core proceeding pursuant to

25  28 U.S.C. Section 157(b)(2)(A), (L), and (O).

1        Turning to the Factual Background.

2        Background information with respect to the Debtors,

3 including their corporate history and structure, prepetition

4 capital structure, and the circumstances leading to the

5 Chapter 11 filings is set out in the "Background and Events

6 Leading up to Chapter 11" section of the Disclosure

7 Statement.  *See* Disclosure Statement Section II.

8        The Court also makes reference to the Court's recently-

9 entered Memorandum Opinion at Docket No. 897, which I will

10 refer to as the "May 2025 Opinion."

11        As explained in the Disclosure Statement and May 2025

12 Opinion, the Debtors operated a business under the brand name

13 Tommy's which originated in Colorado in 2012.  Each of the

14 Debtors is directly or indirectly owned by Borisch or the

15 Matthew Allen Borisch Trust.  At all relevant times up to the

16 date of the Trustee's appointment as Chapter 11 Trustee,

17 Borisch served as the president of each of the Debtors.  As

18 of the time of the bankruptcy filings, the Debtors claimed to

19 be the world's largest dealer of ski and wake boats, offering

20 a wide range of services, with fourteen dealerships and five

21 on-water rental programs across Texas, Colorado, Michigan,

22 Arizona, California, Florida, Nevada, and Tennessee.

23        Prepetition, Tommy's principal dealership relationship

24 was with Malibu Boats.

25        In May 2023, Tommy's transitioned its lending

1  relationship to the Prepetition Lender, whereupon its

2  floorplan facility was increased to $110 million, with an

3  additional revolving line of credit of up to $5 million.  The

4  debt was secured by substantially all of the assets of the

5  Debtors.

6      As additional credit support, the Prepetition Lender

7  obtained a personal guaranty from Borisch, and possibly

8  certain other Borisch affiliates.

9      As of the petition date, the Debtors owed approximately

10  $105.7 million to the Prepetition Lender.

11      A.   The Souring of the Malibu Boats and M&T Bank

12  Relationships.

13      For reasons more thoroughly discussed within the

14  Disclosure Statement and May 2025 Opinion, the Debtors'

15  relationships with Malibu Boats and the Prepetition Lender

16  began to disintegrate in late 2023 and early 2024.  And it is

17  an understatement to say that friction existed and continues

18  to exist between Borisch on the one hand and Malibu Boats and

19  the Prepetition Lender on the other hand.

20      Among other things, prior to the Bankruptcy Case, Borisch

21  caused the Debtors to initiate litigation against Malibu

22  Boats, and postpetition, following the Trustee's appointment,

23  Borisch individually sued Malibu Boats.

24      Separately, in response to the Prepetition Lender's

25  actions to collect on the personal guaranty provided by

1    Borisch, Borisch has aggressively taken steps to not only

2    ensure that his defenses to the guaranty litigation are

3    preserved, but to also pursue affirmative litigation claims

4    against the Prepetition Lender.

5         Specifically, in relation to the latter case, after the

6    Trustee was appointed Borisch filed a motion for leave in the

7    state court guaranty litigation to pursue a variety of

8    counterclaims against the Prepetition Lender.  Thus, as

9    indicated, there is no love lost between Borisch on the one

10   hand and Malibu Boats and the Prepetition Lender on the

11   other.

12        Of note, the pursuit of litigation by Borisch in his

13   individual capacity against both Malibu Boats and the

14   Prepetition Lender presented complications to the Trustee in

15   his efforts to negotiate with Malibu Boats and the

16   Prepetition Lender, given Borisch's improper assertion of

17   estate-owned causes of action in addition to individually-

18   owned claims.  The May 2025 Opinion provides details with

19   respect to the improper actions taken by Borisch.

20        B.  The Trustee's Efforts to Administer the Estates.

21        In any event, rewinding to the time of the Trustee's

22   appointment, when the Trustee joined the fray in June 2024 a

23   viable cash collateral order was not in place.  In fact, the

24   Trustee's appointment was brought about as a result of the

25   Prepetition Lender's withholding of consent to the continuing

use of cash collateral and the Debtors' inability to override
such lack of consent because of a failure to establish that
the Prepetition Lender's interest in cash collateral was
being adequately protected.

Hence, the first order of business for the Trustee was to
pursue a workable agreement with the Prepetition Lender for
use of cash collateral.  The Trustee was successful in
negotiating such an agreement and obtaining the Court's
approval of the agreement, even over the objection of
Borisch.  *See* Docket Nos. 272 and 353.

The second order of business was for the Trustee to then
figure out what to do with the Debtors' continuing, albeit
substantially scaled-back, business operations and boat
inventory in the face of terminated Malibu Boats dealership
agreements, unresolved Malibu Boats disputes, and outstanding
customer obligations.

In relation to the business overall and existing boat
inventory, in early August 2024 the Court approved certain
liquidation procedures and the Trustee's engagement of Gordon
Brothers Retail Partners, LLC as a liquidation consultant for
the Trustee.  *See* Docket No. 364.

As explained in the Disclosure Statement, implementation
of the liquidation process resulted in excess of $50 million
in value for the Debtors' estates.

Additionally, the Trustee obtained court approval for the

sale of certain dealership assets.  *See* Docket Nos. 421, 446, and 608.

In relation to customer obligations, in mid-September 2024 the Court approved a set of complex procedures proposed by the Trustee to address a variety of thorny customer matters, including customer deposit issues, title and registration fee issues, sales tax issues, and warranty issues.  *See* Docket No. 468.

The Trustee's implementation of such procedures resulted in the resolution of many outstanding obligations.  Among the issues that were not resolved, however, were certain claims associated with unremitted proceeds from the sale of customer boats and trade-in and consignment matters related thereto. Remaining customer claims involving these types of matters have been classified as Customer Constructive Trust Claims within Class 4 of the Plan.

Finally, in relation to Malibu Boats dealership issues, in October 2024, with the assistance of retired Judge Nancy Atlas, the Trustee and Malibu Boats reached agreement on the terms of a comprehensive resolution of all estate claims against Malibu Boats and all Malibu Boats claims against the Debtors' estates.  Both the Prepetition Lender and the Committee attended and participated in the mediation. Borisch was not involved, but the Court notes that he was in the midst of his improper pursuit of estate-owned causes of

1  action against Malibu Boats, and thus likely would have only

2  created unnecessary distraction to the negotiations.

3      While Borisch objected to the Trustee's settlement with

4  Malibu Boats, the Malibu Boats Settlement was approved by the

5  Court in late November 2024.  *See* Docket No. 602.

6      With that matter taken care of, the Trustee was then in a

7  position to finally assess whether a viable Chapter 11 plan

8  could be formulated to wind up the Bankruptcy Case.

9  Ultimately, given the outstanding unpaid amount of the

10  Prepetition Lender debt and the Prepetition Lender's liens in

11  cash collateral, the limited amount, if any, of unencumbered

12  cash in the estates, and the amount of unpaid priority

13  unsecured debt, the viability of any Chapter 11 plan would

14  necessarily be dependent upon reaching an agreement with the

15  Prepetition Lender for its contribution of a substantial

16  amount of the remaining cash collateral for plan purposes.

17      Consequently, the Trustee focused his initial plan

18  development negotiations on the Prepetition Lender, because

19  without a deal with the Prepetition Lender, there would be no

20  viable Chapter 11 Plan.

21      In engaging in early discussions with the Prepetition

22  Lender, the Prepetition Lender was obviously interested in

23  how, if at all, the guaranty provided by Borisch to the

24  Prepetition Lender would be addressed and how any causes of

25  action against Borisch would be administered.  Given the

recent success in negotiating a Malibu Boats settlement with the assistance of Judge Atlas, thought was given by the parties to the possibility of an additional mediation session with Judge Atlas in relation to these Borisch issues.

Desiring to facilitate a truly global resolution of all issues, the Trustee attempted to work with the parties to obtain an agreement for such a mediation.  In this regard, in late November 2024, Trustee's counsel reported to Prepetition Lender's counsel and Committee's counsel that the Trustee team had connected with Borisch and his father, and that Borisch and his father had indicated a willingness to commit to a formal mediation with Judge Atlas to address the guaranty and estate claims issues.  *See* Borisch Exhibit 56.

Importantly, from the Prepetition Lender's perspective, given the magnitude of the loan deficiency that it was facing -- *i.e.*, roughly $50 million -- a mediation with Borisch would only make sense if Borisch were willing to (a) come to the mediation with a substantial opening offer to the Prepetition Lender on the guaranty claim, and (b) provide financial disclosures to back up any asserted inability to provide more.  These conditions were reported back to the Borisch camp.

While awaiting word from the Borisch camp, the Trustee marched forward with his effort to negotiate a plan construct with the Prepetition Lender that would commit sufficient cash

1    collateral to make a plan viable.  In this regard, in late

2    December 2024, Trustee's counsel circulated a draft plan term

3    sheet to Prepetition Lender's counsel.  *See* Borisch Exhibit

4    31.

5         About a week later, on January 7th, 2025, Trustee's

6    counsel checked in with Prepetition Lender's counsel to again

7    urge the parties to advance the ball on plan construct

8    concepts while awaiting word from Borisch.  Prepetition

9    Lender's counsel reported, however, that they wanted to first

10   know whether a Borisch mediation and potential settlement

11   would materialize before moving forward.  *See* Borisch Exhibit

12   32.

13        Thereafter, while Borisch remained supportive of a

14   mediation, he made it clear that he would meet neither of the

15   Prepetition Lender's preconditions to a mediation.  Thus, as

16   a result of the stalemate between Borisch and the Prepetition

17   Lender, the mediation effort fell apart.

18        At that point, the Trustee again focused his efforts on

19   the negotiation of a deal with the Prepetition Lender.

20   Eventually, the parameters of a potential deal began to

21   crystallize, whereby the Prepetition Lender would agree to

22   the use of cash collateral to fund certain specified plan

23   reserves, and among other things, the plan would include

24   certain third-party release provisions in favor of the

25   Prepetition Lender.

1        Once the beginnings of a plan construct started to be

2   hammered out, the Trustee brought the Committee into the

3   negotiation fold and drafts of a plan began to be shared with

4   the Prepetition Lender and Committee.  While the Trustee

5   continued his efforts to bring the Prepetition Lender and

6   Borisch together for a group mediation -- *see, for example,*

7   Borisch Exhibit 54 -- it never happened.

8        Even so, Trustee's counsel noted to the parties in March

9   2025, in connection with circulating draft plan documents,

10  that should Borisch, following the filing of the plan, decide

11  to engage and take steps to meet, in one form or another, one

12  or both of the Prepetition Lender's preconditions for

13  mediation, a mediation could be scheduled prior to the

14  Confirmation Hearing to facilitate the potential for a truly

15  global settlement.  *See* Borisch Exhibit 27.  It never

16  happened.

17       C.   The Plan Settlement.

18       Thus, in the end, a comprehensive settlement was

19  negotiated by and among the Trustee, Prepetition Lender, and

20  Committee to be implemented under the Plan.  I will hereafter

21  refer to the comprehensive settlement as the "Plan

22  Settlement."

23       The Plan Settlement is comprised of the following

24  summarized material elements or aspects.  First, from the

25  Prepetition Lender's perspective, the Plan Settlement

provides for the following three categories of relief to the
Prepetition Lender:

(1) On account of and in partial satisfaction of the
allowed Prepetition Lender's Secured Claims, the Plan
provides for (a) payment to the Prepetition Lender on the
Effective Date of all cash held by the Debtors or the Trustee
as of such date, including the Malibu Settlement Payment if
received by then, except as necessary to fund the Plan
Reserves; plus (b) payment to the Prepetition Lender of the
Malibu Settlement Payment if received after the Effective
Date; plus (c) payment to the Prepetition Lender of any
additional cash receipts obtained after the Effective Date
from consummated sales of inventory, refunds of unearned
insurance premiums, merchant card receipts, or any other
assets that are not Creditor Trust Assets; plus (d) an
assignment to the Prepetition Lender of the Assigned Causes
of Action, being Retained Causes of Action against the
Borisch Parties, including Avoidance Actions against the
Borisch Parties.

The Plan provides for the remaining unpaid balance of the
Prepetition Lender's Secured Claims to be treated as a
deficiency General Unsecured Claim in Class 5 of the Plan.

(2) The Plan provides for a broad-based release in favor
of the Prepetition Lender and its current and former
officers, directors, managers, attorneys, and other

professional advisors from the Trustee on behalf of each of the Debtors, in accordance with the terms of the release set out in Section X.C. of the Plan, which I will hereafter refer to as the "Trustee Release."

(3) The Plan provides for a tailored release in favor of the Prepetition Lender and its current and former officers, directors, managers, attorneys, and other professional advisors from each of the "Releasing Parties," as defined in the Plan, in accordance with the terms of the releases set out in Section X.D. of the Plan, which I will hereafter refer to as the "Third-Party Releases."

For purposes of the Third-Party Releases, the term "Releasing Parties" is defined in the Plan as the Debtors, the Trustee, the Committee and its members, the Creditor Trustee, and the Consenting Creditors. *See* Plan Section I.A.84.

As made clear by the Plan Modification, the term "Releasing Parties" expressly excludes the Borisch Parties.

For purposes of the Third-Party Releases, the term "Consenting Creditors" is defined in the Plan as collectively the following holders of claims or equity interests:

(1) All holders of claims or equity interests who vote to accept the Plan and who do not check the box on the Third-Party Release Opt-Out Form, which I will hereafter define, to affirmatively opt out of the Third-Party Releases;

1      (2) All holders of claims who are deemed to have accepted

2    the Plan and who do not check the box on the Third-Party

3    Release Opt-Out Form to affirmatively opt out of the Third-

4    Party Releases;

5      (3) All holders of claims or equity interests who vote to

6    reject the Plan and who do not check the box on the Third-

7    Party Release Opt-Out Form to affirmatively opt out of the

8    Third-Party Releases or object to the Plan in respect of the

9    Third-Party Releases;

10      (4) All holders of claims or equity interests who are

11    deemed to have rejected the Plan and who do not check the box

12    on the Third-Party Release Opt-Out Form to affirmatively opt

13    out of the Third-Party Releases or object to the Plan in

14    respect of the Third-Party Releases; and

15      (5) All holders of claims or equity interests who have a

16    right to vote but abstain from voting on the Plan and who do

17    not check the box on the Third-Party Release Opt-Out Form to

18    affirmatively opt out of the Third-Party Releases or object

19    to the Plan in respect of the Third-Party Releases.  *See* Plan

20    Section I.A.27.

21      The Plan Modification, again, makes clear that the term

22    "Consenting Creditors" expressly excludes the Borisch

23    Parties.

24      Second, from the Committee's perspective, the Plan

25    Settlement provides the following six categories of relief to

1    unsecured creditors and the Committee:

2         (1) Noting the prospect for no recovery at all to

3    unsecured creditors, I should say nonpriority unsecured

4    creditors, in the absence of a settlement -- *see, for*

5    *example*, Paragraphs 61 through 62 of Trustee Exhibit 19 --

6    the Plan provides for the establishment of a Creditor Trust

7    on the Effective Date, for the benefit of holders of Allowed

8    General Unsecured Claims in Class 5 of the Plan, to be

9    administered by a Creditor Trustee, into which will be

10   transferred the Creditor Trust Assets, which will include all

11   Other Retained Causes of Action as of the Effective Date, the

12   Creditor Trust Reserve, any residual portions of the other

13   Plan Reserves, all insurance policies of the Debtors and

14   applicable policy proceeds, excluding refunds of unearned

15   insurance premiums, all tax assets of the Debtors, and any

16   other property of the Estates not otherwise distributed

17   pursuant to the Plan;

18        (2) The Prepetition Lender's contribution of $350,000 in

19   Contributed Cash Collateral to fund the Creditor Trust

20   Reserve under the Plan;

21        (3) The Prepetition Lender's agreement to the

22   subordination of its deficiency Class 5 General Unsecured

23   Claim to all other Class 5 General Unsecured Claims;

24        (4) The Plan provides for a broad-based release in favor

25   of the Committee and its members from the Trustee on behalf

1  of each and all of the Debtors, in accordance with the terms

2  of the Trustee Release;

3      (5) The Plan provides for a tailored release in favor of

4  the Committee and its members from each of the other

5  Releasing Parties, in accordance with the terms of the Third-

6  Party Releases;

7      (6) The Plan provides for a tailored release in favor of

8  each of the Consenting Creditors from each of the "Released

9  Parties," as defined in the Plan, in accordance with the

10  terms of the Third-Party Releases.

11      For purposes of the Third-Party Releases, the term

12  "Released Parties" is defined in the Plan as the Trustee,

13  each Debtor, the Committee and its members, the Creditor

14  Trustee, and M&T Bank and its current and former officers,

15  directors, managers, attorneys, and other professional

16  advisors.  *See* Plan Section I.A.83.

17      The Plan makes clear that the term "Released Parties"

18  expressly excludes the Borisch Parties.

19      Finally, from the Trustee's and Bankruptcy Estates'

20  perspective, the Plan Settlement provides the following three

21  categories of relief to the Bankruptcy Estates, creditors

22  generally, and the Trustee:

23      (1) The Prepetition Lender's contribution of in excess of

24  $3.7 million in Contributed Cash Collateral to fund Plan

25  Reserves necessary for the satisfaction of claims under the

Plan, as follows:

$500,000 for the Administrative Claims Reserve.  And of note, the Administrative Claims Reserve is separate from the Professional Fee Reserve provided for under the Cash Collateral Order, including funds maintained in the "Funded Reserve Account" as defined in the Cash Collateral Order, which reserve provides for a source of funds for budgeted fees and expenses of professional persons in the Bankruptcy Case that become allowed professional fees, and those funds also being cash collateral;

$2.4 million for the Priority Claims Reserve, taking into account the joint stipulation and agreed order entered at Docket No. 1004, which I will hereafter refer to as the "Plan Reserve Stipulation Order," which increased the $1.75 million amount referenced in the Plan to $2.4 million.  *See* Trustee Exhibit 20; and

$825,000 for the Customer Constructive Trust Claims Reserve, taking into account the Plan Reserve Stipulated Order, which increased the $360,000 amount referenced in the Plan to $825,000, to be used to satisfy Customer Constructive Trust Claims of holders who elect to be Consenting Creditors in relation to the Third-Party Releases by not opting out of the Third-Party Releases.

(2) The Prepetition Lender's contribution of $350,000 in Contributed Cash Collateral to fund the Creditor Trust

1  Reserve under the Plan, thereby enabling the Creditor Trust/

2  Creditor Trustee to administer the remaining assets of the

3  Estates that will be transferred to the Creditor Trust as

4  Creditor Trust Assets.

5      (3) The Plan provides for a tailored release in favor of

6  the Trustee and each of the Debtors from each of the other

7  Releasing Parties, in accordance with the terms of the Third-

8  Party Releases.  *See also* Trustee Exhibit 19, Paragraph 5.

9      With respect to the scope of the Third-Party Releases, in

10  summary, and subject to the specific terms of Section X.D. of

11  the Plan, the Third-Party Releases provide for two different

12  sets of releases.

13      First, the release of the Released Parties by the

14  Releasing Parties, to the fullest extent permissible under

15  applicable law, from any and all claims and causes of action

16  (and other similar descriptives), assertable directly or

17  derivatively, including any causes of action asserted or

18  assertable on behalf of the Debtors, the Trustee, the

19  Creditor Trust, or the Estates, as applicable, arising from,

20  relating to, or connected with the Debtors (or any

21  predecessor entity) or the Chapter 11 Cases or affecting

22  property of the Debtors' Estates, the Plan, or the

23  administration and implementation of the Plan, or based upon

24  any other related act or omission, transaction, agreement,

25  event, or other occurrence taking place on or before the

1  Effective Date.

2      Second, the release of each Consenting Creditor by the

3  Released Parties, to the fullest extent permissible under

4  applicable law, from any and all claims and causes of action

5  (and other similar descriptives), including Avoidance

6  Actions, assertable directly or derivatively, arising from,

7  relating to, or connected with the Debtors (or any

8  predecessor entity) or the Chapter 11 Cases or affecting

9  property of the Debtors' Estates, the Plan, or the

10  administration and implementation of the Plan, or based upon

11  any other related act or omission, transaction, agreement,

12  event, or other occurrence taking place on or before the

13  Effective Date.

14      For the avoidance of doubt, the Plan further provides

15  that such releases do not release (1) any obligations of any

16  party under the Plan or any document, instrument, or

17  agreement executed to implement the Plan; or (2) the rights

18  of holders of allowed claims to receive distributions under

19  the Plan.

20      The Trustee's reasons for agreeing to the Trustee Release

21  and why it is fair and equitable and in the best interests of

22  the Debtors' estates are set out in Paragraphs 29 through 35

23  of Trustee Exhibit 19.  The Trustee's reasons for agreeing

24  to, and agreeing to promote, the Third-Party Releases and why

25  the releases are necessary, appropriate, and justified under

1  the facts and circumstances of the Bankruptcy Case, why the

2  notice provided to holders of claims and equity interests of

3  the releases and of the opt-out procedure was reasonable and

4  sufficient to satisfy due process considerations, and why

5  each particular holder's failure to return a completed Third-

6  Party Release Opt-Out Form is a sufficient indication of

7  consent to the Third-Party Releases under the facts and

8  circumstances of the Bankruptcy Case are set out in

9  Paragraphs 36 through 41 of Trustee Exhibit 19.

10     D.  The Plan's Claim Classification Structure, Plan

11  Noticing and Voting, and Additional Plan-Related Filings.

12        To help further frame the issues in this case, it is also

13  helpful to outline the Plan classification structure and

14  approved noticing and voting procedures utilized by the

15  Trustee and to highlight certain additional confirmation-

16  related filings.

17        First, with respect to Plan structure, eight different

18  classes of claims and equity interests are established under

19  the Plan, seven for various types of claims and one for

20  equity interests.

21        Class 1 is for Priority Nontax Claims.

22        Class 2 is for the Prepetition Lender's Secured Claims.

23        Class 3 is for Other Secured Claims.

24        Class 4 is for Customer Constructive Trust Claims.

25        Class 5 is for General Unsecured Claims.

1      Class 6 is for Contribution Claims.

2      Class 7 is for Intercompany Claims.

3      And Class 8 is for Equity Interests.  *See* Plan Article

4 III.

5      Classes 1, 2, 4, 5, 6, 7, and 8 are all identified within

6 the Plan as impaired classes.  Class 7, the class established

7 for Intercompany Claims held by the Debtors against each

8 other, and Class 8, the sole class of Equity Interests held

9 in the Debtors, are both designated as classes that are

10 deemed to have rejected the Plan because the holders of such

11 claims and equity interests, respectively, will not receive

12 or retain anything on account of such claims or equity

13 interests under the Plan.

14      That said, in relation to Class 7, the class of

15 Intercompany Claims, the Plan is functionally an empty class

16 if the Plan's terms for the Plan Settlement and limited

17 substantive consolidation are taken into account.

18      The remaining classes, Classes 1, 2, 4, 5, and 6, are

19 designated as impaired classes of claims entitled to vote.

20 Importantly, this same structure was utilized under the

21 Original Plan.  In other words, the Plan Modification did not

22 change anything in relation to the Original Plan's

23 classification scheme.

24      With that in mind, the process and deadlines applicable

25 to the solicitation of votes on and the establishment of a

1   confirmation objection deadline with respect to the Plan were

2   in relation to the Original Plan because the Plan

3   Modification was not filed until after the initial deadlines

4   had passed.

5       With respect to the Original Plan, on May 1, 2025, the

6   Trustee filed his Proposed Disclosure Statement Regarding

7   Trustee's First Amended Joint Chapter 11 Plan at Docket No.

8   880, which I will refer to as the "Disclosure Statement."

9   *See* Trustee Exhibit 2.

10      On May 2nd, 2025, the Court entered an order at Docket

11   No. 882, which I will refer to as the "Solicitation Order,"

12   that approved the Disclosure Statement as containing adequate

13   information with respect to the Original Plan pursuant to 11

14   U.S.C. Section 1125 and approved certain solicitation and

15   noticing procedures, approved the forms of ballots and

16   notices to be used and sent, and established relevant

17   confirmation deadlines.  *See* Trustee Exhibit 4.

18      More specifically, pursuant to the Solicitation Order,

19   the Court approved, among other things:

20     (1) solicitation and voting procedures in relation to the

21   Original Plan.  *See* Attachment 1 to Solicitation Order.

22     (2) the form of ballots to be sent to the holders of

23   claims within Classes 1, 2, 5, and 6 of the Original Plan.

24   *See* Schedule 2A to Solicitation Order.

25     (3) the form of ballot to be sent to the holders of

claims within Class 4 of the Original Plan.  *See* Schedule 2B

to the Solicitation Order.

(4) the form of Notice of Non-Voting Status to be sent to

the holders of claims within Classes 3, 7, and 8 of the

Original Plan.  *See* Schedule 3 to Solicitation Order.

(5) the form of Notice of Non-Voting Status with Respect

to Disputed Claims to be sent to the holders of claims within

voting classes to which an objection to the allowance of the

claim has been lodged.  *See* Schedule 4 to Solicitation Order.

(6) the form of the Third-Party Release Opt-Out Form to

be used to opt out of the Third-Party Releases included as

part of the Plan Settlement proposed within the Original

Plan, or just the "Third-Party Release Opt-Out Form" for

short, to be sent to all holders of claims and equity

interests.  *See* Schedule 5 to Solicitation Order.

(7) the form of cover letter from the Trustee to be sent

to all holders of claims entitled to vote.  *See* Schedule 6 to

Solicitation Order.

And (8) the form of Confirmation Hearing Notice to be

sent to all holders of claims and equity interests.  *See*

Schedule 7 to Solicitation Order.

In accordance with the Solicitation Order, on May 2nd,

2025, the Trustee filed a Notice of Hearing to Consider

Confirmation of the Trustee's First Amended Joint Chapter 11

Plan at Docket No. 884, which I will refer to as the

1    "Confirmation Hearing Notice." *See* Trustee Exhibit 5.

2        In compliance with the Solicitation Order, the

3    Confirmation Hearing Notice includes, among other things, a

4    QR code that can be used to access all Plan-related documents

5    and instructions on how to alternatively or additionally

6    request a paper copy of such documents.

7        With the foregoing in mind, on June 3, 2025, an Affidavit

8    of Service of Omni was filed at Docket No. 929 to evidence

9    Omni's service of Plan-related documents in compliance with

10   the Solicitation Order.  *See* Trustee Exhibit 9.

11       As evidenced by the Affidavit of Service, Omni served the

12   following items on the holders of claims and equity interests

13   on May 6, 2025:

14       First, all holders of claims and equity interests,

15   including holders of claims that are not classified -- for

16   example, Administrative Claims and Priority Tax Claims --

17   were served with a copy of the Confirmation Hearing Notice

18   and a Third-Party Release Opt-Out Form.

19       Second, in addition, with respect to each voting class:

20       (a) in relation to those claims as to which no claim

21   objection had been lodged, the holders thereof were served

22   with the Trustee's cover letter and an approved form of

23   ballot for such class;

24       (b) in relation to those claims as to which a claim

25   objection had been lodged but not to the full amount of the

claim, the holders thereof were served with the Trustee's
cover letter, a Notice of Disputed Claim, and an approved
form of ballot for such class in relation to the unobjected
portion of the claim; and

(c) in relation to those claims as to which a claim
objection had been lodged to the full amount of the claim,
the holders thereof were served with a Notice of Disputed
Claim.

Third, with respect to Class 4, the holders of claims
therein were also served with a hard copy of the Original
Plan, Disclosure Statement, and Solicitation Order.

Fourth, with respect to each nonvoting class, the holders
of claims or equity interests therein were also served with a
copy of the Non-Voting Notice.  *See* Trustee Exhibits 21
through 26 (finalized forms of the Class 1 Ballot, Class 2
Ballot, Class 4 Ballot, Class 5 Ballot, Class 6 Ballot, and
Third-Party Release Opt-Out Form served on holders of claims
and equity interests, as applicable).

E.   The Ballot Results in Relation to the Original Plan
are Reported, a Plan Drafting Error is Discovered and Fixed,
and the Confirmation Hearing is Continued to Provide the
Borisch Parties with the Opportunity for Additional Discovery
and to Change Their Votes in Relation to the Plan and to
Object to Confirmation of the Plan.

Pursuant to the Solicitation Order, the voting deadline

1  on the Original Plan was fixed at June 5, 2025 at midnight.

2  During the evening of June 5, 2025, technically prior to

3  expiration of the deadline, Omni provided a preliminary

4  provisional ballot tally to Trustee's counsel.  *See* Borisch

5  Exhibit 22.

6      In reviewing the ballot tally, Trustee's counsel was

7  surprised by the voting results of Class 6, the class of

8  Contribution Claims, each of which is held by Borisch or

9  another Borisch Party.  *See* Trustee Exhibit 9, Exhibit H

10  thereto.

11      In particular, given the Plan's provision for all

12  Retained Causes of Action against the Borisch Parties to be

13  assigned to the Prepetition Lender, in partial satisfaction

14  of the Prepetition Lender's Secured Claims, Trustee's counsel

15  was surprised to see that all holders of Class 6 claims had

16  voted to accept the Original Plan.

17      Consequently, Trustee's counsel shared the preliminary

18  results with Committee counsel and the Prepetition Lender's

19  counsel, with the intent that everyone check to ensure that

20  there was not a glitch in the Plan's drafting.  *See* Borisch

21  Exhibits 22 and 24.

22      In fact, it turned out that there was a glitch with

23  respect to the definitions used in relation to the Third-

24  Party Release provisions.  Pursuant to the Original Plan,

25  claims and causes of action against the Borisch Parties were

1  to be retained as Retained Causes of Action and then

2  transferred as Assigned Causes of Action to the Prepetition

3  Lender, in partial satisfaction of the Prepetition Lender's

4  Secured Claims in Class 2.  *See* Original Plan, Section III.B.

5      Additionally, the Plan Supplement identified the Assigned

6  Causes of Action to be assigned to the Prepetition Lender.

7  *See* Trustee Exhibit 7.

8      On top of that, the Original Plan attempted to make clear

9  that no releases would be provided to the Borisch Parties by

10 specifying that the term "Released Parties" expressly

11 excluded the Borisch Parties.  *See* Original Plan, Section

12 I.A.83.

13     Finally, the Disclosure Statement expressly stated the

14 following:  "To be clear, claims and causes of action against

15 insiders and affiliates, such as Matthew A. Borisch and his

16 related companies, are not released under the Plan.  Rather,

17 such claims and causes of action are expressly reserved as

18 Retained Causes of Action under the Plan and will be Assigned

19 Causes of Action assigned to the Prepetition Lender, M&T

20 Bank.  The proceeds of such litigation, if any, shall be the

21 sole property of the Prepetition Lender."  *See* Disclosure

22 Statement Section I.A. at Pages 1 through 2.

23     When considering all of these provisions, it was clear

24 that the Trustee's intent, consistent with the terms of the

25 Plan Settlement negotiated with the Prepetition Lender, was

1   for the Borisch Parties to be excluded from the release

2   provisions and for the Retained Causes of Action constituting

3   Assigned Causes of Action against the Borisch Parties to be

4   assigned to the Prepetition Lender.

5       Notwithstanding same, because the Original Plan failed to

6   expressly exclude the Borisch Parties from the definition of

7   "Consenting Creditors" -- *see* Original Plan, Section I.A.27.

8   -- by returning an acceptance ballot and not returning a

9   Third-Party Release Opt-Out Form, a Borisch Party holder of a

10  Class 6 claim, such as Borisch, could definitionally fit

11  within the category of a Consenting Creditor and thereby,

12  definitionally, make an argument upon the Effective Date of

13  the confirmed Original Plan that it had received a release by

14  the Released Parties under the Third-Party Releases, which

15  would include both the Debtors and M&T Bank.

16      To the credit of counsel for the Borisch Parties, they

17  caught the mistake, and the Borisch Party holders of Class 6

18  claims, including Borisch, understandably attempted to

19  benefit from the mistake by returning acceptance ballots

20  without an executed Third-Party Release Opt-Out Form.

21      Thereafter, however, the Trustee filed the Plan

22  Modification to "clarify" the provisions of the Third-Party

23  Release or to remedy the "ambiguity" within the Original

24  Plan.

25      Immediately after the filing, the Borisch Parties

1    requested an emergency status conference to address the

2    implications of the Plan Modification, which the Court

3    granted.  Finding the Plan Modification to be a material

4    modification to the rights of the Borisch Parties under the

5    Original Plan, on June 11, 2025 the Court entered an order at

6    Docket No. 945 continuing the Confirmation Hearing for

7    several weeks, providing an opportunity for additional

8    discovery by the Borisch Parties, and setting a revised

9    deadline for the Borisch Parties to be able to change their

10   votes in relation to the Plan and file objections to

11   confirmation of the Plan, the Plan obviously being the

12   Original Plan, as modified by the Plan Modification.  *See*

13   Trustee Exhibit 16.

14       Utilizing this opportunity, the Borisch Parties did in

15   fact engage in additional discovery, did in fact return

16   amended Class 6 ballots rejecting the Plan -- *see* Borisch

17   Exhibit 13 -- and did in fact file an objection to

18   confirmation of the Plan, being the previously-referenced

19   Borisch Objection.

20       F.  The Finalized Ballot Tabulation.

21       On July 1, 2025, a Second Amended Declaration of Mr. Paul

22   of Omni was filed at Docket No. 1001, which I will refer to

23   as the "Ballot Tabulation," to evidence the finalized results

24   of the Plan solicitation process.  *See* Trustee Exhibit 15.

25       The Ballot Tabulation reflects the following voting

1   results:

2       Class 1, no ballots received.

3       Class 2, acceptance by 100 percent in number and amount.

4       Class 4, acceptance by 100 percent in number and amount,

5   with the amount voting in favor greater than $734,000.

6       Class 5, acceptance by 90.48 percent in number and 89.75

7   percent in amount, with the amount voting in favor greater

8   than $28.5 million.

9       Class 6, rejection by 100 percent in number and amount,

10  being the class of Contribution Claims held by the Borisch

11  Parties.  *See* Ballot Tabulation, Paragraphs 13 and 14.

12      With respect to the Third-Party Releases under the Plan,

13  it is important to note that each of the Confirmation Hearing

14  Notice, the ballots sent to those entitled to vote, and the

15  Non-Voting Notice sent to those not entitled to vote

16  contained conspicuous language with respect to the terms of

17  the Third-Party Releases, the necessity to submit a completed

18  Third-Party Release Opt-Out Form if the holder did not

19  consent to the Third-Party Releases, instructions on how to

20  submit the Third-Party Release Opt-Out Form, and the deadline

21  for the submission of the Third-Party Release Opt-Out Form.

22  *See* Trustee Exhibits 5 and 21 through 26.  *See also* Ballot

23  Tabulation, Paragraphs 15 through 17.

24      Three Third-Party Release Opt-Out Forms were returned,

25  each by the holder of a claim who also was served with a Non-

1    Voting Notice.  *See* Ballot Tabulation, Paragraphs 15 through

2    17.

3        Turning finally to the Discussion.

4        Confirmation of the Plan in this case is governed by the

5    provisions of 11 U.S.C. Section 1129.  To obtain confirmation

6    of the Plan, the Trustee has the burden of proving by a

7    preponderance of the evidence that each of the applicable

8    requirements of Section 1129(a) has been satisfied.

9        If all of such requirements -- with the sole exception of

10   the requirements of Section 1129(a)(8), requiring that each

11   class of claims or interests under the Plan is either

12   unimpaired or has accepted the Plan -- has been satisfied,

13   then, on the request of the Trustee, which has been made, the

14   Court must confirm the Plan under Section 1129(b) if the Plan

15   does not discriminate unfairly and is fair and equitable with

16   respect to each class of claims or equity interests that is

17   impaired under and has not accepted the Plan.  *See* 11 U.S.C.

18   Section 1129(a) through (b).

19       A.  Consideration of the Initial Question of Whether the

20   Original Plan has Permissively Been Modified by the Plan

21   Modifications.

22       Pursuant to Section 1127(a) of the Bankruptcy Code, a

23   plan proponent may modify a proposed plan at any time before

24   confirmation, but may not modify such plan so that such plan

25   as modified fails to meet the requirements of Sections 1122

1   and 1123 of the Bankruptcy Code.  Provided there is no such

2   failure, the plan as modified becomes the plan under

3   consideration.  *See* 11 U.S.C. Section 1127(a).

4        In relation to the provisions of Section 1127(a),

5   pursuant to the Borisch Objection, the Borisch Parties assert

6   that the Plan Modification proposed a change to the Original

7   Plan which causes the Plan, being the Original Plan, as

8   modified by the Plan Modification, to fail to comply with the

9   provisions of Section 1123(a)(4) of the Bankruptcy Code.

10  Therefore, the Borisch Parties argue that the Original Plan

11  was never modified and that the Original Plan is the Chapter

12  11 Plan that should be confirmed by the Court.

13       Section 1123(a)(4) of the Bankruptcy Code provides that a

14  plan shall provide the same treatment for each claim or

15  interest of a particular class unless the holder of a

16  particular claim or interest agrees to a less-favorable

17  treatment of such particular claim or interest.

18       The Borisch Parties' argument in relation to Section

19  1123(a)(4) is convoluted.  Initially, the Borisch Parties

20  acknowledge that they hold claims against the Debtors based

21  upon guaranties that they have provided to other nondebtor

22  parties.  *See* Borisch Objection, Paragraph 18.

23       As a result, under the terms of the Plan, whether the

24  Original Plan or the Original Plan as modified by the Plan

25  Modification, the Borisch Parties hold Contribution Claims

1    within Class 6.  In summary, the treatment provided to each

2    Contribution Claim of Class 6 is that, in accordance with

3    Section 509 of the Bankruptcy Code, in the event that the

4    holder of such Class 6 claim that is on account of a

5    contribution/reimbursement right tied to the holder's co-

6    liability with one of the Debtors on any allowed claim,

7    referred to as an "Underlying Claim," pays such Underlying

8    Claim in full, then to the extent provided by Section 509 of

9    the Bankruptcy Code, such holder shall be subrogated to the

10   rights of the holder of the Underlying Claim under and for

11   purposes of the Plan, and such subrogated claim shall be

12   treated under the applicable class of the Underlying Claim in

13   accordance with the Plan.  *See* Plan Section IV.F.

14        Thus, the argument goes that if any of the Borisch

15   Parties hereafter ends up paying in full any such Underlying

16   Claim, thereby entitling the Borisch Party to be subrogated

17   to the rights of the holder of the Underlying Claim in

18   relation to the subrogated claim, and if the holder of the

19   Underlying Claim had the right to become a Consenting

20   Creditor, thereby obtaining the benefit of a release from the

21   Released Parties under the Third-Party Releases, then by not

22   giving the Borisch Parties, as the holders of Class 6 claims,

23   the upfront right to also become Consenting Creditors, upon

24   such subrogation pursuant to Section 509, the treatment

25   afforded to the Borisch Party holding the subrogated claim

1    will be different than the treatment afforded to the holders

2    of other claims within the applicable class of the Underlying

3    Claim.

4        Separately, the Borisch Parties also assert that Matthew

5    Borisch holds an Other Secured Claim in Class 3 on account of

6    a scheduled claim in the Tommy's Holding Company, LLC case.

7    *See* Borisch Objection, Paragraph 19.  See also Borisch

8    Exhibit 18, Copy of Page of Schedules.

9        In a cleaner manner, the Borisch Parties argue that

10   because the other holders of Class 3 claims are given the

11   opportunity to become Consenting Creditors, whereas Borisch

12   cannot become a Consenting Creditor, the treatment of

13   Borisch's Class 3 claim is not the same as the treatment

14   afforded to other Class 3 claims.

15       The Trustee's response to such arguments is twofold.

16   First, that the Borisch Parties are improperly conflating the

17   Plan's bankruptcy claims treatment provisions with the Third-

18   Party Release provisions to be implemented under the Plan as

19   part of the Plan Settlement.  And second, that vis-à-vis the

20   Plan's treatment of each bankruptcy claim included within

21   Class 6 of the Plan and the Plan's treatment of each

22   bankruptcy claim included within Class 3 of the Plan, the

23   treatment afforded to each claim within such class is

24   identical.

25       The Court agrees.  In relation to the Borisch Parties'

1   Class 6 argument, there is only one class of the Plan that

2   links the treatment to be afforded to bankruptcy claims

3   included within such class to the Third-Party Release

4   provisions:  Class 4, the class of Customer Constructive

5   Trust Claims.

6        With respect to Class 4 claims, only if the holder of the

7   Customer Constructive Trust Claim does not opt out of the

8   Third-Party Releases will the claim receive the treatment

9   afforded within Class 4 of the Plan.  Otherwise, the claim

10  will be treated as a Class 5 claim and receive the treatment

11  provided by Class 5 of the Plan.

12       But absolutely no evidence was introduced to suggest that

13  any of the Borisch Parties could be subrogated to the rights

14  of the holder of a Customer Constructive Trust Claim pursuant

15  to Section 509 of the Bankruptcy Code in relation to its

16  Class 6 Contribution Claim.

17       In relation to the Borisch Parties' Class 3 argument, and

18  also the Class 6 argument, for that matter, the Plan -- *i.e.*,

19  the Original Plan, as modified by the Plan Modification --

20  clearly provides for the same treatment of each Other Secured

21  Claim in Class 3 and for the same treatment of each

22  Contribution Claim in Class 6, thereby satisfying the

23  requirements of Section 1123(a)(4) of the Bankruptcy Code.

24  The fact that the Borisch Parties were unsuccessful in

25  engaging in settlement negotiations with the Prepetition

1    Lender so as to be folded into the Plan Settlement instead of

2    excluded from the Plan Settlement Third-Party Release

3    provisions has no bearing upon the treatment of the Borisch

4    Parties' bankruptcy claims and whether the Plan violates

5    Section 1123(a)(4) of the Bankruptcy Code.  *See, also, In re*

6    *Adelphia Communications Corp.*, 368 B.R. 140, 251 (Bankr.

7    S.D.N.Y. 2007) and *In re Mallinckrodt PLC*, 639 B.R. 837, 862

8    (Bankr. D. Del. 2022).

9        Secondarily, the Borisch Parties also argue that the Plan

10   Modification violates the requirements of Bankruptcy Rule

11   3019(a).  Initially, because this objection was not lodged as

12   part of the Borisch Objection, the Court finds that the

13   objection is waived.

14       But even if it had been timely asserted, it lacks merit.

15   Bankruptcy Rule 3019(a) starts with the premise that, after a

16   plan has been accepted and before confirmation, the plan

17   proponent may file a plan modification.  This portion of

18   Bankruptcy Rule 3019(a) conforms with the provisions of

19   Section 1127(a) of the Bankruptcy Code.

20       Bankruptcy Rule 3019 then goes on to state that the

21   modification is also considered accepted by any creditor or

22   equity security holder who also accepted the modification in

23   writing.  But for all other creditors and equity security

24   holders who did not accept the modification itself in writing

25   but who previously accepted the pre-modified plan, the

1  modification will also be considered accepted if, after

2  notice and a hearing, the Court finds that the modification

3  does not adversely change the treatment of their claims or

4  interests.  *See* Federal Rule of Bankruptcy Procedure 3019(a).

5        This portion of Bankruptcy Rule 3019(a) effectively

6  marries up with the provisions of Section 1127(d) of the

7  Bankruptcy Code.

8        Pursuant to Section 1127(d), any holder of a claim or

9  interest that has accepted or rejected a plan is deemed to

10  have accepted or rejected, as the case may be, such plan as

11  modified, unless, within the time fixed by the court, such

12  holder changes such holder's previous acceptance or

13  rejection.

14        With this in mind, in the case of a plan modification

15  that the Court, after notice and a hearing, determines does

16  not adversely change the treatment of a claim or interest

17  held by a creditor or equity security holder, it is

18  unnecessary to provide an opportunity for such holder to

19  change the prior acceptance or rejection.

20        As explained in the latter portion of Bankruptcy Rule

21  3019(a), if the holder accepted the pre-modified plan, then

22  the plan modification will also be considered accepted in

23  such instance.

24        Implicitly, the latter part of Bankruptcy Rule 3019(a)

25  recognizes that if the court determines that the plan

1    modification does adversely change the treatment of the

2    holder's claim or interest, then the prior acceptance of the

3    pre-modified plan will not apply to the plan as modified.

4    And pursuant to Section 1127(c), if there is going to be a

5    new opportunity to vote on the plan as modified, then the

6    proponent of the plan modification must comply with the

7    adequate information requirements of Section 1125 of the

8    Bankruptcy Code with respect to the modification.

9        With all of the foregoing in mind, the Court finds that

10   none of the Plan Modifications proposed by the Trustee

11   adversely changed the treatment of any claims held by any

12   creditors other than the Borisch Parties.  Thus, all of the

13   votes cast by the holders of claims other than the Borisch

14   Parties apply with equal force to the Plan, which includes

15   the Plan Modification, as further modified by the Additional

16   Plan Modifications.

17       In fact, as a technical matter, none of the Plan

18   Modifications adversely changed the treatment of any claims

19   or equity interests held by the Borisch Parties, either.

20   However, given the materiality to the Borisch Parties of the

21   exclusionary language added regarding the Borisch Parties in

22   relation to the Third-Party Release provisions, the Court

23   deemed it proper to provide an opportunity for additional

24   discovery, a change of votes, and the filing of a

25   confirmation objection by the Borisch Parties, which the

1    Borisch Parties availed themselves of.

2        And the Court additionally finds that the Trustee

3    complied with Section 1125 of the Bankruptcy Code in

4    connection with the Court's reopening of the voting

5    opportunity to the Borisch Parties in that the Plan

6    Modification itself reflected the modifications and was self-

7    explanatory with respect to the nature of the changes.

8        While unnecessary to dwell on, the Court also notes that

9    the Prepetition Lender has emphasized in its reply that the

10   Plan Settlement agreed upon by the Prepetition Lender

11   obviously did not contemplate the release of any of the

12   Borisch Parties, and that the Plan Settlement is not properly

13   memorialized under the terms of the Original Plan.

14       In any event, for the reasons previously discussed, the

15   Court finds that the Original Plan was permissibly modified

16   by the Plan Modification pursuant to Section 1127(a) of the

17   Bankruptcy Code; that the Plan has also been permissibly

18   modified by the Additional Plan Modifications pursuant to

19   Section 1127(a) of the Bankruptcy Code; that all of the votes

20   cast by holders of claims other than the Borisch Parties

21   apply with equal force to the Plan as modified by the

22   Additional Plan Modifications; and that in the case of the

23   Borisch Parties, the subsequently-cast amended ballots for

24   rejection of the Plan apply to the Plan as modified by the

25   Additional Plan Modifications.

1    For all purposes hereafter, the Court's reference to the

2  Plan will mean and refer to the Plan as modified by the

3  Additional Plan Modifications.

4    B.   The Borisch Parties' Confirmation Objections.

5    (1) Compliance with 11 U.S.C. Section 1129(a)(3), The

6  Plan's Proposal in Good Faith.

7    Section 1129(a)(3) of the Bankruptcy Code requires that

8  the Plan has been proposed in good faith and not by any means

9  forbidden by law.  *See* 11 U.S.C. Section 1129(a)(3).

10    "The generally-applicable test for good faith under

11  Section 1129(a)(3) is that the plan has been 'proposed with

12  the legitimate and honest purpose to reorganize and has a

13  reasonable hope of success.'"  *In re Village at Camp Bowie I,*

14  *LP*, 454 B.R. 702, 709 (Bankr. N.D. Tex. 2011), affirmed 710

15  F.3d 239 (5th Cir. 2013), quoting *B.M. Brite v. Sun Country*

16  *Development, Inc. (In re Sun Country Development, Inc.)*, 764

17  F.2d 406, 408 (5th Cir. 1985).

18    Pursuant to the Borisch Objection, the Borisch Parties

19  argue that the filing of the Plan Modification to exclude the

20  Borisch Parties from the Third-Party Releases was improperly

21  motivated, underhanded, and intentionally exclusionary.  The

22  Borisch Parties suggest that the Trustee had a duty as an

23  appointed independent fiduciary to plow forward with

24  confirmation of the Original Plan instead of changing the

25  Original Plan to exclude the Borisch Parties.

1    In response, the Trustee simply notes that the Plan as

2    currently formulated properly memorialized the actual Plan

3    Settlement; was the result of extensive negotiations with the

4    Prepetition Lender and the Committee, with input from, among

5    others, several Class 4 claimants; that the Trustee attempted

6    on several occasions to bring Borisch into the negotiation

7    fold, without any success; and that the Plan as currently

8    formulated, as indicated, embodies the actual agreement

9    reached with the Prepetition Lender under the Plan

10    Settlement.

11    Moreover, the Trustee has proposed the Plan with the

12    legitimate belief that it presents a viable resolution to the

13    Bankruptcy Case and has a reasonable hope of being

14    successfully confirmed, or did as of the time of its filing.

15    As both parties agree, the good faith test of Section

16    1129(a)(3) is to be determined in light of the totality of

17    the circumstances surrounding the formulation and proposal of

18    the Plan.  Here, the Court easily finds that the Trustee

19    proposed the Plan in good faith.  At multiple stages, the

20    Trustee re-introduced the potential for a joint mediation

21    with Judge Atlas of issues concerning Borisch.  Ultimately,

22    the Prepetition Lender found no utility in doing so unless

23    Borisch was prepared to demonstrate his seriousness about a

24    potential settlement by both (a) putting a substantial

25    opening offer on the table, and (b) offering up reliable

1  financial information with respect to his wherewithal.

2  Borisch did not engage on any front.

3      Ultimately, the Trustee cannot force either Borisch or

4  the Prepetition Lender to settle.  The Trustee was forced to

5  live under the well-known proverbial saying that you can lead

6  a horse, or in this case, horses, to water, but you can't

7  force them to drink.

8      First, the Plan properly embodies the actual Plan

9  Settlement negotiated with the Prepetition Lender.

10      Second, there was nothing improper with the Trustee

11  electing to proceed with a Plan that embodies a settlement

12  with less than all of the key parties in interest in the

13  case.  The Trustee's focus needed to be on developing a Plan

14  that presented a viable means for concluding the case and

15  that had a reasonable hope of success.  He succeeded in doing

16  that.

17      There is no credible evidence in the record to suggest

18  that anything about the Plan process was designed to punish

19  or in any way bring disadvantage to any of the Borisch

20  Parties.  Indeed, there is nothing now to prevent the Borisch

21  Parties and the Prepetition Lender from leaving this hearing

22  today and immediately entering into a settlement with each

23  other alone that includes the very types of releases desired

24  by the Borisch Parties.

25      Irrespective, the Court finds that the Trustee has

1  carried his burden of proving that the Plan was filed in good

2  faith and not by any means forbidden by law, as required by

3  Section 1129(a)(3) of the Bankruptcy Code.

4      (2) Satisfaction of the Cramdown Requirement of No Unfair

5  Discrimination.

6      Based upon the recast votes of the Borisch Parties in

7  relation to Class 6, Class 6 has not accepted the Plan.

8  Consequently, the Trustee requested that the Court approve

9  the Plan over the Class 6 rejection, pursuant to Section

10  1129(b) of the Bankruptcy Code.  Such provision requires,

11  among other things, that the Plan not discriminate unfairly

12  against rejecting classes.

13      According to the Borisch Parties, the Plan here does

14  discriminate unfairly by providing unequal treatment and

15  opportunity through the exclusion of the Borisch Parties from

16  the Third-Party Release provisions.

17      Without reiterating everything that I have already said,

18  I adopt the Trustee's simply-put response that the Borisch

19  Parties do not have a "right" to be released under the Plan

20  and there is no authority for the proposition that insiders,

21  like the Borisch Parties, have a fundamental right to a

22  third-party release from settlement creditors, like the

23  Prepetition Lender.

24      Perhaps if the evidence were such that the Trustee had

25  actively taken steps to prevent or obstruct the Borisch

1    Parties from interfacing with the Prepetition Lender on Plan-

2    related matters or negotiations and/or purposefully concealed

3    important information from the Prepetition Lender that might

4    have had a bearing on whether to include the Borisch Parties

5    in the Third-Party Release provisions, there might be

6    something to talk about.  But here, there is no such

7    evidence.

8         Instead, the evidence demonstrates that, if anything, the

9    Trustee attempted on multiple occasions to open doors and

10   facilitate mediation, all the while, however, understanding

11   that the viability of any plan would necessarily have to

12   start with an agreement with the Prepetition Lender.

13        As previously noted, there is nothing within the Plan

14   that prevents the Borisch Parties from immediately hereafter

15   engaging in negotiations with the Prepetition Lender on a

16   deal that may lead to the inclusion of the release of all

17   claims and causes of action against them that the Prepetition

18   Lender may obtain under the terms of the Plan.

19        In relation to Plan treatment matters, however, the

20   treatment afforded to Class 6 is entirely consistent with

21   Section 509 of the Bankruptcy Code, and there is nothing

22   discriminatory about it, much less unfairly so.

23        Moreover, the Plan's treatment of Class 6 is also fair

24   and equitable inasmuch as no junior class of claims or

25   interests will receive or retain anything under the Plan.

1     Accordingly, the Court finds that the Plan satisfies the

2   cramdown requirements of Section 1129(b) in relation to Class

3   6, and thus the Borisch Parties' objection to the contrary is

4   overruled.

5     C.  The United States Trustee's Confirmation Objections.

6     The United States Trustee raises three high-level

7   objections to confirmation of the Plan.  First, that the

8   Third-Party Release provisions of Section X.D. of the Plan

9   violate the Bankruptcy Code by imposing nonconsensual third-

10  party releases.

11    Second, that the Third-Party Releases improperly purport

12  to release a Creditor Trustee who will not be appointed until

13  the applicable release period of the Third-Party Releases has

14  expired.

15    And third, that the injunction provisions of Section X.E.

16  of the Plan violate the Bankruptcy Code by imposing a

17  sweeping injunction to enforce the Third-Party Releases.

18    (1)  Whether the Third-Party Releases are Consensual.

19    In *Harrington v. Purdue Pharma, LP*, 144 U.S. 2071 (2024),

20  obviously, as you all know, the Supreme Court held in a 5-4

21  opinion that the Bankruptcy Code does not bestow upon a

22  bankruptcy court the power to extinguish claims held by

23  nondebtors against other nondebtors without their consent.

24  In doing so, at every stage of the analysis, the Supreme

25  Court was careful to consistently include the buzzwords

1   "without their consent," "without consent," "without the

2   consent," et cetera.

3        And to hammer the point home, the majority concluded with

4   the statement, "Nothing in what we have said should be

5   construed to call into question consensual third-party

6   releases offered in connection with a bankruptcy

7   reorganization plan.  Those sorts of releases pose different

8   questions and may rest on different legal grounds than the

9   nonconsensual release at issue here.  Nor do we have occasion

10  today to express a view on what qualifies as a consensual

11  release or pass upon a plan that provides for the full

12  satisfaction of claims against a third-party nondebtor."  *Id.*

13  at 2087-88, citation omitted.

14       This stance has been the stance expressed by the Fifth

15  Circuit Court of Appeals for decades.  Yet the U.S. Trustee,

16  in the face of opposition by the Trustee, an independent

17  fiduciary appointed by the U.S. Trustee herself to act for

18  the benefit of all creditors in the Bankruptcy Case, and by

19  the Committee, comprised of individuals selected by the U.S.

20  Trustee herself to represent the interests of unsecured

21  creditors in the Bankruptcy Case, apparently deems the *Purdue*

22  *Pharma* case to be a watershed moment necessitating a complete

23  reevaluation of the means by which consensual third-party

24  releases have been pursued and implemented within this

25  circuit for years.

1     The U.S. Trustee starts with the argument that the test

2  to apply with respect to whether a third-party release is

3  consensual is of a contractual nature under applicable state

4  contract law.  In other words, the U.S. Trustee asserts that

5  a plan proponent must establish that, in relation to each

6  individual nondebtor party to be bound by the third-party

7  release, an agreement was reached in accordance with state

8  law contract principles that apply to the parties'

9  interactions.

10     The Trustee disagrees, arguing that consent is a question

11  of federal law.

12     While the state law contract approach has been adopted by

13  one of my colleagues to the east of this division, and also

14  by at least one other judge of a court outside of this

15  district, I respectfully disagree with such view of the

16  world.  As recognized by both the majority and the dissent in

17  the *Purdue Pharma* case, the bankruptcy process is inherently

18  a form of collective action proceeding.  It brings together

19  in a single forum all creditors of a debtor for the purpose

20  of sorting out debts against the debtor and other debtor-

21  creditor relations.

22     As explained by the majority in *Purdue Pharma*,

23  "bankruptcy courts may have many powers, including the power

24  to address certain collective action problems when they

25  implicate the debtor's rights and responsibilities."  *Id.* at

1    2084.

2         Such a collective action problem implicating the debtor's

3    rights and responsibilities may include the settlement of

4    certain claims by and against the estate that are dependent

5    upon the simultaneous consensual resolution of correlated

6    nondebtor claims that are integrally intertwined with the

7    claims by and/or against the estate to be settled.

8         Pursuant to Section 1123(b)(3) of the Bankruptcy Code,

9    for example, a plan may provide for the settlement of any

10   claim belonging to the debtor or to the estate.  If the

11   effectuation of such a settlement is dependent upon the

12   simultaneous resolution of a correlated nondebtor claim that

13   is integrally intertwined with the claim being settled, then

14   Section 1123(b)(6) of the Bankruptcy Code would appear to

15   provide the means to simultaneously pursue such resolution as

16   part of a plan, provided the buy-in is consensual.  *See* 11

17   U.S.C. Sections 1123(b)(3) and (b)(6).

18        What the Supreme Court did not find convincing in *Purdue*

19   *Pharma* was the concept of attempting to involuntarily bind

20   nondebtor parties, including future claimants who had not

21   even asserted a claim in the bankruptcy case, to a release in

22   favor of another nondebtor.  Because such a release is

23   tantamount to the imposition of a nonconsensual bankruptcy

24   discharge without requiring the nondebtor to comply with the

25   Bankruptcy Code's requirements for obtaining such a

discharge, the Supreme Court invalidated the attempt.  But in
doing so, it did not in any way suggest that the evaluation
of consensual third-party releases should be relegated to a
contract law analysis under applicable state law following a
potentially tortured evaluation of conflicts of law
principles.

Instead, provided the third-party release sought to be
implemented is in fact a necessary component of a settlement
of claims by or against the estate, and the settlement is
necessary to the successful resolution of the case by way of
a Chapter 11 plan, thereby satisfying the "appropriate"
standard of Section 1123(b)(6), then the question of consent
is a question of federal law to be determined under
recognized principles of collective action proceedings in the
nature of bankruptcy proceedings.  *See also In re GOL Linhas
Aereas Inteligentes, S.A.*, 2025 WL 1466055 (Bankr. S.D.N.Y.
May 22, 2025) and *In re Spirit Airlines, Inc.*, 668 B.R. 689
(Bankr. S.D.N.Y. 2025).

Here, the scope of the Third-Party Releases sought to be
implemented are tied exclusively and directly to the Debtors,
the Debtors' estates, and the Bankruptcy Case.  They seek to
affect only claims and causes of action (and other similar
descriptives) arising from, relating to, or connected with
the Debtors (or any predecessor entity) or the Chapter 11
Cases or affecting property of the Debtors' Estates, the

1    Plan, or the administration and implementation of the Plan,

2    or based upon any other related act or omission, transaction,

3    agreement, event, or other occurrence taking place on or

4    before the Effective Date.  And the evidence presented

5    establishes that the Third-Party Releases are a central

6    component of the Plan Settlement and that there is no Chapter

7    11 resolution to this Bankruptcy Case in the absence of the

8    Plan Settlement.

9         Thus, the Court finds that because the Third-Party

10   Release provisions fall within the realm of what may be

11   permissible under Section 1123(b)(6), in conjunction with

12   Section 1123(b)(3), there calling for the evaluation of

13   consent in the context of plan proceedings to be controlled

14   and determined in reference to federal law, not state law.

15        Under federal law collective action principles, the

16   determination of consent is largely a question of due

17   process, taking into account such questions as whether the

18   party to be bound has actively engaged in the proceeding; if

19   not, whether the party to be bound was represented by a

20   person or entity designated to serve as a representative for

21   those in the same shoes as the party; whether notice of the

22   proposed disposition of the party's claim was adequately

23   provided; whether the party was provided an opportunity to

24   opt out and was clearly instructed on how to do so; and

25   whether the party will receive anything in exchange.  *See,*

1    *for example*, *Phillips Petroleum Company v. Shutts*, 472 U.S.

2    797 (1985).  *See also* the *GOL Linhas Aereas Inteligentes,*

3    *S.A.* and *Spirit Airlines* cases, as well as recent opinions of

4    my colleagues within the district who have approved opt-out

5    election mechanics for third-party releases.

6        This then takes the Court to the question of whether

7    consent to the Third-Party Releases was provided by the

8    holders of claims and equity interests in this case.  Here,

9    obviously, the Trustee relied upon an opt-out feature as

10   opposed to an opt-in feature.  Considered in isolation, it

11   presents a thorny question.  However, context matters.

12       Initially, it is important to note certain holders of

13   claims and equity interests that are unnecessary to consider.

14   First, with respect to Classes 6 and 8.  Because each of the

15   holders of Class 6 claims and Class 8 equity interests are

16   Borisch Parties -- and I'll come back to Class 8 -- and the

17   Borisch Parties are not part of the Third-Party Release

18   offering, there is no issue to determine.

19       I should note that, in relation to Class 8, there may be

20   certain direct-line equity holders that are Debtors

21   themselves.  However, the Debtors themselves are part of the

22   Plan Settlement and have expressly consented to the

23   provisions.

24       Second, Class 7.  Because Class 7 involves intercompany

25   claims of the Debtors, and the Debtors are effectively party

1   to the settlement, and the intercompany claims are

2   effectively wiped out in connection with the limited

3   substantive consolidation as well, there is no issue to

4   determine.

5       As an additional threshold matter, the Court finds that

6   by and through the Confirmation Hearing Notice and the

7   ballots, the Disputed Claim Notice, or the Non-Voting Notice,

8   as applicable, information with respect to the Third-Party

9   Releases and the means to opt out of the releases was

10  properly and sufficiently provided to all holders of claims

11  and was reasonably calculated to alert each holder,

12  consistent with federal due process principles, to the fact

13  that consent to the Third-Party Releases would be deemed

14  given in the absence of the return of a completed Third-Party

15  Release Opt-Out Form.

16      Finally, as to all holders of claims other than the

17  Borisch Parties and the Debtors, the Court starts with the

18  easiest of categories of consent: those holders who have

19  actively participated in the Bankruptcy Case.

20      For those holders, the Court finds that the absence of

21  the return of a Third-Party Release Opt-Out Notice

22  constitutes consent to the Third-Party Releases.  And the

23  reason is because all of those holders have actively

24  participated, and given the nature of the clear and

25  unequivocal notice provided to such parties, their lack of

1  action to return a Third-Party Opt-Out Notice is clear

2  indication of consent.

3      Those holders include those who returned a ballot,

4  whether acceptance or rejection, except in the case of

5  rejection if there was an objection to the Plan in relation

6  to the Third-Party Releases, which I don't think occurred

7  here as to any of those parties, that would not constitute

8  consent.  But otherwise, consent.  Those who filed any sort

9  of pleading in relation to confirmation.  Again, unless it

10  was an objection in specific reference to the Third-Party

11  Releases, which I don't think applied here, and they didn't

12  otherwise accept the Plan or be deemed to accept the Plan.

13  Those who filed a proof of claim against any of the Debtors,

14  thereby engaging explicitly in the bankruptcy process.  Those

15  who have filed a notice of appearance, either *pro se* or by

16  and through counsel, again, evidencing their clear

17  participation in the case.

18      With respect to each of those categories of parties, it

19  is not reasonable to conclude that, while actively

20  participating in the case, and in the face of a clear and

21  conspicuous notice of the implications of not returning a

22  Third-Party Release Opt-Out Notice, that they would suddenly

23  play ostrich and put their head in the ground and not know

24  what's going on and thereby not express consent.

25      So, for all of those parties, it's an easy call that

1   consent has been provided unless they returned an executed

2   Third-Party Release Opt-Out Form.

3       The harder case involves those who have not actively

4   participated, which, generally speaking, is probably

5   comprised of just creditors who were scheduled with a claim

6   in the case in a liquidated amount that was not disputed and

7   noncontingent, and like I said, has not separately filed a

8   proof of claim or otherwise filed a notice of appearance or

9   otherwise appeared in the case in conjunction with

10  confirmation proceedings.

11      With respect to those parties, it is important to

12  consider the factors that I previously went through that have

13  been identified by the Supreme Court in the context of

14  consent in a class action context.

15      First, the question of whether or not there was

16  representation.  In this regard, all of the parties at issue

17  here that are focused on are effectively holders of unsecured

18  claims in one form or another.  And in relation to those

19  holders, again, we have the U.S. Trustee's appointed

20  Committee in the case that was appointed for the express

21  purpose of representing the interests of unsecured creditors

22  in the case.  And we have evidence that the Committee itself

23  was actively engaged in the Plan Settlement negotiations that

24  ultimately included, for the benefit of unsecured creditors,

25  the Third-Party Release provisions, which include reciprocal

1    release benefits.

2        While it may be, as candidly disclosed by the Trustee in

3    testimony, that there isn't really a lot of avoidance action

4    exposure, getting released from avoidance action exposure

5    means something.  And I'll come back to that in a minute.

6    But the point is that there was somebody there to look out

7    for the interests of unsecured creditors and who was actively

8    engaged in the actual negotiations that led to the Third-

9    Party Release construct.

10       Second, the question of notice.  I've already gone

11   through this.  There were multiple forms of notice provided

12   to the holders of claims to make it crystal clear of the

13   existence of the Third-Party Releases, the implication of not

14   returning a Third-Party Release Opt-Out Form, and the binding

15   effect of that.

16       Finally, the question of receipt of value.  For all of

17   the unsecured claims, excluding Class 5 for the moment,

18   substantial recoveries will be obtained in the case which

19   would not otherwise be available if the Prepetition Lender

20   were to exercise remedies with respect to cash collateral.

21       In the case of Class 4 in particular, those are very

22   complex claims relating to sales proceeds, and the Plan

23   provides for a meaningful settlement opportunity with respect

24   to that class.

25       Even in the case of Class 5, however, while it is true

1    that there's an estimated recovery of one percent of the

2    allowed amount of the claims in that class, we have active

3    approval of the Plan by holders of claims in the amount of at

4    least $28 million [Court correction], meaning something.  We

5    also have the recovery of something to that class, whereas

6    there would be a recovery of nothing to that class in the

7    absence of the Plan Settlement [Court correction].  And

8    again, we have reciprocal release exchanges for the benefit

9    of Consenting Creditors in that class, as opposed to being

10    nothing more than the attempt to secure a gratuitous Third-

11    Party Release solely given by the Consenting Creditor with

12    the consent of the creditor.

13        So, because there was representation, there was

14    sufficient notice, and there is the receipt of value, all of

15    that indicia suggests that, in the context of considering

16    collective action proceedings similar to class action

17    proceedings, that those parties had a reasoned belief, either

18    expressly acknowledged their consent in affirmatively

19    deciding to not return the form or sort of implicitly

20    expressed such consent by knowing that there was somebody

21    looking out for them in the form of the Committee and not

22    worrying about having to take action to prevent the consent

23    from being given.

24        So, for all of those reasons, I will find that, as a

25    general proposition, the consent provisions of the Third-

1    Party Release mechanics will be approved.

2        (2) With Respect to the Creditor Trustee as a Releasing

3    Party or Released Party.

4        I do agree with the U.S. Trustee's objection in this

5    regard.  Neither the Creditor Trust nor the Creditor Trustee

6    will exist until the Effective Date, yet the Third-Party

7    Release provisions cover a period of time that is up until

8    the Effective Date.  Therefore, it is sort of nonsensical to

9    consider that a release is either being given by or being

10    received by an individual that hasn't even been appointed

11    prior to the Effective Date.

12        Therefore, the Third-Party Release provisions with

13    respect to the Creditor Trustee will be disapproved to the

14    extent that the Creditor Trustee is identified as a Releasing

15    Party or Released Party.

16        (3) Finally, With Respect to the Objection to Plan

17    Injunctions.

18        The Plan injunctions have been specifically tailored to

19    provide for the implementation of both the -- well, all of

20    the release provisions that are included in the Plan.  It is

21    an appropriate corollary basis for relief to provide for the

22    Plan injunctions to effectuate the releases that are granted,

23    and that's within the power of the Court under Section 105(a)

24    of the Bankruptcy Code, in furtherance of a confirmed plan.

25        Therefore, for reasons that have been more thoroughly

1    briefed in the Trustee's Reply, the Court finds that the Plan

2    injunction provisions are appropriate and permissive, and

3    they will be approved.

4        Thus, in conclusion -- I should also note that, in all

5    other respects, and for brevity, the Court adopts the

6    proposed findings and conclusions that are set forth in the

7    Proposed Confirmation Order.

8        And with that said, for all of the foregoing reasons, and

9    taking into account the adoption, the Court overrules all

10   objections to confirmation of the Plan and will confirm the

11   Plan, again, as modified pursuant to all of the Plan

12   Modifications, pursuant to 11 U.S.C. Section 1129.

13       I will also note, however, that in reference to the

14   Proposed Confirmation Order, that I am not going to approve

15   the waiver of any stays that would be applicable to the

16   enforceability of the order.  So whatever the applicable

17   automatic stay provisions are under the Bankruptcy Rules in

18   relation thereto will apply.  But that will be the one

19   modification to make.

20       All right.  Again, thank you for your patience and

21   attention.  That concludes the Court's ruling.

22       Mr. Kaufman, I will look to you to clean up anything that

23   needs to be cleaned up and make sure that everybody is in the

24   loop with respect to --

25           MR. BAKST:  Your Honor?

1          THE COURT:  -- the final confirmation order and have

2     it submitted.

3       Okay.  Yes?  Who's trying to speak?

4          MR. BAKST:  Your Honor?  Marc Bakst, Your Honor.

5          THE COURT:  Okay.

6          MR. BAKST:  Thank you for hearing me.  I apologize

7     for the background noise.  I'm in an airport, so it's a

8     little bit awkward.

9       We were in an awkward position.  You had said today was a

10    decision on the ruling, and I see nothing in your Local

11    Rules, and perhaps I missed it, but our local counsel did not

12    either, about a process for signing off on the order.  We can

13    -- we were hopeful that you would rule in favor of our

14    objections and didn't know, so we couldn't -- and it was

15    difficult to -- we wouldn't submit our comments on the record

16    in the filing about our comments to the Trustee's proposed

17    order.

18      Nonetheless, yesterday I did provide him with substantial

19    redlines.  We have not heard any responses to those.  And I'm

20    wondering if there's a process that we could have in place

21    for addressing those changes, or we could submit them to you

22    as a redline and file that with the Court so the Court could

23    consider our comments to the order.

24      There are some things in the order that are beyond what

25    is in a -- that is necessary for confirmation.  For example,

1   you could just say, "For the reasons stated on the record,

2   the Plan is confirmed," but we don't do that generally in

3   cases.  I understand that, but it could be done.

4       There's 32 pages to this order, and there are a handful,

5   more than a handful of things that are slightly beyond the

6   scope or beyond the scope of what you've ruled upon, in my

7   judgment.  And I don't know how we get that in front of you

8   for you to consider our views on that, Your Honor.  And

9   that's why I -- I thought today was just a ruling and we'd

10  have some opportunity in the future to deal with that.

11  Again, I'm happy to have my local counsel file a redline as

12  something that would give you that guidepost.

13          THE COURT:  All right.  Well, I'm not going to try

14  to go back and unwind my ruling in any respect, although I

15  think I touched upon this a little bit at the conclusion of

16  my ruling.  But in any respect, the point of the exercise

17  here is for parties to be able to have an opportunity to look

18  at form with respect to the finalized confirmation order,

19  which I understand and it's common practice here in the

20  Northern District of Texas to include findings and

21  conclusions.  And, again, rather than spend the rest of the

22  day going through each individual finding and conclusion, I

23  simply tried to reference that I was adopting findings and

24  conclusions set forth within the Proposed Confirmation Order.

25      But nevertheless, I do think it's appropriate to give

1   people an opportunity to take a look at the finalized

2   confirmation order to address any concerns with respect to

3   form.  And then, God forbid, if there are issues, what I

4   would suggest is -- because I don't want this to linger -- is

5   that I don't want to have a hearing on it unless I want a

6   hearing or need a hearing.  But what I would suggest is if

7   the parties aren't on the same page I would say by sometime

8   the morning of next Tuesday, that the parties just simply

9   submit competing drafts of the order.

10      And what I would ask is that anyone who is taking issue

11   with the Trustee's form of order provide with -- well, let me

12   back up.  What I would want is I would want those orders in

13   Word format, and what I would want is, from any party who's

14   taking issue with the Trustee's proposed form of order, to

15   include a redline so that I know what differences are being

16   sought in relation to the Trustee's draft.  And then, like I

17   said, I'll just figure out if a hearing is necessary or not

18   and plow forward.

19      I should note, you did raise one point, though, that I do

20   want to make sure, Mr. Kaufman, that you address, and that is

21   if you will just make sure that the order does incorporate by

22   reference the oral ruling in addition to the additional

23   findings and conclusions within the order, just so that the

24   oral ruling is included.  Okay?  Any other questions?

25          MR. KAUFMAN:  Will do, Your Honor.  Yes.

1          MR. BAKST:  Your Honor, you broke up on that last

2     request of Mr. Kaufman.  I apologize.  It's hard to hear.

3     Could you repeat that?  I apologize.

4          THE COURT:  I just asked him to make sure that he

5     includes language in the proposed order that also

6     incorporates by reference the oral ruling that I've just

7     given.

8          MR. BAKST:  I see.  Thank you.  And thank you for

9     your courtesy on providing time for our commentary.

10          THE COURT:  Okay.  All right.  Well, very good.

11     Anything else from anybody?

12       All right.  Well, again, thank you for your patience.

13     Thank you for also bearing with me to push this a day.

14     Obviously, this is an important matter, so I wanted to give

15     it as much attention as I could.  So that will conclude the

16     hearing for today in the Tommy's case, and the Court will be

17     in recess.

18       (Conclusion of proceedings at 1:12 p.m.)

19                         --oOo--

20                        CERTIFICATE

21       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22     above-entitled matter.

23     **/s/ Kathy Rehling**                              **07/19/2025**

24     _____        _____
     Kathy Rehling, CETD-444                          Date
25     Certified Electronic Court Transcriber

71

INDEX

1

2   PROCEEDINGS                                              3

3   WITNESSES

4   -none-

5   EXHIBITS

6   -none-

7   RULINGS                                                  4

8   END OF PROCEEDINGS                                      70

9   INDEX                                                   71

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25